**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB), § § § *Plaintiff*, § § v. § § PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK, § § § § § § § § § § *Defendants*. § | CIVIL ACTION NO. 25-344<br><br>Complaint for Declaratory Judgment and Injunctive Relief |

**PLAINTIFF'S MOTION FOR EMERGENCY EX PARTE TEMPORARY RESTRAINING ORDER**

TO THE HONORABLE FRED BIERY:

Pursuant to Federal Rule of Civil Procedure 65, Plaintiff Texas Association for Money Services Businesses ("TAMSB") respectfully moves this Court for a Temporary Restraining Order ("TRO") and an Order to Show Cause why a preliminary injunction should not issue, enjoining enforcement of the Geographic Targeting Order ("GTO") issued by the Financial Crimes Enforcement Network ("FinCEN") on March 11, 2025, and scheduled to go into effect April 14, 2025.

**I. INTRODUCTION**

1

The GTO imposes burdensome, unlawful, and discriminatory reporting obligations on Plaintiff's member businesses without legal authority, notice-and-comment procedures, or due process. These obligations threaten the imminent collapse of many TAMSB members, particularly family-owned MSBs operating in economically vulnerable border communities.

This Court should issue a TRO because TAMSB is likely to succeed on the merits of its APA and constitutional claims, faces irreparable harm absent immediate relief, and the balance of equities and public interest favor protecting these law-abiding businesses from regulatory overreach.

## II. BACKGROUND

As detailed in the Complaint, on March 11, 2025, FinCEN issued a Geographic Targeting Order requiring all MSBs in 30 ZIP codes in Texas and California to file Currency Transaction Reports (CTRs) for all cash transactions exceeding $200. This threshold is a radical departure from the long-standing $10,000 requirement and will increase filing volume exponentially for TAMSB's members, from an average of 9 CTRs per week to over 50,000.

TAMSB brings claims under the APA (5 U.S.C. §§ 701–706), the Fifth Amendment's Due Process and Equal Protection Clauses, and seeks declaratory and injunctive relief to halt enforcement of the GTO pending resolution of this action.

## III. FACTS

Each fact stated herein is contained within Plaintiff's Original Complaint for Declaratory Judgment and Injunctive (Dkt. 1), which has been verified with an affidavit attached to this motion.

Money Services Businesses (MSBs) play a crucial role in Texas's financial ecosystem, providing essential services such as money transmission, currency exchange, and issuing or redeeming money orders and traveler's checks. These businesses are regulated at both federal and state levels to ensure compliance with financial laws and to protect consumers. An MSB is generally defined as any person or entity that conducts one or more of the following activities: currency exchange, check cashing, issuing or selling traveler's checks, money orders, or stored value cards, or money transmission.

MSBs in Texas must adhere to several compliance obligations, including registration with FINCEN, Anti-Money Laundering (AML) Programs, Recordkeeping and Reporting. The federal framework under the Bank Secrecy Act (BSA) and related FinCEN regulations is strict and aggressively enforced. MSBs are subject to comprehensive federal regulation under the Bank Secrecy Act (BSA) and its implementing regulations administered by the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of the Treasury. As part of this framework, MSBs are required to register with FinCEN, implement and maintain a written anti-money laundering ("AML") program, and comply with federal recordkeeping and reporting obligations.

Among the core regulatory duties imposed on MSBs are:  registration with FinCEN within 180 days of beginning operations, implementation of an AML program that includes risk-based internal controls, training, independent testing, and designation of a compliance officer;

Filing of Suspicious Activity Reports (SARs) for certain transactions, and Currency Transaction Reports (CTRs) for cash transactions over $10,000. Failure to comply with these regulations carries significant civil and criminal consequences. Under 31 U.S.C. §§ 5318 and 5321, civil penalties may be imposed in amounts of up to $5,000 per day for failure to register as an MSB, and up to $100,000 or more per violation for failures related to AML programs or reporting obligations. Additionally, criminal penalties may be imposed under 31 U.S.C. § 5322 for willful violations, including up to five years' imprisonment and fines of $250,000 for individuals and $500,000 for business entities.

On April 14, 2025, this strictly enforced financial reporting system will be radically changed to the detriment of plaintiff and its members. On March 11, 2025, the Financial Crimes Enforcement Network (FinCEN) issued a Geographic Targeting Order (GTO) aimed at combating illicit financial activity associated with Mexico-based cartels and other criminal organizations operating along the U.S. southwest border. (Exhibit 1). The order imposes enhanced reporting requirements on money services businesses (MSBs) located in specific areas of Texas and California.

Per the order, MSBs operating within 30 designated ZIP codes are required to file Currency Transaction Reports (CTRs) for cash transactions exceeding $200, a significant reduction from the standard $10,000 threshold. This adjustment is intended to improve transparency and facilitate detection of structured or suspicious activity. The GTO is effective from April 14, 2025, through September 9, 2025, unless renewed or modified.

