**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS ASS'N FOR MONEY SERVICES BUSINESSES (TAMSB),<br><br>    *Plaintiff*,<br><br>          v.<br><br>PAM BONDI, in her official capacity as Attorney General; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, in her official capacity as the Director of the Financial Crimes Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,<br><br>    *Defendants*. | Civil Action No. 25-cv-344-FB |

**DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR AN
EMERGENCY EX PARTE TEMPORARY RESTRAINING ORDER**

**INTRODUCTION**

On March 11, 2025, acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order ("GTO" or "Order") that requires money services businesses ("MSBs") in certain counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN. In support of this Order, the agency found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out the purposes of the [Bank Secrecy Act ("BSA")] or to prevent evasions" and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

1

On an emergency basis, Plaintiff asks this Court to act within days to enjoin an agency order Plaintiff has known about for a month. Plaintiff, which purports to be a trade association, has not shown that it has standing to seek this relief, much less that it will suffer "irreparable harm," particularly in light of its delay in bringing this motion.

Nor can Plaintiff show any likelihood of success. FinCEN is acting pursuant to explicit statutory authority, and the administrative record will show that FinCEN acted reasonably when exercising that authority. The Administrative Procedure Act ("APA") does not require notice and comment rulemaking for the order issued here. And the Constitution does not protect money services businesses from this sort of regulation as a matter of substantive or procedural due process. There is certainly no plausible allegation that the GTO is targeted at some protected class.

Finally, the balance of interests tips sharply in Defendants' favor. FinCEN requires the requested information as soon as practicable to address the ongoing threat posed by cartels that launder money through the U.S. financial system, and money service businesses along the southwest border are particularly vulnerable to this type of abuse. Plaintiff's unsubstantiated and implausible allegations do not support Plaintiff's claim that the GTO will be devastating for money services businesses. Moreover, assuming Plaintiff successfully completes service, the parties can then negotiate a reasonable schedule for briefing summary judgment on the basis of an administrative record. There is simply no need for the Court to decide these issues on an emergency schedule.

## BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA). The BSA authorizes the Department of the Treasury to impose reporting and

other requirements on financial institutions and other businesses to help detect and prevent money laundering. Generally speaking, these requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1960, 31 U.S.C. §§ 5311-5314, 5316-5336, and include notes thereto. Among many other requirements and authorities, the BSA and its implementing regulations require financial institutions to file a currency transaction report ("CTR") for transactions in currency greater than $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

In the Anti-Drug-Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain currency transactions in geographic areas thought to pose particular risks. Pub. L. 100–690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 18, 1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. Rep. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
>
> (1) to obtain such information as the Secretary may describe in such order concerning—
>
> (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are

3

equal to or greater than an amount which the Secretary may prescribe; and

(B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a).

Thus, the GTO statute authorizes the Secretary of the Treasury to issue a GTO to "obtain information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . , the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports.  *Id*.  The only prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[1]  *Id*.  A GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(c).  The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN.  *See* Treasury Order 180-01 (Jan. 14, 2020), available at  https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01.  FinCEN has issued regulations which further govern the form of such GTOs.  *See* 31 C.F.R. § 1010.370.  Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including requirements imposed by a GTO.  *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

---

[1] The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions.  *See* 31 U.S.C. § 5311.

On March 11, 2025, FinCEN issued the GTO at issue in this case, which covers money services businesses operating in five counties in Texas and two counties in California (a total of 30 ZIP codes). *See* Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (published Mar. 14, 2025); *see also* Compl. ¶ 29. Money services businesses are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters. *See generally* 31 CFR § 1010.100(ff). The GTO is set to take effect on April 14, 2025.

