# Exhibit 1



Financial Crimes Enforcement Network
U.S. Department of the Treasury

Global Investigations Division | Washington, D.C. 20220

March XX, 2025

**INFORMATION MEMORANDUM FOR DIRECTOR ANDREA M. GACKI**

| | |
|---|---|
| (U) **THROUGH:** | Matthew R. Stiglitz<br>Associate Director |
| | Amanda Joca<br>Deputy Associate Director |
| | Chase Lubbock<br>Office Director, Western Hemisphere |
| (U) **FROM:** | Kieran Murray and Shannon Mizzi<br>Global Investigative Specialists |
| (U//~~FOUO~~) **SUBJECT:** | Administrative Record for Geographic Targeting Order for Cash Transactions at Southwest Border Money Services Businesses |

**I.   (U) Executive Summary**

(U//~~FOUO~~) The Global Investigations Division (GID) of the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommends the issuance of a public Geographic Targeting Order (GTO) to address cash-based money laundering along the southwest border, including by Mexican drug cartels—including cartels linked to illicit opioid trafficking.  This GTO would lower the threshold for filing Currency Transaction Reports (CTRs) to $200 for money services businesses (MSBs) located in 30 ZIP codes along with southwest border.  These ZIP codes are in two counties in California (Imperial and San Diego counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties).  The GTO would carry out the purposes of the Bank Secrecy Act (BSA), 31 U.S.C. 5311 *et seq*, by collecting data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels, which are both drug trafficking organizations (DTOs) and transnational criminal organizations (TCOs) and would assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting

MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States.

## II.    (U) **Applicable Authority**

(U) FinCEN would issue the proposed GTO pursuant to 31 U.S.C. 5326 ("section 5326"). Section 5326 authorizes the Secretary of the Treasury (Secretary), upon finding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof," to issue an order requiring "nonfinancial trades or businesses in a geographic area" to:

(1) Obtain specified information concerning any transaction in which such nonfinancial trades or businesses are involved "for the payment, receipt, or transfer of funds" and "any other person participating in such transaction;"

(2) "Maintain a record of such information" for the period set out in the order; and

(3) File a report regarding any such transaction "in the manner and to the extent specified in the order."[1]

(U) The purposes of the BSA include, but are not limited to, "requir[ing] certain reports … that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering … risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States."[2] The authority of the Secretary to administer the BSA and its implementing regulations has been delegated to FinCEN.[3]

(U) Section 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed.[4]

---

[1] (U) 31 U.S.C. 5326(a); see also 31 CFR 1010.370(a).
[2] (U) 31 U.S.C. 5311(1)(A), (3) and (4).
[3] (U) Treasury, Treasury Order 180-01 (Jan. 14, 2020).
[4] (U) 31 U.S.C. 5326(d).

### III. (U) <u>Background</u>

#### A. (U) **FinCEN's Regulation of MSBs**

(U) An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, travelers' checks, or pre-paid access products for an amount greater than $1,000 per person, per day, in one or more transactions. All persons that engage in the transfer of funds as a money transmitter are also considered MSBs, regardless of the amount of money transmission activity.[5]

(U) Every MSB must register with FinCEN by electronically filing FinCEN Form 107, Registration of Money Services Business, unless a person or business is only an MSB because they serve as an agent of another MSB.[6] The MSB's owner or controlling person must register by the end of a 180-day period beginning the day after the date they established the MSB.[7] They are also required to renew their MSB registration each two-calendar-year period following the initial registration by filing another Form 107.[8] Although agents are not required to register as MSBs, any MSB must prepare and maintain—but not file with FinCEN—a list of its agents.[9] There are persons who violate these rules by operating as MSBs without registering with FinCEN, often because they are engaging in illicit activity. FinCEN and law enforcement agencies target such persons for enforcement measures.

