# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB); HIGH VALUE, INC.; REYNOSA CASA DE CAMBIO, INC.; NYDIA REGALADO d/b/a BEST RATE EXCHANGE; MARIO REGALADO d/b/a BORDER INTERNATIONAL SERVICES; LAREDO INSURANCE SERVICES, LLC; E.MEX. FINANCIAL SERVICES, INC.; R & C, INC. d/b/a TEMEX MONEY EXCHANGE; SAN ISIDRO MULTI SERVICES, INC.; CRIS WIN INC. d/b/a BROWNSVILLE CASA DE CAMBIO; ESPRO INVESTMENT LLC d/b/a LONESTAR MONEY EXCHANGE; and ARNOLDO GONZALEZ, Jr., <br><br> *Plaintiffs*, <br><br> v. <br><br> PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and FINANCIAL CRIMES ENFORCEMENT NETWORK, <br><br> *Defendants*. | Civil Case No. 5:25-cv-00344-FB |

## PLAINTIFFS' FIRST AMENDED ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT AND INJUNCTIVE RELIEF

## INTRODUCTION

Money Services Businesses (MSBs) play a critical role in the American economy and in their local communities. For millions of Americans and visitors to our country, these businesses exchange currency, make money orders, wire transfer money, and provide other services for the unbanked. Many MSBs in Texas along the border are small, privately held, family businesses that offer currency exchange at competitive prices where it is needed. On March 11, 2024, the Financial Crimes Enforcement Network (FinCEN) issued a Geographic Targeting Order that requires all money services businesses located in 30 zip codes across California and Texas near the southwest border to file Currency Transaction Reports (CTRs) with detailed information on cash transactions over a mere $200. The current financial threshold for a CTR is $10,000 per transaction. As a result, the average number of CTRs for a typical MSB is estimated to increase by several orders of magnitude. For instance, one company which is a member of TAMSB has reported that it currently averages 9 CTRs across its dozens of locations in Texas per week. Now, should the order become effective, this MSB will need to file nearly 50,000 CTRs per week for the same level of transactions.

One of two things will happen if the order goes into effect: The administrative burden on the typical MSB will be financially ruinous for these businesses; or, alternately, customers of MSBs in the targeted zip codes will take their business elsewhere, either to other zip codes or to similar stores in Mexico where many are unregulated. Either way, most members of TAMSB will simply cease to exist if this Geographic Targeting Order becomes effective. The blast radius of the effect of this order will not just affect MSBs, but rather a whole microcosm of commerce in these zip codes. Many American border communities are heavily reliant on transnational commerce. The end of MSBs in these zip codes will destroy these economies, as well.

The Geographic Targeting Order is not just burdensome, but also illegal and unconstitutional. The Order operates as a general warrant: It demands information about particular businesses, in a particular area, based on law enforcement's unsubstantiated belief that such information will uncover criminal activity. Yet the Order was issued without any magistrate finding individualized probable cause, in violation of the Fourth Amendment. The Order exceeds FinCEN's statutory authority, was issued under a statute that violates the non-delegation doctrine, was issued without following the substantive and procedural requirements of the Administrative Procedure Act, violates the Fifth Amendment because it is fatally arbitrary, and runs afoul of the Fifth Amendment privilege against self-incrimination.

Plaintiffs file this suit seeking declaratory and injunctive relief against the misguided overreach of FinCEN and the federal government.

## PARTIES

1.      Plaintiff Texas Association for Money Service Businesses (TAMSB) is a Texas non-profit association, whose members are Money Services Businesses affected by the Geographic Targeting Order (GTO). TAMSB's principal place of business in which it transacts all of its business is in San Antonio, Texas. TAMSB brings this case on its own behalf and also on behalf of its members.

2.      Plaintiff High Value, Inc. is a Texas corporation with its principal place of business in Laredo, Texas. High Value is subject to the GTO because its sole store is located in one of the zip codes subject to the GTO (78040). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

3.      Plaintiff Arnoldo Gonzalez Jr. is the manager of High Value. He is also one of High Value's customers, as he regularly uses High Value's services to convert dollars to pesos, and

pesos to dollars, in amounts over $200 (but under $1,000). Plaintiff Gonzalez will continue to use High Value's services over the period the GTO is in effect. Plaintiff Gonzalez resides in Laredo, Texas.

4.    Plaintiff Reynosa Casa de Cambio, Inc. is a Texas corporation with its principal place of business in Hidalgo, Texas. It is subject to the GTO because it has 11 stores located in the zip codes subject to the GTO (78557, 78572, 78577, 78596, 78520, and 78040). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

5.    Plaintiff Nydia Regalado d/b/a Best Rate Exchange is a Texas sole proprietorship with its principal place of business in Laredo, Texas. It is subject to the GTO because it has eight stores located in the zip codes subject to the GTO (78041, 78040, 78045, and 78852). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

6.    Plaintiff Mario Regalado d/b/a Border International Services is a Texas sole proprietorship with its principal place of business in Laredo, Texas. It is subject to the GTO because it has four stores located in the zip codes subject to the GTO (78041, 78040, and 78045). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

7.    Plaintiff Laredo Insurance Services, LLC is a Texas limited liability company with its principal place of business in Laredo, Texas. It is subject to the GTO because it has eight stores located in the zip codes subject to the GTO (78040, 78046, 78041, and 78045). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

8.    Plaintiff E.Mex. Financial Services, Inc. is a Texas corporation with its principal place of business in Laredo, Texas. It is subject to the GTO because it has 36 stores located in the zip codes subject to the GTO (78045, 78040, 78041, 78520, 78503, 78557, 78852, and 79901). It

conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

9.      Plaintiff R & C, Inc. d/b/a Temex Money Exchange is a Texas corporation with its principal place of business in Brownsville, Texas. It is subject to the GTO because it has three stores located in the zip codes subject to the GTO (78520). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

