**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB); HIGH VALUE, INC.; REYNOSA CASA DE CAMBIO, INC.; NYDIA REGALADO d/b/a BEST RATE EXCHANGE; MARIO REGALADO d/b/a BORDER INTERNATIONAL SERVICES; LAREDO INSURANCE SERVICES, LLC; E.MEX. FINANCIAL SERVICES, INC.; R & C, INC. d/b/a TEMEX MONEY EXCHANGE; SAN ISIDRO MULTI SERVICES, INC.; CRIS WIN INC. d/b/a BROWNSVILLE CASA DE CAMBIO; ESPRO INVESTMENT LLC d/b/a LONESTAR MONEY EXCHANGE; and ARNOLDO GONZALEZ, Jr., | Civil Case No. 5:25-cv-00344-FB |
| *Plaintiffs*, | |
| v. | |
| PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and FINANCIAL CRIMES ENFORCEMENT NETWORK, | |
| *Defendants*. | |

**PLAINTIFFS' OPPOSED MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

**Page**

Table of Authorities ............................................................................................................ ii

Introduction ....................................................................................................................... 1

Background ........................................................................................................................ 2

    A. Plaintiff Businesses Perform Simple Transactions for Ordinary People. ............... 2

    B. FinCEN Suddenly Requires a Currency Transaction Report, Previously Reserved for Transactions over $10,000, for Every Transaction Above $200 in Certain Zip Codes Near the Southern Border. ............................................ 4

    C. Lowering the CTR Threshold by *98 Percent* Will Sweep in Countless Honest, Ordinary Businesses and People Like Plaintiffs in a Criminal Dragnet Search. ...................................................................................................... 5

    D. The Invasion of Privacy and Paperwork Burdens Will Likely Destroy Plaintiff Businesses and Chill Plaintiff Gonzalez from Using MSBs, Including His Own. ......................................................................................... 6

Legal Standard .................................................................................................................. 8

Argument .......................................................................................................................... 8

    I.   Plaintiffs Are Likely to Succeed on the Merits of Their Claims. ..................................... 8

        A. The Border GTO Likely Violates the Fourth Amendment. ...................................... 8

        B. The Border GTO Likely Violates the Administrative Procedure Act. .................... 13

            1.   The Border GTO required notice and comment. ............................................. 13

            2.   The Border GTO is arbitrary and capricious. ................................................ 14

        C. The Border GTO Is Likely *Ultra Vires*. ................................................................ 16

    II.  Plaintiffs Face Irreparable Harms Because the Border GTO Will Destroy Their Businesses and Invade Their Financial Privacy. .............................................................. 18

    III. A Likelihood of Success on Merits and Profound Irreparable Harms Means that Plaintiffs Are Entitled to a Preliminary Injunction Enjoining Enforcement Entirely. ........................................................................................................................ 19

Conclusion ...................................................................................................................... 20

Certificate of Service ...................................................................................................... 22

# TABLE OF AUTHORITIES

**CASES**                                                                                        **Page(s)**

*A.L.A. Schechter Poultry Corp. v. United States*,
    295 U.S. 495 (1935) ................................................................................. 17

*Ala. Ass'n of Realtors v. DHHS*,
    594 U.S. 758 (2021) ................................................................................. 18

*Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*,
    878 F.2d 806 (5th Cir. 1989) .................................................................... 19

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011) ................................................................................. 10

*Berger v. New York*,
    388 U.S. 41 (1967) ................................................................................... 11

*Biden v. Nebraska*,
    600 U.S. 477 (2023) ................................................................................. 18

*Big Time Vapes, Inc. v. FDA*,
    963 F.3d 436 (5th Cir. 2020) .................................................................... 17

*BST Holdings, LLC v. OSHA*,
    14 F.4th 604 (5th Cir. 2021) ..................................................................... 14

*Burgess v. FDIC*,
    871 F.3d 297 (5th Cir. 2017) .................................................................... 19

*Cal. Bankers Ass'n v. Shultz*,
    416 U.S. 21 (1974) ................................................................................... 12

*Carpenter v. United States*,
    585 U.S. 296 (2018) ................................................................................. 12

*City of Los Angeles v. Patel*,
    576 U.S. 409 (2015) ................................................................................. 10

*Coolidge v. New Hampshire*,
    403 U.S. 443 (1971) ................................................................................. 11

*Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*,
    45 F.4th 846 (5th Cir. 2022) ..................................................................... 14

*Deerfield Med. Ctr. v. City of Deerfield Beach*,
    661 F.2d 328 (5th Cir. Unit B Nov. 1981) ................................................ 19

*FBME Bank Ltd. v. Lew*,
   125 F. Supp. 3d 109 (D.D.C. 2015) ................................................................ 14

*FCC v. Prometheus Radio Project*,
   592 U.S. 414 (2021)........................................................................................ 14

*In re Application for Historical Cell Site Data*,
   747 F. Supp. 2d 827 (S.D. Tex. 2010)............................................................. 9

*Jackson Women's Health Org. v. Currier*,
   760 F.3d 448 (5th Cir. 2014)........................................................................... 19

*Jarkesy v. SEC*,
   34 F.4th 446 (5th Cir. 2022)....................................................................... 16, 17

*Kort v. Burwell*,
   209 F. Supp. 3d 98 (D.D.C. 2016) ................................................................. 15

*League of Women Voters of U.S. v. Newby*,
   838 F.3d 1 (D.C. Cir. 2016) ........................................................................... 20

*Marchetti v. United States*,
   390 U.S. 39 (1968)......................................................................................... 12

*Morgan v. Fairfield County*,
   903 F.3d 553 (6th Cir. 2018) .......................................................................... 10

