**The New York Times**

https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html

Mexican drug cartels are turning thousands of Americans into fentanyl smugglers, sending an army of couriers who can easily cross between both countries.

**By Natalie Kitroeff and Robert Gebeloff   Photographs by Meridith Kohut**

Natalie Kitroeff reported from Mexico City and San Diego, and Robert Gebeloff from New York.

Published Sept. 28, 2024   Updated Oct. 1, 2024

The teenager practiced driving from his apartment in San Diego down to Tijuana and back, on the orders of the criminals he was working for in Mexico. He rehearsed how he would respond to questions from U.S. border officers. He tracked when the drug-sniffing dogs took a break.

The men who were paying him had cut a secret compartment into his car big enough to fit several bricks of fentanyl. When they loaded it up for the first time and sent him toward the border, Gustavo, who was only 19 at the time, began to tremble.

At the checkpoint, he steadied himself like he had practiced, and calmly told the border officers that he was just heading home.

They looked at his American passport — and waved him through.



In 2021, when he was 19, Gustavo started working for a Mexican drug cartel, driving packages of drugs from Tijuana to California.



A Customs and Border Protection K-9 team inspecting vehicles at the San Ysidro Port of Entry in California.

Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid. The amount of fentanyl crossing the border has increased tenfold in the past five years. Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years.

Former President Donald J. Trump and other Republicans have blamed President Biden's border policies for the fentanyl pouring into the United States, playing on a widespread belief that undocumented immigrants are responsible for bringing it in.

In reality, the largest known group of fentanyl smugglers is not made up of immigrants traversing the desert or moving through secret tunnels — they are Americans coming through legal ports of entry. More than 80 percent of the people

sentenced for fentanyl trafficking at the southern border are U.S. citizens, federal data shows.

Officials say those numbers point to a new and alarming strategy: Mexican drug cartels are turning thousands of Americans into fentanyl mules, deploying a torrent of couriers who can easily cross back and forth into their own country.

"Americans are taking Mexicans' smuggling jobs," said David Bier, a border security expert at the Cato Institute, a libertarian think tank. "The cartels are really using U.S. citizenship as an asset that they can leverage."

Bars, gyms, rehab facilities, trailer parks — these are all places where recruiters have found couriers in recent years, court records show. A college football star was lured in by a friend after dropping out of school. A mother raising three special-needs children took the job while facing eviction. A homeless man was recruited from an encampment in a Walmart parking lot.



Pedestrians crossing from Tijuana, Mexico, into Southern California.



Customs and Border Protection agents watching pedestrians crossing the border at San Ysidro.

Federal agents uncovered a recruitment network inside more than a dozen San Diego high schools, where from 2016 through 2020 students working on behalf of criminal groups in Mexico persuaded their classmates to cross the border with fentanyl, according to three former federal agents directly involved in the operation.

"The cartels are directly recruiting anyone who is willing to do it, which typically is someone who needs the money," said Tara McGrath, U.S. attorney for the Southern District of California. "The cartels spread their tentacles and grab ahold of vulnerable people at every possible opportunity."

Americans have always been involved in drug smuggling, but in recent years, as fentanyl has inundated the country, traffickers have begun to rely more on U.S. citizens than ever before.

Pandemic border closures may have been a factor, experts say, possibly pushing cartels to depend more on Americans, who were among the few people allowed to cross freely. But fentanyl also has unique qualities that make it an ideal product to be moved in compact packages by individual travelers: It is extraordinarily potent and very easy to make.

One hundred times more powerful than morphine, fentanyl can be extremely profitable even in small quantities, meaning a single courier can smuggle lucrative amounts of the drug just by hiding it in their glove compartment or under their clothes.

The synthetic opioid is so lethal that you could die from ingesting a couple of milligrams, an amount that fits on the tip of a pencil. In the past five years, fentanyl became the leading cause of death for young adults in the United States, and now kills nearly as many Americans aged 18 to 45 as guns and car accidents combined, a New York Times analysis of federal data shows.

### Fentanyl has become the leading killer of young adults

Leading causes of death in the U.S., ages 18 to 45



Fentanyl overdoses include all deaths caused by drugs, where the most prevalent drug was a synthetic narcotic, excluding methadone. • Source: Centers for Disease Control and Prevention • By The New York Times

For traffickers, fentanyl is a miracle product. According to U.S. prosecutors, the Sinaloa Cartel spends only $800 on chemicals to produce a kilo, an amount that can net a profit of up to $640,000.

It can also be replaced quickly. If a load gets intercepted at the border, traffickers do not have to wait for plants to grow the way they do with cocaine or heroin — they just mix up a few chemicals and send over a new batch.

"Losing product is relatively unimportant," said Jonathan Caulkins, a drug policy expert at Carnegie Mellon University. With merchandise that expendable, Mr. Caulkins said, "you can use straightforward and low-tech ways of smuggling," like sending inexperienced American drug mules over the border in droves.

Border officials have found giant loads of the synthetic opioid strapped to teenagers' bodies, stuffed into crutches and in bags of potato chips. They seized a microwave oven crammed with 166,000 pills, and opened a backpack with $60,000 worth of fentanyl hidden inside breakfast burritos.

The Biden administration has poured resources into trying to stanch the flow of fentanyl into the United States, reporting record seizures of the drug in recent years. But officials admit that much more could be done.

