An official website of the United States Government Here's how you know

**Home** >  ...  > Designation of International Cartels

# Designation of International Cartels

**FACT SHEET**

**OFFICE OF THE SPOKESPERSON**

FEBRUARY 20, 2025

The United States remains committed to protecting our nation, the American people, and our hemisphere by stopping the campaigns of violence and terror committed by international cartels and transnational organizations.

Today, the Department of State announces the designation of Tren de Aragua (TdA), Mara Salvatrucha (MS-13), Cártel de Sinaloa, Cártel de Jalisco Nueva Generación (CJNG), Cártel del Noreste (CDN), La Nueva Familia Michoacana (LNFM), Cártel de Golfo (CDG), and Cárteles Unidos (CU) as Foreign Terrorist Organizations (FTOs) and Specially Designated Global Terrorists (SDGTs).

TdA is a transnational organization that originated in Venezuela with cells in Colombia, Peru, and Chile, with further reports of sporadic presence in Ecuador, Bolivia, and Brazil. This brutal criminal group has conducted kidnappings, extorted businesses, bribed public officials, authorized its members to attack and kill U.S. law enforcement, and assassinated a Venezuelan opposition figure.

MS-13 is a transnational organization that originated in Los Angeles but shifted to Central America as individuals were deported there from the United States. MS-13 actively recruits, organizes, and spreads violence in several countries, primarily in Central America and North America, including El Salvador, Honduras, Guatemala, Mexico, and the United States. MS-13 has conducted numerous violent attacks, including assassination and

Cookie Settings

000265

drones, against El Salvador government officials and facilities. Additionally, MS-13 uses public displays of violence to intimidate civilian populations to obtain and control territory and manipulate the electoral process in El Salvador.

Cártel de Sinaloa is a transnational organization based in Sinaloa, Mexico. It is one of the world's most powerful drug cartels and is one of the largest producers and traffickers of fentanyl and other illicit drugs to the United States. Cártel de Sinaloa has used violence to murder, kidnap, and intimidate civilians, government officials, and journalists.

CJNG is a transnational organization with a presence in nearly every part of Mexico. In addition to trafficking fentanyl, the group engages in extortion, migrant smuggling, oil and mineral theft, as well as weapons trade. The group has contacts across the Americas, as well as in Australia, China, and Southeast Asia. CJNG has conducted intimidating acts of violence, including attacks on Mexican military and police with military grade weaponry, the use of drones to drop explosives on Mexican law enforcement, and assassinations or attempted assassinations of Mexican officials.

CDN, formerly known as Los Zetas, is a transnational organization based in northeastern Mexico involved in drug trafficking, kidnapping, extortion, human smuggling, and other illicit activities. CDN uses violence to exert its criminal control, including attacks against government officials in Mexico.

LNFM is the successor of the La Familia Michoacana, a violent transnational organization based in the Pacific coast state of Michoacan with operations in the Mexican states Guerrero, Morelos, and Mexico. In addition to drug trafficking, kidnapping, and extortion, LNFM attacks government officials and uses violence, including drone attacks and explosives, to exert its criminal control and terrorize communities.

CDG is a violent transnational organization based in northeast Mexico involved in drug trafficking, kidnapping, extortion, human smuggling, and other illicit activities. CDG employs violence, including assassinations of civilians and government officials to intimidate the public and control territory.

CU is a violent transnational organization that formed from an alliance of multiple cartels and other groups in Michoacán, Mexico. Since its formation, CU has engaged in violent activities which have resulted in numerous civilian, military, and law enforcement casualties.

Terrorist designations expose and isolate entities and individuals, denying them access to the U.S. financial system and the resources they need to carry out attacks. As a result of actions taken

today, all property and interests in property of those designated today that are in the United States or that are in possession or control of a U.S. person are blocked, and U.S. persons are generally prohibited from engaging in transactions with them. Moreover, designations can assist law enforcement actions of other U.S. agencies and governments.

*Today's actions are taken pursuant to section 219 of the Immigration and Nationality Act, as amended, and Executive Order 13224, as amended.  FTO designations go into effect upon publication in the Federal Register.*

*Petitioners requesting removal of those designated today from the Specially Designated Nationals and Blocked Persons List should refer to the Department of State's **Delisting Guidance** page.*

---

TAGS

Bureau of Counterterrorism    Bureau of Western Hemisphere Affairs    Countering Terrorism

Crime    Division for Counter Threat Finance and Sanctions    Office of the Spokesperson

Organized Crime and Gangs    The Secretary of State    Terrorist Designation

---

White House

USA.gov

Office of the Inspector General

Archives

Contact Us



Privacy Policy

Accessibility Statement

Copyright Information

FOIA

No FEAR Act

REUTERS®

A REUTERS SPECIAL REPORT

## How Mexican narcos use remittances to wire U.S. drug profits home

Express Cellular in Columbus, Ohio, as shown in a Google Street View image from May 2019. The shop served as a front for laundering drug money via remittances, according to U.S. federal prosecutors.

Drug cartels are using remittances – money transfers favored by migrant workers – to send illicit earnings back to Mexico. They're hiring armies of people on both sides of the border to move small sums that are difficult to trace to narcotics kingpins, authorities say. Reuters visited Sinaloa, where some residents admitted to cashing remittances for the Sinaloa Cartel.

By DIEGO ORE | Filed Aug. 18, 2023, 11 a.m. GMT

CULIACÁN, Mexico

A Mexican mother walked into a bank in her home city of Culiacán in the Mexican state of Sinaloa, where an $8,000 remittance from the United States was waiting. She withdrew the funds in local currency, then strolled across town and deposited nearly all of it into accounts at two different banks.

Money sent home by migrant workers is a lifeline for millions of Mexicans. But the woman had never met the person who wired her the funds, nor the owners of the accounts where she took the cash. What she did know: The deal had been carefully arranged by the Sinaloa Cartel, one of the world's largest drug trafficking groups, to repatriate profits from U.S. drug sales back to Mexico

000269

disguised as a routine remittance.

Her cut: $230 worth of Mexican pesos.

It was the start of easy money for the woman, who said she previously had struggled to make ends meet cleaning houses. Recalling that day in April 2014 for Reuters, she estimated she had earned some $17,000 over the years recruiting others into the scheme and cashing remittances totaling hundreds of thousands of dollars – but never too much or too often, so as to avoid scrutiny by banking authorities. She said a neighbor got her into the game, and that she had never met her bosses in person.

"Everything was by phone," she said, "and the phone numbers changed every time."

The woman showed Reuters WhatsApp messages on her phone that she said were from traffickers coordinating her remittance pickups and drop-offs. One from early 2022 said: "They are waiting for you outside. They know who you are. Give them the money."

The Culiacán mother is part of an army of civilians recruited by the Sinaloa Cartel and other drug syndicates across Mexico to help move illicit drug profits earned in the United States south of the border. The criminal scheme essentially piggybacks on the vast legal network of money-transfer firms that help migrant laborers send money home to their families.

Remittances to Mexico, nearly all of which come from the United States, hit a record $58.5 billion last year, according to data from Mexico's central bank. That's an increase of $25 billion, or 74%, compared to 2018, when President Andrés Manuel López Obrador came to power. Mexico's economy has been slow to recover from the coronavirus pandemic, a factor that has boosted migration to the United States in recent years along with the remittances that workers send home.

As legitimate remittances have ballooned, it has become ever easier for cartels to disguise their ill-gotten gains in small transfers sent to average people across Mexico who have no obvious links to organized crime, according to four U.S. and Mexican security officials.

# $4.4 billion

A March report by the Mexico think tank Signos Vitales estimated that at least $4.4 billion, or 7.5%, of remittances sent to Mexico last year could come from illegal activity.

The cartels are awash in cash from U.S. sales of fentanyl, cocaine, heroin, methamphetamines and marijuana. Presently, up to 10% of all Mexico-bound remittances may be drug money moved by criminal organizations like the Sinaloa Cartel and the Jalisco New Generation Cartel, according to a U.S. government official who works on illicit finance and asked for anonymity because he is not authorized to speak publicly on the subject. A March report by the Mexico think tank Signos Vitales estimated that at least $4.4 billion, or 7.5%, of remittances sent to Mexico last year could come from illegal activity.

Several features of the remittance sector make it an attractive vehicle through which criminal funds can enter the financial system, according to four industry executives and the Mexican and U.S. law enforcement officials. Chief among them is the worldwide reach of this network and the modest-sized cash transactions that drive it. Identification requirements for such transfers are more relaxed than those needed to set up a formal bank account or to wire significant sums of money.

Cases of crime groups using popular money-transfer services to conduct illegal activities have been documented before. Reuters reported previously on how gangs operating on both sides of the U.S.-Mexico border have kidnapped migrant workers and held them for ransom, demanding that relatives wire remittances to free them.

Now the news agency is the first to detail how Mexican drug gangs have harnessed legitimate remittance networks to repatriate their U.S. drug profits, and the factors that make this activity so difficult for authorities to detect and thwart.

Reuters interviewed two dozen Mexico residents who said they had been paid by the Sinaloa Cartel to act as conduits for remittances, turning the money over to cartel operatives after receiving it. Records from eight U.S. federal court cases and interviews with a dozen industry insiders, analysts and law enforcement agents on both sides of the border paint a detailed picture of how the criminal venture works.

Seven money-transfer firms and banks that responded to Reuters' queries said they are constantly working to thwart criminals. Colorado-based Western Union, the world's largest money-transfer operator, said in a statement that it devotes "significant resources to help detect and deter the misuse of our services."

Jorge Godínez, Americas director for WorldRemit, a London-based money-transfer service, was skeptical that crooks would turn to remittances to move vast sums of money in bite-sized chunks. "They would need to do a lot of transactions," Godínez said. "I don't rule it out, but it's a little more work."

But drug syndicates appear to be doing just that, due in part to the coronavirus.



Remittances sent by migrant workers are a lifeline for millions of people in Mexico, where outlets to pick up these funds are ubiquitous. But authorities say Mexican drug cartels are piggybacking on this legal network to repatriate earnings from U.S. narcotics sales.

The use of remittances to move drug money was supercharged by the COVID-19 pandemic after long-established travel routes were upended by closures and lockdowns, according to four security officials from the United States and Mexico. Between March 2020 and November 2021, the U.S.-Mexico border was closed to all but "essential" travel. That made the traditional method of repatriating drug profits – bulk smuggling of cash hidden in southbound cars, trucks and cargo trailers – much harder. Traffickers turned to other means, the security sources said, resulting in a heavier reliance on remittances. It's an approach that has endured even as the public health emergency has receded, they said, because the networks the narcos established are effective.

In a sign of growing concern within the U.S. government, the office of the Director of National Intelligence, the principal provider of intelligence to the president, included for the first time this year in its annual threat assessment report the "exploitation of legitimate remittances channels" by transnational crime organizations to launder money. The report did not single out any money-transfer companies.

The use of such transfers by narcos is not a new phenomenon, but the huge increase in remittances from the United States to Mexico in recent years "helps obfuscate this practice," according to a person familiar with the report. The Sinaloa Cartel and Jalisco New Generation Cartel are believed to be among the drug syndicates using remittances to repatriate drug proceeds, the person said.

**Remittances to Mexico**

Billions of dollars



|  |  |  |  |  |  |  |  |  |  |  |
|---|---|---|---|---|---|---|---|---|---|---|
| 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 |

**58.5**
Source: Banco de México

## 'Many to many'

There is a clear pattern for how money is laundered via remittances, according to the U.S. official who works on illicit finance, people who have participated in the scheme in Mexico, and federal court documents reviewed by Reuters from U.S. money laundering prosecutions.

