**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | |
|---|---|
| TEXAS ASS'N FOR MONEY SERVICES BUSINESSES (TAMSB), *et al*.<br><br>    *Plaintiffs*,<br><br>              v.<br><br>PAM BONDI, in her official capacity as Attorney General; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, in her official capacity as the Director of the Financial Crimes Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,<br><br>    *Defendants*. | Civil Action No. 25-cv-344-FB |

**DEFENDANTS' MEMORANDUM IN OPPOSITION TO
PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

YAAKOV ROTH
Acting Assistant Attorney General

STEPHEN M. ELLIOTT
Assistant Director, Federal Programs Branch

AMY E. POWELL
Senior Trial Counsel
United States Department of Justice
Civil Division, Federal Programs Branch
c/o U.S. Attorney's Office for EDNC
150 Fayetteville St, Suite 2100
Raleigh, NC 27601
Tel.: 919-856-4013
Email:  amy.powell@usdoj.gov
Counsel for Defendants

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 1

BACKGROUND ...................................................................................................... 2

LEGAL STANDARD ............................................................................................... 8

DISCUSSION .......................................................................................................... 8

I.       Plaintiffs Have Not Established a Likelihood of Success on the Merits. .......................... 8

         A.       Plaintiffs Cannot Show a Likelihood of Success on their APA claims. ................ 8

                  1.       Arbitrary and Capricious.......................................................................10

                  2.       Notice-and-Comment Rulemaking ........................................................14

                  3.       Ultra Vires.............................................................................................16

         B.       Plaintiffs Cannot Show a Likelihood of Success on
                  their Fourth Amendment Claims Because the Supreme
                  Court Has Already Rejected Nearly Identical Claims. ........................................ 18

II.      Plaintiffs Have Not Established Irreparable Injury......................................................... 23

III.     The Balance of Interests Tips in Favor of Defendants. ................................................... 28

CONCLUSION........................................................................................................ 30

## TABLE OF AUTHORITIES

**CASES**                                                                    **PAGES**

*A.L.A. Schechter Poultry Corp. v. United States,*
    295 U.S. 495 (1935)..................................................................... 18

*Ala. Ass'n of Realtors v. HHS,*
    594 U.S. 758 (2021)..................................................................... 17

*Anibowei v. Morgan,*
    70 F.4th 898 (5th Cir. 2023) ........................................................ 8

*Bellion Spirits, LLC v. United States,*
    335 F. Supp. 3d 32 (D.D.C. 2018).............................................. 9

*Brock v. Emerson Elec. Co., Elec. & Space Div.,*
    834 F.2d 994 (11th Cir. 1987) ............................................. 21, 22

*Califano v. Yamasaki,*
    442 U.S. 682 (1979)..................................................................... 29

*California Bankers Ass'n v. Shultz,*
    416 U.S. 21 (1974)....................................................... 18, 19, 20, 22

*City of Los Angeles v. Patel,*
    576 U.S. 409 (2015)..................................................................... 21

*Clifford v. Peña,*
    77 F.3d 1414 (D.C. Cir. 1996) ..................................................... 5

*Donovan v. Master Printers Ass'n,*
    532 F. Supp. 1140 (N.D. Ill. 1981) .......................................... 22

*DSE, Inc. v. United States,*
    169 F.3d 21 (D.C. Cir. 1999)..................................................... 29

*FCC v. Prometheus Radio Project,*
    592 U.S. 414 (2021)..................................................................... 9

*Fence Creek Cattle Co. v. U.S. Forest Service,*
    602 F.3d 1125 (9th Cir. 2010) ..................................................... 9

*Fla. Power & Light Co. v. Lorion,*
    470 U.S. 729 (1985)..................................................................... 9

*Gill v. Whitford*,
    585 U.S. 48 (2018).................................................................................................. 28

*In re Grand Jury Subpoena*,
    696 F.3d 428 (5th Cir. 2012) .................................................................................. 23

*KHOLLE Magnolia 2015, LLC v. Vidal*,
    No. CV H-22-1974, 2024 WL 3371040 (S.D. Tex. July 9, 2024)............................. 9

*Labrador v. Poe*,
    144 S. Ct. 921 (2024)............................................................................................. 29

*Las Americas Immigrant Advoc. Ctr. v. Paxton*,
    No. EP-24-CV-00352-DCG, 2024 WL 4430542 (W.D. Tex. Sept. 27, 2024)......... 27

*Lewis v. United States & United States Army Corps of Eng'rs*,
    No. CV 18-1838, 2019 WL 13115362 (E.D. La. Mar. 28, 2019)............................. 9

*Louisiana v. Verity*,
    853 F.2d 322 (5th Cir. 1988) ................................................................................... 9

*Malone Mortg. Co. Am. v. Martinez*,
    2003 WL 23272381 (N.D. Tex. Jan. 6, 2003) ......................................................... 9

*Manufactured Hous. Inst. v. United States Dep't of Energy*,
    No. 1:23-CV-00174-DAE, 2024 WL 4795985 (W.D. Tex. Aug. 25, 2024) ............. 5

*McLaughlin v. Kings Island, Div. of Taft Broad. Co.*,
    849 F.2d 990 (6th Cir. 1988) ................................................................................. 22

*Mistretta v. United States*,
    488 U.S. 361 (1989)............................................................................................... 17

*Morgan v. Fletcher*,
    518 F.2d 236 (5th Cir. 1975) ................................................................................. 23

*Munaf v. Geren*,
    553 U.S. 674 (2008)................................................................................................. 8

*Nat'l Biodiesel Bd. v. EPA*,
    843 F.3d 1010 (D.C. Cir. 2016) ............................................................................. 16

*Neustar, Inc. v. FCC*,
    857 F.3d 886 (D.C. Cir. 2017) ............................................................................... 16

*Nken v. Holder*,
    556 U.S. 418 (2009)........................................................................................... 8, 28

*N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*,
   No. 23-60483, 2025 WL 980568 (5th Cir. Apr. 1, 2025) ..................................... 8

*OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*,
   73 F.4th 291 (5th Cir. 2023) ......................................................................... 9

*Panama Refin. Co. v. Ryan*,
   293 U.S. 388 (1935) ............................................................................. 17, 18

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015) ................................................................................ 15

*Ridgely v. Fed. Emergency Mgmt. Agency*,
   512 F.3d 727 (5th Cir. 2008) ...................................................................... 8

*Roe v. Dep't of Def.*,
   947 F.3d 207 (4th Cir. 2020) ...................................................................... 5

*Sierra Club v. U.S. Dep't of Interior*,
   990 F.3d 898 (5th Cir. 2021) ...................................................................... 9

*Trump v. Hawaii*,
   585 U.S. 667 (2018) .............................................................................. 29

*U. S. v. W. H. Hodges & Co.*,
   533 F.2d 276 (5th Cir. 1976) ..................................................................... 15

*United States v. Apfelbaum*,
   445 U.S. 115 (1980) .............................................................................. 23

*United States v. Miller*,
   425 U.S. 435 (1976) .............................................................................. 22

*United States v. Oreira*,
   29 F.3d 185 (5th Cir. 1994) ....................................................................... 4

*United States v. Smith*,
   110 F.4th 817 (5th Cir. 2024) .................................................................... 21

*Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*,
   985 F.3d 472 (5th Cir. 2021) ...................................................................... 9

*Util. Air Regul. Grp. v. EPA*,
   573 U.S. 302 (2014) .............................................................................. 16

*Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*,
   435 U.S. 519 (1978) .............................................................................. 15

*Warth v. Seldin*,
    422 U.S. 490 (1975)............................................................................................ 29

*West Virginia v. EPA*,
    597 U.S. 697 (2022)............................................................................................ 17

*Whitman v. Am. Trucking Ass'ns*,
    531 U.S. 457 (2001)............................................................................................ 18

*Winter v. Nat. Res. Def. Council, Inc.*,
    555 U.S. 7 (2008)........................................................................................ 23, 28

## STATUTES

5 U.S.C. § 551 ........................................................................................................ 15

5 U.S.C. § 705 ........................................................................................................ 29

5 U.S.C. § 706 .......................................................................................................... 9

8 U.S.C. § 1324a(b) ............................................................................................... 20

26 U.S.C. § 6012 .................................................................................................... 20

31 U.S.C. § 5311 ................................................................................................. 4, 14

31 U.S.C. § 5313 ................................................................................................. 3, 15

31 U.S.C. § 5318 ...................................................................................................... 4

31 U.S.C. § 5326 ............................................................................................. *passim*

52 U.S.C. § 30104 .................................................................................................. 20

Anti-Drug Abuse Act of 1988,
    Pub. L. No. 100–690, 102 Stat. 4181 (1988) ................................................... 3

Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act,
    Pub. L. No. 107–56, 115 Stat. 272 (2001) ....................................................... 2

William M. (Mac) Thornberry National Defense Authorization Act,
    Pub. L. No. 116-283, 134 Stat. 3388 (2021) .................................................... 2

**RULES**

Federal Rule of Civil Procedure 65 ........................................................ 29

**REGULATIONS**

31 C.F.R. § 1010.100(ff)........................................................................... 5

31 C.F.R. § 1010.100(xx) ....................................................................... 11

31 C.F.R. § 1010.311 ............................................................................... 3

31 C.F.R. § 1010.370 ............................................................................... 4

31 C.F.R. § 1010.410 ............................................................................... 7

31 C.F.R. § 1010.970 ......................................................................... 5, 27

31 C.F.R. § 1022.410 ............................................................................. 26

Agency Information Collection Activities,
   85 Fed. Reg. 29022 (May 14, 2020)................................................... 25

Agency Information Collection Activities,
   89 Fed. Reg. 7767 (Feb. 5, 2024) ...................................................... 25

Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting
   Requirements on Certain Money Services Businesses Along the Southwest Border,
   90 Fed. Reg. 12106 (Mar. 14, 2025).............................................. *passim*

**ADMINISTRATIVE AND EXECUTIVE MATERIALS**

H. R. Rep. No. 79-1980 (1946)................................................................. 3

H. R. Rep. No. 101-74 (Nov. 18, 1988).................................................... 3

Treasury Order 180-01 (reaffirmed Jan. 14, 2020), *available at*
   https://home.treasury.gov/about/general-information/
   orders-and-directives/treasury-order-180-01 ...................................... 4

**OTHER AUTHORITIES**

11A Charles Alan Wright et al., Federal Practice and Procedure § 2947 (3d ed. 1998) .............. 28

FinCEN, *FinCEN Convenes FinCEN Exchange Sessions to Provide
    Stakeholders with Information About U.S. Southwest Border
    Geographic Targeting Order,* U.S. Dep't of the Treasury (Apr. 9, 2025)*,*
    https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-
    exchange-sessions-provide-stakeholders-information-about.................................................. 6

FinCen, *Frequently Asked Questions* (FAQs)*,*
    U.S. Dep't of the Treasury (Mar, 24, 2025),
    https://www.fincen.gov/sites/default/files/shared/
    SWB-MSB-GTO-Order-FINAL508.pdf. ................................................................................ 5

## INTRODUCTION

Acting pursuant to explicit statutory authority, the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") issued a Geographic Targeting Order on March 11, 2025 ("March 2025 GTO") that requires money services businesses ("MSBs") in portions of specific counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN.  In support of the March 2025 GTO, FinCEN found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the [Bank Secrecy Act] or to prevent evasions thereof" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

Plaintiffs—a new trade organization for MSBs, several constituent members, and one individual owner—cannot show a likelihood of success on the merits.  FinCEN is acting pursuant to explicit and well-established statutory authority. The administrative record shows that FinCEN acted reasonably when exercising that authority.  The Administrative Procedure Act ("APA") does not require notice and comment rulemaking for the order issued here.  The Supreme Court has already ruled that similar Bank Secrecy Act reporting requirements do not run afoul of the Fourth Amendment, and the Constitution does not otherwise protect money services businesses from this sort of recordkeeping regulation.

Moreover, Plaintiffs have not demonstrated the sort of irreparable injury that justifies extraordinary relief, and the balance of interests tips sharply in Defendants' favor.  FinCEN requires the requested information as soon as practicable to address the ongoing threat posed by cartels that launder money through the U.S. financial system, and the record establishes that MSBs along the southwest border are particularly vulnerable to these types of money laundering abuses.

1

And Plaintiffs' implausible allegations do not support the claim that the March 2025 GTO will be devastating for money services businesses. Mere speculation about the actions of third parties and exaggerated allegations about the burdens of compliance are insufficient to establish plaintiffs' claims. If anything, the testimony at the TRO hearing supports the opposite conclusion: Plaintiff Laredo Insurance Services indicated that it could come into compliance soon. And two other Plaintiffs (E.Mex. Financial Services and Cris Win) put in no evidence of irreparable harm at all, further supporting the inference that compliance is achievable, including for Plaintiffs. Moreover, assuming Plaintiffs successfully complete service,[1] the parties can then negotiate a reasonable schedule for briefing summary judgment without delay.

## BACKGROUND

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA).[2] The BSA authorizes the Secretary of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. These requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, 31 U.S.C. §§ 5311-14 and 5316-36, including notes thereto. The BSA and its implementing

---

[1] Undersigned counsel understands that Plaintiffs still have not completed service on the Defendants consistent with the requirements of Fed. R. Civ. P. 4(i). Although the complaint was served on the U.S. Attorney's Office, prompting a response to emergency motions, *see* Notice of Appearance, ECF No. 7, the Rules require Plaintiffs to complete service before this matter should proceed.

[2] The BSA consists of the Currency and Foreign Transactions Reporting Act of 1970, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107–56, 115 Stat. 272 (2001) and other legislation, including the Anti-Money Laundering Act of 2020 (AML Act) (sections 6001-6511, of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388).

regulations require financial institutions to file certain reports, including a currency transaction report ("CTR") for transactions in currency greater than an amount set by the Secretary – currently, $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

Separately, in the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain transactions in geographic areas thought to pose particular risks. Pub. L. No. 100–690, title VI, § 6185(c), 102 Stat. 4181, 4355 (1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. R. Rep. No. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
>     (1) to obtain such information as the Secretary may describe in such order concerning—
>         (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and
>         (B) any other person participating in such transaction;
>     (2) to maintain a record of such information for such period of time as the Secretary may require; and
>     (3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a); *see also* Ex. 1, Declaration of Director Andrea Gacki ("Gacki Decl.") ¶ 6. This authority is separate from and in addition to the regulatory authority to require other CTRs in 31 U.S.C. § 5313.

