# Exhibit 1

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS ASS'N FOR MONEY SERVICES BUSINESSES (TAMSB), *et al*.<br><br>*Plaintiffs*,<br><br>v.<br><br>PAM BONDI, in her official capacity as Attorney General; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, in her official capacity as the Director of the Financial Crimes Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,<br><br>*Defendants*. | Civil Action No. SA-25-cv-00344-FB |

## DECLARATION OF ANDREA GACKI

I, Andrea Gacki, declare the following to be a true and correct statement of facts:

1.     I am the Director of the Financial Crimes Enforcement Network ("FinCEN"), a bureau of the U.S. Department of the Treasury ("Treasury"). I have held this position since September 2023. I previously served in several other leadership roles within Treasury. Prior to joining FinCEN, I served as the Director of the Office of Foreign Assets Control, another component of Treasury (within Treasury's Office of Terrorism and Financial Intelligence), for approximately five years and, from January 2021 to December 2021, I performed the duties of the Under Secretary for Terrorism and Financial Intelligence. In my official capacity as the Director of FinCEN, I supervise all aspects of FinCEN's operations, including FinCEN's implementation of the Bank Secrecy Act ("BSA").

2.    Due to the nature of my official duties, I am familiar with FinCEN's implementation of the BSA's requirements, including FinCEN's issuance of orders pursuant to 31 U.S.C. § 5326.

3.    I make this declaration in support of Defendants' opposition to Plaintiffs' motion for preliminary injunction. The statements I make in this declaration are based on my personal knowledge, on information made available to me in my official capacity, and on conclusions reached and determinations made in accordance therewith.

4.    FinCEN was created in 1990 and became a bureau of Treasury by virtue of the USA PATRIOT Act of 2001, Pub. L. 107-56. The Director of FinCEN is appointed by the Secretary of the Treasury and reports to Treasury's Under Secretary for Terrorism and Financial Intelligence.

5.    FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. FinCEN primarily exercises regulatory functions under the legislative framework commonly referred to as the BSA,[1] which includes the Currency and Foreign Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001, the Anti-Money Laundering Act of 2020, and other legislation. The BSA is the nation's first and most comprehensive federal anti-money laundering and countering the financing of terrorism ("AML/CFT") statute. The Secretary of the Treasury has delegated to the Director of FinCEN

---

[1] The BSA is codified at 12 U.S.C. §§ 1829b, 1951-1960 and 31 U.S.C. §§ 5311-5314, 5316-5336, including notes thereto. Regulations implementing the BSA appear at 31 C.F.R. Chapter X.

the authority to implement, administer, and enforce compliance with the BSA and associated regulations. *See* Treasury, Treasury Directive 180-01 (Jan. 14, 2020).

      6.      In the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain currency transactions in geographic areas thought to pose particular money laundering risks. Pub. L. 100-690, title VI, § 6185(c), 102 Stat. 4355 (Nov. 19, 1988). The original purpose was to grant "the Secretary of Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. Rep. 101-74, at 111 (Nov. 18, 1988). As amended and codified at 31 U.S.C. § 5326, the Secretary of the Treasury may issue an order requiring any domestic business in a geographic area to keep additional records or file additional reports upon finding that reasonable grounds exist for concluding that such additional requirements are necessary to carry out the purposes of the BSA or to prevent evasions thereof. 31 U.S.C. § 5326(a). Orders issued under this authority are referred to as geographic targeting orders or GTOs. The statute further authorizes the Secretary of the Treasury to obtain information as described in a GTO concerning any transaction in which a business is involved and the applicable recordkeeping and/or reporting dollar thresholds of such transactions. *Id.* A GTO may be effective for no more than 180 days, unless renewed. 31 U.S.C. § 5326(d). FinCEN has issued a regulation that further governs the form of a GTO. 31 C.F.R. § 1010.370. Additionally, FinCEN may prescribe an appropriate exemption from a requirement imposed under the BSA, including any requirement imposed by a GTO. 31 U.S.C. § 5318(a)(7).

