## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**FILED**

May 07, 2025

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _____ **RR** _____

DEPITY

|  |  |
|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB); HIGH VALUE, INC.; REYNOSA CASA DE CAMBIO, INC.; NYDIA REGALADO d/b/a BEST RATE EXCHANGE; MARIO REGALADO d/b/a BORDER INTERNATIONAL SERVICES; LAREDO INSURANCE SERVICES, LLC; E.MEX. FINANCIAL SERVICES, INC.; R & C, INC. d/b/a TEMEX MONEY EXCHANGE; SAN ISIDRO MULTI SERVICES, INC.; CRIS WIN INC. d/b/a BROWNSVILLE CASA DE CAMBIO; ESPRO INVESTMENT LLC d/b/a LONESTAR MONEY EXCHANGE; and ARNOLDO GONZALEZ, Jr., | Civil Case No. 5:25-cv-00344-FB |

*Plaintiffs*,

v.

PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and FINANCIAL CRIMES ENFORCEMENT NETWORK,

*Defendants*.

---

## PLAINTIFFS' REPLY IN SUPPORT OF
## MOTION FOR A PRELIMINARY INJUNCTION

## ARGUMENT IN REPLY

This is not a case about whether Mexican drug cartels, fentanyl, or money laundering is bad. This is a case about whether FinCEN—simply by invoking those evils—can take sudden, drastic, and devastating action against legitimate businesses without notice-and-comment rulemaking, in an arbitrary and capricious way, and without regard for the Fourth Amendment (among other problems). The difference between the government, on the one hand, and the cartels, fentanyl peddlers, and money launderers, on the other, is the rule of law. The government must pursue its goals lawfully and constitutionally. It has not done so. That is what this case is about.

The government has filed the Administrative Record since Plaintiffs filed their motion. It has over 400 pages but is devoid of substance that supports the $200 Geographic Targeting Order ("GTO"). For example, to justify Orwellian surveillance of 30 border zip codes, the government cites a criminal case about a corrupt money services business ("MSB") far from the border in Sacramento, California (500 miles away), *see* AR330, and another corrupt MSB in Atlanta, Georgia (1,000 miles away), *see* AR393. This makes no sense. In Part I, Plaintiffs explain that nothing in the government's response undermines likelihood of success: (A) the Supreme Court's *Schulz* decision in 1974 upholding a $10,000 reporting requirement for uncommon transactions under the Fourth Amendment cuts directly against the GTO; (B) the GTO is a "rule," not an "order," and hence invalid for failure to do notice and comment, and the Administrative Record reinforces how arbitrary and capricious the GTO is; (C) the GTO is *ultra vires* under the major questions doctrine; and (D) the GTO is invalid under the nondelegation doctrine. Part II previews the extensive irreparable harms the Court will hear about in testimony on May 12. Part III shows how the balance of equities favors Plaintiffs, who will suffer ruinous actual consequences, whereas the government simply won't be able to implement an onerous paperwork burden. Finally, Plaintiffs explain in Part IV that vacatur of the GTO is the proper preliminary remedy.

I.    **Plaintiffs Are Likely to Succeed on the Merits Because a Drastic 98 Percent Reduction in the Reporting Threshold Is Unconstitutional and Unlawful.**

A.    **The GTO Likely Violates the Fourth Amendment.**

The opening brief explained that the GTO operates as a general warrant, allowing the government to sweep up information without individualized probable cause.[1] In response, the government argues the GTO does not violate the Fourth Amendment because it is a reporting requirement of the sort the Supreme Court upheld in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). But *Shultz* did not uphold reporting requirements in general. It upheld a $10,000 reporting requirement in 1974 (about $70,000 today). Those were rare transactions. Here, by contrast, the government admits that it is going after all but *de minimis* transactions. Going after essentially all commerce implicates the Fourth Amendment privacy interests of businesses and individuals much more than the limit in *Shultz*.

1.    **Business privacy: the GTO unreasonably demands corporate records.**

As to the privacy interests of the businesses, the government's argument fails because the GTO cannot survive judicial scrutiny under the very test the Supreme Court adopted in *Shultz*. As the government acknowledges, the Court in *Shultz* held that the over-$10,000 reporting requirement did not violate the Fourth Amendment because it was "sufficiently described and *limited in nature*" and because it did not "impose *unreasonable reporting requirements*." Govt. Br. at 19 (emphasis added) (quoting 416 U.S. at 67). In reaching that conclusion, the Supreme Court emphasized the $10,000 threshold—with inflation, the equivalent of about $70,000 today. That very high threshold limited reporting to "abnormally large transactions in currency," and

