IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS ASS'N FOR MONEY SERVICES BUSINESSES (TAMSB), *et al.*<br><br>    *Plaintiffs*,<br><br>v.<br><br>PAM BONDI, in her official capacity as Attorney General; SCOTT BESSENT, in his official capacity as Secretary of the Treasury; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, in her official capacity as the Director of the Financial Crimes Enforcement Network; FINANCIAL CRIMES ENFORCEMENT NETWORK,<br><br>    *Defendants*. | Civil Action No. 25-cv-344-FB |

**PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

In accordance with direction from the Court received via email May 1, 2025, Defendants hereby file proposed findings of fact and conclusions of law.

**Introduction**

1.  Plaintiffs seek a preliminary injunction enjoining application and enforcement of an agency order issued by the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). The Court reviewed the public administrative record to evaluate the merits of Plaintiffs' claims, *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 73 F.4th 291, 299 (5th Cir. 2023), because with respect to review of agency actions, the district court is not making a factual record in district court, *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985), but is akin to an appellate tribunal over the agency, *see Kovac v. Wray*, 660 F. Supp. 3d 555, 563 (N.D. Tex. 2023) (citing *Am. Bioscience, Inc. v. Thompson*, 269

1

F.3d 1077, 1083 (D.C. Cir. 2001)), *aff'd,* 109 F.4th 331 (5th Cir. 2024), *cert. denied sub nom. Kovac v. Patel*, 145 S. Ct. 1181 (2025).  The Court held an evidentiary hearing to evaluate any other factual dispute, considering other available evidence.  *See Sierra Club, Lone Star Chapter v. FDIC*, 992 F.2d 545, 551 (5th Cir. 1993).

### The GTO and Administrative Record

2. FinCEN issued a Geographic Targeting Order on March 11, 2025 ("March 2025 GTO") that requires money services businesses ("MSBs") in portions of specific counties along the southwest border to keep additional records and report additional categories of currency transactions to FinCEN.  In support of the March 2025 GTO, FinCEN found that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the [Bank Secrecy Act] or to prevent evasions thereof" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."

3. The March 2025 GTO took effect on April 14, 2025 (except as otherwise enjoined) and will expire, unless renewed, on September 9, 2025.  Under the March 2025 GTO, covered MSBs must submit currency transaction reports ("CTRs") within 15 days for currency transactions involving between $200 and $10,000.  A covered MSB is also required to verify the identity of the customer and maintain certain records.  Other than the applicable amount and a code unique to the March 2025 GTO, these required CTRs generally follow the same form and content as those already required for currency transactions exceeding $10,000, and are to be filed in the same way. Accordingly, for covered transactions, the covered MSB must report: information about the MSB, the MSB location conducting the transaction, the type and amount of the transaction, and the customers involved in the transactions.  Much of this information is already collected by the MSB,

and all of it is collected for certain types of transactions. No special software is required to file a CTR, but covered institutions may choose to use various methods to streamline the process.

4. FinCEN certified the public administrative record, which includes those nonprivileged documents that were directly or indirectly considered in connection with the March 2025 GTO. FinCEN has redacted certain documents within this administrative record, as well as the index, to remove privileged or otherwise protected information.

5. FinCEN found that the March 2025 GTO will collect data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels—which are drug trafficking organizations (DTOs) and, in some cases, also foreign terrorist organizations (FTOs). The March 2025 GTO will assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting MSBs to launder the proceeds of their crimes, thereby perpetuating the synthetic opioid crisis in the United States.

6. FinCEN found that DTOs are responsible for the fentanyl crisis that is the leading cause of death for individuals aged 18 to 45 in the United States. To address this illicit opioid epidemic, FinCEN found that it is necessary to disrupt the flow of money conducted by these DTOs across the southwest border, and assessed that the information collected from the March 2025 GTO will aid in disrupting this illicit flow of money by making structuring more difficult, and assisting Treasury and law enforcement partners in identifying and combatting cartel-related money laundering.

7. FinCEN found that MSBs along the southwest border are uniquely vulnerable to exploitation by cartels.

8. FinCEN limited the March 2025 GTO to those ZIP codes that are the highest risk for illicit actors in order to maintain the effectiveness of the GTO while limiting its overall burden on industry. FinCEN selected these ZIP codes based on risk factors that include their proximity

to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. FinCEN found that these locations in general are likely to be targeted by cartels because they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.

