# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | |
|---|---|
| TEXAS ASSOCIATION FOR MONEY SERVICES BUSINESSES (TAMSB); HIGH VALUE, INC.; REYNOSA CASA DE CAMBIO, INC.; NYDIA REGALADO d/b/a BEST RATE EXCHANGE; MARIO REGALADO d/b/a BORDER INTERNATIONAL SERVICES; LAREDO INSURANCE SERVICES, LLC; E.MEX. FINANCIAL SERVICES, INC.; R & C, INC. d/b/a TEMEX MONEY EXCHANGE; SAN ISIDRO MULTI SERVICES, INC.; CRIS WIN INC. d/b/a BROWNSVILLE CASA DE CAMBIO; ESPRO INVESTMENT LLC d/b/a LONESTAR MONEY EXCHANGE; and ARNOLDO GONZALEZ, Jr., | Civil Case No. 5:25-cv-00344-FB |
| *Plaintiffs*, | |
| v. | |
| PAM BONDI, ATTORNEY GENERAL OF THE UNITED STATES; SCOTT BESSENT, SECRETARY OF THE TREASURY; UNITED STATES DEPARTMENT OF THE TREASURY; ANDREA GACKI, DIRECTOR OF THE FINANCIAL CRIMES ENFORCEMENT NETWORK; and FINANCIAL CRIMES ENFORCEMENT NETWORK, | |
| *Defendants*. | |

## PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Plaintiffs present the proposed findings of fact based on what they intend to prove at the hearing scheduled to begin on May 12, 2025. They likewise present the proposed conclusions of law based on those facts.

## PROPOSED FINDINGS OF FACT

I.    **Overview**

1.    The entity Plaintiffs are state and federally registered Money Services Businesses ("MSBs"), which means they handle currency. These businesses across the country offer valuable services, such as check cashing, money orders, money transfers, and currency exchange. *See* 31 C.F.R. § 1010.100(ff).

2.    Plaintiff Arnoldo Gonzalez manages Plaintiff High Value, Inc. He is a resident of Laredo, Texas.

3.    Plaintiff Gonzalez uses the services of High Value to change U.S. dollars to Mexican pesos and vice versa, typically in amounts greater than $200 but far below $10,000. His doctor is in Nuevo Laredo, Mexico, across the Rio Grande from Laredo. Plaintiff Gonzalez also has friends and family in Nuevo Laredo. He routinely crosses the border and spends Mexican pesos while in Mexico, including for medical treatment.

4.    The other entity Plaintiffs are also MSBs in Texas affected by FinCEN's April 14, 2025 Geographic Targeting Order ("GTO").

5.    The official capacity Defendants are responsible for enforcing the Bank Secrecy Act. Defendant Financial Crimes Enforcement Network ("FinCEN") is an agency within the Treasury Department.

6.    The subject of this case is FinCEN's April 14, 2025 Geographic Targeting Order ("GTO"). The GTO requires MSBs in 30 zip codes near the Texas and California borders to file Currency Transaction Reports ("CTRs") for transactions over $200.

7.    Federal law has long required that MSBs report all cash transactions in amounts over $10,000 to FinCEN using CTRs. 31 C.F.R. § 1010.311. This $10,000 reporting requirement

applies to all covered financial institutions across the country; it is neutral as to the location of the financial institution. *See* 31 C.F.R. § 1010.310 (applying to "all financial institutions").

8.  Plaintiffs have challenged the legality and constitutionality of the GTO.

9.  On April 1, 2025, the Texas Association for Money Services Businesses filed the original complaint in this case.

10.  On April 11, 2025, the Court entered a Temporary Restraining Order. ECF 13.

11.  On April 18, 2025, Plaintiffs filed the First Amended Complaint and Motion for Preliminary Injunction. ECF 15, 22. The motion sought a preliminary injunction based on their claims under the Fourth Amendment, the Administrative Procedure Act, and *ultra vires* theories under the major questions and nondelegation doctrines.

12.  On April 21, 2025, the Court extended the TRO to May 10, 2025. ECF 26. The Court specifically asked the government not to "begin[] enforcement of the subject GTO against Plaintiffs on May 10, 2025." *Id.*

13.  On April 25, 2025, Defendants filed the Administrative Record. ECF 28.

14.  On May 12, 2025, the Court held a hearing at which it heard testimony from the following individuals: Mr. Gonzalez, who testified on behalf of himself and on behalf of High Value, Inc.; Mr. Xavier Guerra, on behalf of Reynosa Casa de Cambio, Inc.; Ms. Ashley Light on behalf of Valuta Corporation, Inc.; Mr. Isidro Salinas on behalf of San Isidro Multi-Services, Inc.; Mr. Antonio Carpio on behalf of Metro Money Services, LLC; and Andres Payan, Jr. on behalf of Payan's Fuel Center.

15.  The Court also has the declarations submitted as part of the preliminary injunction briefing, including that of Defendant Gacki, FinCEN's director. The Court also admitted the

declaration of Amelia Torres, the co-owner of an affected MSB in Brownsville, Texas, which Plaintiffs offered at the hearing.

## II.     MSBs Provide Legitimate and Valuable Services to Their Customers.

16.     Plaintiff MSBs, like MSBs in general, provide valuable services to their customers. These services fall into four general categories: (1) currency exchange; (2) check cashing; (3) money transfers; and (4) money orders.

17.     Currency exchange involves a customer changing cash from one currency into another. Most commonly for MSBs along the border, the currencies are U.S. dollars and Mexican pesos, though some offer euros as well. These businesses make money on the difference between what they sell a currency for and what they buy it for. Plaintiff High Value, Inc., for example, operates out of a storefront in Laredo that is part of a gas station. High Value is approximately one-half mile from the border bridge along I-35. Plaintiff Gonzalez, who manages High Value, testified that approximately 80 percent of his customers are tourists from both sides of the border. These include people passing through Laredo from somewhere else, as well as people who live in Laredo or Nuevo Laredo on the Mexican side. People routinely cross the border to shop, see friends and family, or go out to eat. Gonzalez testified that U.S. citizens like his son are married to Mexicans, live in Nuevo Laredo, but work in Laredo, commuting daily across the bridge. The other 20 percent of High Value's customers are businesses that might send employees across the border to purchase supplies, such as a trip to Home Depot.

18.     Another MSB service is check cashing. Witness Andres Payan, Jr., whose family owns Payan's Fuel Center, a gas station and convenience store in El Paso, Texas, testified that check cashing involves a customer presenting a check, typically a paycheck, and Payan's cashing it. Payan's charges a small fee for this service and earns commissions as well. Its customers are typically low-income people who do not use traditional banks or find them inconvenient. Aside

from the commissions on the check cashing, the service is valuable to Payan's because it brings in customers who also buy gas and items at the store.

19.     The third category of MSB service is money transfers. Witness Ashley Light, whose family owns Valuta Corporation in El Paso, Texas, testified that money transfers involve partnership with a larger company such as Western Union or, as in Valuta's case, MoneyGram. A customer provides cash to Valuta, which, through MoneyGram, sends that money to another MoneyGram agent somewhere else so that the customer's intended recipient can pick up the money. When people use a money transfer service to send money to family in Mexico or another country, that is often called a remittance. Valuta earns commissions on money transfers.

20.     The last important category is money orders. Ms. Light testified that this involves a customer presenting cash to Valuta, which then provides a check (which in Valuta's case is also facilitated by MoneyGram) to the customer's designated payee, such as a landlord for rent or a utility company for electricity. Valuta earns commissions on money orders.

21.     MSBs must register with FinCEN and must comply with federal anti-money laundering ("AML") and know-your-customer ("KYC") protocols to ensure that MSBs do not become a conduit for illicitly obtained cash.

22.     MSBs are also routinely audited to ensure their compliance with federal and state regulations.

## III.    Currency Transaction Reports.

23.     MSBs face recordkeeping and reporting requirements at various cash transaction dollar thresholds. Where only recordkeeping is required, the MSB must record information about the transaction and the customer's identification, including social security number, and retain that information for five years. *See, e.g.*, 31 C.F.R. § 1022.410(b)(3). Where reporting is required, the MSB must not only record and retain this information, but also affirmatively report it to FinCEN.

*See generally* 31 C.F.R. § 1010.306. That report must be made within 15 days of the transaction, and the mechanism for reporting is a CTR. *See generally id.*

24.    **Currency Exchange:** No recordkeeping or reporting requirements for transactions under $1,000. For transactions between $1,000 and $10,000, an MSB must record the customer's identification, including social security number, but no report to FinCEN is required. *See* 31 C.F.R. § 1022.410(b)(3). The reporting requirement, which involves the filing of the CTR, kicks in at amounts above $10,000. *See* 31 C.F.R. § 1010.311.

25.    **Check Cashing, Money Transfers, Money Orders:** No recordkeeping or reporting requirements for transactions under $3,000. For transactions between $3,000 and $10,000, an MSB must record and retain the customer's identification, including social security number, but no report to FinCEN is required. *See* 31 C.F.R. §§ 1010.410(e), 1010.415. At amounts above $10,000, an MSB must file a CTR. *See* 31 C.F.R. § 1010.311.