All members of TAMSB are Money Services Businesses affected by the GTO. MSBs covered by the GTO are required to: 1) file CTRs for cash transactions exceeding $200 but not exceeding $10,000. This includes deposits, withdrawals, exchanges, or other forms of currency

4

transfer; 2) verify and record the identity of individuals conducting such transactions, in line with anti-money laundering (AML) program requirements; and 3) submit CTRs within 15 calendar days of the transaction date. The federal government lowered the threshold for CTRs by 98%, meaning that reporting these transactions will increase by several orders of magnitude.

The GTO imposes a substantial compliance burden on affected MSBs, requiring immediate updates to reporting protocols, staff training, and internal controls. Businesses that fail to comply may face civil or criminal penalties, including fines and potential loss of licensure.

Many of the members of TAMSB affected by the GTO will not be able to comply with the GTO risking their licenses, administrative penalties, and criminal sanctions. Other members of TAMSB will lose business because customers will be unwilling to provide this information because of fears of identity theft or invasions into their privacy. The net effect of the GTO on the members of TAMSB will be the shuttering of dozens of family-owned MSBs and the loss of thousands of jobs along the border. Complying with the GTO will also increase labor and technology costs substantially. The members of TAMSB face irreparable harm because of the GTO, which will go into effect on April 14, 2025.

## IV. LEGAL STANDARD

A TRO is appropriate where the plaintiff shows: (1) a substantial likelihood of success on the merits; (2) a substantial threat of irreparable harm if the injunction is not granted; (3) that the threatened injury outweighs any damage the injunction might cause the opposing party; and (4) that the injunction will not disserve the public interest. *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1051 (5th Cir. 1997).

**V. ARGUMENT**

*A. Plaintiff Is Likely to Succeed on the Merits*

The GTO is unlawful for several reasons:

1. **Ultra Vires Action** – FinCEN's imposition of a $200 CTR threshold exceeds the authority granted under 31 U.S.C. § 5326(a), which contemplates narrowly tailored and temporary reporting requirements.

2. **Violation of APA Procedural Requirements** – The GTO imposes substantive compliance burdens without notice and comment, violating 5 U.S.C. § 553.

3. **Due Process Violations** – The GTO was issued without notice, hearing, or a mechanism to challenge inclusion, in violation of the Fifth Amendment.

4. **Unconstitutional Discrimination** – The GTO targets ZIP codes with predominantly Latino and Democratic populations without a narrowly tailored rationale, violating equal protection principles incorporated through the Fifth Amendment.

   i.   *Ultra Vires* **Action**

Under the Administrative Procedure Act, a reviewing court must "hold unlawful and set aside agency action" that is "in excess of statutory jurisdiction, authority, or limitations." 5 U.S.C. § 706(2)(C). Here, Plaintiff is likely to succeed on its claim that the March 2025 Geographic Targeting Order ("GTO") was issued in excess of FinCEN's statutory authority and is therefore *ultra vires*.

FinCEN relies on 31 U.S.C. § 5326(a) as its authority to issue GTOs. That provision permits the Secretary of the Treasury to require certain businesses in a "geographic area" to

6

report transactions involving "coins or currency (or such other monetary instruments as the Secretary may describe)" where there is reasonable grounds to believe the area is being used for transactions "involving the proceeds of illegal activity." Importantly, the statute allows only temporary orders, limited to 180 days, and requires a reasonable identification of both (1) the geographic area and (2) the class of transactions to be covered.

However, FinCEN has exceeded this narrow mandate in at least two respects. First, the $200 reporting threshold imposed by the GTO represents a drastic and unprecedented departure from the statutory and regulatory baseline of $10,000 under 31 U.S.C. § 5313(a) and its implementing regulations at 31 C.F.R. § 1010.311. Congress never authorized FinCEN to create an entirely new transaction threshold far below what is permitted by statute through a unilateral, non-rulemaking order. Courts are clear that when an agency action imposes burdens or obligations beyond what the statute expressly allows, it is ultra vires. *See La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act…unless and until Congress confers power upon it.").

Second, while the statute permits temporary orders, FinCEN has used the GTO mechanism to implement de facto permanent regulations via successive renewals and without the procedural safeguards of notice-and-comment rulemaking. The March 2025 GTO applies to dozens of ZIP codes and thousands of businesses without individualized suspicion or any meaningful explanation in the administrative record. Courts have rejected similar efforts to implement broad, impactful rules through administrative shortcuts. *See National Min. Ass'n v. McCarthy*, 758 F.3d 243, 251–52 (D.C. Cir. 2014) (holding that the EPA exceeded its authority by issuing de facto rules outside of formal rulemaking).