Under this GTO, covered money services businesses must submit currency transaction reports within 15 days for currency transactions involving between $200 and $10,000. 90 Fed. Reg. at 12107. A covered money services business is also required to verify the identity of the customer. *Id*. To assist covered businesses, FinCEN published FAQs on their website. *See* https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. Additionally, FinCEN hosted two webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the GTO were explained, and several questions concerning applicability and reporting were answered. The webinar and the FAQs confirm that, other than the applicable amount and a code unique to the GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000, and are to be filed in the same way. *See, e.g*., FAQ Items 3, 7 (noting that "[t]he GTO does not alter any existing BSA obligation of Covered Businesses (as defined in the GTO), except as otherwise noted in the order itself"; and that the only changes noted in the GTO are that "Covered Businesses are required to report transactions of more than $200 but not more than $10,000, and must record the term

"MSB0325GTO").  To assist the Court with the present motion, Defendants have attached the redacted version of a memorandum that forms part of the administrative record for the GTO.  *See* Ex. 1 ("AR Mem." or "AR Memorandum").[2]  Screenshots of a sample Currency Transaction Report are attached as Ex. 2, and available at https://sdtmut.fincen.treas.gov/docs/CTRX.pdf.

As the Complaint agrees, *see* Compl. ¶¶ 11-22, money services businesses are subject to a range of legal requirements and internal policies that pre-date the GTO, including registering with FinCEN, filing other CTRs, developing and maintaining an effective AML program, filing suspicious activity reports, and maintaining detailed records.  *See* AR Mem. at 3-4 (collecting regulations).  Other regulations require verification of identity for specific types of transactions. *See, e.g.,* 31 C.F.R. § 1022.210(d)(1)(i)(A); 10 C.F.R. § 1010.312.

On April 1, 2025, Plaintiff Texas Association of Money Services Businesses ("TAMSB") filed the present lawsuit.   Plaintiff claims to be a "Texas non-profit organization, whose members are Money Services Businesses affected by the [GTO]."  Compl. ¶ 1 (ECF. 1).  The Complaint asserts that the GTO violates the APA by exceeding FinCEN's statutory authority and failing to undertake notice-and-comment rulemaking, and violates the due process and equal protection guarantees of the Constitution.  On April 9, 2025, Plaintiff filed the instant motion seeking an *ex parte* order that would prevent the GTO from taking effect on April 14, 2025 and enjoining its enforcement.   ECF 5.   For factual support, Plaintiff submits a bare bones affidavit by the "registered agent" of TAMSB to verify the complaint.

_____

[2] Given time constraints, Defendants were not able to provide the full administrative record.  Some information has been redacted from the memorandum at this stage.

## LEGAL STANDARD

Emergency injunctive relief "is an 'extraordinary and drastic remedy.'" *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (citation omitted). A temporary restraining order may only be granted if the movant establishes each of four prerequisites: (1) A substantial likelihood of success on the merits; (2) A substantial threat that failure to grant the injunction will result in irreparable injury; (3) That the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) That the injunction will not disserve the public interest. *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The last two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). To seek *ex parte* relief, the movant must present "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition" and "certif[y] in writing any efforts made to give notice and the reasons why it should not be required." Fed. R. Civ. P. 65(b)(1). The decision to grant or deny a temporary restraining order, like that of a preliminary injunction, is within the discretion of the district court. *Miss. Power & Light Co. v. United Gas Pipe Line Co.*, 760 F.2d 618, 621 (5th Cir. 1985).

## DISCUSSION

Plaintiff has failed to establish standing or any of the preliminary injunction factors.

## I.    Plaintiff Has Not Established Standing to Seek this Injunction Because There Is No Injury at All to TAMSB.

The "irreducible constitutional minimum of standing contains three elements": (1) "the plaintiff must have suffered an injury in fact which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (2) that injury must be "traceable" to the defendant's challenged actions; and (3) the injury must be "likely . . . redressed by a favorable decision." *Lujan*

*v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (cleaned up and citations omitted).  Moreover, a plaintiff must "demonstrate standing for each claim they seek to press."  *Nat'l Fed. of the Blind of Tex., Inc. v. Abbott*, 647 F.3d 202, 209 (5th Cir. 2011).  Finally, the standing inquiry is "especially rigorous" where "reaching the merits of the dispute would force [the court] to decide whether an action taken by one of the other two branches of the Federal Government was unconstitutional," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819–20 (1997)), and where the "plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of someone else," *Defs. of Wildlife*, 504 U.S. at 562.