(U) All MSBs (including those that are agents, rather than principals) must electronically file CTRs when they have a cash-in or cash-out currency transaction, or multiple transactions, totaling more than $10,000 during one business day for any one person, or on behalf of any one person.[10] All individuals (except employees of armored car services)[11] conducting a transaction reportable on a CTR, for themselves or for another person, must be identified by means of an official document, such as a driver's license.[12] CTRs collect information necessary to identify the person or entity on whose behalf the transaction is being conducted; the identity of the person conducting the transaction, if different; payment information; information about the relevant MSB or agent conducting the transaction (name, address, and identification number of the person

---

[5] (U) 31 CFR 1010.100(ff).
[6] (U) 31 CFR 1022.380(a).
[7] (U) 31 CFR 1022.380(b)(3).
[8] (U) 31 CFR 1022.380(b)(2).
[9] (U) 31 CFR 1022.380(d).
[10] (U) 31 CFR 1022.300-313.
[11] (U) FinCEN, FIN-2013-R001, "Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes" (July 12, 2013), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/2024-02-02/FIN-2013-R001.pdf.
[12] (U) 31 CFR 1022.312.

or entity conducting the transaction). The persons conducting transactions reportable on a CTR are prohibited from structuring the transaction to evade the reporting requirement, such as by splitting transactions into smaller amounts in an attempt to evade the $10,000 reporting threshold.[13]

(U) All MSBs are required to develop, implement, and maintain an effective AML/CFT compliance program. The program should be reasonably designed to prevent individuals from using the MSB to facilitate money laundering or to finance terrorist activities. Each program must be written and take into account the inherent risks of the business, as well as:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA;
- Designate a person to assure day-to-day compliance with the BSA;
- Provide education and training to appropriate personnel; and
- Provide for an independent review to monitor and maintain an adequate program.[14]

(U) Generally, MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is suspicious and involves $2,000 or more, must electronically file a FinCEN Form 111, Suspicious Activity Report (SAR), on the activity.[15]

(U) MSBs are required to retain certain records with respect to transmittals of funds for $3,000 or more;[16] purchases of bank checks or drafts, cashier's checks, money orders or traveler's checks for $3,000 or more in currency;[17] and prepaid access.[18]

### B. (U) Vulnerabilities of MSBs to Money Laundering

(U) While most of the business that MSBs conduct is legitimate and essential, MSBs are vulnerable to exploitation by money launderers. Treasury's 2024 National Money Laundering Risk Assessment (NMLRA) identified the illicit financial activities of drug cartels, as a major risk to MSBs and other types of financial institutions.[19] And, FinCEN has identified money

---

[13] (U) 31 CFR 1022.314.
[14] (U) 31 CFR 1022.210.
[15] (U) 31 CFR 1022.320.
[16] (U) 31 CFR 1010.410.
[17] (U) 31 CFR 1010.415.
[18] (U) 31 CFR 1022.420; 31 CFR 1022.210 (d)(1)(iv).
[19] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 ("The illicit financial activities of DTOs pose risks to banks, [MSBs], and other entities, such as real estate agents and attorneys."), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

transfers through MSBs as a financial typology associated with Mexico-based drug cartels and their illicit procurement of fentanyl precursor chemicals and manufacturing equipment.[20]

(U//FOU) MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border. Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.[21] To enable their efforts to traffic fentanyl and other opioids and to launder their funds back to Mexico, these and other drug cartels have gained functional control, through violence, of nearly