10.     Plaintiff San Isidro Multi Services, Inc. is a Texas corporation with its principal place of business in Hidalgo, Texas. It is subject to the GTO because it has three stores located in the zip codes subject to the GTO (78503, 78557, and 78577). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

11.     Plaintiff Cris Win, Inc. d/b/a Brownsville Casa De Cambio is a Texas corporation with its principal place of business in Brownsville, Texas. It is subject to the GTO because it has two stores located in the zip codes subject to the GTO (78520). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

12.     Plaintiff Espro Investment LLC d/b/a Lonestar Money Exchange is a Texas limited liability company with its principal place of business in McAllen, Texas. It is subject to the GTO because it has two stores located in the zip codes subject to the GTO (78503, 78577). It conducts business as an MSB and is registered with FinCEN as an MSB. It is also a member of TAMSB.

13.     Defendant Pam Bondi is the Attorney General of the United States and is sued in her official capacity as the chief law enforcement officer of the United States.

14.     AG Bondi is responsible for the uniform administration and enforcement of federal criminal law in the United States, including the offenses created by the Bank Secrecy Act.

15.    Defendant Scott Bessent is the United States Secretary of the Treasury and is sued in his official capacity as the head of the U.S. Department of the Treasury.

16.    Defendant U.S. Department of the Treasury is an executive agency of the United States tasked with administration and enforcement of the Bank Secrecy Act and its implementing regulations. The Financial Crimes Enforcement Network, which issued the GTO, is a bureau within the Treasury Department.

17.    Defendant Andrea Gacki is the Director of the Financial Crimes Enforcement Network (FinCEN), a bureau of the U.S. Department of the Treasury, and is sued in her official capacity as head of FinCEN. Director Gacki signed the GTO.

18.    Defendant Financial Crimes Enforcement Network (FinCEN) is a bureau of a federal agency tasked with administration and enforcement of the CTA and its implementing regulations. FinCEN issued the GTO at issue in this case.

19.    According to FinCEN, "[t]he mission of the Financial Crimes Enforcement Network is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence."

20.    According to FinCEN, FinCEN "carries out its mission by receiving and maintaining financial transactions data" and by "analyzing and disseminating that data for law enforcement purposes."

## JURISDICTION AND VENUE

21.    Plaintiffs bring their claims under the Administrative Procedure Act, 5 U.S.C. § 702, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202, as well as directly under the Fourth and Fifth Amendments to the U.S. Constitution. *See Ex parte Young*, 209 U.S. 123 (1908).

Plaintiffs seek declaratory and injunctive relief against the federal government's geographic targeting order imposing reporting requirements for cash transactions over $200 in certain zip codes near the border. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) (hereinafter, the "GTO"). The GTO imposes burdensome and discriminatory obligations on Plaintiff without lawful basis.

22.     This Court has jurisdiction pursuant to 5 U.S.C. § 702 and 28 U.S.C. § 1331, as Plaintiffs' claims arise under federal law.

23.     This Court has the authority to grant an injunction and declaratory judgment in this matter pursuant to 28 U.S.C. §§ 2201, 2202, and 5 U.S.C. §§ 705, 706(2), as well as under the Court's inherent equitable authority.

24.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(e) because Defendants are federal agencies and officers and because Plaintiff TAMSB resides and conducts its affairs in San Antonio, TX, which is located within this district.

## FACTS

**Plaintiffs Provide Financial Services For Ordinary Americans**

25.     Money Services Businesses (MSBs) play a crucial role in Texas's financial ecosystem, providing essential services such as money transmission, currency exchange, and issuing or redeeming money orders and traveler's checks. These businesses are regulated at both federal and state levels to ensure compliance with financial laws and to protect consumers.

26.     An MSB is generally defined as any person or entity that conducts one or more of the following activities: currency exchange, check cashing, issuing or selling traveler's checks, money orders, or stored value cards, or money transmission. 31 C.F.R. § 1010.100(ff).

27.    Some MSBs are large corporations—e.g., Western Union. But many are small neighborhood businesses. Plaintiff High Value, for instance, operates just a single location where it provides currency exchange services. Neighborhood MSBs can stand alone or can be situated inside other local businesses, like grocery stores or convenience stores.

28.    These financial services are important for customers who do not have bank accounts and who rely on MSBs for financial services that they need to live their lives.

29.    Plaintiff Arnoldo Gonzales, Jr. is one of the people who uses the services offered by MSBs. He regularly exchanges U.S. dollars for Mexican pesos, and vice versa. He goes into Mexico to visit his doctor (who is based in Mexico), and he needs money for that and for other transactions when he visits the doctor in Mexico. He has exchanged currency in the past in amounts over $200 (but well under the usual $10,000 threshold) and will do so in the future, including within the time the GTO is in effect.

30.    In Texas, MSBs are regulated under the Money Services Modernization Act, codified in Chapter 152 of the Texas Finance Code. This legislation outlines the licensing requirements and operational standards for MSBs operating within the state. The Texas Department of Banking oversees the implementation and enforcement of these regulations.

31.    MSBs in Texas must adhere to several compliance obligations, including registration with FinCEN, Anti-Money Laundering (AML) Programs, Recordkeeping and Reporting.

32.    The Texas Department of Banking has the authority to enforce compliance through examinations and investigations. Non-compliance can result in administrative penalties, license suspension or revocation, and, in some cases, criminal charges.

33.    MSBs are integral to Texas's financial landscape, facilitating various monetary transactions for individuals and businesses. These entities are subject to strict regulatory oversight, and they operate transparently and ethically.