*Nken v. Holder*,
   556 U.S. 418 (2009)......................................................................................... 8

*Opulent Life Church v. City of Holly Springs*,
   697 F.3d 279 (5th Cir. 2012) .......................................................................... 19

*Patel v. City of Los Angeles*,
   738 F.3d 1058 (9th Cir. 2013) ........................................................................ 10

*Phillips Petroleum Co. v. Johnson*,
   22 F.3d 616 (5th Cir. 1994)............................................................................ 13

*Plante v. Gonzalez*,
   575 F.2d 1119 (5th Cir. 1978) ....................................................................... 19

*Rest. L. Ctr. v. DOL*,
   120 F.4th 163 (5th Cir. 2024)........................................................................ 14

*Riley v. California*,
   573 U.S. 373 (2014)......................................................................................... 8

*Safari Club Int'l v. Zinke,*
    878 F.3d 316 (D.C. Cir. 2017) ........................................................................ 13

*SEC v. Jarkesy,*
    603 U.S. 109 (2024) ........................................................................................ 16

*Tex. Top Cop Shop, Inc. v. Garland,*
    2024 WL 5049220 (E.D. Tex. Dec. 5, 2024) ................................................ 20

*United States v. Johnson,*
    632 F.3d 912 (5th Cir. 2011) .......................................................................... 13

*United States v. Jones,*
    565 U.S. 400 (2012) ..................................................................................... 8, 9

*United States v. Miller,*
    425 U.S. 435 (1976) ........................................................................................ 12

*United States v. Smith,*
    110 F.4th 817 (5th Cir. 2024) .................................................................... 10, 11

*W & T Offshore, Inc. v. Bernhardt,*
    946 F.3d 227 (5th Cir. 2019) .......................................................................... 13

*Wages & White Lion Invs., LLC v. FDA,*
    16 F.4th 1130 (5th Cir. 2021) ......................................................................... 19

*Washington v. Reno,*
    35 F.3d 1093 (6th Cir. 1994) .......................................................................... 20

*West Virginia v. EPA,*
    597 U.S. 697 (2022) ........................................................................................ 18

*Whitman v. Am. Trucking Ass'ns, Inc.,*
    531 U.S. 457 (2001) ........................................................................................ 17

*Winter v. NRDC, Inc.,*
    555 U.S. 7 (2008) .............................................................................................. 8

**CODES AND STATUTES**

5 U.S.C. § 551(4) .................................................................................................... 13

5 U.S.C. § 553 ......................................................................................................... 13

5 U.S.C. § 705 ......................................................................................................... 20

5 U.S.C. § 706(2) .................................................................................................... 20

16 C.F.R. § 313.3(k)(1) .................................................................................................. 9

31 C.F.R. §1010.100(ff) ............................................................................................ 2, 3

31 C.F.R. §1010.311 ..................................................................................................... 4

31 C.F.R. §1022.410(b)(3) ........................................................................................... 3

31 U.S.C. § 5326(a) ............................................................................................... 17, 18

**OTHER AUTHORITIES**

11A Charles Alan Wright et al.,
   *Federal Practice and Procedure* § 2948.1 (3d ed. 1998) ...................................... 19

85 Fed. Reg. 29022 (May 14, 2020) .................................................................. 4, 6, 18

89 Fed. Reg. 7767 (Feb. 5, 2024) ................................................................................ 4

90 Fed. Reg. 12106 (Mar. 14, 2025) ................................................................... *passim*

Fed. Trade Comm'n,
   *How to Comply with the Privacy of Consumer Financial Information Rule of the*
   *Gramm-Leach-Bliley Act*, https://www.ftc.gov/business-guidance/resources/how-
   comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act (last
   accessed April 16, 2025) ........................................................................................... 9

## INTRODUCTION

A preliminary injunction is warranted. Plaintiffs in this case challenge a geographic targeting order that targets their businesses and customers with sweeping financial surveillance, while also imposing crushing compliance burdens. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025) (the "Border GTO"). The Border GTO directs Plaintiffs—and other similar businesses—to report all cash transactions over just $200 to the federal government.

Plaintiffs satisfy the requirements for a preliminary injunction. In Part I, Plaintiffs explain their likelihood of success on the merits. The Border GTO likely violates the Fourth Amendment because it operates as a general warrant: It searches Plaintiffs' private financial information to uncover evidence of crimes—specifically, by Mexican cartels—but does so without individualized suspicion or probable cause. It likely violates the Administrative Procedure Act, both because it was promulgated without notice-and-comment procedures and because the threshold that it sets is arbitrary and capricious. And it violates the non-delegation doctrine—as the statute under which it was issued confers boundless discretion to fashion GTOs—or alternately is *ultra vires* under the major questions doctrine.

Plaintiffs also satisfy the other requirements for preliminary injunctive relief. The Border GTO inflicts irreparable harm by violating constitutional rights and destroying Plaintiffs' businesses; or, if customers do not simply take their business elsewhere, the GTO will impose paperwork compliance burdens both far too costly and irreparable because they can't be recovered against the United States due to sovereign immunity. Likelihood of success and irreparable harm alone justify the preliminary injunction because the government is the defendant. But even if the government's interests mattered, Plaintiffs still prevail. The government has no pressing law

enforcement need to create a database for future study by performing searches that are unconstitutional in being untethered from any individualized probable cause, illegal in being based on an invalid administrative rule, and destructive to businesses up and down the border.[1]

## BACKGROUND

### A.    Plaintiff Businesses Perform Simple Transactions for Ordinary People.

Plaintiffs are state and federally registered Money Services Businesses (MSBs), which means they handle currency. These businesses across the country offer valuable services, such as check cashing, money orders, money transfers, and currency exchange. *See* 31 C.F.R. § 1010.100(ff).