"We need more tools — legislation to modernize our customs laws and enhance penalties — and resources like more officers, more technology, and more money to fuel our fight," Customs and Border Protection's commissioner, Troy A. Miller, said in a statement.



The U.S. border wall, seen from Tijuana, Mexico. Since 2019, when Mexico overtook China to become the dominant source of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid.



Mexican law enforcement securing the perimeter of a clandestine narcotics lab that the authorities raided in 2023.

Almost all of the fentanyl found at the southern border arrives in cars — and only 8 percent of the personal vehicles that cross are scanned for drugs, Customs and Border Protection says.

"We continue to utilize all of our assets, all of our interviewing skills to apprehend and interdict these individuals," said Sidney Aki, the director of field operations at the San Diego field office for the agency.

"It's a challenge of a cat-and-mouse game with the cartels," Mr. Aki added. "They see we are hypervigilant, focused on certain strategies — they change in a heartbeat."

For this account, The Times reviewed hundreds of pages of court records and spoke with several Americans convicted of smuggling fentanyl. Their full names are being withheld for fear of reprisals.

One woman met her recruiter while in rehab in Los Angeles, where the two struck up a friendship, according to court records and interviews with the woman and her lawyer. The woman, who asked to be identified by her first initial, M., said that her friend started pressuring her to smuggle drugs only after they spent years getting to know each other. When M. resisted, her friend flew into a rage.

"She was like, 'I have your address,'" M. said. "'I'm part of a cartel in Mexico and we go all around the world, so wherever you go, we're going to find you.'" Anthony Colombo, the lawyer who defended M. after she was detained, said the recruiter had targeted "vulnerable women" at the rehab center. M. was sentenced to 18 months in prison.

Cartels look for Americans who "are naïve as to what they're getting involved in," said Mr. Colombo, who, in addition to a slate of low-income clients, has also represented accused cartel leaders. Low-level couriers, he said, "are going to be intentionally kept in the dark because if they're caught, they don't know anything."



A young American woman who asked to be identified by her first initial, M., was convicted of smuggling fentanyl for a Mexican drug cartel.



Anthony Colombo, the lawyer who defended M.

The job offer reached Gustavo in San Diego after he drank too much beer at a party and confessed to a friend that he badly needed money. At the time, he was the main provider for his mother in their San Diego apartment. His brother had moved out, and his parents were divorced. Gustavo was working at a grocery store, but struggled to pay the bills.

"I want to be a boss," he told his friend that night. "This job isn't feeding me and my mom."

After a few days, his friend called him and said he knew an "old guy in Tijuana" who had a job available and was always at the same bar right across the border. Gustavo did not ask what kind of work.

When he got to the bar a few Sundays later, Gustavo said he spotted a middle-aged man wearing designer clothes and surrounded by beer and women. Gustavo introduced himself, and after the two exchanged some pleasantries, the man took a thick wad of cash out of his pocket. "'If you really want to work,'" Gustavo recalled the man saying, "'then here you go.'"

Gustavo said he barely considered what he might be getting himself into. He had never seen that much money before. He took the job.

"The drivers are interchangeable and disposable to the people at the top of the food chain," said Keith Rutman, the lawyer who represented Gustavo. "If someone says no today, they'll find someone else."

The cartel operatives directly interacting with couriers like Gustavo are often several layers removed from cartel leaders, officials say.

Osvaldo Mendivil-Tamayo, a 25-year-old man from Tijuana who pleaded guilty to drug charges in 2020, operated as a sort of freelancer for cartels, overseeing a cadre of recruiters, according to court records and his lawyer.

He used Snapchat to talk to recruiters about identifying American students who regularly crossed from Tijuana to San Diego. One recruit was only 15 years old. Through his lawyer, Mr. Mendivil-Tamayo, who was recently released from prison, declined to comment.



Customs and Border Protection employees testing packages of drugs seized by border agents at ports of entry in Southern California.



A brick of powder seized by Customs and Border Protection agents at San Ysidro was found to contain fentanyl and other drugs.

The recruiters generally deliver the same pitch: We will pay you anywhere from $1,000 to $10,000 for a few hours of low-risk work.

David, an addict in his 50s, said he drove through the border with drugs nearly every day for three months before he was apprehended by the authorities. Sometimes, when he went to pick up a load from a stash house in Tijuana, he said, he would find four or five other Americans already there, waiting for drugs to be strapped to their bodies.

"Anybody that can drive across the border can get a job down there, literally, passing drugs," David said in an interview from federal prison.

Federal and state law enforcement in San Diego have put up billboards urging teens not to bring drugs across the border. The Drug Enforcement Administration started a program to educate high school students about the risks of smuggling.

But it is hard to compete with a persistent cartel operative.

Gustavo's recruiter called him out of the blue one afternoon. "'I got a car for you,'" he recalled the man saying. It was a Honda Civic, a few years old and gleaming, and it was waiting for him in Tijuana.

Gustavo was ordered to get basic insurance for the car, and to start driving across the border every three days. The man told Gustavo that he wanted him to feel comfortable being approached by the border officers. He was told if he wanted to back out, he would have to pay the man several thousand dollars.



Police officers and paramedics at the scene of a shooting in downtown Tijuana, Mexico.



A man smoking fentanyl at an encampment on the side of a freeway in El Cajon, Calif.

When Gustavo smuggled drugs for the first time, he left the car in a parking lot near the highway in San Diego, as instructed. He came back a few hours later to find more than $6,000 stuffed in the glove box.