In the United States, much of the remittance trade is conducted through corner stores, chain retailers and currency exchanges. These businesses sign on as agents with one or more of the money-transfer companies, for example Western Union, and display the familiar logos of these firms in their shops to entice customers. The retailers receive training from the money-transfer companies on how to use their technology platforms, spot fishy transactions and comply with U.S. anti-money laundering laws. Agents are paid a commission for each transaction they process. Customers can bring cash to these storefronts and send it abroad. Neither senders nor receivers are required to have a bank account.

This fragmented network is key to the functioning of the scheme, according to the people and documents. Although money-transfer companies have internal systems designed to spot and curtail illegal activity, controls largely rely on checks done face-to-face with customers at the shop level. Thus, protections are only as robust as the honesty and diligence of these mom-and-pop agents, some of whom are purportedly in league with drug traffickers, according to law enforcement sources and the eight federal court cases reviewed by Reuters that involved alleged laundering of drug money via money transfers.

Republican U.S. Senator John Cornyn of Texas in 2019 introduced a bill that would require the Secretary of the Treasury to analyze the use of remittances by criminals for narcotics trafficking and other illicit activities, and come up with a strategy for stopping it. That proposed legislation became part of a larger anti-money laundering bill introduced last year by Senator Chuck Grassley of Iowa that failed to come up for a vote in Congress.

"The overdose crisis in the United States makes attacking the cartels in their pocketbook all the more urgent," Grassley said in a statement to Reuters. He said he's working to reintroduce the legislation.

Cornyn's office did not respond to a request for comment.

The Financial Crimes Enforcement Network (FinCen) of the U.S. Department of the Treasury, whose job is to thwart money laundering, said in an emailed statement that it "consistently monitors and evaluates enforcement matters" against financial institutions, including remittance companies.  The statement said that FinCen, as a matter of policy, doesn't comment on investigations or confirm whether a probe is under way.

Currently, U.S. law mandates that money transmitters keep records of all transactions of $3,000 or more for five years, including names and addresses of people on both ends of each transfer. Suspicious activity must be reported to FinCen. To stay under the radar, crooks tend to keep their transactions below the $3,000 threshold, according to the court documents and the people who said they laundered money this way.

Remittance shops have their own internal procedures as well, and many routinely require senders to show identification and provide telephone numbers for transfers of any size. But this information is easily fabricated, particularly by corrupt insiders running these storefronts, making it difficult for law enforcement to identify patterns, according to documents from the eight federal cases and officials on both sides of the border.

cities, couriers transport portions of the cash to complicit recording agents along with lists of

payee names located in Mexico drug source cities. ==Recording agents collaborate with traffickers==

==by fabricating different unique sender names and identities for every unique payee name. Those==

==sender identities are often used no more than twice and then never appear again in transaction==

==activity—all making it difficult for law enforcement to track and analyze.== Involved recording

agents then structure ==the falsified transactions to be just below the corporate MSB's==

==identification threshold,== which in turn enables the recording agent to send the most cash per

transaction without also fabricating a fake government ID number. The involved recording

Excerpt from a 2019 criminal complaint filed by federal prosecutors in an Ohio drug trafficking case. It outlines general methods used by crooked U.S.-based remittance shops to stay off the radar of authorities when laundering drug money for narcos. United States District Court, Southern District of Ohio via Reuters

The process of dividing large amounts of money into smaller transactions to avoid reporting requirements is commonly known as "smurfing" or "structuring." Mobilizing large numbers of people or "smurfs" to send and receive those modest sums is referred to as "many to many" by U.S. law enforcement agents.

U.S.-based accomplices sending money south can earn kickbacks from the cartels as high as 10% of the value of individual transfers that rarely exceed $1,000, according to the U.S. official and a 2019 federal indictment of alleged criminals running an Ohio money laundering ring.

The average size remittance sent to Mexico in 2022 was $390, according to data from the country's central bank. Those funds often are sent to Mexican merchants including convenience stores, supermarkets, pharmacies and department stores.

Rosales-Guadarrama, as well as trained, and oversaw the development and operation of Dulce and

Thania Rosales-Guadarrama's stores. ==As for his own transfers, in total, from approximately 2013==

==until his arrest in the fall of 2019, Defendant, through Los Rosales, initiated thousands of wire==

==transfers to Mexico of drug proceeds on behalf of multiple drug trafficking organizations, all in==

==amounts between $500 and $999, and all totaling more than $25 million.==

**II.    Procedural History**

Excerpt from a 2020 sentencing memorandum filed by federal prosecutors in the case of Jose Rosales-Ocampo. He was convicted of laundering drug money via remittances sent to Mexico from three family-owned cell phone stores in Columbus, Ohio. U.S. District Court, Southern District of Ohio, Eastern Division via Reuters

Two dozen Mexico-based smurfs who said they work for the Sinaloa Cartel told Reuters they prefer dealing with retailers because those businesses tend to ask fewer questions than banks do. They said they typically are required to show their official voter ID card; provide the name of the sender and their relationship to that person; and present a transaction tracking number that senders share only with recipients – details provided to them in advance by the cartel via texts or Whatsapp messages.

Receivers in Mexico typically keep 1% of the proceeds as compensation, the people said, with new recruits pocketing a larger share on their first transaction to entice them into the racket. Security officials said Mexican smurfs are paid less than their U.S. counterparts because the risk of arrest is lower. A Reuters search of Mexican court records dating back to 2012 turned up no cases involving money laundering through remittances.

Mexico's presidency and Attorney General's office did not respond to requests for comment about the country's strategy for combating alleged money laundering via remittances. The Financial Intelligence Unit, which investigates financial crimes, also declined to comment.

In the United States, at least seven drug trafficking cases that involved the use of remittances to send profits to Mexico have been successfully prosecuted since 2017 in federal courts in Colorado, Georgia, Ohio, Oklahoma, Texas, Virginia and Washington state. Collectively, those cases involved the laundering of more than $100 million between 2013 and 2020, according to court documents filed by prosecutors. At least 81 individuals charged in those cases have pleaded guilty to crimes including conspiracy to commit money laundering and to distribute narcotics, and illegal possession of firearms.

"These defendants used their anti-money laundering training to help the drug proceeds flow to Mexico undetected."

U.S. Attorney's Office, Northern District of Georgia, in 2017 announcing guilty pleas from nine Atlanta-area remittance shop workers accused of wiring drug money to Mexico

Then-U.S. Attorney John Horn, who prosecuted the Georgia case, said Mexican cartels "may have found an effective means through unscrupulous remitters" to get their drug profits back to Mexico, according to a June 21, 2017, press release issued at the time of the Georgia indictments. Horn declined to comment.

The government in that case alleged that 11 defendants used remittances to launder more than $40 million from 2013 to 2017 at nine small businesses in metro Atlanta that offered money-transfer services, including a gas station and a taco restaurant. Nine of the defendants pleaded guilty, while two remain fugitives. All were shop managers or employees whom prosecutors said knowingly accepted large amounts of cash from drug traffickers, broke it up into small transactions to evade reporting requirements, and wired it under the names of fictitious customers in exchange for kickbacks.

Of the nine defendants sentenced to jail time, one remains in prison and six were released, according to Federal Bureau of Prisons records, which contained no information on the remaining two.

Reuters was unable to contact attorneys for six of those nine defendants because most records for the case are under seal, including names of defense counsel. Attorneys representing three defendants – Oscar Gustavo Perez-Bernal, Itzayana Guadalupe Perez-Bernal and Susan Fiorella Ayala-Chavez – did not respond to requests for comment.

In the Ohio case, federal prosecutors in 2019 alleged that a family-owned network of three cell phone stores in Columbus offering money-transfer services had moved $44 million in illicit drug profits to Mexico between 2013 and 2019 in transactions that never exceeded $1,000. Those shops – Express Cellular, Los Rosales and Los Rosales 2 – sold very little merchandise and were essentially money laundering fronts whose real clients were traffickers of heroin, fentanyl and marijuana who paid the owners up to 10% of each transfer, prosecutors said. The money was wired in the names of phony senders, the indictment said, and went to Nayarit, Jalisco, Michoacan and Sinaloa, Mexican states that are strongholds of organized crime.

Among those who pleaded guilty were four family members who operated the cell phone stores: Jose Luis Rosales-Ocampo, Josue Gama-Perez, Thania Rosales-Guadarrama and Dulce Rosales-Guadarrama.

The four were sentenced to prison terms ranging from six to 12 years. Attorneys for the defendants did not respond to requests for comment.

000274

51. Witness #11 is a convicted narcotics trafficker and the former head of a DTO that distributed Heroin in the Southern District of Ohio. Witness #11 was instructed by one of his/her sources of Heroin to make contact with her (the woman from the store, **EXPRESS CELLULAR**). Witness #11 was instructed to take a shoe box that contained money to the woman at **EXPRESS CELLULAR**, and tell the woman that the shoes were for her. The source of the Heroin explained to Witness #11 that the woman already knew and would be waiting. The woman made up the names of the senders of the wire transfers. Witness #11 said that he/she made these cash deliveries once a week from approximately 2015 to 2017. The amount of cash delivered would normally be between $30,000 and $40,000. Witness #11 was shown photographs of **DULCE ROSALES** and **JOSUE GAMA** and identified them as the people he/she

Excerpt from a 2019 criminal complaint filed by federal prosecutors in an Ohio drug trafficking case. It describes how operators of a cell phone store worked with heroin traffickers to wire drug profits to Mexico. The defendants pleaded guilty to money laundering. United States District Court, Southern District of Ohio via Reuters

Federal prosecutors in Missouri last year unveiled charges against purported participants in an alleged $4.7 million conspiracy to distribute heroin, fentanyl and methamphetamines on U.S. soil and send some of the proceeds to Mexico via remittances. Among the 44 people charged were the owners of three small Kansas City stores from where prosecutors say drug money was wired. The three proprietors – Ana Lilia Leal-Martinez, Ana Paola Banda, Maria de Lourdes Carbajal, all Mexican nationals – pleaded not guilty.

Banda's attorney, Henri Watson, said "the case is complex and the government has not yet furnished all the discovery needed to adequately defend the case." Lawyers for Leal-Martinez and Carbajal did not respond to requests for comment.

No money-transfer companies whose independent agents were ensnared in the dragnet were charged in the eight federal cases. Still, prosecutors in those cases mentioned several of those firms in court documents because they said the defendants had used their platforms to wire drug money.

The companies mentioned were: Texas-based DolEx, Florida-based Girosol, Boss Revolution (owned by New Jersey-based IDT Corporation), Miami-based Intermex, New Jersey-based Omnex, Ria (owned by Kansas-based Euronet), California-based Sigue, and New York-based Transfast.

RELATED CONTENT


How El Chapo's sons built a fentanyl empire poisoning America


A Mexican soccer icon entered politics. Prosecutors say narcos followed


Latin American crime cartels turn to cryptocurrencies for money laundering

DolEx, Girosol, Intermex, Omnex, Euronet and Sigue did not respond to requests for comment. IDT declined to comment.

Sangita Bricker, senior vice president of global communications at payments giant Mastercard, which acquired Transfast in 2019, said the company uses the latest technology and best practices to monitor suspicious activity and report it to law enforcement authorities.

At least four of those companies – Intermex, Ria, Sigue and Transfast – became aware of potential drug money laundering on their platforms and moved to stop it, according to a 2019 affidavit filed by an IRS investigator who assisted federal prosecutors in taking down the Ohio cell phone store owners. Each of the four firms investigated suspicious transactions performed by one or

more of the cell phone shops that used their platforms, then terminated their agent agreements with those businesses between 2015 and 2017 based on what they found, the document said.