Thus, the statute authorizes the Secretary of the Treasury to issue a GTO to "obtain such information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id.* The primary prerequisite is that the Secretary find "reasonable grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[3] *Id.* A GTO may then be effective for no more than 180 days unless renewed. 31 U.S.C. § 5326(d). The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN. *See* Treasury Order 180-01 (reaffirmed Jan. 14, 2020), *available at* https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01. FinCEN has issued regulations which further govern the form of such GTOs. *See* 31 C.F.R. § 1010.370. FinCEN has repeatedly exercised this authority. *See* Gacki Decl. ¶ 7 (collecting multiple examples of past GTOs imposing temporary recordkeeping and reporting requirements, including at thresholds well below the $10,000 threshold set by 31 C.F.R. § 1010.311); *see also United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (describing Houston-area GTO with $100 threshold).[4]

---

[3] The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions. *See* 31 U.S.C. § 5311.

[4] Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including

On March 11, 2025, FinCEN issued the March 2025 GTO at issue in this case, which covers money services businesses operating in portions of five counties in Texas and two counties in California (a total of 30 ZIP codes). *See* Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border, 90 Fed. Reg. 12106 (Mar. 14, 2025); AR 000001-03; *see also* Am. Compl. ¶ 53. "Money services businesses" are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters, although there are exclusions from those categories as well. *See generally* 31 C.F.R. § 1010.100(ff). The March 2025 GTO took effect on April 14, 2025. Under this GTO, covered MSBs must submit CTRs within 15 days for currency transactions involving between $200 and $10,000. AR 000002. A covered MSB is also required to verify the identity of the customer. *Id.* Defendants have filed the public, non-privileged portions of the certified administrative record. *See generally* Notice of Filing Public Administrative Record, ECF No. 28.[5] The Gacki Declaration provides further information about the background and context of the March 2025 GTO and the administrative record. *See* Ex. 1.[6] Screenshots of a sample CTR are also attached as Ex. 2.

To assist covered businesses, FinCEN published FAQs on their website. *See* FinCen, *Frequently Asked Questions* (FAQs)*,* U.S. Dep't of the Treasury (Mar, 24, 2025),

---

requirements imposed by a GTO. *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

[5] The Administrative Record attached to this Notice is cited herein with the prefix "AR."

[6] Courts may consider such background and context declarations in an administrative record case. *See, e.g., Manufactured Hous. Inst. v. United States Dep't of Energy*, No. 1:23-CV-00174-DAE, 2024 WL 4795985, at *2 (W.D. Tex. Aug. 25, 2024); *see also Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); *Roe v. Dep't of Def.*, 947 F.3d 207, 223 (4th Cir. 2020).

https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf.

Additionally, FinCEN hosted two webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the March 2025 GTO were explained, and several questions concerning applicability and reporting were answered. *See* FinCEN, *FinCEN Convenes FinCEN Exchange Sessions to Provide Stakeholders with Information About U.S. Southwest Border Geographic Targeting Order,* U.S. Dep't of the Treasury (Apr. 9, 2025)*,* https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about. The webinar and the FAQs confirm that, other than the applicable amount and a code unique to the March 2025 GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000, and are to be filed in the same way. *See, e.g.*, FAQs 3, 7; *see also* Gacki Decl. ¶¶ 9, 24. Accordingly, for covered transactions, the MSB must report: information about the MSB, the MSB employee conducting the transaction, the type and amount of the transaction, and the customers involved in the transactions. *See* Ex. 2; *see also* Gacki Decl. ¶ 24. No special software is required to file a CTR, but covered institutions may choose to use various methods to streamline the process. *Id*. ¶¶ 25-26. FinCEN continues to engage with the industry to support compliance, and in fact, has already begun receiving CTRs required under the March 2025 GTO. *Id*. ¶¶ 19, 23.

As the Plaintiffs agree, *see* Am. Compl. ¶¶ 30-43, financial institutions that meet the regulatory definition of an MSB are subject to a range of legal and regulatory requirements that pre-date the March 2025 GTO, including registering with FinCEN, filing CTRs under FinCEN's existing regulations, developing and maintaining an effective AML program, filing suspicious activity reports, verifying customer identity for certain transactions, and maintaining detailed records. *See* AR 000006-07 (collecting regulations). Other regulations require verification of

identity for specific types and amounts of transactions.  *See, e.g.,* 31 C.F.R. § 1010.410(e)(2).
Plaintiffs' witness at the hearing on the temporary restraining order testified that he routinely
provides all of the collected data to state or federal entities as part of routine audits.  Ex. 3, Excerpts
from Tr. of April 11, 2025 Hr'g ("TRO Tr.") at 53-54.

On April 1, 2025, Plaintiff Texas Association of Money Services Businesses ("TAMSB")
filed the present lawsuit.  Plaintiff TAMSB claimed to be a "Texas non-profit organization, whose
members are Money Services Businesses affected by the [GTO]" and asserted APA and
constitutional claims.  Compl. ¶ 1, ECF No. 1.  Following briefing and a hearing that included the
testimony of one MSB owner, the Court entered a temporary restraining order.  TRO, ECF No. 13.
The TRO enjoined Defendants from "enforcing, implementing, or otherwise giving effect to" the
March 2025 GTO with respect to the 10 named members of TAMSB.  *Id.*  At the hearing, the
Court encouraged counsel for TAMSB to add the individual MSBs as Plaintiffs and otherwise
amend the complaint to address some issues raised by defendants.  The Amended Complaint added
ten TAMSB members and one individual owner of an MSB as Plaintiffs, Am. Compl. ¶¶ 1-12,
new factual allegations about the alleged harms to Plaintiffs, *id.* ¶¶ 93-113, and new claims, *id.*
¶¶ 158-81.  Namely, Plaintiffs add claims under the Fourth Amendment that the March 2025 GTO
is an unreasonable search, under the Fifth Amendment that the March 2025 GTO violates their
Fifth Amendment right against self-incrimination, and that the GTO statute violates the
nondelegation doctrine.  *Id.*  On the same day Plaintiffs filed their Amended Complaint, Plaintiffs
sought a preliminary injunction, relying on the APA and Fourth Amendment claims.  *See* Pls.'
Mot. for Prelim. Inj. ("PI Mot."), ECF No. 22.

## LEGAL STANDARD

Emergency injunctive relief "is an extraordinary and drastic remedy."  *Munaf v. Geren*,
553 U.S. 674, 689-90 (2008) (quotation omitted); *Aniboweí v. Morgan*, 70 F.4th 898, 902 (5th Cir.

7

2023). A preliminary injunction may only be granted if the movant establishes four prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*, No. 23-60483, 2025 WL 980568, at *2 (5th Cir. Apr. 1, 2025); *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The last two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant "bears the burden of persuasion on all four factors in order to be entitled to the extraordinary relief of a preliminary injunction." *N. Mississippi Med. Ctr., Inc.*, 2025 WL 980568, at *2 (citation omitted).