7. FinCEN has issued several GTOs in the past that required a great number of businesses in certain geographic areas to report on cash transactions at dollar thresholds far below existing BSA reporting thresholds. For example, in the late 1990s, FinCEN issued GTOs in the New York City metropolitan area (the "New York GTOs") that required certain money transmitters and over 3,000 of their agents to obtain and report identifying information about the sender and recipient of all cash-purchased remittances to Colombia and the Dominican Republic in the amount of $750 or more. *See* https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia; http://www.fincen.gov/news/news-releases/treasury-cracks-down-remittances-dominican-republic. The dollar threshold for reporting cash transactions under the BSA was (and still is) over $10,000. *See* 31 C.F.R. § 1010.311 (current currency transaction report rule). The New York GTOs were issued to disrupt the flow of narcotics proceeds from the targeted money transmitters to Colombia and the Dominican Republic. In addition, in 2014, FinCEN issued a GTO requiring over 2,000 businesses in the Los Angeles fashion district ("LA GTO") to report cash transactions of $3,000 or more. *See* https://www.fincen.gov/news/news-releases/fincen-issues-geographic-targeting-order-covering-los-angeles-fashion-district. The LA GTO was issued to address the use of the targeted businesses in trade-based money laundering schemes in which drug money in the United States is converted into goods that are shipped to countries, such as Mexico, where the goods are then sold and the money—now in the form of local currency—goes to the drug trafficking organizations. Moreover, in 2015, FinCEN issued a GTO requiring about 700 businesses (primarily electronics exporters) in the Miami, Florida area ("Miami GTO") to report cash transactions of $3,000 or more. *See* https://www.fincen.gov/news/news-releases/fincen-targets-money-laundering-infrastructure-

geographic-targeting-order-miami. The Miami GTO, like the LA GTO, was issued to address trade-based money laundering risks associated with the targeted businesses.

### The SW Border GTO: Basics and Scope

8. On March 11, 2025, FinCEN issued the GTO at issue in this case, which covers money services businesses in 30 ZIP codes located in two counties in California—Imperial and San Diego—and the following seven counties in Texas—Cameron, El Paso, Hidalgo, Maverick, and Webb (the "SW Border GTO"). A money services business ("MSB") is defined in the BSA regulations as certain non-bank financial institutions, including but not limited to check cashers, currency exchangers, and money transmitters. 31 C.F.R. § 1010.100(ff). The BSA regulations require MSBs to file currency transaction reports ("CTRs") on transactions in currency of more than $10,000. 31 C.F.R. § 1010.311.

9. The SW Border GTO imposes the additional requirements on covered MSBs to report transactions in currency between $200 and $10,000, and to verify the identity of those persons conducting such transactions. The reports required under the SW Border GTO must be filed in the same manner as those reports filed for transactions involving more than $10,000. For example, a covered MSB must file a report within 15 days after receipt of more than $200 in currency. The SW Border GTO took effect on April 14, 2025, and will expire, unless renewed, on September 9, 2025. FinCEN issued the SWB GTO to address cash-based money laundering along the southwest border, including by Mexican drug cartels—particularly cartels linked to illicit opioid trafficking.

10. On April 11, 2025, the district court in this matter issued a temporary restraining order enjoining Defendants, their officers, agents, servants, employees, and all others acting in

concert with them, from enforcing, implementing, or otherwise giving effect to the SW Border GTO, as applied to the TAMSB and its members as of the date of that order. On April 18, 2025, Plaintiffs filed a motion for preliminary injunction seeking to enjoin the SW Border GTO across all thirty zip codes. If FinCEN's SW Border GTO implementation efforts are preliminarily enjoined at this juncture, the U.S. anti-money laundering and countering terrorist financing efforts will be harmed, particularly as these efforts relate to countering illicit opioid trafficking.

## The SW Border GTO: Justification

11. FinCEN issued the SWB GTO to address cash-based money laundering along the southwest border, including by Mexican drug cartels—including cartels linked to illicit opioid trafficking. The SW Border GTO will collect data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels—which are drug trafficking organizations (DTOs) and, in some cases, also foreign terrorist organizations (FTOs). The SW Border GTO will assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting MSBs to launder the proceeds of their crimes, thereby perpetuating the synthetic opioid crisis in the United States.