---

[1] FinCEN's own conception of its task confirms that this is a general warrant: to "generate new leads" and to "provide FinCEN with a snapshot in time of a significant sample of cash transactions" of a huge swath people in the targeted zip codes. Govt. Br. at 11–12. This is exactly the kind of non-particularized and "unrestrained search for evidence of criminal activity" that the Fourth Amendment exists to prevent. *Riley v. California*, 573 U.S. 373, 403 (2014).

hence was "reasonable" vis-à-vis business privacy interests because it intruded on few transactions. *Shultz*, 416 U.S. at 67; *see also id.* at 78 (Powell, J., concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions").[2] By contrast, here the $200 GTO (about $30 in 1974) by design intrudes on most transactions, thus obliterating financial privacy. That is not reasonable. *Schultz* would have come out differently had the Supreme Court faced a reporting threshold of $30.[3]

United States v. Morton Salt Co., 338 U.S. 632 (1950), the primary authority in *Shultz*, is also instructive. The Court in *Morton Salt* upheld an agency order directing twenty companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. *Id.* at 634–35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651–52. The Court underscored that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652 (emphasis added). The $200 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

---

[2] Justice Powell's concurrence was joined by Justice Blackmun. 416 U.S. at 78. With three Justices dissenting, *see id.* at 79, 91, 93, the concurring Justices provided necessary votes for the decision.
[3] For similar reasons, the government is flat-out wrong to suggest that this invasive information-gathering does not violate the Fourth Amendment because MSBs are already subject to other—less invasive—reporting and recordkeeping requirements. *See* Govt. Br. at 19–20. The GTO vastly ramps up the amount of information gathered about these businesses: As Plaintiffs have explained, before the GTO transactions under $1,000 could be completed without any information-gathering or recordkeeping at all, whereas now all those transactions are the focus of invasive reporting.

In addition to the above, the GTO is unlike the $10,000 reporting requirement upheld in *Shultz* because it is not uniform across the country and instead specifically targets particular companies for special reporting burdens. This matters because (as the government itself acknowledges) the Fourth Amendment guards against abuses of freewheeling investigatory discretion. *See* Govt. Br. at 21 (discussing *Patel v. City of Los Angeles*, 576 U.S. 409 (2015)). In deciding who should be the subject of a GTO, FinCEN claims authority to issue a GTO requiring businesses in any geographic area to report any information that FinCEN deems "necessary to carry out the purposes of" the banking laws, 31 U.S.C. § 5326(a), even if those businesses are not the subject of investigation based on individualized suspicion. FinCEN's basic stance toward MSBs and their customers—everyone is a potential criminal—is not only inherently antithetical to the Fourth Amendment; it also poses an unacceptable risk that a GTO will "be used as a pretext to harass [businesses] and their [customers]." *Patel*, 576 U.S. at 421.

In this regard, one way to think about the GTO is as a staggeringly overbroad subpoena for corporate books and records. In fact, a federal district court adopted precisely that framing in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474–75 (S.D.N.Y. 2019), which applied the Fourth Amendment to grant a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The court in *Airbnb* analogized the bulk reporting requirement to a vastly overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.* at 491. Also unlike with a typical subpoena, there was no procedure for pre-compliance review. *Id.* at 493. The *Airbnb* court explained that, historically, "[a]n attempt . . . to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth

4

Amendment." *Id.* at 494–95. So too here.

The $200 GTO is also unreasonable under the Fourth Amendment because it is immensely burdensome. One of the government's cited cases, *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981), explains that a reporting requirement is unreasonable if it imposes an "undue burden." *See also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (holding, under Fourth Amendment, that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). The GTO imposes just such an undue burden. As the Court will hear at the upcoming hearing, even small businesses must spend hours daily to comply. MSBs are having to pause transactions above $200 after only a few days to clear out paperwork backlogs, which will cost thousands in monthly commission revenue. An obligation of that scope "threatens to unduly disrupt or seriously hinder normal operations of a business." *FHFA v. SFR Invs. Pool 1, LLC*, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018) (citation omitted). For that reason, as well, the GTO likely violates the Fourth Amendment.[4]

### 2. The GTO unreasonably invades the privacy of customers.

The above is sufficient to render the GTO likely unconstitutional, but, separately, the GTO also unlawfully invades the privacy of customers—including Plaintiff Gonzalez. The opening brief explained that customers enjoy a reasonable expectation of privacy in the information that is the