9. FinCEN set the threshold for the GTO reporting at $200, finding that threshold is low enough both to prevent the successful structuring of transactions to avoid CTR requirements and to increase the cost of doing business for drug cartels. The filing threshold allows FinCEN to collect a snapshot of MSB activity in a high risk area, and was set to ensure that FinCEN collects highly useful information about violations and evasions of the Bank Secrecy Act (BSA), while excluding clearly *de minimis* amounts that are more likely to be legitimate.

10. FinCEN assessed that illicit activities are not likely to switch to banks or other options, and that any forced changes to such illicit activity will increase the costs of money laundering.

11. FinCEN did not conduct notice-and-comment rulemaking before issuing the March 2025 GTO.

## Other Findings of Fact

12. FinCEN has issued several GTOs in the past that required a great number of businesses in certain geographic areas to report on cash transactions at dollar thresholds far below existing BSA reporting thresholds. For example, in the late 1990s, FinCEN issued GTOs in the New York City metropolitan area (the "New York GTOs") that required certain money transmitters and over 3,000 of their agents to obtain and report identifying information about the sender and recipient of all cash-purchased remittances to Colombia and the Dominican Republic in the amount of $750 or more. The New York GTOs were issued to disrupt the flow of narcotics

proceeds from the targeted money transmitters to Colombia and the Dominican Republic. In addition, in 2014, FinCEN issued a GTO requiring over 2,000 businesses in the Los Angeles fashion district ("LA GTO") to report cash transactions of $3,000 or more. The LA GTO was issued to address the use of the targeted businesses in trade-based money laundering schemes in which drug money in the United States is converted into goods that are shipped to countries, such as Mexico, where the goods are then sold and the money—now in the form of local currency—goes to the drug trafficking organizations. Moreover, in 2015, FinCEN issued a GTO requiring about 700 businesses (primarily electronics exporters) in the Miami, Florida area ("Miami GTO") to report cash transactions of $3,000 or more. The Miami GTO, like the LA GTO, was issued to address trade-based money laundering risks associated with the targeted businesses. *See also United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994) (describing Houston-area GTO with $100 threshold).

13. An injunction would significantly hamper Defendants' ability to carry out the purposes of the BSA—by collecting data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexico-based drug cartels—and would cause significant harm to U.S. anti-money laundering efforts and the broader AML/CFT regime.

14. To assist covered businesses, FinCEN published FAQs on their website. *See* FinCen, *Frequently Asked Questions* (FAQs)*, U.S. Dep't of the Treasury (Mar, 24, 2025), https://www.fincen.gov/sites/default/files/shared/SWB-MSB-GTO-Order-FINAL508.pdf. FinCEN updated these FAQs on April 16, 2024, in response to questions received from covered MSBs. Additionally, FinCEN hosted two webinars, collectively attended by several hundred representatives of the affected MSB community, in which both the background and the terms of the March 2025 GTO were explained, and several questions concerning applicability and reporting

were answered. *See* FinCEN, *FinCEN Convenes FinCEN Exchange Sessions to Provide Stakeholders with Information About U.S. Southwest Border Geographic Targeting Order,* U.S. Dep't of the Treasury (Apr. 9, 2025), https://www.fincen.gov/news/news-releases/fincen-convenes-fincen-exchange-sessions-provide-stakeholders-information-about.

15. As of May 1, 2025, FinCEN had identified 73 unique filers of CTRs using the keyword "MSB0325GTO," as required by the GTO. FinCEN also previously identified 18 additional filers who were filing CTRs for transactions below $10,000 but not including the keyword. Results from the GTO queried on May 1, 2025, indicate that 46,567 CTRs have been filed thus far, and of that amount, 34,812 are reports filed for under $5,000.

16. FinCEN does not require filers to have any specific software in order to file CTRs. Filers simply need to create an account with FinCEN's BSA E-Filing system, which takes 5-10 minutes at most. CTRs may be filed individually on a PDF containing fields users can complete with relevant information, but FinCEN also makes its Secure File Transfer Protocol—which enables a direct encrypted connection with FinCEN's servers without any specialized software required—available to filers to help facilitate the batch filing of CTRs, if the filer chooses to file multiple CTRs at the same time. FinCEN has previously estimated that the typical burden for a non-depository institution filing each CTR ranges between approximately 4.76 minutes per CTR (if batch filing) and over 20 minutes per CTR (if filing individual CTRs on PDFs and depending on degree of automation). Filing many CTRs on an individual CTR basis generally is more burdensome than batch filing many CTRs at the same time. However, MSBs are free to choose whichever filing method works best for them.

17. Plaintiffs are a new trade organization for MSBs, several constituent members, and one individual owner. These Plaintiff MSBs have at least some locations that are covered by the March 2025 GTO.