26.    **Suspicious Transactions:** In a rare situation in which the MSB has objective reason to believe that a transaction over $2,000 involves illicit funds, that must be reported to FinCEN. *See* 31 C.F.R. § 1022.320(a)(2).

27.    For transactions over $10,000, MSBs (and all financial institutions) must file a Currency Transaction Report ("CTR") with FinCEN. *See* 31 C.F.R. § 1010.311.

28.    The CTR has four sections with 128 boxes for information. In addition to providing detailed information about the entity facilitating the transaction and form the currency takes, each person involved in the transaction must reveal highly personal information, including: full legal name, age, gender, address, phone number, email address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list of dozens), the number from a valid driver's license (or passport or alien registration card [i.e. green card]), amounts of

money, and bank account numbers that transmit or receive the money. The government introduced a copy of the CTR form through Defendant Gacki's declaration.

29.     There is a range of estimates for the amount of time required to prepare and file a CTR. The CTR form itself estimates that it takes 40 minutes to complete. Large institutional filers like banks may use automated systems to facilitate filing. FinCEN has estimated that a CTR may take as little as eight minutes to complete for entities with automated systems. 89 Fed. Reg. 7767, 7768 (Feb. 5, 2024); 85 Fed. Reg. 29022, 29029 (May 14, 2020). For non-bank filers who do not have automated processes—like High Value—FinCEN estimates that each CTR takes 23.93 minutes to complete. 85 Fed. Reg. at 29029. Plaintiff Gonzalez and witnesses at the hearing offered realistic ranges based on their experience of 15 to 25 minutes for the whole process of taking down information, preparing and filing the CTR, and processing the paperwork for storage for five years. Without automated processes for the CTR filing, the MSB employee will often fill out a CTR form by hand and then a trusted manager-level employee or business owner later double checks the CTR for accuracy, enters the information via FinCEN's filing portal, and processes it all for storage.

## IV.     The April 14, 2025 GTO Requires a CTR for Transactions Over $200.

30.     On March 14, 2025, FinCEN published a notice in the Federal Register that MSBs in 30 zip codes near the U.S.-Mexico border would need to file CTRs for every transaction over $200 starting on April 14, 2025, until expiration of the GTO on September 9, 2025. *See Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border*, 90 Fed. Reg. 12106 (Mar. 14, 2025).

31.     This does two things: First, it effectively overrides the previous recordkeeping thresholds of $1,000 (in the case of currency exchanges) and $3,000 (in the case of check cashing, money transfers, and money orders), and imposes a new recordkeeping requirement, including

collection of all the sensitive information required for a CTR and the yearslong retention requirements, for all transactions of $200 and above. Second, it imposes CTR preparation and filing obligations, for all transactions $200 and above.

32.     The FinCEN Memorandum ("Memo"), included in the Administrative Record, states that the general purpose of the GTO is to fight the illegal activities of Mexican drug cartels, especially drug trafficking and human smuggling. By gathering more information, the GTO is intended to "generate new leads and identify new and related subjects in ongoing cases." Memo at 9. It "may allow the identification of a comprehensive network of potential money mules in the geographic area in question," may "create leads related to professional money launderers," and will "likely capture information about the laundering of funds related to multiple criminal typologies." *Id.* FinCEN says the GTO will also "provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Area, allowing FinCEN to more fully understand the money laundering risks related to MSBs." *Id.* at 13–14.

33.     In its brief, the government conceded that the purpose of the $200 GTO is to capture all but *de minimis* transactions. The Court notes that the default CTR reporting threshold was set by regulation at $10,000 in the early 1970s. The Treasury Department has never increased it to keep pace with inflation. The Court takes judicial notice of the fact that $10,000 in 1974, when the reporting requirement was reviewed by the Supreme Court in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974), is the equivalent of approximately $70,000 today. $30 in 1974 is the equivalent of $200 today.

34.     The $200 GTO reduced the reporting requirement for the specific purpose of transforming CTR reporting from a practice aimed at an uncommonly large transaction to a

practice aimed at everyday amounts of money that people use to buy groceries, pay rent or utilities, or, as in Plaintiff Gonzalez' case, pay for medical care in Nuevo Laredo.

35.     Because the $200 GTO is targeting everyday amounts of money, the FinCEN Memo simultaneously acknowledges that "most of the business that MSBs conduct is legitimate and essential." Memo at 4. Services offered by MSBs are "tailored to persons without bank accounts" and provide "competitively priced services and convenient location[s] offered near the border." *Id.* at 6.

36.     Neither the Memo nor the Administrative Record make any attempt to quantify the burden that the GTO imposes on MSBs by dropping the CTR reporting threshold, and all of the attendant recordkeeping requirements, from $10,000 to $200. FinCEN acknowledges a "higher burden" on MSBs, but, because the GTO is "merely a reporting obligation," the agency assumes that the GTO will not "materially alter typical fees charged." *Id.* at 14. Other than this line about fees expected not to change, the FinCEN Memo makes no other mention of burdens on MSBs.

37.     The witness testimony established that the effect of the GTO on MSBs, particularly small ones that do not have automated filing systems, is enormous and nowhere contemplated by FinCEN as part of its decisionmaking process.

38.     First, for many MSBs, a transaction over $10,000 is exceedingly rare.

39.     For instance, Ms. Light testified that in 2024 Valuta did about 68,000 transactions and just 123 were over $10,000 requiring CTRs. Mr. Payan, whose family business cashes about 1,100 checks per month, testified that Payan's Fuel Center had never had a transaction over $10,000 so had never filed a CTR. Plaintiff Gonzalez testified that it is extremely rare for a customer to want to exchange more than $10,000, and in fact most of those transactions over

$10,000 requiring a CTR have been High Value replenishing its inventory of pesos rather than a customer.

40.    In dropping the reporting threshold from $10,000 to $200, the GTO sweeps in an enormous number of transactions not previously requiring recordkeeping or reporting. The result is scores of additional hours in paperwork.

41.    For instance, Mr. Isidro Salinas testified that, in his experience, everything that goes into preparation and filing of a CTR takes about 30 minutes. Based on previous business numbers, he expects to go from about 10 CTRs per month to about 3,288 CTRs per month under the GTO, resulting in 1,645 additional man hours per month. That's about 10 additional full-time people. Currently, San Isidro Multi Services employs 16 people.

42.    Ms. Light testified that, in her experience, each CTR takes about 20 minutes. Before the GTO went into effect Valuta Corporation would have about 10 transactions per month requiring a CTR. In 2024, Valuta did 5,689 transactions per month, 65 percent of which were over $200. That translates from approximately three hours per month processing CTRs to approximately 1,200.

43.    Plaintiff Gonzalez testified that a CTR takes about 20-25 minutes to do. If no injunction from the Court is forthcoming and High Value, Inc. must comply with the GTO, Plaintiff Gonzalez estimates 24 CTRs per day, resulting in over 270 hours per month of extra labor.

44.    Mr. Payan testified that, of the approximately 1,100 checks per month that Payan's cashes, about 1,050 are over $200. Mr. Payan estimates that each CTR is taking about 15 minutes to complete, which means Payan's would have to spend over 260 extra hours per month processing CTRs, when previously Payan's spent zero hours on CTRs.

45.    Mr. Antonio Carpio testified that, across the three Metro Money branches he oversees, less than 1% of transactions have been for more than $10,000 and around 90% have been for more than $200 and less than $10,000. By his estimate, prior to the GTO, his business had four to six CTRs daily across the three locations, but while the GTO has been in effect, it's been approximately 200 CTRs daily. Mr. Carpio testified that each CTR takes approximately 20 to 30 minutes to complete, translating to at least an extra 3,800 minutes daily processing CTRs, or more than 64 hours per day.

46.    Mr. Guerra testified that in a typical month his business does an average of 7,276 cash transactions over $200 within the zip codes covered by the GTO. He estimated that could lead to an additional 1,212 hours of work a month processing CTRs. For his 60-employee business, that would mean hiring an additional 15 employees.

47.    The Court also received declarations from other plaintiffs who, based on the volume of over-$200 transactions they do, are anticipating similar burdens. Plaintiff Espro Investments, LLC d/b/a Lone Star Money Exchange estimates it will go from its current 11 or so CTRs per month to about 1,000 CTRs per month. Plaintiff R & C, Inc. d/b/a TeMex Money Exchange estimates it will go from its current 3 to 6 CTRs monthly to 830 CTRs monthly, at the cost of about 277 additional hours per month. Plaintiff Best Rate Exchange estimates it will go from its current 5 CTRs per month to 6,000 CTRs per month at the cost of 2,000 additional hours per month. Plaintiff Border International Services estimates it will go from its current 9 CTRs a month to 2,600 CTRs a month, at a cost of 870 additional hours per month.