Moreover, FinCEN's expansive application of the GTO undermines the statutory purpose of § 5326, which is to address specific, high-risk zones for suspected illegal activity, not to impose blanket obligations on entire communities. The GTO's use as a proxy for permanent policy reflects an abuse of discretion and a failure to tailor enforcement to actual risk, in violation of APA constraints. *See Texas v. United States*, 809 F.3d 134, 183 (5th Cir. 2015) (upholding APA challenge where agency adopted a sweeping policy inconsistent with underlying statutory limitations).

In sum, FinCEN's issuance of a blanket $200 threshold GTO across broad geographic regions, without individualized findings or clear statutory authority, exceeds the limited powers Congress delegated under the Bank Secrecy Act. This *ultra vires* action is likely to be found unlawful and enjoined under 5 U.S.C. § 706(2)(C).

### ii.     GTO violates the APA and is 'arbitrary' and 'capricious'

The APA requires agencies to engage in notice-and-comment rulemaking before promulgating substantive rules that affect the rights or obligations of regulated parties. *See* 5 U.S.C. § 553(b)–(c). A rule is considered "substantive" or "legislative" if it "affects individual rights and obligations" and "imposes binding norms." *See Texas v. United States*, 809 F.3d 134, 171 (5th Cir. 2015); *Perez v. Mortgage Bankers Ass'n*, 575 U.S. 92, 96 (2015). Rules that create new duties, alter legal standards, or impose significant compliance obligations are legislative in character and require formal rulemaking.

Here, FinCEN's GTO functions as a substantive rule by drastically altering the obligations of MSBs within the affected ZIP codes. It lowers the CTR reporting threshold from

$10,000 to $200, imposes enhanced verification requirements for customers, accelerates filing deadlines, and expands civil and criminal liability for noncompliance. These changes are not interpretive clarifications or enforcement policy adjustments—they materially transform the legal obligations of regulated entities. As such, they fall squarely within the APA's rulemaking requirements.

Courts routinely strike down agency actions that bypass notice-and-comment when imposing new regulatory burdens. *See, e.g.,* National Ass'n of Home Builders v. EPA, 682 F.3d 1032, 1039 (D.C. Cir. 2012) (holding agency action invalid where it imposed new duties without formal rulemaking); *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 38–39 (D.C. Cir. 2005) (requiring notice-and-comment where agency imposed new compliance regime).

Moreover, the statutory authority FinCEN invokes—31 U.S.C. § 5326(a)—does not exempt it from APA rulemaking procedures. While the statute permits temporary orders, it does not grant a blanket exemption from procedural safeguards where an order acts as a rule of general applicability. Even when emergency exceptions are invoked, agencies must still justify their exemption and narrowly tailor their actions, which FinCEN has failed to do. *See Mid Continent Nail Corp. v. United States*, 846 F.3d 1364, 1372 (Fed. Cir. 2017).

Thus, Plaintiff is likely to succeed on the merits of its claim that the GTO is procedurally invalid and must be set aside under 5 U.S.C. § 706(2)(D) for being issued "without observance of procedure required by law."

Moreover the Administrative Procedure Act, courts must "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

9

accordance with law." 5 U.S.C. § 706(2)(A). This standard is deferential but not toothless: an agency must "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n v. State Farm*, 463 U.S. 29, 43 (1983).

Agency action is arbitrary and capricious where the agency:

1. Relies on factors Congress did not intend it to consider;
2. Fails to consider an important aspect of the problem;
3. Offers an explanation counter to the evidence before it; or
4. Is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. *Id.*

In this case, the March 2025 Geographic Targeting Order ("GTO") fails on multiple fronts. First, FinCEN fails to adequately explain how reducing the CTR threshold from $10,000 to $200 will improve law enforcement outcomes, or why such a drastic shift is necessary in the ZIP codes selected. No supporting data, threat assessment, or justification has been made publicly available. A significant change in regulatory posture—especially one that imposes massive costs on thousands of regulated entities—requires more than a conclusory rationale. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (agencies must provide a "reasoned explanation… for disregarding facts and circumstances that underlay or were engendered by the prior policy").

Second, FinCEN has not addressed or even acknowledged the devastating economic impact this order will have on small MSBs in the affected regions. Agencies must consider "the

consequences of their actions," particularly when they affect core operations of private entities. *See Michigan v. EPA*, 576 U.S. 743, 753 (2015) ("[A]gency action is not lawful if it does not rest on a consideration of the relevant factors.").

Third, the geographic scope of the GTO appears arbitrary. The selected ZIP codes cover large swaths of heavily Latino and Democratic communities, yet there is no record of any individualized findings justifying inclusion of these areas. If FinCEN has such findings, it has not disclosed them. Courts have repeatedly held that unexplained or blanket classifications—especially where they risk discriminatory effect—are arbitrary. *See State v. Biden*, 10 F.4th 538, 552 (5th Cir. 2021) ("Blanket policies unsupported by individualized reasoning are not the product of reasoned decision-making.").