Emergency relief, like final relief, must be requested by a plaintiff with standing to seek such relief.  *See Career Colleges & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 233–34 (5th Cir. 2024), *cert. granted in part sub nom. Dep't of Educ. v. Career Colleges & Sch. of Tex.*, 220 L. Ed. 2d 375 (Jan. 10, 2025).  Here, the Complaint and TRO motion are nearly completely devoid of any argument or explanation related to standing.  And we must hypothesize what Plaintiff's theory may be from their scant factual allegations.  Plaintiff claims to be a "Texas non-profit organization, whose members are Money Services Businesses affected by the [GTO]." Compl. ¶ 1.  And further alleges that "Members of TAMSB have multiple stores contained within the counties affected by the GTO and face irreparable injury should the GTO go into effect."  Compl. ¶ 34.  It also generally describes the "compliance burden" on affected MSBs.  *See, e.g.*, *id.* ¶ 35. The only example of a specific impact is in the introduction to the Complaint, where Plaintiff claims that "one company which is a member of TAMSB has reported that it currently averages 9

CTRs across its dozens of locations in Texas per week" and that "should the order become effective, this MSB will need to file nearly 50,000 CTRs per week." Compl., Intro.[3]

As an initial matter, Plaintiff surely cannot establish standing in its own right. "An organization can establish standing in its own name if it meets the same standing test that applies to individuals." *La. Fair Hous. Action Ctr., Inc. v. Azalea Garden Props., LLC*, 82 F.4th 345, 351 (5th Cir. 2023) (cleaned up). An organization may attempt to establish injury-in-fact by showing that its "ability to pursue its mission is 'perceptively impaired' because it has 'diverted significant resources to counteract the defendant's conduct.'" *Tenth St. Residential Ass'n v. City of Dallas*, 968 F.3d 492, 500 (5th Cir. 2020) (quoting *NAACP v. City of Kyle*, 626 F.3d 233, 238 (5th Cir. 2010)). But "not every diversion of resources rises to an injury sufficient to confer standing." *La. Fair Hous. Action Ctr.*, 82 F.4th at 345. Here, Plaintiff has pled no facts from which one could conclude that TAMSB itself is injured by the GTO.

Plaintiff is likely therefore attempting to assert associational standing. The associational standing doctrine permits an organization to sue on behalf of its members where three criteria are met: "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Career Colleges & Sch. of Tex.*, 98 F.4th

---

[3] The complaint verification by a "registered agent" does not indicate that the verifier had personal knowledge of all of the underlying facts or explain how she was able to verify them. *See* ECF 5, at pdf p. 20. Facts in a verified complaint must be "within the personal knowledge of the affiant," and the affiant must "be competent to testify" to them. *K Investments, Inc. v. B-Gas Ltd.*, No. 21-40642, 2022 WL 964210, at *3 (5th Cir. Mar. 30, 2022). Even assuming this verification meets that standard, it is still not clear what weight the Court should give that verification given the lack of information that would allow the Court to evaluate the basis for her knowledge.

at 234.  The first generally requires that would-be organizational plaintiffs must "make specific allegations establishing that at least one identified member had suffered or would suffer harm." *Summers v. Earth Island Inst.*, 555 U.S. 488, 498 (2009) (emphasis added); *see Funeral Consumers All., Inc. v. Serv. Corp. Int'l*, 695 F.3d 330, 344 (5th Cir. 2012) ("An organization lacks standing if it fails to adequately allege that there is a threat of injury to any individual member of the association and thus fails to identify even one individual member with standing." (cleaned up)).

Plaintiff here has failed to identify even one member MSB and has not provided any information whatsoever about the organization's purpose.  Thus, at this stage, there is no information from which the Court could conclude that TAMSB has standing to seek this relief.  It is possible, of course, that TAMSB could present information on these points.  *Cf. Career Colleges & Sch. of Tex.*, 98 F.4th at 234.  But the complaint and TRO motion are devoid of relevant and verified allegations on these points.