---

[20] (U) FinCEN, "Supplemental Advisory on the Procurement of Precursor Chemicals and Manufacturing Equipment Used for the Synthesis of Illicit Fentanyl and Other Synthetic Opioids," (June 20, 2024), pp. 8-9 ("Money transfers through banks, MSBs, and online payment processors are a common financial typology associated with TCOs' procurement of fentanyl precursor chemicals and manufacturing equipment. These transactions may be sent from Mexico or the United States to mainland [China] (including via Hong Kong and other jurisdictions) to individuals and shell and front companies associated with either a [China]-based supplier or a chemical broker. While some money transfers are sent from TCOs in Mexico to [China]-based suppliers without crossing the U.S. financial system, many of these foreign transactions are cleared in U.S. dollars through U.S. correspondent banks, Mexico- and [China]-based agents of U.S. MSBs, and U.S. online payment processors."), *available at* https://www.fincen.gov/sites/default/files/advisory/2024-06-20/FinCEN-Supplemental-Advisory-on-Fentanyl-508C.pdf; *see also* Center for Strategic and International Studies, "Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact" (Jan. 15, 2025), ("The expanding volume of remittance transactions provides more than economic benefits to regular Mexicans; it also presents ample opportunity for exploitation. Criminal organizations take advantage of the small-increment nature of remittance transactions to evade oversight regulations and launder money related to drug trafficking and other illicit income streams, a practice which has increased in frequency since the Covid-19 pandemic disrupted cross-border movement and the associated traditional methods of bulk cash smuggling.") *available at* https://www.csis.org/analysis/understanding-impact-remittances-mexicos-economy-and-safeguarding-their-future-impact.

[21] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf. *See The New York Times*, "The American Drug Mules Smuggling Fentanyl into the U.S." (Sep. 28, 2024) ("Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid. The amount of fentanyl crossing the border has increased tenfold in the past five years. Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years."), *available at* https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html; Brookings Institute, "US-Mexico Relations and the fight against fentanyl trafficking" (Oct. 8, 2024) ("Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cartel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl. They make fentanyl from precursor chemicals that come from China. These precursors arrived in Mexico. The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border. They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine. And they really work until about the middle layer. These groups are not the retailers themselves. They the hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States. And also, they of course then move proceeds from the United States to Mexico as well as weapons."), *available at* https://www.brookings.edu/articles/us-mexico-relations-and-the-fight-against-fentanyl-trafficking/.

all illegal traffic across the southern border of the United States. In light of this fact, President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been named cartels as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[22] MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico.

(U) MSBs typically offer a limited range of services compared to other financial institutions, with many offering services tailored to persons without bank accounts. These MSBs are often agents of a larger MSB and offer MSB services as part of its operation as a corner store or chain retailer. The competitively priced services and convenient location offered near the border by such MSBs make them attractive for persons interested in using cash to fund money transmittals moving value across the border to Mexico, or to Central and South American countries, for both licit and illicit purposes.[23]

(U) MSBs offer a range of services, primarily built around exchanging currencies, cashing checks, receiving cash to fund money transmittals, and paying out cash to recipients of money transmittals. Due to the cash-intensive nature of this industry, it has become an avenue through which drug cartels move untraceable flows of value. For example, illicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico. Similarly, an MSB may be used to receive a money transmittal from anywhere in the United States, funneling the value to the southwest border, which can be cashed out and the value moved to Mexico.[24] Moreover, illicit actors may comingle licit and illicit cash, making dirty money even more difficult to detect for MSBs.

---

[22] (U) Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," 90 FR 8439, (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/; U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), *available at* https://www.state.gov/designation-of-international-cartels/.
[23] (U) D. Ore, "How Mexican narcos use remittances to wire U.S. drug profits home," *Reuters* (Aug. 18, 2023), *available at* https://www.reuters.com/investigates/special-report/mexico-drugs-remittances/.
[24] (U) FinCEN, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), p. 4 ("Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals. Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity. In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account…In some cases, victims also are coerced or forced to

(U) Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including "money mules,"[25] to move funds to Mexico via U.S.-based MSBs, structured to evade reporting requirements (*i.e.*, keeping the amount of any individual cash transaction below the applicable reporting threshold to avoid identification and reporting requirements). Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations.[26]