34.    The federal framework under the Bank Secrecy Act (BSA) and related FinCEN regulations is strict and aggressively enforced. As part of this framework, MSBs are required to register with FinCEN, implement and maintain a written anti-money laundering ("AML") program, and comply with federal recordkeeping and reporting obligations.

35.    Among the core regulatory duties imposed on MSBs are: registration with FinCEN within 180 days of beginning operations, implementation of an AML program that includes risk-based internal controls, training, independent testing, and designation of a compliance officer; filing of Suspicious Activity Reports (SARs) for certain transactions and Currency Transaction Reports (CTRs) for cash transactions over $10,000.

36.    Failure to comply with these regulations carries significant civil and criminal consequences. Under 31 U.S.C. §§ 5318 and 5321, civil penalties may be imposed in amounts of up to $5,000 per day for failure to register as an MSB, and up to $100,000 or more per violation for failures related to AML programs or reporting obligations. Additionally, criminal penalties may be imposed under 31 U.S.C. § 5322 for willful violations, including up to five years' imprisonment and fines of $250,000 for individuals and $500,000 for business entities.

37.    In 2022, for example, FinCEN imposed a $1.5 million civil penalty on a money services business that failed to file required reports and operated without an AML program. The same entity was criminally charged for willful violations of the BSA.

38.     Accordingly, compliance with FinCEN regulations is not merely procedural—it is essential to the lawful operation and survival of an MSB within the regulated financial environment.

39.     Notwithstanding that MSBs are subject to regulation, MSBs are not generally required to collect information about their customers for small-dollar transactions.

40.     Federal law does require MSBs to collect information on transactions over $3,000—including identifying information about the customer—and to retain that information in their records. However, for transactions under $10,000, MSBs are not required to report that information to the federal government.

41.     Federal law requires currency exchange MSBs in particular to retain some customer information—including name and social security number—for transactions over $1,000. Again, however, MSBs do not report that information to the federal government.

42.     MSBs sometimes collect information on transactions for their own purposes. Again, however, MSBs are not required to report that information to the federal government.

43.     MSBs sometimes conduct under-$3,000 transactions—or, in the case of currency exchange MSBs, under-$1,000 transactions—without collecting any information at all.

44.     For instance, Plaintiff High Value does not collect any information from customers for transactions under $1,000.

45.     The privacy of information that MSBs collect about their customers is protected by federal law. Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3, which includes entities that provide services covered by the GTO. Under these requirements, a business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a

nonaffiliated third party" without providing notice and "a reasonable opportunity, before you disclose the information … to opt out of the disclosure." *Id.* at § 313.10.

46.    Plaintiffs value the privacy of their customers and comply with all applicable privacy laws governing the information of their customers.

47.    Plaintiffs also value the privacy of their business records, and Plaintiffs treat information about transactions at their businesses as proprietary business information.

**The March 14, 2025 Geographic Targeting Order**

48.    Invoking the Bank Secrecy Act (BSA), 31 U.S.C. § 5318(a)(2), and its implementing regulations at 31 C.F.R. § 1010.370, the Secretary of the Treasury, acting through the Financial Crimes Enforcement Network (FinCEN), issues Geographic Targeting Orders ("GTOs"). These administrative orders require domestic financial institutions or trades and businesses in a defined geographic area to collect, report, and retain information about certain transactions that would not otherwise trigger mandatory reporting under the BSA.

49.    A GTO is a temporary regulatory action that may be issued for a period of up to 180 days, and may be renewed repeatedly. GTOs may apply to any "financial institution" as defined by FinCEN regulations, including money services businesses (MSBs).

50.    FinCEN has issued GTOs in various contexts, including real estate transactions, cash-based businesses, and high-volume transaction corridors. These orders often impose enhanced data collection and reporting obligations, including identification of customers, recordkeeping of transaction details, and periodic submission of information to FinCEN or other law enforcement agencies.

51.    Businesses subject to a GTO must comply under threat of civil and criminal penalties for noncompliance. Such penalties may include substantial fines, suspension or

revocation of licenses, and referrals to federal law enforcement for investigation. GTOs are typically enforced without individualized suspicion or findings related to a specific business or actor. Instead, FinCEN issues the order based on its assessment of geographic trends in money laundering or other financial crime risks.

52.    The application of GTOs to MSBs often results in substantial compliance burdens, including increased administrative costs, changes to transaction monitoring systems, and exposure to heightened enforcement risk. Businesses may receive no formal notice or opportunity to contest inclusion, and GTOs are not subject to internal administrative appeal or waiver processes.

53.    On March 11, 2025, the Financial Crimes Enforcement Network (FinCEN) issued a Geographic Targeting Order (GTO) with the stated purpose of combating illicit financial activity associated with Mexico-based cartels and other criminal organizations operating along the U.S. southwest border. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025). The order imposes enhanced reporting requirements on money services businesses (MSBs) located in specific areas of Texas and California.

54.    Per the order, MSBs operating within 30 designated zip codes are required to file Currency Transaction Reports (CTRs) for cash transactions exceeding $200, a significant reduction from the standard $10,000 threshold.

55.    The GTO is effective from April 14, 2025, through September 9, 2025, unless renewed or modified.

56.    The order applies to MSBs located in the following Texas counties and zip codes: Cameron County: 78520, 78521; El Paso County: 79901, 79902, 79903, 79905, 79907, 79935;

Hidalgo County: 78503, 78557, 78572, 78577, 78596; Maverick County: 78852; Webb County: 78040, 78041, 78043, 78045, and 78046.