For simplicity, Plaintiffs will use Plaintiff High Value, Inc. as the primary example to illustrate the devastating and pointless effects of the Border GTO on honest businesses and law-abiding people. High Value is a small MSB with five employees that operates from a convenience store right next to where I-35 hits the border checkpoint on the bridge across the Rio Grande in Laredo, Texas. Declaration of Arnoldo Gonzalez ("Gonzalez Dec.") ¶¶ 5–7. High Value is open 24/7, and has only one cashier on duty at a time (Plaintiff Gonzalez, the manager, works in the back from 8am to 5pm). *Id*. All High Value does is exchange American dollars for Mexican pesos and vice versa. *Id*. ¶ 9. High Value has operated since 2000. *Id*. ¶¶ 4, 6.

Currency exchange is an essential and common business in Laredo (and all along the border). Laredo is the busiest border crossing in terms of trade. *Id*. ¶ 26. In Plaintiff Gonzalez' experience, about 80% of High Value customers are Americans going to Mexico, or Mexicans coming to America, for personal reasons. *Id*. ¶ 24. For example, American tourists from all over the country enter and exit Mexico at Laredo. *Id*. It is common for them to stop to change American

---

[1] Counsel for Plaintiffs has conferred with counsel for Defendants under Local Rule 7(g), and Defendants are opposed.

dollars into Mexican pesos. *Id*. A significant portion of that 80 percent are also locals who live in the Laredo, Texas and the Nuevo Laredo, Mexico communities. *Id*. Many Americans, like Plaintiff Gonzalez' son, are married to Mexican citizens. *Id*. They live in Nuevo Laredo on the Mexican side but commute daily to work in Laredo, living their lives on both sides of the border, and using dollars and pesos on a day-to-day basis for things like groceries or haircuts. *Id*. And Americans and Mexicans from the Mexican side like to shop in Laredo. For example, there is a big outlet mall on the Laredo side near the Rio Grande, and on the back wall of the mall is a huge mural facing Nuevo Laredo on the Mexican side advertising American and European brand names. *Id*. Shoppers routinely change money at High Value coming and going to shop at the mall. *Id*. This kind of life may sound unusual to people who don't live in a border community, but it is common in Laredo. *Id*. To people like Plaintiff Gonzalez, there is nothing strange, and certainly nothing criminal, about it. *Id*. The other 20 percent of High Value customers are local business people on both sides of the border who buy goods on one side or the other for use at their businesses. *Id*. ¶ 25. They need to change money coming and going. *Id*. Again, there is nothing suspicious about trans-border business. *Id*.

High Value is a federally registered MSB because it is a currency exchange business. 31 C.F.R. § 1010.100(ff). High Value exchanges are a simple process: The customer provides High Value with currency—whether dollars or pesos—they want to exchange and High Value calculates what amount of the currency they want—pesos or dollars. *Id*. ¶ 10. When currency exchange transactions are under $1,000, which many are, the law does not require the customer to provide identification or any other information. *See id*. ¶ 11; *see also* 31 C.F.R. §1022.410(b)(3). If a transaction is over $1,000 but under $10,000, High Value must collect customer ID information, but need not report the transaction. *See id*. ¶¶ 12–13. Ordinarily, exchanges take just a few minutes.

*See id.* ¶¶ 11–13. Exchanges that exceed $10,000 are rare, and Plaintiff Gonzalez personally knows the business customers who make such exchanges. *Id.* ¶ 15. In fact, High Value is one of those businesses—most of the $10,000 transactions that High Value does (and reports) are for the High Value business itself when it replenishes its supply of pesos. *See id.* ¶ 14.

**B.    FinCEN Suddenly Requires a Currency Transaction Report, Previously Reserved for Transactions over $10,000, for Every Transaction Above $200 in Certain Zip Codes Near the Southern Border.**

Federal law has long required that MSBs report all cash transactions in amounts over $10,000 to FinCEN using a form called a Currency Transaction Report (CTR). 31 C.F.R. § 1010.311. This $10,000 reporting requirement applies to all covered financial institutions across the country; it is neutral as to the location of the financial institution. *See* 31 C.F.R. § 1010.310. (applying to "all financial institutions"). The CTR has four sections with 128 boxes where information can be entered. *See* Ex. 2 to Defs.' Opp to Pls.' Mot. for TRO (Doc. No. 11-2) (screen shots of a sample CTR). In addition to providing detailed information about the entity facilitating the transaction, *id.* at 2–3, and form the currency takes, *id.* at 5, each person involved in the transaction must reveal highly personal information, including: full legal name, age, gender, address, phone number, email address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list of dozens), the number from a valid driver's license (or passport or alien registration card [i.e. green card]), amounts of money, and bank account numbers that transmit or receive the money, *id.* at 4.

FinCEN has estimated that each Currency Transaction Report takes eight minutes to complete. 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024). However, this is an average estimate that includes large firms with automated processes to generate the reports. 85 Fed. Reg. 29022, 29029 (May 14, 2020). For non-bank filers who do not have automated processes—like High Value— FinCEN estimates that each Currency Transaction Report takes 23.93 minutes to complete. *Id.*

FinCEN's March 14, 2025 order—effective Monday, April 14, 2025—requires a CTR in certain zip codes in California and Texas for every cash transaction over $200 that an MSB facilitates. *See* 90 Fed. Reg. 12106 (Mar. 14, 2025) ("the Border GTO"). It does not apply to all MSBs, just those 30 zip codes in Texas and California. *See id. See also* Declaration of Elizabeth L. Sanz ¶¶ 5–7, Exs. A-C (providing maps of targeted zip codes). No New Mexico or Arizona zip codes are included. And the targeted zip codes are not all contiguous. Some Border GTO-targeted zip codes are surrounded by non-targeted zip codes.