"I'm over here struggling, of course I'm gonna use the money to pay bills," Gustavo said. He bought so much food at the store that it did not fit in the fridge. Before he knew it, Gustavo had made tens of thousands of dollars.

But then a few months later, while driving up to the Otay Mesa border entry into California, he got a bad feeling in his gut. There was almost no one else in line to cross and Gustavo suddenly sensed that something was about to go terribly wrong.

He took a breath, told himself it was in his head and kept driving.

While he was waiting in line to show his identification, an officer approached his car and asked where he was headed. San Diego, Gustavo said, trying to sound calm. According to court documents, the officer noticed a loose cloth on the back seat.

The officer popped the trunk, pushed the back seat down, unzipped the seat cover and "immediately observed plastic wrapped packages," according to the court documents. Gustavo was visibly shaking, the officer noted.

More than 13 kilos of fentanyl were found stuffed into the back seat. After he was put under arrest, Gustavo told the officers his story from start to finish, court documents show. Then he called his mother, who was at a new job cleaning offices.

She wailed into the phone. "'Why would you do this?'" he recalled her asking.

Gustavo pleaded guilty to fentanyl trafficking in August 2021, and was sentenced to 32 months in federal prison. He has since found a job in construction, solid work that pays well.

"This is a good path for me," he said.



Gustavo pleaded guilty to fentanyl trafficking in August 2021, and was sentenced to three years in federal prison. He got out in two years for good behavior, and has since found a job in construction.

**Read by Natalie Kitroeff**

Emiliano Rodríguez Mega contributed reporting from Mexico City. Kitty Bennett contributed research.

Audio produced by Sarah Diamond.

**Natalie Kitroeff** is the Mexico City bureau chief for The Times, leading coverage of Mexico, Central America and the Caribbean.

**Robert Gebeloff** is a data journalist for The Times, using data analysis to augment traditional reporting.

A version of this article appears in print on , Section A, Page 1 of the New York edition with the headline: Cartels' Best Fentanyl Mules Are Americans

# BROOKINGS

**COMMENTARY** 

# US-Mexico relations and the fight against fentanyl trafficking

Listen on

   

 0:00                                    38:13        

**Vanda Felbab-Brown and Fred Dews**

October 8, 2024

→  Dominating fentanyl production, the Sinaloa cartel and cartel Jalisco Nueva Generación source their precursor chemicals principally from China.

→  Beyond narcotics, Mexican criminal groups are also taking over legal economies in Mexico, such as agriculture, mining, and fisheries, increasing their control over the economy and daily life, as well as expanding globally.

→  The Mexican government of President López Obrador hollowed out law enforcement actions against the cartels domestically as well as weakened anti-crime cooperation with the United States. The U.S. policy response has been hampered by its reliance on Mexico for migration control.

**Downloads**

000244

⬇ Full Transcript

---

" [President Claudia] Sheinbaum has spoken about the fact that she
wants to increase the numbers of investigators and deploy them to
counter crime. So, I think that's a very important element. But
again, developing a robust law enforcement strategy will be critical."

Vanda Felbab-Brown

──────

In this episode of The Killing Drugs, Vanda Felbab-Brown talks with Fred Dews about
the role of Mexican criminal groups in the U.S. opioid crisis and U.S-Mexico anti-crime
cooperation. She explains how, in addition to dominating fentanyl and
methamphetamine production and supply to the United States, the Sinaloa cartel and
cartel Jalisco Nueva Generación have expanded their role in other illegal as well as
legal economies in Mexico and are building up political and institutional influence.
Felbab-Brown also discusses the state of the U.S.-Mexico counternarcotics and law
enforcement cooperation as well as the role of Chinese money laundering networks in
the fentanyl trade.

- Listen to The Killing Drugs on Apple ↗, Spotify ↗, or wherever ↗ you like to get
  podcasts.

- Watch episodes on YouTube ↗.

- Learn about other Brookings podcasts from the Brookings Podcast Network
  (https://www.brookings.edu/podcasts/) .

- Sign up for the podcasts newsletter (https://connect.brookings.edu/sign-up-to-
  hear-about-brookings-podcasts)  for occasional updates on featured episodes and
  new shows.

- Send feedback email to podcasts@Brookings.edu ↗.

# Transcript

[music]

**FELBAB-BROWN:** I am Vanda Felbab-Brown, a senior fellow at the Brookings Institution. And this is *The Killing Drugs*. With more than 100,000 Americans dying of drug overdoses each year, the fentanyl crisis in North America, already the most lethal drug epidemic ever in human history, remains one of the most significant and critical challenges we face as a nation. In this podcast and its related project, I am collaborating with leading experts on this devastating public health and national security crisis to find policies that can save lives in the United States and around the world.

On today's episode, I am turning the microphone around to another host who will interview me about my own paper in the project. Fred Dews hosted the *Brookings Cafeteria* podcast for eight years and is now the producer of this and other Brookings podcasts. So, thank you, Fred, for taking the host part in this episode.

**DEWS:** You're welcome, Vanda, and I'm very glad to be here and to help you make this podcast series possible. I'll say to listeners and viewers that if you haven't had a chance to watch or listen to previous episodes of the show, please take a chance to do so. They're a masterclass in the state of the opioid epidemic and policies to address it. So, thank you Vanda.

**FELBAB-BROWN:** Well, thank you, Fred. They are masterclass very much thanks to your amazing work as a producer of the show.