> 2014; and October 31, 2014. According to Intermex, these transactions were suspicious for the following reasons:
>
> A. There were consecutive transactions under a $1,000.
>
> B. Time and date of the transactions make them appear to be a cluster of transactions.
>
> C. Customers that have no history with Intermex.
>
> D. Senders with no apparent relationship with the beneficiary.
>
> E. High dollar amounts.
>
> F. Transactions with Tepic, Nayarit; an area on the money laundering radar.
>
> 83. Intermex called all of the senders of these wire transfers and the numbers were either disconnected, out of service, or did not belong to the customers.

Excerpt from a 2019 criminal complaint filed by federal prosecutors in an Ohio drug trafficking case. An independent agent for Miami-based money-transfer company Intermex was charged with helping narcos use remittances to send illicit drug proceeds to Mexico. An internal investigation by Intermex showed multiple suspicious transactions executed by the agent, according to the complaint. United States District Court, Southern District of Ohio via Reuters

Sigue, for example, examined 375 transactions performed by Express Cellular from March to August of 2017 and found multiple indicators of "wire transfers related to narcotics trafficking," the affidavit said. Among the warning signs noted in the document: Nearly two-thirds of the transactions were sent to the "high risk" Mexican state of Nayarit, a place renowned as a center of opium poppy cultivation. And many of the transactions were for amounts between $800 and $999, a range Sigue flagged as indicative of "narcotics proceeds." Sigue terminated its relationship with Express Cellular in November 2017, the affidavit said.

The document did not indicate whether Sigue, Intermex, Ria and Transfast launched their internal probes of the cell phone stores on their own, or in response to federal law enforcement officials investigating suspicious activity at those shops.

Prosecutors and the IRS did not respond to requests for comment.

Some major players have been accused in the past of allowing crooks to use their networks. In 2017, Colorado-based Western Union agreed to pay $586 million to settle allegations by the U.S. Department of Justice and Federal Trade Commission that it failed to prevent criminals from using its service for money laundering and fraud. As part of that deal, the company agreed to strengthen consumer protections and improve oversight of its agents in exchange for not being criminally prosecuted.

In an emailed statement, Western Union said the company "made significant investments in people, processes, and technology" to fulfill its agreement with the government, which closed the criminal case in March 2020.

## 'Most of my family has done it'

Barely 28,000 people live in the Sinaloan town of Costa Rica, located about 35 kilometers south of Culiacán, the state capital. It is an area of low migration to the United States, according to Mexican government data. Yet Costa Rica boasts a thriving financial cluster: Six branches of the country's main banks are located there, as well as convenience stores, pharmacies and other retailers where residents can pick up remittances.

In a visit to the town last year, Reuters saw at least five people on motorcycles, wearing fanny packs and accompanied by bodyguards, collecting cash from people exiting branches of Banco Azteca, Banorte and BanCoppel located on the poorly paved main drag. Six locals told Reuters these couriers worked for the Sinaloa Cartel picking up drug money sent as remittances, without elaborating further.

Juan de Dios Gámez, the mayor of Culiacán whose municipal jurisdiction includes the city of Costa Rica, did not respond to a request for comment. A spokeswoman from the office of Sinaloa Governor Rubén Rocha referred Reuters to the federal Attorney General's office, which did not respond to a request for comment.

UNITED STATES

MEXICO

SINALOA

**Culiacán**

Grupo Elektra, which owns Banco Azteca, told Reuters in an emailed statement that it goes beyond the standard regulatory requirements to protect against money laundering and fraud by using technology that allows the bank to do real-time background checks on those using its services. The company said it has its own financial intelligence unit that "permanently" shares information with Mexican authorities that it did not name.

Still, it acknowledged that it was difficult to weed out people who are paid to perform transactions on behalf of someone else. "No institution is completely protected from people who individually and illegally charge commission to act for others," the statement said.

BanCoppel declined to comment. Banorte said it hadn't identified any money laundering cases through its remittance payment system, but said it had the tools to stop any attempt to do so. Banorte did not provide further details.

Costa Rica is not the only community whose residents say the Sinaloa Cartel hires locals to launder money via remittances.

Across Sinaloa, 49 people familiar with this activity – many of whom have participated themselves – told Reuters it's a common side hustle for residents. A mother from El Tepuche, a small rural town about 18 kilometers outside Culiacán, said she had been cashing remittances for the Sinaloa Cartel for four years. "I've done it, most of my family has done it," she said.



A woman who cashes remittances for the Sinaloa Cartel poses in Culiacán, Mexico. The woman, who didn't want to be identified, estimates she has earned around $17,000 since 2014 by helping the cartel repatriate drug money to Mexico, and from recruiting others into the scheme. REUTERS/Stringer

000277



The woman said some of her relatives retrieve remittances for the cartel using a smartphone app from Albo, a Mexican fintech company. Here she shows Albo debit cards linked to three of those accounts. Albo did not respond to requests for comment. REUTERS/Stringer

While U.S. officials are increasingly concerned about the use of remittances to move drug money, López Obrador has stressed the importance of the vast and growing sums being sent from the United States. Mexico last year received the second highest amount of remittances globally, behind only India and surpassing China, according to the World Bank. Remittances last year accounted for 4.3% of Mexican GDP, nearly double the percentage from 2015, government data show. Almost 2 million Mexican households received remittances last year, according to Mexico's central bank.

"This goes to the poorest people," López Obrador said at a Feb. 2 press conference in Mexico City, where he praised migrant workers for sending remittances.

His office did not respond to requests for comment about law enforcement allegations that Mexican cartels are using remittances to launder drug money.

Mexican think tank Signos Vitales examined the recent surge in remittances and concluded that increased migration alone cannot explain the rapid expansion. "Money laundering, closely related to drug trafficking activities," appears to account for at least some of the growth, the report said.

That March 2023 study pointed to a variety of data points that Signos Vitales analysts found highly unusual. Among them:

- Eight U.S. states with relatively modest numbers of residents of Mexican origin showed outsized growth in remittances to Mexico between 2018 and 2022. The biggest outlier was Minnesota. Senders using money-transfer services there last year wired $4.7 billion to Mexico, or 8% of the 2022 total, according to central bank data, ranking Minnesota third behind only California and Texas, and ahead of states such as Arizona, Colorado, Florida, Illinois, New Mexico and Nevada, all places with significantly higher numbers of Latino residents. Minnesota is home to roughly 200,000 people of Mexican descent. They all would have had to send an average of around $23,000 each to approach $4.7 billion, a "powerful reason" to doubt that workers alone could manage to send such high levels of remittances to Mexico, Signos Vitales said.

- In the first nine months of last year, 227 Mexican municipalities received so many money transfers that every single household in those places could have received at least one remittance per month. "Statistically speaking, such phenomena are unlikely," Signos Vitales said. Collectively, those places received $10.5 billion, or nearly 25% of all remittances sent to Mexico in the first three quarters of 2022.

> Oquitoa is a hamlet of around 500 people located in a region of Sonora state dominated by the Caborca Cartel. As recently as 2017, Oquitoa registered no remittances. Last year it received $2.5 million.

Signos Vitales also found hundreds of municipalities that have only started receiving money transfers in the past few years. Among them is Oquitoa, a hamlet of around 500 people located in a region of Sonora state dominated by the Caborca Cartel. As recently as 2017, Oquitoa registered no remittances. Last year it received $2.5 million, central bank data show.

"There is a lot of information that...at the very least, raises suspicions of some kind of illegal activity," said Enrique Cardenas, president of Signos Vitales.

The offices of Minnesota Governor Tim Walz and state Attorney General Keith Ellison did not respond to requests for comment.



Yoli's Western Wear, Dallas, Texas. Source: Google Street View, July 2018

Cell phone shops, restaurants, markets, check-cashing outlets and a Western wear store. Defendants convicted of money laundering in seven federal cases since 2017 used a variety of small businesses to wire drug proceeds to Mexico on behalf of narcotics traffickers, U.S. court records show. (Slide show)

## Shot dead

In Culiacán, the former house cleaner who began cashing remittances for the Sinaloa Cartel in 2014 said she had initially been nervous about getting involved with narcos, but did so "out of necessity."

She had recently returned with her daughter to Mexico from the United States and was struggling to live on her $150 monthly earnings when a neighbor suggested a way to make some easy money.

Her initial cut of $230 went towards paying that month's rent. Soon, she was retrieving remittances regularly, but no more than three times a month, a limit imposed by the cartel. Sometimes, her handlers messaged that she must "take a break" for a few months, she said.

The woman said she received about 1% of each remittance she cashed. But a good chunk of her total earnings – around $8,000 – came from bringing others into the ring. She said she was paid $40 a head for people she recruited herself, $20 for each person her enlistees brought in, followed by a final payout of $10 per person from the next layer of the pyramid.

She said the work hasn't made her rich, but it has made life a little more comfortable. "We used the money to improve the house," she said.

One of her direct recruits was a Sinaloan truck driver in his 50s, who told Reuters he eventually brought his daughter in on the action. He said she and other younger recruits used Albo, a Mexican fintech, or mobile payments company, to receive money for the cartel.

The daughter's activities cast light on how new banking technology offers traffickers fresh ways of laundering money, a trend confirmed by security experts and 13 smurfs who said they cash remittances for the Sinaloa Cartel. Some fintechs offer app-based services that wire money internationally in seconds, and provide users with a debit or credit card to make purchases with those funds.

Albo works with WorldRemit, the London-based money-transfer firm, to enable people in the United States to send remittances to Albo users in Mexico. The truck driver said he stuck to the traditional method of cashing remittances at banks and retailers because he wasn't as familiar with smartphone apps.

He said his daughter received the transfers via a virtual wallet on the Albo app. Then she would transfer the funds electronically to a bank account number passed to her by the cartel over WhatsApp. He showed Reuters an Albo debit card with his daughter's name on it that he said had been linked to the virtual wallet.

Albo didn't respond to requests for comment. WorldRemit said it uses market-leading security features to fight suspected financial crimes on its platform, without providing further details.

The truck driver said his daughter cashed remittances for the Sinaloa Cartel for three years. Then, in June 2019, two unidentified men shot her dead.

The father suspects the money that had landed in her Albo account had proved too much of a temptation for her. In the months before she was killed, he said, she moved to a new place, upgraded her wardrobe, replaced her smartphone and bought a new television.

"They shot my daughter, here in front of my house," he said. Reuters viewed a copy of her death certificate. It said she died of gunshot wounds.

The man said he still cashes remittances for the Sinaloa Cartel. He's afraid they'll harm him if he stops.

REUTERS INVESTIGATES

 More Reuters investigations and long-form narratives

 Got a confidential news tip? Reuters Investigates offers several ways to securely contact our reporters

**Narcos Inc**
By Diego Ore
Photo editing: Tomas Bravo
Graphics and art direction: John Emerson
Edited by Marla Dickerson and Stephen Eisenhammer



Follow Reuters Investigates

OTHER REUTERS INVESTIGATIONS



### Redefining Famine

Amid Israel's military assault, the world's hunger monitor has struggled to access key data to determine whether conditions in Gaza constitute a famine.



### OnlyFans Exposed

OnlyFans is among the world's most successful social media platforms – but a secretive one. Reuters traces its journey from an obscure, porn-free site to an adults-only phenomenon turbocharged by erotic performers and influencers.



### Donor Decline

It's a simple but brutal equation: The number of people going hungry or otherwise struggling around the world is rising, while the amount of money the world's wealthiest nations are contributing toward helping them is dropping.



### OnlyFans Exposed

Multiple OnlyFans accounts featured suspected child sex abuse, investigator reports.