## DISCUSSION

Plaintiffs have failed to carry their burden with respect to any of the preliminary injunction factors.

## I. Plaintiffs Have Not Established a Likelihood of Success on the Merits.

Plaintiffs' Motion is limited to the APA claims and the Fourth Amendment claim, but they have not established a likelihood of success on any of these claims.

### A. Plaintiffs Cannot Show a Likelihood of Success on their APA claims.

A number of Plaintiffs' arguments purport to sound in the APA, including that the March 2025 GTO is arbitrary and capricious, that the March 2025 GTO exceeds FinCEN's statutory authority, and that FinCEN failed to engage in notice-and-comment rulemaking. *See* Am. Compl. ¶¶ 114-42. Plaintiffs cannot establish a likelihood of success on any of these claims.

An emergency motion is particularly ill-suited to judicial review of final agency action under the APA. *See* 5 U.S.C. § 706(2)(A). APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id*. § 706. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021); *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 73 F.4th 291, 299 (5th Cir. 2023), nor should the court "weigh the evidence in the record pro and con." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988). Although a court's review is "searching and careful," it ultimately does not "substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021).[7]

---

[7] Plaintiffs' constitutional claims, to the extent they are not purely legal, should be reviewed on the basis of the administrative record as well. The focus of judicial review of agency action, including challenges to agency action "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), "should be the administrative record already in existence, not some new record made initially in the reviewing court." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). A plaintiff cannot avoid record review by separately pleading a constitutional claim. *See Malone Mortg. Co. Am. v. Martinez*, 2003 WL 23272381, at *2 (N.D. Tex. Jan. 6, 2003) ("The APA's restriction of judicial review to the administrative record would be meaningless if any party seeking review based on statutory or constitutional deficiencies were entitled to broad-ranging discovery."); *Lewis v. United States & United States Army Corps of Eng'rs*, No. CV 18-1838, 2019 WL 13115362, at *6 (E.D. La. Mar. 28, 2019) (same); *KHOLLE Magnolia 2015, LLC v. Vidal*, No. CV H-22-1974, 2024 WL 3371040, at *2 (S.D. Tex. July 9, 2024) (same); *see also Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1131 (9th Cir. 2010); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018).

Here, the administrative record currently available confirms that FinCEN acted within its statutory authority, acted reasonably, and was not required to engage in notice-and-comment rulemaking.

1.      **Arbitrary and Capricious.**  FinCEN acted reasonably and considered all relevant factors when issuing the March 2025 GTO.  The Order itself reflects the agency's reasonable finding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the BSA or to prevent evasions" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."  AR 000002.  The administrative record confirms this finding.  Surveying available intelligence and data, FinCEN found that MSBs along the southwest border are uniquely vulnerable to money laundering activities by drug cartels that use both witting and unwitting MSBs as part of various illegal schemes to transport and launder drug money.  *See* AR 000007-12.  "FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings."  AR 000011-12; *see also* Gacki Decl. ¶ 12 (describing unique vulnerabilities of these MSBs).  For example, the administrative record provides examples where MSBs are targeted for funneling operations (where money is funneled to MSBs near the border from locations all over the country in smaller amounts, then cashed out or changed to pesos before being smuggled across the border), *see* AR 000009-10 n.24 (citing AR 000286, AR 000300), or targeted for the purpose of disguising illicit gains as remittances, transmitted across the border in smaller amounts, AR 000011-12 & n.32 (citing AR 000403-08).  And of course, on some occasions, MSBs have become witting partners of drug trafficking organizations (DTOs) trying to move or launder money.  *See* AR 000010 (citing examples at AR 000323-402).

FinCEN further found that, "[b]y lowering the CTR threshold, the information reported under this GTO would help . . . identify cartel-related money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States" in part because the reports "are expected to generate new leads and identify new and related subjects in ongoing cases." AR 000012. FinCEN further noted that the reduced dollar reporting threshold "will help make structuring more difficult, thereby increasing the cost of doing business for cartels" and "help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules." *Id.*[8] The evidentiary memorandum that forms part of the administrative record ("AR Memorandum") explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes." *Id.* at 000012-16 (surveying information about selected counties, and explaining why some other counties were excluded); *see also* Gacki Decl. ¶¶ 12-18 (describing how and why the agency chose these ZIP codes). Finally, the AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts. . . ." and would "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing

---

[8] "[A] person structures a transaction if that person . . . conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, in any manner, for the purpose of evading the reporting requirements under [31 C.F.R.] §§ 1010.311, 1010.313, 1020.315, 1021.311 and 1021.313 . . . ." 31 C.F.R. § 1010.100(xx). This includes "the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions at or below $10,000 . . ." *Id.*

FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances."  AR 000016-17; *see* Gacki Decl. ¶¶ 19-22.

Plaintiffs argue that the March 2025 GTO is arbitrary and capricious for essentially two reasons.  First, Plaintiffs challenge the $200 threshold itself, arguing that there is no "reasoned explanation" for that number and that FinCEN failed to consider the impact of that $200 threshold. PI Mot at 14-15.  These arguments fail because FinCEN considered all relevant factors and engaged in reasoned decisionmaking.  The administrative record explicitly acknowledges that the March 2025 GTO may place an increased burden on "covered businesses."  FinCEN reasoned that the March 2025 GTO, however, "is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs" and that FinCEN "does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services."  AR 000017.  Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors.[9]

Nor was the monetary threshold chosen arbitrarily.  The AR Memorandum explains that the "$200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts . . . ."  AR 000016.  Plaintiffs do not seriously dispute that the $200 threshold would realistically include all transactions vulnerable to illicit activity; they just argue that it also includes licit activity.  FinCEN never claimed, however, that all such activity was illicit or even

---

[9] As discussed in further detail below in Part II, FinCEN has internal estimates of the time burden imposed by CTRs; those burdens vary by type of institution and type of filing software used (and logically will vary by transaction as well), but the average burden is about 8 minutes per CTR, with many institutions (including nondepository institutions) acting more quickly.  *See infra* p. 25

suspicious; rather, this reporting requirement, which is consistent with other reporting requirements under the BSA that do not require any indicia of suspicion, because this comprehensive data is necessary to "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas, allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances." *Id.* As Director Gacki explains, "FinCEN assessed that the $200 threshold is low enough both to prevent the successful structuring of transactions to avoid CTR requirements and to increase the cost of doing business for drug cartels." Gacki Decl. ¶ 19.

Second, Plaintiffs argue that there is "[n]o reasoned explanation for targeting the 30 zip codes." PI Mot. at 15-16. The AR Memorandum explains that these specific ZIP codes were selected "based on risk factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes," AR 000012-13, and the administrative record includes the specific data relied upon to reach those conclusions, AR 000013-16, 000413-43. Logically, these locations in general are likely to be targeted by cartels because they "are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash." Gacki Decl. ¶ 12. FinCEN sees a "high volume of cash transactions" near these locations already known to be targeted by cartels, AR 000013, and reasonably assessed that additional reporting would further the purposes of the BSA, such as assessing money laundering risks, AR 000019; *see also* Gacki Decl. ¶¶ 11, 28-33.