12. FinCEN does not believe that southwest border-based MSBs are the only MSBs vulnerable to exploitation by cartels. Southwest border-based MSBs, however, do have some unique vulnerabilities, as they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.

13. In addition, FinCEN has worked with law enforcement in California on this issue, and law enforcement has identified problems in some of the areas covered by this GTO.

14. FinCEN limited the GTO to those ZIP codes that are the highest risk for illicit actors in order to maintain the effectiveness of the GTO while limiting its overall burden on industry.

15. In reaching that decision, FinCEN examined the total number of CTRs filed along border counties in all four states and found that overall filings in Arizona and New Mexico were significantly lower than in Texas and California. AR000012-16. Based on this finding, combined with the fact that Texas and California contain all the most significant U.S.-Mexico border crossings, FinCEN decided not to cover any counties or ZIP codes in Arizona and New Mexico in this GTO. *Id.*

16. In an effort to further reduce the burden, FinCEN covered only 30 ZIP codes in California and Texas. To choose these ZIP codes, FinCEN looked at the number of CTRs filed relative to the population in border ZIP codes in Texas and California and emphasized those with higher numbers of filings per capita, as well as areas containing or close to border crossings, in its choice of covered ZIP codes. *Id.*

17. FinCEN did not cover certain ZIP codes that appeared to have a very high number of CTR filings relative to the population, but for which the volume could be explained by some of the businesses located there. For example, FinCEN did not cover one ZIP code that had a high number of CTR filings due to the fact that it contains a location for Brink's, a cash handling service.

18. FinCEN recognizes that MSBs all along the southwest border are uniquely vulnerable due to their location, and ultimately settled on these 30 ZIP codes to limit burden as FinCEN gathered information to address cash-based money laundering along the southwest

border, including by Mexican drug cartels, and thus, carry out the purposes of the BSA and prevent evasion thereof. AR000008-9, AR000013.

19.   FinCEN assesses that the $200 threshold is low enough both to prevent the successful structuring of transactions to avoid CTR requirements and to increase the cost of doing business for drug cartels. AR000016-17. The filing threshold was set to ensure that FinCEN collects highly useful information about violations and evasions of the BSA, while excluding clearly *de minimis* amounts that are more likely to be legitimate. *Id.* Results from the GTO queried on May 1, 2025, indicate that 46,567 CTRs have been filed thus far, and of that amount, 34,812 are reports filed for under $5,000.

20.   Further, FinCEN does not anticipate that illicit activities will switch to banks in the covered geographic areas as a result of this GTO for several reasons. First, banks usually deny services to non-customers, and for those that do offer services, banks usually impose higher fees, limit the types of services available, and impose low dollar thresholds on services provided to non-customers. Second, banks are subject to more stringent customer identification and due diligence obligations, regardless of CTR requirements. *See* AR000017.

21.   FinCEN similarly does not expect illicit activity to easily move to exchanges in Mexico. Regardless, the southwest border presents particularized risks of money laundering due to its proximity to Mexico, and it is those that the SW Border GTO seeks to address by significantly curtailing the ability of illicit actors to move money anonymously through MSBs in the GTO's covered geographic areas.

22.   Any effort by illicit actors to evade the SW Border GTO's reporting requirements imposes additional costs to those actors, raising the cost of their money laundering operations.

For example, illicit funds may be transmitted from a financial institution elsewhere in the United States to an MSB covered by this GTO, where the funds are cashed out before being physically moved across the border. If the funds were instead transmitted directly to a Mexican MSB, we assessed that the transaction would be higher risk, likely invite higher scrutiny from the U.S. financial institution, and would have higher fees.

### SW Border GTO: Technical Compliance and Burden

23.     As of May 1, 2025, FinCEN has identified 73 unique filers of CTRs using the keyword "MSB0325GTO," as required by the GTO. FinCEN also previously identified 18 additional filers who were filing CTRs for transactions below $10,000 but not including the keyword.