---

[4] The government gestures at—but does not actually develop—the argument that MSBs are part of a "highly regulated industry." Govt. Br. at 19. The government does not actually argue that MSBs qualify as a closely regulated industry under the Fourth Amendment. And, even if they did, that would merely mean that MSBs are subject to administrative inspections to ensure compliance with federal regulations. "In the law of administrative searches, one principle emerges with unusual clarity and unanimous acceptance: the government may not use an administrative inspection scheme to search for criminal violations." *Morgan v. Chapman*, 629 F. Supp. 3d 616, 633 (S.D. Tex. 2022) (citation omitted). Because the purpose of the GTO is to search for evidence of crimes, it cannot be upheld as an administrative search—which presumably is why the government does not actually invoke the closely regulated industry doctrine.

subject of the GTO. *See* Pls.' Br. at 9 (citing, among other things, federal privacy laws). And the Supreme Court has held that, when government subpoenas corporate records, "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter v. United States*, 585 U.S. 296, 319 (2018); *see also United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024) (invalidating general search of Google phone data for thousands of customers). Because the GTO demands private customer data, the GTO is *per se* unreasonable without a warrant—which FinCEN does not have.

The third-party doctrine does not apply. The government argues that customers' privacy lacks Fourth Amendment protection under the so-called "third-party doctrine" because *United States v. Miller*, 425 U.S. 435 (1976), held that bank customers' privacy interests were not implicated by the requirement that banks report transactions over $10,000. *See* Govt. Br. at 22–23. However, *Miller* must be read in conjunction with *Carpenter*, which explains that the third-party doctrine does not apply when customers *do* have a legitimate privacy interest in corporate records; addressing *Miller*, the Court in *Carpenter* specifically warned that courts should not "uncritically extend existing precedents" to new contexts. 585 U.S. at 318. In *Carpenter*, the Court warned against uncritical extension of *Miller* to the "novel" context of digital cell-site location data; here, the Court likewise should not uncritically extend a case about reporting of abnormally large transactions to a requirement that encompasses ordinary, everyday transactions over $200. Customers have a legitimate privacy interest, and the government needs a warrant.

### B.    The $200 GTO Likely Violates the APA.

Since Plaintiffs filed their PI motion, the government has filed a 443-page Administrative Record in support of the GTO. (ECF 28.) The Admin Record consists of the sources cited in the FinCEN internal memorandum (dated "March XX, 2025" (sic)) that the Court already saw in the TRO proceeding and Plaintiffs' opening brief. AR004–020. There is nothing new here. Notably,

the Administrative Record is **not** the result of notice-and-comment rulemaking or an adjudication in which non-FinCEN parties were able to contribute evidence. The sources are reports and news articles that FinCEN itself cherrypicked as part of its internal process.

The Admin Record and government response only reinforce two conclusions: (1) the GTO is a rule subject to notice and comment, which never happened; and (2) the GTO is arbitrary and capricious, both due to a lack of support in the Admin Record for such drastic action and because FinCEN ignored the widespread harms the GTO will cause legitimate businesses.

### 1.    The GTO is a "rule" requiring notice-and-comment.

In their opening brief, Plaintiffs argued that the GTO is "invalid because FinCEN did not go through the notice and comment process required for substantive rules." Pls.' Br. at 13. "[I]t is only when the agency seeks to *make substantive law* that notice and comment is required." *Flight Training, Inc. v. FAA*, 58 F.4th 234, 241 n.5 (5th Cir. 2023). The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). Plaintiffs explained that the GTO is a substantive "rule" because it "grant[s] rights, impose[s] obligations, or produce[s] other significant effects on private interests." Pls.' Br. at 13 (quoting *W & T Offshore, Inc. v. Bernhardt*, 946 F.3d 227, 237 (5th Cir. 2019)).

In response, the government does not dispute that no rulemaking occurred. Nor does it dispute that the GTO is invalid if it is a rule. Instead, it contends that "the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA." Govt. Br. at 14. It notes that the GTO was issued under 31 U.S.C. § 5326(a), which "authorize[s] the agency to act by 'order' rather than by rule." *Id.* at 15. FinCEN's logic appears to be: (1) we are allowed to issue orders; (2) we've called the GTO here an "order"; therefore, (3) the GTO *is* an order, so no notice-and-comment rulemaking was required.

But calling the GTO an "order" doesn't make it one. The government's argument calls to mind an old saw: President Lincoln reputedly "once posed the following riddle: 'How many legs does a dog have if you call the tail a leg?' The answer is, of course, 'four' because 'calling a tail a leg doesn't make it a leg.'" *United States v. Bowen*, 527 F.3d 1065, 1077 n.9 (10th Cir. 2008). An "order" is the result of an "adjudication." 5 U.S.C. § 551(7). "Two principal characteristics distinguish rulemaking from adjudication." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "Adjudications typically 'resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals.'" *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012), *aff'd,* 569 U.S. 290 (2013) (quoting *Yesler*, 37 F.3d at 448); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (rulemaking involves "proceedings for the purpose of promulgating policy-type rules or standards" and an adjudication involves "proceedings designed to adjudicate disputed facts in particular cases"). "Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)." *Yesler*, 37 F.3d at 448. Courts consistently apply this distinction in rejecting attempts to pass off "rules" as "orders" to evade notice-and-comment. For example, in *Safari Club International v. Zinke*, a "determination" about importing ivory was a "rule" because it "applied to all potential imports of sport-hunted elephant trophies from Zimbabwe" and did not "adjudicate any dispute between specific parties." 878 F.3d 316, 333 (D.C. Cir. 2017).