18. Plaintiffs are capable of complying with the March 2025 GTO. At a minimum, not all Plaintiffs have demonstrated that they cannot comply or that compliance would be catastrophic.

19. Prior to initiating litigation, no Plaintiff has sought exemptive relief from FinCEN.

20. Plaintiffs waited weeks after the 2025 GTO was issued to seek judicial relief.

## Conclusions of Law

<u>Statutory and Regulatory Background</u>

21. The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act (BSA).[1] The BSA authorizes the Secretary of the Treasury to impose reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. These requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, 31 U.S.C. §§ 5311-14 and 5316-36, including notes thereto. The BSA and its implementing regulations require financial institutions to file certain reports, including a currency transaction report ("CTR") for transactions in currency greater than an amount set by the Secretary—currently, $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); 31 C.F.R. § 1010.311 (currency transaction reporting requirements).

22. Separately, in the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain

---

[1] The BSA consists of the Currency and Foreign Transactions Reporting Act of 1970, as amended by the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (USA PATRIOT Act), Pub. L. No. 107–56, 115 Stat. 272 (2001) and other legislation, including the Anti-Money Laundering Act of 2020 (AML Act) (sections 6001-6511, of the William M. (Mac) Thornberry National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283, 134 Stat. 3388).

transactions in geographic areas thought to pose particular risks. Pub. L. No. 100–690, title VI, § 6185(c), 102 Stat. 4181, 4355 (1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. R. Rep. No. 101-74, at 111 (Nov. 18, 1988). As amended, this statutory provision reads:

> If the Secretary of the Treasury finds, upon the Secretary's own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area—
>    (1) to obtain such information as the Secretary may describe in such order concerning—
>       (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and
>       (B) any other person participating in such transaction;
>    (2) to maintain a record of such information for such period of time as the Secretary may require; and
>    (3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a). This authority is separate from and in addition to the regulatory authority to require other CTRs in 31 U.S.C. § 5313.

      23.    Thus, the statute authorizes the Secretary of the Treasury to issue a GTO to "obtain such information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id*. The primary prerequisite is that the Secretary find "reasonable

8

grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof."[2] *Id*.  A GTO may then be effective for no more than 180 days unless renewed.  31 U.S.C. § 5326(d).  The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN.  *See* Treasury Order 180-01 (reaffirmed Jan. 14, 2020), *available at* https://home.treasury.gov/about/general-information/orders-and-directives/treasury-order-180-01.  FinCEN has issued regulations which further govern the form of such GTOs.  *See* 31 C.F.R. § 1010.370.

24. Additionally, pursuant to 31 U.S.C. § 5318(a)(7), FinCEN may "prescribe an appropriate exemption from a requirement under" the BSA and its implementing regulations, including requirements imposed by a GTO.  *See also* 31 C.F.R. § 1010.970 (further describing this exemptive authority).

25. "Money services businesses" are broadly defined in the BSA regulations and generally include, for example, check cashers, issuers or sellers of traveler's checks or money orders, and money transmitters, although there are exclusions from each of those categories as well.  *See generally* 31 C.F.R. § 1010.100(ff).  Financial institutions that meet the regulatory definition of an MSB have long been subject to a range of legal and regulatory requirements that substantially pre-date and are independent of the March 2025 GTO, including registering with FinCEN, filing CTRs under FinCEN's existing regulations, developing, implementing, and maintaining an effective AML program (including policies, procedures, and internal controls for verifying customer identity), filing suspicious activity reports, , and maintaining detailed records.

---

[2] The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from illegal activity, and assessing money laundering risks to financial institutions.  *See* 31 U.S.C. § 5311.

Other regulations require verification of identity for specific types and amounts of transactions. They are subject to routine audits or examinations for multiple purposes.

Legal Standard for a Preliminary Injunction

26. Emergency injunctive relief "is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008) (quotation omitted); *Anibowei v. Morgan*, 70 F.4th 898, 902 (5th Cir. 2023). A preliminary injunction may only be granted if the movant establishes four prerequisites: (1) a substantial likelihood of success on the merits; (2) a substantial threat that failure to grant the injunction will result in irreparable injury; (3) that the threatened injury outweighs any damage that the injunction may cause the opposing party; and (4) that the injunction will not disserve the public interest. *See N. Mississippi Med. Ctr., Inc. v. Quartiz Techs.*, No. 23-60483, 2025 WL 980568, at *2 (5th Cir. Apr. 1, 2025); *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008); *see also* Fed. R. Civ. P. 65. The last two factors merge when the government is the opposing party. *See Nken v. Holder*, 556 U.S. 418, 435 (2009). The movant "bears the burden of persuasion on all four factors in order to be entitled to the extraordinary relief of a preliminary injunction." *N. Mississippi Med. Ctr., Inc.*, 2025 WL 980568, at *2 (citation omitted). The "denial of a preliminary injunction will be upheld where the movant has failed sufficiently to establish *any one* of the four criteria." *Pastel Cartel, LLC v. U.S. Food & Drug Admin.*, No. 1:23-CV-1010-DAE, 2023 WL 9503484, at *3 (W.D. Tex. Dec. 14, 2023) (quoting *Black Fire Fighters Ass'n v. City of Dall.,* 905 F.2d 63, 65 (5th Cir. 1990) (emphasis in original)).