48.    The estimates for the extra hours are in flux because the market itself is changing in response to the GTO.

49.     For instance, customers are walking out. Mr. Payan testified that Payan's, which was not included in the TRO, has experienced as much as a 35 percent decline in check cashing business since the GTO went into effect. Valuta Corporation was also not covered by the TRO and Ms. Light testified that one day she was in the Valuta building for about an hour and personally watched about 10 customers simply leave after being told they must hand over their personal information in order to do small dollar transactions. Mr. Carpio estimated that Metro Money, also not protected by the TRO, has lost about 15 percent of its transaction volume, but added that he could not be sure of the number because he suspects some potential customers that would have chosen to use Metro Money are just not coming in at all.

50.     Other market players are also responding. Plaintiff Gonzalez testified that banks in Laredo have begun advertising their money changing services are for all comers, something that was not explicit in advertisements prior to the GTO. Plaintiff Gonzalez also testified that customers can change money on the Mexican side where American law does not apply at all.

51.     The Plaintiffs and witnesses testified that there is no realistic way to comply with the number of CTRs that the $200 GTO will generate. There is no realistic way to hire and train people to immediately begin processing paperwork in this volume. Filling out and filing CTRs is not only detailed, requiring an employee capable of precision, but the information is confidential, so employees also need to be trustworthy.

52.     Compliance is no idle matter. Federal law provides penalties of up to $1,430 per violation for negligent filing errors. For willful errors, the per-violation fine can run as high as $70,000. Willful violations of the Bank Secrecy Act are also crimes, carrying the potential of prison time. *See* 31 U.S.C. § 5321(a)(6)(A); 31 C.F.R. § 1010.821. MSB witnesses testified that they make extraordinary efforts to ensure accuracy and timeliness. On this latter point, an MSB is

required to file a CTR within 15 days of a triggering transaction. Thus, as CTRs accumulate in numbers that small MSBs lack the infrastructure to deal with, a clock is ticking that could result in $1,430 fines for any CTR that is simply late. These are the same penalties that apply to other violations of the Bank Secrecy Act. Financial institutions regularly pay eye-watering sums for alleged reporting failures—for instance, a $390 million settlement against Capital One, including negligent failure to file CTRs; or a $1.3 billion penalty against T.D. Bank, including for late-filed CTRs. *See FinCEN Announces $390,000,000 Enforcement Action Against Capital One, National Association for Violations of the Bank Secrecy Act (Jan. 15, 2021)*, https://www.fincen.gov/news/ news-releases/fincen-announces-390000000-enforcement-action-against-capital-one-national (last accessed Apr. 26, 2025*); FinCEN Assesses Record $1.3 Billion Penalty against TD Bank (Oct.   10,   2024)*, https://www.fincen.gov/news/news-releases/fincen-assesses-record-13-billion-penalty-against-td-bank.

53.    CTRs, then, are high stakes. Mr. Isidro Salinas testified that, for that reason, only his father Efrain or Isidro himself file CTRs. It isn't that they do not trust their employees. It is that they are ultimately responsible for their businesses in the eyes of the federal government, and mistakes could be so costly as to destroy their business. Ms. Light, too, testified that only she and Valuta's general manager work on CTRs. Mr. Guerra testified that, though his business employs about 60 people, and he and his four siblings manage the business together, only Mr. Guerra himself and his secretary file CTRs. Mr. Payan testified that only Mr. Payan's mother, sister, or Mr. Payan himself file CTRs.

54.    FinCEN has suggested, through a webinar it hosted for MSBs, that there are ways for MSBs to automate their CTR process to reduce the time required to file a CTR, such as by implementing "batch filing" processes. However, automation comes at a high cost. Batch

processing with FinCEN is not proving as easy as FinCEN suggests, and even if batch processing is implemented, it does not appear that it would eliminate all or even most of the time required.

55.    Mr. Salinas testified that he is currently working with his software developer vendor to update his business system to lower the threshold to $200, then hopes to be able to implement batch filing, at a cost of up to $12,000. However, batch filing requires special coding that accounts for the variables that the business faces, and Mr. Salinas and his developer have not yet been successful. Mr. Salinas has contacted FinCEN for help, which the webinar host suggested MSBs do, but has never received anything but an automated response, no actual help.

56.    Ms. Light faces the same problems. She, too, is working with her software vendor, at an expected cost of thousands of dollars, to attempt to start batch filings, and has opened up several help tickets with FinCEN to no avail. She, too, has only received automated responses including an attached 114-page "XML Schema 2.0 User Guide" that reads like a coding manual, and appears to be just that.

57.    Until the MSBs get successfully connected to FinCEN, batch filing is not an option, and manual filing will continue. Mr. Payan testified that Payan's employs entry level workers, and if they expect to be able to continue cashing checks, they will have to hire a high skilled employee or employees in order to either do CTRs or free the family members up to do CTRs while others do the critical tasks of the business that the family now does, like human resources management, buying, and operations.

58.    MSBs not covered by the Court's TRO have had to resort to declining transactions over $200 to try to catch up on accumulated CTRs. Mr. Payan testified that Payan's has had to stop cashing checks over $200 in order to catch up, which means Payan's has stopped earning fees and commissions on those services. In April 2024, Payan's earned $8,246 on its check cashing

business. In April 2025, with only half the month affected by the GTO, Payan's earned just $5,606 on its check cashing business. Ms. Light testified that Valuta Corporation has stopped offering money transfers and money orders over $200, partly because she cannot risk getting behind on CTR filings, which is taking up all of her time, and partly because MoneyGram has also limited its services in response to the GTO.

59.     The GTO is also having a negative effect on customers. They report being wary of having to provide so much personal financial information to perform an ordinary transaction. Mr. Salinas testified that they have *received* customers from an MSB, not a block away, which is not a plaintiff covered by this Court's TRO. Customers are leaving that MSB to come to San Isidro Multi-Services, asking if they will have to give their personal information to exchange over $200 (and under $10,000). San Isidro has been covered by the TRO so has been able to say yes, and customers who left that MSB have given businesses to San Isidro.

60.     All of the MSB representatives expressed doubt about whether their MSB businesses could survive application of the GTO. The Court finds these concerns well founded.

### PROPOSED CONCLUSIONS OF LAW

61.     This is not a case about whether Mexican drug cartels, fentanyl, or money laundering is bad. This is a case about whether FinCEN—simply by invoking those evils—can take sudden, drastic, and devastating action against legitimate businesses without notice-and-comment rulemaking, in an arbitrary and capricious way, and without regard for the Fourth Amendment (among other problems). The difference between the government, on the one hand, and the cartels, fentanyl peddlers, and money launderers, on the other, is the rule of law. The government must pursue its goals lawfully and constitutionally. It has not done so. The Court, therefore, concludes that a preliminary injunction is warranted.

62.    Plaintiffs are entitled to a preliminary injunction because they have satisfied each prong of the familiar test for preliminary injunctive relief. "A plaintiff seeking a preliminary injunction must establish that [it] is likely to succeed on the merits, that [it] is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in [its] favor, and that an injunction is in the public interest." *Winter v. NRDC, Inc.*, 555 U.S. 7, 20 (2008). When, as here, the government is the opposing party, the last two factors (equities and public interest) "merge." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The Court finds that the record here favors Plaintiffs on each factor.

## I.    The Motion to Supplement the Administrative Record Is Granted, Though the Court Would Reach the Same Decision Even Without the Supplemental Evidence.

63.    As an initial matter, the government has argued that the motion should be resolved on the Administrative Record. Plaintiffs have filed a motion to supplement the Administrative Record with the live testimony and other evidence admitted during the preliminary injunction hearing. ECF 50.

64.    The general rule is that APA review is limited to the agency record. *See, e.g.*, *Camp v. Pitts*, 411 U.S. 138, 142 (1973) ("[T]he focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."); *Sierra Club v. U.S. Dep't of Interior*, 990 F.3d 898, 907 (5th Cir. 2021) (A court "may not consider evidence outside the administrative record"). This rule cuts both ways. The government cannot generally supplement the record it created or resort to post hoc justifications for challenged agency action. *Luminant Generation Co. v. EPA*, 675 F.3d 917, 925 (5th Cir. 2012) ("We must disregard any *post hoc* rationalizations of the EPA's action and evaluate it solely on the basis of the agency's stated rationale at the time of its decision.").

65.     On a motion, a court may allow supplemental evidence into the record if "the moving party demonstrates 'unusual circumstances justifying a departure' from the general presumption that review is limited to the record compiled by the agency." *Medina Cnty. Env't Action Ass'n v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (quoting *Am. Wildlands v. Kempthorne*, 530 F.3d 991, 1002 (D.C. Cir. 2008)). Supplementing the administrative record is appropriate when plaintiffs bring constitutional claims. Courts reviewing agency action "have allowed the introduction of extra-record evidence on constitutional claims" because "a court reviewing the constitutionality of agency action must make 'an independent assessment of a citizen's claim of constitutional right.'" *Texas v. Biden*, No. 2:21-CV-067-Z, 2021 WL 4552547, at *3 (N.D. Tex. July19, 2021) (quoting *Porter v. Califano*, 592 F.2d 770, 780 (5th Cir. 1979)).