Fourth, FinCEN provides no explanation for why existing BSA tools (like SARs and $10,000 CTRs) are inadequate, nor why targeted enforcement actions would not be preferable to blanket reporting. A failure to consider obvious alternatives is a hallmark of arbitrary decision-making. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (agency action arbitrary where alternatives were "neither considered nor explained").

Taken together, these deficiencies render the GTO arbitrary and capricious under the APA. The agency's failure to justify its sweeping policy change, account for its economic impact, or explain its selection criteria makes it highly likely that Plaintiff will succeed on this claim.

### iii.   **Violation of Due Process**

The Due Process Clause of the Fifth Amendment prohibits the federal government from depriving any person of life, liberty, or property without due process of law. This includes both

procedural and substantive protections against arbitrary and unaccountable government action. *See Mathews v. Eldridge*, 424 U.S. 319, 332–33 (1976); *Dep't of Agric. v. Murry*, 413 U.S. 508, 513 (1973).

The March 2025 GTO violates both components of due process. Procedurally, it deprives MSBs of protected property interests—namely, their right to lawfully operate a licensed business—without providing notice, a hearing, or any opportunity to contest the order's application. Affected businesses were never advised that FinCEN was considering the GTO, were not provided an avenue to opt out or seek administrative relief, and are subject to immediate penalties for noncompliance. Such a deprivation of business rights without individualized findings or procedural recourse contravenes well-established due process standards. *See Bell v. Burson*, 402 U.S. 535, 542 (1971) ("Once licenses are issued, their continued possession may become essential...and thus cannot be taken away without due process."); *Mennonite Bd. of Missions v. Adams*, 462 U.S. 791, 795 (1983) ("The central meaning of procedural due process is notice and an opportunity to be heard.").

Substantively, the GTO imposes severe burdens on lawful businesses based purely on geographic location, without individualized suspicion or evidence of wrongdoing. It operates as a form of collective punishment and regulatory profiling. Arbitrary or irrational agency actions that severely impact liberty or property interests without a legitimate justification violate substantive due process. *See County of Sacramento v. Lewis*, 523 U.S. 833, 846–47 (1998); *Washington v. Glucksberg*, 521 U.S. 702, 721 (1997).

Here, the selection of ZIP codes appears untethered from specific intelligence or risk assessments, and no mechanism exists for a business to demonstrate its compliance record or

12

contest its inclusion. This lack of tailoring or accountability—especially when paired with criminal liability for noncompliance—renders the GTO constitutionally infirm.

In short, Plaintiff is likely to prevail on its claim that the GTO violates the Fifth Amendment by imposing immediate, burdensome legal obligations without any procedural safeguards and by targeting an entire class of lawful businesses through arbitrary geographic profiling.

### B. Plaintiff Will Suffer Irreparable Harm

Without immediate relief, TAMSB members face existential threats: ruinous compliance costs, loss of customer base, reputational damage, and closure. These are not compensable by monetary damages and constitute classic irreparable injury. See *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012).

### C. The Balance of Equities Favors Plaintiff

Defendants will suffer no harm from a short delay in implementing the GTO, especially where the record lacks individualized findings of wrongdoing. In contrast, Plaintiff's members face economic annihilation.

### D. The Public Interest Favors Injunctive Relief

Preserving lawful businesses that provide critical financial services in underserved communities serves the public interest. It also serves the rule of law by preventing unlawful administrative action.

**VI. REQUEST FOR RELIEF**

Plaintiff respectfully requests that this Court:

1. Issue a Temporary Restraining Order enjoining enforcement of the GTO issued on March 11, 2025;

2. Order Defendants to appear and show cause why a preliminary injunction should not issue;

3. Waive bond under Rule 65(c), or alternatively, set a nominal amount not exceeding $100 given the public interest nature of this case;

4. Grant such other and further relief as the Court deems just and proper.

**DATE**: April 9, 2025                    Respectfully submitted,

By: */s/ Martin Golando*

The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia
San Antonio, Texas 78201
Office: (210) 471-1185
Email: martin.golando@gmail.com

Roland Gutierrez
The Law Office of Roland Gutierrez
SBN #: 24007291
104 Babcock Ste. 107
San Antonio, Texas 78201
(210) 225-7114

ATTORNEYS FOR PLAINTIFF

## CERTIFICATE OF CONFERENCE

On April 9, 2025, counsel for Plaintiff attempted to contact Margaret Leachman, acting U.S. Attorney for the Western District of Texas, to inform her that Plaintiff would seek a temporary restraining order enjoining the Defendants. Plaintiff was unable to confer with Defendants' counsel. Defendants likely oppose this motion.