For example, Plaintiff does not assert that any member is unable to comply or would be forced to shut down, as some of the more dramatic language in the brief suggests could be the case in general.  Notably, any affected MSBs have likely already undertaken compliance and training, given that the GTO takes effect Monday, and the requested injunction could not redress those types of injuries.  The only injury that the injunction could theoretically redress is the actual requirement to check IDs and file CTRs (which, under the terms of the GTO, a covered business would have another 15 days to do).  And Plaintiff has not described how significant such a burden would be beyond any member's existing AML and anti-fraud policies.  It seems likely, for example, that many such businesses routinely confirm identity when cashing checks.  And already maintain records about their customers in most circumstances.  And already know how to file CTRs.  Even if we assume that the GTO imposes some additional meaningful burden on MSBs in general, we

do not know whether each CTR typically takes 30 seconds or 10 minutes, or how member organizations will accommodate the changes (*e.g.*, will a new employee or overtime be required or can existing employees complete CTRs during slower business hours, thus imposing no additional cost on the business?). Weeks after the GTO was entered and days before it goes into effect, any affected MSB presumably knows the answers to these questions, but Plaintiff provides no such information to the Court. Even the one quantification included in the Complaint is unclear as to how it is calculated or whether it is useful: the 9 weekly reports that one MSB currently averages is explicitly calculated across all of its businesses, even those that are not in the area targeted by the GTO. If the alleged estimated increase to 50,000 weekly reports is calculated in the same manner, it might vastly overstate the impact of the GTO.

Moreover, Defendants have thus far been unable to locate any public website or other public material substantiating this organization's existence, stating when it was incorporated or explaining what its mission or purpose is. It seems likely from the scant information provided that the association may have been only recently incorporated.[4] Absent additional information, Plaintiff thus has not shown that the injuries above are germane to its purpose, as Defendants have no idea what its purpose may be.

Plaintiff has not established standing for the purpose of seeking this emergency relief.

## II.    Plaintiff Has Not Established Irreparable Injury.

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Mere

---

[4] It is also not clear that venue is appropriate in this division. The only two counties affected by the GTO that are in in this district are Maverick (in the Del Rio division) and El Paso (in the El Paso division). Without further information about the plaintiff organization and its members, Defendants are unable to evaluate whether venue is appropriate here.

injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough.  The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against the claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975).

Plaintiff has not established irreparable injury for much of the same reasons it has not established standing.  It has alleged no harm whatsoever to itself, nor quantified and explained the extent of any alleged injury to its member organizations.  The claim in the TRO motion that TAMSB member face "ruinous compliance costs, loss of customer base, reputational damage, and closure," TRO Mot. at 13, is not substantiated by the record before the Court.  Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Moreover, Plaintiff's delay in bringing this motion militates against a finding of irreparable harm.  "A party who faces an existential threat to its mission and survival—as Plaintiff claims to face here—will presumably spring into action and seek relief as soon as practicable after discovering that threat," and an "unexplained delay before seeking a TRO . . . implies a lack of urgency and irreparable harm." *See Las Americas Immigrant Advocacy Ctr. v. Paxton*, No. EP-24-CV-00352-DCG, 2024 WL 4430542, at *5 (W.D. Tex. Sept. 27, 2024).  Thus, "whenever a plaintiff could have brought [a] TRO motion earlier, but instead s[eeks] a TRO at the eleventh hour, giving [the d]efendants no real opportunity to respond, that delay discredits [the plaintiff's] argument that irreparable injury will result if th[e] Court does not issue the requested TRO." *Id*. (internal quotation marks omitted).  Here, the GTO was issued March 11, but Plaintiff waited

nearly a full month, until April 9, to bring this emergency motion on an *ex parte* basis, providing Defendants little time to respond and the Court no real time to consider.  These are not the actions of a plaintiff facing "existential threats" as the motion claims.[5]  The Court could and should deny the motion for that reason alone.

### III.    Plaintiff Has Not Established a Likelihood of Success on the Merits.

Plaintiff's Motion restates claims that appear in the Complaint but have not shown a likelihood of success on the merits as to any claim.

### A.  Plaintiff Cannot Show a Likelihood of Success on their APA claims.

A number of Plaintiff's arguments purport to sound in the APA, including arguments that the GTO exceeds FinCEN's statutory authority, that the GTO is arbitrary and capricious, and that FinCEN failed to engage in notice-and-comment rulemaking.   Plaintiff cannot establish a likelihood of success on any of these claims.