(U) The services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer. For example, the owner of an MSB in California was convicted in 2024 for conspiracy to commit money laundering on behalf of the Jalisco New Generation Cartel, by knowingly laundering drug proceeds by accepting cash from drug dealers below the CTR threshold and wiring it to Mexico, disguising it to look like routine remittances.[27] Similarly, in 2017, the owners and employees of an MSB pleaded guilty to accepting cash that was represented as coming from drug sales, which, in exchange for a kickback, they agreed to launder to Mexico by breaking the transactions into smaller amounts, resulting in more than $40 million laundered over a roughly four-year timeframe.[28]

---

wire proceeds via [MSBs] to facilitate the funneling of proceeds."), *available at* https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf; FinCEN, "FinCEN Alert on Human Smuggling along the Southwest Border of the United States" (Jan. 13, 2023) ("Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border."), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Human%20Smuggling%20FINAL_508.pdf.

[25] (U) FBI, "Money Mules," *available at* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules.

[26] (U) *See, e.g.*, FinCEN, "Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids" (Aug. 21, 2019), pp. 3, 9 ("An analysis of sensitive financial data illustrates that when U.S. individuals purchase fentanyl directly from China and other foreign countries, they often structure the money transfers to evade [BSA] reporting and recordkeeping requirements. Individuals frequently transfer the funds using multiple MSB agent locations…Professional money laundering organizations hire loosely associated parties (including "money mules") to send money transfers to Mexico via U.S. MSBs, primarily money transmitters, structured to evade reporting requirements. In this context, structuring (*i.e.*, keeping the amount of the money transfer below the applicable threshold of $3,000 in order to avoid identification and reporting requirements) is accomplished through one of, or a combination of, the following: • The illicit proceeds are divided between multiple individuals who send the transfers; • An individual uses multiple MSB agent locations to send transfers; and/or • An individual sends multiple transactions consecutively."), *available at* https://www.fincen.gov/sites/default/files/advisory/2019-08-21/Fentanyl%20Advisory%20FINAL%20508.pdf.

[27] (U) Complaint, *United States v. Chavez Zepeda et al*, No. 2:22-cr-00064 (E.D. Cal., Mar. 14, 2022).

[28] (U) Indictment, *United States v. Perez et al*, No. 1:17-cr-00200 (N.D. Ga., June 16, 2016).

IV.     (U) **Justification for the GTO**

(U//FOUO) This GTO is necessary to carry out the purposes of the BSA because the GTO, due to the money laundering risks discussed above, would likely result in information highly useful in money laundering investigations, especially in the context of the fentanyl crisis, discussed in Section IV.A. The anticipated benefits of the GTO are discussed in Section IV.B.

   A.   (U) **Necessity to Address the Fentanyl Crisis**

(U) The supply and sale of fentanyl and other synthetic opioids is one of the greatest national security threats facing the United States. Nearly 38,000 Americans died from fentanyl use in the first six months of 2023, and fentanyl and other synthetic drugs, including methamphetamine, account for nearly all fatal drug overdoses that occur in the United States.[29] Drug cartels make billions of dollars in profit from the production and distribution of these drugs in the United States, enriching themselves, and allowing them to continue to traffic in drugs and other illicit goods, as well as expand their economic, political, and social influence.[30] Drug cartels and the professional money launderers who support their illicit drug trafficking activities—including Chinese Money Laundering Organizations (CMLOs)—introduce smuggled and illicitly generated cash into the legitimate financial system, including through MSBs.[31]

   B.   (U) **Anticipated Benefits of the GTO**

(U//FOUO) As discussed above, MSBs along the southwest border are a point of vulnerability in the U.S. financial system. MSBs are, wittingly and unwittingly, facilitating the movement of funds that finance fentanyl trafficking and the commission of other crimes by drug cartels, including Mexico-based cartels, that threaten the national security of the United States. Drug cartels based in Mexico and other countries in Central and South America need to repatriate illicitly generated proceeds to benefit from their crimes and remain in business. FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important

---

[29] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 1, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

[30] (U) Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), pp. 18-24 (describing the major money laundering by DTOs of proceeds generated from the trafficking of illicit synthetic opioids), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf; U.S. Drug Enforcement Administration, "National Drug Threat Assessment," (May 2024), pp. 46-50 (describing how DTOs launder profits, providing in part that "The Sinaloa and Jalisco cartels, and other global criminal networks, generate billions of dollars in profits from the sale of illicit drugs"), *available at* https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf.