57.     MSBs covered by the GTO are required to: 1) file CTRs for cash transactions exceeding $200 but not exceeding $10,000 (this includes deposits, withdrawals, exchanges, or other forms of currency transfer); 2) verify and record the identity of individuals conducting such transactions, in line with anti-money laundering (AML) program requirements; and 3) submit CTRs within 15 calendar days of the transaction date.

58.     This means that for a cash transaction as small as $201, an MSB must collect the customer information that is required by a CTR, even though federal law generally does not require MSBs to collect any customer information for transactions under $3,000 (or, in the case of a currency exchange MSB, under $1,000).

59.     This also means that for a cash transaction as small as $201, MSBs must report that customer information to FinCEN, even though such reports generally are not required for transactions under $10,000.

60.     In practice, the GTO means that cashing a check over $200, using over $200 in cash to purchase a money order (for instance, to pay the rent), or using over $200 in cash to make a wire transfer (for instance, to send money to family abroad) will now trigger a report to the federal government.

61.     For businesses, the GTO means business-crushing burdens. Currently, the vast majority of transactions by MSBs do not require CTRs, because they are well below the $10,000 reporting threshold. But many of those transactions are not below $200, which means that, under the GTO, large numbers of transactions will require CTRs. This will result in a huge increase in

costs to GTO-affected MSBs as they dedicate many hours per week just to gathering information from customers and then filling out paperwork to report that information to the federal government.

62.    Because neighboring zip codes are not targeted by the GTO, customers who do not want to provide private information can simply move their business to other nearby companies. Targeted businesses will therefore lose revenue as customers flee GTO-affected MSBs for other MSBs not targeted by the GTO.

63.    For businesses, the GTO invades the privacy of business records by requiring MSBs to provide information on large numbers of transactions that otherwise would not be reported to the federal government.

64.    And, of course, for individuals, the GTO authorizes a significant invasion of personal privacy, as everyday, ordinary, and perfectly lawful transactions of just a few hundred dollars will be reported to the federal government.

65.    The amount of time that customers spend to access services provided by MSBs will also increase, as it will take time for customers to provide the information required by the additional paperwork.

66.    By requiring MSBs to collect this information from individuals, the GTO also enlists MSBs to conduct surveillance on the private transactions of their own customers.

67.    FinCEN justifies the GTO as "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors." 90 Fed. Reg. at 12107.

68.    An internal FinCEN memorandum proposing the GTO states that in FinCEN's view "MSBs are vulnerable to exploitation by money launderers," and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug

cartels." In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels."

69.    In FinCEN's view, some MSBs are themselves criminal actors, as "services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer."

70.    That same internal FinCEN memorandum, however, also concedes that "most of the business that MSBs conduct is legitimate and essential." Services offered by MSBs are "tailored to persons without bank accounts" and provide "competitively priced services and [a] convenient location offered near the border."

71.    The internal FinCEN memorandum therefore acknowledges that the GTO will indiscriminately sweep up information about both "licit and illicit" transactions.

72.    The internal FinCEN memorandum states that the information provided by the GTO will "generate new leads and identify new and related subjects in ongoing cases." It "may allow the identification of a comprehensive network of potential money mules in the geographic area in question," may "create leads related to professional money launderers," and will "likely capture information about the laundering of funds related to multiple criminal typologies."

73.    According to the internal FinCEN memorandum, the GTO will also "support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls."

74.    The internal memorandum states that the GTO will "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Area, allowing FinCEN to more fully understand the money laundering risks related to MSBs."

75.    Taken together, the thirty zip codes targeted by the GTO comprise a part of the country with a population over 1.2 million persons.

76.    While thirty zip codes is a large area, it is also a relatively small portion of the territory along the U.S./Mexico border. The targeted zip codes are not all contiguous, and other zip codes next to the targeted zip codes are not always targeted.

77.    FinCEN's internal memorandum acknowledges that "MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels," but the GTO nonetheless does not include any counties in Arizona or New Mexico.

78.    To the extent that criminals are currently engaged in money laundering using over-$200 transactions at MSBs, criminals can respond to the GTO by simply moving their money to a zip code that is not covered by the GTO.

79.    The internal FinCEN memorandum proposing the GTO explains that FinCEN targeted these zip codes based on "risk factors that include their proximity to the border and to a border crossing" as well as based on "whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes."

80.    In other words, FinCEN targeted these zip codes because they are close to border crossings and because the number of Currency Transaction Reports filed in these counties (for over $10,000 transactions) is high relative to the population.

81.    The government believes that these factors are indicators of criminal activity. At a hearing in this case, a government lawyer explained the "counties weren't chosen at random" and were "chosen based on the intelligence available to FinCEN."

82.    In fact, however, the factors that the government relied on do not provide a reasoned basis to explain why these requirements are being imposed on these particular zip codes and not other zip codes along the border.

83.    The fact that a high number of over-$10,000 transactions are occurring in these zip codes does not mean that those transactions are illegitimate. It simply means that there are more cash transactions occurring.

84.    In addition, even if the high number of over-$10,000 transactions in the zip codes was a sign of illicit financial activity involving *high-dollar* cash transactions (and it is not), it would not follow that *small-dollar* transactions of just $201 are more likely to be associated with illicit activity in those jurisdictions.

85.    Beyond the irrelevant fact that over-$10,000 transactions occur in these jurisdictions, FinCEN has not articulated any explanation for targeting over-$200 transactions in these jurisdictions rather than in other jurisdictions along the border.

86.    The absolute number of over-$10,000 transactions in these zip codes is not even that large. For instance, the FinCEN memorandum states that zip code 78040, where Plaintiff High Value is located, had 702 CTRs filed in 2024. Other zip codes in Texas were targeted based on even lower number of CTRs. For instance, 78046 was targeted based on just 46 CTRs filed in 2024, and 78852 was targeted based on just 25 CTRs filed in 2024.