### C. Lowering the CTR Threshold by *98 Percent* Will Sweep in Countless Honest, Ordinary Businesses and People Like Plaintiffs in a Criminal Dragnet Search.

Dropping the CTR threshold from $10,000 to $200 is a 98 percent reduction. FinCEN justifies the Border GTO as "in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors." 90 Fed. Reg. at 12107. An internal FinCEN memorandum proposing the Border GTO, produced by the United States in this case, states that in FinCEN's view "MSBs are vulnerable to exploitation by money launderers," and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug cartels." *See* Ex. 1 to Defs.' Opp to Pls.' Mot. for TRO (Doc. No. 11-1) (hereinafter "Border GTO Memo") at 4–5. In FinCEN's view, "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels." *Id.* at 5.

FinCEN admits that the purpose of lowering the threshold amount is to cast a much wider net for criminal investigations by creating a much larger CTR database than what presently exists at the $10,000 level. By gathering much more information, the Border GTO will "generate new leads and identify new and related subjects in ongoing cases." Border GTO Memo at 9. It "may allow the identification of a comprehensive network of potential money mules in the geographic area in question," may "create leads related to professional money launderers," and will "likely

capture information about the laundering of funds related to multiple criminal typologies." *Id.* The GTO will also "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Area, allowing FinCEN to more fully understand the money laundering risks related to MSBs." *Id.* at 13–14.

Yet, the FinCEN memo simultaneously acknowledges that "most of the business that MSBs conduct is legitimate and essential." *Id.* at 4. Services offered by MSBs are "tailored to persons without bank accounts" and provide "competitively priced services and convenient location[s] offered near the border." *Id.* at 6. The Border GTO will alter how "legitimate and essential" MSBs like High Value operate. Because so many financial services transactions offered by Plaintiffs involve cash transactions over $200 (but nowhere near the transactions thresholds where basic identification is required), many customers will now require a CTR.

### D. The Invasion of Privacy and Paperwork Burdens Will Likely Destroy Plaintiff Businesses and Chill Plaintiff Gonzalez from Using MSBs, Including His Own.

The Border GTO will likely destroy High Value and other MSBs businesses because they cannot realistically comply with the paperwork or withstand the loss of privacy. Take the paperwork first. High Value is a small business. Gonzalez Dec. ¶ 6. At most, it has two employees at a time—there is always a cashier and Plaintiff Gonzalez runs operations during regular business hours. *Id.* Assuming customers are not simply driven away, Plaintiff Gonzalez estimates compliance will require about 13.75 hours of extra work per day. *Id.* ¶ 18.[2] In effect, he will need to have multiple employees on duty at all times and correspondingly increase prices to levels people will not pay. *See id.* ¶¶ 18, 22. There are many MSBs in Mexico or unaffected zip codes,

---

[2] FinCEN's own estimates are in accord. FinCEN estimates that a business like High Value, without automated batch processing, would take 23.9 minutes to file each CTR. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020). High Value processes 33 daily transactions—averaging out to an additional 13.15 hours of paperwork per day.

as well as regular banks, which aren't subject to the GTO, meaning people can take their business to other currency exchanges and pay a lower price. *Id.* ¶¶ 22, 34.

Other Plaintiff businesses also face crushing burdens. For example, Reynosa Casa de Cambio: 1,212 additional hours per month, requiring 15 new full-time employees. Guerra Dec. ¶ 9. Plaintiff Best Rate Exchange: 2,000 additional hours per month. Miguel A. Regalado Dec. ¶ 9. Plaintiff Border International Services: 870 additional hours per month. Mario A. Regalado Dec. ¶ 9. Plaintiff Temex Money Exchange: 277 additional hours per month. Granado Dec. ¶ 9.

People will also take their business elsewhere to preserve their privacy. *See* Gonzalez Dec. ¶ 23. High Value's exchange services, for example, involve modest amounts for shopping, trade, and everyday living that is perfectly normal in border communities. *See id.* ¶¶ 24–26. FinCEN will now be creating records of ordinary people obtaining the currency, cash, and financial products they use to do everyday things like buy groceries and care for their families. And FinCEN will be doing this solely for the purposes of criminal investigations. Plaintiff Gonzalez, who knows his business and many of his customers well, anticipates that they prefer to obtain exchange services elsewhere to avoid becoming part of drug investigations as a result of legal, ordinary transactions. *See id.* ¶¶ 23–27.

Plaintiff Gonzalez himself objects to the loss of his personal privacy. *Id.* ¶¶ 40–42. Though he lives and works on the American side of the border, his doctor is located on the Mexican side, so he regularly exchanges currency to pay his doctor. *Id.* ¶ 39. That is a perfectly legal, everyday transaction that is none of the government's business. *See id.* ¶ 41. Yet now he will have to disclose the details of such transactions to FinCEN, and unwillingly make himself part of drug investigations, every time he goes to the doctor.

## LEGAL STANDARD

"A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). When, as here, government is the opposing party, the last two factors (equities and public interest) "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## ARGUMENT

### I.    Plaintiffs Are Likely to Succeed on the Merits of Their Claims.

Beginning with the first factor of the preliminary injunction analysis, Plaintiffs are likely to succeed on the merits of their claims under the Fourth Amendment (Part I.A), the Administrative Procedure Act (Part I.B), and the non-delegation and major questions doctrines (Part I.C).