**DEWS:** So, this is one of two episodes in which I'm talking to you about your own research and papers. The other one is focused on China. This one's focused on Mexico. So, can you start us off with the big picture view of the role that Mexico plays in the U.S. fentanyl and opioids epidemic?

[1:51]

**FELBAB-BROWN:** Well, Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cártel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl. They make fentanyl from precursor chemicals that come from China. These precursors arrived in Mexico. The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border.

They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine. And they really work until about the middle layer. These groups are not the retailers themselves. They the hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States. And also, they of course then move proceeds from the United States to Mexico as well as weapons.

**DEWS:** So, how did the Sinaloa cartel and the Jalisco cartel get into fentanyl trafficking in the first place?

[3:02]

**FELBAB-BROWN:** So, those two groups are not just the dominating cartels in the United States, the dominant ones, they also are some of the most powerful drug trafficking organizations around the world. And in a place like Mexico, they are involved in very many other activities, not just drug trafficking.

Now, how did they get into fentanyl? So, in about 2014, 2015, 2016, operators from the two groups, including their leaders, are watching what's happening with the U.S. market. And the thing that's happening with the U.S. illicit market is that synthetic opioids are arriving from China. So, by that time the Mexican cartels have invested heavily into expanding the cultivation of opium poppy in Mexico and making heroin out of that opium poppy and bringing them to the U.S. That was nothing new for them—on and off Mexican criminal groups were doing this since World War II and including during World War II.

So, the United States, as a result of overprescription of opioids, is experiencing a significant rise in people who have developed opioid use disorder who are addicted to opioids, and they are no longer able to source them from doctors and pharmacies as they used to be during the overprescription crisis. And so, now they're looking to the illegal market. And first, the Mexican cartels start supplying heroin. But several years into that supply, all of a sudden, these new drugs are popping up in the U.S. market. And the new drugs being fentanyl, synthetic opioids.

And so, the cartels then faced a choice. Do they get into this new drug, or do they stay only supplying heroin and cocaine and methamphetamine? And first the Jalisco cartel and very rapidly the Sinaloa cartel make the decision that they'll lose the market if they don't move into fentanyl. And they quickly realized, also based on their experience with methamphetamine, that these synthetic drugs provide enormous advantages for them. So, when they want to produce heroin, they need to control parts of Mexico for poppy to be grown. And they need to prevent law enforcement from identifying those poppy fields and destroying them in places that are known as the Sierra Caliente, in parts of Sinaloa, Guerrero, Michoacán, and parts of Jalisco.

But when there is the option of producing synthetic drugs, this need to control vast territories and prevent the destruction of the plants, the drug plants, just goes away. So, the ease of production and the ease of smuggling is enormous. So, they face this choice: there are these newcomers to the illegal market, these Chinese trafficking networks that are bringing super potent, easily produced drugs that they can either ignore or they can move into it. And they make the choice of embracing those synthetic drugs. Heroin production in Mexico collapses, poppy prices staying down, farmers can no longer make the livelihoods in it, and the cartels start cooking fentanyl in Mexico, and then start bringing it from Mexico to the United States.

[6:15]

And moreover, as a result of U.S. wiretaps and court indictments against the leaders of one branch of the Sinaloa cartel, the so-called Chapitos, we have this incredible information about the judgments they're making. They're purposefully talking about the fact, look, fentanyl gives us these unprecedented opportunities. The leaders of the Sinaloa cartel say we want to create streets of American junkies. And even more amazingly, they are also totally indifferent to the deaths they cause along the way.

So, if you think of the older leadership of the Sinaloa cartel, drug traffickers like El Mayo and El Chapo that have notorious kind of household names, they were brutal, vicious, traded on human destruction through violence, through drug use, but they still operated within certain red lines. And one of the red lines was not provoking U.S. law enforcement too much. But as the sons of these generations, the sons of El Chapo, the Chapitos, just talk about you create streets of American junkies. It doesn't matter if many people die because we will get so many more people addicted than those who will die. So, they don't just embrace synthetic drugs, they embrace synthetic opioids in a manner that just ignores all the redlines. And the consequence, of course, is that they start putting fentanyl into everything—into cocaine, into methamphetamine, originally also into heroin with not just addiction rates increasing, but the lethality dramatically increases as well.

**DEWS:** I want to pick up on something you alluded to a moment ago, and ask you to expand more on it, which is beyond the narcotics trafficking that these cartels do in Mexico to the United States, what activities, what role do they play today in Mexico itself beyond narcotics trafficking?

[8:11]

**FELBAB-BROWN:** Yeah. So, you know, we refer to them as drug trafficking organizations, and they obviously are. They do smuggle drugs. And in fact, Sinaloa and Jalisco Nueva Generación are some of the most potent drug trafficking groups with presence from Asia-Pacific, from Australia, New Zealand, all the way down to Chile. They're also very violent groups. Oftentimes the modality of their drug trafficking is associated with very high violence rate. This is especially the case in Latin America where law enforcement is weak, in striking contrast to East Asia, where these groups operate and very powerful Asian Chinese criminal groups operate like 14K that are very peaceful. I mean, they kill people, but you might have torture and assassination of 100 people or a few hundred people a year whereas in Mexico we're talking about death rates of 30,000 people a year.

So, they're involved in drug trafficking around the world. But they are also involved in a variety of other legal and illegal economies. And in fact, what we are seeing in Mexico is really the systematic takeover of legal economies such as fisheries, agriculture, mining, logging, water distribution by these actors. So, they have become true mafia

actors, poly-crime entities that smuggle humans, not just from Latin America, but also from Africa to the United States. They are engaged in trafficking and sexual exploitation. But they're also taking over legal economies.