Latest

**Home**

**Authors**

**Topic Sitemap**

**Archive**

**Article Sitemap**

Media

**Videos**

**Pictures**

**Graphics**

Browse

**World**

**Business**

**Markets**

**Sustainability**

**Legal**

**Breakingviews**

**Technology**

**Investigations**

**Sports**

**Science**

**Lifestyle**

About Reuters

About Reuters

Advertise with Us

Careers

Reuters News Agency

Brand Attribution Guidelines

Reuters and AI

Reuters Leadership

Reuters Fact Check

Reuters Diversity Report

Stay Informed

Download the App (iOS)

Download the App (Android)

Newsletters

---

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us



---

Advertise With Us    Advertising Guidelines    Purchase Licensing Rights

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

Cookies    Terms of Use    Privacy    Digital Accessibility    Corrections    Site Feedback

© 2025 Reuters. All rights reserved



# FinCEN ADVISORY

**FIN-2020-A008**                                                          **October 15, 2020**

## Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity

*Human traffickers and their facilitators exploit the innocent and most vulnerable of our society for financial gain, employing an evolving range of money laundering tactics to evade detection, hide their proceeds, and grow their criminal enterprise.*

**This Advisory should be shared with:**

- *Chief Executive Officers*
- *Chief Operating Officers*
- *Chief Compliance Officers*
- *Chief Risk Officers*
- *AML/BSA Departments*
- *Legal Departments*
- *Cyber and Security Departments*
- *Customer-Facing Staff*
- *Money Services Businesses*
- *Casinos*

**SAR Filing Request:**

FinCEN requests financial institutions reference this advisory in SAR field 2 (Filing Institution Note to FinCEN) and the narrative by including the following key term: "**HUMAN TRAFFICKING FIN-2020-A008**" and selecting **SAR Field 38(h)** (human trafficking).  Additional guidance appears near the end of this advisory.

The Financial Crimes Enforcement Network (FinCEN) is issuing this advisory to help save lives, and to protect the most vulnerable in our society from predators and cowards who prey on the innocent and defenseless for money and greed.  This advisory supplements the 2014 FinCEN Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags ("2014 Advisory").[1]

Human traffickers and their facilitators exploit adults and children in the United States, and around the world, for financial gain, among other reasons.  Victims are placed into forced labor, slavery, involuntary servitude, and peonage, and/ or forced to engage in commercial sex acts.  Anyone can be a victim regardless of origin, sex, age, or legal status.[2]  And anyone can be a trafficker, from a single individual, such as a family member, to a criminal network, terrorist organization, or corrupt government regime.[3]  The global COVID-19 pandemic can exacerbate the conditions that contribute to human trafficking, as the support structures for potential victims collapse, and

---

1. FinCEN Advisory, FIN-2014-A008, "Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags," (September 11, 2014).
2. *See* U.S. Department of Homeland Security, Blue Campaign, "What is Human Trafficking?"
3. *See* U.S. Department of State, "Trafficking in Persons Report," (June 2019); *see also* Financial Action Task Force, "Financial Flows from Human Trafficking," p. 15 (July 2018).

000283

**F I N C E N   A D V I S O R Y**

traffickers target those most impacted and vulnerable.[4]  Other effects of the pandemic (e.g., travel limitations, shelter-in-place orders, teleworking) also may affect the typologies and red flag indicators provided below.

Unfortunately, in addition to the horrific toll on victims and their families, their very lives, dignity, and livelihood, human trafficking is now one of the most profitable and violent forms of international crime, generating an estimated $150 billion worldwide per year.[5]  In the United States, human trafficking now occurs in a broad range of licit and illicit industries (e.g., hospitality, agricultural, janitorial services, construction, restaurants, care for persons with disabilities, salon services, massage parlors, retail, fairs and carnivals, peddling and begging, child care, domestic work, and drug smuggling and distribution).[6]  Transactions involving proceeds generated by human trafficking can be the basis for federal criminal charges and asset forfeiture, as human trafficking and associated crimes constitute specified unlawful activities (SUAs) for the crime of money laundering.[7]

Since the 2014 Advisory, FinCEN collaborated with law enforcement to identify 20 new financial and behavioral indicators of labor and sex trafficking, and four additional typologies.  This advisory provides: (i) new information to assist in identifying and reporting human trafficking, and to aid the global effort to combat this crime; and (ii) two illustrative recent case studies.  The 2014 Advisory remains relevant, and provides information related to human smuggling, in addition to human trafficking.

| **Human Smuggling** | **Human Trafficking** |
|---|---|
| *Acts or attempts to bring unauthorized aliens to or into the United States, transport them within the U.S., harbor unlawful aliens, encourage entry of illegal aliens, or conspire to commit these violations, knowingly or in reckless disregard of illegal status*.[8] | *The act of recruiting, harboring, transporting, providing or obtaining a person for forced labor or commercial sex acts through the use of force, fraud, or coercion*.[9] |

---

4.  Polaris, "COVID-19 May Increase Human Trafficking in Vulnerable Communities," (April 7, 2020).  *See also* U.S. Department of State, "Trafficking in Persons Report," (June 2019) (discussing the vulnerabilities that traffickers target globally).

5.  International Labour Organization, "Profits and Poverty: The Economics of Forced Labour," p. 13, (May 20, 2014).  *See also* U.S. Department of the Treasury, "Combatting Human Trafficking," (January 29, 2020).

6.  *See* U.S. Department of State, "Trafficking in Persons Report," pp. 491–492 (June 2019).  Relatedly, goods that are produced by forced or child labor can be illegally imported into the United States.  The U.S. Customs and Border Protection issues Withhold and Release Orders against imported merchandise suspected of being produced from forced or child labor.  The U.S. Department of Labor maintains a list of goods and their source countries, which it has reason to believe are produced by forced or child labor in violation of international standards.

7.  SUAs relevant to human trafficking cases include a variety of offenses listed under 18 U.S.C.  §§ 1956(c)(7) and 1961(1), such as those listed in Title 18, unless otherwise specified.

8.  *See* 8 U.S.C.  § 1324.  *See also*, U.S. Department of State, "Human Trafficking and Migrant Smuggling: Understanding the Difference," (June 27, 2017).

9.  *See generally* 18 U.S.C.  §§ 1581, 1584, 1589, 1590, 1591, 2421, 2422, 2423, and 2425; 22 U.S.C.  §§ 7102(4) and (11); The Victims of Trafficking and Violence Protection Act of 2000 (Pub.  L.  No.  106-386); applicable state laws; and U.S. Department of State, "Report on U.S. Government Efforts to Combat Trafficking in Persons," (December 1, 2017).

000284

In contrast to human smuggling, human trafficking does not require movement. Human traffickers can exploit individuals within the border of a country, and even in a victim's own home. Human trafficking can also begin as human smuggling, as individuals who enter a country voluntarily and illegally are inherently vulnerable to abuse and exploitation, and often owe a large debt to their smuggler.[10]

Because the information financial institutions collect and report is vital to identifying human trafficking and stopping the growth of this crime, it is imperative that financial institutions enable their detection and reporting of suspicious transactions by becoming aware of the current methodologies that traffickers and facilitators use. It is also critical that customer-facing staff are aware of behavioral indicators that may indicate human trafficking, as the only outside contact for victims of human trafficking may occur when visiting financial institutions.

# I.  New Typologies of Human Trafficking

To evade detection, hide their illicit proceeds, and profit off the backs of victims, human traffickers employ a variety of evolving techniques. Below are four typologies, identified in Bank Secrecy Act (BSA) data since FinCEN issued the 2014 Advisory, that human traffickers and facilitators have used to launder money.

*1. Front Companies*

Human traffickers routinely establish and use front companies, sometimes legal entities, to hide the true nature of a business, and its illicit activities, owners, and associates. Front companies are businesses that combine illicit proceeds with those gained from legitimate business operations. Examples of front companies used by human traffickers for labor or sex trafficking include massage businesses, escort services, bars, restaurants, and cantinas.[11] In the case of businesses that act as a front for human trafficking, typically the establishment appears legitimate with registrations and licenses. The front company generates revenue from sales of alcoholic beverages and cover charges. Patrons, however, also can obtain illicit sexual services from trafficked individuals, usually elsewhere in the establishment.[12] In addition, illicit massage businesses or nail and hair salons can offer sexual services under the guise of legitimate businesses and/or exploit individuals for the purpose of forced labor.[13] Often, these establishments will appear to be a single storefront, yet are part of a larger network. Payments for these illicit services are usually in cash, and traffickers may invest the illicit proceeds in high-value assets, such as real estate and cars.

---

10. *See* U.S. Immigrations and Customs Enforcement, "Human Trafficking vs Human Smuggling," (Summer 2017); and *see also* U.S. Department of State, "Human Trafficking and Migrant Smuggling: Understanding the Difference," (June 27, 2017).

11. An establishment that provides food, drinks, dancing, and music, and is typically found in Latin American communities.

12. *See* Financial Action Task Force, "Financial Flows from Human Trafficking," p. 54 (July 2018). *See also* U.S. Department of Justice, "Sex Trafficking Ring Leader Gets Life in Federal Prison," (January 20, 2016).

13. U.S. Department of Justice, "What is Human Trafficking?" (January 6, 2017).

000285

### FINCEN ADVISORY

#### 2. *Exploitative Employment Practices*

Some seemingly legitimate businesses use exploitative employment schemes, such as visa fraud and wage retention, to amass profit from labor and sex trafficking.  For instance, some labor recruiters mislead or defraud victims, taking advantage of workers before and after they enter the United States.  Some labor recruiters also mislead workers about the conditions and nature of a job, engage in contract switching, and confiscate or destroy workers' identity documents.[14]  Foreign nationals who have legitimate temporary work or student visas also can be exploited.[15]

Another common practice is to charge exploitative fees to workers by withholding their salary or paying less than promised.  The trafficker claims that the fees cover the costs of recruitment or access to job opportunities.[16]  Recruitment fees can range from hundreds of dollars to tens of thousands of dollars, and take years to repay.[17]  Victims' salaries are transferred to the traffickers or their co-conspirators via teller checks or wire transfers.  Proceeds also can be "disguised" as a legitimate business expense, such as a cleaning service.  Financial institutions may see multiple employees receiving their salaries in the same account, or payment for employment may be followed by immediate withdrawal or transfer into another account.[18]

#### 3. *Funnel Accounts*

Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.[19]  Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity.[20]  In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account.[21]  Traffickers maintain control of the victims' bank accounts through coercion, and direct victims to deposit money into their accounts and other accounts that the traffickers can access.[22]  In some cases, victims also are coerced or forced to wire proceeds via money services businesses (MSBs) to facilitate the funneling of proceeds.

14. U.S. Department of State, "Paying to Work: The High Cost of Recruitment Fees," (June 27, 2017); *see also* U.S. Department of Justice, "Brothers Sentenced to 20 Years for Running Violent Human Trafficking Enterprise," (February 25, 2016).

15. U.S. Department of Justice, Journal of Federal Law and Practice, "Human Trafficking," Executive Office of United States Attorneys, pp. 5 and 28, (November 2017).

16. For more information *see* U.S. Department of Justice, "Leader of Human Trafficking Organization Sentenced to Over 15 Years for Exploiting Guatemalan Migrants at Ohio Egg Farms," (June 27, 2016); and U.S. Department of Justice, "Brothers Sentenced to 20 Years for Running Violent Human Trafficking Enterprise," (February 25, 2016).

17. *See* U.S. Department of State, "Paying to Work: The High Cost of Recruitment Fees," (June 27, 2017).

18. Financial Action Task Force, "Financial Flows from Human Trafficking," p. 28, (July 2018).

19. FinCEN Advisory, FIN-2014-A005, "Update on U.S. Currency Restrictions in Mexico: Funnel Accounts and TBML," p. 1, (May 28, 2014).

20. *See* U.S. Immigration and Customs Enforcement, "Using a Financial Attack Strategy to Combat Human Trafficking," (January 29, 2015).

21. For additional behavioral indicators of human trafficking, *see* Section II, *infra*.

22. Policies of certain large national banks to restrict third-party cash deposits for private customer accounts seem to have lessened the use of funnel account activity.