Plaintiffs insist that much of the business of MSBs is legitimate, PI Mot. 16, but this is beside the point and FinCEN has never contended to the contrary. *See* AR 000007 (acknowledging legitimate business). Rather, a full picture of MSB activity in the region is helpful to allow law enforcement to "facilitate the tracking of money that has been sourced through" or that is "intended

to promote" criminal activity.  *See* AR at 13-14 (comprehensive "snapshot" of MSB activity of a "significant sample" will help FinCEN assess money laundering risks); *see also* 31 U.S.C. § 5311(3).[10]  FinCEN reasonably found that reducing the CTR threshold would provide a fuller picture of money laundering risks along the southwest border and make structuring more difficult, while producing new investigatory leads.  AR 000011-12; Gacki Decl. ¶ 19.  This is, indeed, common sense.  MSBs in these seven counties are particularly vulnerable to abuse, and gathering data about MSB transactions will provide a fuller picture to law enforcement and further the purposes of the BSA.  *See* 31 U.S.C. § 5311.  This reporting will be used to generate analysis and information about previously unsuspected money laundering activity (e.g., uncovering possible funneling activity to a network of suspected DTO associates operating in the region, previously undetected, or because such activities are operating through multiple unwitting MSBs), and generate leads for new and existing cases (e.g., new identifying information or financial activity related to a current subject of investigation).

Accordingly, the GTO is reasonable, and there is no basis to conclude that FinCEN's decision was arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

2.  **Notice-and-Comment Rulemaking**.  Plaintiffs argue that FinCEN should have engaged in notice-and-comment rulemaking before issuing the order authorized by 31 U.S.C. § 5326(a).  PI Mot. at 13.  But the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA.  *See* 90 Fed. Reg. at 12106.  The APA defines an "order" as "the whole or a part of a final disposition, whether affirmative, negative,

---

[10] Plaintiffs point to what they apparently view as low or normal numbers of CTRs in certain ZIP codes, PI Mot. 16, but fail to note that the number of CTRs in those counties were unusually high in proportion to the population.  AR 000016.  Plaintiffs argue that these numbers might be explained by "high volumes" of trade at a busy port of entry, PI Mot. at 16, but those same characteristics also make these locations attractive for illicit activity.

injunctive, or declaratory in form, of an agency in a matter other than rule making but including licensing." 5 U.S.C. § 551(6). Here, Congress specifically authorized the agency to act by "order" rather than by rule. That is in sharp contrast to the statutory provision governing CTRs, which generally requires the Secretary to set the reporting threshold "by regulation" rather than by order outside of the GTO context. *Compare* 31 U.S.C. § 5313(a) (requiring the Secretary to set reporting threshold "by regulation") *with* 31 U.S.C. § 5326 (authorizing the Secretary to act by order, including setting the applicable amount of reportable transactions in a GTO).

This reading of the statute is buttressed by the purposes of a GTO—to target a geographic area of particular interest for a time-limited period. GTOs last only for 180 days absent renewal; if notice-and-comment rulemaking were required, it would likely take longer than the duration of a GTO to issue a GTO and they could not be used effectively to respond to dynamic threats and developing financial intelligence.[11] Congress also specifically authorized confidential GTOs, which would not be possible with notice-and-comment rulemaking. *See* 31 U.S.C. § 5326 (prohibiting unauthorized disclosure of the existence of a GTO). Here, Congress authorized the agency to act by order rather than rule, and the Supreme Court has repeatedly reaffirmed that the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress. *See Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

Even if Congress had not explicitly authorized the agency to act by order, the March 2025 GTO is not exclusively legislative in nature. *Cf. U. S. v. W. H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was not subject to

---

[11] In the original 1988 law, a GTO lasted only 60 days, subject to renewal. 102 Stat. at 4355. When Congress extended the length of time a GTO could last, Congress did not impose any additional procedural requirements; the agency is authorized to act by "order."

rulemaking requirements). And the fact that the March 2025 GTO affects a group of businesses does not itself require notice-and-comment rulemaking. *See Neustar, Inc. v. FCC*, 857 F.3d 886, 894 (D.C. Cir. 2017) (that an order "'may affect agency policy and have general prospective application,' does not make it rulemaking subject to APA section 553 notice and comment") (citation omitted); *Nat'l Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1018 (D.C. Cir. 2016) ("[T]he fact that an agency action applies to a 'large number of [parties]' 'carr[ies] [little] weight' in [the Court's] analysis." (citation omitted)).

    **3.    Ultra Vires.** Plaintiffs appear to assert an "ultra vires" claim that FinCEN exceeded its statutory authority by issuing the March 2025 GTO, but rely entirely on the "major questions doctrine" and the non-delegation doctrine. *See* PI Mot. at 17-18. FinCEN acted within its explicit statutory authority.

    Under the major questions doctrine, courts have rejected claims of regulatory authority where (1) the underlying claim of authority concerns an issue of "vast economic and political significance," and (2) Congress has not clearly authorized the agency to act on the issue. *Util. Air Regul. Grp. v. EPA,* 573 U.S. 302, 324 (2014) (citation omitted). But, here, Congress has explicitly authorized exactly this agency action. By its plain terms, the GTO statutory provision authorizes "additional recordkeeping and reporting requirements" beyond those required by other regulatory provisions. *See* 31 U.S.C. § 5326(a). And it explicitly permits the Secretary, without limitations, to set an appropriate reporting threshold for a GTO. *Id*. § 5326(a)(1)(A) ("which the Secretary may prescribe"). The primary prerequisite is a finding that such an order is necessary to carry out the purposes of the BSA or prevent evasions thereof. FinCEN, in making the finding required by statute and imposing the temporary reporting requirements for one category of businesses in seven counties, did not exceed its statutory authority.

This case therefore lacks the hallmarks of the major questions decisions that Plaintiffs invoke, all of which grounded their analysis in the text, structure, and context of the relevant statutes. Here, FinCEN is not asserting regulatory power that is "markedly different" from the type of authority that Congress expressly identified in the relevant provision, *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 764 (2021) (per curiam) (cited at Pl Mot. at 18) or claiming "an unheralded power representing a transformative expansion in [its] regulatory authority . . . that Congress has conspicuously and repeatedly declined to enact," *West Virginia v. EPA*, 597 U.S. 697, 723-24 (2022) (quotation marks omitted) (cited at PI Mot. at 18). FinCEN's temporary, geographically limited reporting requirements are exactly the sort of order contemplated by Congress, and injunctive relief based on the "major questions" doctrine would be unwarranted. Plaintiffs' exaggerated allegations of harm, PI Mot. 18, would not create a major question even if those allegations were wholly accurate because the statutory language is clear and FinCEN acted well within it.

Nor does the nondelegation doctrine somehow aid Plaintiffs' ultra vires claim; in this part of the motion, Plaintiffs appear to argue, not that the agency exceeded its authority, but that Congress acted unconstitutionally. PI Mot. at 16-17. Under this doctrine, Congress "is not permitted to abdicate[,] or to transfer to others[,] the essential legislative functions with which it is . . . vested." *Panama Refin. Co. v. Ryan*, 293 U.S. 388, 421 (1935). The Supreme Court has recognized, however, "that the separation-of-powers principle, and the nondelegation doctrine in particular, do not prevent Congress from obtaining the assistance of its coordinate Branches." *Mistretta v. United States*, 488 U.S. 361, 372 (1989). "[I]n our increasingly complex society, replete with ever changing and more technical problems, Congress simply cannot do its job absent an ability to delegate power under broad general directives." *Id.* The Supreme Court has

17

invalidated statutes under the nondelegation doctrine only twice, both times in 1935.  *See A.L.A. Schechter Poultry Corp. v. United States*, 295 U.S. 495 (1935); *Panama Refin.*, 293 U.S. at 388.