24.     As noted earlier, the CTR is the form used to report certain cash transactions to FinCEN—namely, transactions in currency of more than $10,000. 31 C.F.R. § 1010.311. The CTR form is completed online and contains fields corresponding to information that MSBs may often already collect or necessarily have for certain types of transactions, including information about relevant financial institutions, relevant financial institution employee(s), the customer, and the type and amount of the cash transaction. For example, MSBs have a general requirement to verify customer identification and specific requirements to obtain identifying information about a customer above certain dollar thresholds for certain transactions. For instance, certain funds transfers and purchases of bank checks and drafts, cashier's checks, money orders, and traveler's checks with currency at $3,000 or more require the collection of customer identification information. 31 C.F.R. § 1010.410 and 31 C.F.R. § 1010.415. Additionally, dealers in foreign exchange, under 31 C.F.R. § 1022.410, are required to collect identifying information for

customers involved in transactions in excess of $1,000. The MSB also has information about itself and its employees. This is all information that MSBs collect or maintain as part of their normal business practice.

25. FinCEN does not require filers to have any specific software in order to file CTRs. Filers simply need to create an account with FinCEN's BSA E-Filing system, which takes 5-10 minutes at most. Further, with the U.S. government platform login.gov, filers will be able to submit their filing.

26. FinCEN makes its Secure File Transfer Protocol—which enables a direct encrypted connection with FinCEN's servers without any specialized software required—available to filers to help facilitate the filing of individual CTRs or the batch filing of CTRs, if the filer chooses to file multiple CTRs at the same time. FinCEN does not charge filers to use this protocol. When batch filing CTRs, FinCEN has previously estimated that the typical burden for a non-depositary institution filing each CTR ranges between approximately 4.76 minutes per CTR (if batch filing) and over 20 minutes per CTR (if filing individually and depending on degree of automation). 85 Fed. Reg. 29022, 29020 (May 14, 2020). Filing many CTRs on an individual CTR basis generally is more burdensome that batch filing many CTRs at the same time. However, MSBs are free to choose whichever filing method works best for them.

27. Neither the Texas Association for Money Services Businesses (TAMSB) nor its members have requested exemptive relief from FinCEN through an administrative ruling request or a help desk request via the Regulatory Support Section (RSS).

### Harm to Treasury's Anti-Money Laundering and Countering Fentanyl Efforts and the U.S. AML/CFT Regime from the Court's Order

28. If Plaintiffs are granted a preliminary injunction in this case and Defendants are enjoined from enforcing, implementing, or otherwise giving effect to the SW Border GTO, both FinCEN and the public interest will be harmed.

29. DTOs are responsible for the fentanyl crisis that is the leading cause of death for individuals aged 18 to 45 in the United States. Sixty eight percent of all drug poisoning deaths in 2022 and 2023—216,294 in total—were caused by synthetic opioids, primarily fentanyl.

30. To address this illicit opioid epidemic, it is necessary to disrupt the flow of money conducted by these DTOs across the southwest border. The information collected from the SW Border GTO will not only aid in disrupting this illicit flow of money by, for example, making structuring more difficult, but it will also assist Treasury and law enforcement partners in identifying and combatting cartel-related money laundering.

31. Moreover, some of the DTOs may also be designated Foreign Terrorist Organizations, and disrupting their supply of money directly supports Treasury's—and the whole of government's—efforts to counter the financing of terrorism.

32. Thus, given the profound national security, homeland security, terrorist financing, and money laundering threats inherent in the operation of these DTOs along the border, FinCEN determined that the potential benefits of the GTO outweigh the potential burdens the GTO may impose on covered MSBs.

33. In sum, the SW Border GTO is a critical component of FinCEN's efforts to combat money laundering, terrorist financing, and other criminal activities. If Plaintiffs are granted the injunction, Defendants' ability to carry out the purposes of the BSA—by collecting

data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexico-based drug cartels—would be significantly hampered. In FinCEN's judgment, a preliminary injunction enjoining the SW Border GTO would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime and thereby to the U.S. financial system as a whole.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on May 1, 2025.

Andrea Gacki
Director
Financial Crimes Enforcement Network (FinCEN)