So too here. The GTO is not an "order." FinCEN did not adjudicate a "concrete dispute" between "specific individuals" and issue an "order" in their case with an "immediate effect" on them alone. Instead, it announced a "rule" applicable to broad classes of unspecified individuals that has "legal consequences only for the future." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S.

204, 216 (1988) (Scalia, J. concurring). The government's arguments only reinforce this obvious fact. The government notes that the statute authorizes "confidential GTOs, which would not be possible with notice and comment rulemaking." Govt. Br. at 15. Yes, exactly. A confidential GTO would be issued to specific parties as part of a specific investigation under specific facts. The government's own cases, *see id.* at 16, confirm that "orders" involve individualized adjudications. *Neustar, Inc. v. FCC* was about whether the FCC needed to do notice and comment rulemaking to "nam[e] another company to replace Neustar" on competency grounds as the "Local Number Portability Administrator." 857 F.3d 886, 888 (D.C. Cir. 2017). *National Biodiesel Board v. EPA* involved the EPA's approval of a "comprehensive survey program" submitted by the "Argentine Chamber of Biofuels," a trade group. 843 F.3d 1010, 1014 (D.C. Cir. 2016). No rulemaking was required because both cases involved individualized adjudications about specific parties on a specific record. *Cf. Mock v. Garland*, 75 F.4th 563, 580 (5th Cir. 2023) (explaining that a rule is legislative—requiring notice and comment—rather than merely interpretive when the agency "intend[s] to speak with the force of law" and "the rule will produce significant effects on private interests" (cleaned up)).

## 2. Dropping the reporting threshold by 98 percent is arbitrary and capricious.

Now that Plaintiffs have the Administrative Record, it is even clearer that the GTO is arbitrary and capricious. The government's response walks through objectives in the FinCEN Memo (like fighting cartels), links those objectives to sources in the administrative record (or FinCEN Director Gacki's declaration), and then declares the GTO reasoned because a $200 threshold could advance the government's goals. *See generally* Govt. Br. at 10–14. For example, "FinCEN further noted that the reduced dollar reporting threshold 'will help make the structuring more difficult, thereby increasing the cost of doing business for cartels.'" *Id.* at 11 (quoting

FinCEN Memo at AR012).

But the problem here is the important things FinCEN didn't consider or was capriciously dismissive of. The tone and logic of the FinCEN Memo (and the government's brief) is: "We're fighting a drug war here, we get to do whatever we want, and the consequences for you don't matter." The government is just as dismissive of the concern that subjecting everyone to invasive financial surveillance is irrational and paranoid—the product of FinCEN's belief that a cartel member is around every corner, behind every door, and under every bed. Govt. Br. at 13 (noting that the GTO is supposedly "consistent with other reporting requirements . . . that do not require any indicia of suspicion").

**(1) The scope of the problem:** The FinCEN Memo and Administrative Record identify problems but contain no evidence about the size of the problem relative to legitimate transactions. This matters because whether a sledgehammer is a "reasoned" solution depends on whether you're trying to drive a railroad spike or swat a fly.

- "[I]llicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico." Memo at 6 (AR009). No discussion of legitimate versus illegitimate transactions.

- "Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including 'money mules,' to move funds to Mexico via U.S.-based MSBs." Memo at 7 (AR010). But the source is a single page from an FBI document about how to avoid being duped into becoming a "money mule." *See* AR304. No discussion of what fraction of MSB transactions involve money mules.

- "Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations." Memo at 7 (AR010). But the source is a 2019 FinCEN report that identifies MSBs as one of many tools drug cartels use, including online virtual currency such as bitcoin, "bulk cash smuggling," "trade-based money laundering," and "funnel account activity." AR309–14. No discussion of what fraction of MSB transactions are illicit versus legitimate.

- The Memo identifies two criminal cases involving MSBs (from **outside** the targeted zip codes) whose owners were active conspirators. Memo at 7 (AR010) (citing AR323–402)). Nothing in the Record connects these cases to a $200 CTR requirement for legitimate MSBs.