Likelihood of Success on the APA Claims

27. Plaintiffs assert several claims under the Administrative Procedure Act.

28. APA review properly takes place at summary judgment based on "the whole [administrative] record" before the agency, "or those parts of it cited by a party." *Id*. § 706. "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably

explained," and "[j]udicial review under that standard is deferential." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).  A court "may not consider evidence outside the administrative record," *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021); *OnPath Fed. Credit Union v. U.S. Dep't of Treasury, Cmty. Dev. Fin. Institutions Fund*, 73 F.4th 291, 299 (5th Cir. 2023), nor should the court "weigh the evidence in the record pro and con." *Louisiana v. Verity*, 853 F.2d 322, 327 (5th Cir. 1988).  Although a court's review is "searching and careful," it ultimately does not "substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned." *Univ. of Tex. M.D. Anderson Cancer Ctr. v. HHS*, 985 F.3d 472, 475–76 (5th Cir. 2021).

29. Here, Plaintiffs have not shown a likelihood of success on the merits because the administrative record confirms that FinCEN engaged in reasoned decisionmaking and considered relevant factors when issuing the March 2025 GTO.  The administrative record supports FinCEN's finding that the additional recordkeeping and reporting requirements set forth in the March 2025 GTO "are necessary to carry out the purposes of the BSA or to prevent evasions" and to further "Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States."   FinCEN's decision was not arbitrary, capricious, or an abuse of discretion under 5 U.S.C. § 706(2)(A).

30. FinCEN engaged in reasoned decisionmaking and considered relevant factors when targeting this geographic area.

31. FinCEN engaged in reasoned decisionmaking and considered relevant factors when choosing the reporting threshold for the GTO.

32. Plaintiffs have not shown a likelihood of success on their notice-and-comment claim.  Congress specifically authorized the agency to issue GTOs by order rather than by rule, and therefore notice-and-comment rulemaking is not required.  31 U.S.C. § 5326(a).  This is not,

in any event, the sort of "rule" requiring such rulemaking, *U. S. v. W. H. Hodges & Co.*, 533 F.2d 276, 278 (5th Cir. 1976) (finding that order to provide reports to Secretary of Agriculture was not subject to rulemaking requirements), and the APA does not permit the courts to impose additional procedural requirements beyond those required by Congress, *see Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc.*, 435 U.S. 519, 549 (1978); *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 100 (2015).

33. Plaintiffs have not shown a likelihood of success on the merits of their ultra vires claim because the March 2025 GTO is within FinCEN's explicit statutory authority, and does not require application of the major questions doctrine. *See* 31 U.S.C. § 5326.

34. The nondelegation doctrine does not support Plaintiffs' APA claim, nor stand alone as a constitutional claim. To survive a challenge under the nondelegation doctrine, Congress must only articulate an intelligible principle pursuant to which a person authorized to act must conform. *See Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457 (2001). The GTO statute articulates an intelligible principle pursuant to which a person authorized to act must confirm. *See* 31 U.S.C. § 5326.

Likelihood of Success on the Fourth Amendment Claim

35. Plaintiffs' constitutional claims, to the extent they are not purely legal, should also be reviewed on the basis of the administrative record. The focus of judicial review of agency action, including of challenges to agency action "contrary to constitutional right, power, privilege, or immunity," 5 U.S.C. § 706(2)(B), "should be the administrative record already in existence, not some new record made initially in the reviewing court." *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743 (1985). A plaintiff cannot avoid record review by separately pleading a constitutional claim. *See Malone Mortg. Co. Am. v. Martinez*, 2003 WL 23272381, at *2 (N.D. Tex. Jan. 6, 2003) ("The APA's restriction of judicial review to the administrative record would

be meaningless if any party seeking review based on statutory or constitutional deficiencies were entitled to broad-ranging discovery."); *Lewis v. United States & United States Army Corps of Eng'rs*, No. CV 18-1838, 2019 WL 13115362, at *6 (E.D. La. Mar. 28, 2019) (same); *KHOLLE Magnolia 2015, LLC v. Vidal*, No. CV H-22-1974, 2024 WL 3371040, at *2 (S.D. Tex. July 9, 2024) (same); *see also Fence Creek Cattle Co. v. U.S. Forest Service*, 602 F.3d 1125, 1131 (9th Cir. 2010); *Bellion Spirits, LLC v. United States*, 335 F. Supp. 3d 32, 43 (D.D.C. 2018).