66.     The case law on when to allow supplemental evidence is not a model of clarity. The Fifth Circuit employs a three-factor test: "(1) the agency deliberately or negligently excluded documents that may have been adverse to its decision; (2) the district court needed to supplement the record with background information in order to determine whether the agency considered all of the relevant factors; or (3) the agency failed to explain administrative action so as to frustrate judicial review." *Medina*, 602 F.3d at 706 (cleaned up).

67.     The federal district courts have broken this down into an eight-factor test: "(1) when agency action is not adequately explained in the record before the court; (2) when looking to determine whether the agency considered all relevant factors; (3) when a record is incomplete; (4) when a case is so complex that a court needs more evidence to enable it to understand the issues; (5) when evidence arising after the agency action shows whether the decision was correct or not; (6) in certain NEPA cases; (7) in preliminary injunction cases; and (8) when an agency acts in bad faith." *City of Dallas v. Hall*, No. CIV.A. 307CV0060-P, 2007 WL 3257188, at *5 (N.D. Tex. Oct.

29, 2007). These eight factors have been found to "fit within" the three *Medina* factors. *La Union del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 141 F. Supp. 3d 681, 694 (S.D. Tex. 2015); *Rethink35, et al., Plaintiffs v. Texas Dep't of Transport.*, No. 1:24-CV-00092-ADA, 2025 WL 1191594, at *3 (W.D. Tex. Mar. 6, 2025).

68.     Plaintiffs argue that supplementation of the Administrative Record is appropriate here under factors (1), (2), (3), and (7) of the eight-factor test. As explained in more detail below in analyzing likelihood of success on the merits, Plaintiffs' basic objection is that the Administrative Record does not meaningfully address, much less take into account, the practical impact the GTO will have on MSBs, which now face the prospect of filing thousands of CTRs per month while facing severe civil and criminal penalties for each and every violation. Nor, they argue, does the Administrative Record take into account the legitimate Fourth Amendment interests that businesses and individuals have in financial privacy.

69.     Last year, in *National Ass'n for Gun Rights, Inc. v. Garland*, Judge O'Connor of the Northern District of Texas considered evidence outside the administrative record under factors (2), (4), and (5) in a challenge to the Bureau of Alcohol, Tobacco, Firearms and Explosives' broadening of the definition of "machine gun" to include forced reset triggers (FRT). 741 F. Supp. 3d 568, 599 (N.D. Tex. 2024). In analyzing the second factor, the court noted, "[w]hether an agency considered all relevant factors can sometimes only be determined by looking outside the record to see what the agency may have ignored." *Id.* (cleaned up). Furthermore,

> [t]here was no public comment period during which Plaintiffs, or anyone else, could weigh in and correct errors in the agency's administrative process as it relates to FRT operation. Rather, Defendants classified FRTs as 'machineguns' based entirely on their own analysis and on a record of their own making. The extra-record information reflects documentation that is adverse to the agency's determination and reveals factors which are relevant to [the ATF's] final decision.

*Id.* (cleaned up). *See also Rethink35*, 2025 WL 1191594, at *3 (granting motion to supplement the record because the Texas Department of Transportation failed to analyze a highway expansion's impact on emissions and declined to prepare a supplemental environmental impact statement in light of new national air quality standards).

70.     The Court finds *National Ass'n for Gun Rights*' analysis instructive here. The fundamental problem was the failure of the agency to consider "input or challenge from Plaintiffs and the broader public." 741 F. Supp. 3d at 600. In short, an agency can't rig the administrative record in its favor and then insist that the analysis be confined to a closed record. Indeed, as the court noted in *National Ass'n for Gun Rights*, "one need not exert much energy to imagine the abuses that could result." *Id.*

71.     The Administrative Record here suffers from the same obvious flaw. FinCEN cherrypicked all the sources without any input from anyone outside the government. As will be discussed below in the APA analysis, the Administrative Record here is neither the result of a rulemaking nor an adjudication. Because FinCEN did not go through the notice and comment procedure, members of the public, such as MSBs in the 30 targeted zip codes, had no opportunity to offer testimony and evidence into the record raising the problem of impacts on MSBs and FinCEN had no corresponding duty under the notice and comment process to provide a reasoned explanation for the $200 GTO in light of concerns raised by the public. Likewise, because the GTO was not the product of an adjudication in which any MSBs (much less Plaintiff MSBs here) were parties, there was no opportunity for any entity or person to submit evidence into an adjudicatory record. The Administrative Record here consists solely of sources that FinCEN itself selected and did so for the obvious purpose of justifying the $200 GTO. As Judge O'Conor observed, it is not hard to imagine the abuses that could result, especially as to constitutional rights.

72.     A basic precept of procedural due process is notice and an opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case." (cleaned up)). FinCEN cannot exclude the public, including MSBs, from the process of compiling the Administrative Record and then insist in court that Plaintiff MSBs and Plaintiff Gonzalez must litigate their constitutional and statutory claims on a closed Administrative Record. After all, the premise behind restricting an APA claim to a closed administrative record at the litigation stage is the opportunity to contribute to the administrative record at the pre-litigation stage when the matter is still before the agency. *See Nat'l Ass'n for Gun Rts., Inc.*, 741 F. Supp. 3d at 600 (courts should not "functionally defer to" a record "made without any opportunity for input or challenge from Plaintiffs and the broader public"). FinCEN cannot have its cake and eat it too. If it is deliberately going to exclude interested parties from the process of creating an administrative record, it cannot later complain when litigants want to add evidence.

73.     That said, the Court also notes that inclusion of the testimony and evidence from the preliminary injunction hearing in consideration of the substantive claims is not the factor that tips the scales. The analysis would have come out the same way even on a closed record. Ultimately, the evidence Plaintiffs submitted via testimony and exhibits is relevant to irreparable harm, balance of equities, and scope of relief. All of that evidence was properly heard and taken under consideration as part of Plaintiffs' preliminary injunction motion. To the extent the Court considers that evidence in analyzing likelihood of success, the outcome would have been the same even without considering the supplemental evidence. Unlike the technical expert evidence at issue in many cases, such as *Rethink35*, for example, Plaintiffs' objection to the Administrative Record

is based on common sense. Slashing the reporting requirement threshold by 98 percent is obviously going to have a significant impact on affected businesses. FinCEN's failure to address those impacts is an obvious deficiency in the record. The Court does not require expert testimony to understand why, based on the Administrative Record, the GTO is arbitrary and capricious, as well as in likely violation of the Fourth Amendment, major questions doctrine, and nondelegation doctrine. Thus, the Court grants the motion to supplement, but emphasizes that the outcome would have been the same even had the motion to supplement been denied.

## II.    Plaintiffs Are Likely to Succeed on the Merits

### A.    The Administrative Procedure Act

#### 1.    The GTO is a "rule," not an "order," under the APA and hence invalid because FinCEN did not do notice-and-comment rulemaking.

74.    Plaintiffs argue that the GTO is a "rule" under the Administrative Procedure Act. 5 U.S.C. § 551(4) (defining "rule" as "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law orpolicy"). If it is a "rule," then the GTO is invalid as a matter of law because FinCEN did not go through the formal notice-and-comment process required for rules. The government does not dispute that the GTO is invalid if, legally, it is a rule.

75.    The government argues that the GTO is an "order," not a "rule," and hence is exempt from formal rulemaking procedures. The government notes that it issued the GTO under 31 U.S.C. § 5326(a), which expressly authorizes the Treasury Secretary to issue orders. The "O" in GTO stands for "order."

76.    What the government *calls* the GTO does not matter. What matters is whether the GTO is a rule or order under the APA. An "order" is the result of an "adjudication." 5 U.S.C. § 551(7). "Two principal characteristics distinguish rulemaking from adjudication." *Yesler*

*Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "Adjudications typically 'resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals.'" *City of Arlington v. FCC*, 668 F.3d 229, 242 (5th Cir. 2012) (quoting *Yesler*, 37 F.3d at 448), *aff'd,* 569 U.S. 290 (2013); *United States v. Fla. E. Coast Ry. Co.*, 410 U.S. 224, 245 (1973) (rulemaking involves "proceedings for the purpose of promulgating policy-type rules or standards" and an adjudication involves "proceedings designed to adjudicate disputed facts in particular cases"). "Second, because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)." *Yesler*, 37 F.3d at 448.

77.    The GTO is not an adjudication. It is not the result of FinCEN holding a hearing with specific parties and determining their rights under a specific fact-record. The government's cases illustrate that orders are the result of individualized adjudications. *Neustar, Inc. v. FCC* was about whether the FCC needed to do notice and comment rulemaking to "nam[e] another company to replace Neustar" on competency grounds as the "Local Number Portability Administrator." 857 F.3d 886, 888 (D.C. Cir. 2017). *National Biodiesel Board v. EPA* involved the EPA's approval of a "comprehensive survey program" submitted by the "Argentine Chamber of Biofuels," a trade group. 843 F.3d 1010, 1014 (D.C. Cir. 2016). No rulemaking was required because both cases involved individualized adjudications about specific parties on a specific record.