Respectfully,

 /s/ *Martin Golando*
Martin Golando

## CERTIFICATE OF SERVICE

I certify that, on April 9, 2025, I filed the foregoing PLAINTIFF'S APPLICATION FOR EMERGENCY EX PARTE TEMPORARY RESTRAINING ORDER via the Court's ECF/CM system, which will serve a copy on all counsel of record.

Respectfully,

 /s/ *Martin Golando*
Martin Golando

# EXHIBIT 1

# FINCEN GTO [Effective April 14, 2025]

formal orders of investigation that authorize specifically-designated enforcement staff to exercise the Commission's statutory power to subpoena witnesses and take the other actions authorized by the relevant cited provisions.

The Commission delegated authority to issue formal orders of investigation to the Director on August 11, 2009. ''Delegation of Authority to Director of Division of Enforcement,'' 74 FR 40068–01 (Aug. 11, 2009). The delegation was made effective for a one-year period, ending on August 11, 2010, to allow Commission review of the Division's exercise of formal order authority. On August 16, 2010, the Commission amended its rules to extend the Director's delegated authority to issue formal orders of investigation beyond the one-year period. ''Delegation of Authority to the Director of Its Division of Enforcement,'' 75 FR 49820–01 (Aug. 16, 2010); *see also* 17 CFR 200.30–4(a)(13). The amendment will delete this delegation provision, 17 CFR 200.30–4(a)(13), to more closely align the Commission's use of its investigative resources with Commission priorities.

### Administrative Law Matters

The Commission finds, in accordance with the Administrative Procedure Act (''APA''), that this amendment relates solely to agency organization, procedure, or practice. 5 U.S.C. 553(b)(A). Accordingly, the APA's provisions regarding notice of rulemaking and opportunity for public comment are not applicable. In accord with the APA, we find that there is good cause to establish an effective date less than 30 days after publication of this amendment. 5 U.S.C. 553(d). This amendment does not substantially affect the rights or obligations of non-agency parties and pertains to increasing efficiency of internal Commission operations. This amendment is therefore effective on March 14, 2025. For the same reasons, the provisions of the Small Business Regulatory Enforcement Fairness Act are not applicable. *See* 5 U.S.C. 804(3)(C) (the term ''rule'' does not include ''any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties''). Additionally, the provisions of the Regulatory Flexibility Act, 5 U.S.C. 60 *et seq.,* which apply only when notice and comment are required by the APA or other law, are not applicable. *See* 5 U.S.C. 601(2). This amendment does not contain any collection of information requirements as defined by the Paperwork Reduction Act of 1995. *See* 5 CFR 1320.3(c). Further, because this amendment imposes no new burdens on private parties, the Commission does not believe that the amendment will have any impact on competition for purposes of section 23(a)(2) of the Securities Exchange Act of 1934. 15 U.S.C. 78w(a)(2).

### Statutory Authority

The amendment contained in this release is being adopted pursuant to statutory authority granted to the Commission, including section 19 of the Securities Act of 1933, 15 U.S.C. 77s; sections 4A, 4B, and 23 of the Securities Exchange Act of 1934, 15 U.S.C. 78d–1, 78d–2, and 78w; section 38 of the Investment Company Act, 15 U.S.C. 80a–37; section 211 of the Investment Advisers Act, 15 U.S.C. 80b–11; and section 3 of the Sarbanes-Oxley Act, 15 U.S.C. 7202.

### List of Subjects in 17 CFR Part 200

Administrative practice and procedure, Authority delegations (Government agencies).

### Text of Amendment

For the reasons set out in the preamble, the Commission is amending 17 CFR part 200 as follows:

## PART 200—ORGANIZATION; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552a, 552b, and 557; 11 U.S.C. 901 and 1109(a); 15 U.S.C. 77c, 77e, 77f, 77g, 77h, 77j, 77o, 77q, 77s, 77u, 77z–3, 77ggg(a), 77hhh, 77sss, 77uuu, 78b, 78c(b), 78d, 78d–1, 78d–2, 78e, 78f, 78g, 78h, 78i, 78k, 78k–1, 78*l,* 78m, 78n, 78o, 78o–4, 78q, 78q–1, 78t–1, 78u, 78w, 78*ll*(d), 78mm, 78eee, 80a–8, 80a–20, 80a–24, 80a–29, 80a–37, 80a–41, 80a–44(a), 80a–44(b), 80b–3, 80b–4, 80b–5, 80b–9, 80b–10(a), 80b–11, 7202, and 7211 *et seq.;* 29 U.S.C. 794; 44 U.S.C. 3506 and 3507; Reorganization Plan No. 10 of 1950 (15 U.S.C. 78d); sec. 8G, Pub. L. 95–452, 92 Stat. 1101 (5 U.S.C. App.); sec. 913, Pub. L. 111–203, 124 Stat. 1376, 1827; sec. 3(a), Pub. L. 114–185, 130 Stat. 538; E.O. 11222, 30 FR 6469, 3 CFR, 1964–1965 Comp., p. 36; E.O. 12356, 47 FR 14874, 3 CFR, 1982 Comp., p. 166; E.O. 12600, 52 FR 23781, 3 CFR, 1987 Comp., p. 235; Information Security Oversight Office Directive No. 1, 47 FR 27836; and 5 CFR 735.104 and 5 CFR parts 2634 and 2635, unless otherwise noted.