An emergency motion is particularly ill-suited to evaluation of whether a final agency action is arbitrary or capricious under the APA, 5 U.S.C. § 706(2)(A).  APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id*. § 706.  "The APA's arbitrary and capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Proj*., 592 U.S. 414, 423 (2021).  A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021), nor should the court "weigh the evidence in the record pro and con."

---

[5] Plaintiff also has some additional time to come into compliance with the reporting requirement; the GTO requires CTRs to be filed within 15 days of the covered transaction.

*Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Although a court's review is "searching and careful," it ultimately does not "substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021).

Although the expedited nature of Plaintiff's filing has prevented FinCEN from compiling and certifying the whole administrative record in time for the Court's review on this emergency motion, all available material, including the redacted AR Memorandum attached to this brief, confirms that FinCEN acted within its statutory authority, acted reasonably, and was not required to engage in notice-and-comment rulemaking.

1.      **Ultra Vires.**  Plaintiff argues that FinCEN exceeded its statutory authority in two respects.  First, Plaintiff argues that the "$200 reporting threshold imposed by the GTO represents a drastic and unprecedented departure" from the pre-existing requirements for a $10,000 reporting threshold.  *See* TRO Mot. at 7 (citing 31 U.S.C. § 5313(a) and its implementing regulations).  But by its plain terms, the GTO statutory provision authorizes "*additional* recordkeeping and reporting requirements" beyond those required by other regulatory provisions.  *See* 31 U.S.C. § 5326(a).  And it explicitly permits the Secretary to set the reporting threshold without any limitation on what that threshold might be.  *Id*.§ 5326(a)(1)(A) ("which the Secretary may prescribe").  In setting a lower threshold than that required by other regulations for one category of businesses in seven counties, FinCEN has not exceeded its statutory authority.

Second, Plaintiff argues that "FinCEN has used the GTO mechanism to implement de facto permanent regulations via successive renewals and without the procedural safeguards of notice-and-comment rulemaking" and that the "March 2025 GTO applies to dozens of ZIP codes and thousands of businesses without individualized suspicion or any meaningful explanation in the

administrative record." TRO Mot. at 7-8. To the extent Plaintiff is just arguing that the GTO is "de facto permanent" because it could be renewed in the future, that fails as an ultra vires claim because the GTO comports with the terms of the statute, which allows that a GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(c).[6] Here, the GTO is effective for 180 days unless renewed. *See* 90 Fed. Reg. at 12107.

To the extent Plaintiff is requiring that the statute requires "individualized suspicion," that is simply wrong. By its terms, the statute permits orders applying to a "group" of businesses in a "geographic area" based on a finding that additional requirements are necessary to effectuate the purposes of the Act. 31 U.S.C. § 5326(a). No individualized suspicion requirement appears. And to the extent Plaintiff is just arguing that the administrative record does not adequately support the agency's finding or that the APA requires notice-and-comment rulemaking, those are not ultra vires claims at all and are addressed below. The GTO is well within the agency's authority to issue geographic targeting orders. 31 U.S.C. § 5326(a).

2.    **Arbitrary and Capricious.** In addition to being within the agency's authority, the GTO is reasonable and considers all relevant factors. The Order itself reflects the agency's reasonable finding that the additional recordkeeping and reporting requirements set forth in the GTO "are necessary to carry out the purposes of the BSA or to prevent evasions" and further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States." 90 Fed. Reg. at 12107. This finding is further buttressed by analysis in the attached AR memorandum. Surveying a great deal of information, FinCEN found

---

[6] In the original 1988 law, a GTO lasted only 60 days. 102 Stat. 4355. When Congress extended the length of time a GTO could last, Congress does not appear to have imposed any additional procedural requirements.

that MSBs along the southwest border are uniquely vulnerable to money laundering activities by drug cartels that use both witting and unwitting MSBs as part of various illegal schemes to transport and launder drug money.  *See* AR Mem. at 4-9.  "FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings."  AR Mem. at 8-9.  FinCEN further found that, "[b]y lowering the CTR threshold, the information reported under this GTO would help . . . identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States" in part because the reports "are expected to generate new leads and identify new and related subjects in ongoing cases."  *Id*. FinCEN further noted that the reduced dollar reporting threshold "will help make structuring more difficult, thereby increasing the cost of doing business for cartels" and "help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules."  *Id*.[7]  The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 9-13 (surveying information about selected counties, and explaining why some other counties