[31] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 46 (describing how DTOs launder profits), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings.[32]

(U//FOUO) By lowering the CTR threshold, the information reported under this GTO would help Treasury, including FinCEN and its fellow Office of Terrorism and Financial Intelligence components, as well as its law enforcement partners identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States. These additional GTO reports are expected to generate new leads and identify new and related subjects in ongoing cases. For example, the resulting reports may allow the identification of a comprehensive network of potential money mules in the geographic areas in question. They may also create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them—meaning that any increased monitoring of MSBs would likely capture information about the laundering of funds related to multiple criminal typologies. The GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls.

(U//FOUO) Finally, the parameters of this GTO, in particular the reduced dollar reporting threshold, will help make structuring more difficult, thereby increasing the cost of doing business for cartels. In addition, the GTO will help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules. Each piece of information collected on a CTR form has the potential to augment an investigation, including the transaction date and amount; the name, date of birth, Social Security Number or Taxpayer Identification Number, phone number, email address, occupation, identification number, and account number of the individual and/or entity sending and receiving funds; the location and business at which the transaction took place; and information about the filer.

V.   (U) **Scope of the GTO**

   A. (U) **Covered Geographic Areas**

The GTO will initially cover the following ZIP codes near the U.S.-Mexico border in the states of California and Texas (the "Covered Geographic Area"), which were selected based on risk

---

[32] Homeland Security Investigations, "Issue #57," *Cornerstone* (Oct. 2024), *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/3babbe0; U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 49, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. Therefore, GID assesses that these same ZIP codes likely correspond to a large number of cash transactions below the $10,000 threshold, relative to other ZIP codes. While MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels, GID chose to keep this GTO limited in scope, focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and to be able to assess trends and effectiveness. However, FinCEN may consider expanding this GTO to ZIP codes in Arizona and New Mexico in the future.

*California*

| Zip Code | Rationale |
|---|---|
| **Imperial County** | |
| 92231 | Borders Mexico; contains significant border crossings – Calexico West and Calexico East Ports of Entry; 1,570 CTRs filed for a population of 39,542, the highest CTR to population ratio in the county. |
| 92249 | 43 CTRs filed for a population of 6,975, the second highest CTR to population ratio in the county. |
| 92281 | 11 CTRs filed for a population of 2,122, the third highest CTR to population ratio in the county. |
| 92283 | Borders Mexico; contains a border crossing – Andrade Port of Entry; 13 CTRs filed for a population of 2,695, the fourth highest CTR to population ratio in the county. |
| **San Diego County** | |
| 91910 | 1,358 CTRs filed for a population of 79,613, the seventh highest CTR to population ratio in the county. |

| | |
|---|---|
| 92101 | 2,142 CTRs filed for a population of 47,505, the fourth highest CTR to population ratio in the county. |
| 92113 | 930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the county. |
| 92117 | 1,394 CTRs filed for a population of 51,586, the fifth highest CTR to population ratio in the county. |
| 92126 | 4,752 CTRs filed for a population of 74,788, the third highest CTR to population ratio in the county. |
| 92154 | Borders Mexico; contains a significant border crossing – Otay Mesa Port of Entry; 6,494 CTRs filed for a population of 84,027 the second highest CTR to population ratio in the county. |
| 92173 | Borders Mexico; contains significant border crossings – San Ysidro Port of Entry and Cross Border Xpress; 2,793 CTRs filed for a population of 29,703, the highest CTR to population ratio in the county. |