87.    The fact that 25, 46, or even 702 cash transactions over $10,000 occurred in a zip code within a year-long period is not a colorable reason to assume that over-$200 cash transactions in that zip code are more likely to be associated with criminal activity.

88. FinCEN has not articulated any basis to think that the number of over-$10,000 transactions in any of the zip codes where Plaintiffs' businesses are located is suspicious or in any way warrants enhanced focus on over-$200 transactions.

89. FinCEN certainly has not established individualized probable cause to support targeting the MSBs in these jurisdictions.

90. FinCEN has not obtained a warrant from a magistrate to target the MSBs that are covered by the GTO.

91. MSBs that fail to comply with the requirements of the GTO face civil fines up to $71,545 per violation, as well as criminal liability.

92. Although the GTO was published in the Federal Register, *see* 49 Fed. Reg. 12106, it was issued by FinCEN without any prior notice or any opportunity to comment.

**Impact of the GTO on Plaintiffs**

93. TAMSB is an association that was formed to advance the interest of MSBs in Texas in being free from overbearing and unlawful regulation. Suing to challenge the GTO is therefore germane to TAMSB's purpose as an Association, and in fact TAMSB was created to address the GTO and exclusively devotes its time to that issue.

94. Members of TAMSB have multiple stores contained within the counties affected by the GTO and face irreparable injury should the GTO go into effect.

95. Plaintiff businesses, which are all TAMSB members and registered MSBs that provide services within the definition of an MSB, have stores located within the affected zip codes and therefore themselves face irreparable injury should the GTO go into effect. Plaintiff businesses are all subject to the GTO as MSBs because they provide currency exchange services at their stores within the area covered by the GTO, and some provide additional services in addition to currency

exchange (for instance, Plaintiff Reynosa Casa de Cambio also offers check cashing and money transmissions).

96.     The GTO imposes a substantial compliance burden on affected MSBs, including Plaintiffs. For instance, the GTO requires immediate updates to reporting protocols, staff training, and internal controls. Businesses that fail to comply may face civil or criminal penalties, including fines and potential loss of licensure.

97.     Plaintiff High Value, for instance, estimates that compliance with the GTO (if transaction volume is not affected) will require an additional *13.75 hours of work per day*—both gathering information from customers and filling out paperwork—or an additional 412.5 hours per month. High Value is a small operation with a single location, and there is only one cashier on duty at any given time. High Value would have to hire additional full-time employees to file all the necessary paperwork, and it cannot afford to do that. If High Value has to comply with the law, it will go out of business.

98.     The other Plaintiff businesses face similarly crushing compliance costs. While some of the Plaintiff businesses are larger, that just means that even more time will be required to complete the paperwork that is required by the GTO. Plaintiff businesses simply cannot afford to fill out extensive paperwork for every over-$200 transaction.

99.     The GTO will cause customers to leave Plaintiffs' businesses for other MSBs that won't have to take and report their personal information. Since the GTO does not include all zip codes along the border, customers will simply go to other zip codes to make their transactions.

100.    The GTO will also cause reputational damage to Plaintiffs' businesses, as customers will view Plaintiffs as prying into their personal information (either on their own

initiative or at the behest of the government) when other MSBs outside the targeted area are not asking for that same information.

101.    The GTO will also result in an enormous increase in expenses for Plaintiffs' businesses related particularly to preparing CTRs.

102.    The GTO will invade the privacy of Plaintiffs' businesses, as it requires the affirmative disclosure of private business records without suspicion that Plaintiffs have done anything wrong. The government has stated that part of the purpose of the GTO is to investigate MSBs for wrongdoing.

103.    The GTO will invade the privacy of Plaintiffs' customers by reporting private information about their financial transactions.

104.    The GTO will force Plaintiffs to participate in the government's invasion of the privacy of their customers, essentially enlisting Plaintiffs as agents of federal law enforcement for the purpose of this dragnet search.

105.    Plaintiffs do not want to be enlisted to help the government monitor the private financial transactions of their customers.

106.    Plaintiff Arnoldo Gonzalez, Jr., will be personally affected by the GTO because, if it goes into effect, his own personal information will have to be reported to the government.

107.    Arnoldo uses High Value's services to convert dollars to pesos, and vice versa, when he makes trips to Mexico—including to see his doctor. Arnoldo regularly converts currency in amounts over $200 (but under $1,000) and will do so within the next 180 days, including while the GTO is in effect.

108.    Arnoldo does not want his information reported to the federal government. He considers information about his cash transactions private, and he expects High Value to keep that information private. He views the reporting of that information as an invasion of his privacy.

109.    The government has not suggested that it has probable cause to suspect Plaintiffs of any wrongdoing, nor has the government presented a warrant for Plaintiffs' business records.

110.    The government has not suggested that it has probable cause to suspect Plaintiffs' customers of any wrongdoing, nor has the government presented a warrant for Plaintiffs' customers' private information or financial records.

111.    If the government ever had a warrant based on probable cause pertaining to actual crime, Plaintiffs would cooperate. Plaintiffs have no desire to deal with criminals or protect criminals.

112.    The GTO will not be effective to fight illicit activity. In Plaintiffs' experience, the vast majority of customers are average people who regularly use Plaintiffs' services to facilitate legitimate, everyday transactions—and the government has not suggested that it suspects anything different.

113.    The GTO will also be ineffective because it allows other MSBs in other zip codes to continue reporting only transactions over $10,000. That means illicit actors—more mobile and sophisticated than the average low-income local—will just go to other zip codes to do their crimes.