### A.    The Border GTO Likely Violates the Fourth Amendment.

The Border GTO is a drastic, novel method of criminal investigation that functions as "reviled 'general warrants' . . . which allowed . . . an unrestrained search for evidence of criminal activity." *Riley v. California*, 573 U.S. 373, 403 (2014). FinCEN is treating MSBs and their customers as potential criminals and forcing them to disclose personal information as part of a general campaign to catch members of Mexican drug cartels. This turns the rules of criminal investigation on their head. Normally, the government obtains personal information via a warrant supported by probable cause in a specific case. Here, by contrast, FinCEN has issued a general warrant that applies to everyone so it can go fishing in the named zip codes.

Step one in a Fourth Amendment analysis is determining whether the Border GTO is a search. It is. A search "occurs when government officers violate a person's 'reasonable expectation of privacy.'" *United States v. Jones*, 565 U.S. 400, 406 (2012). An expectation exists

when: (1) there is "a subjective expectation of privacy"; and (2) societal recognition of that expectation as "reasonable." *Id.* at 414 (Sotomayor, J., concurring). Both are satisfied here.

Plaintiff Gonzalez has a subjective expectation of privacy in his small-dollar cash transactions and in the personal information that the Border GTO compiles—his name, address, phone number, social security number, occupation, time and location of his transactions, dollar amounts, and a description of the property or service. He does not want to create a detailed government record every time he changes dollars to pesos to go to the doctor or shop in Mexico—perfectly legal activities. *See* Gonzalez Dec. ¶¶ 39–42.

Society recognizes a reasonable expectation of privacy in financial information. Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services covered by the Border GTO.[3] A business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party" without providing notice and "a reasonable opportunity, before you disclose the information . . . to opt out of the disclosure." *Id.* at § 313.10(a)(1)(iii). These legal requirements confirm that society considers financial privacy reasonable. *Jones*, 565 U.S. at 406; *see also In re Application for Historical Cell Site Data*, 747 F. Supp. 2d 827, 841–42 (S.D. Tex. 2010).

And it is not just Plaintiff Gonzalez with privacy interests at stake. Searching through business information is a search of the business itself. *See* Gonzalez Dec. ¶¶ 28–29. The rule that "searches conducted outside the judicial process[] are *per se* unreasonable" "applies to

---

[3] *See* Fed. Trade Comm'n, *How to Comply with the Privacy of Consumer Financial Information Rule of the Gramm-Leach-Bliley Act*, https://www.ftc.gov/business-guidance/resources/how-comply-privacy-consumer-financial-information-rule-gramm-leach-bliley-act (last accessed April 16, 2025) (explaining that regulatory definition includes, among other things, "check cashers, wire transfer services, and sellers of money orders").

commercial premises as well as to homes." *City of Los Angeles v. Patel*, 576 U.S. 409, 419–20 (2015). In *Patel*, the Court affirmed an en banc Ninth Circuit decision considering a Los Angeles law that required hotel operators to keep records about their guests and that authorized "warrantless, onsite inspections of those records upon the demand of any police officer." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1060 (9th Cir. 2013) (en banc). The threshold question was whether such inspections were searches. *Id*. at 1061. The Ninth Circuit had "little difficulty concluding" that they were, reasoning that the hotels' business records were the private property of the business and the hotel's expectation of privacy in that property was reasonable." *Id*. at 1061–62. And that expectation of privacy held, "notwithstanding the fact that the records [were] required to be kept by law." *Id*. at 1062. The "hotel's property and privacy interests [were] more than sufficient to trigger Fourth Amendment protection." *Id*.

Plaintiffs are likely to succeed on their claim that the Border GTO violates the Fourth Amendment. First, given that the GTO is a search, FinCEN needs a warrant supported by individualized probable cause. *See United States v. Smith*, 110 F.4th 817, 836 (5th Cir. 2024) ("[When something] is a search, it follows that the government must generally obtain a warrant supported by probable cause and particularity before requesting such information."); *Morgan v. Fairfield County*, 903 F.3d 553, 567–68 (6th Cir. 2018) (Thapar, J., concurring in part). That is the bare constitutional minimum for a criminal search and totally absent here.

Second, the Border GTO operates as a general warrant. British general warrants and writs of assistance were sweeping grants of authority to "search and seize whatever and whomever [officials] pleased while investigating crimes or affronts to the Crown." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011); *see also Smith*, 110 F.4th at 836 ("The Fourth Amendment was the founding generation's response to the reviled 'general warrants' and 'writs of assistance' of the colonial

era." (cleaned up)). "It is undeniable that general warrants are plainly unconstitutional." *Smith*, 110 F.4th at 836; *see also Berger v. New York*, 388 U.S. 41, 58 (1967). While the historical general warrant involved entering and ransacking buildings, the underlying principle isn't about buildings; it is about starting with a crime (or, with the Border GTO, possible crimes) and conducting a mass search of innocent people in the hopes of turning up a suspect.

The Fifth Circuit just reaffirmed the invalidity of general warrants in *Smith*, a case about "geofence" warrants in which law enforcement seeks information from Google about its customers presence in certain areas. *Smith* held "that geofences are general warrants categorically prohibited by the Fourth Amendment." *Smith*, 110 F.4th at 838. In doing so, the court reasoned that "the quintessential problem" with this type of search is that "they *never* include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search." *Id.* at 837.

That's exactly the case with the Border GTO, which targets a specific place (30 zip codes) for a specific time (180 days, subject to renewal)—without any specific suspect or crime. This is all done for law enforcement:

- The Border GTO is imposed by law enforcement in a particular geographic area where law enforcement has determined that it needs to gather information to uncover evidence of crimes. *See* 90 Fed. Reg. at 12107 ("efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border").