And this is really something that we need to pay far more attention to in the United States that we have been able to, because the United States is looking to Mexico to nearshore, to friendshore, to reduce risks of economic integration with China. The U.S. is trying to de-risk by embracing economic partnerships with Mexico. And yet large parts of the Mexican economy are being taken over by the narcos.

[10:13]

And it's not just the economies. And is not just illegal markets. We also see massive expansion of the cartels into dominating and dictating the terms of lives of Mexican people and even Mexican government institutions. With the narcos deciding when farmers can cultivate citrus, and if farmers decide to collect their citrus, their lemons, on Wednesday, but their permission was only to do it on Thursday, they and their families will be killed. We'll see these cartels going to institutions like the fisheries regulatory institution in Mexico and saying, we will tell you how you can regulate the fish. We will enforce the way we enforce.

Two years ago, in 2022, I had a big report that highlighted just how dramatically the cartels were taking over fisheries and how this was simply one stepping point in the way that the cartels would insert themselves into a wide panoply of economic activity and daily life in Mexico.

[11:15]

And finally, it's important to understand that this economic power, this insertion into daily lives, all intersects with political power. And although the criminal groups do not want to topple the Mexican government and declare the Republic of the Cartel of Sinaloa, they have for decades been building corruption networks. And today, they are strongly influencing elections. We are doing this podcast in the summer of 2024, in the fall of 2024, and in June 2024, Mexico had large elections, presidential, for the

Mexican Congress. And we saw unprecedented levels of violence by the cartels to assassinate candidates, push forward their candidates, as well as massive efforts to corrupt government officials.

So, in Mexico, they're really poly-crime mafias trying to take over the state and society, expanding their territorial control, their control of people, control over the economy and control over institution.

They behave strikingly differently in the U.S. And let me just explain that. In the U.S. they are deeply involved in the drug market, but they are not violent, or at least nowhere as violent in Mexico. They're not the source of homicides in the U.S., by and large. They operate with great restraint. They do not have this ability to corrupt, to take over institutions. They do not provide services to American citizens, to people living in the United States. And they don't have the ability or seek to control people's lives.

**DEWS:** You talked in our episode about Chinese traffickers' use of money laundering. I expect that these cartels from Mexico are also heavily engaged in money laundering?

[12:58]

**FELBAB-BROWN:** Well, they are, engaged to some extent in money laundering, but principally, Fred, they are the customers of money laundering networks. And the big striking change is that it's the Chinese money laundering networks that have become the principal to go actors to the big cartels, to Sinaloa, to Jalisco for money laundering.

So, you know, traditionally, if you were a drug trafficking organization, you had several problems you needed to solve. One of which was what to do with all the money that you get for your drugs. And back in the '80s, you would have the money being smuggled from Florida, from Miami, in boats and barrels. And sometimes the boat would capsize, and the money would go into the sea. The Colombian traffickers would often bury the pesos or even the dollars in just the jungles. And sometimes the barrels with the cash would rot. Later on, in the United States, a common problem and common frustration of the Mexican government was that vast amounts of bulk cash were moving from the U.S., from U.S. retail markets to Mexico.

Is this not how it happens anymore? Yes, sometimes bulk cash still moves. But by and large, money is laundered in very many different ways. And much of that money laundering is trade based. Very frequently these days, there are no international wires that move the money. Instead, a set of mirror transaction takes place in the United States, in China, and in Mexico without international wires, without international money transfers taking place. And the money is hidden this way.

And the Chinese criminal groups have enormous advantage in the global money laundering market. And their big advantage is the capital controls that the government of China imposes on how Chinese money can leave China. So, there is a limit of about $60,000 equivalent, which is the amount of money that the Chinese individual or entity company can take out of China in any given year. But you have Chinese traders, Chinese government officials, Chinese diaspora that want to move far more money than that out.

[15:07]

And so, over the past two decades an informal Chinese banking system has evolved to facilitate movement of that money out. This informal banking system became increasingly connected to global organized crime, including the Mexican cartels. But it has this captive audience. It's the Chinese companies and Chinese customers that bear the majority of the cost of changing the money, of engaging in this three-way mirror transactions. So, the Chinese operators can charge very little to the Mexican cartels in comparison to what other money laundering networks, money launderers would charge them like the black peso market. And so, they have stolen the market from underneath everyone else.

And we see increasingly the presence of these Chinese money laundering networks in dramatic, nefarious ways in the United States, in Europe. One way that money laundering is taking place is that the Sinaloa cartel or any of the Mexican cartels give the cash to the Chinese brokers. The Chinese brokers then buy cell phones, iPhones with it. Export those iPhones to China with profit. Meanwhile, money moves only within the U.S. and China, money moves between two Chinese banks, but does not cross the international border. And then, Chinese money laundering networks in Mexico bring pesos in cash to the Mexican cartels or sometimes sell goods, provide goods to the cartels. So, barter and trade-based money laundering is a very crucial element.

[16:45]

And what we also see is the trade-based exchange or the exchange between illicit economies also increasingly involves wildlife trafficking. So, there's two components of where money needs to change. One is laundering these vast proceeds for the Mexican cartel. But the second component is that the cartels need to pay the Chinese brokers for precursors for meth and for fentanyl. And they can pay in cash. They can pay, however, in resources and those resources increasingly involve timber and wildlife. And this is then putting tremendous pressure on the quality and sustainability of Mexico's incredible biodiversity as we see vast sourcing of marine products to pay for precursors as well as other wildlife products.