000286

FINCEN ADVISORY

Case Study: Funnel Accounts Facilitate International Thai Sex Trafficking Ring

*4. Alternative Payment Methods*

In addition to payment via cash, traffickers also have accepted payment via credit cards, prepaid cards,[23] mobile payment applications, and convertible virtual currency.[24] Buyers of commercial sex use prepaid cards—a method of payment using funds paid in advance, which can be acquired anonymously with cash or on darknet websites—to register with escort websites and to purchase sexual services, flights, throw-away phones, and hotel rooms.[25]

Illicit actors also use virtual currency to advertise commercial sex online. For example, human traffickers have purchased prepaid cards, and then used the cards to purchase virtual currency on a peer-to-peer exchange platform. Human traffickers then use the virtual currency to buy online advertisements that feature commercial sex acts to obtain customers.[26]

FinCEN also has identified transactions in which human traffickers use third-party payment processors (TPPPs) to wire funds, which gives the appearance that the TPPP is the originator or beneficiary of the wire transfer and conceals the true originator or beneficiary. For example, human traffickers facilitate payments via TPPPs for the operation of online escort services and online streaming services that use voice-over Internet protocol technology. Human traffickers and their facilitators use TPPPs to wire funds to individuals or businesses both domestically and abroad.[27]

Case Study: Trafficking Involving Prepaid Cards and Bitcoin

## II. Behavioral and Financial Red Flag Indicators of Human Trafficking

In applying the red flags below and the red flags in the 2014 Advisory, financial institutions are advised that no single red flag is a clear indicator of human trafficking activity, although each can be indicative of forced labor and/or sex trafficking. Given that human trafficking is a predicate offense to money laundering, the financial red flags also may be indicative of other money laundering-related offenses. Financial institutions should consider additional factors, such as a customer's previous financial activity and the existence of typologies or other red flags, when determining whether transactions may be associated with human trafficking.

---

23. *See* U.S. Department of the Treasury, "National Money Laundering Risk Assessment," p. 15-16, (2018).

24. For more information about illicit activity involving convertible virtual currency *see* FinCEN Advisory, FIN-2019-A003, "Advisory on Illicit Activity Involving Convertible Virtual Currency," (May 9, 2019).

25. *See* New York County District Attorney Cyrus Vance Jr.'s testimony, "Following the Money: How Human Traffickers Exploit the U.S. Financial Markets: Hearing before the Subcommittee on Oversight and Investigations of the Committee on Financial Services of the U.S. House of Representatives," (January 30, 2018). *See also* U.S. Department of Homeland Security, "Using a Financial Attack Strategy to Combat Human Trafficking," (January 29, 2015); and U.S. Department of the Treasury, "National Money Laundering Risk Assessment," p. 15-16, (2018).

26. *See* New York County District Attorney Cyrus Vance Jr.'s testimony, "Following the Money: How Human Traffickers Exploit the U.S. Financial Markets: Hearing before the Subcommittee on Oversight and Investigations of the Committee on Financial Services of the U.S. House of Representatives," (January 30, 2018); and Financial Action Task Force, "Financial Flows from Human Trafficking," p. 55-56, (July 2018).

27. *See*, e.g., Financial Action Task Force, "Financial Flows from Human Trafficking," pp. 20-26, (July 2018).

000287

F I N C E N   A D V I S O R Y

## *Behavioral Indicators*

Many victims of human trafficking do not have regular contact with anyone other than their traffickers.  The only outside contact they may have is when visiting financial institutions such as bank branches, check cashing counters, or money wiring services.  Consequently, it is important that customer-facing staff consider the following behavioral indicators when conducting transactions,[28] particularly those that also present financial indicators of human trafficking schemes discussed below.  As appropriate, such information should be incorporated into Suspicious Activity Report (SAR) filings and/or reported to law enforcement.[29]  When incorporated into SAR filings, it is important that behavioral indicators, and the staff who witnessed them, are included in the SAR narrative so that information may be effectively searched for, and later used by, law enforcement.

This list is not exhaustive and is only a selection of behavioral indicators:[30]

1. A third party speaks on behalf of the customer (a third party may insist on being present and/or translating).

2. A third party insists on being present for every aspect of the transaction.

3. A third party attempts to fill out paperwork without consulting the customer.

4. A third party maintains possession and/or control of all documents or money.

5. A third party claims to be related to the customer, but does not know critical details.

6. A prospective customer uses, or attempts to use, third-party identification (of someone who is not present) to open an account.

7. A third party attempts to open an account for an unqualified minor.

8. A third party commits acts of physical aggression or intimidation toward the customer.

9. A customer shows signs of poor hygiene, malnourishment, fatigue, signs of physical and/or sexual abuse, physical restraint, confinement, or torture.

10. A customer shows lack of knowledge of their whereabouts, cannot clarify where they live or where they are staying, or provides scripted, confusing, or inconsistent stories in response to inquiry.

28. Additional resources discussing human trafficking and the role of financial institutions include the U.S. Department of Homeland Security, Blue Campaign, "Resources Page"; U.S. Department of the Treasury, "Combatting Human Trafficking," (January, 29, 2020); U.S. Department of State, "Tracking Suspicious Financial Activity to Address Human Trafficking," (June 28, 2018); U.S. Immigration and Customs Enforcement, "Using a Financial Attack Strategy to Combat Human Trafficking," (January 29, 2015); and Financial Action Task Force, "Financial Flows from Human Trafficking," (July 2018).

29. To report suspicious activity indicative of human trafficking to the U.S. Immigration and Customs Enforcement (ICE) Homeland Security Investigations (HSI) Tip Line, call 1-866-DHS-2-ICE (1-866-347-2423) 24 hours a day, seven days a week, every day of the year.  The Tip Line is also accessible outside the United States by calling 802-872-6199.

30. *See* Organization for Security and Co-operation in Europe, "Following the Money: Compendium of Resources and Step-by-step Guide to Financial Investigations into Trafficking in Human Beings," (November 7, 2019).

000288

## *Financial Indicators*

To help identify and report transactions possibly associated with human trafficking, FinCEN has identified 10 new financial red flag indicators.  These red flags do not replace the red flags identified in the 2014 Advisory, all of which remain relevant.[31]  The Financial Action Task Force report on the "Financial Flows from Human Trafficking" also provides numerous indicators of money laundering related to human trafficking.[32]

**11** Customers frequently appear to move through, and transact from, different geographic locations in the United States.  These transactions can be combined with travel and transactions in and to foreign countries that are significant conduits for human trafficking.[33]

**12** Transactions are inconsistent with a customer's expected activity and/or line of business in an apparent effort to cover trafficking victims' living costs, including housing (e.g., hotel, motel, short-term rentals, or residential accommodations), transportation (e.g., airplane, taxi, limousine, or rideshare services), medical expenses, pharmacies, clothing, grocery stores, and restaurants, to include fast food eateries.

**13** Transactional activity largely occurs outside of normal business operating hours (e.g., an establishment that operates during the day has a large number of transactions at night), is almost always made in cash, and deposits are larger than what is expected for the business and the size of its operations.

**14** A customer frequently makes cash deposits with no Automated Clearing House (ACH) payments.

**15** An individual frequently purchases and uses prepaid access cards.

**16** A customer's account shares common identifiers, such as a telephone number, email, and social media handle, or address, associated with escort agency websites and commercial sex advertisements.

**17** Frequent transactions with online classified sites that are based in foreign jurisdictions.

**18** A customer frequently sends or receives funds via cryptocurrency to or from darknet markets or services known to be associated with illicit activity.  This may include services that host advertising content for illicit services, sell illicit content, or financial institutions that allow prepaid cards to pay for cryptocurrencies without appropriate risk mitigation controls.

**19** Frequent transactions using third-party payment processors that conceal the originators and/or beneficiaries of the transactions.

**20** A customer avoids transactions that require identification documents or that trigger reporting requirements.

---

31. FinCEN Advisory, FIN-2014-A008, "Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags," (September 11, 2014).
32. Financial Action Task Force, "Financial Flows from Human Trafficking," pp. 65-70, (July 2018).
33. For information on specific countries, and whether they are conduits for human trafficking, *see* U.S. Department of State, "Trafficking in Persons Report," (June 2019).

000289

# Case Studies

## *Funnel Accounts Facilitate International Thai Sex Trafficking Ring*

In December 2018, 36 defendants were found guilty in St. Paul, Minnesota, for their various roles in operating an international sex trafficking ring, i.e., traffickers, house bosses, money launderers, and facilitators.  Traffickers based in Thailand lured women to the United States through false promises of a better life.  To facilitate the transport of the victims, the organization engaged in visa fraud by creating false identification documents, and forced many of the victims to enter into fraudulent marriages and debt bondage.  In exchange, each victim incurred a debt of $55,000, which far exceeded actual expenses.  Once in the United States, the victims were sent to various cities, isolated in a residence, and forced to pay off their debt by engaging in commercial sex acts.[34]

To conceal and redistribute the proceeds of the sex trafficking business, victims were forced to open U.S. bank accounts in Los Angeles in their own names.  Once an account was opened, however, traffickers based in the United States took control of the account, kept a percentage of the cash generated, and sent the remainder back to the traffickers in Thailand.  Other members of the organization, the "facilitators," rented the houses, apartments, and hotels, and facilitated the transport of victims.

The organization used funnel accounts to launder money deposited in cities across the United States to third-party launderers who made cash withdrawals in Los Angeles.[35]  According to data made available to FinCEN, deposits were made in cash, and were just enough to cover account debits.  To move funds to and from Thailand, the organization employed third-party money launderers who made bank accounts available and coordinated cash deposits and withdrawals.

Bulk cash smuggling was another scheme used to physically transport proceeds to Thailand.  According to law enforcement, individuals were recruited to carry large volumes of cash in suitcases and transport the money to Thailand.  To evade detection, the trafficking organization paid flight attendants to keep quiet, and in some limited instances, to transport bulk cash in their own luggage.  Money also was concealed in clothing and dolls that were shipped to Thailand.  To date, law enforcement has recovered $1.5 million in cash, and testimony revealed that more than $40 million was sent to Thailand by one money launderer alone.

---

34. For information on this case, *see* U.S. Department of Justice, "Twenty-One Additional Defendants Indicted for their Roles in Thai Sex Trafficking Enterprise," (May 25, 2017); *see also* U.S. Department of Justice, "Thirty-Six Defendants Guilty for their Roles in International Thai Sex Trafficking Organization," (December 13, 2018).

35. For a definition of third-party money launderers *see* U.S. Department of Homeland Security, "Third Party Money Launderers," (Summer 2017).

000290

*Trafficking Involving Prepaid Cards and Bitcoin*

In April 2016, law enforcement agents from HSI in El Paso, Texas, responded to a call made to local police regarding a woman who was being forcibly held by an individual identified as "Tae" at a motel.  Officers discovered two adult victims when they searched the motel room.  Police located William "Tae" Harris, who was stopped while driving a suspect vehicle in the area.  He possessed a semi-automatic firearm.  Harris and his passenger, Dean Hall, were members of the West Side City Crips gang from Phoenix, Arizona.

The subsequent HSI investigation revealed that Harris and Hall brought the victims to Texas from Arizona, where the victims were forced into prostitution, beaten, and suffered threats of violence.  HSI determined that at least three other West Side City Crips were operating a prostitution scheme in El Paso.  During a forensic extraction of Harris' mobile phone, HSI discovered bitcoin transaction data and was able to exploit Harris' bitcoin wallet information.  Evidence revealed that the group's illicit activity revolved around the purchase of Vanilla Visa prepaid credit cards, which were then used to purchase bitcoin on the Paxful virtual currency exchange.  Those bitcoin were used to purchase prostitution ads on Backpage.com.  Furthermore, during Harris' prosecution, HSI uncovered and disrupted an attempted murder-for-hire in which Harris planned to have a key witness and her sister murdered.