To survive a challenge under the non-delegation doctrine, Congress must only articulate an intelligible principle pursuant to which a person authorized to act must conform.  *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001).  The GTO statute does exactly that.  The GTO statute states that additional recordkeeping and reporting requirements can only be imposed upon a finding that reasonable grounds exist for concluding that such requirements are necessary to carry out the purposes, or prevent evasions of, the BSA.  *See* 31 U.S.C. § 5326.  The GTO statute explicitly describes the kinds of transactions about which information can be collected and from which parties, and limits the application of any requirements to businesses in a geographic area. *Id.*  The GTO statute further limits the duration of these additional requirements, subject to renewal upon a further finding of necessity.  *Id.*  In short, FinCEN has acted reasonably and pursuant to its explicit statutory authority, and Plaintiffs cannot show a likelihood of success on these claims.

B.    Plaintiffs Cannot Show a Likelihood of Success on their Fourth Amendment Claims Because the Supreme Court Has Already Rejected Nearly Identical Claims.

Plaintiffs have not shown a substantial likelihood of success on their Fourth Amendment claims.  In arguing that the GTO is a "general warrant," Plaintiffs give short shrift to the key precedent on the Fourth Amendment and financial reporting requirements, the Supreme Court's decision in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974).  *Shultz* (like this case) involved a Fourth Amendment challenge to various BSA recordkeeping and reporting requirements, including CTRs (which Treasury required for currency transactions over $10,000) as well as certain other reports set at lower thresholds.  *Id.* at 35-41.  For each covered transaction, the BSA required the bank to disclose "the name, address, business or profession and social security number of the person conducting the transaction," among other information.  *Id.* at 39 n.15.  Congress

created these "precise and detailed reporting requirements," *id*. at 27, to address "the use of financial institutions, both domestic and foreign, in furtherance of activities designed to evade" U.S. law, *id*. at 38; *see also id*. at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions.").

The Supreme Court concluded that these BSA reporting requirements were reasonable and consistent with the Fourth Amendment. The Court connected its Fourth Amendment analysis to the specific context of corporate reporting requirements, where it has long been clear "that organizations engaged in commerce c[an] be required by the Government to file reports dealing with particular phases of their activities." *Id*. at 65; *see also id*. at 59 ("Since a statute requiring the filing and subsequent publication of a corporate tax return has been upheld against a Fourth Amendment challenge . . . , reporting requirements are by no means per se violations of the Fourth Amendment." (citation omitted)). As to the constitutionality of the BSA reporting requirements at issue, the Court's rationale had two components: the information required to be reported was "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA provisions at issue "d[id] not impose unreasonable reporting requirements" and did not require a warrant or probable cause. *Id.* at 67.

*Shultz* establishes the proper Fourth Amendment rubric applicable to the March 2025 GTO, which takes a similar form and arose in similar circumstances. MSBs along the southwest border are already engaged in a highly regulated industry subject to extensive recordkeeping and reporting requirements, as well as audits. *See, e.g*., Am. Compl. ¶¶ 30-45; TRO Tr. 53-54 (witness describing audits that regularly require him to turn over all business records to state and federal agencies); Gonzalez Decl. ¶ 33; Mario Regalado Decl. ¶ 10 (all customer information goes to IRS).

Neither the individual nor the MSBs have shown a reasonable expectation of privacy that would impact reporting requirements like this one. Just like the reporting in *Shultz*, the GTO requires companies to "file reports dealing with particular phases of their activities." 416 U.S. at 65. Like the reporting requirements challenged in *Shultz*, the March 2025 GTO was motivated by increasing use of covered entities for illicit purposes: "MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border." *See* AR 000008; Gacki Decl. ¶¶ 11-22, 30, 33.

*Shultz* disproves Plaintiffs' Fourth Amendment claim, as the Supreme Court repeatedly explained that the BSA arose because of "the heavy utilization of our domestic banking system by the minions of organized crime." *Shultz*, 416 U.S. at 30; *see also id.* at 26-27 ("Congress found that the recent growth of financial institutions in the United States had been paralleled by an increase in criminal activity which made use of these institutions."). As the Supreme Court recognized, Congress determined that the BSA's reporting requirements were necessary "in ferreting out criminal activity and desired to strengthen the statutory basis for requiring such reports." *Id.* at 38. Neither a warrant nor probable cause are required in this circumstance.

Plaintiffs' insistence that a warrant is required, or that GTO "operates as a general warrant", PI Mot. at 10, simply cannot be squared with *Shultz* or with the many other statutory reporting requirements that have long been understood as constitutional.[12] The requirements for a warrant or a certain level of individualized suspicion that Plaintiffs seek to impose on cases involving statutory reporting schemes come from (and are applicable to) cases involving discretionary and

---

[12] *See, e.g.,* 8 U.S.C. § 1324a(b) (employment verification reporting requirements); 52 U.S.C. § 30104 (political campaigns); 26 U.S.C. § 6012 (tax returns).

often physical searches.  In cases where agencies or officers have discretion to control the timing, manner, scope, and frequency of individual searches, an opportunity for pre-compliance review may mitigate any risk of abuse or harassment. *See Brock v. Emerson Elec. Co., Elec. & Space Div.*, 834 F.2d 994, 996 n.2 (11th Cir. 1987) (differentiating cases "involv[ing] discretionary and potentially arbitrary requests for document inspection," where a subpoena may be required, with "cases in which businesses or individuals are required to report particular information to the government on a regular basis," like *Shultz*).

For instance, Plaintiffs rely on *Patel*, which concerned on-demand "inspections" of hotel guest records by city police.  *City of Los Angeles v. Patel,* 576 U.S. 409, 412-14 (2015).  The Supreme Court required pre-compliance review because of a "risk that searches . . . will exceed statutory limits, or be used as a pretext to harass hotel operators and their guests," such as a hotel being "searched 10 times a day, every day, for three months." *Id.* at 421; *see also id.* at 423 ("[T]he availability of precompliance review . . . reduces the risk that officers will use these administrative searches as a pretext to harass business owners.").  Here, the March 2025 GTO requires reporting of specific information under specific statutory criteria, rather than providing officers with leave to conduct limitless, discretionary searches of Plaintiffs' premises, persons, or files.  *See* 31 U.S.C. § 5326; 90 Fed. Reg. at 12107.  Like the BSA provisions at issue in *Shultz*, it does not create the risk of pretextual or arbitrary harassment or abuse present in *Patel* and similar cases.