**(2) $200 is arbitrary and ignores the destructive impact on legitimate businesses:** The government admits that it set the threshold at $200 to capture all but de minimis illegal transactions and concedes that this will also capture all but de minimis legal transactions. Govt. Br. at 12–13. The government doesn't try to *justify* the immense burden this will impose. It just says, in effect, "We don't care what this does to you because we don't care about you at all; all we care about is fighting cartels." For example, the response does not confront the sheer increase in CTRs the GTO requires, as if a 98 percent reduction in the reporting threshold is itself *de minimis*. But clearly it is not. Under the GTO, Plaintiff MSBs estimate their CTR numbers will go from[5]: 10 CTRs per month to 3,288;[6] 31 CTRs per month to 7,276;[7] 3 to 6 CTRs per month to 830;[8] 5 CTRs per month

---

[5] Plaintiffs note that not every business is the same; Plaintiffs do different volumes and may offer different services that affect their percentage of transactions subject to the GTO.
[6] Decl. of Efrain Salinas in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.
[7] Decl. of Xavier Guerra in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.
[8] Decl. of Ricardo Granado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

to 6,000;[9] 9 CTRs per month to 2,600.[10]

And each of those CTRs takes time. Plaintiff Arnoldo Gonzalez estimates 25 minutes. Decl. of Arnoldo Gonzalez in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 18. Though the government tries to downplay the time impact, Govt. Br. at 24–25, it cannot deny that FinCEN's own estimates are 8 minutes on average, and for non-bank filers like Plaintiffs, 23.93 minutes. *See* Pls.' Br. at 4–5. But it could be up to 40 minutes, according to FinCEN—just look at the printed notice at the bottom of the sample CTR that the government itself produced in this proceeding and which it conveniently ignores in its response. *See* Govt. Br. Ex. 2 at 1.

Also, the government freely concedes that, with respect to the crushing compliance burdens on legitimate MSBs, FinCEN did literally nothing more than write a sentence or two in the Memo dismissing those burdens. Govt. Br. at 12 (stating that "FinCEN 'does not expect these Covered Businesses to materially alter typical fees'"). The government does not defend this conclusion; it simply says that the *existence* of this conclusion about the impact on the prices MSBs charge means that FinCEN must have considered all the potential burdens it was imposing and Plaintiffs aren't entitled to question that: "Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors." *Id.*

Well, actually, there is a doubt that FinCEN considered the relevant factors. A big doubt. The Court will hear testimony at the upcoming hearing from Texas MSBs not covered by the Court's TRO. They will explain how the $200 threshold has drastically altered their business, how they have lost significant revenue, how the GTO has required dozens of extra hours every day of skilled labor (after all, not just anyone off the street can be trusted to process CTRs with

---

[9] Decl. of Miguel A. Regalado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.
[10] Decl. of Mario Regalado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

confidential information), how customers are walking out, how banks (free from the GTO) are advertising competitive services, how MSBs have had to stop offering services altogether because their service partners are stopping services in response to the GTO or because they simply need a chance to process accumulated CTRs, how automated bulk-filing of CTRs is impossible for small businesses, how they are terrified of errors because of $1,400-plus fines *per violation* for negligent oversights ($70,000 *per violation* for willful ones; not to mention prison time), how they are losing goodwill that has taken decades to build, how they have watched other MSBs shutter already, and how they fear that their businesses will have to shutter, too.

The GTO is having a destructive impact up and down the border on legitimate businesses. And, again, FinCEN just doesn't care: "Plaintiffs insist that much of the business of MSBs is legitimate . . . but this is beside the point." Govt. Br. at 13. But willfully ignoring the major destructive impacts of a rule is the hallmark of arbitrary and capricious agency action. *See Texas v. EPA*, 829 F.3d 405, 429, 433 (5th Cir. 2016) (holding plaintiffs had strong likelihood of success in showing EPA acted arbitrarily and capriciously by disapproving of consultation between two states); *see also id.* at 425 ("Agency action[] is arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem[.]" (cleaned up)).

Furthermore, the limited evidence in the Administrative Record about impacts on legitimate business indicates that $200 is ruinously low. The January 15, 2025 report by the Center for Strategic and International Studies ("CSIS")—*Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact*—does what FinCEN didn't: attempt to balance the cartel fight against legitimate money transfers to Mexico. AR148–67. It recommends that the basic level of "recordkeeping" (**not** a CTR) for "transactions above $3,000" be reduced to "$1,000." AR163. The CSIS report chose $1,000 because it was significantly above "the <u>average</u>

size of a remittance [which is] in the low to mid three hundreds with its <u>highest point</u> being $390." *Id.* (emphasis in original).[11]