36. The Plaintiffs cannot show a likelihood of success on their Fourth Amendment claim because the Supreme Court has already ruled that similar BSA recordkeeping and reporting requirements are constitutional. *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). Like the BSA requirements at issue in *Shultz*, the GTO is a reasonable corporate reporting requirement justified the growth of criminal organizations targeting U.S. financial institutions. As with the currency reporting in *Shultz*, the information required by the GTO is "[1] sufficiently described and limited in nature, and [2] sufficiently related to a tenable congressional determination as to improper use of transactions of that type in interstate commerce," such that the BSA provisions at issue "do not impose unreasonable reporting requirements" and do not require a warrant or probable cause. *Id.* at 67. The Fourth Amendment does not require a warrant and probable cause under these circumstances.

37. Plaintiff Gonzalez has not shown a likelihood of success on the argument that the reporting requirement violates his own Fourth Amendment rights in his personal data as a customer. Even assuming that his transactions are covered transactions, the customer of a financial institution "can assert neither ownership nor possession" in the business records of the financial institution, even where the Government requires those records to be maintained, and thus cannot object to their disclosure. *United States v. Miller*, 425 U.S. 435, 440 (1976). Because the Supreme Court rejected the argument in *Shultz* that the financial institution has a Fourth Amendment right

to avoid reporting requirements and rejected the argument in *Miller* that the customer has a protected right to avoid such requirements, Mr. Gonzalez does not have some different special kind of protected interest simply because he is both.

<u>Balancing of Interests</u>

38. Plaintiffs seeking preliminary relief must demonstrate that "irreparable injury is likely in the absence of an injunction." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). Generally speaking, a bare assertion of irreparable harm, or even a possibility of irreparable harm, is not sufficient, because "a possibility of irreparable harm is inconsistent with [the] characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that . . . plaintiff is entitled to such relief." *Winter*, 555 U.S. at 22.

39. Plaintiff TAMSB has alleged no harm whatsoever to itself. Given that its member organizations are now parties to the lawsuit, TAMSB is entirely superfluous, and is entitled to no relief.

40. The testimony of Mr. Martinez of Plaintiff Laredo Insurance Services does not support Plaintiffs' claim that compliance would be ruinous to him, much less in every instance.

41. Two other Plaintiffs (E.Mex. Financial Services and Cris Win) so far have put in no evidence of irreparable harm at all, and are entitled to no relief. Their lack of submission further supports the inference that compliance is perfectly achievable for many MSBs, including some of the Plaintiffs.

42. For those Plaintiffs who did put in evidence that it may be costly for their business to comply with the TRO, the evidence does not support a claim that temporary compliance costs are necessarily ruinous or cannot be mitigated.

43. Plaintiffs' failure to pursue other options or administrative relief and their delay in bringing suit militates against a finding of irreparable harm.

44. The balance of equities and the public interest factors "merge when the Government is the opposing party." *Nken*, 556 U.S. at 435. Moreover, when assessing whether to grant a preliminary injunction before the merits have been adjudicated, courts "should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24 (citation omitted).

45. In the face of Plaintiffs' weak evidence of harm to a few MSBs, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry the day.

46. The Court hereby DENIES the motion for a preliminary injunction and directs counsel for the parties to meet and confer about next steps and propose a reasonably expedited schedule for the remaining proceedings.

Dated: May 8, 2025                                  Respectfully submitted,

                                                    YAAKOV ROTH
                                                    Acting Assistant Attorney General

                                                    STEPHEN M. ELLIOTT
                                                    Assistant Director, Federal Programs Branch

                                                    /s/Amy E. Powell
                                                    AMY E. POWELL
                                                    Senior Trial Counsel
                                                    United States Department of Justice
                                                    Civil Division, Federal Programs Branch
                                                    c/o U.S. Attorney's Office for EDNC
                                                    150 Fayetteville St, Suite 2100
                                                    Raleigh, NC 27601
                                                    Tel.: 919-856-4013
                                                    Email: amy.powell@usdoj.gov
                                                    Counsel for Defendants