78.    The GTO, by contrast, is the equivalent of a new law. It is an "agency statement of . . . particular applicability [30 zip codes] and future effect designed to . . . prescribe law." 5 U.S.C. § 551(4). When it became effective on April 14, 2025, the GTO applied to all MSBs in the 30 zip codes uniformly, simply as result of their being MSBs. The GTO created an affirmative legal obligation for all MSBs—namely, filing CTRs for all transactions over $200—that did not

exist prior to April 14, 2025. All MSBs subject to the GTO likewise now face significant criminal and civil penalties, including prison sentences, for failure to comply with this new legal obligation. None of the MSBs subject to the GTO were parties before FinCEN in an adjudicatory proceeding prior to April 14, 2025. As such, the GTO is not the equivalent of a "judgment" against specific parties as the result of an adjudication. The GTO is a "rule," regardless of what the government calls it.

79.     To be clear, the Court does not dispute that 31 U.S.C. § 5326(a) authorizes the Secretary of the Treasury (and, by extension, FinCEN) to issue geographic targeting orders. The Court simply rejects the government's argument that it can issue what is, legally, a "rule" and evade the rulemaking process by slapping the label "order" on its actions instead. The government argues that Congress specifically authorized the Secretary to proceed by "order" under Section 5326, whereas the Secretary must proceed by regulation in other contexts of the Banking Secrecy Act. But that does not mean that Congress thereby impliedly authorized the Secretary to issue orders that are, in reality, rules under the APA. The more sensible reading is that the undefined term "order" in 31 U.S.C. § 5326(a) must be read in a manner consistent with the definition of "order" in the APA.

80.     Under 5 U.S.C. § 553, federal agencies must "publish notice of proposed rulemaking in the *Federal Register* and 'shall give interested persons an opportunity to participate in the rule making' by allowing submission of comments." *United States v. Johnson*, 632 F.3d 912, 927 (5th Cir. 2011) (footnote omitted). That statutory term "shall" indicates that notice and comment is mandatory. That did not happen. FinCEN Director Gacki cannot create rules with the stroke of her pen. The GTO is invalid as a matter of law. Plaintiffs are, therefore, not just likely, but certain to prevail on the merits of this aspect of their APA claim.

### 2.    The GTO is likely arbitrary and capricious

81.    "The APA's arbitrary-and-capricious standard requires that agency action be reasonable and reasonably explained." *Data Mktg. P'ship, LP v. U.S. Dep't of Lab.*, 45 F.4th 846, 855 (5th Cir. 2022) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An "agency rule" is "arbitrary and capricious if the agency has . . . entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto Ins. Co.*, 463 U.S. 29, 43 (1983). *See also Texas v. EPA*, 829 F.3d 405, 429, 433 (5th Cir. 2016) (holding plaintiffs had strong likelihood of success in showing EPA acted arbitrarily and capriciously by disapproving of consultation between two states); *id.* at 425 ("Agency action[] is arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem[.]" (cleaned up)).

82.    The Court finds the GTO arbitrary and capricious. In broad brushstrokes, the Court finds that reducing the CTR reporting threshold by 98 percent was not a reasoned agency decision because the Administrative Record lacks meaningful evidence: (1) that the abuse of legitimate MSBs to launder money at the low-dollar level is widespread enough to justify the immense burden the GTO imposes; (2) that the targeted zip codes are likely to have a large number of low-dollar illegitimate transactions; (3) that FinCEN considered the impact on MSBs; (4) that FinCEN considered the likelihood that a GTO at $200 would so drastically alter the behavior of MSB customers, including any criminals out there, that collecting CTRs will not generate useful information; and (5) that FinCEN has the capability of translating what will surely be millions of CTRs that never otherwise would have been filed, into actionable intelligence that will result in actual convictions.

83.    In reaching this conclusion, the Court acknowledges FinCEN's role in combatting financial crime. *See generally* Govt. Br. at 10–14. The Court acknowledges FinCEN's legitimate concerns about the danger that Mexican cartels present through drug and human trafficking. The Court recognizes the threat posed by the increased prevalence of fentanyl in the illegal drug trade. The Court likewise acknowledges that the GTO is part of the Trump Administration's new policies on border issues. The Court's decision here is no way a commentary on or rejection of the Administration's priorities or policies. For the Court, the question is solely a question of law about this specific GTO to be resolved under long settled precedent.

84.    The Court finds the GTO arbitrary and capricious for the following reasons:

85.    **The scope of the problem:** The FinCEN Memo and Administrative Record identify problems but contain no evidence about the size of the problem relative to legitimate transactions. This matters because whether a sledgehammer is a "reasoned" solution depends on whether you're trying to drive a railroad spike or swat a fly.

    a.    "[I]llicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico." Memo at 6 (AR009). No discussion of legitimate versus illegitimate transactions.

    b.    "Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including 'money mules,' to move funds to Mexico via U.S.-based MSBs." Memo at 7 (AR010). But the source is a single page from an FBI document about how to avoid being duped into becoming a "money mule." *See* AR304. No discussion of what fraction of MSB transactions involve money mules.

c.  "Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations." Memo at 7 (AR010). But the source is a 2019 FinCEN report that identifies MSBs as one of many tools drug cartels use, including online virtual currency such as bitcoin, "bulk cash smuggling," "trade-based money laundering," and "funnel account activity." AR309–14. No discussion of what fraction of MSB transactions are illicit versus legitimate.

d.  The Memo identifies two criminal cases involving MSBs (from **outside** the targeted zip codes) whose owners were active conspirators. Memo at 7 (AR010) (citing AR323–402). Nothing in the Record connects these cases to a $200 CTR requirement for legitimate MSBs.

86.     **$200 is arbitrary and ignores the destructive impact on legitimate businesses:** The government admits that it set the threshold at $200 to capture all but *de minimis* illegal transactions and concedes that this will also capture all but *de minimis* legal transactions. Govt. Br. at 12–13. Under the GTO, MSBs estimate their CTR numbers will go from: 10 CTRs per month to 3,288 (Isidro Salinas of San Isidro Multi-Services, Inc.); 31 CTRs per month to 7,276 (Xavier Guerra of Reynosa Casa de Cambio, Inc.); 3 to 6 CTRs per month to 830 (Ricardo Granado of R & C, Inc. d/b/a TeMex Money Exchange); 5 CTRs per month to 6,000 (Miguel Regalado of Best Rate Exchange); 9 CTRs per month to 2,600 (of Mario Regalado of Border International Services).

a.  And each of those CTRs takes time. Plaintiff Arnoldo Gonzalez estimates 25 minutes. Though the government tries to downplay the time impact, it cannot deny that FinCEN's own estimates are 8 minutes on average for institutional

filers with special software, and for non-bank filers like Plaintiffs and non-Plaintiff witnesses, 23.93 minutes. But even FinCEN believes it could take up to 40 minutes, based on the printed notice at the bottom of the sample CTR that the government itself produced in this proceeding in the Administrative Record.

b. The extent of the FinCEN's consideration of impacts on MSBs appears to consist of a single statement: FinCEN "does not expect these Covered Businesses to materially alter typical fees." *Id.* at 14 (AR017). The government asserts that "Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors." *Id.* To the contrary, however, there is nothing in the Administrative Record to indicate that FinCEN did consider the relevant factors. There is nothing in the Record contemplating any real impact and certainly not an impact of the magnitude that the witnesses described at the hearing. The impact consists of huge amounts of time processing CTRs, the need to hire skilled employees to do so, the costs of hiring such employees, the need to stop doing transactions to allow time to catch up on processing CTRs, and the loss of business as customers take advantage of other options not subject to the GTO.

c. The Court does not find it unreasonable to expect the government to engage in more careful consideration. The drastic impacts on MSBs are entirely obvious and foreseeable as a result of reducing a reporting threshold by 98 percent. The impact strikes the Court as the rough equivalent of the Treasury Secretary demanding that ordinary taxpayers file tax returns every week instead of annually. If the Treasury Secretary did that and then claimed that it foresaw no

meaningful change in the paperwork burdens on taxpayers, that would obviously be arbitrary and capricious. So too here.

d. In fact, the limited evidence in the Administrative Record about impacts on legitimate business indicates that $200 is ruinously low. The January 15, 2025 report by the Center for Strategic and International Studies ("CSIS")— *Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact*—does what FinCEN didn't: attempt to balance the cartel fight against legitimate money transfers to Mexico. AR148– 67. It recommends that the basic level of "recordkeeping" (**not** a CTR) for "transactions above $3,000" be reduced to "$1,000." AR163. The CSIS report chose $1,000 because it was significantly above "the <u>average size</u> of a remittance [which is] in the low to mid three hundreds with its <u>highest point</u> being $390." *Id.* (emphasis in original).

e. Willfully ignoring the major destructive impacts of a rule is the hallmark of arbitrary and capricious agency action. *See Texas v. EPA*, 829 F.3d 405, 429, 433 (5th Cir. 2016) (holding plaintiffs had strong likelihood of success in showing EPA acted arbitrarily and capriciously by disapproving of consultation between two states); *see also id.* at 425 ("Agency action[] is arbitrary and capricious if the agency . . . entirely failed to consider an important aspect of the problem[.]" (cleaned up)).