### § 200.30–4  [Amended]

■ 2. Section 200.30–4 is amended by removing and reserving paragraph (a)(13).

By the Commission.

Dated: March 10, 2025.

**Vanessa A. Countryman,**

*Secretary.*

[FR Doc. 2025–04064 Filed 3–13–25; 8:45 am]

**BILLING CODE 8011–01–P**

## DEPARTMENT OF THE TREASURY

**Financial Crimes Enforcement Network**

**31 CFR Part 1010**

## Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border

**AGENCY:** Financial Crimes Enforcement Network (FinCEN), Treasury.

**ACTION:** Order.

**SUMMARY:** FinCEN is issuing notice of a Geographic Targeting Order, requiring certain money services businesses along the southwest border of the United States to report and retain records of transactions in currency of more than $200 but not more than $10,000, and to verify the identity of persons presenting such transactions.

**DATES:** This action is effective April 14, 2025.

**FOR FURTHER INFORMATION CONTACT:** FinCEN's Regulatory Support Section by submitting an inquiry at *www.fincen.gov/contact.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

If the Secretary of the Treasury (Secretary) finds, upon his own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of the Bank Secrecy Act (BSA)[1] or to prevent evasions thereof, the Secretary may issue a Geographic Targeting Order (GTO) requiring any domestic financial institution or group of domestic financial institutions, or any domestic nonfinancial trade or business or group of domestic nonfinancial trades or businesses, in a geographic area to obtain such information as the Secretary may describe in such GTO concerning

---

[1] The Bank Secrecy Act, as amended, is codified at 12 U.S.C. 1829b, 1951–1960 and 31 U.S.C. 5311–5314, 5316–5336 and includes other authorities reflected in notes thereto. Regulations implementing the BSA appear at 31 CFR chapter X. The Secretary of the Treasury's authority to administer the BSA has been delegated to the Director of FinCEN.

any transaction in which such financial institution or nonfinancial trade or business is involved in for the payment, receipt, or transfer of funds (as the Secretary may describe in such GTO), and concerning any other person participating in such transaction. For any such transaction, the Secretary may require the financial institution or nonfinancial trade or business to maintain a record and/or file a report in the manner and to the extent specified. The maximum effective period for a GTO is 180 days unless renewed.[2] The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN (Director).[3]

The Director finds that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO contained in this document (the "Order") are necessary to carry out the purposes of the BSA or to prevent evasions thereof. This action is being taken in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States. The Order does not alter any existing BSA obligation of a Covered Business (as defined in the Order), except as otherwise noted in the Order itself. Thus, for example, a Covered Business must continue to file Currency Transaction Reports (CTRs) for transactions in currency above $10,000 and Suspicious Activity Reports (SARs) where appropriate and in accordance with the BSA and applicable regulations. Although the dollar thresholds for filing SARs in the SAR regulation applicable to Covered Businesses remains the same (as low as $2,000),[4] FinCEN encourages the voluntary filing of SARs where appropriate to report transactions conducted to evade the $200 reporting threshold imposed by the Order.

## II. Geographic Targeting Order

### A. Businesses and Transactions Covered by This Order

1. For purposes of this Order, the "Covered Business" means a money services business, as defined in 31 CFR 1010.100(ff), located in the Covered Geographic Area.

2. For purposes of this Order, a "Covered Transaction" means each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business which involves a transaction in currency, of more than $200 but not more than $10,000.

3. For purposes of this Order, a "Covered Geographic Area" means the areas denoted by the ZIP codes below corresponding to the following seven counties in California and Texas:

   a. Imperial County, California: 92231, 92249, 92281, and 92283;
   b. San Diego County, California: 91910, 92101, 92113, 92117, 92126, 92154, and 92173;
   c. Cameron County, Texas: 78520 and 78521;
   d. El Paso County, Texas: 79901, 79902, 79903, 79905, 79907, and 79935;
   e. Hidalgo County, Texas: 78503, 78557, 78572, 78577, and 78596;
   f. Maverick County, Texas: 78852; and
   g. Webb County, Texas: 78040, 78041, 78043, 78045, and 78046.

4. All terms used but not otherwise defined herein shall have the same meaning set forth in part 1010 of chapter X of subtitle B of title 31 of the Code of Federal Regulations.