---

[7] "[A] person structures a transaction if that person, acting alone, or in conjunction with, or on behalf of, other persons, conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under [31 C.F.R.] §§ 1010.311, 1010.313, 1020.315, 1021.311 and 1021.313 . . . ." 31 CF.R. § 1010.100(xx).  This includes "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000 . . . ." *Id*.

16

were excluded).  Finally, the AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts . . . " and would "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." *Id*. at 13-14.

Plaintiff argues that the GTO is arbitrary and capricious for four reasons.  First, Plaintiff alleges that "FinCEN fails to adequately explain how reducing the CTR threshold . . . will improve law enforcement outcomes, or why such a drastic shift is necessary in the ZIP codes selected" and complains that "No supporting data, threat assessment, or justification has been made publicly available." TRO Mot. at 10.  Nothing in the statute, the regulation, or the APA requires publication of the full administrative record underlying the agency decision, of course, nor does it appear that Plaintiff has requested such record.  Nor do the applicable legal authorities require the specific findings that Plaintiff demands.  But in any event, Plaintiff's concerns are misplaced because the administrative record demonstrates that FinCEN reasonably found that reducing the CTR threshold would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads.  AR Mem. at 8-9.  This is, indeed, common sense.  MSBs in these seven counties are vulnerable to abuse and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA.

Second, Plaintiff argues that "FinCEN has not addressed or even acknowledged the devastating economic impact this order will have on small MSBs in the affected regions." TRO Mot. at 10-11.  Plaintiff has put forward no competent evidence, of course, that the GTO will have

"devastating economic impact."  It is a reporting requirement that expands existing reporting requirements in a subset of financial institutions in a narrow region of the country vulnerable to money laundering risks.  But in any event, the AR Memorandum explicitly acknowledges that the GTO may place an increased burden on "covered businesses."  FinCEN reasoned that the GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and "does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services."  AR Mem. at 14.

Third, Plaintiff argues that "the geographic scope of the GTO appears arbitrary" and hypothesizes that it is somehow focused on "Latino and Democratic communities."  TRO Mot. at 11.  Nonsense.  The AR Memorandum explains precisely why these seven counties were chosen and includes the specific data relied upon.  *See* AR Mem. at 9-13.  Obviously, that rationale does not depend on the ethnic or political make-up of those counties.  Nor has Plaintiff provided or alleged any evidence that would support their implausible hypothesis.

Finally, Plaintiff argues that FinCEN has not explained why existing BSA tools are inadequate or why targeted enforcement would not address the issue.  TRO Mot. at 11.  In fact, both the Federal Register notice and the AR Memorandum explain that the GTO is needed beyond existing alternatives and explains the reasons for the alternative chosen.  Plaintiff's proposed alternative of "targeted enforcement" is, of course, the status quo as well, and does not advance all of the goals described in the AR memorandum, like gaining a complete "snapshot" of potential money laundering at vulnerable MSBs and generating leads and investigations by making previously unknown connections.

Accordingly, the GTO is reasonable, and there is no basis to conclude that FinCEN's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

**3.     Notice-and-Comment Rulemaking**.  Plaintiff argues that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a).  But the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA.  *See* 90 Fed. Reg. 12106.  The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative, injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing."  5 U.S.C. § 551(6).  The GTO is fundamentally investigatory rather than legislative in nature; it is limited in scope and time and tied to specific facts found by the agency in this geographic area. *Cf. U. S. v. W. H. Hodges & Co., Inc.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was not subject to rulemaking requirements).

Most importantly, Congress specifically authorized the agency to act by order rather than by rule here.  That is in sharp contrast to the statutory provision governing other CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order outside of the GTO context.  *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO).  Plaintiff appears to read the statute the same way.  Compl. ¶ 24 (in describing FinCEN's authority, "GTOs are not enacted through formal rulemaking, and do not require notice-and-comment procedures").