*Texas*

| ZIP Code | Rationale |
|---|---|
| **Cameron County** | |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing – Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |
| **El Paso County** | |

| | |
|---|---|
| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,0127, the fourth highest CTR to population ratio in the county. |
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |
| *Hidalgo County* | |
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

| | |
|---|---|
| *Maverick County* | |
| 78852 | Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712. |
| *Webb County* | |
| 78040 | Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county. |
| 78041 | Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county. |
| 78043 | 364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county. |
| 78045 | Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county. |
| 78046 | 46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county. |

### B. (U) Covered Transactions

(U//FOUO) The impact of the GTO would be to generally lower the existing threshold for filing CTRs from $10,000 to $200. Under the GTO, a covered Transaction would be any deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business (defined, here, as an MSB operating in the Covered Geographic Area), which involves a transaction in currency of more than $200 but less than $10,000. Because the GTO, except as noted therein, would not otherwise alter any currently applicable BSA requirement, money services businesses would still be required to file transactions in currency of more than $10,000. The $200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate. It would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas,

allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances.

(U//FOUO) The GTO would retain the requirement to aggregate different cash transactions conducted by or on behalf of the same person during a single day, regardless of whether the additional cash transactions occur within the Covered Geographic Areas, but without lowering the $10,000 threshold. Aggregation is meant to detect structured transactions attempting to evade the filing threshold, but GID believes that the $200 filing threshold under the GTO largely negates the risks inherent in aggregation, as it would already capture the majority of cash transactions. Structuring below $200 to evade the requirement would make laundering large amounts of currency at the border more difficult and costly. Not requiring aggregation down to the $200 threshold also would help mitigate burdens on the Covered Businesses, as aggregation is inherently complicated.

(U//FOUO) GID does not expect that the lower reporting threshold will materially affect the flow of legitimate funds, including remittances, between the United States and Mexico. While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs. GID does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services (compared to which the Covered Businesses generally offer lower fees) and from MSBs outside of the Covered Geographic Areas.

(U//FOUO) GID recognizes that, due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity. FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO. Based on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP codes or counties in any future issuances. FinCEN anticipates some illicit actors may change the methods by which they launder money, including by attempting to launder illicit funds through banks over MSBs; FinCEN believes that this may be a benefit of the GTO, as banks have more stringent reporting and recordkeeping obligations than MSBs and would likely inform FinCEN of new suspicious activity.

### C. (U) Covered Businesses

(U//FOUO) Any person that meets the definition of an MSB operating in the Covered Geographic Areas, as well the subsidiaries and agents of an MSB if such subsidiaries and agents are located in the Covered Geographic Area, would be considered a "Covered Business". MSBs are required to keep current lists of their agents and, as with other GTOs, MSBs would be responsible for communicating the order's requirements to its agents.

### D. (U) Order Period

(U) To provide the Covered Businesses time to comply with the GTO, the relevant period for the GTO would begin 30 days after the order is published and be in force for 180 days from that date.

### E. (U) Analytic Plan

[redacted]

## V.   (U) **Conclusion**

(U//~~FOUO~~) For the foregoing reasons, GID believes that, by requiring reporting of high-risk cash transactions along the southwest border, the proposed GTO is necessary to carry out the purposes of the BSA. Accordingly, GID recommends issuing the proposed GTO.

## Southwest Border Geographic Targeting Order Clearance Sheet

**Subject: Administrative Record for Geographic Targeting Order for Cash Transactions at Southwest Border Money Services Businesses**

| | | |
|---|---|---|
| Drafted: | Global Investigations Division – ▮▮▮▮▮ | (02/27/2025) |
| Approved: | FinCEN Director – Andrea Gacki | (MM/DD/YYYY) |
| Cleared: | Global Investigations Division – ▮▮▮▮▮ | (02/28/2025) |
| | Office of Chief Counsel – ▮▮▮▮ | (03/04/2025) |
| | Principal Deputy Assistant General Council (E&I) – | (MM/DD/YYYY) |

17