**CLAIMS FOR RELIEF**

**<u>Count I</u>: Violation of the Administrative Procedure Act
The GTO is not in Accordance with Law, Arbitrary and Capricious, and Contrary to
Constitutional Right
(5 U.S.C. § 706(2))**

114.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as if fully set forth herein.

20

115.    The Administrative Procedure Act (APA) directs a court to "hold unlawful and set aside" any agency rule that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," "contrary to constitutional right," or "in excess of statutory jurisdiction [or] authority." 5 U.S.C. § 706(2)(A), (B), (C).

116.    The GTO is a "final agency action," which is reviewable under the APA. *See* 5 U.S.C. § 704.

117.    The GTO also determines rights and legal obligations, as it purports to establish filing deadlines, including the time to file reports and corrected reports, and sets out criteria for determining what information must be reported.

118.    The GTO is arbitrary and capricious insofar as it selected thirty zip codes without articulating any satisfactory explanation why those particular zip codes should be targeted for higher reporting obligations.

119.    FinCEN has stated, outside the GTO itself, that it selected these zip codes because these zip codes have a high proportion of CTRs filed given their population. But that merely reflects the fact that there are cash transactions occurring in these zip codes—transactions that have not been shown to be criminal in nature.

120.    The GTO also is arbitrary and capricious insofar as it offers no satisfactory explanation for setting the reporting threshold for MSBs within those zip codes at just $200.

121.    FinCEN has articulated no satisfactory explanation as to why high numbers of over-$10,000 transactions in a zip code would be a reason to require reporting for transactions over $200 in that same zip code.

122.    Under 31 U.S.C. § 5326(a), FinCEN may impose a GTO if "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to

carry out the purposes of this subtitle or to prevent evasions thereof." FinCEN has not articulated any such "reasonable grounds" to support the sweeping obligation imposed by the GTO.

123.    Because the GTO is arbitrary and capricious, and contrary to law, it must be vacated and enjoined.

## <u>Count II</u>: Violation of APA – Exceeding Statutory Authority<br>(5 U.S.C. § 706(2)(C))

124.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

125.    The Bank Secrecy Act (BSA), 31 U.S.C. § 5311 et seq., grants the Secretary of the Treasury limited and specific authority to issue Geographic Targeting Orders (GTOs) pursuant to 31 U.S.C. § 5326(a). That statute permits the issuance of temporary orders requiring domestic financial institutions or trades and businesses within a narrowly defined geographic area to report certain currency transactions when there is a reasonable belief that such transactions may be related to a violation of federal law.

126.    The statute limits the duration of any such order to 180 days and imposes a requirement that the Secretary reasonably identify the class of transactions and the geographic area subject to the order. GTOs were originally designed as a tool to assist law enforcement in detecting structured transactions and other forms of money laundering activity in narrowly tailored, high-risk areas.

127.    In issuing the March 11, 2025 Geographic Targeting Order applicable to money services businesses (MSBs) in Texas and other Southwest border regions, the Financial Crimes Enforcement Network (FinCEN), acting under delegated authority from the Secretary of the Treasury, exceeded the bounds of its statutory authority in both scope and substance. The order imposes sweeping compliance obligations on a broad class of financial institutions across multiple

counties, many of which lack any individualized findings or current, case-specific evidence of criminal activity.

128.    Moreover, the order reduces the currency transaction reporting threshold from $10,000 to $200—an unprecedented and ultra vires expansion of FinCEN's authority. There is no express or implied statutory basis within the Bank Secrecy Act or its implementing regulations that authorizes FinCEN to impose such a low-dollar threshold, nor to do so indefinitely through successive renewals without formal rulemaking or congressional authorization.

129.    Under the major questions doctrine, courts hold that statutes should not be interpreted to allow agencies to adopt policies of economic and political significance unless authority to adopt such a policy is clear on the face of the statute. This doctrine upholds basic separation of powers principles insofar as it ensures that such decisions will be made by Congress, rather than by executive agencies.

130.    The surveillance regime put in place by the GTO implicates the major questions doctrine because it singles out an area with a population of over 1 million persons for additional burdensome reporting obligations not imposed on any other part of the country.

131.    The surveillance regime put in place by the GTO implicates the major questions doctrine because it will impose significant costs on the businesses that are subjected to these new obligations, while also unlawfully infringing the privacy rights of those businesses' customers.

132.    The statute under which FinCEN purported to act, 31 U.S.C. § 5326, contemplates more limited orders targeted at more discrete geographic areas and does not clearly authorize executive officials to adopt this type of sweeping surveillance system for an area comprising over 1 million persons.

23

133.    The March 2025 GTO is also devoid of procedural safeguards, individualized findings, or administrative recourse, effectively converting what was intended as a temporary investigative tool into a de facto rule of general applicability. In doing so, FinCEN has exercised legislative-type powers that exceed the scope of its delegated administrative authority under the BSA and violate the APA.

134.    Accordingly, the March 2025 GTO must be set aside as unlawful under 5 U.S.C. § 706(2)(C), because it was issued in excess of statutory jurisdiction, authority, or limitations, and is not in accordance with law.

135.    Because the GTO is *ultra vires* and exceeds the authority granted to the executive branch, it must be vacated and enjoined.

## <u>Count III</u>: Violation of APA – Procedural Defects – The GTO Was Promulgated Without Following Notice-and-Comment Procedures (5 U.S.C. § 553 and 5 U.S.C. § 706(2)(D))

136.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

137.    The Administrative Procedure Act (APA), 5 U.S.C. § 553, establishes that federal agencies must engage in notice-and-comment rulemaking before adopting rules that affect the rights and obligations of regulated parties, unless a specific statutory exemption applies. Under the APA, a "rule" includes any agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy.