- The Border GTO is imposed by law enforcement in that area for a limited time, during which law enforcement has determined that requiring such information will lead to evidence of crimes. *Id.* ("ending on September 9, 2025").

- The Border GTO is imposed to gather information to pursue particular crimes and criminal actors, specifically "drug cartels." *Id.*

This type of targeted, yet indiscriminate searching is "the exact sort of 'general, exploratory rummaging' that the Fourth Amendment was designed to prevent." *Smith*, 110 F.4th at 837 (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 467 (1971)).

As a criminal investigation, the Border GTO is thus *unlike* the familiar requirement to report cash transactions over $10,000. The Supreme Court upheld a uniform, nationwide requirement to report such transactions in *California Bankers Ass'n v. Shultz*, 416 U.S. 21, 27 (1974). In doing so, the Court reasoned that the reporting requirement was the type of general regulatory requirement that could be imposed on corporations as a condition of the "privilege of engaging in interstate commerce." *Id.* at 66. The requirement at issue in *Shultz* did not specifically target particular businesses in a particular area, to uncover particular types of crimes, like the Border GTO does here. Moreover, $10,000 in 1974 is the inflation-adjusted equivalent of about $65,000 today; such large cash transactions are comparatively rare, implicate tax and other regulatory law, and would represent only a miniscule sliver of transactions by individuals. While the reporting at issue at *Shultz* could be upheld as a uniform reporting requirement for unusual classes of transactions, the Border GTO operates as an impermissible general warrant targeted at particular businesses operating in a particular area.[4]

---

[4] The Supreme Court's decision in *United States v. Miller*, 425 U.S. 435, 446 n.9 (1976), held that a bank customer did not have a Fourth Amendment interest in bank records sufficient to allow him to challenge the validity of a subpoena for those records where the "banks upon which [the subpoenas] were served did not contest their validity." Plaintiffs preserve for appeal the argument that *Miller* should be overruled. For current purposes, though, *Miller* is beside the point because Plaintiffs include a business subject to the reporting requirement as well as a customer whose information is at issue.

Also for preservation purposes, Plaintiffs contend that the Border GTO raises serious concerns under a proper view of the Fifth Amendment, *see Carpenter v. United States*, 585 U.S. 296, 404 (2018) (Gorsuch, J., dissenting), as the Border GTO requires businesses and individuals to report personal information for use by law enforcement to ferret out crime. *See also Marchetti v. United States*, 390 U.S. 39 (1968).

**B.     The Border GTO Likely Violates the Administrative Procedure Act.**

**1.     *The Border GTO required notice and comment.***

The Border GTO is invalid because FinCEN did not go through the notice and comment process required for substantive rules. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). A rule "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests." *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019). For example, in *Safari Club International v. Zinke*, a "determination" about importing ivory was a "rule" because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." 878 F.3d 316, 333 (D.C. Cir. 2017). Here, the Border GTO is plainly a "rule." All MSBs in 30 zip codes must comply or face harsh "civil or criminal penalties for violating any of the terms of this Order." 90 Fed. Reg. at 12108.

Because the Border GTO is a "rule," FinCEN needed "to [do] notice and comment." *W & T Offshore, Inc.*, 946 F.3d at 237. Under 5 U.S.C. § 553, federal agencies must "publish notice of proposed rulemaking in the *Federal Register* and 'shall give interested persons an opportunity to participate in the rule making' by allowing submission of comments." *United States v. Johnson*, 632 F.3d 912, 927 (5th Cir. 2011). Note the mandatory ***shall***. Notice and comment "afford[s] an opportunity for 'the agency promulgating the rule to educate itself before establishing rules and procedures which have a substantial impact on those regulated.'" *Phillips Petroleum Co. v. Johnson*, 22 F.3d 616, 620 (5th Cir. 1994) (citation omitted). The Border GTO is invalid because FinCEN did no notice and comment. Defendant Gacki, FinCEN's director, created legal obligations carrying civil and criminal penalties with a stroke of her pen. That is illegal.

## 2. *The Border GTO is arbitrary and capricious.*

"The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An "agency rule" is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). The Border GTO is analogous to the vaccine mandate preliminarily enjoined in *BST Holdings, LLC v. OSHA*, which was "overinclusive" in "applying to employers and employees in virtually all . . . workplaces" irrespective of individual risk (meatpackers versus a "lonely" security guard) and "underinclusive" in exempting businesses with "98 or fewer coworkers." 17 F.4th 604, 611–12 (5th Cir. 2021). So too here.

**No reasoned explanation for $200 as the new CTR threshold**. FinCEN has not adequately explained its decision to lower the CTR threshold for these businesses by 98 percent, to sweep in vast categories of transactions never before subject to reporting. *See Rest. L. Ctr. v. DOL*, 120 F.4th 163, 176 (5th Cir. 2024) (finding agency action arbitrary and capricious where agency's approach to line-drawing was illogical and unsupported); *FBME Bank Ltd. v. Lew*, 125 F. Supp. 3d 109, 125 (D.D.C. 2015) (granting preliminary injunction against FinCEN "special measure" where "the agency's failure to explain its consideration of potentially viable alternatives appears to have run afoul of the APA"). FinCEN generically asserts that in its experience "MSBs are vulnerable to exploitation by money launderers" and that "FinCEN has identified money transfers through MSBs as a financial typology associated with Mexico-based drug cartels." Border GTO Memo at 4–5. In FinCEN's view, "MSBs along the southwest border are particularly

at risk for abuse by money launderers for cartels." *Id.* at 5. Yet that, in itself, does not support that it is somehow necessary to sweep up information about all transactions over $200. After all, $200 is an average amount for a grocery cart full of food and much less than most rent payments. There is no reasoned basis for assuming that info about such small-dollar transactions will lead to cartels.