And, you know, kind of one concluding thought here. This is uniquely available in the case of synthetic opioids. The precursors for synthetic opioids are very, very cheap and very little is needed of them. So, it might be that you only generate some tens of millions of money from wildlife trafficking in Mexico, and that would not be enough to pay for cocaine or for precursors for cocaine and heroin. But it's sufficient to pay for synthetic opioids. So, the high potency and cheapness of synthetic opioids also makes them uniquely susceptible or uniquely available to be paying with something like wildlife products. So, snorting or using fentanyl is encouraging also wildlife trafficking.

**DEWS:** Well, Vanda, let's shift our focus to government response. What has been Mexico's government's response? What policies has it taken toward the cartels and fentanyl trafficking over the past few years?

[18:36]

**FELBAB-BROWN:** So, you know, let me just back up a little bit here, Fred, and kind of give you a broad sense of where we have been in U.S.-Mexico counternarcotics cooperation overall, and then specifically how this pertains to fentanyl. So, for decades, the U.S.-Mexico law enforcement counternarcotics cooperation was a challenging proposition. The countries were not very close, and they had some very difficult histories. Like, in the 1980s, the torture of U.S drug enforcement agent Enrique "Kiki" Camarena, with the complicit knowledge of Mexican government officials. And the relationship was strained for many reasons, one of which was concerns for

sovereignty in Mexico, but the other was the deep infiltration and penetration of criminal groups in Mexico into the Mexican government, law enforcement institutions, the military.

Now, unfortunately, we are still in that same stage, that there is still tremendous amount of corruption and infiltration of the cartels into the political system, the law enforcement system, and the military. And arguably even more than ever, as the cartels have just expanded to so many domains of the economy.

Despite this challenge, during the administration of Felipe Calderón, between 2006 and 2012, the U.S.-Mexico cooperation reached very high levels, the highest ever. And since then, there's been significant decline in that cooperation as that cooperation started revealing just how much corruption that is in Mexico. So, the end of the Calderón administration was backing away because Calderón administration became very uncomfortable with the U.S. seeing all the dirty socks in Mexican law enforcement, judiciary, public sector.

The next administration of Enrique Peña Nieto went further down in reducing cooperation. And then comes the administration of Andrés Manuel López Obrador that is very traditional Mexican politician oriented, that does not like significant engagement with the U.S. President López Obrador is a big fan of Vladimir Putin, a traditional Mexican leftist. And there's also tremendous amount of violence in Mexico caused by the cartels, which Mexican governments and many Mexican analysts blame on the U.S. and on the war on the cartels.

[20:55]

So, López Obrador comes in and scales cooperation back down to zero. Well, at first, he scales it considerably down. Then, a big challenge comes in as U.S. law enforcement indicts a former Mexican secretary of defense for drug trafficking. It was the highest indictment at that point of a Mexican government official. The López Obrador administration is very focused on cooperating with the military. There is a massive militarization of all public policy domains in Mexico. López Obrador himself is very close with the military, and the military is appalled that their former secretary of defense is arrested and indicted in the United States for drug trafficking. And who

knows if U.S. law enforcement gets to keep him, who knows what kind of secrets he would reveal?

So, the López Obrador administration puts tremendous pressure on the U.S. to release General Cienfuegos, General Salvador Cienfuegos, that's the secretary of defense who was indicted. The U.S. does so. Mexico conducts a very swift investigation, says there is no evidence against him, immediately lets him loose. Wink wink, nudge nudge. And still however, the U.S.-Mexico cooperation remains very limited.

And although there is a new framework, the so-called Bicentennial Framework between the two countries that on paper reiterates many dimensions of law enforcement and counternarcotics cooperation, in practice very little is happening.

[22:26]

Now, this also coincides with a larger disposition of the López Obrador administration toward violence in Mexico and criminality. Essentially the López Obrador administration and the president himself comes in with the view that he will not use law enforcement against the criminal groups, and that he will let the criminal groups work out their problems among themselves. So, the view is, if I just pull back law enforcement, if I am no longer arresting the criminal groups, if I am no longer trying to influence their local operations, they'll battle it out among themselves. They'll work it out, violence will go down. Problem solved. Well, that doesn't happen. The violence just intensifies, becomes only all the more brazen. And the narcos start taking over many aspects of life, economy, and politics in Mexico in a way that we were talking about.

Now, López Obrador has a problem, and that problem is deaths in the United States and the U.S. saying, look, we are having 100,000 people dying of overdoses, 110 sometimes in some years. Your Mexican cartels are responsible for it. And so, the U.S. is pressuring him to do something. And so, every so often, the López Obrador administration would placate U.S. government by making some high value arrests, such as one of the sons of El Chapo, Ovidio Guzmán. Is even been willing to absorb significant local violence resulting from these arrests.

But these are sporadic, limited, and vastly inadequate actions. Reuters revelations have showed just how much the Mexican government has been faking information about the the numbers of labs busted. At some point, President López Obrador started fallaciously claiming that no fentanyl is produced in Mexico, that there are no fentanyl labs, that no one is using fentanyl in Mexico, all of which are not true. But sort of this just shows the state of cooperation.