In January 2018, Hall and Harris were convicted and sentenced for violating several anti-trafficking statutes.  Hall was sentenced to 90 months' imprisonment and five years of supervised release, and Harris was sentenced to 180 months' imprisonment and ten years of supervised release.

## Guidance to U.S. Financial Institutions

### Customer Due Diligence and Identification of Beneficial Owners of New Legal Entity Accounts

As of May 11, 2018, FinCEN's Customer Due Diligence (CDD) Rule requires banks, brokers or dealers in securities, mutual funds, and futures commission merchants and introducing brokers in commodities to identify and verify the identity of beneficial owners of legal entity customers, subject to certain exclusions and exemptions.[36]  Identifying and verifying the beneficial owners of legal entities could facilitate the identification of the beneficiaries of the illicit proceeds.

---

36.  *See* 31 CFR § 1010.230 (describing beneficial ownership requirements for legal entity customers).

FINCEN ADVISORY

## Information Sharing

Information sharing among financial institutions is critical to identifying, reporting, and preventing evolving fraud schemes.  Financial institutions sharing information under the safe harbor authorized by section 314(b) of the USA PATRIOT Act are reminded that they may share information relating to transactions that the institution suspects may involve the proceeds of one or more SUAs and such an institution still will remain protected from civil liability under section 314(b) safe harbor.  The SUAs listed in 18 U.S.C. §§ 1956 and 1957 include an array of fraudulent and other criminal activities, including fraud against individuals or the government. FinCEN strongly encourages information sharing via section 314(b) where financial institutions suspect that a transaction may involve terrorist financing or money laundering, including one or more SUAs.[37]

## Suspicious Activity Reporting (SAR)

A financial institution is required to file a SAR if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from illegal activity, or attempts to disguise funds derived from illegal activity; is designed to evade regulations promulgated under the BSA; lacks a business or apparent lawful purpose; or involves the use of the financial institution to facilitate criminal activity.[38]

### *SAR Filing Instructions*

Financial institutions should provide all pertinent available information in the SAR form and narrative.  A potential victim of human trafficking should not be reported as the subject of a SAR.  Rather, all available information on the victim should be included in the narrative portion of the SAR.  **FinCEN further requests that financial institutions reference this advisory by including the key term:**

### "HUMAN TRAFFICKING FIN-2020-A008"

**in SAR field 2 (Filing Institution Note to FinCEN)** to indicate a connection between the suspicious activity being reported and the activities highlighted in this advisory.  Additional information to include behavioral indicators, email addresses, phone numbers, and IP addresses also should be included when possible to aid law enforcement investigations.

---

37.  For further guidance related to the 314(b) Program, *see* FinCEN Section 314(b) Fact Sheet (November 2016), and FinCEN Guidance FIN-2009-G002, "Guidance on the Scope of Permissible Information Sharing Covered by Section 314(b) Safe Harbor of the USA PATRIOT Act," (June 16, 2009).
38.  31 CFR §§ 1020.320, 1021.320, 1022.320, 1023.320, 1024.320, 1025.320, 1026.320, 1029.320, and 1030.320.

000292

## FINCEN ADVISORY

Financial institutions that suspect human trafficking activity should also mark the check box for human trafficking (SAR Field 38(h)) on the SAR form.



## For Further Information

Questions or comments regarding the contents of this advisory should be addressed to the FinCEN Regulatory Support Section at frc@fincen.gov.

**The mission of the Financial Crimes Enforcement Network is to safeguard the financial system from illicit use, combat money laundering and its related crimes including terrorism, and promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.**

000293

# FinCEN ALERT

**FIN-2023-Alert001**                                                                    **January 13, 2023**

## FinCEN Alert on Human Smuggling along the Southwest Border of the United States

The Financial Crimes Enforcement Network (FinCEN) is issuing this alert to better aid financial institutions in the detection of financial activity related to human smuggling along the U.S. southwest border ("SW border").[1] Human smugglers engage in the crime of transporting people across international borders through deliberate evasion of immigration laws, often for financial benefit.[2] Human smuggling can endanger lives and have devastating consequences because criminal organizations involved in human smuggling value profit over human life.[3] This alert builds upon FinCEN's previous 2014 and 2020 human smuggling and human trafficking advisories,[4] while providing trends and typologies specifically related to human smuggling occurring along the SW border. This alert also provides red flag indicators to help financial institutions better identify transactions potentially related to human smuggling and reminds financial institutions of their Bank Secrecy Act (BSA) reporting obligations. It further supports ongoing initiatives by the U.S. Government to combat human smuggling and human trafficking.[5] Human smuggling

> **Suspicious Activity Report (SAR) Filing Request:**
>
> FinCEN requests that financial institutions reference the alert by including "**FIN-2023-HUMANSMUGGLING**" in SAR field 2 ("Filing Institution Note to FinCEN") and selecting human smuggling (**SAR Field 38(g)**). Additional guidance on filing SARs appears near the end of the alert.

---

1. The SW border consists of the 1,954-mile border area along Texas, Arizona, New Mexico, and California.
2. *See* 8 U.S.C. § 1324. *See also* U.S. Department of State, "Human Trafficking and Migrant Smuggling: Understanding the Difference," (Understanding the Difference) (June 27, 2017).
3. *See* U.S. Department of Homeland Security (DHS) Press Release, "DHS Announces Operation to Target Criminal Smuggling Organizations," (April 27, 2021). *See also* U.S. Department of the Treasury (Treasury), "National Money Laundering Risk Assessment," (February 2022), at p. 27.
4. *See* FinCEN Advisory, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity," (2020 Advisory) (October 15, 2020) and FinCEN Advisory, "Guidance on Recognizing Activity that May be Associated with Human Smuggling and Human Trafficking – Financial Red Flags," (2014 Advisory) (September 11, 2014).
5. The U.S. Government has established several initiatives to combat human smuggling and human trafficking. This includes an unprecedented interagency effort launched in June 2022 to disrupt and dismantle human smuggling networks. *See* DHS, "FACT SHEET: DHS Leads First-of-Its-Kind Campaign of Unprecedented Scale to Foil Human Smuggling Networks," (DHS Human Smuggling Fact Sheet) (June 9, 2022) and "FACT SHEET: Counter Human Smuggler Campaign Update" (October 6, 2022). The interagency effort includes actions taken by the Department of Justice's (DOJ) Joint Task Force Alpha; DHS's Operation Sentinel and Operation Expanded Impact; the Treasury, and the Intelligence Community. Other U.S. Government initiatives include the White House's National Action Plan to Combat Human Trafficking (December 2021); the DOJ's National Strategy to Combat Human Trafficking, and the creation the Los Angeles Declaration on Migration and Protection, which is a joint declaration from the participants of the Ninth Summit of the Americas that seeks to mobilize the entire region around bold actions that will transform the approach to managing migration in the Americas. *See* DOJ Press Release, "Attorney General Announces Initiatives to Combat Human Smuggling and Trafficking and to Fight Corruption in Central America," (June 27, 2021); DHS Press Release, "DHS Announces Operation to Target Criminal Smuggling Organizations," (April 27, 2021); White House,

000294

**F I N C E N   A L E R T**

and human trafficking are also included in FinCEN's anti-money laundering and countering the financing of terrorism priorities (AML/CFT) published in June 2021.[6]

| | |
|---|---|
| **Human Smuggling:** Acts or attempts to bring unauthorized persons to or into the United States, transport them within the United States, harbor unauthorized persons, encourage entry of unauthorized persons, or conspire to commit these violations, knowingly or in reckless disregard of illegal status.[7] | **Human Trafficking:** The recruitment, harboring, transportation, provision, obtaining, patronizing, or soliciting a person for the purpose of a commercial sex act (sex trafficking), in which a commercial sex act is induced by force, fraud, or coercion, or in which the person induced to perform such act has not attained 18 years of age, or the recruitment, harboring, transportation, provision, or obtaining of a person for labor or services through the use of force, fraud, or coercion for the purpose of subjection to involuntary servitude, peonage, debt bondage, or slavery (forced labor).[8] |

The information contained in this alert is derived from FinCEN's analysis of BSA data, open-source reporting, and information provided by law enforcement partners.

"FACT SHEET: The National Action Plan to Combat Human trafficking (NAP)," (December, 3, 2021); DOJ, "National Strategy to Combat Human Trafficking," (January 2022); and White House, "FACT SHEET: The Los Angeles Declaration on Migration and Protection U.S. Government and Foreign Partner Deliverables," (June 10, 2022).

6.   *See* FinCEN, "Anti-Money Laundering and Countering the Financing of Terrorism National Priorities," (June 30, 2021), at p. 11.

7.   *See* 8 U.S.C. § 1324.  *See also* Understanding the Difference, *supra* Note 2.

8.   *See* 18 U.S.C. §§ 1581, 1584, 1589, 1590, 1591, 24121, 2422, 2423 and 2425, The Victims of Trafficking and Violence Protection Act of 2000 (Pub. L. No. 106-386), and applicable State Laws.

000295

# Human Smuggling on the SW Border

In fiscal year (FY) 2020, during the height of the COVID-19 pandemic, less than 500,000 encounters[9] occurred at the SW border, a 53 percent decrease from the prior year.[10]  However, in FY2021, there were 1.7 million encounters and over 2.3 million encounters in FY2022.  Illicit actors seeking to make a profit by smuggling migrants across the SW border have exploited this volume of migration activity, which is being driven by a variety of factors, including oppressive and corrupt regimes in countries such as Venezuela, Cuba, and Nicaragua.[11]  Extremely harsh terrains and travel conditions, combined with the potential detection by law enforcement and the threat of violence posed by cartels controlling territory along smuggling routes across Central America and Mexico, make it difficult for migrants to travel from their home countries and reach the SW border without the assistance of smugglers.[12]  According to the Financial Action Task Force (FATF), in 2019, approximately two-thirds of migrants transiting through Mexico hired a guide to cross into the United States.[13]  As such, individuals from Latin America as well as irregular migrants[14] from across the globe risk their lives and pay sums ranging from hundreds of dollars to over $10,000 to human smuggling networks and organizations in an attempt to cross into the United States through the SW border.  According to the Homeland Security Operational Analysis Center, human smuggling along the SW border generates an estimated $2 billion to $6 billion in yearly revenue for these illicit actors.[15]

---

9.  An "encounter" is a U.S. Customs and Border Protection (CBP) enforcement action that can include Title 8 apprehensions, Title 8 inadmissible aliens, and Title 42 expulsions by CBP's U.S. Border Patrol between U.S. ports of entry.  Title 8 Enforcement Actions refers to apprehensions or inadmissibles processed under CBP's immigration authority.  "Inadmissibles" refers to individuals encountered at ports of entry who are seeking lawful admission into the United States but are determined to be inadmissible, individuals presenting themselves to seek humanitarian protection under our laws, and individuals who withdraw an application for admission and return to their countries of origin within a short timeframe. Apprehensions refers to the physical control or temporary detainment of a person who is not lawfully in the U.S. which may or may not result in an arrest.  Title 42 Expulsions refers to individuals encountered by U.S. Border Patrol and Office of Field Operations and expelled to the country of last transit or home country in the interest of public health under Title 42 U.S.C. 265.  *See* CBP Enforcement Statistics, "Nationwide Enforcement Encounters: Title 8 Enforcement Actions and Title 42 Expulsions Fiscal Year 2023," (Last Modified; November 14, 2022).  *See also* Congressional Research Service Report, "Immigration: Apprehensions and Expulsions at the Southwest Border," (Human Smuggling CRS Report) (December 22, 2021), at Summary.