Plaintiffs also rely on *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), which held that a geofence warrant violated the Fourth Amendment.  In *Smith*, law enforcement was looking for a particular criminal and demanding that a private company sift through large amounts of purportedly private location data to find the particular criminal.  But that case did not involve a corporate reporting requirement, does not purport to limit the ruling in *Shultz*, and does not address a heightened regulatory reporting requirement like this one.  The Supreme Court has already

concluded that similar reporting requirements under the BSA and its implementing regulations do not run afoul of the Fourth Amendment, and the outcome is no different here simply because the temporary reporting requirement is imposed under a different provision of the BSA.

Indeed, as contrasted with cases involving "an arbitrary and discretionary demand to inspect company records," the Sixth Circuit and others have recognized the permissibility of "a warrantless inspection" in the form of "reporting requirement[s]" like those at issue in *Shultz*. *McLaughlin v. Kings Island, Div. of Taft Broad. Co.*, 849 F.2d 990, 994-95 (6th Cir. 1988); *see also Brock*, 834 F.2d at 996 n.2 (11th Cir. 1987) (observing that in cases like *Shultz*, "a uniform statutory or regulatory reporting requirement satisfies the Fourth Amendment concern regarding the potential for arbitrary invasions of privacy"); *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981) (upholding Labor Management Reporting and Disclosure Act requirements and stating that the Fourth Amendment "simply requires that the reporting scheme imposed by the statute bear a reasonable relationship to a permissible subject of governmental inquiry and not place an undue burden on the defendant").  This distinction is present in *Shultz* itself.  *See Shultz*, 416 U.S. at 62 (stating that "[u]nlike the situation in" other cases dealing with defective warrant procedures, the BSA "do[es] not authorize indiscriminate rummaging among the records of the plaintiffs").

Finally, Plaintiff Gonzalez, an MSB owner, argues that the reporting requirement violates his own Fourth Amendment rights because he may have to report his own currency exchange transactions.  Mr. Gonzalez does not testify as to where he does his regular currency exchanges. Even assuming that his transactions are covered transactions, the customer of a financial institution "can assert neither ownership nor possession" in the business records of the financial institution, even where the Government requires those records to be maintained, and thus cannot object to their disclosure.  *United States v. Miller*, 425 U.S. 435, 440 (1976).  Because the Supreme Court

rejected the argument in *Shultz* that the financial institution has a Fourth Amendment right to avoid reporting requirements and rejected the argument in *Miller* that the customer has a protected right to avoid such requirements, Mr. Gonzalez does not have some different special kind of protected interest simply because he is both.[13]

## II.    Plaintiffs Have Not Established Irreparable Injury.

Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay, are not enough" and the "possibility" of "compensatory or other corrective relief . . . weighs heavily against the claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975). Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that . . . plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

Here, it is necessary to treat the various Plaintiffs differently because they have alleged different levels of irreparable harm. First, as explained in Defendants' Opposition to the TRO, TAMSB has alleged no harm whatsoever to itself. *See* Defs.' Opp'n to Pl.'s Mot. for an Emer. Ex Parte TRO, at 9, ECF No. 11. Given that its member organizations are now parties to the lawsuit,

---

[13] Plaintiffs' effort to "preserve" a self-incrimination claim also fails. *See* PI Mot. 12 n.4. No Plaintiff has even alleged that any information that the Government would gain is incriminating. *See United States v. Apfelbaum*, 445 U.S. 115, 128 (1980). In any event, the Fifth Circuit has rejected the notion that the BSA's recordkeeping and reporting requirements violate the Fifth Amendment even where such evidence is being used in a criminal proceeding. *See In re Grand Jury Subpoena*, 696 F.3d 428, 432 (5th Cir. 2012).

TAMSB is entirely superfluous, and is entitled to no relief.  The conclusory assertion in the TRO motion that TAMSB members face "ruinous compliance costs, loss of customer base, reputational damage, and closure," has proven at least partially incorrect.  For example, at the TRO hearing, Mr. Martinez of Plaintiff Laredo Insurance Services testified that he was not ready to fully comply with the March 2025 GTO in a few days because his engineers were still working on the software, but that he was probably going to do it anyway now that Walmart was not going to handle certain transactions.  TRO Tr. 55-56.  In other words, there may be a large business opportunity for MSBs like his if they can comply with the March 2025 GTO.  He later stated that they might need to downsize in the future if their volume goes down, TRO Tr. at 62-63, but there is no reason to think that is likely, and he never opined that it was.  His speculation that customers might prefer to go to banks to avoid ID requirements is implausible.  *See, e.g.*, AR 000017 (generally higher fees at banks); Gacki Decl. ¶ 20 (most banks will not perform certain services for non-account-holders and tend to check identification regardless).  Mr. Martinez's own testimony shows that his business can comply with the GTO without ruinous harm and may even profit, and his speculation about what his customers might do is not supported by facts.  Two other Plaintiffs (E.Mex. Financial Services and Cris Win) so far have put in no evidence of irreparable harm at all, further supporting the inference that compliance is perfectly achievable for many MSBs, including some of the Plaintiffs.  The Gacki Declaration demonstrates that many covered businesses have begun filing CTRs with respect to covered transactions.  Gacki Decl. ¶¶ 19, 23.

For those Plaintiffs who did put in evidence that it may be costly for their business to comply with the TRO, the estimates of those costs appear to be exaggerated, there is no evidence that they have explored automated alternatives like automated batch-filing, and they otherwise just speculate about the future actions of customers who they claim may not want to provide the additional information required by the CTR.  As a baseline, the Paperwork Reduction Act notice

cited by Plaintiffs estimates that each CTR takes eight minutes to complete, an average of ranges from 3.24 minutes to over 20 minutes per CTR depending on filing method. *See* Agency Information Collection Activities, 85 Fed. Reg. 29022, 29029 (May 14, 2020), 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024); *see also* Gacki Decl. ¶ 26. Notably, many nondepository institutions like MSBs use automated batch filing, and for them, the average time per CTR is estimated at 4.76 minutes per CTR. Not a single one of the submitted declarations indicates that the Plaintiff had explored the relative cost of temporary adoption of such automated filing options, or considered alternative options like training current personnel to perform additional duties. Accordingly, those Plaintiffs have not demonstrated irreparable harm. The one Plaintiff who did consider the automated option concluded that it made sense for his business to adopt batch filing software, and was just trying to finalize how to do so at the time of the TRO hearing. Weeks later, he should be ready to comply.

But the PRA estimate is facially quite conservative for discrete, non-automated filers as some Plaintiffs claim to be, and Plaintiffs' submissions estimating 25-30 minutes or more per CTR do not appear to take into account the types of transactions they do, the types of information and paperwork they already have, or other relevant factors. Plaintiff Gonzalez's estimate of 25 minutes for each and every CTR, Gonzalez Decl. ¶ 18, appears to be premised on discrete, nonautomated filings and does not consider other options. It also does not account for the fact that he already collects this same information for transactions over $1000, *id*. ¶ 12 (claiming it typically takes 5-10 minutes) and yet more information (beyond that required for a CTR) for transactions over $3000, *id.* ¶ 13 (claiming this takes 15 minutes). His estimate of 25 minutes for each CTR for 33 CTRs thus appears to include the time already spent gathering information from a subset of his customers for at least some of those CTRs. He also states that his MSB is open twenty four hours/day with one cashier always on duty and himself on duty during weekday workhours. The

25

declaration does not indicate how much of the additional work imposed could be absorbed by himself and existing employees. Given that it is a twenty-four hour business, could some or all of the work be absorbed by training employees to do it during slow hours or slow days? The declaration does not indicate. And the speculation that customers will be afraid is just that—speculation. Gonzalez Decl. ¶ 23 (speculating that "a lot of people . . . may not want to attract attention" and wondering about what people "might think.").