**(3) The 30 zip codes are arbitrary:** First, there's no reason to assume that zip codes that have a lot of high-dollar transactions also have a lot of low-dollar transactions. (Indeed, that's belied by Plaintiffs' evidence here; they almost exclusively do low-dollar transactions and rarely handle amounts over $10,000.) But, second, even if that were the right inquiry, a spreadsheet that does not identify any sources (let alone explain why those sources are accurate) isn't enough to establish the proposition. FinCEN puts a crude spreadsheet in the Administrative Record purportedly showing an abnormal number of over-$10,000 transactions, but those are just numbers on a page. Memo at 11-13 (A014–16); AR436, 442–43. There is no way to tell where the numbers came from, who made them, if they are accurate, or if the number of $10,000 transactions in the targeted zip codes truly is high.[12] Third, even if there were a high number of small-dollar transactions, it does not follow that they are more likely to be illegitimate. FinCEN is piling supposition upon supposition upon supposition. A house of cards is arbitrary and capricious.

Also notably absent: any evidence that there are more prosecutions in the targeted zip codes. FinCEN's theory is that CTRs lead to prosecutions and hence a $200 threshold will lead to many more CTRs and thus many more prosecutions. If this theory is true (prosecutions happen in proportion to CTRs filed with FinCEN), then the government should have proof that the supposedly high number of over-$10,000 CTRs in the targeted zip codes has resulted in above-

---

[11] Plaintiffs do not endorse lowering the basic recordkeeping requirement to $1,000. They are simply illustrating the less invasive recommendations that FinCEN ignored.

[12] Director Gacki, in her declaration, says the agency excluded some zip codes because they were able to identify a reason for the high number of CTR filings in those jurisdictions (e.g., one zip code had a location for Brink's). Decl. of Director Andrea Gacki ¶ 17. But Director Gacki does *not* say that the agency did anything to determine whether there were similar (but perhaps less immediately obvious to FinCEN) explanations for the volume of CTR filings in other jurisdictions.

average numbers of prosecutions. Yet there is no such evidence in the record. But if $10,000 CTRs aren't leading to more prosecutions, why should anyone believe that exponentially increasing the number of CTRs via a $200 threshold will lead to more prosecutions?

The government argues that "[l]ogically, [the targeted zip codes] in general are likely to be targeted by cartels because 'they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.'" Govt. Br. at 13. But this isn't logical at all. The government cares most about electronic remittances, which can be sent from anywhere. The two criminal cases in the Administrative Record are in northern California and Georgia, not the border. Bulk physical cash, by definition, isn't going through MSBs. Even assuming drug and human smuggling takes place at border checkpoints, it isn't "logical" to believe that the illicit revenue from these crimes is going to be sent back to Mexico via thousands of structured transactions via MSBs right at the border.

(4) **No consideration of cartel countermeasures:** Speaking of cartel behavior, their criminals can exploit non-targeted zip codes (San Diego is a Swiss cheese of targeted and non-targeted zip codes). Decl. of Elizabeth Sanz in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 5–7, Exs. A–C (providing maps of targeted zip codes). Or go to Arizona or New Mexico. Or use bitcoin, bulk cash smuggling, or other laundering techniques. FinCEN's own sources cast doubt on the supposition that cartels are remitting millions of dollars back to Mexico via small-dollar cash transactions, noting what an absurd logistical nightmare this would be: "[I]t would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." AR160. That report explains that rather than use implausible numbers of low-dollar money transfers, cartels use China-based money launderers and cryptocurrency. *Id.* In other words, FinCEN itself relies on sources that say its new rule will be ineffective. It just ignores them.

**(5) No capacity to act on the CTRs:** To find more needles, FinCEN is exponentially increasing the size of the haystack. But does FinCEN have the capacity to turn millions of new CTRs into actionable leads and real prosecutions? Again, there's no evidence FinCEN is routinely using $10,000 CTRs for prosecutions. FinCEN cites two criminal cases, but those involved corrupt MSBs outside the targeted zip codes.

### C.    The GTO Is Likely *Ultra Vires*.

The opening memorandum explained that Plaintiffs are likely to prevail on their argument that the GTO is *ultra vires*, as the statute FinCEN relied on—31 U.S.C. § 5326—does not "authorize a reporting requirement so broad in scope and so destructive in effect." Pls.' Br. at 18. The government responds that Section 5326 confers authority to issue GTOs, so "FinCEN is not asserting regulatory power that is 'markedly different' from the type of authority that Congress expressly identified in the relevant provision." Govt. Br. at 17.