87. **The 30 zip codes are arbitrary:** First, there's no reason to assume that zip codes that have a lot of high-dollar transactions also have a lot of low-dollar transactions. (Indeed, that's belied by Plaintiffs' evidence here; they almost exclusively do low-dollar transactions and rarely

handle amounts over $10,000.) But, second, even if that were the right inquiry, a spreadsheet that does not identify any sources (let alone explain why those sources are accurate) isn't enough to establish the proposition. FinCEN puts a crude spreadsheet in the Administrative Record purportedly showing an abnormal number of over-$10,000 transactions, but those are just numbers on a page. Memo at 11–13 (AR014–16); AR436, 442–43. There is no way to tell where the numbers came from, who made them, if they are accurate, or if the number of $10,000 transactions in the targeted zip codes truly is high. Third, even if there were a high number of small-dollar transactions, it does not follow that they are more likely to be illegitimate. FinCEN is piling supposition upon supposition upon supposition.

a. Also notably absent: any evidence that there are more prosecutions in the targeted zip codes. FinCEN's theory is that CTRs lead to prosecutions and hence a $200 threshold will lead to many more CTRs and thus many more prosecutions. If this theory is true (prosecutions happen in proportion to CTRs filed with FinCEN), then the government should have proof that the supposedly high number of over-$10,000 CTRs in the targeted zip codes has resulted in above-average numbers of prosecutions. Yet there is no such evidence in the record. But if $10,000 CTRs aren't leading to more prosecutions, why should anyone believe that exponentially increasing the number of CTRs via a $200 threshold will lead to more prosecutions?

b. The government argues that "[l]ogically, [the targeted zip codes] in general are likely to be targeted by cartels because 'they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.'" Govt. Br. at 13. But the Court does not find this logical

at all. The government cares most about electronic remittances, which can be sent from anywhere. The two criminal cases in the Administrative Record are in northern California and Georgia, not the border. Bulk physical cash, by definition, isn't going through MSBs. Even assuming drug and human smuggling takes place at border checkpoints, it isn't "logical" to believe that the illicit revenue from these crimes is going to be sent back to Mexico via thousands of structured transactions via MSBs right at the border.

88. **No consideration of cartel countermeasures:** Criminals can exploit non-targeted zip codes. Plaintiffs' maps illustrate that San Diego is a Swiss cheese of targeted and non-targeted zip codes. Or criminals can go to Arizona or New Mexico. Or use bitcoin, bulk cash smuggling, or other laundering techniques. FinCEN's own sources cast doubt on the supposition that cartels are remitting millions of dollars back to Mexico via small-dollar cash transactions, noting what an absurd logistical nightmare this would be: "[I]t would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." AR160. That report explains that rather than use implausible numbers of low-dollar money transfers, cartels use China-based money launderers and cryptocurrency. *Id.* In other words, FinCEN itself relies on sources that say its new rule will be ineffective. It just ignores them.

89. **No capacity to act on the CTRs:** To find more needles, FinCEN is exponentially increasing the size of the haystack. But does FinCEN have the capacity to turn millions of new CTRs into actionable leads and real prosecutions? Again, there's no evidence FinCEN is routinely using $10,000 CTRs for prosecutions. FinCEN cites two criminal cases, but those involved corrupt MSBs outside the targeted zip codes.

**B.    The Fourth Amendment**

90.    The Fourth Amendment guarantees Americans the right "to be secure in their persons, houses, papers, and effects, against unreasonable searches." U.S. Const. amend. IV. Step one in a Fourth Amendment analysis is determining whether the GTO is a search. It is. A search "occurs when government officers violate a person's 'reasonable expectation of privacy.'" *United States v. Jones*, 565 U.S. 400, 406 (2012). An expectation exists when: (1) there is "a subjective expectation of privacy"; and (2) societal recognition of that expectation as "reasonable." *Id.* at 414 (Sotomayor, J., concurring).

91.    Plaintiff Gonzalez has a subjective expectation of privacy in his small-dollar cash transactions and in the personal information that the GTO compiles—his name, address, phone number, social security number, occupation, time and location of his transactions, dollar amounts, and a description of the property or service. He does not want to create a detailed government record every time he changes dollars to pesos to go to the doctor or shop in Mexico—perfectly legal activities. Society recognizes a reasonable expectation of privacy in financial information. Federal law imposes privacy obligations on any "institution that is significantly engaged in financial activities," 16 C.F.R. § 313.3(k)(1), which includes entities that provide services covered by the GTO. A business offering such services cannot "directly or through any affiliate, disclose any nonpublic personal information about a consumer to a nonaffiliated third party" without providing notice and "a reasonable opportunity, before you disclose the information . . . to opt out of the disclosure." *Id.* § 313.10(a)(1)(iii). These legal requirements confirm that society considers financial privacy reasonable. *Jones*, 565 U.S. at 406; *see also In re Application for Historical Cell Site Data*, 747 F. Supp. 2d 827, 841–42 (S.D. Tex. 2010). Thus, Plaintiff Gonzalez has Fourth Amendment interests at stake.

92.     Searching through business information is a search of the business itself. The rule that "searches conducted outside the judicial process . . . are *per se* unreasonable" "applies to commercial premises as well as to homes." *City of Los Angeles v. Patel*, 576 U.S. 409, 419–20 (2015). In *Patel*, the Court affirmed an en banc Ninth Circuit decision considering a Los Angeles law that required hotel operators to keep records about their guests and that authorized "warrantless, onsite inspections of those records upon the demand of any police officer." *Patel v. City of Los Angeles*, 738 F.3d 1058, 1060 (9th Cir. 2013) (en banc). The threshold question was whether such inspections were searches. *Id*. at 1061. The Ninth Circuit had "little difficulty concluding" that they were, reasoning that the hotels' business records were the private property of the business and the hotel's expectation of privacy in that property was reasonable. *Id*. at 1061–62. And that expectation of privacy held, "notwithstanding the fact that the records [were] required to be kept by law." *Id*. at 1062. The "hotel's property and privacy interests [were] more than sufficient to trigger Fourth Amendment protection." *Id*. Thus, the Plaintiff MSBs' Fourth Amendment rights are also at stake.

93.     The government argues that a conventional Fourth Amendment analysis is inappropriate. Instead, the government argues that the GTO is subject only to a reasonableness analysis because it is a reporting requirement of the sort the Supreme Court upheld in *California Bankers Ass'n v. Shultz*, 416 U.S. 21 (1974). But even if *Shultz* is the right framework, it did not uphold reporting requirements in general. It upheld a $10,000 reporting requirement in 1974 (about $70,000 today). Those were rare transactions. Here, by contrast, the government admits that it is going after all but *de minimis* transactions. Going after essentially all commerce implicates the Fourth Amendment privacy interests of businesses and individuals much more than the limit in *Shultz*.

94.     The government's argument fails because the GTO cannot survive under the test the Supreme Court adopted in *Shultz*. As the government acknowledges, the Court in *Shultz* held that the over-$10,000 reporting requirement did not violate the Fourth Amendment because it was "sufficiently described and *limited in nature*" and because it did not "impose *unreasonable reporting requirements*." Govt. Br. at 19 (emphasis added) (quoting 416 U.S. at 67). In reaching that conclusion, the Supreme Court emphasized the $10,000 threshold. That very high threshold limited reporting to "abnormally large transactions in currency," and hence was "reasonable" vis-à-vis business privacy interests because it intruded on few transactions. *Shultz*, 416 U.S. at 67; *see also id.* at 78 (Powell, J., concurring) (specifically citing $10,000 threshold and stating that "[a] significant extension of the regulations' reporting requirements, however, would pose substantial and difficult constitutional questions"). By contrast, here the $200 GTO (about $30 in 1974) by design intrudes on most transactions, thus obliterating financial privacy. That is not reasonable. *Shultz* would have come out differently had the Supreme Court faced a reporting threshold of $30.

95.     *United States v. Morton Salt Co.*, 338 U.S. 632 (1950), the primary authority in *Shultz*, is also instructive. The Court in *Morton Salt* upheld an agency order directing twenty companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. *Id.* at 634–35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id.* at 651–52. The Court underscored that "a governmental investigation into corporate matters may be of *such a sweeping nature* and so *unrelated to the matter properly under inquiry* as to exceed the investigatory power." *Id.* at 652

(emphasis added). The $200 GTO is precisely the kind of "sweeping" requirement *Morton Salt* condemned.