### B. Reports Required To Be Filed by the Covered Business

5. Except as otherwise set forth in this Order, if the Covered Business is involved in a Covered Transaction, then the Covered Business shall report the Covered Transaction to FinCEN on a Currency Transaction Report within 15 days following the day on which the Covered Transaction occurred. In the case of the U.S. Postal Service, the obligation contained in the preceding sentence shall not apply to payments or transfers made solely in connection with the purchase of postage or philatelic products.

**Note:** When submitting the report, the Covered Business may receive a warning that the transaction is below $10,000. The Covered Business shall ignore the warning and continue with the submission.

6. Each report filed pursuant to this Order must be: (a) completed in accordance with the terms of this Order and the Currency Transaction Report instructions (when those terms and those instructions conflict, the terms of this Order prevail); and (b) e-filed though the BSA E-Filing System.[5]

7. Before concluding a Covered Transaction, the Covered Business must comply with the identification requirements set forth at 31 CFR 1010.312, including the requirement that the specific identifying information (e.g., the account number of the credit card, the driver's license number) used in verifying the identity of the customer shall be recorded on the Currency Transaction Report, and the mere notation of "known customer" or "bank signature card on file" on the report is prohibited. For purposes of this requirement, the Covered Business need not identify employees of armored car services.

8. The Covered Business is not required to file a report otherwise required under this Order on a Covered Transaction between the Covered Business and a commercial bank.

9. Part IV of the Currency Transaction Report shall contain the following information in Field 45: "MSB0325GTO".

### C. Order Period

The terms of this Order are effective beginning April 14, 2025 and ending on September 9, 2025.

### D. Retention of Records

The Covered Business must: (a) retain all reports filed to comply with this Order and any other records relating to compliance with this Order for a period of five years from the last day that this Order is effective (including any renewals of this Order); (b) store all such records in a manner accessible within a reasonable period of time; and (c) make such records available to FinCEN, or any other appropriate law enforcement or regulatory agency, upon request, in accordance with applicable law.

### E. No Effect on Other Provision of the BSA or Its Implementing Regulations

Nothing in this Order otherwise modifies or affects any provision of the BSA or the regulations implementing the BSA to the extent not expressly stated herein.

### F. Confidentiality

This Order is being publicly issued, and its terms are not confidential.

### G. Compliance

The Covered Business must supervise, and is responsible for, compliance by each of its officers, directors, employees, and agents with the terms of this Order. The Covered Business must transmit this Order to each of its agents located in the Covered Geographic Area. The Covered Business must also transmit this Order to its Chief Executive Officer or other similarly acting manager.

### H. Penalties for Noncompliance

The Covered Business, and any of its officers, directors, employees, and

---

[2] 31 U.S.C. 5326; see also 31 CFR 1010.370.
[3] Treasury Order 180–01 (Jan. 14, 2020).
[4] 31 CFR 1022.320 (SAR rule for money services businesses).
[5] To electronically file a Currency Transaction Report, a Covered Business will need a BSA E-Filing User account. To create a BSA E-Filing User account, please visit https://bsaefiling.fincen.treas.gov/Enroll_Now.html. For more information on e-filing, please visit https://bsaefiling.fincen.treas.gov/AboutBsa.html.

agents, may be liable, without limitation, for civil or criminal penalties for violating any of the terms of this Order.

*I. Validity of Order*

Any judicial determination that any provision of this Order is invalid shall not affect the validity of any other provision of this Order, and each other provision shall thereafter remain in full force and effect. A copy of this Order carries the full force and effect of an original signed Order.

*J. Paperwork Reduction Act*

The collection of information subject to the Paperwork Reduction Act contained in this Order has been approved by the Office of Management and Budget (OMB) and assigned OMB control number 1506–0056. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number.

*K. Questions*

All questions about the Order should be directed to the FinCEN at *https://www.fincen.gov/contact.*

(Authority: 31 U.S.C. 5326)

**Andrea M. Gacki,**
*Director, Financial Crimes Enforcement Network.*
[FR Doc. 2025–04099 Filed 3–13–25; 8:45 am]
**BILLING CODE 4810–02–P**

---

**DEPARTMENT OF THE INTERIOR**

**National Park Service**

**36 CFR Part 7**

**[NPS–GLCA–NPS39678; NPS–2024–0005; PPIMGLCAA0.PPMPSAS1Z.Y00000–255P10361]**

**RIN 1024–AE91**

**Glen Canyon National Recreation Area; Motor Vehicles; Postponement of Effective Date**

**AGENCY:** National Park Service, Interior.
**ACTION:** Final rule; postponement of effective date.

**SUMMARY:** This action further postpones the effective date for a rule published on January 13, 2025, pending judicial review.