This reading of the statute is buttressed by the purposes of a GTO – to target specific threatened geographic area for a time-limited period.  GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of

a GTO to issue a GTO and they could not be used effectively to respond to dynamic threats and developing financial intelligence. Finally, notice-and-comment rulemaking is not required simply because the GTO affects a group of businesses. *See Neustar, Inc. v. Fed. Commc'ns Comm'n*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment."); *Nat'l Biodiesel Bd. v. Env't Prot. Agency*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) (internal citation omitted) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis."). In any event, the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc*., 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

B. Plaintiff Cannot Show a Likelihood of Success on its Due Process Claims Because it Has Not Been Deprived of a Liberty Interest Protected by Due Process

Plaintiff argues that the GTO violates both procedural and substantive due process rights. Both claims fail.

1. **Procedural Due Process.** A procedural due process claim turns on "(1) whether there exists a liberty or property interest which has been interfered with by the State, and (2) whether the procedures attendant upon that deprivation were constitutionally sufficient." *See James v. Cleveland Sch. Dist*., 45 F.4th 860, 864 (5th Cir. 2022) (cleaned up); *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 228–29 (5th Cir. 2020). The Supreme Court has emphasized that the Due Process Clause protects only "fundamental rights and liberties" that are "deeply rooted in this Nation's history and tradition . . . and implicit in the concept of ordered liberty." *Washington v. Glucksberg*, 521 U.S. 702, 720-21 (1997). Without a cognizable interest in liberty or property,

"there is nothing subject to Due Process protections and our inquiry ends." *Hampton Co. Nat. Sur., LLC v. Tunica County*, 543 F.3d 221, 225 (5th Cir. 2008) (citation omitted).  Where a liberty interest has been infringed, "'due process,' unlike some legal rules, is not a technical conception with a fixed content unrelated to time, place and circumstances." *Gilbert v. Homar*, 520 U.S. 924, 930 (1997) (citation omitted). Rather, "[d]ue process is flexible and calls for such procedural protections as the particular situation demands." *Id*. (citation omitted).  In general, courts evaluate the constitutional adequacy of available procedures under the familiar framework from *Mathews v. Eldrige*, 424 U.S. 319, 344 (1976).

The Plaintiff has not shown a protected liberty interest in not filing CTRs below a certain threshold.  MSBs are highly regulated businesses and subject to numerous reporting and recordkeeping requirements.  The due process clause is not implicated every time those regulations are adjusted.  Nor has Plaintiff shown that the procedures available are constitutionally inadequate. Plaintiff appears to be unaware that there is a statutory mechanism for seeking exceptive relief, and has not shown that TAMSB or its members sought such relief in the month since the GTO was issued.  *Compare* Compl. ¶ 55 *with* 31 U.S.C. § 5318(a)(7), 31 C.F.R § 1010.970 (implementing regulation).  Plaintiff has not explained why this mechanism is inadequate.  Any limited interest an MSB has in not being subject to recordkeeping and reporting requirements is more than adequately protected by this mechanism.

2.    **Substantive Due Process.**  The rights protected by substantive due process are generally narrower than those liberty interests protected by procedural due process.  In *Dobbs v. Jackson Women's Health Org*., 597 U.S. 215 (2022), the Supreme Court explained that the "liberty" protected by the Due Process Clause of the Fourteenth Amendment includes only "two categories of substantive rights[:]" (1) "rights guaranteed by the first eight Amendments" and (2)

"a select list of fundamental rights that are not mentioned anywhere in the Constitution." *Id*. at 237. Under either category, a right must be "deeply rooted in [our] history and tradition" and must be "essential to our Nation's 'scheme of ordered liberty.'" *Id*. *See also James*, 45 F.4th at 866–67.

Accordingly, Plaintiff's substantive due process claim fails for much the same reason as the procedural claim. TAMSB has not been deprived of any fundamental liberty interest deeply rooted in our Nation's scheme of ordered liberty. As Plaintiff admits, MSBs are highly regulated businesses and one additional recordkeeping and reporting requirement in no way crosses the line into deprivation of a fundamental right.