138.    On March 11, 2025, the Financial Crimes Enforcement Network (FinCEN), acting under delegated authority from the Secretary of the Treasury, issued a Geographic Targeting Order (GTO) applicable to money services businesses (MSBs) operating in thirty zip codes across Texas and California. This GTO significantly alters the legal obligations of affected MSBs by lowering the transaction reporting threshold from $10,000 to $200 and requiring the identification,

recordkeeping, and reporting of routine cash transactions far below the existing regulatory minimums.

139.    The issuance of the GTO operates as a binding rule of general applicability, imposing new substantive compliance requirements that extend beyond the statutory and regulatory baseline set by the Bank Secrecy Act and its implementing rules. Affected MSBs are compelled to modify internal operations, file additional transaction reports, collect customer data for previously exempt transactions, and face potential penalties for noncompliance—all without any opportunity to submit comments or raise objections prior to implementation.

140.    Despite the substantial and ongoing impact of this order on a class of regulated businesses, FinCEN did not fully initiate or properly conduct notice-and-comment rulemaking as prescribed by law.

141.    This failure to engage in notice-and-comment procedures violates the APA and deprives affected parties, including Plaintiffs, of procedural rights guaranteed by law. The GTO therefore constitutes an unlawful agency action that must be set aside under 5 U.S.C. § 706(2)(D) as it was issued "without observance of procedure required by law."

142.    Because the GTO was issued in violation of procedural requirements set out in the APA, it must be vacated and enjoined.

<u>Count IV</u>: Violation of Due Process Clause
(Fifth Amendment; 5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))

143.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

144.    The Due Process Clause of the Fifth Amendment to the United States Constitution prohibits the federal government from depriving any person of life, liberty, or property without due process of law. This constitutional guarantee includes both procedural and substantive

protections, ensuring that federal agency action is not arbitrary, oppressive, or undertaken without notice and a meaningful opportunity to be heard.

145.    The March 11, 2025 Geographic Targeting Order (GTO), issued by the Financial Crimes Enforcement Network (FinCEN), imposes mandatory recordkeeping, reporting, and identification requirements on money services businesses (MSBs) operating in thirty zip codes across Texas and California. These obligations are imposed under threat of civil penalties, criminal liability, and potential loss of licensure for noncompliance.

146.    The GTO applies automatically and indiscriminately to all MSBs located within the designated zip codes, regardless of whether there is any individualized suspicion or evidence of wrongdoing. FinCEN provided no advance notice to affected businesses prior to the issuance of the order, and no mechanism exists to seek an exemption, request a hearing, or appeal inclusion under the GTO's coverage.

147.    Plaintiffs, along with similarly situated MSBs, were not notified of the agency's intent to impose these expanded regulatory burdens, were not given an opportunity to respond or contest inclusion, and were not afforded any forum in which to challenge the order's application. As a result, Plaintiffs are subject to sudden and significant compliance obligations—enforceable by law—without any due process safeguards.

148.    Furthermore, the application of the GTO to businesses based solely on geographic location, without individualized findings or a rational basis for targeting all entities within those zip codes, lacks any appreciable rational basis. The GTO's indefinite renewability and lack of procedural protections compound its due process deficiencies.

149.    Accordingly, the issuance and enforcement of the March 2025 GTO violate the Fifth Amendment rights of Plaintiffs and other similarly situated businesses by depriving them of

protected property interests without notice, hearing, or an opportunity to contest the agency's determination, in violation of constitutional due process.

<u>Count V</u>: **Violation of Equal Protection Clause**
**(Fifth Amendment; 5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

150.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

151.    Although the Equal Protection Clause is found in the Fourteenth Amendment and applies to state action, the Supreme Court has long held that the Fifth Amendment's Due Process Clause incorporates equivalent equal protection guarantees that apply to the federal government. Federal agencies, including the Department of the Treasury and its sub-agency FinCEN, are therefore constitutionally prohibited from taking actions that discriminate between different classes of persons without a rational basis for that discrimination.

152.    On March 11, 2025, the Financial Crimes Enforcement Network (FinCEN) issued a Geographic Targeting Order (GTO) that imposes enhanced regulatory burdens on all money services businesses (MSBs) located within thirty zip codes across Texas and California.

153.    The government has no rational basis for targeting these particular zip codes. The fact that there are high levels of over-$10,000 transactions in a jurisdiction is not a rational basis to gather information about over-$200 transactions in that jurisdiction.

154.    This is particularly illogical because the over-$10,000 transactions that the government has cited as the reason for targeting these zip codes have not been shown to be in any way illegitimate. A high number of *presumptively legal* over-$10,000 cash transactions is not a reason to target over $200 transactions.

155.    This is particularly illogical because these over-$10,000 transactions did not necessarily occur at MSBs—and could have happened at banks or other businesses not covered by the GTO.

156.    Further, the GTO will not achieve its stated aims, as criminals (to the extent they are laundering funds in $200 increments) can just go to other zip codes.

157.    Accordingly, the March 2025 GTO violates the Fifth Amendment's equal protection guarantees and must be enjoined and set aside.

**Count VI: Violation of the Fourth Amendment**
**(5 U.S.C. § 706(2)(A) and (B); *Ex parte Young*, 209 U.S. 123 (1908))**

158.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

159.    The Fourth Amendment to the U.S. Constitution protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or Affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

160.    The Fourth Amendment prohibits general warrants, meaning warrants that allow government to broadly search for evidence of crimes without establishing particularized probable cause specific to the person or place to be searched.