**Failure to consider the impact of that $200 threshold**. FinCEN did not estimate the crushing paperwork burdens imposed by the GTO. *See* 90 Fed. Reg. at 12108. FinCEN has not explained how those burdens and destroying MSBs are warranted. Plaintiff Reynosa Casa de Cambio anticipates an additional 1,212 working-hours per month, requiring the business to hire 15 full-time employees just to keep up with the new CTRs. Guerra Dec. ¶ 9. The Border GTO is arbitrary and capricious because FinCEN has "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

**No reasoned explanation for targeting the 30 zip codes**. FinCEN's internal memorandum asserts that these particular border zip codes were selected—as opposed to other zip codes near the border—because they have a high ratio of CTRs (for over-$10,000 transactions) to population. But that makes no sense. An area with a commercial district (or even particular types of commercial establishments) may have high numbers of over-$10,000 cash transactions, relative to population, without indicating anything suspicious. And even assuming there were something suspicious about those *large-dollar* transactions—which has not been established—it would not follow that *small-dollar* transactions in the same area bear closer scrutiny. Because FinCEN treats different geographic areas differently without any colorable basis, FinCEN's "failure to provide a cogent explanation for the disparate outcomes was arbitrary and capricious," *Kort v. Burwell*, 209 F. Supp. 3d 98, 115 (D.D.C. 2016).

Indeed, viewed more closely, the number of over-$10,000 transactions in these zip codes does not justify the draconian surveillance instituted here. FinCEN states that the zip code where High Value is located, for instance, had 702 CTRs filed in 2024. *See* Border GTO Memo at 13. It makes no sense to crush the businesses of all the MSBs located in that zip code—including High Value—because of just 702 over-$10,000 cash transactions, spread out over the course of a year, that are not necessarily associated with those MSBs and that have not even been shown to be illegitimate transactions. In fact, many of those transactions are logically legitimate—MSBs must file CTRs that cover their very own transactions for the purposes of doing their business, such as when Plaintiff Gonzalez files CTRs when he replenishes High Value's inventory of pesos. *See* Gonzalez Dec. ¶ 14. Given that Laredo is the nation's busiest port of entry for international trade where dollars and pesos are exchanging at high volumes, *see id.* ¶ 26, the CTR numbers in zip code 78040 could just as easily be explained by the nature of currency exchange MSBs and the large cash transactions they must do themselves just to stay in business. Other zip codes are targeted based on even lower numbers of CTRs: For instance, 78046, where Plaintiff Laredo Insurance has a store, is targeted based on just 46 CTRs. *See* Border GTO Memo at 13.

The failure of FinCEN to fully consider and justify such a drastic policy—or to even take into account the collateral effects of the Border GTO on the MSBs like Plaintiffs and their customers—renders the rule arbitrary and capricious.

### C.    The Border GTO Is Likely *Ultra Vires*.

**Non-Delegation:** Under the separation of powers, Congress writes laws and the Executive executes them. The Executive Branch cannot exercise legislative power, and Congress cannot delegate its legislative authority to the Executive Branch. *See Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024). "Congress may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the

power can exercise it." *Id.* at 461 (citation omitted). The nondelegation doctrine is "not demanding," but that "does not mean . . . that we must rubber-stamp all delegations of legislative power." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442–43 (5th Cir. 2020).

The Border GTO violates the non-delegation doctrine because the statute that FinCEN relied on to promulgate it, 31 U.S.C. § 5326(a), contains no intelligible principle. The statute authorizes the Treasury Department to issue any GTO that it wants—any area, class of transactions, amount of money, or class of businesses. 31 U.S.C. § 5326(a) (Secretary of the Treasury may require reports on "any transaction" involving a "financial institution or nonfinancial trade or business," to direct the business to report "such information as the Secretary may describe" in any "geographic area"). This grant of "exclusive authority and absolute discretion" violates the nondelegation doctrine. *Jarkesy*, 34 F.4th at 462; *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001) (explaining that the nondelegation doctrine is violated where Congress provides "no guidance for the exercise of discretion"). There is no intelligible principle set forth by Congress for the Secretary to follow. The only limiting principle is no principle at all: "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle." 31 U.S.C. § 5326(a). Those "purposes" consist of an aspirational commitment to combat malfeasance: through "criminal, tax, or regulatory investigations," identifying spying ("intelligence or counterintelligence"), "laundering of money," and "tracking of money that has been sourced through criminal activity" with the objective being to "protect the financial system of the United States from criminal abuse" and "safeguard the national security of the United States." *Id.* § 5311. "Instead of prescribing rules of conduct, [Section 5326(a)] authorizes the making of codes to prescribe them." *A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495, 541 (1935).

**Major Questions:** Also informed by separation of powers principles, the Supreme Court has developed the major questions doctrine, under which courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (cleaned up); *see also Biden v. Nebraska*, 600 U.S. 477, 501–03 (2023); *West Virginia v. EPA*, 597 U.S. 697, 721 (2022).