[24:30]

Now, you will say, Fred, how is it possible that Mexico, our neighbor, our partner, can get away with these lies and this lack of cooperation? And the answer, unfortunately, is that the Trump administration taught the Mexican government that migration matters more than anything else that dominates U.S. political lives, and that as long as the Mexican government controls on and off the spigot of migration, controls how many flows, how many people, how many migrants are trying to get to the U.S.-Mexico border, it will be able to evade and reduce pressure from the United States on other issues like fentanyl, like law enforcement cooperation, like the decline of democracy in Mexico that has taken place during the López Obrador administration—dramatic destruction of technocratic institutions, of checks and balances, dramatic weakening of democracy.

The U.S. has been ineffective in influencing changes and halting the negative trends in these issues because Mexico holds the migration club over the United States. And so, the U.S. must find a way to break out of that straitjacket that it finds itself in.

**DEWS:** So, new President Claudia Sheinbaum, who won the June elections, is about to start her term. What policies do you expect that her administration might take vis-a-vis the cartels and fentanyl?

[26:00]

**FELBAB-BROWN:** So, Claudia Sheinbaum has certainly given some hints as to what she intends to do in the security space. So, first of all, she is a close student and acolyte of López Obrador. Her career, her political career has been very closely linked

to him. And she was the mayor of Mexico City during his administration and has a long history with him. She positioned her entire campaign as perpetuating the policies of López Obrador that have cumulatively come to be known as the Fourth Transformation. So, her whole campaign motto was I'll do more of the Fourth Transformation.

She has said on the security space and law enforcement space that she will continue promoting the socioeconomic approaches that López Obrador took toward criminality. I spoke about how the López Obrador administration really pulled back from law enforcement against criminality in Mexico and criminality from Mexico. But that policy had a second dimension, that was trying to bring socioeconomic opportunities for young people in Mexico so they would not join criminal groups. This, this broad strategy, broad program was known as "hugs, not bullets," which is a pun, alliteration of Spanish terms.

Now, I have spent two decades of my professional work often arguing for combining law enforcement approaches with socioeconomic ones. And yet I find myself in the sort of unique position of saying, well, the problem was, A, that the socioeconomic approaches were totally unaccompanied by any meaningful law enforcement. And, B, the socioeconomic approaches were also defined but also developed in extremely problematic, extremely inadequate way. I mean, they were really profoundly undercooked. And so, you know, I have little confidence that the money transfers that took place under the rubric of these socioeconomic programs were in the short-term or even long-term, going to significantly reduce criminality.

[28:05]

So, anyway, Claudia Sheinbaum has said that she wants to continue with this basic approach of "hugs, not bullets." That she will continue investing in and prioritizing socioeconomic approaches to dealing with crime. She also speaks about peace building in Mexico and defining the security policy of peacebuilding and peacemaking. Not yet clear what that means. Whether that means negotiating with criminal groups that has been informally happening in Mexico. I hope not. Or whether it means involving local communities in violence reduction.

That would certainly be important. But we need to know that many communities have been pleading with municipal officials, state officials, national officials in Mexico for support against the criminal groups that are so encroaching on their daily lives without any help from the Mexican government. So, peacebuilding is great, but it needs to come with community protection, and that means putting the law enforcement strongly back in.

And finally, President Sheinbaum has said that she will strongly focus on increasing the numbers of investigators in Mexico and deploying them to hotspots of criminality. I am most optimistic about this element if she can do so. One of the big problems with the López Obrador administration was that it essentially decimated investigative capacities of law enforcement in Mexico. It undone the federal police, the one entity that was, yes, corrupt, but also had greatest investigative assets—that institution was completely dismantled. And the replacement institution, the National Guard, had neither the capacities nor the authorities to engage in investigative work.

So, the only left investigators in Mexico are in the judiciary and the Attorney General's office at both the national and state level. Sheinbaum has spoken about the fact that she wants to increase the numbers of investigators and deploy them to counter crime. So, I think that's a very important element. But again, developing a robust law enforcement strategy will be critical.

She comes in with a record as a mayor of Mexico City, where five subtypes of criminality went down during her tenure. She robustly takes the claim for the reduction in crime, she says it's the result of her policies that brought criminality down. Others will say, well, you know, there were other dynamics, like, certain actors, such as the Sinaloa cartel getting more of a dominant hand in Mexico City. But nonetheless, hopefully productive lesson from Mexico City will be brought to the national agenda.

The scale of the problem and the intensity of the problem at the national level is, however, far beyond anything that she had to deal with as a mayor of Mexico City. So, you know, reducing criminality in Mexico City is not easy, but it's far easier than reducing criminality in Chiapas, in Guerrero, in Michoacán, in Tijuana Ciudad Juárez.

**DEWS:** Final question for you, Vanda. And this is about an event that happened in July and that a lot of people in America saw, and that is U.S law enforcement arrested the top heads of two branches of the Sinaloa cartel in an elaborate sting. You wrote a blog about it, it's published on our website, I'll link to it in our show notes. What impact, if any, will those arrests have on fentanyl smuggling from Mexico and violence in Mexico, if any?

[31:34]

**FELBAB-BROWN:** Yeah. So, the two people that were arrested was El Mayo, he's the head of the Zambada branch—that's his last name—of the Sinaloa cartel and, along with El Chapo, the founder of the cartel and probably Mexico's shrewdest drug trafficker. He eluded law enforcement for decades, had never been arrested before. And among the drug trafficking actors in Mexico, he would be the consigliere. So, you know those who are fan of the old *Godfather* series, the one who has wide tool of actions at the disposal, the one who can negotiate reductions in violence with rival cartels, within the cartels, as opposed to just cocking up the gun. That would be El Mayo.