10.  All percentages derived from statistics published by CBP.  CBP Stats and Summaries, "Southwest Land Border Encounters," (Last Modified: November, 14, 2022).  The U.S. Government fiscal year (FY) runs from October 1 of the preceding year through September 30 of the current year.

11.  According to CPB, there were 135,370 total unique encounters at the SW border in September 2022, of which 77,302 were from Venezuela, Cuba, or Nicaragua, which represents 42 percent of unique encounters, or a 245 percent increase over September 2021.  CBP Press Release, "CBP Releases September 2022 Monthly Operational Update", (October 21, 2022).

12.  *See* U.S. House of Representatives, "Statement of Patrick J. Lechleitner, Acting Executive Associate Director Homeland Security Investigations, Regarding a Hearing on Unaccompanied Children and the Root Causes," (Statement of Patrick J. Lechleitner) (June 10, 2021), at p. 1.

13.  FATF Report, "Money Laundering and Terrorist Financing Risk Arising from Migrant Smuggling," (FATF Human Smuggling Report) (March 2022), at p. 12.

14.  Irregular migration is the movement of persons that takes place outside the laws, regulations, or international agreements governing the entry into or exit from the State of origin, transit or destination.  For more information, *see* International Organization on Migration, "Key Migration Terms."

15.  Statement of Patrick J. Lechleitner, *supra* Note 12 at p. 2.

000296

Migrants often seek to enter the United States in hopes of greater economic opportunity, family reunification, or to flee from violence and conflict.  Despite these aspirations, many migrants face exploitation or mistreatment by human smuggling organizations who prey upon them for financial gain and have little regard for their well-being or physical care.[16]  Upon arrival in the United States, some migrants' status and circumstances may make them vulnerable to human trafficking or other forms of exploitation.  Transnational human smuggling networks profit from the exploitation of migrants and routinely expose them to violence, injury, and even death.[17]  For example, in June 2022, 53 migrants seeking to enter the United States died in San Antonio, Texas while being smuggled in a tractor trailer.[18]  This tragedy, as well as other recent events involving the deaths of migrants,[19] illustrates how dangerous human smuggling into the United States can be and how smuggling organizations exploit human beings for profit.

While a majority of migrants encountered at the border originate from Mexico and the Northern Triangle countries of El Salvador, Guatemala, and Honduras, a growing number of encounters are with migrants originating from South America, the Caribbean, Europe, and Asia.[20]

### SW Border Used to Smuggle Migrants into United States From Around the World

In 2021, U.S. courts sentenced a Bangladeshi national to 46 months in prison for his role in a scheme to smuggle undocumented individuals from Mexico into the United States.  Between March 2017 and June 2019, Mohamed Milon Hossain conspired with and assisted human smugglers operating out of Bangladesh, South and Central America, and Mexico to bring numerous undocumented migrants from Bangladesh to the U.S. border in exchange for payment.  Hossain operated out of Tapachula, Mexico, where he maintained a hotel that housed the individuals on their way to the United States.  Hossain provided plane tickets and other assistance for the individuals to travel from Tapachula to Monterrey, Mexico, where his co-conspirator Moktar Hossain assisted their illegal crossing into the United States.[21]

---

16.  *See* DOJ Press Releases, "Two Guatemalan Nationals Plead Guilty to Human Smuggling Conspiracy Resulting in 2021 Death of Migrant in Odessa, Texas," (September 30, 2022) and "Eight Indicted in Joint Task Force Alpha Investigation and Arrested as Part of Takedown of Prolific Human Smuggling Network," (September 13, 2022).

17.  DOJ Press Release, "Attorney General Announces Initiatives to Combat Human Smuggling and Trafficking and to Fight Corruption in Central America," (June 7, 2021).

18.  *See* DOJ Press Release, "53 Fatalities from Tractor Trailer Smuggling Incident – Charges Filed against Four," (June 29, 2022).

19.  For example, *see* Washington Examiner, "Uvalde rocked by horrific fatal crash involving immigrant smuggler (msn.com)" (September 29, 2022); NBC News, "4 migrants killed, 2 critical in Texas crash during suspected human smuggling incident (nbcnews.com)" (June 30, 2022); Fort Worth Star-Telegram, "Overloaded human smuggling plane crashes in Texas desert. Pilot flees, cops say," (January 3, 2022).

20.  In FY2012, encounters of foreign nationals originating from outside Mexico and the Northern Triangle represented just two percent of all encounters. In FY2021 that figure increased to 22 percent.  *See* Human Smuggling CRS Report, *supra* Note 9 at p. 12.

21.  *See* DOJ Press Release, "Man Sentenced for Role in International Human Smuggling Conspiracy," (September 28, 2021).

In 2019, U.S. courts sentenced a Jordanian national to 36 months in prison for his role in a conspiracy to bring aliens to the United States and actually bringing Yemeni aliens through Mexico into the United States. During the second half of 2017, Moayad Heider Mohammad Aldairi conspired with others to smuggle at least six Yemeni nationals across the Texas border and into the United States in exchange for payment. Aldairi admitted his role in transporting the aliens from Monterrey, Mexico to Piedras Negras, where he directed them to cross the Rio Grande River into the United States.[22]

## How Human Smuggling Networks Operate

Smuggling operations along the SW border are typically conducted by networks of smaller groups and organizations that perform different functions along smuggling routes. These networks can be extensive and complex and include individuals who may, among other functions, organize the initial travel arrangements, facilitate lodging, and provide services to guide or facilitate the actual crossing of the SW border. These networks often are associated in some way with transnational criminal organizations (TCO), such as drug cartels that "control" territory through which smuggling operations take place. These associations range from the smuggling networks paying a portion of their illicit gains as a "protection tax" to a TCO for safe passage to more direct involvement by the TCO in the day-to-day operations of the smuggling networks.[23]

### Human Smuggling and Organized Crime

In November 2020, the United States, in coordination with El Salvador, Guatemala, and Honduras, arrested 36 individuals and issued criminal charges against hundreds of individuals involved in a human smuggling operation controlled by MS-13 and the 18th Street Gang. These TCOs are also suspected of being involved with a number of other crimes, including human trafficking, narcotics trafficking, and murder.[24]

Human smuggling involves two main phases: solicitation and transportation.[25] During the solicitation phase, smugglers advertise their services, for example, by posing as seemingly legitimate businesses such as travel agencies or work recruiters, and build trust with migrants seeking smuggling services. Smugglers acting in a solicitation role will often share the same national origin or related ethnic background as the migrants they smuggle.[26] Historically, much of the solicitation was done by word of mouth, but with the rapid development of social media and other technology, smugglers have been able to leverage various platforms to reach a broader audience and potential pool of migrants.[27]

---

22. *See* DOJ Press Release, "Jordanian National Sentenced for Conspiracy to Bring Aliens into the United States," (October 29, 2019).
23. *See* Statement of Patrick J. Lechleitner, *supra* Note 12 at p. 2.
24. *See* DOJ Press Release, "More than 700 Members of Transnational Organized Crime Groups Arrested in Central America in U.S. Assisted Operation," (November 27, 2020).
25. 2014 Advisory, *supra* Note 4 at p. 2.
26. *See* United Nations Office on Drugs and Crime Report, "Global Study on Smuggling of Migrants," (June 29, 2018) at p. 7.
27. *See* FATF Human Smuggling Report, *supra* Note 13 at p. 16.

000298

During the transportation phase, smuggling networks often use social media platforms—particularly those that offer end-to-end encrypted communication—to coordinate along the route.[28]  Smugglers have also been using social media to recruit third parties to serve as part of the smuggling operation along the SW border.  One example involves the recruitment of unaffiliated truck drivers based in the United States to smuggle migrants across the SW border.  This is advantageous to the smuggling networks because crossing the SW border presents one of the largest risks of apprehension by law enforcement associated with the journey.  By contracting out this portion of the operation to third parties, smuggling networks insulate themselves to a degree because these contracted individuals lack knowledge of the network's operations or chain-of-command.

## Illicit Finance Typologies

As previously reported in FinCEN's 2014 Advisory, migrants generally pay smugglers in one of three ways: 1) payment in advance, in which the migrant or the migrant's relatives provide full payment to the smuggler before traveling; 2) partial payment, in which a migrant pays some portion upon departure and the remaining balance is paid in full upon arrival, and 3) payment on arrival, in which the migrant's relatives pay the full fee to the smuggler after the migrant is successfully smuggled.[29]  These payments are still primarily conducted in cash, but the use of wire transfers is also common.  Migrants who cannot afford full payment might also enter into work agreements with the smugglers to assist along the smuggling route or upon arrival to the United States.  However, migrants who cannot afford full payment, are unable to pay any outstanding debt upon arrival in the United States or do not voluntarily enter into work agreements may be vulnerable to human trafficking, to include commercial sex trafficking, forced labor, fraud, kidnapping, and other forms of exploitation, once within the United States.[30]

The methodologies used by human smuggling networks to launder their illicit gains remain largely the same as previously reported.[31]  Because human smuggling is often tied to larger criminal organizations, these often overlap with money laundering methods used by TCOs.

- *Cash Placement and Layering into the Formal Financial System*: Cash is still the primary method migrants use to pay smugglers.[32]  Smuggling networks often engage in bulk cash smuggling[33] and, among other money laundering methods, also engage in cash purchases of high-value assets, including real estate and businesses.[34]  In some cases, smugglers avoid

---

28.  *Id*. at p. 2.
29.  2014 Advisory, *supra* Note 4 at p. 3.
30.  *See* DHS Human Smuggling Fact Sheet, *supra* Note 5.
31.  FinCEN has previously reported on common methods used to launder funds associated with human smuggling and human trafficking.  *See* 2014 Advisory and 2020 Advisory, *supra* Note 4.
32.  *See* FATF Human Smuggling Report, *supra* Note 13 at p. 22.
33.  Bulk cash smuggling involves moving physical currency across an international border, often to be deposited in a financial institution in another country.  Criminals will often divide the cash into multiple smaller increments so that any individual portion that is seized represents a fraction of the total amount being trafficked.  *See* Government Accountability Office Report, "Trafficking and Money Laundering: Strategies Used by Criminal Groups and Terrorists and Federal Efforts to Combat Them," (December 2021), at p. 14.
34.  *See* FATF Human Smuggling Report, *supra* Note 13 at p. 20.

000299

depositing their cash proceeds into a financial institution and instead use them to finance their living expenses, to purchase luxury items, or to support their drug or gambling habits.[35]  For example, in 2021, the DOJ indicted members of a human smuggling network alleged to have reaped more than $200 million from a human smuggling scheme that exploited migrants for labor.  This network allegedly laundered the funds through cash purchases of land, homes, vehicles, and businesses; and by funneling millions of dollars through casinos.[36]

- *Funnel Accounts*: Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border.[37]  Smuggling networks may seek to establish accounts with financial institutions with a large U.S. presence to allow for easy collection of payments from the families of those being smuggled and who may be located throughout the United States.

- *Alternative Payment Methods*:  In addition to payment via cash, human smugglers also use mobile payment applications and other forms of peer-to-peer (P2P) networks to transfer funds. For example, smugglers may use P2P networks to collect payments from migrants to cover the expenses necessary for their travel from the country of origin to their final destination.

## Financial Red Flag Indicators of Human Smuggling

FinCEN has identified the following financial red flag indicators to assist financial institutions in detecting, preventing, and reporting suspicious transactions associated with human smuggling. Because no single financial red flag indicator is determinative of illicit or suspicious activity, financial institutions should consider the relevant facts and circumstances of each transaction, in keeping with their risk-based approach to compliance.

 Transactions involving multiple wire transfers, cash deposits, or P2P payments from multiple originators from different geographic locations either across (1) the United States, or (2) Mexico and Central America, to one beneficiary located on or around the SW border, with no apparent business purpose.