Other Plaintiffs' submissions suffer from similar defects. Mr. Salinas of Plaintiff San Isidro Multi-Services runs a currency exchange business like Plaintiff Gonzalez, but he estimates that every CTR will take him an additional 30 minutes of employee time, as opposed to the 25 minutes estimated by Gonzalez. Salinas Decl. ¶ 9. Salinas operates multiple locations, *see id*. ¶ 5, and thus appears to be a larger operation, akin to that described by Mr. Martinez at the TRO hearing, but he does not indicate that he has considered the batch-filing alternative that Plaintiff Laredo Insurance Services was working on. It is unclear how Mario Regalado of Border International Services came to his estimate of 870 additional hours, but he appears to have estimated more than 30 minutes per CTR, *see* Mario Regalado Decl. ¶¶ 8-9, despite the fact that he acknowledges that the MSB already collects customer information on many such transactions, *id*. ¶¶ 10, 13. Like San Isidro Multi-Services, Border International Services appears to be a large operation that has not disclosed any other possible methods of addressing these burdens. *Id*. ¶ 5. The other declarations similarly tend to estimate 30 minutes per CTR (which is beyond even the conservative FinCEN estimate) and fail to provide many details or show whether the Plaintiff considered other measures. *See generally* Espinoza Decl. (for Espro Investments);[14] Miguel

---

[14] The Espinoza Declaration indicates that their various locations perform around 250 transactions worth between $200 and $3000 daily without collecting customer information. To the extent that

Regalado Decl. (for Best Rate); Granado Decl. (for Temex).  And the relative burden on different Plaintiff businesses varies because it varies widely as a percentage of their business.  *Compare* Guerra Decl. ¶ 6 (13.77% of transactions are worth over $200) with Gonzalez Decl. ¶ 17 (27% of business is worth between $200 and $10000).  It bears repeating that before the parties hold a hearing on this motion, all Plaintiffs will have had over 60 days to figure out how to come into compliance with the March 2025 GTO.

Finally, Plaintiffs' failure to pursue other options or relief and their delay in bringing suit militates against a finding of irreparable harm.  "A party who faces an existential threat to its mission and survival—as Plaintiffs claim to face here—will presumably spring into action and seek relief as soon as practicable after discovering that threat," and an "unexplained delay before seeking a TRO . . . implies a lack of urgency and irreparable harm."  *See Las Americas Immigrant Advoc. Ctr. v. Paxton*, No. EP-24-CV-00352-DCG, 2024 WL 4430542, at *5 (W.D. Tex. Sept. 27, 2024) (quotations omitted).  Thus, "whenever a plaintiff could have brought a TRO motion earlier, but instead seeks a TRO at the eleventh hour, giving the defendants no real opportunity to respond, that delay discredits the plaintiff's argument that irreparable injury will result if the Court does not issue the requested TRO."  *Id.* (cleaned up).  Here, the March 2025 GTO was issued March 11, but Plaintiffs waited nearly a full month, until April 9, to bring an emergency TRO motion on an *ex parte* basis, providing Defendants little time to respond and the Court little time to consider.  In between, they incorporated a new association.  They did not, however, seek exemptive relief from FinCEN.  *See* Gacki Decl. ¶ 27; 31 C.F.R. § 1010.970.  A plaintiff facing "existential threats" might reasonably be expected to seek immediate administrative or judicial relief.  These Plaintiffs

---

number included currency exchange transactions worth more than $1000, it would be legally problematic or inaccurate. *See* 31 C.F.R. § 1022.410 (requiring collection of customer information for foreign currency transactions over $1000).

did not, and they also continue to not treat the March 2025 GTO as an existential threat. The Court could and should deny the motion for that reason alone.

## III.    The Balance of Interests Tips in Favor of Defendants.

The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter,* 555 U.S. at 24 (citation omitted). Any preliminary relief should be carefully tailored to address only the harms that plaintiffs have established. 11A Charles Alan Wright et al., Federal Practice and Procedure § 2947 (3d ed. 1998).

In the face of Plaintiffs' weak evidence of harm to a few MSBs, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry the day. It is in the public interest for the Government to act swiftly on these issues, particularly in light of the ongoing fentanyl crisis and evidence that drug cartels are using MSBs to further their devastating criminal activity. *See* AR 000011-12; Gacki Decl. ¶ 30 ("The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money laundering."). The Gacki Declaration further explains that "given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs." *Id*. ¶ 32. And an

injunction "would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole." *Id.* ¶ 33.

Were the Court nonetheless to grant Plaintiffs' motion, the Court should limit any relief to the Plaintiff MSBs, based on the constitutional and equitable principles mandating that "[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury," *Gill v. Whitford*, 585 U.S. 48, 72-73 (2018) (emphasis added), and that equitable relief may "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs," *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). Any broader relief is inconsistent with Article III's judicial power, which "exists *only* to redress or otherwise protect against injury to the complaining party." *Warth v. Seldin*, 422 U.S. 490, 499 (1975) (emphasis added). It is also inconsistent with traditional equitable principles premised on "providing equitable relief only to parties." *Trump v. Hawaii*, 585 U.S. 667, 718 (2018) (Thomas, J., concurring); *cf. Labrador v. Poe*, 144 S. Ct. 921, 923 (2024) (Gorsuch, J., concurring).

The APA's § 705 likewise explicitly incorporates the constitutional and equitable limitations on non-party relief. *See* 5 U.S.C. § 705 (permitting a court to stay agency action only "to the extent necessary to prevent irreparable injury"); *cf.* H.R. Rep. No. 79-1980, at 43 (1946) (recognizing § 705 relief "would normally, if not always, be limited to the parties complainant"). Plaintiffs have not established irreparable harm to each Plaintiff, much less more broadly, and no injunction should issue at all. Were the Court to do so, however, any relief granted should be limited to identified Plaintiffs.

Finally, under Federal Rule of Civil Procedure 65(c), the Court may issue such relief "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). In the event the Court issues an injunction here, the Court should require Plaintiff to post an appropriate bond commensurate with

29

the scope of any injunction. *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999)

(stating that Rule 65(c) places "broad discretion in the district court to determine the appropriate

amount of an injunction bond").

## CONCLUSION

  For these reasons, the Court should deny the emergency motion.

Dated: May 1, 2025       Respectfully submitted,

           YAAKOV ROTH
           Acting Assistant Attorney General

           STEPHEN M. ELLIOTT
           Assistant Director, Federal Programs Branch

           /s/Amy E. Powell
           AMY E. POWELL
           Senior Trial Counsel
           United States Department of Justice
           Civil Division, Federal Programs Branch
           c/o U.S. Attorney's Office for EDNC
           150 Fayetteville St, Suite 2100
           Raleigh, NC 27601
           Tel.: 919-856-4013
           Email:  amy.powell@usdoj.gov
           Counsel for Defendants