In fact, however, at least three features of Section 5326 confirm that the statute does not reach this type of broad information-gathering request. First, Section 5326(a) states that the agency should act through an "order." As discussed above in the APA notice-and-comment analysis, an "order" is the result of an "adjudication." 5 U.S.C. § 551(7). There is no adjudication here. Second, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." Read in conjunction with the word "order," that language limits GTOs to an *identified* business or group of businesses, not a *category* of businesses such as "MSBs" that apply indiscriminately to everyone meeting certain regulatory criteria. Finally, Section 5326(c) also requires that an "order" issued be confidential—a requirement that FinCEN ignored here (instead proceeding via notice in the Federal Register). Because the GTO applies to everyone in the targeted zip codes, it cannot be confidential. Putting these three features of Section

5326 together, it becomes apparent that the statute authorizes the sort of limited reporting obligation that the Supreme Court allowed in *Morton Salt* (discussed in the context of the Fourth Amendment claim above). The statute does not authorize the agency to rewrite financial reporting rules for an entire industry across an entire geographic region, as it did here.

As the opening brief explained, this conclusion is confirmed by the major questions doctrine. The government, notably, does not seriously dispute that the GTO implicates a major question—i.e., a question "of vast economic and political significance." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (cleaned up). And, while the government argues that the statute here provides clearer authority than statutes in other major questions cases, in fact (as explained above) the statute does not clearly authorize the type of reporting ordered here. In this regard, this case is on all fours with *Biden v. Nebraska*, where the Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. 477, 496–97 (2023). The Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506–07. Likewise here. The word "order" does not mean "rule." And hence a statute allowing FinCEN to issue an order to a "business" or "group of businesses" does not allow FinCEN to impose a massive financial dragnet across a stretch of California and Texas with over one million people.

**D.    The GTO Likely Violates the Nondelegation Doctrine.**

Finally, the opening memorandum explained that the GTO runs afoul of the nondelegation doctrine because Section 5326—under which it was promulgated—violates the nondelegation doctrine. Pls.' Br. at 16–17. The government argues that Section 5326 does articulate an intelligible principle because (in the government's words) FinCEN must make "a finding that reasonable grounds exist for concluding that such requirements are necessary to carry out the purposes, or

prevent evasions of, the BSA." Govt. Br. at 18. Given the broad "purposes" of the BSA, however, this articulation grants FinCEN effectively unlimited authority to determine what records should be required, when they should be required, and who should be required to produce them. *See* 31 U.S.C. § 5311(1) (listing, as a "purpose" of the BSA, to require records "that are highly useful in . . . criminal, tax, or regulatory investigations"). The government identifies no intelligible standard that FinCEN—or a reviewing court—could apply when deciding what records are "necessary." This grant of "exclusive authority and absolute discretion" violates the nondelegation doctrine. *Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022); *see also Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) (explaining that nondelegation doctrine is violated where Congress provides "no guidance for the exercise of discretion").

## II.    Imposing Crushing Compliance Costs Is an Irreparable Harm.

Plaintiffs' preliminary-injunction motion explained that all economic harms are irreparable because of sovereign immunity; that loss of goodwill and reputation are irreparable; and that loss of constitutional rights is irreparable. Pls.' Br. at 19–20. In response, the government doesn't dispute that these harms are irreparable. Instead, the government, which doesn't run an MSB, insists that Plaintiffs, who do run MSBs, have "exaggerated" the cost of complying with the GTO, have failed to "explore[] automated alternatives like automated batch-filing, and they otherwise just speculate about the future actions of customers." Govt. Br. at 24. The government tries to cast further doubt on harms via Defendant Gacki's declaration, which "demonstrates that many covered businesses have begun filings CTRs with respect to covered transactions." *Id.*

Plaintiffs don't doubt they have. The penalties for noncompliance are ruinous and can include prison; *of course* they are doing whatever they can to comply. But the whole story, as the Court will hear at the PI hearing, is that businesses are being crushed by the cost of compliance, facing significant losses and incurring dozens of extra hours of labor per day. MSBs in Texas have

had to suspend transactions above $200 not only to catch up on paperwork, which is piling up at tremendous rates and resulting in lost income, but because their service partners (such as MoneyGram and Western Union) are also responding to the GTO by limiting services. Witnesses will testify about the expense and complexity of automated software, which cannot be implemented overnight. In the real world, the GTO is inflicting immense irreparable harms.

## III.    The Equities Weigh in Favor of Plaintiffs.

It is always in the public interest to enjoin the violation of individuals' constitutional rights. *See Tex. Top Cop Shop, Inc. v. Garland*, 758 F. Supp. 3d 607, 660 (E.D. Tex. 2024). Similarly, when it comes to Plaintiffs' claims under the APA, there is "no public interest in the perpetuation of unlawful agency action." *Texas v. Becerra*, 577 F. Supp. 3d 527, 562 (N.D. Tex. 2021) (citation omitted). Against this, the government's equities argument is just a generic invocation of the need to "act swiftly" against "drug cartels" (by creating CTR paperwork) and their "devastating criminal activity," which pose "profound national security, homeland security, terrorist financing, and money laundering threats." Govt. Br. at 28; *see also* Gacki Decl. ¶¶ 28–33 (generically asserting that GTO is important for law enforcement).