96.    In addition to the above, the GTO is unlike the $10,000 reporting requirement upheld in *Shultz* because it is not uniform across the country and instead specifically targets particular companies for special reporting burdens. This matters because (as the government itself acknowledges) the Fourth Amendment guards against abuses of freewheeling investigatory discretion. *See* Govt. Br. at 21 (discussing *Patel v. City of Los Angeles*, 576 U.S. 409 (2015)). In deciding who should be the subject of a GTO, FinCEN claims authority to issue a GTO requiring businesses in any geographic area to report any information that FinCEN deems "necessary to carry out the purposes of" the banking laws, 31 U.S.C. § 5326(a), even if those businesses are not the subject of investigation based on individualized suspicion. FinCEN's basic stance toward MSBs and their customers—everyone is a potential criminal—is not only inherently antithetical to the Fourth Amendment; it also poses an unacceptable risk that a GTO will "be used as a pretext to harass [businesses] and their [customers]." *Patel*, 576 U.S. at 421.

97.    The GTO functions as a staggeringly overbroad subpoena for corporate books and records. In fact, a federal district court adopted precisely that framing in *Airbnb, Inc. v. City of New York*, 373 F. Supp. 3d 467, 472, 474–75 (S.D.N.Y. 2019), which applied the Fourth Amendment to grant a preliminary injunction against an ordinance that required short-term rental companies to file "monthly transaction reports" with "voluminous data regarding customers who use their platforms." The court in *Airbnb* analogized the bulk reporting requirement to a vastly overbroad subpoena, explaining that, unlike a typical subpoena, the reporting obligation "applies across-the-board" without any need for individualized suspicion. *Id.* at 491. Also unlike with a typical subpoena, there was no procedure for pre-compliance review. *Id.* at 493. The *Airbnb* court

explained that, historically, "[a]n attempt . . . to compel an entire industry monthly to copy and produce its records as to all local customers would have been unthinkable under the Fourth Amendment." *Id.* at 494–95. So too here.

98.    The $200 GTO is also unreasonable under the Fourth Amendment because it is immensely burdensome. One of the government's cited cases, *Donovan v. Master Printers Ass'n*, 532 F. Supp. 1140, 1153 (N.D. Ill. 1981), explains that a reporting requirement is unreasonable if it imposes an "undue burden." *See also Donovan v. Lone Steer, Inc.*, 464 U.S. 408, 415 (1984) (holding, under Fourth Amendment, that a subpoena for corporate records must be "sufficiently limited in scope, relevant in purpose, and specific in directive so that compliance will not be unreasonably burdensome"). The GTO imposes just such an undue burden. An obligation of that scope "threatens to unduly disrupt or seriously hinder normal operations of a business." *FHFA v. SFR Invs. Pool 1, LLC*, 2018 WL 1524440, at *7 (D. Nev. Mar. 27, 2018) (citation omitted). For that reason, as well, the GTO likely violates the Fourth Amendment.

99.    The above is sufficient to render the GTO likely unconstitutional, but, separately, the GTO also unlawfully invades the privacy of customers—including Plaintiff Gonzalez. As noted earlier, MSB customers enjoy a reasonable expectation of privacy in the information that is the subject of the GTO. The Supreme Court has held that, when government subpoenas corporate records, "a warrant is required in the rare case where the suspect has a legitimate privacy interest in records held by a third party." *Carpenter v. United States*, 585 U.S. 296, 319 (2018); *see also United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024) (invalidating general search of Google phone data for thousands of customers). Because the GTO demands private customer data, the GTO is *per se* unreasonable without a warrant—which FinCEN does not have.

100.    The third-party doctrine does not apply. The government argues that customers' privacy lacks Fourth Amendment protection under the so-called "third-party doctrine" because *United States v. Miller*, 425 U.S. 435 (1976), held that bank customers' privacy interests were not implicated by the requirement that banks report transactions over $10,000. *See* Govt. Br. at 22–23. However, *Miller* must be read in conjunction with *Carpenter*, which explains that the third-party doctrine does not apply when customers *do* have a legitimate privacy interest in corporate records; addressing *Miller*, the Court in *Carpenter* specifically warned that courts should not "uncritically extend existing precedents" to new contexts. 585 U.S. at 318. In *Carpenter*, the Court warned against uncritical extension of *Miller* to the "novel" context of digital cell-site location data; here, this Court likewise will not uncritically extend a case about reporting of abnormally large transactions to a requirement that encompasses ordinary, everyday transactions over $200. Customers have a legitimate privacy interest, and the government needs a warrant.

101.    The GTO is likely unconstitutional under *Shultz*' reasonableness standard for routine reporting requirements. But it also likely unconstitutional under a more conventional Fourth Amendment analysis. The $200 GTO is not a routine reporting requirement for high-dollar events. The government freely admits that the purpose of the GTO is to make a detailed record of the private financial information of every non *de minimis* transaction in 30 zip codes. And the government is concededly doing this to create targets for criminal investigation. This is comprehensive surveillance that calls to mind Big Brother. In this regard, Plaintiffs may be understating things in characterizing the GTO as a general warrant. Whether thinking of general warrants in colonial times or modern versions—such as the Google geofence warrants in *United States v. Smith*, 110 F.4th 817 (5th Cir. 2024), or the cell phone tower dump warrants in *United States v. Spurlock*, 2025 WL 1095512, at *1, *7 (D. Nev. Apr. 11, 2025)—the authorities at least

had a specific crime in mind. Here, FinCEN wants to invade the protected financial privacy of countless innocent people in the hopes of running that information through a computer that will spit out the names of suspects. What the Fifth Circuit just said in striking down the geofence warrants—requiring Google to produce a list of people in a specific location at a specific time—applies directly to the GTO here: "[T]he quintessential problem" with these types of searches is that "they *never* include a specific user to be identified, only a temporal and geographic location where any given user *may* turn up post-search." *Smith*, 110 F.4th at 837. That is the GTO in a nutshell and that is why it is an unconstitutional general warrant.

### C.    The GTO Is Likely *Ultra Vires* and Violates the Major Questions and Nondelegation Doctrines.

102.    The Bank Secrecy Act authorizes the Secretary of the Treasury to issue geographic targeting orders. But the statute does not appear to authorize the specific GTO at issue in this case. First, Section 5326(a) states that the agency should act through an "order." As discussed above in the APA notice-and-comment analysis, an "order" is the result of an "adjudication." 5 U.S.C. § 551(7). There is no adjudication here. Second, Section 5326(a) specifies that a GTO should apply to a "domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area." Read in conjunction with the word "order," that language limits GTOs to an *identified* business or group of businesses, not a *category* of businesses such as "MSBs" that apply indiscriminately to everyone meeting certain regulatory criteria. Finally, Section 5326(c) also contemplates that an "order" will be confidential—a requirement that FinCEN ignored here (instead proceeding via notice in the Federal Register). Because the GTO applies to everyone in the targeted zip codes, it cannot be confidential. Putting these three features of Section 5326 together, it becomes apparent that the statute authorizes the sort of limited reporting obligation that the Supreme Court allowed in *Morton*

*Salt* (discussed in the context of the Fourth Amendment claim above). The statute does not authorize the agency to rewrite financial reporting rules for an entire industry across an entire geographic region, as it did here.

103.    The major questions and nondelegation doctrines compel the Court's narrower reading of the statute. Courts "expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Ala. Ass'n of Realtors v. DHHS*, 594 U.S. 758, 764 (2021) (cleaned up); *see also Biden v. Nebraska*, 600 U.S. 477, 501–03 (2023); *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). Here, FinCEN is reading a statute that authorizes confidential, post-adjudication orders as authority to impose sweeping, intrusive, burdensome, destructive, and unprecedented financial surveillance across 30 zip codes at the $200 level. In this regard, this case is on all fours with *Biden v. Nebraska*, where the Supreme Court held that wholesale forgiveness of student loans could not be justified under a provision allowing the government to "waive or modify" student loans. 600 U.S. at 496–97. The Supreme Court reasoned that the authority to waive or modify student loans envisioned more modest action: "the words 'waive or modify' do not mean 'completely rewrite.'" *Id.* at 506–07. Likewise here. The word "order" does not mean "rule." And hence a statute allowing FinCEN to issue an order to a "business" or "group of businesses" does not allow FinCEN to impose a sweeping GTO across the border in Texas and California. If Congress intended 31 U.S.C. § 5326 to permit all of that, we would expect Congress to say so clearly.

104.    Turning to the nondelegation doctrine, under the separation of powers, Congress writes laws and the Executive executes them. The Executive Branch cannot exercise legislative power, and Congress cannot delegate its legislative authority to the Executive Branch. *See Jarkesy v. SEC*, 34 F.4th 446, 462 (5th Cir. 2022), *aff'd on other grounds*, 603 U.S. 109 (2024). "Congress

may grant regulatory power to another entity only if it provides an 'intelligible principle' by which the recipient of the power can exercise it." *Id.* at 461 (citation omitted). The nondelegation doctrine is "not demanding," but that "does not mean . . . that we must rubber-stamp all delegations of legislative power." *Big Time Vapes, Inc. v. FDA*, 963 F.3d 436, 442–43 (5th Cir. 2020).