**DATES:** As of March 14, 2025, the effective date of the rule amending 36 CFR part 7 published at 90 FR 2621, January 13, 2025, delayed on February 13, 2025, at 90 FR 9518, is postponed indefinitely, pending judicial review. The National Park Service (NPS) will publish a document in the **Federal Register** announcing the new effective date or other dates the public may need to know.

**FOR FURTHER INFORMATION CONTACT:** Michelle Kerns, Superintendent, Glen Canyon National Recreation Area, P.O. Box 1507, Page, Arizona 86040, by phone at 928–608–6210, or by email at *GLCA_Superintendent@nps.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On January 13, 2025, the NPS published a final rule revising special regulations at Glen Canyon National Recreation Area to update rules about the use of motor vehicles on roads and off roads on designated routes and areas (the "Final Rule"; 90 FR 2621). On January 20, 2025, the President issued a memorandum titled "Regulatory Freeze Pending Review" ("Freeze Memo"). The Freeze Memo directed all executive departments and agencies to consider postponing for 60 days from the date of the Freeze Memo the effective date for any rules that had been published in the **Federal Register** but had not yet taken effect for the purpose of reviewing any questions of fact, law, and policy that the rules may raise.

On February 13, the NPS published an action delaying the effective date for the Final Rule until March 21, 2025 (90 FR 9518) for the purpose of giving agency officials the opportunity to further review any questions of fact, law, and policy that the Final Rule may raise.

After conducting that review, the NPS has determined that justice requires an indefinite postponement of the effective date of the Final Rule, pending resolution of ongoing litigation. Under section 705 of the Administrative Procedure Act "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. 705. The State of Utah, Wayne and Garfield Counties, and the Utah School and Institutional Trust Lands Administration have challenged the special regulations for motor vehicle use at Glen Canyon National Recreation Area that were promulgated in 2021 (the "2021 Rule"; 86 FR 3804) and the corresponding off-road vehicle management plan ("ORV plan"). *State of Utah* v. *Haaland,* 4:24–cv–00048 (D. Utah). The plaintiffs allege numerous legal deficiencies, including claimed State interests in roads affected by the 2021 Rule, the plaintiffs' inability to economically develop school trust lands accessed from roads managed by the ORV Plan, and the opportunity for Department of the Interior agencies to better coordinate motorized vehicle regulation across jurisdictional boundaries. While the plaintiffs' challenge is to the 2021 Rule, many of the issues raised in that litigation, including the effects of off-road vehicle management on State interests and school trust lands, are also relevant to the Final Rule.

The NPS has determined that postponing the effective date of the Final Rule and preserving the regulatory status quo of the 2021 Rule pending the resolution of ongoing litigation regarding that rule is necessary in order to avoid unduly foreclosing potential remedies, ensure proper adjudication of these claims, and avoid creating a shifting regulatory landscape that may frustrate resolution of the issues raised in that litigation. Maintaining the status quo will also serve the public interest by avoiding confusion with the public on what motorized uses are allowed in the Recreation Area and avoiding unnecessary and costly agency operations to implement additional changes while the previous changes are the subject of the pending litigation.

Additionally, the Bureau of Land Management ("BLM") released its Travel Management Plan for the Henry Mountains and Freemont Gorge Area on January 17, 2025, shortly after the publication of the Final Rule. This area is adjacent to the Recreation Area, and roads from the Recreation Area extend into this BLM planning area, and vice versa. Postponing the effective date of the Final Rule will allow for ongoing coordination on these matters that will better inform the adjudication of the pending claims from the State of Utah and the other plaintiffs.

Finally, the National Parks Conservation Association and Southern Utah Wilderness Alliance, parties to the Settlement Agreement under which the Final Rule was published, have been granted intervenor status in the challenge from the State of Utah to the 2021 Rule, so that the interests of all parties will be heard and adequately protected by resolution of these issues in that forum. In light of this active litigation, the NPS has concluded that justice requires it to postpone the effective date for the Final Rule until the

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB), <br><br>*Plaintiff*, <br><br>v. <br><br>PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; FINANCIAL CRIMES ENFORCEMENT NETWORK, <br><br>*Defendants*. | § § § § § § § § § § § § § § § § § § | CIVIL ACTION NO. 25-344 <br><br> Complaint for Declaratory Judgment and Injunctive Relief |

## Verification

### DECLARATION UNDER PENALTY OF PERJURY

I, Cecilia Alvarez, declare under penalty of perjury under the laws of the United States of America that the facts listed and exhibits attached in PLAINTIFF'S MOTION FOR EMERGENCY EX PARTE TEMPORARY RESTRAINING ORDER and PLAINTIFF'S ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF are true and correct.

Executed on this 9th day of April 2025, in San Antonio, Texas.

*[signature]*

Cecelia Alvarez, Registered Agent for Texas Association of Money Services Business (TAMSB)