C.    <u>Plaintiff Cannot Show a Likelihood Success on its Equal Protection Claim Because the GTO Is Facially Neutral and Plaintiff Cannot Show Purposeful Discrimination.</u>

Plaintiff argues that the "GTO targets ZIP codes with predominantly Latino and Democratic populations without a narrowly tailored rationale, violating equal protection principles." TRO Mot. at 6. As an initial matter, Plaintiff, an organization, does not allege that it or any of its members has been discriminated against on the basis of race, political affiliation, or any other protected characteristic. To be sure, on "certain, limited" occasions, litigants may "bring actions on behalf of third parties." *Powers v. Ohio*, 499 U.S. 400, 410–11 (1991). But here, Plaintiff does not even allege that it brings this Fifth Amendment claim on behalf of other third parties who are subject to some discriminatory impact. To the extent that Plaintiff means to bring claims on behalf of unspecified racial minorities, TAMSB has not alleged that it has a "close relation to the third party" or that there is "some hindrance to the third party's ability to protect his or her own interests." *See Powers*, 499 U.S. at 411.

But even if Plaintiff somehow had standing to raise this claim, TAMSB has not shown a likelihood that it can succeed on the merits.  To maintain an equal protection claim, Plaintiff must show that it received treatment different from that received by similarly situated individuals and that the unequal treatment stemmed from a discriminatory intent.  *See Taylor v. Johnson*, 257 F.3d 470, 473 (5th Cir. 2001); *see also City of Cleburne v. Cleburne Living Ctr.,* 473 U.S. 432, 439–40 (1985).  "Discriminatory purpose . . . implies that the decisionmaker singled out a particular group for disparate treatment and selected his course of action at least in part for *the purpose* of causing its adverse effect on an identifiable group." *Lavernia v. Lynaugh,* 845 F.2d 493, 496 (5th Cir. 1988).

On its face, the GTO is neutral as to race, political opinions, or any other factor that could form the basis of invidious discrimination, and there is no reason to suppose otherwise.  In support of its claim that the GTO is discriminatory, Plaintiff alleges (without citing any specific evidence) only that 4 of the 7 counties subject to the GTO have leaned Democratic in recent elections.  Compl. ¶¶ 66-68.  Even if assumed to be true, evidence that 4 of the 7 affected counties lean Democratic would not support an inference of targeting, bias, or animus of any kind.  Nor does Plaintiff identify any similarly situated MSBs that were treated differently.  In fact, the record supports FinCEN's explanation that specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 9-13 (surveying information about ZIP codes in selected counties, and explaining why some other counties were excluded).  Moreover, more effective detection of money laundering and other illicit financial activity is more protective of the interests of the citizens of the targeted counties.  In any event, there is zero indication inside or

outside the record that these seven counties were targeted for reasons related to race or politics, and Plaintiff's bare allegations do not suffice to state a claim, much less support a motion for emergency relief.

## IV. The Balance of Interests Tips in Favor of Defendants.

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Wright et al., FPP § 2947 (3d ed.)).

Here, Plaintiff has provided only scant evidence of any injury likely to be caused by a new, temporary recordkeeping and reporting requirement. In the face of their scant allegations, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry the day. It is particularly in the public interest for the Government to act swiftly on these issues in light of the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their devastating criminal activity. *See* AR Mem. at 8.

Were the Court nonetheless to grant Plaintiff's motion, the Court should limit any relief to the plaintiff's established injury, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial

power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added).  It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief.  *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). TAMSB has established neither its standing nor irreparable harm, and the Court should issue no injunction or stay at all.  Were the Court to do so, however, any relief granted should be limited to Plaintiff or at most its identified members.

Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  In the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with the scope of any injunction.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999) (stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate amount of an injunction bond").

## CONCLUSION

For these reasons, the Court should deny the emergency motion.

Dated: April 10, 2025                          Respectfully submitted,

                                               YAAKOV ROTH
                                               Acting Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director, Federal Programs Branch

/s/Amy E. Powell
AMY E. POWELL
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
c/o U.S. Attorney's Office for EDNC
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Tel.: 919-856-4013
Email:  amy.powell@usdoj.gov
Counsel for Defendants