161.    The GTO operates as a general warrant insofar as it sweeps up information about otherwise private cash transactions at MSBs throughout the targeted zip codes in order to discover evidence to further law enforcement's stated objective of combatting Mexican cartels, yet does so without any individualized probable cause.

162.    The $200 threshold set by the GTO results in an unreasonable search because it requires businesses to report information about their customers' ordinary, everyday cash transactions without any individualized suspicion or showing of probable cause.

163.    The GTO infringes on individuals' and businesses' reasonable expectation of privacy in their ordinary, everyday, small-dollar cash transactions, and the GTO demands information that businesses would otherwise have a legal and contractual obligation to hold private and confidential.

164.    The GTO also conscripts MSBs, forcing them to obtain information from their customers that they would not otherwise solicit and to report that information to federal law enforcement, even if they do not suspect those customers of any wrongdoing.

165.    The GTO will capture voluminous information about ordinary, lawful, and legitimate transactions without any probable cause.

166.    Plaintiffs are injured by this Fourth Amendment violation insofar as the GTO will provide the government with information about their private cash transactions.

167.    Because the GTO is unconstitutional under the Fourth Amendment, it must be vacated and enjoined.

<u>Count VII:</u> <b>Violation of the Non-Delegation Doctrine</b><br>(5 U.S.C. § 706(2)(A) and (B); <i>Ex parte Young</i>, 209 U.S. 123 (1908))

168.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

169.    Article I, section 1 of the U.S. Constitution provides that "[a]ll legislative Powers … shall be vested in a Congress of the United States." Congress therefore cannot delegate the power to make basic legislative decisions for the country to other branches of government.

170.    This means that legislative policy decisions must be made by Congress, not by executive agencies. When Congress delegates power to executive agencies, Congress must establish the governing rule of law by articulating an "intelligible principle" for the agency to apply. The agency's permissible role is then to apply that intelligible principle to specific facts and circumstances.

171.    The statute under which FinCEN purported to act when issuing the GTO, 31 U.S.C. § 5326, does not articulate any intelligible principle to be followed when issuing geographic targeting orders. Instead, it grants open-ended authority for executive officials to issue any geographic targeting order that they find necessary to implement the anti-money laundering laws—granting executive officials unfettered discretion to determine the businesses, geographic areas, reporting thresholds, and reports that should be required.

172.    Plaintiffs are injured by this non-delegation violation insofar as FinCEN relied on this broad, open-ended grant of authority to issue the GTO targeting their cash transactions for additional reporting burdens.

173.    Because the GTO was enacted under purported statutory authority that violates the non-delegation doctrine and separation of powers principles, it must be vacated and enjoined.

**<u>Count VIII</u>: Violation of the Fifth Amendment Right Against Self-Incrimination**
**(5 U.S.C. § 706(2)(A) and (B); Ex parte Young, 209 U.S. 123 (1908))**

174.    Plaintiffs repeat and reallege each and every allegation above (at paragraphs 1-113) as fully set forth herein.

175.    The Fifth Amendment to the U.S. Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself."

176.    The Fifth Amendment bars the government from compelling an individual to file reports containing information that the government intends to use to uncover evidence of criminal wrongdoing.

177.    The reports that are required by the GTO are filed with a law enforcement agency (FinCEN) and are available to other law enforcement personnel for purposes of criminal law enforcement; indeed, these law enforcement aims are the only stated reason for requiring the reports directed by the GTO.

178.    The government has candidly acknowledged that the purpose of the reports that are required by the GTO is to uncover evidence of criminal wrongdoing.

179.    Accordingly, for individual customers, the reporting required by the GTO creates a real and appreciable risk of self-incrimination.

180.    The GTO, meanwhile, conscripts businesses as agents of the government to gather this information from their customers, in violation of those customers' right against self-incrimination.

181.    Because the GTO is unconstitutional under the Fifth Amendment's right against self-incrimination, it must be vacated and enjoined.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    The issuance of an injunction prohibiting Defendants from enforcing the GTO pursuant to 5 U.S.C. §§ 705 and 706(2) and *Ex parte Young*, 209 U.S. 123 (1908);

(ii)    A declaratory judgment, pursuant to 5 U.S.C. § 706(2) and 28 U.S.C. §§ 2201 and 2202, invalidating the GTO;

(iii)    An order vacating and setting aside the GTO under 5 U.S.C. § 706(2);

(iv)    An award of attorneys' fees and costs to Plaintiffs, under the Equal Access to Justice Act or otherwise; and

(v)    Any other relief as the Court deems just, equitable and proper.

Dated: April 18, 2025

Respectfully submitted,

Martin Golando
The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia
San Antonio, Texas 78201
Office: (210) 471-1185
Email: martin.golando@gmail.com

Roland Gutierrez
The Law Office of Roland Gutierrez
SBN #: 24007291
104 Babcock Ste. 107
San Antonio, Texas 78201
(210) 225-7114

*Attorneys for Plaintiffs Texas Association for Money Services Businesses (TAMSB); Reynosa Casa De Cambio, Inc.; Nydia Regalado d/b/a Best Rate Exchange; Mario Regalado d/b/a Border International Services; Laredo Insurance Services, LLC; E.Mex. Financial Services, Inc.; R & C, Inc. d/b/a Temex Money Exchange; San Isidro Multi Services, Inc.; Cris Win Inc. d/b/a Brownsville Casa De Cambio; and Espro Investment LLC d/b/a Lonestar Money Exchange*

/s/ Christen Mason Hebert
Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

* *Pro Hac Vice* motions to be filed

*Attorney for Plaintiffs Arnoldo Gonzalez, Jr. and High Value, Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 18, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Christen Mason Hebert
Christen Mason Hebert (TX Bar No. 24099898)