The Border GTO likely violates the major questions doctrine because Section 5326(a) does not authorize a reporting requirement so broad in scope and so destructive in effect. The GTO upends existing cash transaction reporting requirements for a vast swath of the country, home to over one million residents. FinCEN itself estimates that it takes a business without automated filing technology 23.9 minutes per transaction. *See* 85 Fed. Reg. 29022, 29029 (May 14, 2020). While FinCEN has not attempted to quantify the number of reports that will be required under the Border GTO, High Value, for example, estimates it will spend 13.75 hours *per day* preparing CTRs. *See* Gonzalez Dec. ¶ 18. As a two-person shop, High Value cannot do that. *Id.* ¶¶ 5–6. Plaintiff Reynosa Casa de Cambio anticipates an additional 1,212 working-hours per month, requiring the business to hire 15 full-time employees just to keep up with the new CTRs. Guerra Dec. ¶ 9. These economic impacts, moreover, are magnified by the impact of the rule on the personal financial privacy of the million Americans who live within the targeted zip codes. The decision to sweep up information about ordinary, everyday cash transactions as low as $201 is unprecedented, disruptive, and staggeringly intrusive. To the extent such a reporting requirement is legal at all, it should be imposed by Congress—not an agency.

## II. Plaintiffs Face Irreparable Harms Because the Border GTO Will Destroy Their Businesses and Invade Their Financial Privacy.

Plaintiffs will suffer irreparable harm. Their businesses will be destroyed and their rights violated. *See, e.g.*, Gonzalez Dec. ¶¶ 28–33 (noting customers' responses and difficulties with

compliance). Ordinarily, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981). But monetary losses can be irreparable when "complying with an agency order later held invalid . . . because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (cleaned up). Hence, the loss of Plaintiffs' business and livelihood are profound irreparable harms. On top of that, other irreparable economic harms include: "damage to the goodwill of [Plaintiff's] customers," *Allied Mktg. Grp., Inc. v. CDL Mktg., Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989); and "reputational injury," *Burgess v. FDIC*, 871 F.3d 297, 304 (5th Cir. 2017).

Plaintiffs will also suffer irreparable harms to their Fourth Amendment interests in being free of searches for private financial information. The "deprivation of a constitutional right" is always irreparable. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citations omitted). A loss of privacy in personal information is irreparable because the genie can't be put back in the bottle. *See, e.g.*, *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) ("Privacy of personal matters is an interest in and of itself, protected constitutionally, as discussed above, and at common law."). When "an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).

### III.    A Likelihood of Success on the Merits and Profound Irreparable Harms Mean that Plaintiffs Are Entitled to a Preliminary Injunction Enjoining Enforcement Entirely.

A preliminary injunction should issue. No separate analysis is required for the public interest and balance of equities. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). Furthermore, FinCEN has no "interest in the perpetuation of

unlawful agency action." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)). In any case, these last two factors cut in Plaintiffs' favor. A preliminary injunction will work no practical harm to FinCEN or the public because there is no urgent law enforcement need for the Border GTO. After all, it is a general dragnet search—not a response to particularized individual suspicion.

The only remaining question is what relief should look like. Because the Border GTO applies uniformly across thirty zip codes, the appropriate remedy is to enjoin the Border GTO throughout that area. *See Tex. Top Cop Shop, Inc. v. Garland*, 2024 WL 5049220, at \*35–37 (E.D. Tex. Dec. 5, 2024) ("the scope of injunctive relief is dictated by the extent of the violation established" (citation omitted)). This is particularly appropriate, moreover, because this case concerns final agency action, which may be vacated and set aside in its entirety to the extent it is contrary to law. *See* 5 U.S.C. § 706(2). Under the APA, a reviewing court may "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705. It would be appropriate to postpone the effective date of the Border GTO here—if not across the affected area, then at least across Texas.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully ask the Court to enter a preliminary injunction to preserve the status quo until the Court can decide the final merits.

Dated: April 18, 2025

Martin Golando
The Law Office of Martin Golando, PLLC
Texas Bar No. 24059153
2326 W. Magnolia
San Antonio, Texas 78201
Office: (210) 471-1185
Email: martin.golando@gmail.com

Roland Gutierrez
The Law Office of Roland Gutierrez
SBN #: 24007291
104 Babcock Ste. 107
San Antonio, Texas 78201
(210) 225-7114

*Attorneys for Plaintiffs Texas Association for Money Services Businesses (TAMSB); Reynosa Casa De Cambio, Inc.; Nydia Regalado d/b/a Best Rate Exchange; Mario Regalado d/b/a Border International Services; Laredo Insurance Services, LLC; E.Mex. Financial Services, Inc.; R & C, Inc. d/b/a Temex Money Exchange; San Isidro Multi Services, Inc.; Cris Win Inc. d/b/a Brownsville Casa De Cambio; and Espro Investment LLC d/b/a Lonestar Money Exchange*

Respectfully submitted,

/s/ Christen Mason Hebert
Christen Mason Hebert (TX Bar No. 24099898)
Jeffrey Rowes (TX Bar No. 24104956)*
INSTITUTE FOR JUSTICE
816 Congress Ave., Suite 970
Austin, TX 78701
(512) 480-5936
chebert@ij.org
jrowes@ij.org

Robert E. Johnson (DC Bar No. 1013390)*
INSTITUTE FOR JUSTICE
16781 Chagrin Blvd., Suite 256
Shaker Heights, OH 44120
(703) 682-9320
rjohnson@ij.org

Elizabeth L. Sanz (CA Bar No. 340538)*
INSTITUTE FOR JUSTICE
901 N. Glebe Road, Suite 900
Arlington, VA 22203
(703) 682-9320
bsanz@ij.org

Katrin Marquez (FL Bar No. 1024765)*
INSTITUTE FOR JUSTICE
2 South Biscayne Blvd., Suite 3180
Miami, FL 33131
(305) 721-1600
kmarquez@ij.org

* Pending admission *pro hac vice*

*Attorney for Plaintiffs Arnoldo Gonzalez, Jr. and High Value, Inc.*

## CERTIFICATE OF SERVICE

I certify that on April 18, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Christen Mason Hebert

Christen Mason Hebert (TX Bar No. 24099898)