The other man who was arrested was one of the sons of El Chapa, Joaquín. And the arrests are just dramatic in the nature they took place. It's like out of a movie. And in fact, you know, you will probably go see a movie and say, oh, this is too fantastical. This is not how the sting, and arrests, and the betrayals would happen, one of which is that Joaquín probably betrayed his putative de facto uncle—not blood uncle, but someone who was kind of a god uncle to the Chapitos. So, much so that he apparently even, like, physically kidnaped him to deliver him to U.S. law enforcement as a payment. So, really dramatic, TV drama.

What impact it will have? Well, I am very skeptical that this will translate into the reduction of drug flows, fentanyl flows in the United States. Both the Chapitos branch of the cartel and the Zambada branch have very many redundancy systems. Those are very large, very powerful organizations, with wide set of actors and operators involved in moving drugs to the U.S, as well as in operating other markets in Mexico.

But there is very high and distressing chance that the arrest, the betrayal of the Chapitos, of El Mayo Zambada, will further exacerbate already intense intra-cartel and inter-cartel fighting in Mexico. And that we will see big escalation of violence between the Chapitos branch and the Zambada branch and their principal rival, Jalisco Nueva Generación, will come in and be fighting them over drug territories, over corruption networks.

[33:56]

So, the immediate prospect, I think, is very bleak in terms of any benefits regarding the drug trade and a significant cost regarding intensified violence in Mexico that could reverberate way beyond Mexico. Sinaloa and Jalisco are fighting each other all the way down to Chile, and they're prodding their allies and partners to be fighting each other over routes, over corruption networks.

Now, there is one interesting opportunity. You know, I mentioned that El Mayo was the consigliere of the drug trade in Mexico and globally. I mean, he's also the corruptor-in-chief in Mexico. He is the man who for decades was developing access networks to layers and layers of the Mexican government, military, law enforcement, across very many administrations in Mexico. So, I would hope that the United States' prosecution will be able to say, look, you can end up in really tough conditions for the rest of your life, like El Chapo in the Supermax in Colorado. Or you provide evidence, you tell us about these extensive corruption networks.

And more than anyone, El Mayo really can just deliver vast amount of information that could lead to more indictments by the United States against top politicians, top law enforcement actors, against other actors in the military. Just like we saw the indictment of General Cienfuegos, the former secretary of defense, and we saw the arrest and successful prosecution of Genaro García Luna, who was Mexico's de facto security minister, we would use that term. Hopefully the El Mayo arrest will generate a lot of such evidence.

And this, to me, could potentially make the biggest impact in starting to restore the rule of law in Mexico, if the political protection, the networks of corruption came under

000260

pressure. That has perhaps most chance of breaking out of both the violent cycle in Mexico and importantly, the takeover of so much of the country by criminal groups.

**DEWS:** Well, let's leave it there. Vanda, I thank you again for the opportunity to interview you about your papers in this series on Mexico and China's role in the opioid and fentanyl epidemics. And I encourage listeners and viewers to find all of the other episodes and the papers on our website. So, thanks, Vanda.

**FELBAB-BROWN:** Well, it was tremendous fun talking with you, Fred, again, and I look very much forward to our other episodes where I'll be back as the host working with you as the producer, as we speak with our other interlocutors on the show.

[music]

*The Killing Drugs* is a production of the Brookings Podcast Network. Many thanks to all my guests for sharing their time and expertise on this podcast and in this project.

Also, thanks to the team at Brookings who makes this podcast possible, including Kuwilileni Hauwanga, supervising producer; Fred Dews, producer; Gastón Reboredo, audio engineer; Daniel Morales, video editor; and Diana Paz Garcia, senior research assistant in the Strobe Talbott Center for Security, Strategy, and Technology; Natalie Britton, director of operations for the Talbott Center; and the promotions teams in the Office of Communications and the Foreign Policy program at Brookings. Katie Merris designed the compelling logo.

You can find episodes of *The Killing Drugs* wherever you like to get your podcasts and learn more about the show on our website at Brookings dot edu slash Killing Drugs.

I am Vanda Felbab-Brown. Thank you for listening.

PARTICIPANTS

 **Vanda Felbab-Brown** Director - Initiative on Nonstate Armed Actors, **Co-Director -** Africa Security Initiative, **Senior Fellow -** Foreign Policy, Strobe Talbott Center for Security, Strategy, and Technology

𝕏 @VFelbabBrown

 **Fred Dews** Senior Multimedia Project Manager - Office of Communications **in** FredDews

---

**The Brookings Institution is committed to quality, independence, and impact.**
We are supported by a diverse array of funders (/about-us/annual-report/) . In line with our values and policies (/about-us/research-independence-and-integrity-policies/) , each Brookings publication represents the sole views of its author(s).

Copyright 2025 The Brookings Institution

Federal Register / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents    8439

# Presidential Documents

Executive Order 14157 of January 20, 2025

# Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1**. *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere. The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

**8440**    **Federal Register** / Vol. 90, No. 18 / Wednesday, January 29, 2025 / Presidential Documents

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation.* (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.,* in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions.* (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004

Filed 1–28–25; 11:15 am]

Billing code 3395–F4–P