 Deposits made by multiple individuals in multiple locations into a single account, not affiliated with the account holder's area of residence or work, with no apparent business purpose.

 Currency deposits into U.S. accounts without explanation, followed by rapid wire transfers to countries with high migrant flows (e.g., Mexico, Central America), in a manner that is inconsistent with expected customer activity.

---

35.  *Id*. at p. 20.

36.  *See* DOJ Press Release, "Human smuggling, forced labor among allegations in south Georgia federal indictment," (November 22, 2021).

37.  Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.  *See* 2020 Advisory, *supra* Note 4 at p. 4.

000300



FINCEN ALERT

**4** Frequent exchange of small-denomination for larger-denomination bills by a customer who is not in a cash-intensive industry.

**5** Multiple customers sending wire transfers to the same beneficiary (who is not a relative, and may be located in the sender's home country), inconsistent with the customer's usual business activity and reported occupation.

**6** A customer making significantly greater deposits—including cash deposits—than those of peers in similar professions or lines of business.

**7** A customer making cash deposits that are inconsistent with the customer's line of business.

**8** Extensive use of cash to purchase assets, such as real estate, and to conduct transactions.

## Reminder of Relevant BSA Obligations and Tools for U.S. Financial Institutions
### *Suspicious Activity Reporting*
### *Other Relevant BSA Reporting*
### *USA PATRIOT ACT Section 314(b) Information Sharing Authority*

### Suspicious Activity Reporting

A financial institution is required to file a SAR if it knows, suspects, or has reason to suspect a transaction conducted or attempted by, at, or through the financial institution involves funds derived from illegal activity; is intended or conducted to disguise funds derived from illegal activity; is designed to evade regulations promulgated under the BSA; lacks a business or apparent lawful purpose; or involves the use of the financial institution to facilitate criminal activity, including sanctions evasion.[38] All statutorily defined financial institutions may voluntarily report suspicious transactions under the existing suspicious activity reporting safe harbor.[39]

When a financial institution files a SAR, it is required to maintain a copy of the SAR and the original or business record equivalent of any supporting documentation for a period of five years from the date of filing the SAR.[40] Financial institutions must provide any requested

---

38. *See* 31 CFR §§ 1020.320, 1021.320, 1022.320, 1023.320, 1024.320, 1025.320, 1026.320, 1029.320, and 1030.320.
39. *See* 31 U.S.C. § 5318(g)(3). Financial institutions may report suspicious transactions regardless of amount involved and still take advantage of the safe harbor.
40. *See* 31 CFR §§ 1020.320(d), 1021.320(d), 1022.320(c), 1023.320(d), 1024.320(c), 1025.320(d), 1026.320(d), 1029.320(d), 1030.320(d).

000301

SAR and all documentation supporting the filing of a SAR upon request by FinCEN or an appropriate law enforcement or supervisory agency.[41]  When requested to provide supporting documentation, financial institutions should take special care to verify that a requestor of information is, in fact, a representative of FinCEN or an appropriate law enforcement or supervisory agency.  A financial institution should incorporate procedures for such verification into its BSA compliance or AML program.  These procedures may include, for example, independent employment verification with the requestor's field office or face-to-face review of the requestor's credentials.

### *SAR Filing Instructions*

FinCEN requests that financial institutions indicate a connection between the suspicious activity being reported and the activities highlighted in this alert by including the key term "**FIN-2023-HUMANSMUGGLING**" in SAR field 2 (Filing Institution Note to FinCEN), as well as in the narrative, and by selecting SAR field 38(g) (human smuggling).  Financial institutions that suspect human trafficking activity should also select SAR field 38(h) (human trafficking) and highlight other advisory or alert keywords in the narrative, if applicable.

*Financial institutions wanting to expedite their report of suspicious transactions that may relate to the activity noted in this alert should call the Financial Institutions Toll-Free Hotline at (866) 556-3974 (7 days a week, 24 hours a day).[42]*

Financial institutions should include any and all available information relating to the account and locations involved in the reported activity, identifying information and descriptions of any legal entities or arrangements involved and associated beneficial owners, and any information about related persons or entities involved in the activity.  Financial institutions also should provide any and all available information regarding other domestic and foreign financial institutions involved in the activity; where appropriate, financial institutions should consider filing a SAR jointly on shared suspicious activity.[43]

## Other Relevant BSA Reporting Requirements

Financial institutions and other entities or persons also may have other relevant BSA reporting requirements to provide information in connection with the subject of this alert.  These include obligations related to the Currency Transaction Report (CTR),[44] Report of Cash Payments

---

41.  *Id.  See also* FinCEN, "Suspicious Activity Report Supporting Documentation," (June 13, 2007).

42.  The purpose of the hotline is to expedite the delivery of this information to law enforcement.  Financial institutions should immediately report any imminent threat to local-area law enforcement officials.

43.  *See* 31 CFR §§ 1020.320(e)(1)(ii)(A)(2))(i), 1021.320(e)(1)(ii)(A)(2)), 1022.320(d)(1)(ii)(A)(2), 1023.320(e)(1)(ii)(A)(2)(i), 1024.320(d)(1)(ii)(A)(2), 1025.320(e)(1)(ii)(A)(2), 1026.320(e)(1)(ii)(A)(2)(i), 1029.320(d)(1)(ii)(A)(2), 1030.320(d)(1)(ii)(A)(2).

44.  A report of each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to a financial institution that involves a transaction in currency of more than $10,000.  Multiple transactions may be aggregated when determining whether the reporting threshold has been met.  *See* 31 CFR §§ 1010.310-313, 1020.310-313, 1021.310-313, 1022.310-313, 1023.310-313, 1024.310-313, and 1026.310-313.

000302

Over $10,000 Received in a Trade or Business (Form 8300),[45] Report of Foreign Bank and Financial Accounts (FBAR),[46] Report of International Transportation of Currency or Monetary Instruments (CMIR),[47] Registration of Money Service Business (RMSB),[48] and Designation of Exempt Person (DOEP).[49]  These standard reporting requirements may not have an obvious connection to illicit finance, but may ultimately prove highly useful to law enforcement.

### Form 8300 Filing Instructions

When filing a Form 8300 involving a suspicious transaction relevant to this alert, FinCEN requests that the filer select *Box 1b* ("suspicious transaction") and include the key term "**FIN-2023-HUMANSMUGGLING**" in the "**Comments**" section of the report.

## Information Sharing

Information sharing among financial institutions is critical to identifying, reporting, and preventing human smuggling and human trafficking.  Financial institutions and associations of financial institutions sharing information under the safe harbor authorized by section 314(b) of the USA PATRIOT Act are reminded that they may share information with one another regarding individuals, entities, organizations, and countries suspected of possible terrorist financing or money laundering.[50]  FinCEN strongly encourages such voluntary information sharing.

## For Further Information

Questions or comments regarding the contents of this alert should be sent to the FinCEN Regulatory Support Section at frc@fincen.gov.

### ###

---

45. A report filed by a trade or business that receives currency in excess $10,000 in one transaction or two or more related transactions. The transactions are required to be reported on a joint FinCEN/IRS form when not otherwise required to be reported on a CTR. *See* 31 CFR § 1010.330; 31 CFR § 1010.331.  A Form 8300 also may be filed voluntarily for any suspicious transaction, even if the total amount does not exceed $10,000.
46. A report filed by a U.S. person that has a financial interest in, or signature or other authority over, foreign financial accounts with an aggregate value exceeding $10,000 at any time during the calendar year. *See* 31 CFR § 1010.350; FinCEN Form 114.
47. A form filed to report the transportation of more than $10,000 in currency or other monetary instruments into or out of the United States.  *See* 31 CFR § 1010.340.
48. A form filed to register a money services business (MSB) with FinCEN, or to renew such a registration. *See* 31 CFR § 1022.380.
49. A report filed by banks to exempt certain customers from currency transaction reporting requirements. *See* 31 CFR § 1010.311.
50. *See* FinCEN, "Section 314(b) Fact Sheet," (December 20, 2020).

000303

An official website of the United States government.  Here's how you know

# Money Mules

A money mule is someone who transfers or moves illegally acquired money on behalf of someone else.

Criminals recruit money mules to help launder proceeds derived from online scams and frauds or crimes like human trafficking and drug trafficking. Money mules add layers of distance between crime victims and criminals, which makes it harder for law enforcement to accurately trace money trails.

Money mules can move funds in various ways, including through bank accounts, cashier's checks, virtual currency, prepaid debit cards, or money service businesses.

Some money mules know they are supporting criminal enterprises; others are unaware that they are helping criminals profit.

Money mules often receive a commission for their service, or they might provide assistance because they believe they have a trusting or romantic relationship with the individual who is asking for help.

If you are moving money at the direction of another person, you may be serving as a money mule.

## Types of Money Mules

**Unwitting or unknowing** money mules are unaware they are part of a larger scheme.

- Often solicited via an online romance scheme or job offer
- Asked to use their established personal bank account or open a new account in their true name to receive money from someone they have never met in person
- May be told to keep a portion of the money they transferred
- Motivated by trust in the actual existence of their romance or job position

**Witting** money mules ignore obvious red flags or act willfully blind to their money movement activity.

- May have been warned by bank employees they were involved with fraudulent activity
- Open accounts with multiple banks in their true name
- May have been unwitting at first but continue communication and participation
- Motivated by financial gain or an unwillingness to acknowledge their role

**Complicit** money mules are aware of their role and actively participate.

- Serially open bank accounts to receive money from a variety of individuals/businesses for criminal reasons
- Advertise their services as a money mule, to include what actions they offer and at what prices. This may also include a review and/or rating by other criminal actors on the money mule's speed and reliability.
- Travel, as directed, to different countries to open financial accounts or register companies
- Operate funnel accounts to receive fraud proceeds from multiple lower level money mules
- Recruit other money mules
- Motivated by financial gain or loyalty to a known criminal group

## Protect Yourself

Criminals often target students, those looking for work, or those on dating websites, but anyone can be approached to be a money mule.

- Perform online searches to check the legitimacy of any company that offers you a job.
- Do not accept any job offers that ask you to use your own bank account to transfer money. A legitimate company will not ask you to do this.
- Be wary if an employer asks you to form a company to open up a new bank account.
- Be suspicious if an individual you met on a dating website wants to use your bank account for receiving and forwarding money.
- Never give your financial details to someone you don't know and trust, especially if you met them online.

## Signs of a Money Mule Scam

**Work-from-Home Job Opportunities**

- You received an unsolicited email or social media message that promises easy money for little or no effort.
- The "employer" you communicate with uses web-based email services (such as Gmail, Yahoo, Hotmail, Outlook, etc.).
- You are asked to open a bank account in your own name or in the name of a company you form to receive and transfer money.
- As an employee, you are asked to receive funds in your bank account and then "process" or "transfer" funds via: wire transfer, ACH, mail, or money service business (such as Western Union or MoneyGram).
- You are allowed to keep a portion of the money you transfer.
- Your duties have no specific job description.

**Dating and Social Media Sites**

- An online contact or companion, whom you have never met in person, asks you to receive money and then forward these funds to one or more individuals you do not know.

**Cryptocurrency Kiosks**

- You are directed to deposit cash into one or more cryptocurrency kiosks.

## Consequences of Being a Money Mule

Acting as a money mule is illegal and punishable, even if you aren't aware you're committing a crime.

If you are a money mule, you could be prosecuted and incarcerated as part of a criminal money laundering conspiracy. Some of the federal charges you could face include mail fraud, wire fraud, bank fraud, money laundering, and aggravated identity theft.

Serving as a money mule can also damage your credit and financial standing. Additionally, you risk having your own personally identifiable information stolen and used by the criminals you are working for, and you may be held personally liable for repaying money lost by victims.