## IV.    The Preliminary Injunction Ought to Vacate the GTO and Enjoin Its Enforcement Everywhere.

The government argues that any preliminary injunction "should limit any relief to the Plaintiff MSBs, based on the constitutional and equitable principles mandating that '[a] plaintiff's remedy must be tailored to redress *the plaintiff's* particular injury.'" Govt. Br. at 29 (emphasis in Govt. Br.) (quoting *Gill v. Whitford*, 585 U.S. 48, 72–73 (2018)). That is the default rule, "[b]ut in the APA, Congress did in fact depart from that baseline and authorize vacatur" as a remedy. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). "The text of § 706(2) directs federal courts to vacate agency actions in the same way

that appellate courts vacate the judgments of trial courts." *Id. See also Career Colleges & Sch. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025) (concluding that "the scope of preliminary relief" under § 706 is "not party-restricted and allows a court to 'set aside' an unlawful agency action"). That is exactly what the Fifth Circuit did, for instance, in enjoining OSHA's COVID-19 vaccine mandate beyond the parties. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 619 (5th Cir. 2021).

The government also asks the Court to require a "bond commensurate with the scope of any injunction." Govt. Br. at 29–30. But the purpose of a bond is security for "costs and damages sustained" by a defendant if "wrongfully enjoined." Fed. R. Civ. P. 65(c). In the government's own case, *DSE, Inc. v. United States*, plaintiff arms manufacturer obtained a TRO and PI to enjoin the Army's artillery contract with another supplier. Govt. Br. at 29–30 (citing 169 F.3d 21, 33 (D.C. Cir. 1999)). A small bond was appropriate because the United States, as a party to a contract, faced actual monetary losses for nonperformance. Here, by contrast, the government faces no money harm from not receiving a flurry of CTRs. No bond should be required.

## CONCLUSION

For these reasons, and those that will be further explained at the May 12, 2025 hearing, a preliminary injunction should issue.

Dated: May 5, 2025.                       Respectfully submitted,

                                          /s/ Jeffrey Rowes
Martin Golando                            Jeffrey Rowes (TX Bar No. 24104956)*
The Law Office of Martin Golando, PLLC    Christen Mason Hebert (TX Bar No. 24099898)
Texas Bar No. 24059153                    INSTITUTE FOR JUSTICE
2326 W. Magnolia                          816 Congress Ave., Suite 970
San Antonio, Texas 78201                  Austin, TX 78701
Office: (210) 471-1185                    (512) 480-5936
Email: martin.golando@gmail.com           jrowes@ij.org
                                          chebert@ij.org
Roland Gutierrez
The Law Office of Roland Gutierrez        Robert E. Johnson (DC Bar No. 1013390)*
SBN #: 24007291                           INSTITUTE FOR JUSTICE
104 Babcock Ste. 107                      16781 Chagrin Blvd., Suite 256
San Antonio, Texas 78201                  Shaker Heights, OH 44120
(210) 225-7114                            (703) 682-9320
                                          rjohnson@ij.org

*Attorneys for Plaintiffs Texas Association for*   Elizabeth L. Sanz (CA Bar No. 340538)*
*Money Services Businesses (TAMSB); Reynosa*       INSTITUTE FOR JUSTICE
*Casa De Cambio, Inc.; Nydia Regalado d/b/a*       901 N. Glebe Road, Suite 900
*Best Rate Exchange; Mario Regalado d/b/a*         Arlington, VA 22203
*Border International Services; Laredo*            (703) 682-9320
*Insurance Services, LLC; E.Mex. Financial*        bsanz@ij.org
*Services, Inc.; R & C, Inc. d/b/a Temex Money*
*Exchange; San Isidro Multi Services, Inc.; Cris*  Katrin Marquez (FL Bar No. 1024765)*
*Win Inc. d/b/a Brownsville Casa De Cambio;*       INSTITUTE FOR JUSTICE
*and Espro Investment LLC d/b/a Lonestar*          2 South Biscayne Blvd., Suite 3180
*Money Exchange*                                   Miami, FL 33131
                                                   (305) 721-1600
                                                   kmarquez@ij.org

                                          * Admitted *Pro Hac Vice*

                                          *Attorney for Plaintiffs Arnoldo Gonzalez, Jr.*
                                          *and High Value, Inc.*

**CERTIFICATE OF SERVICE**

I certify that on May 5, 2025, I electronically filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide electronic service upon all attorneys of record.

/s/ Jeffrey Rowes
Jeffrey Rowes