105.    The GTO violates the non-delegation doctrine because the statute that FinCEN relied on to promulgate it, 31 U.S.C. § 5326(a), contains no intelligible principle. The statute authorizes the Treasury Department to issue any GTO that it wants—any area, class of transactions, amount of money, or class of businesses. 31 U.S.C. § 5326(a) (Secretary of the Treasury may require reports on "any transaction" involving a "financial institution or nonfinancial trade or business," to direct the business to report "such information as the Secretary may describe" in any "geographic area"). This grant of "exclusive authority and absolute discretion" violates the nondelegation doctrine. *Jarkesy*, 34 F.4th at 462; *see also Whitman v. Am. Trucking Ass'ns, Inc.*, 531 U.S. 457, 474 (2001) (explaining that the nondelegation doctrine is violated where Congress provides "no guidance for the exercise of discretion"). There is no intelligible principle set forth by Congress for the Secretary to follow. The only limiting principle is no principle at all: "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of this subtitle." 31 U.S.C. § 5326(a).

## III.    Plaintiffs Are Suffering Irreparable Harm.

106.    Ordinarily, "[a]n injury is 'irreparable' only if it cannot be undone through monetary remedies." *Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. Unit B Nov. 1981). But monetary losses can be irreparable when "complying with an agency order later held invalid . . . because federal agencies generally enjoy sovereign immunity for any monetary damages." *Wages & White Lion Invs., LLC v. FDA*, 16 F.4th 1130, 1142 (5th Cir. 2021) (cleaned up).

107.    The government does not dispute that financial losses here are irreparable due to sovereign immunity. It argues instead that the harms are speculative or exaggerated. But the testimony established that the financial harms are very real. The GTO is leading affected businesses to lose business and damaging their customer relationships. Witnesses testified that customers do not want to give their personal information for low-dollar transactions and are leaving MSBs without completing their transactions. Witnesses testified that clients are especially unwilling to give their social security numbers. Mr. Salinas said that customers are wary of giving social security numbers because of concerns over identity theft and Mr. Guerra noted that customers were already concerned about giving social security numbers for higher-dollar transactions, wondering why a license was not enough for transactions over $1,000. Ms. Light testified that customers do not want to give their personal information aloud while surrounded by others in a busy lobby and are choosing to walk out. She testified that in an hour she saw approximately 10 customers choosing to walk out rather than completing transactions. Mr. Carpio also testified about customers choosing not to complete transactions and noted that the same is not true for his unaffected location. Mr. Carpio testified that, as someone who occasionally uses MSB services himself, he understands customer frustrations because he also doesn't like the idea of the government collecting his information for such small-dollar transactions. Witnesses testified that their customers have other options for their transactions that they are going to. Mr. Gonzalez testified and offered images showing that at least one bank is advertising that its currency-exchange services are "available . . . to everyone" (not just accountholders) in both English and Spanish. He also testified that High Value is close to the border with Mexico and that there are unaffected currency-exchange businesses in Mexico that customers can go to. Mr. Carpio testified that some of his customers can easily go to Mexico to do their transactions since one of his

business's affected locations is just six blocks from the border and the other is about one mile from the border.

108.    Witnesses testified that they have also lost business as the result of having to offer fewer services or capping the value of their services. Ms. Light testified that, because of the added volume of CTRs to process, her business decided to stop certain services at values over $200. Mr. Carpio testified that his business is not currently offering money order services because the company they work with—Western Union—has paused money orders because of the GTO, leading to lost revenue of approximately $4,000 per month.

109.    Testimony supports that, for some MSBs, alternatives like using automating software to batch-file CTRs or hiring more staff to file CTRs are not viable or have been considered and rejected as unfeasible. Mr. Gonzalez testified that for a small business like High Value, batch-filing and hiring additional staff to file CTRs is not viable. He believes batch-filing software is costly and is concerned about not being able to review each CTR, leading to a greater likelihood of errors. Because CTR filing is a heightened responsibility, he does not think High Value could afford to pay an employee the appropriate salary for such work. Mr. Guerra testified that, without software, his business would need to hire an additional 15 employees to process CTRs. He testified that he has looked into getting software to process CTRs but the program is not ready yet. Part of the reason it has taken a long time to prepare the program is that FinCEN has been unresponsive to Mr. Guerra's inquiries. He believes that with batch-filing they would need to hire 5 additional employees. Mr. Carpio testified that he has looked into batch-filing software and is not fully satisfied with the options. One company gave him a quote at $3,700 per month for them to batch-file the CTRs. That option would require the MSB to send the information they collect from customers to the company which would then complete and submit the CTRs on the MSB's behalf.

Mr. Carpio testified he was concerned about having to give a third party so much of his customers' personal information. Another company quoted them $40,000 for the company to code a program so that the MSB would be able to automate the CTR completion and submission process. Other companies Mr. Carpio has been in touch with do not want to work on this project because they think FinCEN makes it too complicated to do batch-filing for small businesses.

110.    Mr. Gonzalez testified that the GTO puts his personal financial privacy at risk. He testified that he regularly uses affected MSBs to exchange currency in amounts over $200 and under $1,000 (usually around $250) because his doctor is based in Mexico. He does not want his personal information to be sent to the federal government for small-dollar transactions.

111.    Plaintiffs will also suffer irreparable harms to their Fourth Amendment interests in being free of searches for private financial information. The "deprivation of a constitutional right" is always irreparable. *Opulent Life Church v. City of Holly Springs*, 697 F.3d 279, 295 (5th Cir. 2012) (citations omitted). A loss of privacy in personal information is irreparable because the genie can't be put back in the bottle. *See, e.g.*, *Plante v. Gonzalez*, 575 F.2d 1119, 1135 (5th Cir. 1978) ("Privacy of personal matters is an interest in and of itself, protected constitutionally . . . and at common law."). When "an alleged deprivation of a constitutional right is involved . . . no further showing of irreparable injury is necessary." 11A Charles Alan Wright et al., *Federal Practice and Procedure* § 2948.1 (3d ed. 1998).

## IV.    The Balance of Equities Favors Plaintiffs.

112.    The balance of equities favors Plaintiffs. First, the Court has found it likely that the government has violated the Fourth Amendment. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Jackson Women's Health Org. v. Currier*, 760 F.3d 448, 458 n.9 (5th Cir. 2014) (citation omitted). Second, the Court has determined that the GTO is invalid under the APA. FinCEN has no "interest in the perpetuation of unlawful agency action."

*League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). "To the contrary, there is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations.'" *Id.* (quoting *Washington v. Reno*, 35 F.3d 1093, 1103 (6th Cir. 1994)).

113.   In addition to those controlling principles, the government will suffer no imminent practical harm. It wants to generate a massive amount of paperwork on the theory that this will generate leads in criminal investigations down the road. The government has never collected information on this scale and nothing in the record supports its ability to transform this paperwork into actionable leads. Plaintiffs, by contrast, have established concrete irreparable harms to ongoing businesses, many of which have served their communities for decades. Thus, as a practical matter, the equities cut squarely in favor of preserving existing businesses, not creating unprecedented paperwork.

## V.   The GTO Is Vacated and Defendants Are Enjoined from Enforcing It Anywhere.

114.   In an abundance of caution, the Court issued the temporary restraining order as applied only to the Plaintiff MSBs. Having now had the benefit of additional testimony and other evidence, as well as detailed briefing and argument, the proper injunctive remedy ought to extend more broadly.

115.   The APA claims provide the most straightforward basis for injunctive relief. The APA provides that a court shall "*hold unlawful and set aside*" agency action that is "arbitrary [and] capricious," "not in accordance with law," "contrary to constitutional right," or "without observance of procedure required by law." 5 U.S.C. § 706(2) (emphasis added). Rather than constrain an APA remedy to the parties before the court, "Congress did in fact depart from that baseline and authorize vacatur" as a remedy. *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 838 (2024) (Kavanaugh, J., concurring). "The text of § 706(2) directs federal

courts to vacate agency actions in the same way that appellate courts vacate the judgments of trial courts." *Id. See also Career Colls. & Schs. of Tex. v. U.S. Dep't of Educ.*, 98 F.4th 220, 255 (5th Cir. 2024) (concluding that "the scope of preliminary relief" under § 706 is "not party-restricted and allows a court to 'set aside' an unlawful agency action"), *cert. granted in part on other grounds*, 145 S. Ct. 1039 (2025). That is exactly what the Fifth Circuit did, for instance, in enjoining OSHA's COVID-19 vaccine mandate beyond the parties. *See BST Holdings, LLC v. OSHA*, 17 F.4th 604, 619 (5th Cir. 2021).

116.    The GTO is invalid twice over. The failure to do notice and comment means that the GTO was adopted "without observance of procedure required by law." It was also "arbitrary and capricious." This means that the GTO was void *ab initio*, not that it is invalid only as applied to Plaintiffs. Defendants, therefore, are enjoined from enforcing the GTO anywhere.


SIGNED this _____ day of _____, 2025.


_____
FRED BIERY
UNITED STATES DISTRICT JUDGE