# EXHIBIT 1

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Email:   dsilva@buchalter.com
         asadeghi@buchalter.com
         dwilson@buchalter.com

Attorneys for Amicus Curiae,
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>Defendants. | CASE NO. 3:25-cv-008866-JLS-DDL<br><br>**UNOPPOSED BRIEF OF AMICUS CURIAE MONEY SERVICES BUSINESS ASSOCIATION, INC. IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**<br><br>Date:      May 15, 2025<br>Time:      9:30 a.m.<br>Dept.:     4D<br>Judge:     Hon. Janis L. Sammartino |

Money Services Business Association, Inc. respectfully submits an unopposed amicus curiae brief in support of plaintiffs' motion for preliminary injunction. The amicus brief and associated declarations provide "unique information or perspective that can help the court." *NGV Gaming, LTD v. Upstream Point Molate, LLC*, 355 F. Supp. 2d 1061, 1067 (N.D. Cal. 2005) (citations omitted). The amicus brief's arguments build from the concurrent declarations of former government and law enforcement officials, with expertise in international money laundering, financial crimes and prosecutions along the southwest border, money services businesses, and compliance with anti-money laundering laws, regulations, and best practices.

/ / /

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION

Case No. 3:25-cv-008866-JLS-DDL

1   The United States should be enjoined from enforcing the geographic targeting

2   order because it: (i) lacks reasonable grounds to combat money laundering;

3   (ii) contradicts the U.S. government's prior intent to reduce the amount of reports

4   that financial institutions file with the Treasury Department; and (iii) is otherwise

5   unreasonable, arbitrary and capricious, and will prove ineffective—and more likely

6   detrimental—to the government's ability to combat financial crime.

7                              **Disclosure Statement**

8       Pursuant to Rule 29(a) of the Federal Rules of Appellate Procedure,

9   which generally governs amicus briefs in a District Court (*In re YBA Nineteen, LLC*,

10  505 B.R. 289, 304 (S.D. Cal. 2014)), all parties have consented to the appearance of

11  Money Services Business Association, Inc. as amicus curiae in this matter and the

12  filing of this brief.

13      Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure Money

14  Services Business Association, Inc., by and through its undersigned counsel,

15  hereby certifies that it has no parent corporation and that no publicly held corporation

16  owns 10% or more of its stock.

17      Money Services Business Association, Inc.'s counsel authored this brief.

18  No counsel for any party that participated in this brief, and no person or entity,

19  other than the amicus curiae and its members, made a monetary contribution intended

20  to fund the preparation or submission of this brief.

21  DATED: May 6, 2025                    BUCHALTER
                                          A Professional Corporation
22

23                                        By:  _s/ Ava Sadeghi_

24                                              Daniel C. Silva
                                                Ava Sadeghi
25                                              David S. Wilson
                                                Attorneys for Amicus Curiae
26                                              MONEY SERVICES BUSINESS
                                                ADMINISTRATION, INC.
27

28

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                             ii

**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**              Case No. 3:25-cv-008866-JLS-DDL

# TABLE OF CONTENTS

**Page**

I.     INTRODUCTION AND INTEREST OF *AMICUS CURIAE* ........................ 1

II.    COMBATTING FINANCIAL CRIME EFFECTIVELY THROUGH THE USE OF FINCEN, AML, CTRS, AND GTOS ................. 2

    A.    FinCEN's Role in BSA and AML Compliance..................................... 2

    B.    FinCEN Maintains and Ensures Secure Access to BSA Reports .......... 3

    C.    FinCEN Has Routinely Acknowledged that CTRs are Infrequently Used by Law Enforcement, and Should be Reduced........ 3

    D.    Geographical Targeting Orders and Their Effectiveness ..................... 5

        1.    The SWB GTO Is Ineffectively Designed.................................... 5

        2.    The NYC GTO Was Designed Well and Proved Effective ........ 6

III.   THE SWB GTO WILL IMPAIR LAW ENFORCEMENT, UNDERMINE THE BSA, AND BURDEN MSBS ......................................... 7

    A.    The SWB GTO Violates the BSA and Administrative Procedure Act .................................................................................... 7

    B.    The SWB GTO Undermines the BSA and Congress's Authority........ 8

    C.    The SWB GTO Does Not Advance the BSA's Policies........................ 8

    D.    The SWB GTO Is Unsupported by Reliable and Relevant Evidence—Rendering it Unreasonable and Unworkable ................... 10

        1.    The SWB GTO Stands in Stark Contrast to the NYC GTO ..... 10

        2.    The Record is Devoid of Substantial Evidence in Support of the SWB GTO ................................................................ 11

        3.    The Record is Devoid of Any Evidence Supporting the Need for More CTRs in the Covered ZIP Codes ...................... 12

        4.    The SWB GTO is Fatally Overbroad ....................................... 13

    E.    The SWB GTO Is Arbitrary and Capricious ..................................... 14

        1.    FinCEN Did Not Consider Alternatives to the SWB GTO....... 14

        2.    FinCEN's Justification for the SWB GTO Contradicts the Evidence Before It ................................................................ 15

        3.    FinCEN Ignored the SWB GTO's Negative Impact on MSBs ..................................................................................... 16

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**         Case No. 3:25-cv-008866-JLS-DDL

4.    Absent An Injunction, Covered MSBs Face Irreparable Harm ......................................................................17

a.    The SWB GTO Will Deplete MSB Resources ............177

b.    The SWB GTO Will Eliminate the First and Last Line of Defense Against Illicit Finance ..........................17

III.    CONCLUSION .................................................................199

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1

**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**

Case No. 3:25-cv-008866-JLS-DDL

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*ACA Connects v. Bonta,*
24 F.4th 1233 (9th Cir. 2022) .................................................................... 9

*Burlington Truck Lines v. U.S.,*
371 U.S. 156 (1962) ................................................................................ 10

*Lge. of Unt. Latin Amer. Citizens v. Regan,*
996 F.3d 673 (9th Cir. 2021) .................................................................. 16

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
Co.,*
463 U.S. 29 (1983) ........................................................... 10, 14, 15, 16

*SAS Inst., Inc. v. Iancu,*
584 U.S. 357 (2018) ................................................................................. 8

**Federal Statutes**

5 U.S.C.
§ 551(13) ................................................................................................ 14
§ 706(2)(A) ......................................................................................... 7, 14

31 U.S.C.
§ 5311 ............................................................................................. 2, 6, 8
§ 5312(a)(2) ............................................................................................. 2
§ 5313(d)-(g) ........................................................................................... 4
§ 5318(g)(1) ............................................................................................. 2
§ 5326 ................................................................................................. 5, 6
§ 5326(a) ........................................................................................... 7, 10

**California Statutes**

Cal. Fin. Code
§ 2001(d) ............................................................................................... 18

**Other Authorities**

31 C.F.R. Chapter X ................................................................................. 2

31 C.F.R. pt. 1022 .................................................................................... 2

**BUCHALTER**
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                    v

**AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION**        Case No. 3:25-cv-008866-JLS-DDL

31 C.F.R. § 1022.320(a)(2)................................................................... 2

134 Cong. Rec. H7074-02, 1988 WL 184933 ................................... 5, 9

85 Fed. Reg. 29,022, 29,029 (May 14, 2020)....................................... 3

*Currency Transaction Reports: Improvements Could Reduce Filer*
      *Burden While Still Providing Useful Information to Law*
      *Enforcement* (Dec. 11, 2024) at 43 ....................................... 4

H.R. 1799, 119th Cong. (2025) .......................................................... 5

H.R. Rep. No. 91-975, p. 11 (1970) ................................................... 3

S. Rep. No. 91-1139, p. 4 (1970)..................................................... 4, 8

S. Rep. No. 91-1139, p. 18 (1970)...................................................... 6

U.S. Treasury, FinCEN *Report to the Congress: Use of Currency*
      *Transaction Reports* (2002) at 2, 15...................................... 4

U.S. Treasury, FinCEN *Year in Review for FY 2023* (2024) .................. 4

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                    vi

**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                 Case No. 3:25-cv-008866-JLS-DDL

# I.     INTRODUCTION AND INTEREST OF *AMICUS CURIAE*

Money Services Business Association, Inc. ("MSBA") supports and promotes the interests of non-banking financial companies, including money services businesses ("MSBs"). It advocates for fair regulation, promotes the secure and beneficial services MSBs provide, and encourages payment innovation. With more than 30 members who are federally-registered MSBs, MSBA represents several MSBs subject to the geographic targeting order that is the subject of plaintiff's motion for preliminary injunction (the "SWB GTO"). MSBA is uniquely qualified to highlight the SWB GTO's deficiencies and the irreparable harm it will produce.

MSBA and its members are committed to America's anti-money laundering ("AML") laws, regulations, and best practices. Indeed, they embrace their role as key partners in the government's efforts to combat and disrupt transnational criminal organizations. Unfortunately, the SWB GTO will not aid in those efforts.

The Financial Crimes Enforcement Network ("FinCEN") failed to consider how currency transaction reports ("CTRs") are most commonly and effectively used. The declarations in support of this brief are from experts with extensive government, law enforcement, and industry experience; people who have prosecuted the biggest, most complex southwest border money laundering crimes, and have crafted effective GTOs. Instead of helping, they all conclude that the SWB GTO will impair law enforcement's and the financial industry's ability to fight financial crime.

As proposed, the SWB GTO will increase small, negligible CTRs that law enforcement disregards. FinCEN has acknowledged that these de minimis CTRs should be reduced. Multiplying the number of micro-CTRs will amplify irrelevant and distracting information. They will, in effect, conceal financial crime. They will not produce better, or any, criminal investigations. Moreover, the $200 reporting threshold will destroy the very businesses who are doing everything to stop money laundering.

FinCEN should be enjoined from enforcing the SWB GTO. It should develop

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1
**AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION**             Case No. 3:25-cv-008866-JLS-DDL

a more targeted, statistically-supported, and effective GTO. MSBA is ready to help.

## II.   COMBATTING FINANCIAL CRIME EFFECTIVELY THROUGH THE USE OF FINCEN, AML, CTRS, AND GTOS

### A.   FinCEN's Role in BSA and AML Compliance

FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence. Declaration of Connie Fenchel ("Fenchel Decl."), ¶ 9. FinCEN's regulatory authority is grounded in a body of law commonly known as the Bank Secrecy Act ("BSA"), which is the U.S.'s primary and most comprehensive legal regime regarding AML and counter-terrorism financing ("CFT") laws, regulations, and best practices. *Id*. ¶ 11.

The BSA requires financial institutions (as defined in 31 U.S.C. § 5312(a)(2) and 31 C.F.R. Chapter X), businesses, and individuals to file a variety of reports with the Treasury Department ("BSA Reports"). Fenchel Decl., ¶ 11. BSA Reports: (i) are considered highly useful in criminal, tax, and regulatory investigations; (ii) can help "prevent the laundering of money and the financing of terrorism"; and (iii) facilitate the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity." 31 U.S.C. § 5311.

All financial institutions, including MSBs, must file suspicious activity reports ("SARs") for "any suspicious transaction relevant to a possible violation of law or regulation" and for transactions exceeding $2,000 which meet specific criteria related to illegal activity, structuring to evade regulations, lack of lawful purpose, or facilitating criminal conduct. 31 U.S.C. § 5318(g)(1); 31 C.F.R. § 1022.320(a)(2). MSBs must register with FinCEN on a form known as an "RMSB," which subjects them to AML examination by the Treasury Department. Fenchel Decl., ¶¶ 20-23.

MSBs and financial institutions must also file Currency Transaction Reports ("CTR") with FinCEN. 31 C.F.R. Part 1022; Fenchel Decl., ¶ 17. CTRs are filed with

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                    2

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION          Case No. 3:25-cv-008866-JLS-DDL

FinCEN. Fenchel Decl., ¶ 17. CTRs contain no less than 57 fields of information. *Id.*, ¶ 26. Underlying the imposition of this regulatory requirement is the recognition that "[t]he deposit and withdrawal of *large amounts of currency* . . . under unusual circumstances may betray a criminal activity." H.R. Rep. No. 91-975, p. 11 (1970) (emphasis added). But in enforcing that requirement, agencies like FinCEN are to be "given flexibility to avoid the imposition of unwarranted and burdensome reporting and recordkeeping requirements." *Id.*, at 10. To that end, Congress initially expected that CTRs "should impose almost no additional expense upon those affected." *Ibid.*

**B.**    **FinCEN Maintains and Ensures Secure Access to BSA Reports**

One of FinCEN's key responsibilities is to securely maintain BSA Reports, including CTRs, while also ensuring that they remain accessible to law enforcement and authorized third parties. Fenchel Decl., ¶ 24; Declaration of Nona Rangel ("Rangel Decl."), ¶ 18. Law enforcement agencies at all levels of U.S. government, as well as certain foreign counterparts, can access BSA Reports through a secure web connection hosted by FinCEN—the "FinCEN Portal." Fenchel Decl., ¶ 25.

Law enforcement officials and agencies with direct access to the FinCEN Portal are able to search individuals and businesses that appear on BSA Reports by name, address, taxpayer identification number ("TIN"), social security number ("SSN"), passport number, driver's license number, and several other unique items of information. Rangel Decl., ¶ 18; Fenchel Decl., ¶ 24. CTRs contain no less than 57 fields of information, with certain fields allowing for multiple records—some of which FinCEN has acknowledged are "rarely or never used." Fenchel Decl., ¶ 26. FinCEN estimates that, on average, one CTR takes at least 8 minutes to complete, but up to 23.93 minutes for non-bank filers without automated processes. 85 Fed. Reg. 29,022, 29,029 (May 14, 2020).

**C.**    **FinCEN Has Routinely Acknowledged that CTRs Are Infrequently Used by Law Enforcement, and Should Be Reduced**

Despite the Congressional intent to avoid "creating a mountain of paperwork

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                    3

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                Case No. 3:25-cv-008866-JLS-DDL

when the benefits to law enforcement officials are only marginal" (S. Rep. No. 91-1139, p. 4 (1970)), law enforcement has historically made little to no use of CTRs. Fenchel Decl., ¶ 30; Rangel Decl., ¶¶ 30-35. Between 2014-2023, 167 million CTRs were filed, but law enforcement only accessed 2.3%. U.S. Gov't Accountability Off., GAO-25-106500, *Currency Transaction Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement* (Dec. 11, 2024) at 43 (available at https://www.gao.gov/assets/gao-25-106500.pdf ("2024 GAO Report"). Of the 20.8 million CTRs filed in 2023, the FBI made use of only 0.1%. U.S. Treasury, FinCEN *Year in Review for FY 2023* (2024) at 2 (available at https://www.fincen.gov/sites/default/files/shared/FinCEN_Infographic_Public_508 FINAL_2024_June_7.pdf) ("FinCEN's Year in Review").

More specifically, per the testimony of a financial crimes task force officer based in the Southern District of California for a decade, "very few, if any, of the [Financial Investigations and Border Crimes Task Force's] investigations began from a CTR" because "their utility is most frequently a secondary consideration following [an] original source of information," like a SAR, cooperating defendant or whistleblower. Rangel Decl., ¶¶ 30-31. This is unsurprising: financial institutions file an average of 57,000 CTRs every day—a total of 20.8 million across a year. FinCEN's Year in Review, at 3.

As such, for more than 30 years, the government's goal has been to *decrease* the number of CTRs filed by financial institutions. In 1994, the Money Laundering Suppression Act required the Treasury Department to implement exemptions to reduce the number of CTRs filed. *See* 31 U.S.C. § 5313(d)-(g). In 2002, FinCEN recognized that "[t]he number of CTRs filed on an annual basis is still extremely high" and concluded that "seeking to reduce the number of unnecessary CTR filings is still a valid concern in terms of costs to both the industry and the government." U.S. Treasury, FinCEN *Report to the Congress: Use of Currency Transaction Reports* (2002) at 2, 15 (available at https://www.fincen.gov/sites/default/files/

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                        4
AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                Case No. 3:25-cv-008866-JLS-DDL

1    shared/section366report.pdf.); *see also* Fenchel Decl., ¶¶ 28-32.

2        Only a few months ago, in October 2024, the FinCEN Director stated that
3    "FinCEN concurs . . . that the Secretary of Treasury should ensure that the Director
4    of FinCEN takes steps to reduce the number of CTRs filed . . . such as by raising the
5    reporting threshold." Declaration of Lee Jeffrey Ross, Jr. ("Ross Decl."), ¶42—a goal
6    consistent    with    the    Financial    Reporting    Threshold    Modernization    Act,
7    a bill Congress has explored (but not yet adopted) that would increase the reporting
8    threshold for CTRs from $10,000 to $30,000. H.R. 1799, 119th Cong. (2025).

9        **D.    Geographical Targeting Orders and Their Effectiveness**

10            **1.    The SWB GTO Is Ineffectively Designed**

11        In 1988, to "improve law enforcement efforts to get at the drug trafficker and
12    money launderer," Congress authorized the Secretary of the Treasury to issue
13    Geographic Targeting Orders (a "GTO"). 134 Cong. Rec. H7074-02, 1988 WL
14    184933; 31 U.S.C. § 5326. A GTO is a regulation that places specific additional
15    restrictions on financial transactions occurring within certain geographic locations,
16    which usually aim to address, in a targeted fashion, money laundering hot spots to
17    reduce illegal financial activity while simultaneously not placing an undue burden on
18    the businesses, financial institutions, or individuals subject to the GTO. Ross Decl.,
19    ¶ 23.

20        The GTO statute and regulations can only be effective after identifying distinct
21    money laundering typologies and threats, and where surgical targeting in a restricted
22    geographic area can disrupt and prevent systemic cash money laundering. *Id*., ¶¶ 32-
23    37. The SWB GTO fails this test of effectiveness on multiple levels. *Id*., ¶¶ 39-51.

24        GTOs are to be adopted "without unduly burdening the recordkeeping or
25    reporting requirements of financial institutions" and records required by GTOs were
26    to be "analyzed separately from other [CTRs] on the spot . . . ." 134 Cong. Rec.
27    H7074-02, 1988 WL 184933. In furtherance of the original intent behind the BSA—
28    that "no records . . . would be required by . . . any [] financial institution unless []

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                    5
**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                    Case No. 3:25-cv-008866-JLS-DDL

Treasury determined that such records would have a high degree of usefulness" (S. Rep. No. 91-1139, p. 18 (1970))—GTOs must be "necessary to carry out the purposes of" the BSA, which includes requiring reports that are "highly useful…." 31 U.S.C. §§ 5311, 5326. The SWB GTO fails on these metrics as well. Fenchel Decl., ¶¶ 45-48; Ross Decl., ¶ 37.

A GTO's success and effectiveness is contingent on FinCEN's ability to rely on the results of the GTO to identify and obtain tailored information on a specific financial problem that is exclusive to a specific type of transaction, financial institution, or crime. Ross Decl., ¶ 35. In contrast, a GTO that lacks precision or is not supported by statistical analysis or evidence of an extremely unique type of crime (such as, for example, a unique money laundering technique), will be both ineffective and detrimental to law enforcement's effort to combat crime. *Ibid*. A deficient GTO may have the unintended consequence of causing financial institutions, their employees, agents, and customers, and the American public to lose confidence in the U.S. government's AML efforts to combat money laundering and terrorist financing. *Id.*, ¶ 36. Over time, this reduced confidence can result in less compliance by financial institutions. *Ibid*.

### 2.    The NYC GTO Was Designed Well and Proved Effective

By way of example, in consultation with the El Dorado Task Force—a multi-agency task force comprised of 14 agents, police officers, and support personnel from 3 federal, state, and local law enforcement agencies—FinCEN issued one of its first ever GTOs in 1996, based on a statistical review of concerning transactions by a limited number of MSBs in New York (initially 12, later expanded to 23 total MSBs) in New York City (the "NYC GTO"). Ross Decl., ¶¶ 4-11.

The NYC GTO required those 23 specific MSBs and their 4,000 agents in New York to obtain and report identifying information on all cash remittances of $750 or more that were destined for Colombia. *Id*. ¶ 9. The NYC GTO was not only targeted in a geographical sense but was also tailored to specific MSBs and specific types of

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                        6
**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                    Case No. 3:25-cv-008866-JLS-DDL

transactions—cash remittances to Colombia—all based on extensive statistical evidence. *Id.*, ¶¶ 11 & 34. In fact, the NYC GTO was effective solely due to its limited scope, all while imposing the least possible burden on legitimate businesses and financial institutions. *Ibid.*

The NYC GTO, which proved to be extremely successful, and led to a series of similar GTOs focusing on other specific MSBs providing remittance services to the Dominican Republic, is vastly different from the SWB GTO, in both the evidence and analysis of the need to impose the SWB GTO in its current form. *Id.*, ¶¶ 36-51. The SWB GTO is fatally deficient because it "was crafted without any evidence of statistical or law enforcement investigative and prosecutorial rigor." *Id.*, ¶ 39.

Furthermore, the NYC GTO was not just targeted in geographical location, it was also targeted "in a manner that imposed additional restrictions in a reasonably-targeted way, on specific MSBs, based on a statistical review of their transactions, as all underpinned by the real-world findings of the El Dorado Task Force members." *Id.*, ¶ 33. The same cannot be said of the SWB GTO, which applies to *all* MSBs within the ZIP codes identified, rather than, for example, specifically targeted MSBs that are laundering money, with evidence and analysis of such laundering.

## III. THE SWB GTO WILL IMPAIR LAW ENFORCEMENT, UNDERMINE THE BSA, AND BURDEN MSBS

### A. The SWB GTO Violates the BSA and Administrative Procedure Act

To comply with the BSA, a GTO must (1) be "necessary to carry out the purposes of [the BSA]" and (2) be supported by "reasonable grounds." 31 U.S.C. § 5326(a). The SWB GTO fails to do both and is thus unlawful under both the BSA and Administrative Procedure Act ("APA"). 5 U.S.C. § 706(2)(A) ("The reviewing court shall… hold unlawful and set aside agency action… found to be… not in accordance with law…[or] in excess of statutory jurisdiction, authority, or limitations….").

/ / /

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

### B.    The SWB GTO Undermines the BSA and Congress's Authority

It is the BSA's purpose to "require certain reports or records that are *highly* useful," as well as to prevent money laundering through "reasonably designed risk-based programs" and to facilitate the tracking of illicit money. 31 U.S.C. § 5311.

FinCEN has consistently acknowledged the need to lower the number of CTRs, perhaps by increasing the reporting threshold or allowing filing exemptions, because law enforcement makes little to no use of CTRs. Thousands of CTRs, SARs, and CMIRs are filed per month in the Southern District of California alone. Rangel Decl., ¶ 28. Unsurprisingly, no one in law enforcement monitors these BSA Reports, especially CTRs, because: (1) it is physically impossible to do so given the flood of reports; and (2) CTRs, and CMIRs, are particularly devoid of context. *Ibid.*

The SWB GTO ignores and contradicts these statutes, regulations, and facts. FinCEN seeks to generate significantly more CTRs and further defy Congress's expectation that Treasury will not use the BSA to create "a mountain of paperwork when the benefits to law enforcement officials are *only marginal*." S. Rep. No. 91-1139, p. 4. The SWB GTO will add to the already massive pile of BSA Reports that few law enforcement agencies are reviewing in the first place. Rangel Decl., ¶ 28.

### C.    The SWB GTO Does Not Advance the BSA's Policies

FinCEN's stated purpose in adopting the SWB GTO also fails on its face to advance the policies underpinning the BSA. Per FinCEN, the SWB GTO was adopted to: (1) "combat illicit finance by drug cartels"; (2) "conduct targeted investigations and prosecutions of suppliers and facilitators"; (3) "generate new leads and identify new and related subjects in ongoing cases"; (4) "support investigations into MSBs themselves"; and (5) "help make structuring more difficult, thereby increasing the cost of doing business for cartels." Dkt. 18-2.

While perhaps well-intentioned, these goals will not be achieved, thereby negating them. *See SAS Inst., Inc. v. Iancu*, 584 U.S. 357, 368 n. * (2018) ("That an agency's improvisation might be thought by some more expedient than what the law

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

allows… does nothing to commend it either, for lawful ends do not justify unlawful means."); *ACA Connects v. Bonta*, 24 F.4th 1233, 1243 (9th Cir. 2022) ("[N]o matter how desirous of protecting their policy judgments, agency officials cannot invest themselves with power that Congress has not conferred.") (citation and quotations omitted).

Nor is the SWB GTO consistent with Congress' intent that geographic targeting orders improve law enforcement efforts and do so "*witho*ut unduly burdening the recordkeeping or reporting requirements of financial institutions." 134 Cong. Rec. H7074-02, 1988 WL 184933. On the contrary, the SWB GTO reflects a misunderstanding about how law enforcement effectively uses BSA Reports, and fails to appreciate the functional uselessness of CTRs, at MSBs, for less than $10,000, in a few ZIP codes near the border. Rangel Decl., ¶¶ 26-40.

The SWB GTO is silent on the amount of MSBs that fail to adhere to their BSA/AML obligations. Perhaps this is because the vast majority of financial institutions maintain compliant BSA/AML programs and actively avoid money launderers, transnational criminal organizations, or otherwise turning a blind eye to unlawful transactions. *Id*., ¶ 27. Those financial institutions that failed to do so, and were engaged in money laundering, were discovered relatively quickly. In fact, in most cases the volume of funds transacted are significant and are usually done through banks and depository institutions, rather than MSBs. *Ibid.* The money laundering operations that law enforcement investigates are high-volume, highly-sophisticated, and nimble operations—none of which the SWB GTO targets. *Id*., ¶ 40.

Moreover, very few, if any, of the investigations led by the Financial Investigations and Border Crimes Task Force (the "FIBC")—a multi-agency task force based in San Diego and Imperial Counties that have prosecuted the largest, and most complex financial crimes in the history of the Southern District of California—began from a CTR. *Id*., ¶¶ 4 & 32. This is because CTRs are most often a secondary

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

consideration, after the original source (i.e., cooperating defendants; informants or whistleblowers; direct contact from a bank; or a SAR). *Id.*, ¶ 32. The SWB GTO is also silent on this point.

As such, FinCEN has failed to demonstrate how the SWB GTO would carry out the purposes of the BSA, much less how it would be necessary to achieve those purposes. The SWB GTO would achieve the opposite; not only because it would be impossible to monitor the hundreds and thousands of additional daily CTRs, but also because CTRs would simply not identify new money launderers.

## D.  **The SWB GTO Is Unsupported by Reliable and Relevant Evidence—Rendering It Unreasonable and Unworkable**

An "agency must make findings that support its decision, and those findings must be supported by substantial evidence." *Burlington Truck Lines v. U.S.*, 371 U.S. 156, 168 (1962); *see also Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (holding agencies "must examine the relevant data and articulate a satisfactory explanation for [their] action[s]" and that there must be a "rational connection between the facts found and the choice made"); 31 U.S.C. § 5326(a) (conditioning the issuance of a GTO on a finding by Treasury that "reasonable grounds" exist to support the GTO).

The absence of extensive statistical analysis dooms the SWB GTO. Such analysis would provide the underlying rationale for the SWB GTO—both the need to target a specific money laundering risk with MSBs along the southwest border and the likelihood that a reduced CTR threshold of $200 at these same locations will result in effective and useful information. Fenchel Decl., ¶ 33; Ross Decl., ¶ 40-48.

### 1.  **The SWB GTO Stands in Stark Contrast to the NYC GTO**

Lee Jeffery Ross, Jr., who worked on the NYC GTO, has noted multiple statistical flaws and deficiencies in the SWB GTO (Ross Decl., ¶¶ 40-51), leading him to conclude that it is "predicated upon an insufficient record, lacks

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                    10

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-008866-JLS-DDL

statistical support, and contains flawed reasoning, all leading to an unsupportable GTO that presents significant risks to MSBs and little support for the targeting of transnational criminal organizations and money launderers engaged in international transactions along the Southwest Border." *Id.*, ¶ 51.

In contrast to the SWB GTO, the evidence in support of the NYC GTO demonstrated that the specifically identified MSBs had funneled approximately $800 in a single year to Colombia. Further analysis in advance of issuing the NYC GTO revealed that the only way such an amount could be legitimate was if each Colombian household in the area of the MSBs that were covered by the NYC GTO had each remitted $30,000 to Colombia—an amount that was nearly impossible, considering the average annual income for the community at the time was $27,000. Ross Decl., ¶ 6.

Furthermore, the NYC GTO was targeted in multiple ways, over and above geographic location. It was also crafted "in a manner that imposed additional restrictions in a reasonably-targeted way, on specific MSBs, based on a statistical review of their transactions, as all underpinned by the real-world findings of the El Dorado Task Force members." *Id.*, ¶ 33. The same cannot be said about the SWB GTO. FinCEN's Administrative Record ("Record")—composed of an internal memorandum that purports to provide the basis for the SWB GTO ("FinCEN Memo") and more than 400 pages of articles and reports cited therein, and covering topics like foreign terrorist organizations, Mexican cartels, the national drug threat, and human trafficking (Dkt. 18)—exposes the absence of statistical analysis to support the SWB GTO's chances of successfully targeting money laundering. *Id.*, ¶ 43.

### 2. The Record Is Devoid of Substantial Evidence in Support of the SWB GTO

FinCEN has not shown a rational connection between the Record and the SWB GTO. Nor could it. Of the 443-page Record, only 9 pages are cited in the FinCEN

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

Memo to support FinCEN's purported justification for the SWB GTO: (1) a 5-page Homeland Security blog post that discusses, generally, MSBs' vulnerability to financial crimes, including red flag indicators, and (2) a redacted, 4-page email thread. Dkts. 18-2 pp. 12-13, 18-6 pp. 99-108. The rest of the more than 400-page Record supports only the general background sections of the FinCEN Memo. Dkt. 18. Beyond the lack of support in the FinCEN Memo about rampant money laundering activity occurring through southwest border MSBs, the primary issue endures: FinCEN offers no whether there are "reasonable grounds," as supported by "substantial evidence," to justify the SWB GTO.

### 3. The Record Is Devoid of Any Evidence Supporting the Need for More CTRs in the Covered ZIP Codes

The Record is bereft of any evidence supporting the need for *more* CTRs—particularly where FinCEN has acknowledged the need to *decrease* the number of CTRs to accomplish the purposes of the BSA. It is the same for the absence of support for "this extraordinarily-low reduction" in the CTR threshold from $10,000 to $200 (Ross Decl., ¶¶ 46-50); or the methodology of choosing zip codes with high numbers of CTRs (a fact that may simply evidence that MSBs within those zip codes are more actively complying).

Furthermore, the Record is devoid of any analysis, by FinCEN or law enforcement, of the CTRs filed by MSBs in the geographic areas targeted by the SWB GTO; the demographics and wealth of individuals in the subject area; any cases or investigations generated by in-depth analysis of CTRs filed in the Southern District of California. *Id.*, ¶ 49. "Nothing … remotely suggests that cash transactions of $200 were more likely to be abused by drug money launderers (who are moving hundreds of millions of dollars and thousands of pounds of currency across the southwest border), than are cash transactions at even $1,000." *Id.*, ¶ 46.

/ / /

/ / /

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                                           12
**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                Case No. 3:25-cv-008866-JLS-DDL

### 4. The SWB GTO Is Fatally Overbroad

The SWB GTO's multiple deficiencies cause it to have an additional flaw: it fails to target specific MSBs, and instead applies to all MSBs within the targeted ZIP codes, which includes entities as varied as currency dealers or exchangers, cryptocurrency exchange platforms, check cashers, issuers of traveler's checks, money orders, or stored value, and money transmitters. This overbreadth negates the usefulness of the CTRs required under the SWB GTO. *Id.* ¶ 40. Put simply, the only thing that will result from the SWB GTO is that CTRs will flood the FinCEN Portal with relatively insignificant reports of small denomination cash transactions without any material connection to money laundering—more likely having a "detrimental impact on BSA/AML compliance." Rangel Decl., ¶ 35. These additional and unhelpful CTRs will drown out the cash transactions that law enforcement is more commonly interested in. *Id.*, at ¶ 29 (explaining law enforcement's focus on "sophisticated, and high-volume money laundering schemes" and "prioritizing [of] the most egregious financial crimes"); Ross Decl., ¶ 39 ("attempts to try to digest this flood of [additional] CTRs may ultimately have a detrimental effect on the ability of federal agents to stem unlawful financial activities.").

FinCEN admitted in its opposition to Plaintiff's motion for a temporary restraining order ("TRO") that it is required to weigh the risks and benefits of GTOs, yet the Record is devoid of any such analysis. Dkt. 13 at 12:5-8 citing *DOC v. New York*, 588 U.S. 752, 777 (2019). General concern about drug trafficking and money laundering does not establish any material "reasonable grounds" for the overbroad SWB GTO. In fact, GTOs that lack precision and those that are not supported by statistical analysis or evidence of an extremely unique type of crime or money laundering technique will be nothing short of ineffective and give rise to negative consequences to those entities and financial institutions targeted by the GTO. Ross Decl., ¶ 35.

///

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1

13

**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                    Case No. 3:25-cv-008866-JLS-DDL

The SWB GTO contravenes the purposes of the BSA and is not supported by reasonable grounds or substantial evidence. It is thus unlawful.

### E.   The SWB GTO Is Arbitrary and Capricious

The APA empowers courts to set aside unlawful agency actions that are "arbitrary, capricious . . . or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); 5 U.S.C. § 551(13). An agency action is considered arbitrary and capricious if: (1) "the agency has relied on factors which Congress has not intended it to consider"; (2) "entirely failed to consider an important aspect of the problem"; (3) "offered an explanation for its decision that runs counter to the evidence before the agency"; or (4) "is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The SWB GTO is unlawful under all four factors.

### 1.   FinCEN Did Not Consider Alternatives to the SWB GTO

The "most obvious reason for finding the [SWB GTO] arbitrary and capricious is that [FinCEN] apparently gave no consideration whatever" to potential alternatives that would accomplish the same goals without overburdening or running the MSBs in the targeted zip codes out of business. *State Farm*, 463 U.S. at 46 (holding that the National Highway Traffic Safety Administration acted arbitrarily and capriciously by revoking a motor vehicle safety standard for failing to address its refusal to consider "alternative[s] within the ambit of the existing standard.").

Despite a 443-page-long Record, there is no indication that FinCEN considered potential alternatives to the SWB GTO. What the Record does reveal, however, is that potential alternatives were readily accessible. The same Homeland Security blog post FinCEN relied on to justify the SWB GTO discusses the Transaction Record Analysis Center ("TRAC"), a "centralized searchable database" that contains detailed MSB transactional records subpoenaed from MSBs of "person to person money transfers [] of at least $500 and greater primarily sent from or paid in the U.S. Southwest border States and Mexico." Dkt. 18-6, at 101.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                                    14
**AMICUS CURIAE BRIEF OF MSBA, INC.**
**ISO MOTION FOR PRELIMINARY INJUNCTION**                    Case No. 3:25-cv-008866-JLS-DDL

Using TRAC as an alternative would have been effective and more comprehensive than the SWB GTO. The number of transactions in TRAC—337 million—dwarfs the 167 million CTRs FinCEN has received over the last ten years. And TRAC records are available to "authorized federal, state and local law enforcement" in the same way that CTRs are available to FinCEN. *Id.* Yet FinCEN did not consider its access to the data on TRAC or its ability to issue additional TRAC subpoenas—subpoenas that would have provided each individual MSB with an opportunity to seek judicial relief.

Nor did FinCEN address other, more immediate alternatives that the MSBA and members of Congress proposed before the SWB GTO took effect, including: (1) extending the effective date of the SWB GTO by at least 60 days to allow MSBs to prepare for compliance; (2) increasing the CTR filing threshold to $2,000 to avoid sweeping up CTRs regarding everyday transactions; (3) extending the time period for filing CTRs from 15 to 30 days to alleviate the significant burden on MSBs; and (4) excluding certain categories of transactions from the CTR filings requirement due to their low money laundering risk—i.e., cashing government-issued checks or paying utility bills—from the SWB GTO requirements. Kathryn Tomasofsky Declaration ("Tomasofsky Decl."), Exs. A-C. FinCEN's failure to consider these alternatives, in addition to TRAC, renders the SWB GTO unlawful.

## 2. FinCEN's Justification for the SWB GTO Contradicts the Evidence Before It

That the SWB GTO is arbitrary and capricious is also evidenced by FinCEN's purported "reasoning" that ultimately "runs counter to the evidence before" it. *State Farm,* 463 U.S. at 43. FinCEN's justification for the lower $200 threshold is that more CTRs are necessary to "identify cartel-related, money laundering and to conduct targeted investigations and prosecutions...." Dkt. 18-2, at 12. But the actual evidence before FinCEN is that CTRs are of such little use to law enforcement that, for at least the last 30 years, Congress, the GAO, and FinCEN itself have recognized

a need to decrease the number of CTRs collected to carry out the purposes of the BSA. Only seven months ago, FinCEN agreed "to take steps to reduce the number of CTRs filed…such as by raising the reporting threshold," recognizing that, between 2014-2023, law enforcement accessed only 2.3% of the over 167 million CTRs filed. 2024 GAO Report, at 43.

Despite repeatedly admitting that the millions of CTRs collected at the higher $10,000 threshold go largely untouched, FinCEN now seeks to justify the SWB GTO by arguing that law enforcement needs more CTRs to do its job. Both cannot be true and this contradiction betrays the capriciousness of the SWB GTO. *See Lge. of Unt. Latin Amer. Citizens v. Regan*, 996 F.3d 673, 677-78, 696 (9th Cir. 2021) (where EPA had previously taken the position that certain pesticides were not safe, finding EPA's refusal to take action as to those pesticides to be arbitrary and capricious).

It is also not an accurate statement. Law enforcement does not need more CTRs. They have enough already. Rangel Decl., ¶32-40.

### 3. FinCEN Ignored the SWB GTO's Negative Impact on MSBs

The SWB GTO has already wreaked havoc on covered MSBs and is likely to continue causing irreparable harm absent an injunction. Fenchel Decl., ¶¶ 45-48; Ross Decl., ¶ 35.

The opposite appears to have happened: the Record reveals that FinCEN dismissed the devastating and destructive burden that the SWB GTO would place on covered MSBs by simply stating that those MSBs were not expected to "materially alter typical fees charged for cash services, given that the reporting period is temporary, and [targeted MSBs] will face continued competition from banks and other financial institutions…." Dkt. 18-2, at 17. FinCEN "entirely failed to consider an important aspect of the problem"—namely, the irreparable harm to targeted MSBs—rendering the SWB GTO arbitrary and capricious. *State Farm*, 463 U.S. at 43.

/ / /

**4.** **Absent an Injunction, Covered MSBs Face Irreparable Harm**

a.    <u>The SWB GTO Will Deplete MSB Resources</u>

Between the SWB GTO's April 14, 2025 effective date and April 28, 2025, one MSBA member was obligated to prepare and file more than 14,000 CTRs as a direct result of the SWB GTO, which, compared to the 243 total CTRs that members filed in 2024, represents an increase of over 5,000%. Tomasofsky Decl., ¶ 9.c. Another member estimated that, because of the SWB GTO, its CTR filings will increase from 7,000 per year nationwide to 130,000 annually just in the targeted zip codes (*Id.* at ¶ 9.d.)—an endeavor that, at best, will take over an additional 16,000 hours of work to complete (more than the total number of hours in one calendar year) and, at worst, over 49,000 hours. A third member estimates that it would have had to file 55,000 CTRs in 2024—compared to zero—had the SWB GTO been in effect. *Id.* at ¶ 9.e. Because that member is still working on developing an automated system to complete and submit the CTRs, it was forced to cease processing all cash transactions of $200 or more, resulting in a 60% decrease in transactions within the targeted zip codes. *Ibid*.

Due to the unprecedented increase in work caused by the SWB GTO, MSBs have been forced to spend significant resources on overtime costs, operational delays, software updates, and hiring and training additional employees. *Id.* at ¶ 9.f. This material increase in costs not only threatens to put MSBs out of business and at a significant competitive disadvantage, but is also particularly unjustified considering the SWB GTO's limited effective period. That is, the astronomical costs MSBs are being forced to take on to remain in compliance for a short period will be a worthless investment once the SWB GTO sunsets.

b.    <u>The SWB GTO Will Eliminate the First and Last Line of Defense Against Illicit Finance</u>

MSBA supports FinCEN's efforts to combat illicit finance, but not at the cost of eliminating MSBs in the targeted ZIP codes—which, thanks to their robust

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1                    17
AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-008866-JLS-DDL

compliance programs and reporting obligations serve as a valued partner to law enforcement's efforts against financial crime. MSBs serve as liaisons between unbanked communities and law enforcement, providing underserved communities with access to the financial system while simultaneously providing law enforcement with a direct window into potentially suspicious conduct in those same communities.

The that the SWB GTO threatens is not only looming over covered MSBs, but threatens to irreparably harm the financial industry, along with individuals and businesses underserved or rejected by the traditional banking system. California as a state regulates MSBs, with a particular focus on consumer protections. *See* Cal. Fin. Code § 2001(d) ("To protect the interests of consumers of money transmission businesses in this state, to maintain public confidence in financial institutions doing business in this state, and to preserve the health, safety, and general welfare of the people of this state, it is necessary to regulate money transmission businesses in this state."). As FinCEN recognized, MSBs are already subject to a comprehensive regulatory scheme, including requirements that they: register with FinCEN; file CTRs for transactions above $10,000; develop, implement, and maintain an effective AML compliance program; retain records for transactions at or above $3,000; and file SARs for suspicious transactions. Dkt. 18-2, at 3-4. To that end, "most of the business that MSBs conduct is legitimate and essential…." *Id.*

Adopting a GTO that will undermine this frontline role of financial institutions, and risk driving underserved individuals and businesses into the grasp of unregulated or even underground operators and organizations—particularly where the GTO is not supported by reasonable grounds, and illicit actors can simply shift their conduct to non-targeted financial institutions—is not a justified means to accomplishing FinCEN's critical role in combatting financial crime.

/ / /

/ / /

/ / /

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                    Case No. 3:25-cv-008866-JLS-DDL

## III.   **CONCLUSION**

For the reasons stated above, and those expressed by plaintiffs in their motion for a preliminary injunction, the Court should enjoin the Executive Branch and prevent FinCEN from enforcing the SWB GTO.


DATED: May 6, 2025                    BUCHALTER
                                      A Professional Corporation


                                      By:   _s/ Ava Sadeghi_
                                            Daniel C. Silva
                                            Ava Sadeghi
                                            David S. Wilson
                                            Attorneys for Amicus Curiae
                                            MONEY SERVICES BUSINESS
                                            ADMINISTRATION, INC.

BUCHALTER
A PROFESSIONAL CORPORATION
LOS ANGELES

BN 89100898v1

19

AMICUS CURIAE BRIEF OF MSBA, INC.
ISO MOTION FOR PRELIMINARY INJUNCTION                Case No. 3:25-cv-008866-JLS-DDL

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Facsimile: 619.235.5351
Email: dsilva@buchalter.com
        asadeghi@buchalter.com
        dwilson@buchalter.com

Attorneys for Amicus Curiae
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>                    Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>                    Defendants. | Case No. 3:25-cv-00886-JLS-DDL<br><br>**DECLARATION OF DANIEL C. SILVA IN SUPPORT OF AMICUS CURIAE'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:        May 15, 2025<br>Time:       9:00 a.m.<br>Dept.:       4D<br>Judge:      Hon. Janis L. Sammartino |

I, Daniel C. Silva, declare as follows:

    1.    I make this declaration based on my own personal knowledge and if called as a witness, could and would testify competently thereto.

    2.    I am an active member of the California State Bar and this Court and a Shareholder at the law firm of Buchalter APC, attorney for Money Services Business Association, Inc. ("MSBA"), amicus curiae in the above-captioned action.

    3.    I make this declaration in support of MSBA's Unopposed Amicus Curiae Brief in Support of Plaintiff's Motion for a Preliminary Injunction ("Amicus Brief").

///

4.      On April 28, 2025, I contacted counsel for plaintiffs in this action to inquire whether they would consent to MSBA appearing as amicus curiae and filing the Amicus Brief. Plaintiffs consented to the same.

5.      On April 29, 2025, I contacted counsel for defendants in this action to inquire whether they would consent to MSBA appearing as amicus curiae and filing the Amicus Brief. Defendants consented to the same.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of May, 2025 from San Diego, California.

_____
DANIEL C. SILVA

---

**DECLARATION OF DANIEL C. SILVA**                                    Case No. 3:25-cv-00886-JLS-DDL

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Facsimile: 619.235.5351
Email: dsilva@buchalter.com
        asadeghi@buchalter.com
        dwilson@buchalter.com

Attorneys for Amicus Curiae
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-00886-JLS-DDL<br><br>**DECLARATION OF CONNIE FENCHEL IN SUPPORT OF AMICUS CURIAE'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:       May 15, 2025<br>Time:      9:00 a.m.<br>Dept.:     4D<br>Judge:    Hon. Janis L. Sammartino |

I, Connie Fenchel, declare as follows:

1.     I am the owner of an independent consulting firm and a strategic advisor for a consultancy that provides regulatory guidance, compliance solutions, fraud investigations, and forensic accounting services.

2.     With more than 45 years of government and private sector experience in law enforcement, financial crimes, regulatory compliance, anti-money laundering ("AML"), and sanctions, I advise companies and financial institutions in a variety of issues regarding AML regulations and laws, best practices for international transactions, third-party risk management, all forms of fund transfers (from cash to international wire transfers), and other regulatory compliance for financial institutions

in general, and money services businesses ("MSBs") in particular. I have led numerous independent reviews and investigations, risk assessments of U.S. financial institutions (including MSBs), domestic and international training for AML compliance, expert testimony, and AML program development and remediation.

3.     Throughout my career, I have conducted numerous training seminars in the United States and internationally for law enforcement personnel and the broader financial industry on money laundering and AML compliance, while also leading delegations to international conferences and multi-lateral meetings throughout the world regarding financial compliance.

4.     This declaration is in support of the amicus curiae brief submitted by the Money Services Business Administration, Inc. which supports plaintiffs' motion for a preliminary injunction against the Treasury Department's proposed "Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border." 90 F.R. 49 (Mar. 14, 2025) at 12106-12108 (the "SWB GTO"). A true and correct copy of the SWB GTO is attached hereto as **Exhibit "A."** Based on my training, knowledge, and experience, the SWB GTO will not be helpful in combatting the money laundering risks it is targeting, lacks facial coherence, and will otherwise counteract decades of policy toward reducing the number of reports filed by financial institutions with the Treasury Department.

5.     Additionally, the SWB GTO will impose a significant burden on smaller MSBs that have to date avoided large-scale cash transactions as a way both to increase their AML compliance and to reduce the very same money laundering risks that the SWB GTO claims to be targeting. In short, the SWB GTO will have extensive consequences to smaller MSBs, requiring massive investment and changes to their operations if they want to remain in business.

///

///

**Professional Experience**

6.      Across more than 25 years working for the federal government, my final role was as Deputy Director for Operations at the Financial Crimes Enforcement Network ("FinCEN"). FinCEN sits within the U.S. Department of the Treasury. The Director of FinCEN is appointed by the Secretary of the Treasury and reports to the Treasury Under Secretary for Terrorism and Financial Intelligence.

7.      As Deputy Director for Operations, I directed FinCEN's role as the custodian and administrator of the recordkeeping, reporting, and AML provisions of the Bank Secrecy Act ("BSA") and USA PATRIOT Act. This role required me to testify occasionally before Congress on money laundering and counter-terrorism matters.

8.      Before joining FinCEN, I worked in various roles over more than 20 years with the U.S. Customs Service, including several senior-level positions focusing on: violations of the BSA and forfeiture matters; criminal investigations related to money laundering, financial crimes, narcotics importation and smuggling, trade sanctions, and anti-terrorism laws. My final role at the U.S. Customs Service was as Executive Director of the Office of Investigation, where I oversaw and directed all national and international investigations regarding these same criminal and forfeiture laws.

9.      Upon retirement from the government in 2003, I established an independent consulting firm that continues to advise banks, all types of financial institutions (including MSBs and other non-banking institutions), and businesses with AML compliance. I have provided consulting and training services to hundreds of MSBs, banks, credit unions, cryptocurrency companies, payment processors, money transmitters, precious metal dealers, and other businesses relating to domestic and international transactions and financial compliance.

/ / /

/ / /

DECLARATION OF CONNIE FENCHEL                                    Case No. 3:25-cv-00886-JLS-DDL

### FinCEN's Role in BSA/AML Compliance

10.    FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.

11.    FinCEN carries out its mission by receiving and maintaining data and reports of financial transactions; analyzing and disseminating that data for law enforcement purposes; and building global cooperation with counterpart organizations in other countries and with international bodies.

12.    FinCEN exercises regulatory functions primarily under the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation—the legislative framework commonly referred to as the "Bank Secrecy Act" or "BSA." The BSA is the United States of America's primary and most comprehensive legal regime regarding AML and counter-terrorism financing ("AML/CFT") laws, regulations, and best practices.

13.    Congress has given FinCEN certain duties and responsibilities to centralize the collection, analysis, and dissemination of data reported under FinCEN's regulations, and related data, in support of government and financial industry partners at the federal, state, local, and international levels. To fulfill its responsibilities toward the detection and deterrence of financial crime, FinCEN:

    a.    Issues and interprets regulations authorized by statute;

    b.    Supports and enforces compliance with those regulations;

    c.    Supports, coordinates, and analyzes data regarding compliance examinations delegated to other federal agencies and regulators;

    d.    Manages the collection, processing, storage, dissemination, and protection of data filed under FinCEN's reporting requirements;

    e.    Maintains a government-wide access service to FinCEN's data, and networks users with overlapping interests—known as the "FinCEN

DECLARATION OF CONNIE FENCHEL          Case No. 3:25-cv-00886-JLS-DDL

1          Portal" and discussed in more detail below;

2      f.    Supports law enforcement investigations and prosecutions;

3      g.    Synthesizes data to recommend internal and external allocation of

4          resources to areas of greatest financial crime risk;

5      h.    Shares information and coordinates with foreign financial intelligence

6          unit ("FIU") counterparts on AML/CFT efforts; and

7      i.    Conducts analysis to support: policymakers; law enforcement,

8          regulatory, and intelligence agencies; FIUs; and the financial industry.

9                **FinCEN's Management of BSA Reports**

10     14.    The BSA authorizes the Secretary of the Treasury to issue regulations

11  requiring banks and other financial institutions to take a number of precautions against

12  financial crime, including the establishment of AML programs and the filing of reports

13  that have been determined to have a high degree of usefulness in criminal, tax, and

14  regulatory investigations and proceedings, and certain intelligence and counter-

15  terrorism matters. The Secretary of the Treasury has delegated to the Director of

16  FinCEN the authority to implement, administer, and enforce compliance with the BSA

17  and associated regulations. As Deputy Director of Operations at FinCEN, I took a lead

18  role in these efforts.

19     15.    The basic concept underlying FinCEN's core activities is to "follow the

20  money." The primary motive of criminals is financial gain, and they leave financial

21  trails as they try to launder the proceeds of crimes or attempt to spend their ill-gotten

22  profits. FinCEN partners with law enforcement at all levels of government and

23  supports the nation's foreign policy and national security objectives. Law enforcement

24  agencies successfully use similar techniques, including searching information

25  collected by FinCEN from the financial industry, to investigate and hold accountable

26  a broad range of criminals, including perpetrators of fraud, tax evaders, and narcotics

27  traffickers. More recently, the techniques used to follow money trails also have been

28  applied to investigating and disrupting terrorist groups, which often depend on

financial and other support networks.

16.     The BSA requires multiple reports by a variety of financial institutions, businesses, and individuals. For instance, airports and border crossings often have signs that advise travelers that they must report whether they possess more than $10,000 in cash that they as they enter of leave the United States. This is a specific type of "BSA Report" known as a "CMIR"—a currency and monetary instrument report on FinCEN Form 105, as required under 31 U.S.C. § 5316. Although CMIRs are not directly relevant to the SWB GTO, I refer to it as an example of the various BSA Reports that FinCEN receives, maintains, and makes accessible to law enforcement. A true and correct list of all "BSA Reports" is attached hereto as **Exhibit "B."**

## **BSA Reports**

17.     The BSA requires all "financial institutions" (as defined in 31 U.S.C. § 5312(a)(2) and 31 C.F.R. Chapter X) to file CTRs with FinCEN. 31 U.S.C. § 5313 Since the BSA first came into effect in the 1970s, the threshold amount for CTR filings has been $10,000 cash transactions at banks, casinos, MSBs, and similar financial institutions. *See*, *e.g.*, *id.* and 31 C.F.R. Parts 1020 (banks), 1021 (casinos), and 1022 (MSBs); *see also* 37 F.R. 6818, 6912 (Apr. 5, 1972). As a result of these statutes and regulations, financial institutions electronically submit CTRs to FinCEN.

18.     Financial institutions, including MSBs, also have a duty to file Suspicious Activity Reports ("SAR(s)") to FinCEN for "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

19.     The U.S. Treasury Secretary has further developed regulations that require MSBs to file a SAR with FinCEN for any transaction:

> [C]onducted or attempted by, at, or through a money services business, involves or aggregates funds or other assets of at least $2,000 . . . and the money services business knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):

(i) Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation

(ii) Is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act; or

(iii) Serves no business or apparent lawful purpose, and the reporting money services business knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction. [sic]

(iv) Involves use of the money services business to facilitate criminal activity.

31 C.F.R. § 1022.320(a)(2).

### Registration of MSBs with FinCEN

20.     Although banks, credit unions, and casinos are regulated at the state and federal levels, MSBs are unique among financial institutions because they alone must formally register with FinCEN as an MSB, via a form known as a "Registration of MSB" on FinCEN Form 107 (a "RMSB"). According to FinCEN, RMSBs are helpful in AML compliance because they assist with "mitigating the risk of criminal abuse of money services businesses." *In re Baltic Financial Services, Inc.*, FinCEN Enforcement No. 2010-5, at A true and correct copy of FinCEN Enforcement No. 2010-5 is attached hereto as **Exhibit "C."**

21.     Within the broader BSA and FinCEN regulatory framework, the RSMB requirement:

[S]eeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked. RMSB forms promote greater transparency with respect to [MSBs] that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, [FinCEN] and other government agencies. RMSB forms are also useful for money

DECLARATION OF CONNIE FENCHEL                                    Case No. 3:25-cv-00886-JLS-DDL

transmitters and other types of [MSBs] in establishing and maintaining banking relationships. Banking organizations, in keeping with their responsibilities under the [BSA], normally request registration information from money transmitters and other types of [MSBs] customers that are required to register.

*Id*. at 2

22.　FinCEN is accordingly the primary federal regulator of MSBs. The RMSB registration obligation applies to a variety of businesses involved in "money services." The Code of Federal Regulations references no fewer than 7 different types of MSBs—ranging from money transmitters that primarily engage in person-to-person transfers of funds like Western Union, to the U.S. Postal Service. *See* 31 C.F.R. § 1010.100(ff). The United States Code defines an MSB even more broadly, covering any "money transmitting business" that:

> [P]rovides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system[.]

31 U.S.C. § 5330(d)(1)(A). Any MSB or money transmitting business that fails to file an RMSB is subject to criminal penalties. 18 U.S.C. § 1960. Violations of 18 U.S.C. § 1960 are punishable by 5 years' imprisonment, forfeiture (18 U.S.C. § 982(a)(1)), and can function as a predicate offense for both money laundering and RICO purposes (18 U.S.C. §§ 1956(7)(A) and 1961(1)).

23.　Finally, by registering as an MSB with the filing of an RMSB, an MSB will also be subject to examination by the Treasury Department. These examinations scrutinize MSBs for BSA compliance, including the development of a written AML program that effectively and reasonably addresses money laundering and CFT risks. FinCEN worked with several federal and state regulators and MSB trade associations

DECLARATION OF CONNIE FENCHEL

to develop a manual for examining MSBs and compliance with all facets of the BSA.[1]

**Use of BSA Reports**

24.    One of FinCEN's most critical functions is to maintain all BSA Reports in a secure manner, while also remaining accessible to law enforcement and other third-parties who agree to maintain the confidentiality of that information. Law enforcement at all levels of the U.S. government, and some foreign counterparts, can access BSA Reports through a secure web connection after agreeing to FinCEN's terms of use. FinCEN provides training and monitors use to ensure that the BSA Reports are properly used, disseminated, and kept secure.

25.    Those law enforcement officials and agencies that have direct access to the "FinCEN Portal" can search individuals and businesses who appear on BSA Reports. For instance, a special agent for Homeland Security Investigations, working in the Southern District of California, can search for CTRs, SARs, RMSBs, and any other BSA Report by entering any known identifiable information. They can search the FinCEN Portal by name, address, taxpayer identification number ("TIN"), social security number ("SSN"), passport number, driver's license number, and several other unique information to a person or business.

26.    In all, CTRs contain no less than 57 fields for information, with "some fields allowing for multiple records." U.S. Government Accountability Office Report to Congressional Committees, *Currency Transactions Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement* (Dec. 2024) at 14 (the "2024 GAO Report"). A true and correct copy of the relevant page of the 2024 GAO Report is attached hereto as **Exhibit "D."** FinCEN estimates that several fields are "rarely or never used" by law enforcement agencies for those CTRs that are ever reviewed in the first place. *Id*. at 18.

/ / /

/ / /

---

[1] See https://www.fincen.gov/sites/default/files/shared/MSB_Exam_Manual.pdf

27.   Upon finding a relevant BSA Report in the FinCEN Portal, unique information will be hyperlinked. A user can click on that hyperlink to find all other BSA Reports with a similar piece of information. For instance, if the relevant BSA Report is a CTR, which involves a business suspected of being involved in a crime, the FinCEN Portal user can click on the business's TIN, or the SSN of the business's owner, to find all other BSA Reports—every SAR, CTR, CMIR, etc.—that contains the same TIN or SSN. From there, every hyperlink can reveal additional bank accounts on which a CTR or SAR was filed, or link to CMIRs or RMSBs in the name of certain businesses or individuals. From this information, law enforcement can build an investigation, prepare and serve grand jury subpoenas for more a formal process and production of financial records, or pursue the investigation in the most effective manner.

### **FinCEN's Historical Attempts to Reduce CTR Filings**

28.   Since approximately 2002, the U.S. government—and financial institutions, whose efforts date back to the earliest days of the BSA—have sought to reduce the number of BSA Reports that need to be filed. The primary focus has been on CTRs. Financial institutions have spent significant sums to develop AML policies, programs, software, and personnel to ensure that they are not being used for money laundering or terrorist financing. This has resulted in an ever-increasing number of BSA Reports. FinCEN has historically sought to balance the need for accurate, timely, and material BSA Reports with the risks of overburdening financial institutions.

29.   While working as FinCEN's Deputy Director for Operations in 2002, FinCEN prepared and submitted a report to the U.S. Congress finding that "number of CTRs filed on an annual basis is still extremely high—12.3 million in FY2002." FinCEN, *Report to Congress—Use of Currency Transaction Reports* (Oct. 2002) at 2 ("FinCEN 2002 Report") That FinCEN 2002 Report concluded that "seeking to reduce the number of unnecessary CTR filings is still a valid concern in terms of costs to both the industry and the government." *Id*. at 15. A true and correct copy of the

DECLARATION OF CONNIE FENCHEL                                    Case No. 3:25-cv-00886-JLS-DDL

1    relevant pages of the FinCEN 2002 Report is attached hereto as **Exhibit "E."**

2        30.    More than 20 years later, the U.S. continued to promote "taking steps to

3    reduce the number of unused CTRs" because only "a small percentage of CTRs" were

4    accessed—let alone effectively used in criminal, civil, or forfeiture investigations and

5    prosecutions—and ultimately "leaving most unused." Ex. D, at Introduction. FinCEN

6    proposed several ways that it "could reduce unnecessary filer burden without affecting

7    CTRs' usefulness to law enforcement." *Ibid*.

8        31.    Even more in conflict with the SWB GTO, the U.S. government recently

9    found that "[m]ost CTRs are not accessed by law enforcement agencies, according to

10   our analysis of data from FinCEN's BSA Portal and agencies' internal systems." *Id*.

11   at 36. And even for those CTRs that are "accessed," this "does not necessarily mean

12   that law enforcement personnel viewed it or used it in their work." *Ibid*. In total, "less

13   than 3 percent of the more than 167 million CTRs filed" between 2014 and 2024 were

14   "accessed" by law enforcement agencies. *Id*. at 39.

15       32.    Officials from the Department of Homeland Security—whose criminal

16   investigative agency is known as "Homeland Security Investigations" or "HSI"—

17   "said one reason most CTRs are not accessed could be because <u>CTRs largely reflect

18   lawful activity</u>, making them less relevant to law enforcement than SARs, which focus

19   on suspicious activity." *Id*. at 40 (emphasis added).

20       **The SWB GTO's Deficiencies**

21       33.    As one of FinCEN's primary responsibilities, it "analyzes information in

22   CTRs and other BSA reports and shares such analyses with appropriate federal, state,

23   local, and foreign law enforcement agencies." *Id* at 5. In practice, this means that the

24   SWB GTO can and should be supported by extensive statistical analysis. That analysis

25   should provide the underlying rationale for the SWB GTO—both the need to target

26   specific money laundering risks involving MSBs along the Southwest Border and the

27   likelihood that a reduced CTR threshold of $200 at these same locations will result in

28   effective and useful information in the form of additional CTRs and other BSA

DECLARATION OF CONNIE FENCHEL        Case No. 3:25-cv-00886-JLS-DDL

1   Reports. On these metrics, the SWB GTO fails for several reasons.

2   **The SWB GTO Contradicts the BSA's Objectives and FinCEN's Goals**

3   34.   The SWB GTO proposes "that reasonable grounds exist for concluding

4   that the additional recordkeeping and reporting requirements set forth in the GTO . . .

5   are necessary to carry out the purposes of the BSA or to prevent evasions thereof. This

6   action is being taken in furtherance of Treasury's efforts to combat illicit finance by

7   drug cartels and other illicit actors along the Southwest Border of United States." Ex.

8   A, at 12107.

9   35.   Yet the U.S. government recently concluded the opposite. It found that

10  increasing the number of CTRs through more expansive filing requirements "do[es]

11  not fully align with the statutory objective of providing highly useful information" via

12  BSA Reports. Ex. D, at 12 (caps omitted). More CTRs would not fulfill the BSA's

13  statutory objectives because they are "infrequently used by law enforcement" and

14  prove excessively burdensome due to the "challenges in collecting certain data,

15  implementing exemptions, and complying with aggregation requirements." *Ibid*. Even

16  more concerning, FinCEN has no "performance goals or related measures specific to

17  CTRs"—meaning FinCEN cannot determine the statistical effectiveness of CTRs in

18  fulfilling the BSA's statutory objectives. *Ibid*.

19  36.   To this end, Congress directed the Treasury Department "to review CTR

20  processes and requirements and propose changes to reduce unnecessary filer burden"

21  and "to determine whether the number and nature of CTR fields need to be adjusted."

22  *Id*. at 19; *see* Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, § 6204, 134

23  Stat. 3388, 4569-4571 (2021). FinCEN had not conducted this review as of December

24  2024. *Id*. at 19-20.

25  37.   The U.S. government has, however, conducted prior statistical analysis

26  on CTRs and other BSA Reports, their usefulness in criminal investigations, and how

27  to make them more effective. *See, e.g.*, GAO, *Bank Secrecy Act: Action Needed to*

28  *Improve DOJ Statistics on Use of Reports on Suspicious Financial Transactions*,

12

GAO-22-105242 (Aug. 25, 2022)[2]; and GAO, *Anti-Money Laundering: Opportunities Exist to Increase Law Enforcement Use of Bank Secrecy Act Reports, and Banks' Costs to Comply with the Act Varied*, GAO-20-574 (Sept. 22, 2020).[3] The administrative record in support of the SWB GTO. including FinCEN's *Information Memorandum for Director Andrea M. Gacki* ("FinCEN Memo"), are silent on the findings in these analyses. *See* Doc No. 18; a true and correct copy of the FinCEN Memo is attached hereto as **Exhibit "F."** But the Government Accountability Office recently concluded that "by reducing less relevant CTR filings, FinCEN could reduce the burden on financial institutions while preserving valuable CTRs." Ex. D, at 45. The SWB GTO achieves the exact opposite.

38.     Finally, "[m]ost federal, state, and local law enforcement agencies . . . supported maintaining the $10,000 threshold"—with the primary consideration being whether to *increase the $10,000 threshold. Id*. at 53 (emphasis added). Only one federal law enforcement agency (out of 11) and one BSA compliance consultant (out of 7) "advocated lowering the CTR threshold." *Id*. at 54. Notably, that survey considered lowering the $10,000 CTR threshold at all financial institutions, not just MSBs. In any event, the office representing federal prosecutors—the Executive Office for U.S. Attorneys—"noted that U.S. Attorneys primarily focus on CTRs with high dollar values, making a threshold change less relevant to their investigations." *Ibid*. Law enforcement agencies typically followed the same logic—"access[ing] a larger share of CTRs with higher dollar values than those with lower dollar values." *Ibid*. The U.S. government concluded that, because "law enforcement agencies access relatively few CTRs," FinCEN should take "steps to reduce the number of unused CTRs." *Id*. at 57.

39.     As a result, the SWB GTO contradicts both (i) FinCEN's stated goal of providing useful information to law enforcement through CTRs and other BSA Reports, and (ii) the statutory objectives underlying the BSA itself.

---

[2] Available at  https://www.gao.gov/products/gao-22-105242.
[3] Available at https://www.gao.gov/ products/gao-20-574.

**The GTO is Ambiguous and Presumes all MSBs have Automated CTR-Filing Software**

40.     Initially, the SWB GTO suffers from an ambiguity in that it is impossible to determine exactly what transactions it covers. The SWB GTO defines a "Covered Transaction" as follows: "each deposit, withdrawal, exchange of currency or other payment or transfer, *by, through, or to the Covered Business which involves* a transaction in currency, of more than $200 but not more than $10,000." Ex. A, at 12107 (emphasis added). But because the SWB GTO is limited to certain ZIP codes, and MSBs often have multiple branches, it is unworkably vague and ambiguous as to whether an MSB with one branch in a ZIP code within the "Covered Geographic Area" must file CTRs for all transactions, or just those taking place at branches within the targeted ZIP codes.

41.     Additionally MSBs must aggregate—like every other BSA-defined financial institutions that file CTRs—all transactions in currency when determining if daily cash transactions exceed the CTR-filing threshold. 31 C.F.R. §§ 1022.313 and 1010.313. The SWB GTO is accordingly vague and ambiguous as to whether an MSB that maintains a branch in a ZIP code within the "Covered Geographic Area" must file CTRs for all multiple transactions at every branch, or just those taking place at branches within the targeted ZIP codes. It also presumes that the MSB branches in the covered ZIP codes will be able to easily and accurately identify multiple transactions by the same person, on the same day, that exceeds the CTR-filing threshold. To do so, the MSBs would have to have software that automatically records and shares every transactions. In my experience, this is not common with smaller MSBs along the Southwest Border.

**The SWB GTO Contradicts U.S. Government Policy Towards BSA Reports**

42.     SARs largely capture the same information as CTRs, with the added benefit of having been reviewed by a person, trained in and knowledgeable of AML obligations and best practices under the BSA, who is in effect telling the Treasury

14

Department that a specific person attempted a suspicious transaction, while including all of the relevant transactional information that would also appear on a CTR. The U.S. government's own analysis shows as much. Ex. D, at 33 ("most surveyed agencies reported they would have been able to use information from other sources, such as SARs, if CTR information had been unavailable").

43.     Indeed, "few law enforcement agencies track whether using CTRs leads to outcomes such as case originations, indictments, convictions, or recoveries." *Id*. at 34. Moreover, the U.S. government found "that law enforcement agencies had difficulty linking BSA reports to outcomes, and some reported difficulty determining what it means to 'use' a BSA report." *Id*. at 35.

44.     And so the SWB GTO, without any direct support in the administrative record, does not align with historical U.S. policy when it claims that "reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO." Ex. A, at 12107.

### The SWB GTO will Not Support the BSA's Policy Objectives

45.     The 2024 GAO Report analyzed throughout this declaration establishes the U.S. government's interest in reducing the number of CTRs that financial institutions must file. The SWB GTO will achieve the opposite: requiring MSBs to file likely thousands more CTRs than they have in the past. This will result in more BSA Reports, that are less useful to law enforcement, while increasing burdens on financial institutions. Each of these consequences are in conflict with the BSA's policy objectives.

46.     Additionally, my work as a consultant for the past 22 years has focused on BSA/AML compliance for all financial institutions, including MSBs situated along Southwest Border. From that experience, I have learned that many MSBs take steps to reduce the amount of cash that customers can exchange, use to buy money orders, or otherwise to send for transmission. Not only does this reduce the burden on the MSBs by decreasing personnel to prepare CTRs, it is also an effective AML policy

15

because it reduces the risk of money laundering. That is, the less cash any one person can provide to or receive from an MSB is one way to limit an MSB's exposure to large-scale money laundering operations.

47.    Should the SWB GTO come into effect, many of the smaller MSBs along the Southwest Border will have to do one of two things (or both): (i) hire an employee, or several employees, to prepare and file CTRs with FinCEN; or (ii) invest thousands of dollars in an electronic system to document cash transactions that can automatically prepare and file CTRs with FinCEN. The burden and costs to the MSBs accumulate even further, as opposed to large banks or credit unions, because many of the automated transactional and CTR filing software are not fit for single-branch, or low-volume MSBs. Nor is that software always compatible with a small MSB's cash transaction systems, to the extent they have one at all.

48.    Lastly, GTOs are routinely extended for several years. For instance, a GTO on real estate—the "Geographic Targeting Order Covering Title Insurance Companies" ("Real Estate GTO")—has been continually extended since February 2016, most recently in April 2025.[4] The FinCEN Memo indicates the Executive Branch is already considering ways to extend and expand its reach. Ex. F, at 9-10 ("The GTO will initially cover the following ZIP codes" and "FinCEN may consider expanding this GTO . . ."). Taken together, an MSB that is subject to the SWB GTO will have to budget for the additional transaction-monitoring and CTR-filing expenses, for an unknown, but perhaps indefinite, amount of time. Many smaller MSBs operate at very small margins. Any additional expense, let alone one that could incur thousands of dollars in employee costs, licensing expenses, and training requirements would have severe profitability consequences.

**The U.S. Government has Indicated it Will Reduce AML Enforcement**

49.    Although the Treasury Secretary delegated the authority to administer the BSA to FinCEN, FinCEN has re-delegated responsibility for assuring civil

---

[4]    See   https://www.fincen.gov/sites/default/files/shared/RRE-GTO-Order-April-14-2025-FINAL508.pdf.

compliance with the BSA to the IRS. 31 C.F.R. § 1010.810(b)(8) and (f); *see also* Internal Revenue Manual, 4.26.6.1.1[5]. With reports of reductions in many government departments and agencies, including the Treasury Department and the IRS—up to half of its workforce—there will be fewer and fewer resources to manage the increase in CTRs, documents, and data the SWB GTO will necessarily create. Additionally, with those reductions to the Treasury Department, it will be virtually impossible for FinCEN to enforce compliance with the SWB GTO. *See* Hussein, Fatima, AP News *The IRS is drafting plans to cut as much as half of its 90,000-person workforce, AP sources say* (Mar. 4, 2025).[6]

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 6, 2025 in Phoenix, Arizona.

Connie Fenchel

[5] Available at https://www.irs.gov/irm/part4/irm_04-026-006.
[6] Available at https://apnews.com/article/irs-doge-layoffs-tax-season-0659e4b439400 bf6602327 3f6a532fa0.

DECLARATION OF CONNIE FENCHEL                                    Case No. 3:25-cv-00886-JLS-DDL

**EXHIBIT "A"**
Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

**12106** Federal Register / Vol. 90, No. 49 / Friday, March 14, 2025 / Rules and Regulations

formal orders of investigation that authorize specifically-designated enforcement staff to exercise the Commission's statutory power to subpoena witnesses and take the other actions authorized by the relevant cited provisions.

The Commission delegated authority to issue formal orders of investigation to the Director on August 11, 2009. ''Delegation of Authority to Director of Division of Enforcement,'' 74 FR 40068–01 (Aug. 11, 2009). The delegation was made effective for a one-year period, ending on August 11, 2010, to allow Commission review of the Division's exercise of formal order authority. On August 16, 2010, the Commission amended its rules to extend the Director's delegated authority to issue formal orders of investigation beyond the one-year period. ''Delegation of Authority to the Director of Its Division of Enforcement,'' 75 FR 49820–01 (Aug. 16, 2010); *see also* 17 CFR 200.30–4(a)(13). The amendment will delete this delegation provision, 17 CFR 200.30–4(a)(13), to more closely align the Commission's use of its investigative resources with Commission priorities.

**Administrative Law Matters**

The Commission finds, in accordance with the Administrative Procedure Act (''APA''), that this amendment relates solely to agency organization, procedure, or practice. 5 U.S.C. 553(b)(A). Accordingly, the APA's provisions regarding notice of rulemaking and opportunity for public comment are not applicable. In accord with the APA, we find that there is good cause to establish an effective date less than 30 days after publication of this amendment. 5 U.S.C. 553(d). This amendment does not substantially affect the rights or obligations of non-agency parties and pertains to increasing efficiency of internal Commission operations. This amendment is therefore effective on March 14, 2025. For the same reasons, the provisions of the Small Business Regulatory Enforcement Fairness Act are not applicable. *See* 5 U.S.C. 804(3)(C) (the term ''rule'' does not include ''any rule of agency organization, procedure, or practice that does not substantially affect the rights or obligations of non-agency parties''). Additionally, the provisions of the Regulatory Flexibility Act, 5 U.S.C. 60 *et seq.*, which apply only when notice and comment are required by the APA or other law, are not applicable. *See* 5 U.S.C. 601(2). This amendment does not contain any collection of information requirements as defined by the Paperwork Reduction Act of 1995. *See* 5 CFR 1320.3(c). Further, because this

amendment imposes no new burdens on private parties, the Commission does not believe that the amendment will have any impact on competition for purposes of section 23(a)(2) of the Securities Exchange Act of 1934. 15 U.S.C. 78w(a)(2).

**Statutory Authority**

The amendment contained in this release is being adopted pursuant to statutory authority granted to the Commission, including section 19 of the Securities Act of 1933, 15 U.S.C. 77s; sections 4A, 4B, and 23 of the Securities Exchange Act of 1934, 15 U.S.C. 78d–1, 78d–2, and 78w; section 38 of the Investment Company Act, 15 U.S.C. 80a–37; section 211 of the Investment Advisers Act, 15 U.S.C. 80b–11; and section 3 of the Sarbanes-Oxley Act, 15 U.S.C. 7202.

**List of Subjects in 17 CFR Part 200**

Administrative practice and procedure, Authority delegations (Government agencies).

**Text of Amendment**

For the reasons set out in the preamble, the Commission is amending 17 CFR part 200 as follows:

**PART 200—ORGANIZATION; CONDUCT AND ETHICS; AND INFORMATION AND REQUESTS**

■ 1. The authority citation for part 200 continues to read as follows:

**Authority:** 5 U.S.C. 552, 552a, 552b, and 557; 11 U.S.C. 901 and 1109(a); 15 U.S.C. 77c, 77e, 77f, 77g, 77h, 77j, 77o, 77q, 77s, 77u, 77z–3, 77ggg(a), 77hhh, 77sss, 77uu, 78b, 78c(b), 78d, 78d–1, 78d–2, 78e, 78f, 78g, 78h, 78i, 78k, 78k–1, 78*l*, 78m, 78n, 78o, 78o–4, 78q, 78q–1, 78t–1, 78u, 78w, 78*ll*(d), 78mm, 78eee, 80a–8, 80a–20, 80a–24, 80a–29, 80a–37, 80a–41, 80a–44(a), 80a–44(b), 80b–3, 80b–4, 80b–5, 80b–9, 80b–10(a), 80b–11, 7202, and 7211 *et seq.*; 29 U.S.C. 794; 44 U.S.C. 3506 and 3507; Reorganization Plan No. 10 of 1950 (15 U.S.C. 78d); sec. 8G, Pub. L. 95–452, 92 Stat. 1101 (5 U.S.C. App.); sec. 913, Pub. L. 111–203, 124 Stat. 1376, 1827; sec. 3(a), Pub. L. 114–185, 130 Stat. 538; E.O. 11222, 30 FR 6469, 3 CFR, 1964–1965 Comp., p. 36; E.O. 12356, 47 FR 14874, 3 CFR, 1982 Comp., p. 166; E.O. 12600, 52 FR 23781, 3 CFR, 1987 Comp., p. 235; Information Security Oversight Office Directive No. 1, 47 FR 27836; and 5 CFR 735.104 and 5 CFR parts 2634 and 2635, unless otherwise noted.

**§ 200.30–4 [Amended]**

■ 2. Section 200.30–4 is amended by removing and reserving paragraph (a)(13).

By the Commission.

Dated: March 10, 2025.

**Vanessa A. Countryman,**
*Secretary.*

[FR Doc. 2025–04064 Filed 3–13–25; 8:45 am]

**BILLING CODE 8011–01–P**

---

**DEPARTMENT OF THE TREASURY**

**Financial Crimes Enforcement Network**

**31 CFR Part 1010**

**Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border**

**AGENCY:** Financial Crimes Enforcement Network (FinCEN), Treasury.

**ACTION:** Order.

**SUMMARY:** FinCEN is issuing notice of a Geographic Targeting Order, requiring certain money services businesses along the southwest border of the United States to report and retain records of transactions in currency of more than $200 but not more than $10,000, and to verify the identity of persons presenting such transactions.

**DATES:** This action is effective April 14, 2025.

**FOR FURTHER INFORMATION CONTACT:** FinCEN's Regulatory Support Section by submitting an inquiry at *www.fincen.gov/contact.*

**SUPPLEMENTARY INFORMATION:**

**I. Background**

If the Secretary of the Treasury (Secretary) finds, upon his own initiative or at the request of an appropriate Federal or State law enforcement official, that reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of the Bank Secrecy Act (BSA)[1] or to prevent evasions thereof, the Secretary may issue a Geographic Targeting Order (GTO) requiring any domestic financial institution or group of domestic financial institutions, or any domestic nonfinancial trade or business or group of domestic nonfinancial trades or businesses, in a geographic area to obtain such information as the Secretary may describe in such GTO concerning

---

[1] The Bank Secrecy Act, as amended, is codified at 12 U.S.C. 1829b, 1951–1960 and 31 U.S.C. 5311–5314, 5316–5336 and includes other authorities reflected in notes thereto. Regulations implementing the BSA appear at 31 CFR chapter X. The Secretary of the Treasury's authority to administer the BSA has been delegated to the Director of FinCEN.

any transaction in which such financial institution or nonfinancial trade or business is involved in for the payment, receipt, or transfer of funds (as the Secretary may describe in such GTO), and concerning any other person participating in such transaction. For any such transaction, the Secretary may require the financial institution or nonfinancial trade or business to maintain a record and/or file a report in the manner and to the extent specified. The maximum effective period for a GTO is 180 days unless renewed.[2] The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN (Director).[3]

The Director finds that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO contained in this document (the "Order") are necessary to carry out the purposes of the BSA or to prevent evasions thereof. This action is being taken in furtherance of Treasury's efforts to combat illicit finance by drug cartels and other illicit actors along the southwest border of United States. The Order does not alter any existing BSA obligation of a Covered Business (as defined in the Order), except as otherwise noted in the Order itself. Thus, for example, a Covered Business must continue to file Currency Transaction Reports (CTRs) for transactions in currency above $10,000 and Suspicious Activity Reports (SARs) where appropriate and in accordance with the BSA and applicable regulations. Although the dollar thresholds for filing SARs in the SAR regulation applicable to Covered Businesses remains the same (as low as $2,000),[4] FinCEN encourages the voluntary filing of SARs where appropriate to report transactions conducted to evade the $200 reporting threshold imposed by the Order.

## II. Geographic Targeting Order

### A. Businesses and Transactions Covered by This Order

1. For purposes of this Order, the "Covered Business" means a money services business, as defined in 31 CFR 1010.100(ff), located in the Covered Geographic Area.

2. For purposes of this Order, a "Covered Transaction" means each deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business which involves a transaction in

currency, of more than $200 but not more than $10,000.

3. For purposes of this Order, a "Covered Geographic Area" means the areas denoted by the ZIP codes below corresponding to the following seven counties in California and Texas:

a. Imperial County, California: 92231, 92249, 92281, and 92283;

b. San Diego County, California: 91910, 92101, 92113, 92117, 92126, 92154, and 92173;

c. Cameron County, Texas: 78520 and 78521;

d. El Paso County, Texas: 79901, 79902, 79903, 79905, 79907, and 79935;

e. Hidalgo County, Texas: 78503, 78557, 78572, 78577, and 78596;

f. Maverick County, Texas: 78852; and

g. Webb County, Texas: 78040, 78041, 78043, 78045, and 78046.

4. All terms used but not otherwise defined herein shall have the same meaning set forth in part 1010 of chapter X of subtitle B of title 31 of the Code of Federal Regulations.

### B. Reports Required To Be Filed by the Covered Business

5. Except as otherwise set forth in this Order, if the Covered Business is involved in a Covered Transaction, then the Covered Business shall report the Covered Transaction to FinCEN on a Currency Transaction Report within 15 days following the day on which the Covered Transaction occurred. In the case of the U.S. Postal Service, the obligation contained in the preceding sentence shall not apply to payments or transfers made solely in connection with the purchase of postage or philatelic products.

**Note:** When submitting the report, the Covered Business may receive a warning that the transaction is below $10,000. The Covered Business shall ignore the warning and continue with the submission.

6. Each report filed pursuant to this Order must be: (a) completed in accordance with the terms of this Order and the Currency Transaction Report instructions (when those terms and those instructions conflict, the terms of this Order prevail); and (b) e-filed though the BSA E-Filing System.[5]

7. Before concluding a Covered Transaction, the Covered Business must comply with the identification requirements set forth at 31 CFR 1010.312, including the requirement that the specific identifying information

(e.g., the account number of the credit card, the driver's license number) used in verifying the identity of the customer shall be recorded on the Currency Transaction Report, and the mere notation of "known customer" or "bank signature card on file" on the report is prohibited. For purposes of this requirement, the Covered Business need not identify employees of armored car services.

8. The Covered Business is not required to file a report otherwise required under this Order on a Covered Transaction between the Covered Business and a commercial bank.

9. Part IV of the Currency Transaction Report shall contain the following information in Field 45: "MSB0325GTO".

### C. Order Period

The terms of this Order are effective beginning April 14, 2025 and ending on September 9, 2025.

### D. Retention of Records

The Covered Business must: (a) retain all reports filed to comply with this Order and any other records relating to compliance with this Order for a period of five years from the last day that this Order is effective (including any renewals of this Order); (b) store all such records in a manner accessible within a reasonable period of time; and (c) make such records available to FinCEN, or any other appropriate law enforcement or regulatory agency, upon request, in accordance with applicable law.

### E. No Effect on Other Provision of the BSA or Its Implementing Regulations

Nothing in this Order otherwise modifies or affects any provision of the BSA or the regulations implementing the BSA to the extent not expressly stated herein.

### F. Confidentiality

This Order is being publicly issued, and its terms are not confidential.

### G. Compliance

The Covered Business must supervise, and is responsible for, compliance with the terms of this Order by each of its officers, directors, employees, and agents with the terms of this Order. The Covered Business must transmit this Order to each of its agents located in the Covered Geographic Area. The Covered Business must also transmit this Order to its Chief Executive Officer or other similarly acting manager.

### H. Penalties for Noncompliance

The Covered Business, and any of its officers, directors, employees, and

---

[2] 31 U.S.C. 5326; see also 31 CFR 1010.370.

[3] Treasury Order 180–01 (Jan. 14, 2020).

[4] 31 CFR 1022.320 (SAR rule for money services businesses).

[5] To electronically file a Currency Transaction Report, a Covered Business will need a BSA E-Filing User account. To create a BSA E-Filing User account, please visit *https://bsaefiling. fincen.treas.gov/Enroll_Now.html*. For more information on e-filing, please visit *https:// bsaefiling.fincen.treas.gov/AboutBsa.html*.

agents, may be liable, without limitation, for civil or criminal penalties for violating any of the terms of this Order.

### I. Validity of Order

Any judicial determination that any provision of this Order is invalid shall not affect the validity of any other provision of this Order, and each other provision shall thereafter remain in full force and effect. A copy of this Order carries the full force and effect of an original signed Order.

### J. Paperwork Reduction Act

The collection of information subject to the Paperwork Reduction Act contained in this Order has been approved by the Office of Management and Budget (OMB) and assigned OMB control number 1506–0056. An agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a valid OMB control number.

### K. Questions

All questions about the Order should be directed to the FinCEN at *https://www.fincen.gov/contact.*

(Authority: 31 U.S.C. 5326)

**Andrea M. Gacki,**
*Director, Financial Crimes Enforcement Network.*
[FR Doc. 2025–04099 Filed 3–13–25; 8:45 am]
**BILLING CODE 4810–02–P**

---

## DEPARTMENT OF THE INTERIOR

### National Park Service

### 36 CFR Part 7

**[NPS–GLCA–NPS39678; NPS–2024–0005; PPIMGLCAA0.PPMPSAS1Z.Y00000–255P10361]**

**RIN 1024–AE91**

### Glen Canyon National Recreation Area; Motor Vehicles; Postponement of Effective Date

**AGENCY:** National Park Service, Interior.
**ACTION:** Final rule; postponement of effective date.

**SUMMARY:** This action further postpones the effective date for a rule published on January 13, 2025, pending judicial review.

**DATES:** As of March 14, 2025, the effective date of the rule amending 36 CFR part 7 published at 90 FR 2621, January 13, 2025, delayed on February 13, 2025, at 90 FR 9518, is postponed indefinitely, pending judicial review.

The National Park Service (NPS) will publish a document in the **Federal Register** announcing the new effective date or other dates the public may need to know.

**FOR FURTHER INFORMATION CONTACT:** Michelle Kerns, Superintendent, Glen Canyon National Recreation Area, P.O. Box 1507, Page, Arizona 86040, by phone at 928–608–6210, or by email at *GLCA_Superintendent@nps.gov.* Individuals in the United States who are deaf, deafblind, hard of hearing, or have a speech disability may dial 711 (TTY, TDD, or TeleBraille) to access telecommunications relay services. Individuals outside the United States should use the relay services offered within their country to make international calls to the point-of-contact in the United States.

**SUPPLEMENTARY INFORMATION:** On January 13, 2025, the NPS published a final rule revising special regulations at Glen Canyon National Recreation Area to update rules about the use of motor vehicles on roads and off roads on designated routes and areas (the "Final Rule"; 90 FR 2621). On January 20, 2025, the President issued a memorandum titled "Regulatory Freeze Pending Review" ("Freeze Memo"). The Freeze Memo directed all executive departments and agencies to consider postponing for 60 days from the date of the Freeze Memo the effective date for any rules that had been published in the **Federal Register** but had not yet taken effect for the purpose of reviewing any questions of fact, law, and policy that the rules may raise.

On February 13, the NPS published an action delaying the effective date for the Final Rule until March 21, 2025 (90 FR 9518) for the purpose of giving agency officials the opportunity to further review any questions of fact, law, and policy that the Final Rule may raise.

After conducting that review, the NPS has determined that justice requires an indefinite postponement of the effective date of the Final Rule, pending resolution of ongoing litigation. Under section 705 of the Administrative Procedure Act "[w]hen an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review." 5 U.S.C. 705. The State of Utah, Wayne and Garfield Counties, and the Utah School and Institutional Trust Lands Administration have challenged the special regulations for motor vehicle use at Glen Canyon National Recreation Area that were promulgated in 2021 (the "2021 Rule"; 86 FR 3804) and the corresponding off-road vehicle

management plan ("ORV plan"). *State of Utah* v. *Haaland,* 4:24–cv–00048 (D. Utah). The plaintiffs allege numerous legal deficiencies, including claimed State interests in roads affected by the 2021 Rule, the plaintiffs' inability to economically develop school trust lands accessed from roads managed by the ORV Plan, and the opportunity for Department of the Interior agencies to better coordinate motorized vehicle regulation across jurisdictional boundaries. While the plaintiffs' challenge is to the 2021 Rule, many of the issues raised in that litigation, including the effects of off-road vehicle management on State interests and school trust lands, are also relevant to the Final Rule.

The NPS has determined that postponing the effective date of the Final Rule and preserving the regulatory status quo of the 2021 Rule pending the resolution of ongoing litigation regarding that rule is necessary in order to avoid unduly foreclosing potential remedies, ensure proper adjudication of these claims, and avoid creating a shifting regulatory landscape that may frustrate resolution of the issues raised in that litigation. Maintaining the status quo will also serve the public interest by avoiding confusion with the public on what motorized uses are allowed in the Recreation Area and avoiding unnecessary and costly agency operations to implement additional changes while the previous changes are the subject of the pending litigation.

Additionally, the Bureau of Land Management ("BLM") released its Travel Management Plan for the Henry Mountains and Freemont Gorge Area on January 17, 2025, shortly after the publication of the Final Rule. This area is adjacent to the Recreation Area, and roads from the Recreation Area extend into this BLM planning area, and vice versa. Postponing the effective date of the Final Rule will allow for ongoing coordination on these matters that will better inform the adjudication of the pending claims from the State of Utah and the other plaintiffs.

Finally, the National Parks Conservation Association and Southern Utah Wilderness Alliance, parties to the Settlement Agreement under which the Final Rule was published, have been granted intervenor status in the challenge from the State of Utah to the 2021 Rule, so that the interests of all parties will be heard and adequately protected by resolution of these issues in that forum. In light of this active litigation, the NPS has concluded that justice requires it to postpone the effective date for the Final Rule until the

**EXHIBIT "B"**

Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

Case 1:25-cv-00000-ABC    Document 53-2    Filed 05/06/25    Page 52 of 69    Page ID #:
23 of 69



## FINANCIAL CRIMES        ENFORCEMENT NETWORK

HOME | ABOUT ⌄ | RESOURCES ⌄ | NEWSROOM ⌄ | CAREERS ⌄ | ADVISORIES

Search

**Resources**

- Alerts/Advisories/Notices/Bulletins/Fact Sheets
- Bank Secrecy Act Filing Information
- Beneficial Ownership Information Reporting
- COVID-19 Information
- Financial Trend Analyses
- Financial Institutions
- FinCEN Exchange
- Innovation
- International
- Law Enforcement
- Ransomware
- SAR Stats
- Scams
- Statutes and Regulations
- Suspicious Activity Report (SAR) Advisory Key Terms

**QUICK LINKS**

- Benefits of Using BSA E-Filing
- Log into BSA E-Filing
- Useful Information for Filing
- Chapter X Main Page
- Webinar on the FinCEN SAR
- Webinar on the FinCEN CTR and DOEP
- Webinar on the Introduction to the BSA E-Filing System
- Webinar on the Updated BSA E-Filing Technical Specifications for FinCEN's New SAR, CTR, and DOEP

**RELATED FAQs**

- Mandatory E-Filing FAQs
- FinCEN CTR FAQs
- FinCEN SAR FAQs
- BSA FAQs
- FinCEN FAQs on Cyber-Events

**Ready to E-File?**

Visit the BSA E-Filing System to file your reports.

[ Go to BSA E-File ]

**Get FinCEN News Updates**

Stay Informed with FinCEN Updates

[ Subscribe ]

# Bank Secrecy Act Filing Information

**BSA E-FILING SYSTEM**
FINANCIAL CRIMES ENFORCEMENT NETWORK
**Welcome to the BSA E-Filing System**

REMINDER: As of April 1, 2013, financial institutions must use the new FinCEN reports, which are available only electronically through the BSA E-Filing System. FinCEN is no longer accepting legacy reports. For more information, click here.

To File a BSA report please visit us at BSA E-Filing System

To view a BSA report or test your batch filing program please visit us at BSA E-Filing Test System. Do not mail or electronically attempt to file a test report.

## Bank Secrecy Act Forms and Filing Requirements

| ▸ FinCEN SAR Form 111 |
| --- |
| ▸ FinCEN CTR Form 112 |
| ▸ FinCEN DOEP Form 110 |
| ▸ FinCEN RMSB Form 107 |
| ▸ FinCEN 8300 (Cash Over 10K Received in Trade/Business) |
| ▸ CMIR 105 |
| ▸ Customer Due Diligence (CDD) – APPENDIX A - Certification Form |
| ▸ FBAR (Foreign Bank Account Report) 114 |



Home
About
Contract Opportunities

Resources
Careers
Get News Updates

Contact
Newsroom
Languages

   

USA.gov | Regulations.gov | Treasury.gov | IRS.gov | Freedom of Information Act (FOIA) | NO FEAR Act | Vote.gov | Accessibility | Office of Equal Opportunity | Privacy Policy | Public Posting Notice of Finding of Discrimination | Security and Vulnerability Disclosure Policies (VDP) | Office of Inspector General

**EXHIBIT "C"**
Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
FINANCIAL CRIMES ENFORCEMENT NETWORK

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| | ) | |
| BALTIC FINANCIAL SERVICES, INC. | ) | Number 2010-5 |
| MONTCLAIR, NEW JERSEY | ) | |

### ASSESSMENT OF CIVIL MONEY PENALTY

I.   INTRODUCTION

Under the authority of the Bank Secrecy Act and regulations issued pursuant to that Act, the Financial Crimes Enforcement Network has determined that grounds exist to assess a civil money penalty against Baltic Financial Services, Inc. ("Baltic" or the "Money Services Business").[1]   To resolve this matter, and only for that purpose, Baltic has entered into a CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") without admitting or denying the determinations by the Financial Crimes Enforcement Network, as described in Sections III and IV below, except as to jurisdiction in Section II below, which is admitted.

The CONSENT is incorporated into the ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by this reference.

II.   JURISDICTION

Baltic is an independent money transmitter, located in Montclair, New Jersey. The privately owned company is a New Jersey corporation, with assets amounting to approximately $76,000. Baltic markets funds transfer services to and from Latvia, a "major money laundering country."[2]   At all relevant times, Baltic was a "money services business," "money transmitter" and "financial institution" within the meaning of the Bank Secrecy Act and its implementing regulations.[3]   The Internal Revenue Service, Small Business/Self-Employed Division examines money services businesses for compliance with the Bank Secrecy Act, under delegated authority from the Financial

---

[1] 31 U.S.C. § 5311 et seq. and 31 C.F.R. Part 103.

[2] United States Department of State International Narcotics Control Strategy Reports ("INCSRs") for 2006, 2007, 2008, 2009, and 2010 identified Latvia as a "major money laundering country." The term means a country whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking. 22 U.S.C. § 2291(e)(7).

[3] 31 U.S.C. § 5312(a)(2) and 31 C.F.R. § 103.11.

Crimes Enforcement Network.[4]  The State of New Jersey Department of Banking and Insurance examines money services businesses for compliance with anti-money laundering requirements, under laws of the State of New Jersey.

III.   DETERMINATIONS

The Financial Crimes Enforcement Network has determined that Baltic violated Bank Secrecy Act registration requirements for money services businesses.[5]  Since 2001, the Bank Secrecy Act has required certain money transmitters to register with FinCEN by filing a registration of money services business ("RMSB") form, and renewing the registration every two years.  If the money services business' ownership or number of agents changes, a re-registration requirement may apply.

Bank Secrecy Act compliance by money services businesses is a critical part of the government's efforts against money laundering, terrorist financing, and other financial crimes. Bank Secrecy Act forms, including RMSB forms, must be filed in an accurate, complete and timely manner.  The registration requirement is an initial and foundational step required as part of the Financial Crimes Enforcement Network's regulations that are intended to assist law enforcement and other government agencies in the enforcement of criminal, tax and regulatory laws, and to prevent money services businesses from engaging in, or being misused to facilitate, the flow of illicit proceeds.[6]  By mitigating the risk of criminal abuse of money services businesses, the Financial Crimes Enforcement Network's regulatory framework seeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked.  RMSB forms promote greater transparency with respect to money services businesses that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, the Financial Crimes Enforcement Network and other government agencies.  RMSB forms are also useful for money transmitters and other types of money services businesses in establishing and maintaining banking relationships.  Banking organizations, in keeping with their responsibilities under the Bank Secrecy Act, normally request registration information from money transmitters and other types of money services business customers that are required to register.[7]

At all relevant times, Baltic conducted business as an independent money transmitter, and had knowledge of Bank Secrecy Act registration requirements.  Baltic provides money transfer services in any amount to and from Latvia.  In a typical transaction, the customer would complete a

---

[4] 31 C.F.R. § 103.56(b)(8).

[5] 31 U.S.C. § 5330 and 31 C.F.R. § 103.41.

[6] *See* Amendment to the Bank Secrecy Act Regulations-Definitions Relating to, and Registration of, Money Services Businesses, 64 FR 45438 (August 20, 1999).

[7] A money services business should retain a copy of RMSB forms it submitted to the Financial Crimes Enforcement Network, as part of its records, for five years.  Determinative evidence of a money services business' registration is an acknowledgement letter sent by the Internal Revenue Service-Enterprise Computing Center-Detroit upon receipt, and appropriate processing, of a RMSB form.  The Financial Crimes Enforcement Network's website, www.fincen.gov, contains a "MSB Registration List," identifying money services businesses that are currently registered.  The MSB Registration List is updated monthly, and provided as a general reference for the public.

form[8] provided by Baltic, and provide Baltic with cash, check or money order payable to Baltic in U.S. dollars for the amount of the transaction and applicable service fees. The form would typically contain the names, addresses, and telephone numbers for the customer and beneficiary to the transaction including an alternate contact person's name and phone number in the event the beneficiary could not be reached as well as an indication if physical delivery by a Baltic agent in Latvia would be required. Baltic would deposit the cash, checks or money orders provided by the customer in its financial institution account. Once the funds cleared and became available, Baltic would instruct the financial institution to wire transfer the funds to a designated financial institution in Latvia. Baltic's agent would retrieve the funds from the designated financial institution and make the funds physically available to the beneficiary. The funds would be provided in U.S. dollars or a designated currency. The Baltic agent would check identification and obtain the beneficiary's signature in processing the disbursement of funds to the beneficiary. Baltic would also provide the above described process in reverse order to accommodate customer transactions originating in Latvia with beneficiaries in the United States. Baltic filed RMSB forms with the Financial Crimes Enforcement Network in 2001 and 2003. Afterwards, however, Baltic repeatedly failed to comply with biennial renewal requirements in a timely manner, despite notifications that it was not in compliance with Bank Secrecy Act registration requirements for money transmitters.[9] In fact, for a majority of the time between January 2005 and September 2010 Baltic conducted business as an unregistered money transmitter, in violation of the Bank Secrecy Act.

## IV.    CIVIL MONEY PENALTY

As administrator of the Bank Secrecy Act, the Financial Crimes Enforcement Network may impose civil money penalties against Baltic, or any person who owns or controls Baltic, for violations of money transmitter registration requirements.[10] The Financial Crimes Enforcement Network may assess a civil money penalty for failure to register as a money services business, in an amount up to $5,000 per violation. Each day a violation continues constitutes a separate violation. The Financial Crimes Enforcement Network has determined that a civil money penalty is due for the violations of the Bank Secrecy Act and its implementing regulations described in this ASSESSMENT. After considering the seriousness of the violations and the financial resources available to Baltic, the Financial Crimes Enforcement Network has determined that the appropriate penalty in this matter is $12,000. This civil money penalty shall be satisfied by four $3,000 payments to the United States Department of the Treasury.

## V.    CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Baltic, without admitting or denying either the facts or determinations described in Sections III and IV above, except as to jurisdiction in Section II which is admitted, consents to the assessment of a civil money penalty in the sum of $12,000, which shall be satisfied by four $3,000 payments to the United States Department of the Treasury. Baltic shall pay the first $3,000 installment within five business days of the date of this

---

[8] The form is called by Baltic the "Agreement for the Transfer of Funds."
[9] Baltic filed renewals during 2006 and 2010, instead of renewing in 2005, 2007, and 2009 as required by the registration regulation and instructions to the RMSB form. *See* 31 C.F.R. § 103.41(b)(2).
[10] *See* 31 U.S.C. § 5330(e) and 31 C.F.R. § 103.41(e).

ASSESSMENT, and the second, third and fourth $3,000 installments within ninety (90), one hundred and eighty (180), and two hundred and seventy (270) calendar days respectively.

Baltic recognizes and states that it enters into the CONSENT freely and voluntarily and that no offers, promises, or inducements of any nature whatsoever have been made by the Financial Crimes Enforcement Network or any employee, agent, or representative of the Financial Crimes Enforcement Network to induce Baltic to enter into the CONSENT, except for those specified in the CONSENT.

Baltic understands and agrees that the CONSENT embodies the entire agreement between the Money Services Business and the Financial Crimes Enforcement Network relating to this enforcement matter only, as described in Section III above. Baltic further understands and agrees that there are no express or implied promises, representations, or agreements between the Money Services Business and the Financial Crimes Enforcement Network other than those expressly set forth or referred to in this document and that nothing in the CONSENT or in this ASSESSMENT is binding on any other agency of government, whether Federal, State, or local.

VI.    RELEASE

Baltic understands that execution of the CONSENT, and compliance with the terms of this ASSESSMENT and the CONSENT, constitute a complete settlement and release of the Money Services Business' civil liability for violations of the Bank Secrecy Act and regulations issued pursuant to that Act as described in the CONSENT and this ASSESSMENT against Baltic.

By:

_____/s/_____

James H. Freis, Jr., Director
FINANCIAL CRIMES ENFORCEMENT NETWORK
United States Department of the Treasury

Date:

_____December 13, 2010_____

**EXHIBIT "D"**
Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



United States Government Accountability Office

## Report to Congressional Committees

**December 2024**

# CURRENCY TRANSACTION REPORTS

# Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement

December 2024

# CURRENCY TRANSACTION REPORTS

## Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement

Highlights of GAO-25-106500, a report to congressional committees

## Why GAO Did This Study

Financial institutions filed roughly 167 million CTRs in fiscal years 2014–2023. The Anti-Money Laundering Act of 2020 includes a provision for GAO to review CTR requirements and issue a report by December 2025. GAO has issued four prior reports in response to the act, including one on law enforcement's use of reports about suspicious financial transactions.

This report examines (1) the potential effects of changing the CTR threshold, (2) the extent that CTR requirements align with statutory objectives, and (3) the extent that CTR requirements provide useful information to law enforcement.

GAO analyzed data from FinCEN on CTRs filed in fiscal years 2014–2023 and conducted a survey of all 327 federal, state, and local law enforcement agencies that can directly access CTRs (60 percent response rate). GAO also interviewed officials of tribal, federal, state, and local agencies; industry groups representing CTR filers; and 13 financial institutions (selected to represent different asset sizes and types of institutions), as well as privacy and compliance experts. GAO also reviewed relevant laws and regulations.

## What GAO Recommends

GAO is making four recommendations, including that FinCEN take steps to reduce the number of unused CTRs, eliminate infrequently used fields, and simplify and clarify aggregation requirements. FinCEN agreed with GAO's recommendations.

View GAO-25-106500. For more information, contact Michael Clements at (202) 512-8678 or clementsm@gao.gov

## What GAO Found

Currency transaction reports (CTR) must be filed by financial institutions for cash transactions exceeding $10,000 in a day and are intended to provide law enforcement with highly useful information. The $10,000 threshold, set in regulation by the Department of the Treasury in 1972, has not been adjusted for inflation. Inflation may have contributed to the increase in volume of CTRs filed, which has increased by about 62 percent since fiscal year 2002 (see figure). The inflation-adjusted threshold in 2023 would have been about $72,880. Using an inflation-adjusted threshold would have reduced the number of CTRs filed by at least 90 percent annually since 2014.



Currency Transaction Reports Filed, Fiscal Years 2002–2023

Currency transaction reports filed (in millions)

Source: Financial Crimes Enforcement Network. | GAO-25-106500

GAO identified key challenges and potential inefficiencies in the CTR system:

- **Unused reports.** Law enforcement agencies accessed a small percentage of CTRs through either the Financial Crimes Enforcement Network's (FinCEN) BSA Portal or agencies' internal systems, leaving most unused. From 2014 through 2023, law enforcement agencies accessed about 5.4 percent of CTRs filed in FinCEN's BSA Portal during that period. For CTRs accessed in either FinCEN's BSA Portal or agencies' internal systems in 2023 (the most recent full year), law enforcement agencies accessed less than 3 percent of CTRs filed from 2014 through 2023.

- **Difficult and infrequently used fields.** Filers GAO interviewed reported difficulty completing certain fields, some of which law enforcement agencies reported infrequently using.

- **Unclear or unhelpful aggregation requirements.** FinCEN's requirements for aggregating related transactions exceeding $10,000 in 1 day was sometimes unclear to filers GAO interviewed. Further, some law enforcement agencies noted that large aggregated CTRs of unrelated parties do not provide useful information.

By taking steps to reduce the number of unused CTRs—such as through adjusting the reporting threshold—and by eliminating rarely used fields and clarifying aggregation requirements, FinCEN could reduce unnecessary filer burden without affecting CTRs' usefulness to law enforcement.

United States Government Accountability Office

standards. Those standards require that we plan and perform the audit to obtain sufficient, appropriate evidence to provide a reasonable basis for our findings and conclusions based on our audit objectives. We believe that the evidence obtained provides a reasonable basis for our findings and conclusions based on our audit objectives.

# Background

## Bank Secrecy Act Roles and Responsibilities

The BSA and its implementing regulations provide the legal and regulatory framework for preventing, detecting, and deterring money laundering and terrorist financing.[12] The framework is designed to prevent criminals from using private individuals and financial institutions to launder the proceeds of their crimes and to detect criminals who successfully use the system to launder those proceeds. The main entities involved in implementing the framework include the following:

**FinCEN.** FinCEN oversees the administration of the BSA and related anti-money laundering regulations.[13] It implements the BSA through the issuance of regulations and guidance. FinCEN also has authority to enforce compliance with BSA requirements, and it serves as the repository of BSA reporting from financial institutions.[14] In addition, FinCEN analyzes information in CTRs and other BSA reports and shares such analyses with appropriate federal, state, local, and foreign law enforcement agencies.

**Financial regulators and the Internal Revenue Service (IRS).** FinCEN has delegated its examination authority to certain federal agencies, including the financial regulators who supervise institutions for BSA

---

[12]Certain parts of the Currency and Foreign Transactions Reporting Act, its amendments, and the other statutes relating to the subject matter of that act, have come to be referred to as the Bank Secrecy Act. These statutes are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-1960, 18 U.S.C. §§ 1956, 1957, and 1960, and 31 U.S.C. §§ 5311-5314 and 5316-5336, and notes thereto. BSA implementing regulations are found at 31 C.F.R. Chapter X.

[13]See 31 U.S.C. § 310.

[14]31 C.F.R. § 1010.810(a). FinCEN has responsibility for operating a government-wide data access service for CTRs and other BSA reports. 31 U.S.C. § 310(b)(2)(B).

|  | Agencies without direct access to BSA reports may request searches of the BSA database through FinCEN or through the agency designated as their state coordinator. |
|---|---|

## CTR Requirements Have Expanded and Do Not Fully Align with the Statutory Objective of Providing Highly Useful Information

Expansions to CTR requirements in statute and regulation have broadened the scope of institutions required to file and increased the amount of information collected. However, some of this information is reported by CTR filers to be burdensome and is infrequently used by law enforcement, inconsistent with the statutory objective of requiring reports that provide highly useful information to law enforcement. Financial institution representatives told us they faced challenges in collecting certain data, implementing exemptions, and complying with aggregation requirements. Further, FinCEN does not have performance goals or related measures specific to CTRs.

### Laws and Regulations Have Expanded CTR Scope Despite Alternative Tools for Identifying Suspicious Transactions

Although the CTR threshold has remained the same for over 50 years, the scope of CTR requirements has expanded significantly. Statutes and requirements implemented through FinCEN's regulations have increased the number and types of institutions required to file CTRs, as well as the amount of information collected in CTRs.[27] Figure 2 provides a timeline of the key statutes and regulations affecting CTRs.

---

[27]The BSA authorized Treasury to implement a reporting requirement and prescribe regulations the Secretary of the Treasury may deem appropriate to provide information that is "highly useful" in criminal, tax, or regulatory investigations or proceedings. Pub. L. No. 91-508, §§ 202 and 204, 84 Stat. 1114, 1118 (1970). Treasury, through its implementing regulations, set the $10,000 reporting threshold in 1972. The regulations included limited information on the rationale for the threshold amount, and FinCEN officials we interviewed could not provide us with documentation of the rationale for the original threshold amount. 37 Fed. Reg. 6818, 6912 (Apr. 5, 1972). However, Treasury regulations in 1945, issued under a pre-BSA authority, included a $10,000 threshold for financial institution reporting of currency transactions (unless the financial institution judged the transaction to be commensurate with legitimate and customary conduct). See 10 Fed. Reg. 6556 (June 5, 1945).

related transactions from multiple branches and sources of cash transactions (e.g., ATMs and certain transactions conducted by armored car services).[30]

FinCEN further expanded the types of information collected in CTRs when it designed the BSA database for electronic CTR filings, which became mandatory for filers in April 2013. FinCEN added fields to the CTR form and designated all data fields as critical (required to file) or noncritical (not required to file). Newly added noncritical fields included gender and North American Industry Classification System (NAICS) code.[31] According to FinCEN's 2012 guidance, fields were added in response to law enforcement feedback that the fields would be useful for their queries.[32] FinCEN officials told us the agency consulted its Data Management Council, comprising federal law enforcement and regulatory stakeholders, before making these form changes. The council reviews any changes to BSA reports, FinCEN officials said.

The CTR form consists of 57 fields, with some fields allowing for multiple records. For example, "person involved in transaction(s)" and "transaction location" fields may include up to 999 records (see fig. 3).

---

[30]Current regulations state that a financial institution must include "all of its domestic branch offices" for the purposes of reporting requirements. 31 C.F.R. § 1010.313(a). For additional information on filing CTRs related to armored cars, see, Department of the Treasury, Financial Crimes Enforcement Network, *Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes,* FIN-2013-R001 (July 12, 2013).

[31]The Census Bureau assigns business classification codes, including Standard Industrial Classification and NAICS codes, to each company to classify its main industry and line of business.

[32]Department of the Treasury, Financial Crimes Enforcement Network, *Filing FinCEN's new Currency Transaction Report and Suspicious Activity Report,* FIN-2012-G002 (Mar. 29, 2012).

phone number, occupation or business type, gender, and email address.[42]

**Table 1: Percentage of Noncritical Currency Transaction Report (CTR) Fields Populated by Filers, Fiscal Years 2019–2023**

| CTR field | Percentage populated |
|---|---|
| Phone number | 86% |
| Occupation or business type | 85% |
| Gender | 77% |
| Email address | 62% |
| Industry code[a] | 41% |

Source: Summary data provided by the Financial Crimes Enforcement Network (FinCEN). | GAO 25-106500

[a]These are standard industry codes from the North American Industry Classification System. Filers must link the codes to an occupation or business type.

FinCEN has stated it added noncritical fields because feedback from law enforcement officials indicated such information was important for query purposes.[43] However, our survey results indicated law enforcement agencies infrequently use some of these noncritical fields.[44] We estimated that about 60 percent of law enforcement agencies rarely or never used gender information and about 75 percent rarely or never used NAICS code information.

In contrast, our survey indicated law enforcement agencies frequently used critical fields, such as those related to account and identification numbers and location. For example, an estimated 94 percent of law

---

[42]We considered a field to be populated if it contained any information for at least one party in a CTR. We considered a field not populated if it contained no information (i.e., a blank field or an "Unknown" value for gender) for any party.

[43]See response to question 1 to Frequently Asked Questions Regarding the FinCEN Currency Transaction Report (CTR), effective October 3, 2019, available at https://www.fincen.gov/frequently-asked-questions-regarding-fincen-currency-transaction-report-ctr.

[44]We surveyed all law enforcement agencies that had an active memorandum of understanding with FinCEN to access BSA reports as of June 30, 2023. See app. I for additional discussion of our survey methodology and app. II for detailed survey results.

enforcement agencies at least occasionally used account number, and about 85 percent at least occasionally used location (see fig. 4).[45]

**Figure 4: Estimated Percentage of Law Enforcement Agencies That Used Selected Currency Transaction Report (CTR) Fields At Least Occasionally**



NAICS = North American Industry Classification System

⊢—⊣ 95% confidence interval

Source: GAO survey of law enforcement agencies.  |  GAO-25-106500

Note: We use the term "at least occasionally" to cover survey responses that reported using CTR fields "occasionally" or "frequently." The response options to this survey question were: frequently; occasionally; not often; never; and don't know.

Section 6204 of AMLA directs Treasury to review CTR processes and requirements and propose changes to reduce unnecessary filer burden while still ensuring that the information in CTRs is highly useful in criminal, tax, or regulatory investigations. The section also calls for Treasury to determine whether the number and nature of CTR fields need to be adjusted. According to FinCEN officials, this review has not been

---

[45]We use the term "at least occasionally" to cover survey responses that reported using CTR fields "occasionally" or "frequently". The response options to survey questions that asked about frequency were: frequently; occasionally; not often; never; and don't know.

completed due to competing priorities. These priorities include addressing new authorities and mandates imposed by AMLA, according to officials.[46]

As of May 2024, officials told us FinCEN was in the process of consulting with law enforcement, regulatory, and other stakeholders to review CTR requirements and consider potential revisions. They noted a commitment to making changes as needed to ensure law enforcement continues to have access to highly useful information while eliminating unnecessary regulatory burdens.[47] However, FinCEN has not yet determined what actions, if any, it will take in response to its review, including whether it will make changes to CTR fields. By eliminating optional, noncritical fields that are not frequently used by law enforcement, FinCEN could reduce unnecessary burden on financial institutions while maintaining information highly useful to law enforcement.

## Institutions Face Constraints Using Exemptions

As discussed previously, depository institutions can exempt certain customers from CTR filing requirements.[48] However, these exemptions are limited to exempting customers that are other banks, government agencies, or business customers meeting specific criteria. FinCEN implemented two types of exemptions—Phase I and Phase II—for different customer types (see table 2). The exemptions vary, based on customer type and business activities, in whether they require the

---

[46]FinCEN issued a request for information in December 2021 that it stated was intended to support its ongoing formal review of BSA regulations and guidance required pursuant to Section 6216 of AMLA. FinCEN received comments on a variety of topics, including CTR exemption requirements. See 86 Fed. Reg. 71201 (Dec. 15, 2021).

[47]FinCEN officials said FinCEN is undertaking a stakeholder consultation process similar to what it used when implementing changes to the CTR form in 2012. This process involved multiple meetings with federal law enforcement, regulatory, and other stakeholders that were members of FinCEN's Data Management Council to review required and nonrequired data fields and design the consolidated CTR, according to FinCEN officials.

[48]See 31 C.F.R. § 1020.315 for requirements related to banks and transactions of exempt persons. See FinCEN, *Guidance on Determining Eligibility for Exemption from Currency Transaction Reporting Requirements*, FIN-2012-G003 (June 11, 2012), available at https://www.fincen.gov/sites/default/files/shared/FIN-2012-G003.pdf. See also 31 C.F.R. § 1010.315 for requirements related to certain nonbank financial institutions (e.g., casinos, money services businesses, broker-dealers, mutual funds, and futures commission merchants and introducing brokers in commodities) and exemptions from obligation to file reports of transactions in currency.

modify their behavior to avoid CTRs. Many of these officials said CTR requirements force criminals to act in ways that increase chances of detection through other methods, such as structuring SARs. Financial institutions reported more than 900,000 structuring activities on SARs each fiscal year from 2019 through 2023.[70] From 2019 through 2022, law enforcement agencies accessed structuring SARs through BSA Portal more than 450,000 times each fiscal year.[71]

Officials from many law enforcement agencies we spoke with told us that CTRs are more likely to contain accurate information than other sources or may contain information that is not available from other sources. For example, IRS-CI officials said a CTR may capture the identity of a person conducting a transaction on behalf of a business, while bank records may not, which could help trace illicit currency movements. Additionally, some officials said it would often be harder and more time- or resource-intensive to obtain information from alternative sources, potentially hindering investigations.

Still, most surveyed agencies reported they would have been able to use information from other sources, such as SARs, if CTR information had been unavailable. An estimated 90 percent of agencies would have been able to use SARs instead of CTRs from January 2021 through January 2024. An estimated 64 percent of agencies would have been similarly efficient in their work by using SARs instead of CTRs (see table 3).

**Table 3: Estimated Percentage of Law Enforcement Agencies That Were Able to Use Other Sources Instead of Currency Transaction Reports, January 2021–January 2024**

|  | Estimated percentage | 95 percent confidence interval |
|---|---|---|
| **Bank records** | **91%** | **87–95%** |
| Yes, with similar efficiency | 51% | 44–59% |
| Yes, but with less efficiency | 40% | 32–47% |

[70]SARs can report multiple types of suspicious activities on a single report, including multiple types of structuring activities. For purposes of this report, we considered a structuring SAR to be any SAR that reports at least one structuring activity. Not all reportable structuring activities arise from attempts to avoid CTRs. For example, attempts to avoid threshold-based recordkeeping requirements for funds transfers are also reportable as structuring activity. There were over 575,000 structuring SARs filed in fiscal year 2023 that reported structuring activity to avoid the CTR threshold.

[71]Most agencies did not specifically track access to structuring SARs on agencies' internal systems over this period.

GAO-25-106500  Currency Transaction Reports

| | Estimated percentage | 95 percent confidence interval |
|---|---|---|
| **Suspicious activity reports (other than structuring)** | **90%** | **86–95%** |
| Yes, with similar efficiency | 64% | 57–72% |
| Yes, but with less efficiency | 26% | 19–32% |
| **Suspicious activity reports (structuring)** | **88%** | **83-93%** |
| Yes, with similar efficiency | 60% | 52–67% |
| Yes, but with less efficiency | 28% | 21–35% |
| **Other Bank Secrecy Act reports** | **79%** | **73–85%** |
| Yes, with similar efficiency | 45% | 37–53% |
| Yes, but with less efficiency | 34% | 27–42% |
| **314(a) program[a]** | **66%** | **58–75%** |
| Yes, with similar efficiency | 25% | 17–34% |
| Yes, but with less efficiency | 41% | 32–50% |
| **Tax records** | **63%** | **55–71%** |
| Yes, with similar efficiency | 26% | 19–33% |
| Yes, but with less efficiency | 37% | 29–45% |

Source: GAO. | GAO-25-106500

Notes: We conducted a generalizable survey of 327 law enforcement agencies that had an active memorandum of understanding with the Financial Crimes Enforcement Network (FinCEN) to access Bank Secrecy Act reports as of June 30, 2023. Upper- and lower-bound 95 percent confidence intervals are provided for each estimate.

[a]FinCEN's 314(a) program enables law enforcement agencies, through FinCEN, to contact U.S. financial institutions to locate accounts and transactions of subjects that may be involved in terrorism or money laundering.

IRS-CI provided data showing that, on average, about 35 cases originated from CTRs each fiscal year from 2020 to 2022. Other than IRS-CI, few law enforcement agencies track whether using CTRs leads to outcomes such as case originations, indictments, convictions, or recoveries.[72] Officials from some agencies we interviewed said they do not track use of CTRs separately from other sources of information used during an investigation or prosecution. Additionally, officials from four agencies told us they do not mention CTRs in court records, warrants, or

---

[72]FinCEN operates the FinCEN Law Enforcement Awards program, which recognizes BSA reporting that was particularly helpful in supporting investigations. FinCEN publishes brief descriptions of award-receiving cases but does not make public the extent to which the investigations used any specific type of BSA report. In previous reports, we discuss some other mechanisms that FinCEN and law enforcement use to provide metrics and feedback to financial institutions on their use of BSA reports. See GAO-24-106301 and GAO-19-582.

other evidentiary documents.[73] An estimated 13 percent of surveyed agencies reported tracking their CTR use. Among 23 agencies that described on our survey how they tracked their CTR use, two described tracking outcome-related metrics.[74]

In response to a Congressional mandate, DOJ began submitting an annual report to Treasury in 2022 that is required to contain statistics, metrics, and information on contributions of BSA reports to law enforcement outcomes.[75] In a 2022 report, we found that law enforcement agencies had difficulty linking BSA reports to outcomes, and some reported difficulty determining what it means to "use" a BSA report.[76] We made two recommendations for DOJ to improve data collection and analytical rigor for its annual reports to Treasury, and as of July 2024, DOJ had implemented one of these two recommendations.[77] The second annual DOJ report to Treasury, covering fiscal year 2022, did not include any outcome metrics specifically for CTRs.[78]

## A Small Portion of CTRs Are Accessed by Law Enforcement

---

[73]Some law enforcement agencies may avoid using CTRs as evidence because of concerns about revealing investigative techniques, officials said.

[74]One agency described tracking investigations that use CTRs generally and one described specifically tracking investigative outcomes of investigations that use CTRs.

[75]Anti-Money Laundering Act of 2020, Pub. L. No. 116-283, § 6201, 134 Stat. 3388, 4565-4566 (2021). Section 6201 of the act requires DOJ, in consultation with other agencies, to annually produce a report containing statistics, metrics, and other information on the use of data derived from financial institutions reporting under the BSA, and directs DOJ to submit the report to Treasury, which is to use the information to help assess the usefulness of BSA reporting, enhance feedback and communications with financial institutions and other entities subject to BSA requirements, and assist FinCEN in considering revisions to certain reporting requirements.

[76]GAO, *Bank Secrecy Act: Action Needed to Improve DOJ Statistics on Use of Reports on Suspicious Financial Transactions,* GAO-22-105242 (Washington, D.C.: Aug. 25, 2022).

[77]GAO-22-105242. DOJ neither agreed nor disagreed with the recommendations.

[78]The report included statistics on investigations initiated by some law enforcement agencies as a result of BSA data in general.

Most CTRs are not accessed by law enforcement agencies, according to our analysis of data from FinCEN's BSA Portal and agencies' internal systems.[79]

Five federal agencies—FBI, U.S. Immigration and Customs Enforcement, IRS-CI, CBP, and DEA—accounted for about two thirds of all law enforcement CTR accesses through BSA Portal in fiscal years 2019–2023. Overall, personnel from these five agencies constituted more than half of all active law enforcement users on BSA Portal. All except DEA also have Agency Integrated Access agreements with FinCEN, permitting them to allow personnel to access BSA reports on their internal systems.[80] DEA officials told us that the agency has requested Agency Integrated Access, and FinCEN officials told us FinCEN is working with DEA to draft an Agency Integrated Access agreement to provide DEA access.[81]

Accessing a CTR does not necessarily mean that law enforcement personnel viewed it or used it in their work. For example, officials said IRS-CI's internal system records access when a user loads a page with information from multiple sources, including CTRs, making it impossible

---

[79]Most authorized agencies access BSA reports through FinCEN's BSA Search tool within BSA Portal. Some large users of BSA reports also have special authority permitting them to allow personnel to access BSA reports on their internal systems. As part of this authority, agencies are required to maintain auditable logs of CTRs accessed on their systems. Systems differ in how they display CTR information and record CTR access. Access includes users opening a CTR on-screen, downloading a CTR, or—for certain agencies' internal systems only—loading a summary screen that contained information from a CTR. Throughout this report we specify whether we are referring to CTRs accessed through BSA Portal, agencies' internal systems, or both. See app. III for additional information on agency access.

[80]Agency Integrated Access, formerly called bulk data access, allows agencies to download BSA data onto their own audited and protected computer systems. The agencies then may grant personnel access to search BSA data directly on internal systems. As of June 2024, the law enforcement agencies with Agency Integrated Access were FBI, ICE, IRS-CI, CBP, OCDETF, and Secret Service. Secret Service officials told us that, as of December 2023, the agency was in the process of implementing direct access to BSA reports on its internal systems and investigative personnel did not yet have access.

[81]In 2023, the Acting Director of FinCEN testified that the agency was updating its procedures related to access to BSA information in response to weaknesses identified by the Treasury Office of the Inspector General. Himamauli Das, Acting Director, FinCEN, testimony before the House Committee on Financial Services, Subcommittee on National Security, Illicit Finance, and International Financial Institutions, 118th Cong., April 27, 2023.

and how such access is recorded. As a result, data on CTR accesses from internal systems are not directly comparable between agencies or with FinCEN's BSA Portal.[89] To present a more comprehensive picture, we combined BSA Portal data with internal system data from agencies with Agency Integrated Access.[90]

Our analysis of the combined data for fiscal year 2023 (the most recent full year with complete data) showed that law enforcement agencies accessed between about 3.9 million and about 4.2 million of the CTRs filed since fiscal year 2014.[91] This represented less than 3 percent of the more than 167 million CTRs filed in that period. See figure 8 for law enforcement access to CTRs on BSA Portal or agencies' internal systems.

---

[89]For example, BSA Portal displays some information from CTRs to users on a search results screen but does not record a view unless the user opens the full CTR or downloads the CTR. Some agency internal systems record a view when CTR information is displayed on summary screens, and their users may rely on CTR information from summary screens without opening the full CTR. See app. III for more details about access data.

[90]We obtained full fiscal year 2023 data on CTR accesses from FBI, IRS-CI, CBP, and OCDETF systems. We obtained partial fiscal year 2023 data from ICE's recently implemented internal system, but most of the agency's internal CTR use occurred on an older system. The combined data do not include accesses by FinCEN analysts through BSA Portal or FinCEN internal systems. See app. III for more information on FinCEN's use of CTRs for analytic purposes.

[91]In fiscal year 2023, law enforcement agencies accessed at least 3,929,286 and as many as 4,214,595 of the 167,525,214 CTRs filed since fiscal year 2014. Law enforcement personnel accessed 3,929,286 such CTRs through BSA Portal, ICE's newer system, and the internal systems of IRS-CI, CBP, and OCDETF. FBI personnel accessed 193,001 such CTRs through FBI's internal system and up to 92,308 such CTRs appeared in search results in ICE's older system. However, because these agencies did not provide us with FinCEN CTR identification numbers for these two systems, we could not determine how many of the CTRs accessed in these systems were also accessed in other agencies' systems.

**Figure 8: Number of CTRs Accessed by Law Enforcement on BSA Portal or Agency Internal Systems in Fiscal Year 2023 (FY23), for CTRs Filed in Fiscal Years 2014–2023**



Source: GAO analysis of agency data.  |  GAO-25-106500

BSA = Bank Secrecy Act
CTR = currency transaction report
FBI = Federal Bureau of Investigation
ICE = U.S. Immigration and Customs Enforcement

Notes: Internal systems category includes CTRs accessed on the internal systems of IRS Criminal Investigation, U.S. Customs and Border Protection, the Organized Crime and Drug Enforcement Task Forces, and ICE's newer internal system. Systems differ in how they display CTR information and record CTR access.

[a]We were not able to determine the extent to which CTRs accessed by FBI or ICE's older system overlap with CTRs accessed by other law enforcement agencies because FBI and ICE did not provide us with FinCEN CTR identification numbers for these systems. For that reason, these numbers are presented separately.

Officials from the Department of Homeland Security said one reason most CTRs are not accessed could be because CTRs largely reflect lawful activity, making them less relevant to law enforcement than SARs, which focus on suspicious activity. According to Department of Homeland Security officials, CTRs typically are used to support SAR information and may not be useful unless they contain information related to a SAR. In addition, officials from one law enforcement agency told us that an absence of CTR filings can provide useful information about the sufficiency of a financial institution's anti-money laundering program, making even search results with no matches useful to investigators.

## Characteristics of CTRs Accessed by Law Enforcement

**Table 7: Currency Transaction Report (CTR) Filings, Fiscal Years 2014–2023, and Proportion Accessed in Fiscal Year 2023, by Selected Industry**

| | Number of CTRs filed in fiscal years 2014–2023[a] | Number accessed by law enforcement agencies in fiscal year 2023 (proportion) |
|---|---|---|
| **All CTRs** | **167,525,214** | **3,929,286 (2.3%)** |
| Missing/unknown[b] | 105,078,134 | 2,517,405 (2.4%) |
| 1. Food and beverage retailers | 8,702,093 | 154,144 (1.8%) |
| 2. Food services and drinking places | 8,513,308 | 132,395 (1.6%) |
| 3. Gasoline stations | 7,504,655 | 109,186 (1.5%) |
| 4. Administrative and support services | 5,297,020 | 120,337 (2.3%) |
| 5. Motor vehicle and parts dealers | 4,484,701 | 105,452 (2.4%) |
| 6. Credit intermediation and related activities | 4,383,286 | 128,048 (2.9%) |
| 7. Couriers and messengers | 3,795,634 | 72,940 (1.9%) |
| 8. Merchant wholesalers, durable goods | 2,293,877 | 74,319 (3.2%) |
| 9. Merchant wholesalers, nondurable goods | 2,202,856 | 60,853 (2.8%) |
| 10. Miscellaneous store retailers | 1,787,116 | 47,569 (2.7%) |
| All others | 23,732,101 | 706,998 (3.0%) |

Source: GAO analysis of agency data. | GAO-25-106500

Notes: Includes CTRs accessed through BSA Portal and CTRs accessed on the internal systems of IRS Criminal Investigation, U.S. Customs and Border Protection, the Organized Crime and Drug Enforcement Task Forces, and U.S. Immigration and Customs Enforcement. Systems differ in how they display CTR information and record CTR access. Industries are based on three-digit North American Industry Classification System (NAICS) codes. This analysis does not include CTRs accessed on FBI's internal system because FBI did not provide information on NAICS codes.

[a]The sum of CTRs by industry is higher than the total number of CTRs filed because a single CTR may report on parties in more than one industry. A CTR is counted for each industry reported, but multiple parties in the same industry are counted only once.

[b]NAICS code is a noncritical (nonrequired) field and CTRs may be filed without reporting a NAICS code for any party. Filers are expected to complete noncritical fields if they have direct knowledge of the information.

As discussed earlier, the BSA called for CTRs to be highly useful for law enforcement purposes. AMLA required Treasury to review CTR requirements and reporting thresholds to reduce unnecessary burdens on filers while maintaining usefulness for law enforcement. Our analysis shows that most CTRs are never accessed by law enforcement, suggesting room for optimization. FinCEN does not use access data to measure CTR usefulness or evaluate CTR requirements and instead relies on user surveys and other measures of value, according to FinCEN officials. By reducing less relevant CTR filings, FinCEN could reduce the burden on financial institutions while preserving valuable CTRs.

**Figure 13: Effect a Hypothetical Increase in CTR Threshold Would Have Had on Different Filer Types in Fiscal Year 2023**



Source: GAO analysis of Financial Crimes Enforcement Network data. | GAO-25-106500

[a]Inflation-adjusted amount calculated using Bureau of Labor Statistics' Consumer Price Index for All Urban Consumers for calendar year 2023.

## Most Law Enforcement Agencies Support Maintaining the Current CTR Threshold

Most federal, state, and local law enforcement agencies we surveyed supported maintaining the $10,000 threshold. An estimated 76 percent of law enforcement agencies thought that increasing the threshold would negatively affect their ability to fight crime.[105] In interviews, some agencies expressed similar concerns. For example, Homeland Security Investigations officials said a higher threshold could hinder money

---

[105]The Financial Action Task Force develops and promotes policy recommendations that are recognized as international anti-money laundering standards. It recommends that countries consider establishing a large currency transaction reporting system as part of establishing a financial intelligence unit. However, the Financial Action Task Force does not specify a threshold at which it should be reported. See Financial Action Task Force (2012–2022), *International Standards on Combating Money Laundering and the Financing of Terrorism & Proliferation* (Paris, France: Mar. 4, 2022).

laundering investigations by making it harder to prove a suspect's knowledge of the threshold. Officials from IRS-CI told us that a higher threshold would have a negative effect on its investigations and reduce the number of leads the agency reviews for investigative potential.

Federal, state, and local law enforcement, BSA compliance consultants, and think tanks we interviewed had mixed opinions on whether lowering the CTR threshold would be beneficial. One out of the 11 federal law enforcement agencies and one out of seven of the BSA compliance consultants and think tanks we interviewed advocated lowering the CTR threshold. In our survey, an estimated 52 percent of law enforcement agencies thought a lower threshold would benefit their agency, and an estimated 67 percent of those identifying an optimal threshold level selected an amount lower than $10,000.

However, some agencies noted drawbacks to a lower threshold, including unnecessary burden or irrelevant data. For example, officials from the Executive Office for United States Attorneys noted that U.S. Attorneys primarily focus on CTRs with high dollar values, making a threshold change less relevant to their investigations State and local law enforcement agencies we interviewed had mixed opinions on whether the threshold should be lowered.

Analysis of CTR access data indicates law enforcement agencies accessed a larger share of CTRs with higher dollar values than those with lower dollar values. In fiscal year 2023, agencies accessed just over 3.4 percent of CTRs filed from fiscal years 2014 through 2023 with dollar values over $50,000 and about 2.2 percent of CTRs with values under $50,000 in BSA Portal or agencies' internal systems (see fig. 14).[106] However, agencies still accessed more CTRs with values of $20,000 or less than those with higher dollar values due to the large number filed, despite viewing a smaller share of CTRs with values of $20,000 or less.

---

[106]We did not include CTRs accessed on the internal system of the FBI because we were not able to determine the extent to which CTRs accessed by FBI overlap with CTRs accessed by other law enforcement agencies because FBI did not provide us with FinCEN CTR identification numbers.

found that avoiding banks to have more privacy was the third-most cited reason by unbanked individuals for not having a bank account.[108]

# Conclusions

CTRs play an important role in helping law enforcement combat money laundering, terrorism financing, and other financial crimes. However, opportunities exist to reduce unnecessary burden on filers while maintaining the usefulness of CTRs for law enforcement:

- **Streamlining CTR fields.** Evidence indicates that certain noncritical fields on CTRs were burdensome for filers to complete and not highly useful for law enforcement. Identifying and eliminating such fields could reduce unnecessary filer burden while still providing highly useful information to law enforcement.

- **Clarifying aggregation requirements.** Many financial institutions identified challenges complying with aggregation requirements, and their interpretations of these requirements was inconsistent. Simplifying and clarifying these requirements could make CTR compliance easier and less burdensome.

- **Establishing CTR-specific performance management.** FinCEN has some performance goals and measures for BSA reports overall, but none that are specific to CTRs. Establishing a CTR-specific performance management process, including related goals and measures, would enable FinCEN to better assess the effectiveness of CTRs in achieving statutory objectives and identify areas for enhancement.

- **Optimizing the number of CTRs required.** CTR filings have increased substantially over the years, in part because the reporting threshold has never been adjusted for inflation and eligibility for exemptions is limited. Yet law enforcement agencies access relatively few CTRs. By taking steps to reduce the number of unused CTRs, such as by raising the reporting threshold or expanding exemptions, FinCEN has opportunities to reduce reporting burdens without compromising the value of CTRs to law enforcement. An analysis of existing data on the characteristics of CTRs rarely accessed by law enforcement would help inform such an effort.

---

[108]Federal Deposit Insurance Corporation, *2021 FDIC National Survey of Unbanked and Underbanked Households*, (Washington, D.C.: Oct. 2022).

**EXHIBIT "E"**
Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



REPORT TO THE CONGRESS

*Use of*
*Currency*
*Transaction*
*Reports*

*Submitted by the*
Financial Crimes Enforcement Network
*On behalf of the*
U.S. Department of the Treasury

*October 2002*

I. **Executive Summary**

On October 26, 2001, the President of the United States signed into law the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Public Law 107-56. Section 366 of the USA PATRIOT ACT requires the Secretary of the Treasury to conduct a study regarding the system for exempting bank customers from currency transaction reporting under 31 U.S.C. 5313. The study must consider:

> (A) the possible expansion of the statutory exemption system in effect under section 5313 of title 31, United States Code; and

> (B) methods for improving financial institution utilization of the statutory exemption provisions as a way of reducing the submission of currency transaction reports that have little or no value for law enforcement purposes, including improvements in the systems in effect at financial institutions for regular review of the exemption procedures used at the institution and the training of personnel in its effective use.

The Secretary of the Treasury submits this report in accordance with the above requirement. The Financial Crimes Enforcement Network ("FinCEN") was directed by the Secretary to carry out the study required by Section 366 because of its regulatory authority over currency transaction reporting under the Bank Secrecy Act ("BSA") and its role in administering the BSA database of which currency transaction reports ("CTRs") form a part.

**Methodology**

FinCEN's study focused on determining the extent to which depository institutions are using exemptions, identifying the areas in which exemptions are not being used, and the reasons for their lack of use. To make these determinations, FinCEN relied on: (1) a study of the BSA database by its analysts of the categories of exemptible customers for which CTRs were being filed; (2) a survey conducted by a contractor of a random sample of depository institutions concerning, in part, their exemption practices and the reasons underlying them; and (3) an analysis of the exemption process to determine how it could be improved.

**Findings**

The number of CTRs filed on an annual basis is still extremely high – 12.3 million in FY2002 (although this represents a decrease from the 13 million filed in FY2000). While the number of exemptions that have been filed with FinCEN has increased substantially since FinCEN's phase-in of the current exemption process was completed in 2000, the 118,678 exemptions filed in FY 2002 represent only a tiny fraction of total CTR filings. Many financial institutions have taken advantage of exemptions for government entities, educational institutions and utilities, but financial institutions generally have not taken advantage of exemptions for large companies that either have a cash intensive business or are payroll customers. Some financial

Nearly three-quarters of mega banks viewed the additional costs associated with continually reviewing exemption eligibility to be an important factor in not exempting all eligible Phase II customers.  In addition, according to the survey, the certification language in 31 CFR 103.22(d)(5)(ii) has been interpreted by banks as imposing an obligation beyond the suspicious transaction monitoring and reporting requirement that all banks are subject to regardless of whether a customer is exempted from currency transaction reporting.

The certification process was never intended to impose enhanced due diligence obligations concerning exempted customers.  FinCEN, after consultation with its law enforcement partners, should amend the exemption regulation to simplify and make less burdensome the biennial certification and monitoring system for non-listed customers and payroll customers.

**(5) The exemption process should not be made mandatory, nor are any other statutory changes necessary at this time.**

For institutions that do not file sufficient CTRs to justify the use of the exemption process, making the exemption process mandatory would be particularly burdensome.  The exemption process was designed to benefit financial institutions as well as law enforcement. Penalizing financial institutions that do not find it to be a benefit would be inconsistent with this objective.  FinCEN believes the system is capable of absorbing excess CTRs in such circumstances, especially since such CTRS do not represent a burden on law enforcement in light of the way CTRs are now used.  No statutory changes are necessary at this time.

**Conclusion**

CTRs provide important information to law enforcement and represent an important and frequently used link in following the money trail.  Because the way CTRs are used has changed with the advent of SARs, the law enforcement concerns animating the exemption process no longer exist.  Nonetheless, seeking to reduce the number of unnecessary CTR filings is still a valid concern in terms of costs to both the industry and the government.  Treasury and FinCEN are committed to seeking ways to improve the system and ensure that regulatory burdens are justified by the benefits of the system.

The recommendations in this report are incremental.  They represent feasible measures that can be taken to address the most significant issues identified both by FinCEN's analysis of the database and by the depository institutions responding to the survey questions.  The recommendations are aimed at eliminating perceived and actual regulatory disincentives toward use of exemptions, providing better education and guidance about the exemption process, and streamlining the process where possible.

**EXHIBIT "F"**
Declaration of Connie Fenchel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



Financial Crimes Enforcement Network
U.S. Department of the Treasury

Global Investigations Division │ Washington, D.C. 20220

March XX, 2025

**INFORMATION MEMORANDUM FOR DIRECTOR ANDREA M. GACKI**

| | |
|---|---|
| (U) **THROUGH:** | Matthew R. Stiglitz<br>Associate Director |
| | Amanda Joca<br>Deputy Associate Director |
| | Chase Lubbock<br>Office Director, Western Hemisphere |
| (U) **FROM:** | Kieran Murray and Shannon Mizzi<br>Global Investigative Specialists |
| (U//~~FOUO~~) **SUBJECT:** | Administrative Record for Geographic Targeting Order for Cash<br>Transactions at Southwest Border Money Services Businesses |

**I.**     (U) <u>Executive Summary</u>

(U//~~FOUO~~) The Global Investigations Division (GID) of the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommends the issuance of a public Geographic Targeting Order (GTO) to address cash-based money laundering along the southwest border, including by Mexican drug cartels—including cartels linked to illicit opioid trafficking.  This GTO would lower the threshold for filing Currency Transaction Reports (CTRs) to $200 for money services businesses (MSBs) located in 30 ZIP codes along with southwest border.  These ZIP codes are in two counties in California (Imperial and San Diego counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties). The GTO would carry out the purposes of the Bank Secrecy Act (BSA), 31 U.S.C. 5311 *et seq*, by collecting data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels, which are both drug trafficking organizations (DTOs) and transnational criminal organizations (TCOs) and would assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting

MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States.

## II.      (U) **Applicable Authority**

(U) FinCEN would issue the proposed GTO pursuant to 31 U.S.C. 5326 ("section 5326"). Section 5326 authorizes the Secretary of the Treasury (Secretary), upon finding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof," to issue an order requiring "nonfinancial trades or businesses in a geographic area" to:

(1) Obtain specified information concerning any transaction in which such nonfinancial trades or businesses are involved "for the payment, receipt, or transfer of funds" and "any other person participating in such transaction;"

(2) "Maintain a record of such information" for the period set out in the order; and

(3) File a report regarding any such transaction "in the manner and to the extent specified in the order."[1]

(U) The purposes of the BSA include, but are not limited to, "requir[ing] certain reports … that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering … risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States."[2]  The authority of the Secretary to administer the BSA and its implementing regulations has been delegated to FinCEN.[3]

(U) Section 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed.[4]

---

[1] (U) 31 U.S.C. 5326(a); *see also* 31 CFR 1010.370(a).
[2] (U) 31 U.S.C. 5311(1)(A), (3) and (4).
[3] (U) Treasury, Treasury Order 180-01 (Jan. 14, 2020).
[4] (U) 31 U.S.C. 5326(d).

000005

III.    (U) **Background**

A.  (U) **FinCEN's Regulation of MSBs**

(U) An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, travelers' checks, or pre-paid access products for an amount greater than $1,000 per person, per day, in one or more transactions.  All persons that engage in the transfer of funds as a money transmitter are also considered MSBs, regardless of the amount of money transmission activity.[5]

(U) Every MSB must register with FinCEN by electronically filing FinCEN Form 107, Registration of Money Services Business, unless a person or business is only an MSB because they serve as an agent of another MSB.[6]  The MSB's owner or controlling person must register by the end of a 180-day period beginning the day after the date they established the MSB.[7]  They are also required to renew their MSB registration each two-calendar-year period following the initial registration by filing another Form 107.[8]  Although agents are not required to register as MSBs, any MSB must prepare and maintain—but not file with FinCEN—a list of its agents.[9] There are persons who violate these rules by operating as MSBs without registering with FinCEN, often because they are engaging in illicit activity.  FinCEN and law enforcement agencies target such persons for enforcement measures.

(U) All MSBs (including those that are agents, rather than principals) must electronically file CTRs when they have a cash-in or cash-out currency transaction, or multiple transactions, totaling more than $10,000 during one business day for any one person, or on behalf of any one person.[10]  All individuals (except employees of armored car services)[11] conducting a transaction reportable on a CTR, for themselves or for another person, must be identified by means of an official document, such as a driver's license.[12]  CTRs collect information necessary to identify the person or entity on whose behalf the transaction is being conducted; the identity of the person conducting the transaction, if different; payment information; information about the relevant MSB or agent conducting the transaction (name, address, and identification number of the person

---

[5] (U) 31 CFR 1010.100(ff).
[6] (U) 31 CFR 1022.380(a).
[7] (U) 31 CFR 1022.380(b)(3).
[8] (U) 31 CFR 1022.380(b)(2).
[9] (U) 31 CFR 1022.380(d).
[10] (U) 31 CFR 1022.300-313.
[11] (U) FinCEN, FIN-2013-R001, "Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes" (July 12, 2013), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/2024-02-02/FIN-2013-R001.pdf.
[12] (U) 31 CFR 1022.312.

000006

or entity conducting the transaction). The persons conducting transactions reportable on a CTR are prohibited from structuring the transaction to evade the reporting requirement, such as by splitting transactions into smaller amounts in an attempt to evade the $10,000 reporting threshold.[13]

(U) All MSBs are required to develop, implement, and maintain an effective AML/CFT compliance program. The program should be reasonably designed to prevent individuals from using the MSB to facilitate money laundering or to finance terrorist activities. Each program must be written and take into account the inherent risks of the business, as well as:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA;

- Designate a person to assure day-to-day compliance with the BSA;

- Provide education and training to appropriate personnel; and

- Provide for an independent review to monitor and maintain an adequate program.[14]

(U) Generally, MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is suspicious and involves $2,000 or more, must electronically file a FinCEN Form 111, Suspicious Activity Report (SAR), on the activity.[15]

(U) MSBs are required to retain certain records with respect to transmittals of funds for $3,000 or more;[16] purchases of bank checks or drafts, cashier's checks, money orders or traveler's checks for $3,000 or more in currency;[17] and prepaid access.[18]

## B.  (U) **Vulnerabilities of MSBs to Money Laundering**

(U) While most of the business that MSBs conduct is legitimate and essential, MSBs are vulnerable to exploitation by money launderers. Treasury's 2024 National Money Laundering Risk Assessment (NMLRA) identified the illicit financial activities of drug cartels, as a major risk to MSBs and other types of financial institutions.[19] And, FinCEN has identified money

---

[13] (U) 31 CFR 1022.314.
[14] (U) 31 CFR 1022.210.
[15] (U) 31 CFR 1022.320.
[16] (U) 31 CFR 1010.410.
[17] (U) 31 CFR 1010.415.
[18] (U) 31 CFR 1022.420; 31 CFR 1022.210 (d)(1)(iv).
[19] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 ("The illicit financial activities of DTOs pose risks to banks, [MSBs], and other entities, such as real estate agents and attorneys."), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000007

transfers through MSBs as a financial typology associated with Mexico-based drug cartels and their illicit procurement of fentanyl precursor chemicals and manufacturing equipment.[20]

(U//FOU) MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border.  Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.[21]  To enable their efforts to traffic fentanyl and other opioids and to launder their funds back to Mexico, these and other drug cartels have gained functional control, through violence, of nearly

---

[20] (U) FinCEN, "Supplemental Advisory on the Procurement of Precursor Chemicals and Manufacturing Equipment Used for the Synthesis of Illicit Fentanyl and Other Synthetic Opioids," (June 20, 2024), pp. 8-9 ("Money transfers through banks, MSBs, and online payment processors are a common financial typology associated with TCOs' procurement of fentanyl precursor chemicals and manufacturing equipment.  These transactions may be sent from Mexico or the United States to mainland [China] (including via Hong Kong and other jurisdictions) to individuals and shell and front companies associated with either a [China]-based supplier or a chemical broker.  While some money transfers are sent from TCOs in Mexico to [China]-based suppliers without crossing the U.S. financial system, many of these foreign transactions are cleared in U.S. dollars through U.S. correspondent banks, Mexico- and [China]-based agents of U.S. MSBs, and U.S. online payment processors."), *available at* https://www.fincen.gov/sites/default/files/advisory/2024-06-20/FinCEN-Supplemental-Advisory-on-Fentanyl-508C.pdf; *see also* Center for Strategic and International Studies, "Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact" (Jan. 15, 2025), ("The expanding volume of remittance transactions provides more than economic benefits to regular Mexicans; it also presents ample opportunity for exploitation.  Criminal organizations take advantage of the small-increment nature of remittance transactions to evade oversight regulations and launder money related to drug trafficking and other illicit income streams, a practice which has increased in frequency since the Covid-19 pandemic disrupted cross-border movement and the associated traditional methods of bulk cash smuggling.") *available at* https://www.csis.org/analysis/understanding-impact-remittances-mexicos-economy-and-safeguarding-their-future-impact.

[21] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.  *See The New York Times*, "The American Drug Mules Smuggling Fentanyl into the U.S." (Sep. 28, 2024) ("Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid.  The amount of fentanyl crossing the border has increased tenfold in the past five years.  Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years."), *available at* https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html; Brookings Institute, "US-Mexico Relations and the fight against fentanyl trafficking" (Oct. 8, 2024) ("Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cartel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl.  They make fentanyl from precursor chemicals that come from China.  These precursors arrived in Mexico.  The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border.  They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine.  And they really work until about the middle layer.  These groups are not the retailers themselves.  They hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States.  And also, they of course then move proceeds from the United States to Mexico as well as weapons."), *available at* https://www.brookings.edu/articles/us-mexico-relations-and-the-fight-against-fentanyl-trafficking/.

all illegal traffic across the southern border of the United States.  In light of this fact, President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been  named cartels as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[22]  MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico.

(U) MSBs typically offer a limited range of services compared to other financial institutions, with many offering services tailored to persons without bank accounts.  These MSBs are often agents of a larger MSB and offer MSB services as part of its operation as a corner store or chain retailer.  The competitively priced services and convenient location offered near the border by such MSBs make them attractive for persons interested in using cash to fund money transmittals moving value across the border to Mexico, or to Central and South American countries, for both licit and illicit purposes.[23]

(U) MSBs offer a range of services, primarily built around exchanging currencies, cashing checks, receiving cash to fund money transmittals, and paying out cash to recipients of money transmittals.  Due to the cash-intensive nature of this industry, it has become an avenue through which drug cartels move untraceable flows of value.  For example, illicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico.  Similarly, an MSB may be used to receive a money transmittal from anywhere in the United States, funneling the value to the southwest border, which can be cashed out and the value moved to Mexico.[24]  Moreover, illicit actors may comingle licit and illicit cash, making dirty money even more difficult to detect for MSBs.

---

[22] (U) Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," 90 FR 8439, (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/; U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), *available at* https://www.state.gov/designation-of-international-cartels/.
[23] (U) D. Ore, "How Mexican narcos use remittances to wire U.S. drug profits home," *Reuters* (Aug. 18, 2023), *available at* https://www.reuters.com/investigates/special-report/mexico-drugs-remittances/.
[24] (U) FinCEN, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), p. 4 ("Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.  Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity.  In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account…In some cases, victims also are coerced or forced to

000009

(U) Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including "money mules,"[25] to move funds to Mexico via U.S.-based MSBs, structured to evade reporting requirements (*i.e.*, keeping the amount of any individual cash transaction below the applicable reporting threshold to avoid identification and reporting requirements). Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations.[26]

(U) The services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer. For example, the owner of an MSB in California was convicted in 2024 for conspiracy to commit money laundering on behalf of the Jalisco New Generation Cartel, by knowingly laundering drug proceeds by accepting cash from drug dealers below the CTR threshold and wiring it to Mexico, disguising it to look like routine remittances.[27] Similarly, in 2017, the owners and employees of an MSB pleaded guilty to accepting cash that was represented as coming from drug sales, which, in exchange for a kickback, they agreed to launder to Mexico by breaking the transactions into smaller amounts, resulting in more than $40 million laundered over a roughly four-year timeframe.[28]

---

wire proceeds via [MSBs] to facilitate the funneling of proceeds."), *available at* https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf; FinCEN, "FinCEN Alert on Human Smuggling along the Southwest Border of the United States" (Jan. 13, 2023) ("Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border."), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Human%20Smuggling%20FINAL_508.pdf.

[25] (U) FBI, "Money Mules," *available at* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules.

[26] (U) *See, e.g.*, FinCEN, "Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids" (Aug. 21, 2019), pp. 3, 9 ("An analysis of sensitive financial data illustrates that when U.S. individuals purchase fentanyl directly from China and other foreign countries, they often structure the money transfers to evade [BSA] reporting and recordkeeping requirements. Individuals frequently transfer the funds using multiple MSB agent locations…Professional money laundering organizations hire loosely associated parties (including "money mules") to send money transfers to Mexico via U.S. MSBs, primarily money transmitters, structured to evade reporting requirements. In this context, structuring (*i.e.*, keeping the amount of the money transfer below the applicable threshold of $3,000 in order to avoid identification and reporting requirements) is accomplished through one of, or a combination of, the following: • The illicit proceeds are divided between multiple individuals who send the transfers; • An individual uses multiple MSB agent locations to send transfers; and/or • An individual sends multiple transactions consecutively."), *available at* https://www.fincen.gov/sites/default/files/advisory/2019-08-21/Fentanyl%20Advisory%20FINAL%20508.pdf.

[27] (U) Complaint, *United States v. Chavez Zepeda et al*, No. 2:22-cr-00064 (E.D. Cal., Mar. 14, 2022).

[28] (U) Indictment, *United States v. Perez et al*, No. 1:17-cr-00200 (N.D. Ga., June 16, 2016).

000010

**IV.**   (U) **Justification for the GTO**

(U//FOUO) This GTO is necessary to carry out the purposes of the BSA because the GTO, due to the money laundering risks discussed above, would likely result in information highly useful in money laundering investigations, especially in the context of the fentanyl crisis, discussed in Section IV.A.  The anticipated benefits of the GTO are discussed in Section IV.B.

**A.**   (U) **Necessity to Address the Fentanyl Crisis**

(U) The supply and sale of fentanyl and other synthetic opioids is one of the greatest national security threats facing the United States.  Nearly 38,000 Americans died from fentanyl use in the first six months of 2023, and fentanyl and other synthetic drugs, including methamphetamine, account for nearly all fatal drug overdoses that occur in the United States.[29]  Drug cartels make billions of dollars in profit from the production and distribution of these drugs in the United States, enriching themselves, and allowing them to continue to traffic in drugs and other illicit goods, as well as expand their economic, political, and social influence.[30]  Drug cartels and the professional money launderers who support their illicit drug trafficking activities—including Chinese Money Laundering Organizations (CMLOs)—introduce smuggled and illicitly generated cash into the legitimate financial system, including through MSBs.[31]

**B.**   (U) **Anticipated Benefits of the GTO**

(U//FOUO) As discussed above, MSBs along the southwest border are a point of vulnerability in the U.S. financial system.  MSBs are, wittingly and unwittingly, facilitating the movement of funds that finance fentanyl trafficking and the commission of other crimes by drug cartels, including Mexico-based cartels, that threaten the national security of the United States.  Drug cartels based in Mexico and other countries in Central and South America need to repatriate illicitly generated proceeds to benefit from their crimes and remain in business.  FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important

---

[29] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 1, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

[30] (U) Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), pp. 18-24 (describing the major money laundering by DTOs of proceeds generated from the trafficking of illicit synthetic opioids), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf; U.S. Drug Enforcement Administration, "National Drug Threat Assessment," (May 2024), pp. 46-50 (describing how DTOs launder profits, providing in part that "The Sinaloa and Jalisco cartels, and other global criminal networks, generate billions of dollars in profits from the sale of illicit drugs"), *available at* https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf.

[31] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 46 (describing how DTOs launder profits), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000011

avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings.[32]

(U//FOUO) By lowering the CTR threshold, the information reported under this GTO would help Treasury, including FinCEN and its fellow Office of Terrorism and Financial Intelligence components, as well as its law enforcement partners identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States.  These additional GTO reports are expected to generate new leads and identify new and related subjects in ongoing cases.  For example, the resulting reports may allow the identification of a comprehensive network of potential money mules in the geographic areas in question.  They may also create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them—meaning that any increased monitoring of MSBs would likely capture information about the laundering of funds related to multiple criminal typologies.  The GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls.

(U//FOUO) Finally, the parameters of this GTO, in particular the reduced dollar reporting threshold, will help make structuring more difficult, thereby increasing the cost of doing business for cartels.  In addition, the GTO will help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules.  Each piece of information collected on a CTR form has the potential to augment an investigation, including the transaction date and amount; the name, date of birth, Social Security Number or Taxpayer Identification Number, phone number, email address, occupation, identification number, and account number of the individual and/or entity sending and receiving funds; the location and business at which the transaction took place; and information about the filer.

**V.**     (U) **Scope of the GTO**

    **A.**  (U) **Covered Geographic Areas**

The GTO will initially cover the following ZIP codes near the U.S.-Mexico border in the states of California and Texas (the "Covered Geographic Area"), which were selected based on risk

---

[32] Homeland Security Investigations, "Issue #57," *Cornerstone* (Oct. 2024), *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/3babbe0; U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 49, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

000012

factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. Therefore, GID assesses that these same ZIP codes likely correspond to a large number of cash transactions below the $10,000 threshold, relative to other ZIP codes. While MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels, GID chose to keep this GTO limited in scope, focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and to be able to assess trends and effectiveness. However, FinCEN may consider expanding this GTO to ZIP codes in Arizona and New Mexico in the future.

*California*

| Zip Code | Rationale |
|---|---|
| *Imperial County* | |
| 92231 | Borders Mexico; contains significant border crossings – Calexico West and Calexico East Ports of Entry; 1,570 CTRs filed for a population of 39,542, the highest CTR to population ratio in the county. |
| 92249 | 43 CTRs filed for a population of 6,975, the second highest CTR to population ratio in the county. |
| 92281 | 11 CTRs filed for a population of 2,122, the third highest CTR to population ratio in the county. |
| 92283 | Borders Mexico; contains a border crossing – Andrade Port of Entry; 13 CTRs filed for a population of 2,695, the fourth highest CTR to population ratio in the county. |
| *San Diego County* | |
| 91910 | 1,358 CTRs filed for a population of 79,613, the seventh highest CTR to population ratio in the county. |

---

[33]

000013

| 92101 | 2,142 CTRs filed for a population of 47,505, the fourth highest CTR to population ratio in the county. |
|---|---|
| 92113 | 930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the county. |
| 92117 | 1,394 CTRs filed for a population of 51,586, the fifth highest CTR to population ratio in the county. |
| 92126 | 4,752 CTRs filed for a population of 74,788, the third highest CTR to population ratio in the county. |
| 92154 | Borders Mexico; contains a significant border crossing – Otay Mesa Port of Entry; 6,494 CTRs filed for a population of 84,027 the second highest CTR to population ratio in the county. |
| 92173 | Borders Mexico; contains significant border crossings – San Ysidro Port of Entry and Cross Border Xpress; 2,793 CTRs filed for a population of 29,703, the highest CTR to population ratio in the county. |

*Texas*

| ZIP Code | Rationale |
|---|---|
| *Cameron County* | |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing – Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |
| *El Paso County* | |

000014

| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,0127, the fourth highest CTR to population ratio in the county. |
|---|---|
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |
| *Hidalgo County* | |
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

000015

| Maverick County | |
|---|---|
| 78852 | Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712. |
| **Webb County** | |
| 78040 | Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county. |
| 78041 | Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county. |
| 78043 | 364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county. |
| 78045 | Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county. |
| 78046 | 46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county. |

**B.** (U) **Covered Transactions**

(U//~~FOUO~~) The impact of the GTO would be to generally lower the existing threshold for filing CTRs from $10,000 to $200.  Under the GTO, a covered Transaction would be any deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business (defined, here, as an MSB operating in the Covered Geographic Area), which involves a transaction in currency of more than $200 but less than $10,000.  Because the GTO, except as noted therein, would not otherwise alter any currently applicable BSA requirement, money services businesses would still be required to file transactions in currency of more than $10,000. The $200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate.  It would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas,

000016

allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances.

(U//FOUO) The GTO would retain the requirement to aggregate different cash transactions conducted by or on behalf of the same person during a single day, regardless of whether the additional cash transactions occur within the Covered Geographic Areas, but without lowering the $10,000 threshold.  Aggregation is meant to detect structured transactions attempting to evade the filing threshold, but GID believes that the $200 filing threshold under the GTO largely negates the risks inherent in aggregation, as it would already capture the majority of cash transactions.  Structuring below $200 to evade the requirement would make laundering large amounts of currency at the border more difficult and costly.  Not requiring aggregation down to the $200 threshold also would help mitigate burdens on the Covered Businesses, as aggregation is inherently complicated.

(U//FOUO) GID does not expect that the lower reporting threshold will materially affect the flow of legitimate funds, including remittances, between the United States and Mexico.  While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs.  GID does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services (compared to which the Covered Businesses generally offer lower fees) and from MSBs outside of the Covered Geographic Areas.

(U//FOUO) GID recognizes that, due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity.  FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO.  Based on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP codes or counties in any future issuances.  FinCEN anticipates some illicit actors may change the methods by which they launder money, including by attempting to launder illicit funds through banks over MSBs; FinCEN believes that this may be a benefit of the GTO, as banks have more stringent reporting and recordkeeping obligations than MSBs and would likely inform FinCEN of new suspicious activity.

000017

### C.  (U) **Covered Businesses**

(U//FOUO) Any person that meets the definition of an MSB operating in the Covered Geographic Areas, as well the subsidiaries and agents of an MSB if such subsidiaries and agents are located in the Covered Geographic Area, would be considered a "Covered Business".  MSBs are required to keep current lists of their agents and, as with other GTOs, MSBs would be responsible for communicating the order's requirements to its agents.

### D.  (U) **Order Period**

(U) To provide the Covered Businesses time to comply with the GTO, the relevant period for the GTO would begin 30 days after the order is published and be in force for 180 days from that date.

### E.  (U) **Analytic Plan**

000018

**V.**    (U) **Conclusion**

(U//FOUO) For the foregoing reasons, GID believes that, by requiring reporting of high-risk cash transactions along the southwest border, the proposed GTO is necessary to carry out the purposes of the BSA.  Accordingly, GID recommends issuing the proposed GTO.

000019

**Southwest Border Geographic Targeting Order Clearance Sheet**

Subject: **Administrative Record for Geographic Targeting Order for Cash Transactions at Southwest Border Money Services Businesses**

Drafted:     Global Investigations Division – Shannon Mizzi/Kieran Murray       (02/27/2025)

Approved:  FinCEN Director – Andrea Gacki                    (MM/DD/YYYY)

Cleared:     Global Investigations Division – Associate Director Matthew Stiglitz    (02/28/2025)

              Office of Chief Counsel – Sean Boyce             (03/04/2025)

              Principal Deputy Assistant General Council (E&I) –        (MM/DD/YYYY)

000020

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Facsimile: 619.235.5351
Email: dsilva@buchalter.com
        asadeghi@buchalter.com
        dwilson@buchalter.com

Attorneys for Amicus Curiae
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-00886-JLS-DDL<br><br>**DECLARATION OF NONA RANGEL IN SUPPORT OF AMICUS CURIAE'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:     May 15, 2025<br>Time:     9:00 a.m.<br>Dept.:    4D<br>Judge:    Hon. Janis L. Sammartino |

I, Nona Rangel, declare as follows:

1.      I was employed by the California Franchise Tax Board (the "FTB") for over 25 years, during which time I worked in a variety of increasingly complex and high-responsibility roles involving financial crimes, tax auditing, anti-money laundering ("AML"), and multi-agency enforcement efforts, including nearly a decade on a federal financial crimes task force.

2.      I submit this declaration in support of the amicus curiae brief filed by the Money Services Business Association, Inc., which supports plaintiffs' motion for a preliminary injunction against the Treasury Department's proposed "Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting

Requirements on Certain Money Services Businesses Along the Southwest Border" (the "SWB GTO"). 90 F.R. 49 (Mar. 14, 2025) at 12106-12108. Based on my training, knowledge, and experience, the SWB GTO will not be helpful in combatting the money laundering risks it is targeting—namely, cross-border money laundering as directed or controlled by transnational criminal organizations. Ultimately, the additional Currency Transaction Reports ("CTR(s)") that will be filed by federally registered Money Services Businesses ("MSB(s)") in the ZIP codes along the Southwest Border with Mexico, as proposed by the SWB GTO, will generate very little, if any, investigative leads and otherwise fall well below the typical threshold for money laundering and other financial crime investigations by federal law enforcement. It could also have significant negative consequences for the financial institution by impacting their ability to report suspicious transactions in a timely, complete, and helpful manner.

**Professional Experience**

3.     As a certified fraud specialist, and after beginning my career as a tax auditor for the FTB, I have developed unique experience in investigating and disrupting cross-border money laundering schemes through the use of records that financial institutions must file with the Treasury Department. These reports are required by the Bank Secrecy Act (the "BSA," defined and analyzed in more detail below), all of which are regulated and maintained by the Financial Crimes Enforcement Network ("FinCEN"), which is within the U.S. Department of the Treasury.

4.     In 2020, FinCEN's Director awarded me with its "Significant Fraud" Law Enforcement Award, for "effectively using BSA data to safeguard the financial system from abuse by illicit actors." As the award ceremony program noted, the award resulted from a "multi-agency investigation" involving cross-border cash transactions, and "ultimately led to the first Bank Secrecy Act enforcement criminal conviction of a financial institution" and "the first investigation to result in the criminal conviction

of [a] financial institution for conspiring to defraud the United States and obstructing the functions of its regulator"—resulting in the largest financial penalty in the history of the Southern District of California.

5.    That award related to an investigation led by the Financial Investigations and Border Crimes Task Force (the "FIBC"), a multiagency task force based in San Diego and Imperial Counties, which was funded by the Treasury Executive Office of Asset Forfeiture and supervised by IRS-Criminal Investigation ("IRS-CI").

6.    From 2012 until my retirement from the FTB in 2021, I was a special agent assigned to the FIBC. At the FIBC, I worked alongside other special agents from federal, state, and local law enforcements. The focus of the FIBC was exclusively financial crimes. This led to numerous investigations and prosecutions of complex and significant money laundering, fraud, tax, and related crimes—including violations of the BSA—by individuals, businesses, and financial institutions.

7.    In addition to the FinCEN Director's Law Enforcement Award mentioned above, I also received the Department of Justice Award for Excellence in the Pursuit of Justice. I regularly gave updates, trainings, and appeared at conferences focused on BSA/AML compliance and best practices, including the West Coast Anti-Money Laundering Forum.

8.    Prior to joining the FIBC, I served as a special agent with the FTB for a decade investigating financial crimes. That followed seven years as a tax auditor, also with the FTB, where I audited complex tax returns, while also developing its internal audit manual. Since retiring from government service in 2021, I have been an independent accounting director and consultant related to BSA, anti-fraud, and tax compliance, primarily for cash-intensive businesses in Southern California.

**FinCEN's Role in BSA/AML Compliance**

9.    Although I am not entirely familiar with FinCEN's operations and policies, I am extremely familiar with the use of reports, information, and accessing those reports and information from the FinCEN Portal in criminal and forfeiture

investigations. FinCEN exercises regulatory functions primarily under the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA." The BSA is the United States of America's primary and most comprehensive legal regime regarding AML and counter-terrorism financing ("AML/CFT") laws, regulations, and best practices.

10.     The BSA requires multiple reports by a variety of financial institutions, businesses, and individuals. For instance, airports and border crossings often have signs that advise travelers that they must report whether they are transporting more than $10,000 in cash into or out of the U.S. This is a specific type of "BSA Report" is known as a "CMIR"—a currency and monetary instrument report on FinCEN Form 105, as required under 31 U.S.C. § 5316. Although CMIRs are not directly relevant to the SWB GTO, I refer to it as an example of the various BSA Reports that FinCEN receives, maintains, and makes accessible to law enforcement. A true and correct list of all "BSA Reports" is attached hereto as **Exhibit "A."**

### BSA Reports

11.     The BSA requires all "financial institutions" (as defined in 31 U.S.C. § 5312(a)(2) and 31 C.F.R. Chapter X) to file CTRs with FinCEN. 31 U.S.C. § 5313 Since the BSA first came into effect in the 1970s, the threshold amount for CTR filings has been $10,000 cash transactions at banks, casinos, MSBs, and similar financial institutions. *See*, *e.g.*, *Ibid.* and 31 C.F.R. Parts 1020 (banks), 1021 (casinos), and 1022 (MSBs); *see also* 37 F.R. 6818, 6912 (Apr. 5, 1972). As a result of these statutes and regulations, financial institutions electronically submit CTRs to FinCEN.

12.     Financial institutions, including MSBs, also have a duty to file Suspicious Activity Reports ("SAR(s)") to FinCEN for "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1).

/ / /

/ / /

13.     The U.S. Treasury Secretary has further developed regulations that require MSBs to file a SAR with FinCEN for any transaction:

> [C]onducted or attempted by, at, or through a money services business, involves or aggregates funds or other assets of at least $2,000 . . . and the money services business knows, suspects, or has reason to suspect that the transaction (or a pattern of transactions of which the transaction is a part):
>
> (i) Involves funds derived from illegal activity or is intended or conducted in order to hide or disguise funds or assets derived from illegal activity (including, without limitation, the ownership, nature, source, location, or control of such funds or assets) as part of a plan to violate or evade any Federal law or regulation or to avoid any transaction reporting requirement under Federal law or regulation
>
> (ii) Is designed, whether through structuring or other means, to evade any requirements of this chapter or of any other regulations promulgated under the Bank Secrecy Act; or
>
> (iii) Serves no business or apparent lawful purpose, and the reporting money services business knows of no reasonable explanation for the transaction after examining the available facts, including the background and possible purpose of the transaction. [sic]
>
> (iv) Involves use of the money services business to facilitate criminal activity.

31 C.F.R. § 1022.320(a)(2).

## Registration of MSBs with FinCEN

14.     Although banks, credit unions, and casinos are regulated at the state and federal levels, MSBs are unique among financial institutions because they alone must formally register with FinCEN as an MSB, via a form known as a "Registration of MSB" on FinCEN Form 107 (an "RMSB"). According to FinCEN, RMSBs are helpful in AML compliance because they assist with "mitigating the risk of criminal abuse of money services businesses." A true and correct copy of FinCEN Enforcement No. 2010-5 is attached hereto as **Exhibit "B."**

/ / /

/ / /

DECLARATION OF NONA RANGEL

15.     Within the broader BSA and FinCEN regulatory framework, the RSMB requirement:

> [S]eeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked. RMSB forms promote greater transparency with respect to [MSBs] that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, [FinCEN] and other government agencies. RMSB forms are also useful for money transmitters and other types of [MSBs] in establishing and maintaining banking relationships. Banking organizations, in keeping with their responsibilities under the [BSA], normally request registration information from money transmitters and other types of [MSBs] customers that are required to register.

*Ibid*.

16.     FinCEN is accordingly the primary federal regulator of MSBs. The RMSB registration obligation applies to a variety of businesses involved in "money services." The Code of Federal Regulations references no fewer than 7 different types of MSBs—ranging from money transmitters that primarily engage in person-to-person transfers of funds like Western Union, to the U.S. Postal Service. *See* 31 C.F.R. § 1010.100(ff). The United States Code defines an MSB even more broadly, covering any "money transmitting business" that:

> [P]rovides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of currency, funds, or value that substitutes for currency, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internationally outside of the conventional financial institutions system[.]

31 U.S.C. § 5330(d)(1)(A). Any MSB or money transmitting business that fails to file an RMSB is subject to criminal penalties. 18 U.S.C. § 1960. Violations of 18 U.S.C. § 1960 are punishable by 5 years' imprisonment, forfeiture (18 U.S.C. § 982(a)(1)), and can function as a predicate offense for both money laundering and RICO purposes

(18 U.S.C. §§ 1956(7)(A) and 1961(1)).

17.    Finally, by registering as an MSB through the filing of an RMSB, an MSB will also be subject to examination by the Treasury Department. These examinations scrutinize MSBs for BSA compliance, including the development of a written AML program that effectively and reasonably addresses money laundering and CFT risks. FinCEN worked with several federal and state regulators and MSB trade associations to develop a manual for examining MSBs and compliance with all facets of the BSA.[1]

## Use of BSA Reports

18.    While assigned to the FIBC in the Southern District of California, my fellow task force officers and I were able to access BSA Reports through a secure web connection after agreeing to FinCEN's terms of use. We had direct access to the FinCEN Portal, with the ability to search transactions, individuals, and businesses who appeared on BSA Reports. For instance, once I had identified a target of the investigation, I routinely searched the FinCEN Portal for CTRs, SARs, RMSBs, and other BSA Reports by entering any known identifiable information. We searched the FinCEN Portal on our computers in the Southern District of California by inputting information as varied as name, address, taxpayer identification number ("TIN"), social security number ("SSN"), passport number, driver's license number, and other categories of information that were unique to a transactions, individual, or business.

19.    Upon finding a potentially useful BSA Report in the FinCEN Portal, all unique information was hyperlinked. We were able to click on that hyperlink to find all other BSA Reports with that same piece of information. For instance, if the relevant BSA Report was a CTR, which involved a suspicious business, the FinCEN Portal user can click on the business's TIN, or the SSN of the business's owner, to find all other BSA Reports—every SAR, CTR, CMIR, etc.—that contained the same TIN or SSN. From there, every hyperlink had the potential to reveal additional bank accounts

---

[1] See https://www.fincen.gov/sites/default/files/shared/MSB_Exam_Manual.pdf.

on which a CTR or SAR has been filed, or links to a CMIR or RMSB in the name of certain businesses or individuals. From this information, the FIBC task force officers built our financial crimes investigations, prepared and served grand jury subpoenas for more formal process and production of financial records, and pursued the investigation in coordination with our law enforcement partners.

20.     Critically, all of the FIBC task force officers were trained in complex financial investigations. This was necessary because these investigations were considered the most challenging types of investigations to prosecute—reverse, international money laundering, involving records of transactions that had already taken place and funds that had already been transferred out of the subject account or even out of the U.S. banking system. As noted in the next section, these investigations routinely involved dozens of bank accounts, across multiple banks and different financial institutions, involving all manner of financial transactions, by multiple individuals and businesses who operated in extremely fast and sophisticated ways such that it was difficult, time-consuming, and often frustrating to unravel.

21.     Stated differently, not just any law enforcement agent could develop a successful criminal investigation from BSA Reports. The FIBC task force officers were, to my knowledge, the only law enforcement agents in the Southern District of California who were primarily dedicated to prosecuting financial crimes with BSA Reports at the heart of their investigations. It was common for other agencies—based in Southern California, and the rest of the country—to request the FIBC's assistance, or to more formally partner with the FIBC, on their financial crimes.

22.     One final note about SAR-based investigations. FinCEN maintained "SAR Review Teams" in every federal district. A true and correct copy of relevant pages of FinCEN's Year in Review for 2022 is attached hereto as **Exhibit "C"** at 2. SAR Review Teams involved IRS-CI special agents reviewing SARs filed in a specific district, and then disseminating the most promising SARs to other federal, state, and local law enforcement agencies on a monthly, quarterly, or annual basis. For

instance, IRS-CI might find a SAR indicative of postage fraud and hand it to U.S. Postal Inspectors for further investigation. The FIBC was not a SAR Review Team. The FIBC had a dedicated Assistant U.S. Attorney, or two, who worked with the task force officers and IRS-CI to set the FIBC's priorities, develop investigations, and when appropriate, formally prosecute crimes and conduct law enforcement actions (i.e., issue grand jury subpoenas, apply for search and seizure warrants, and pursue criminal, civil, and administrative forfeiture proceedings).

**Notable FIBC Prosecutions**

23.     With this access to the FinCEN Portal, and as the FIBC developed greater experience using all types of BSA Reports in our complex financial crime investigations, we pursued increasingly challenging investigations. Below are a few of the more notable prosecutions, all in the Southern District of California, involving cross-border financial crimes and where BSA Reports played a critical role:

a.     U.S. v. Rabobank, N.A. (18-cr-614): $368 million penalty and guilty plea for bank's attempts to defraud its regulators about its deficient AML program, which resulted in hundreds of millions of dollars in untraceable cash, sourced from Mexico and elsewhere. The bank admitted that it had been aware that the suspicious transactions made by certain customers were indicative of international narcotics trafficking, organized crime, and money laundering. Despite this risk, the bank solicited businesses and individuals conducting these transactions, and failed to monitor or conduct adequate investigations into these suspicious transactions, as required under the BSA. One of the bank's vice presidents similarly admitted failures in maintaining an adequate BSA/AML compliance program.

b.     U.S. v. Jesus Vazquez Padilla, et al. (22-cr-1472, 1473, & 1551): $42 million of illicit proceeds, derived from narcotics, were transmitted through an unlicensed MSB, across at least 22 shell companies and 85 bank accounts. The primary money laundering technique was the use of "funnel accounts"—

9

depositing cash in a national bank at branches around the country, transferring those funds to other banks in a variety of ways (e.g., check, wire transfer, etc.), and then sending international wire transfers to Mexico. Three individuals were prosecuted, including for false tax returns and otherwise supporting the unlawful transactions.

c.    U.S. v. Global Gold Exchange, LLC, et al. (19-cr-2936): Multi-million dollar scheme to launder money through a gold-dealing business acting as an unlicensed MSB. The company unlawfully laundered cash and funds from a variety of sources—both lawful and unlawful—and fraudulently documented the transactions as "a complete gold transaction" through "an informal money transfer system engaged in facilitating the transfer of money domestically and internationally outside of the conventional financial institutions system, and did so without regard for the source, destination, purpose, or legality of the funds transmitted." The scheme had been effective enough for the defendants to claim that they had worked with a "local cartel out of Mexico."

d.    U.S. v. Nat'l Auto Parts Mexico, S.A. de C.V., *et al.* (13-cr-3283): Multi-million dollar scheme to evade CMIRs and CTRs through the use of a purported Mexico-based auto parts business. Over the course of a year and a half, the defendants imported from Mexico and deposited at banks in the Southern District of California more than a million dollars in cash. It was not uncommon for the defendants to make more than 5 cash deposits in a single day totaling more than $10,000, multiple days in a row, with the total amount of daily cash deposits often exceeding $30,000, and on occasion exceeding $40,000.

24.    I participated in many more investigations where the primary focus was on criminal actors using the financial system to launder unlawful proceeds, engage in financial crime, or evade taxes. All FIBC task force officers supported each other's investigations. This included extensive financial analysis, surveillance, interviews

with financial professionals and witnesses, and occasionally informants and undercover operations. Due to its proximity to Mexico, the majority of the FIBC's investigations involved cross-border transactions with Mexico, cash, and significant evidence that the transactions involved funds derived from narcotics transactions and were laundered for the benefit of Mexico-based transactional criminal organizations.

### SWB GTO Impact on Cross-Border Financial Crimes Investigations

25. Based on my training, experience, and knowledge of cross-border financial crimes, especially those that contain the hallmarks of money laundering for the benefit of transnational criminal organizations, the SWB GTO will have minimal to no—or even a detrimental—impact on these financial crime investigations. There are several reasons for this.

### The SWB GTO Misunderstands how Law Enforcement Uses BSA Reports in Cross-Border Financial Crimes Investigations

26. First and foremost, FinCEN's *Information Memorandum for Director Andrea M. Gacki* ("FinCEN Memo"), which is included in the administrative record in this case, fundamentally misunderstands how law enforcement uses BSA Reports and the FinCEN Portal in financial crimes investigations. *See* Doc. No. 18-2, at 4-20 a true and correct copy of the FinCEN Memo is attached hereto as **Exhibit "D."** CTRs involving cash transactions less than $200 would not, as claimed in the FinCEN Memo, "likely result in information highly useful in money laundering investigations." (Ex. D, at 8)—especially for investigations where millions of dollars in narcotics proceeds are first generated in the U.S. and then laundered and transmitted back to Mexico or other places in Latin America. Simply put, laundering millions of dollars in sub-$10,000 increments would be self-defeating because it would: (i) be too time-consuming to achieve the scale necessary to launder millions of dollars from around the country, and (ii) draw the scrutiny of all types of U.S.-based financial institutions—not just MSBs—well before the total amount of illicit cash could be converted to funds that would be transmitted internationally.

27.     A critical point to understand is that, in my experience, most financial institutions attempted to maintain compliant BSA/AML programs. From the largest international banks, to the smallest MSB near the U.S.-Mexico border, most financial institutions actively avoided money launderers, transnational criminal organizations, or otherwise turning a blind eye to unlawful transactions. The exceptions to that general rule were discovered relatively quickly, and prosecuted in the examples discussed above. In all of those cases, the volume of funds transacted was significant and all used banks and other depository institutions, as opposed to relying exclusively on an MSB or conducting sub-$1,000 transactions.

## CTRs Rarely, if Ever, Provide "Leads" for an Investigation

28.     Second, the FinCEN Memo is mistaken in concluding that the additional CTRs from the SWB GTO will "generate new leads" or "create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them." Ex. D, at 9. This is extremely unlikely for several reasons. Thousands of CTRs, SARs, and CMIRs are filed every month in the Southern District of California alone. No one at the FIBC was monitoring every one of those BSA Reports. Beyond being physically impossible to keep up with the flood of reports, the CTRs and CMIRs were particularly devoid of context. They're just names, dates, locations, and amounts of individual transactions. Adding thousands more CTRs, especially at sub-$1,000 levels would merely add to the massive pile of BSA Reports that few law enforcement agencies are reviewing in the first place.

29.     To that end, the FIBC prioritized large, sophisticated, and high-volume money laundering schemes; those which were on their face reflective of professional criminal transactions on behalf of transnational criminal organizations. Financial crimes investigations are complex and time-consuming. It was not uncommon for a money laundering scheme to require multiple years before charging a business or individuals with a crime. As a result, prioritizing the most egregious financial crimes allowed the FIBC and the U.S. Attorney's Office to have the greatest impact—not

only by prosecuting the individuals that were laundering illicit proceeds or turning a blind eye to it, but also by sending a message of deterrence to the smaller-scale money laundering operations.

30. Moreover, the "comprehensive networks of potential money mules" referenced in the FinCEN Memo ultimately need the resources and access to the financial system provided by banks to accomplish their money laundering, especially for the "funnel account" activity. Ex. D, at 9. Of course, there may be examples of a CTR filed by an MSB for a sub-$1,000 cash transaction that "has the potential to augment an investigation" but this would be of limited value. The reason for its limited value is that the investigation is most likely to have started with a more direct source of information: cooperating defendant(s); an informant or whistleblower; a phone call from a bank; or a SAR. That's where the majority of the FIBC's investigations began, though I am not allowed to disclose when or if a SAR was filed in any specific case due to confidentiality provisions in the BSA. 31 U.S.C. § 5318(g)(2)(ii).

31. Nearly all of the individuals and entities that were investigated during my time as a special agent on the FIBC, either by me or other agents, and subsequently prosecuted, were reported by banks rather than MSBs. And even finding a CTR for this amount would not generate a new "lead" because the MSBs themselves maintain their own business bank accounts at a federally-regulated depository institution. Those banks must conduct regular due diligence of their customers, as required under the BSA, especially high-risk accountholders and customers like MSBs near the Southwest Border. In short, an investigation is significantly more likely to discover a money laundering connection to an MSB through a bank's SAR or otherwise through information received from an informant or basic surveillance.

## SARs are Significantly More Valuable than Other CTRs

32. Third, but somewhat related, very few, if any, of the FIBC's investigations began from a CTR, CMIR, RMSB, or other BSA Report. Indeed, very few actually started with a SAR. This is not to discount the value of BSA Reports. But

13

their utility is frequently a secondary consideration, following the original source of different information. As mentioned above, the volume of BSA Reports along the southwest border is immense. Daily monitoring of all of them was impossible. It would have been difficult just to stay up to date on the CTRs, CMIRs, and SARs with values over $100,000.

33.    We typically only searched the FinCEN Portal upon learning that a person or business might have engaged in significant financial crimes. The BSA Reports then provided several pieces of helpful information to develop the investigation at an early stage, for instance: where the target of the investigation banked, allowing the issuance of grand jury subpoenas for banking records and potential surveillance; and additional persons or accounts conducting financial transactions with a subject bank account; the home or business address associated with the bank account.

34.    Notably, SARs provide the much of same information as CTRs— locations of cash transactions, who conducted those transactions, and when—but add critical analysis. SARs included additional accounts involved in the suspicious activity, a time period of the activity, a total amount involved, and theory of the suspicious activity (i.e., tax evasion, human trafficking, fraud, etc.). None of this information appear on a sub-$1,000 CTR at an MSB because they simply don't service these types of transactions and also don't have the time to dedicate to this type of internal investigation and analysis.

35.    For that reason, requiring MSBs to file an abundance of CTRs will more likely have a detrimental impact on BSA/AML compliance. Some of the most effective investigations that the FIBC led involved SARs that required significant time and analytical resources by the financial institutions who filed them. Many of these SARs included comments from the front line bank tellers and managers who spoke directly to the person suspected of engaging in financial crime. If the financial institution were consumed by more basic, low-threshold CTR preparation and filings,

DECLARATION OF NONA RANGEL                                        Case No. 3:25-cv-00886-JLS-DDL

1   the number of SARs would likely decrease. Even worse, the front line staff would be
2   too busy preparing and filing CTRs to take the time to ask more questions of the person
3   engaged in the suspicious transaction—further reducing the value of the already
4   reduced number of SARs.

**Enough Information Already Resides on the FinCEN Portal**

6       36.    Finally, with the advances in technology, I do concede that law
7   enforcement might have a greater ability to analyze the significant amount of
8   information contained in BSA Reports and conduct increasingly more "targeted
9   investigations and prosecutions of suppliers and facilitators that enable the flow of
10  deadly drugs such as fentanyl into the United States." Ex. D, at 9. As a resident with
11  family in the Southern District of California and a former law enforcement agent, I
12  am eager to see transnational criminal organizations, money launderers, and drug
13  dealers fully prosecuted for their crimes. But the CTRs, CMIRs, RMSBs, SARs, and
14  other BSA Reports currently on the FinCEN Portal already provide law enforcement
15  the opportunity to analyze all the necessary information to identify and prosecute
16  large-scale money laundering operations.

17      37.    The FIBC also contracted with some of the most sophisticated software
18  companies in the world, as well as financial analysts and global consultancies, to assist
19  with financial analysis of BSA Reports. All of their resources, training, sophistication,
20  and education did not initiate a single investigation. Instead, the software and the
21  financial analysts incorporated BSA Reports to expand the investigation. They did this
22  by expediting the review and analysis of transactional records. In some cases, the
23  software could search the FinCEN Portal for additional BSA Reports, which led to
24  additional bank accounts that were eventually obtained through grand jury subpoenas
25  and analyzed by FIBC task force officers and analysts.

26      38.    Ultimately, however, we learned that there was no shortcut or magic
27  wand to wave in complex financial crimes investigations. This is because BSA
28  Reports all mention something that happened in the past—i.e., cash transactions. If

DECLARATION OF NONA RANGEL                                    Case No. 3:25-cv-00886-JLS-DDL

the SWB GTO is attempting to identify cash transactions related to already-imported and sold narcotics, and the proceeds were later sent internationally back to Mexico or wherever the transnational criminal organization operated, then the only way to prove this is through a massive amount of manpower, creativity, and experience.

39.    A sub-$1,000 exchange of currency at an MSB is merely one step in long series of international money laundering transactions. To reach the point of convincing a jury that an individual or business engaged in unlawful conduct beyond a reasonable doubt, law enforcement needs precise and nearly-undeniable evidence.

40.    While I applaud the U.S. government's desire to prosecute this type of crime through the SWB GTO, it is unfortunately more likely to have a detrimental impact on those efforts rather than abet them. The SWB GTO misunderstands how law enforcement uses BSA Reports effectively, and fails to appreciate the functional uselessness of CTRs at MSBs for less than $10,000, in a few ZIP codes near the border. The money laundering that the FIBC prosecuted were high-volume, highly-sophisticated, nimble, and professional organizations—the same organizations targeted by the SWB GTO. Ex. D, at 9. Their money laundering techniques changed rapidly and effectively depending on what law enforcement knew and investigated. The SWB GTO will do nothing to change that.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 6, 2025 in San Marcos, California.



_____

Nona Rangel

**EXHIBIT "A"**

Declaration of Nona Rangel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



An official website of the United States Government  Here's how you know ˅

# FINANCIAL CRIMES     ENFORCEMENT NETWORK

HOME | ABOUT ˅ | RESOURCES ˅ | NEWSROOM ˅ | CAREERS ˅ | ADVISORIES     [Search]

**Resources**

- Alerts/Advisories/Notices/Bulletins/Fact Sheets
- Bank Secrecy Act Filing Information
- Beneficial Ownership Information Reporting
- COVID-19 Information
- Financial Trend Analyses
- Financial Institutions
- FinCEN Exchange
- Innovation
- International
- Law Enforcement
- Ransomware
- SAR Stats
- Scams
- Statutes and Regulations
- Suspicious Activity Report (SAR) Advisory Key Terms

## QUICK LINKS

- Benefits of Using BSA E-Filing
- Log into BSA E-Filing
- Useful Information for Filing
- Chapter X Main Page
- Webinar on the FinCEN SAR
- Webinar on the FinCEN CTR and DOEP
- Webinar on the Introduction to the BSA E-Filing System
- Webinar on the Updated BSA E-Filing Technical Specifications for FinCEN's New SAR, CTR, and DOEP

## RELATED FAQs

- Mandatory E-Filing FAQs
- FinCEN CTR FAQs
- FinCEN SAR FAQs
- BSA FAQs
- FinCEN FAQs on Cyber-Events

**Ready to E-File?**
Visit the BSA E-Filing System to file your reports.

[Go to BSA E-File]

**Get FinCEN News Updates**
Stay Informed with FinCEN Updates

[Subscribe]

# Bank Secrecy Act Filing Information

## BSA E-FILING SYSTEM
## FINANCIAL CRIMES ENFORCEMENT NETWORK
### Welcome to the BSA E-Filing System

REMINDER: As of April 1, 2013, financial institutions must use the new FinCEN reports, which are available only electronically through the BSA E-Filing System. FinCEN is no longer accepting legacy reports. For more information, click here.

To File a BSA report please visit us at BSA E-Filing System

To view a BSA report or test your batch filing program please visit us at BSA E-Filing Test System. Do not mail or electronically attempt to file a test report.

## Bank Secrecy Act Forms and Filing Requirements

- ▸ FinCEN SAR Form 111
- ▸ FinCEN CTR Form 112
- ▸ FinCEN DOEP Form 110
- ▸ FinCEN RMSB Form 107
- ▸ FinCEN 8300 (Cash Over 10K Received in Trade/Business)
- ▸ CMIR 105
- ▸ Customer Due Diligence (CDD) – APPENDIX A - Certification Form
- ▸ FBAR (Foreign Bank Account Report) 114

Home    Resources    Contact
About    Careers    Newsroom
Contract Opportunities    Get News Updates    Languages

   

USA.gov | Regulations.gov | Treasury.gov | IRS.gov | Freedom of Information Act (FOIA) | NO FEAR Act | Vote.gov | Accessibility | Office of Equal Opportunity | Privacy Policy | Public Posting Notice of Finding of Discrimination | Security and Vulnerability Disclosure Policies (VDP) | Office of Inspector General

**EXHIBIT "B"**
Declaration of Nona Rangel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
FINANCIAL CRIMES ENFORCEMENT NETWORK

| | | |
|---|---|---|
| IN THE MATTER OF: | ) | |
| | ) | |
| | ) | |
| BALTIC FINANCIAL SERVICES, INC. | ) | Number 2010-5 |
| MONTCLAIR, NEW JERSEY | ) | |

## ASSESSMENT OF CIVIL MONEY PENALTY

### I.   INTRODUCTION

Under the authority of the Bank Secrecy Act and regulations issued pursuant to that Act, the Financial Crimes Enforcement Network has determined that grounds exist to assess a civil money penalty against Baltic Financial Services, Inc. ("Baltic" or the "Money Services Business").[1]   To resolve this matter, and only for that purpose, Baltic has entered into a CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") without admitting or denying the determinations by the Financial Crimes Enforcement Network, as described in Sections III and IV below, except as to jurisdiction in Section II below, which is admitted.

The CONSENT is incorporated into the ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by this reference.

### II.   JURISDICTION

Baltic is an independent money transmitter, located in Montclair, New Jersey.  The privately owned company is a New Jersey corporation, with assets amounting to approximately $76,000. Baltic markets funds transfer services to and from Latvia, a "major money laundering country."[2]  At all relevant times, Baltic was a "money services business," "money transmitter" and "financial institution" within the meaning of the Bank Secrecy Act and its implementing regulations.[3]  The Internal Revenue Service, Small Business/Self-Employed Division examines money services businesses for compliance with the Bank Secrecy Act, under delegated authority from the Financial

---

[1] 31 U.S.C. § 5311 et seq. and 31 C.F.R. Part 103.

[2] United States Department of State International Narcotics Control Strategy Reports ("INCSRs") for 2006, 2007, 2008, 2009, and 2010 identified Latvia as a "major money laundering country."  The term means a country whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking.  22 U.S.C. § 2291(e)(7).

[3] 31 U.S.C. § 5312(a)(2) and 31 C.F.R. § 103.11.

Crimes Enforcement Network.[4]  The State of New Jersey Department of Banking and Insurance examines money services businesses for compliance with anti-money laundering requirements, under laws of the State of New Jersey.

III.   DETERMINATIONS

The Financial Crimes Enforcement Network has determined that Baltic violated Bank Secrecy Act registration requirements for money services businesses.[5]  Since 2001, the Bank Secrecy Act has required certain money transmitters to register with FinCEN by filing a registration of money services business ("RMSB") form, and renewing the registration every two years.  If the money services business' ownership or number of agents changes, a re-registration requirement may apply.

Bank Secrecy Act compliance by money services businesses is a critical part of the government's efforts against money laundering, terrorist financing, and other financial crimes.  Bank Secrecy Act forms, including RMSB forms, must be filed in an accurate, complete and timely manner.  The registration requirement is an initial and foundational step required as part of the Financial Crimes Enforcement Network's regulations that are intended to assist law enforcement and other government agencies in the enforcement of criminal, tax and regulatory laws, and to prevent money services businesses from engaging in, or being misused to facilitate, the flow of illicit proceeds.[6]  By mitigating the risk of criminal abuse of money services businesses, the Financial Crimes Enforcement Network's regulatory framework seeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked.  RMSB forms promote greater transparency with respect to money services businesses that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, the Financial Crimes Enforcement Network and other government agencies.  RMSB forms are also useful for money transmitters and other types of money services businesses in establishing and maintaining banking relationships.  Banking organizations, in keeping with their responsibilities under the Bank Secrecy Act, normally request registration information from money transmitters and other types of money services business customers that are required to register.[7]

At all relevant times, Baltic conducted business as an independent money transmitter, and had knowledge of Bank Secrecy Act registration requirements.  Baltic provides money transfer services in any amount to and from Latvia.  In a typical transaction, the customer would complete a

---

[4] 31 C.F.R. § 103.56(b)(8).

[5] 31 U.S.C. § 5330 and 31 C.F.R. § 103.41.

[6] *See* Amendment to the Bank Secrecy Act Regulations-Definitions Relating to, and Registration of, Money Services Businesses, 64 FR 45438 (August 20, 1999).

[7] A money services business should retain a copy of RMSB forms it submitted to the Financial Crimes Enforcement Network, as part of its records, for five years. Determinative evidence of a money services business' registration is an acknowledgement letter sent by the Internal Revenue Service-Enterprise Computing Center-Detroit upon receipt, and appropriate processing, of a RMSB form. The Financial Crimes Enforcement Network's website, www.fincen.gov, contains a "MSB Registration List," identifying money services businesses that are currently registered. The MSB Registration List is updated monthly, and provided as a general reference for the public.

form[8] provided by Baltic, and provide Baltic with cash, check or money order payable to Baltic in U.S. dollars for the amount of the transaction and applicable service fees. The form would typically contain the names, addresses, and telephone numbers for the customer and beneficiary to the transaction including an alternate contact person's name and phone number in the event the beneficiary could not be reached as well as an indication if physical delivery by a Baltic agent in Latvia would be required. Baltic would deposit the cash, checks or money orders provided by the customer in its financial institution account. Once the funds cleared and became available, Baltic would instruct the financial institution to wire transfer the funds to a designated financial institution in Latvia. Baltic's agent would retrieve the funds from the designated financial institution and make the funds physically available to the beneficiary. The funds would be provided in U.S. dollars or a designated currency. The Baltic agent would check identification and obtain the beneficiary's signature in processing the disbursement of funds to the beneficiary. Baltic would also provide the above described process in reverse order to accommodate customer transactions originating in Latvia with beneficiaries in the United States. Baltic filed RMSB forms with the Financial Crimes Enforcement Network in 2001 and 2003. Afterwards, however, Baltic repeatedly failed to comply with biennial renewal requirements in a timely manner, despite notifications that it was not in compliance with Bank Secrecy Act registration requirements for money transmitters.[9] In fact, for a majority of the time between January 2005 and September 2010 Baltic conducted business as an unregistered money transmitter, in violation of the Bank Secrecy Act.

IV.    CIVIL MONEY PENALTY

As administrator of the Bank Secrecy Act, the Financial Crimes Enforcement Network may impose civil money penalties against Baltic, or any person who owns or controls Baltic, for violations of money transmitter registration requirements.[10] The Financial Crimes Enforcement Network may assess a civil money penalty for failure to register as a money services business, in an amount up to $5,000 per violation. Each day a violation continues constitutes a separate violation. The Financial Crimes Enforcement Network has determined that a civil money penalty is due for the violations of the Bank Secrecy Act and its implementing regulations described in this ASSESSMENT. After considering the seriousness of the violations and the financial resources available to Baltic, the Financial Crimes Enforcement Network has determined that the appropriate penalty in this matter is $12,000. This civil money penalty shall be satisfied by four $3,000 payments to the United States Department of the Treasury.

V.    CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Baltic, without admitting or denying either the facts or determinations described in Sections III and IV above, except as to jurisdiction in Section II which is admitted, consents to the assessment of a civil money penalty in the sum of $12,000, which shall be satisfied by four $3,000 payments to the United States Department of the Treasury. Baltic shall pay the first $3,000 installment within five business days of the date of this

---

[8] The form is called by Baltic the "Agreement for the Transfer of Funds."
[9] Baltic filed renewals during 2006 and 2010, instead of renewing in 2005, 2007, and 2009 as required by the registration regulation and instructions to the RMSB form. *See* 31 C.F.R. § 103.41(b)(2).
[10] *See* 31 U.S.C. § 5330(e) and 31 C.F.R. § 103.41(e).

ASSESSMENT, and the second, third and fourth $3,000 installments within ninety (90), one hundred and eighty (180), and two hundred and seventy (270) calendar days respectively.

Baltic recognizes and states that it enters into the CONSENT freely and voluntarily and that no offers, promises, or inducements of any nature whatsoever have been made by the Financial Crimes Enforcement Network or any employee, agent, or representative of the Financial Crimes Enforcement Network to induce Baltic to enter into the CONSENT, except for those specified in the CONSENT.

Baltic understands and agrees that the CONSENT embodies the entire agreement between the Money Services Business and the Financial Crimes Enforcement Network relating to this enforcement matter only, as described in Section III above. Baltic further understands and agrees that there are no express or implied promises, representations, or agreements between the Money Services Business and the Financial Crimes Enforcement Network other than those expressly set forth or referred to in this document and that nothing in the CONSENT or in this ASSESSMENT is binding on any other agency of government, whether Federal, State, or local.

VI.    RELEASE

Baltic understands that execution of the CONSENT, and compliance with the terms of this ASSESSMENT and the CONSENT, constitute a complete settlement and release of the Money Services Business' civil liability for violations of the Bank Secrecy Act and regulations issued pursuant to that Act as described in the CONSENT and this ASSESSMENT against Baltic.


By:


_____/s/_____

James H. Freis, Jr., Director
FINANCIAL CRIMES ENFORCEMENT NETWORK
United States Department of the Treasury


Date:

_____December 13, 2010_____

**EXHIBIT "C"**

Declaration of Nona Rangel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

# Financial Crimes Enforcement Network (FinCEN)
## Year in Review for FY 2022



*The mission of FinCEN is to safeguard the financial system from illicit use, combat money laundering and its related crimes including terrorism, and promote national security through the strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.*

# FinCEN Year in Review for FY 2022

## Bank Secrecy Act Data Advances Law Enforcement Mission*

### Internal Revenue Service – Criminal Investigation

**FY22**
**15.8%** of all investigations were the direct result of BSA data

**FY22**
**84.2%** of all investigations have BSA filings related to the primary subject

**FY20-FY22**
**83.2%** of all investigations recommended for prosecutions have a primary subject with a related BSA filing

The average sentence was **38 months**

**$7.7B** in asset seizures

**$225M** in asset forfeiture & **$256M** in restitution

### U.S. Department of Justice (DOJ)

DOJ has run millions of queries in the past six years

| BSA filings from 10/1/20 to 7/31/22 supported a significant portion of FBI-led investigations | | | | | |
|---|---|---|---|---|---|
| **46%** of active transnational *organized crime* investigations | **39.6%** of active Organized Crime Drug Enforcement Task Force investigations with FBI participation | **36.3%** of active *complex financial crimes* investigations | **27.5%** of active *public corruption* investigations | **20.6%** of active *international terrorism* investigations | **15.7%** of active FBI investigations |

### Suspicious Activity Report (SAR) Review Teams

SAR review teams consist of DOJ attorneys and law enforcement with the aim to prevent future terrorist attacks, disrupt and dismantle criminal enterprises, combat money laundering, strengthen the U.S. financial system through the enforcement of the BSA, facilitate interagency cooperation and information sharing, gather intelligence, and improve communications among law enforcement agencies and the financial community. SAR review teams generally meet to discuss their analysis of recent SAR filings, share information, deconflict potential targets, refer SARs to other agencies for follow-up, and provide feedback to financial institutions in their districts, among other things.

SAR review teams cover most of the **94** federal judicial districts and reported the following:

many investigations originate wholly from SARs.

many crimes would never be discovered without BSA data.

BSA reports yield valuable information about targets' specific financial activities, which can, in turn, lead to the identification of, among other things; (i) other targets; (ii) assets for seizure and forfeiture; and (iii) victims.

*"HSI* special agents are committed to using all legally available tools, information, and resources to **protect the Homeland**. **BSA data**, when combined with other investigative information, can **illuminate crimes** committed by transnational criminal organizations: child exploitation, cybercrime, narcotics, human smuggling, weapons trafficking, and various financial crimes. We will continue to **leverage BSA data** in the suite of tools HSI utilizes to **protect the American people** from dynamic transnational threats.*"

*– Steve Francis, HSI Acting Executive Associate Director*

*All statistics are approximate.

**EXHIBIT "D"**
Declaration of Nona Rangel in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



Financial Crimes Enforcement Network
U.S. Department of the Treasury

_Global Investigations Division_ │ _Washington, D.C. 20220_

March XX, 2025

**INFORMATION MEMORANDUM FOR DIRECTOR ANDREA M. GACKI**

(U) **THROUGH:**         Matthew R. Stiglitz
                         Associate Director

                         Amanda Joca
                         Deputy Associate Director

                         Chase Lubbock
                         Office Director, Western Hemisphere

(U) **FROM:**            Kieran Murray and Shannon Mizzi
                         Global Investigative Specialists

(U//~~FOUO~~) **SUBJECT:**    Administrative Record for Geographic Targeting Order for Cash
                         Transactions at Southwest Border Money Services Businesses

**I.**      (U) <u>**Executive Summary**</u>

(U//~~FOUO~~) The Global Investigations Division (GID) of the Financial Crimes Enforcement
Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommends the
issuance of a public Geographic Targeting Order (GTO) to address cash-based money laundering
along the southwest border, including by Mexican drug cartels—including cartels linked to illicit
opioid trafficking.  This GTO would lower the threshold for filing Currency Transaction Reports
(CTRs) to $200 for money services businesses (MSBs) located in 30 ZIP codes along with
southwest border.  These ZIP codes are in two counties in California (Imperial and San Diego
counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties).
The GTO would carry out the purposes of the Bank Secrecy Act (BSA), 31 U.S.C. 5311 _et seq_,
by collecting data that is expected to be highly useful to law enforcement for case generation,
ongoing investigations, and prosecutions targeting Mexican drug cartels, which are both drug
trafficking organizations (DTOs) and transnational criminal organizations (TCOs) and would
assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting

MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States.

## II.     (U) **Applicable Authority**

(U) FinCEN would issue the proposed GTO pursuant to 31 U.S.C. 5326 ("section 5326"). Section 5326 authorizes the Secretary of the Treasury (Secretary), upon finding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof," to issue an order requiring "nonfinancial trades or businesses in a geographic area" to:

(1) Obtain specified information concerning any transaction in which such nonfinancial trades or businesses are involved "for the payment, receipt, or transfer of funds" and "any other person participating in such transaction;"

(2) "Maintain a record of such information" for the period set out in the order; and

(3) File a report regarding any such transaction "in the manner and to the extent specified in the order."[1]

(U) The purposes of the BSA include, but are not limited to, "requir[ing] certain reports … that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering … risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States."[2]  The authority of the Secretary to administer the BSA and its implementing regulations has been delegated to FinCEN.[3]

(U) Section 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed.[4]

---

[1] (U) 31 U.S.C. 5326(a); *see also* 31 CFR 1010.370(a).
[2] (U) 31 U.S.C. 5311(1)(A), (3) and (4).
[3] (U) Treasury, Treasury Order 180-01 (Jan. 14, 2020).
[4] (U) 31 U.S.C. 5326(d).

000005

## III.   (U) **Background**

### A.  (U) **FinCEN's Regulation of MSBs**

(U) An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, travelers' checks, or pre-paid access products for an amount greater than $1,000 per person, per day, in one or more transactions.  All persons that engage in the transfer of funds as a money transmitter are also considered MSBs, regardless of the amount of money transmission activity.[5]

(U) Every MSB must register with FinCEN by electronically filing FinCEN Form 107, Registration of Money Services Business, unless a person or business is only an MSB because they serve as an agent of another MSB.[6]  The MSB's owner or controlling person must register by the end of a 180-day period beginning the day after the date they established the MSB.[7]  They are also required to renew their MSB registration each two-calendar-year period following the initial registration by filing another Form 107.[8]  Although agents are not required to register as MSBs, any MSB must prepare and maintain—but not file with FinCEN—a list of its agents.[9]  There are persons who violate these rules by operating as MSBs without registering with FinCEN, often because they are engaging in illicit activity.  FinCEN and law enforcement agencies target such persons for enforcement measures.

(U) All MSBs (including those that are agents, rather than principals) must electronically file CTRs when they have a cash-in or cash-out currency transaction, or multiple transactions, totaling more than $10,000 during one business day for any one person, or on behalf of any one person.[10]  All individuals (except employees of armored car services)[11] conducting a transaction reportable on a CTR, for themselves or for another person, must be identified by means of an official document, such as a driver's license.[12]  CTRs collect information necessary to identify the person or entity on whose behalf the transaction is being conducted; the identity of the person conducting the transaction, if different; payment information; information about the relevant MSB or agent conducting the transaction (name, address, and identification number of the person

---

[5] (U) 31 CFR 1010.100(ff).
[6] (U) 31 CFR 1022.380(a).
[7] (U) 31 CFR 1022.380(b)(3).
[8] (U) 31 CFR 1022.380(b)(2).
[9] (U) 31 CFR 1022.380(d).
[10] (U) 31 CFR 1022.300-313.
[11] (U) FinCEN, FIN-2013-R001, "Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes" (July 12, 2013), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/2024-02-02/FIN-2013-R001.pdf.
[12] (U) 31 CFR 1022.312.

000006

or entity conducting the transaction). The persons conducting transactions reportable on a CTR are prohibited from structuring the transaction to evade the reporting requirement, such as by splitting transactions into smaller amounts in an attempt to evade the $10,000 reporting threshold.[13]

(U) All MSBs are required to develop, implement, and maintain an effective AML/CFT compliance program. The program should be reasonably designed to prevent individuals from using the MSB to facilitate money laundering or to finance terrorist activities. Each program must be written and take into account the inherent risks of the business, as well as:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA;

- Designate a person to assure day-to-day compliance with the BSA;

- Provide education and training to appropriate personnel; and

- Provide for an independent review to monitor and maintain an adequate program.[14]

(U) Generally, MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is suspicious and involves $2,000 or more, must electronically file a FinCEN Form 111, Suspicious Activity Report (SAR), on the activity.[15]

(U) MSBs are required to retain certain records with respect to transmittals of funds for $3,000 or more;[16] purchases of bank checks or drafts, cashier's checks, money orders or traveler's checks for $3,000 or more in currency;[17] and prepaid access.[18]

### B. (U) **Vulnerabilities of MSBs to Money Laundering**

(U) While most of the business that MSBs conduct is legitimate and essential, MSBs are vulnerable to exploitation by money launderers. Treasury's 2024 National Money Laundering Risk Assessment (NMLRA) identified the illicit financial activities of drug cartels, as a major risk to MSBs and other types of financial institutions.[19] And, FinCEN has identified money

---

[13] (U) 31 CFR 1022.314.
[14] (U) 31 CFR 1022.210.
[15] (U) 31 CFR 1022.320.
[16] (U) 31 CFR 1010.410.
[17] (U) 31 CFR 1010.415.
[18] (U) 31 CFR 1022.420; 31 CFR 1022.210 (d)(1)(iv).
[19] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 ("The illicit financial activities of DTOs pose risks to banks, [MSBs], and other entities, such as real estate agents and attorneys."), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000007

transfers through MSBs as a financial typology associated with Mexico-based drug cartels and their illicit procurement of fentanyl precursor chemicals and manufacturing equipment.[20]

(U//FOU) MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border.  Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.[21]  To enable their efforts to traffic fentanyl and other opioids and to launder their funds back to Mexico, these and other drug cartels have gained functional control, through violence, of nearly

---

[20] (U) FinCEN, "Supplemental Advisory on the Procurement of Precursor Chemicals and Manufacturing Equipment Used for the Synthesis of Illicit Fentanyl and Other Synthetic Opioids," (June 20, 2024), pp. 8-9 ("Money transfers through banks, MSBs, and online payment processors are a common financial typology associated with TCOs' procurement of fentanyl precursor chemicals and manufacturing equipment.  These transactions may be sent from Mexico or the United States to mainland [China] (including via Hong Kong and other jurisdictions) to individuals and shell and front companies associated with either a [China]-based supplier or a chemical broker.  While some money transfers are sent from TCOs in Mexico to [China]-based suppliers without crossing the U.S. financial system, many of these foreign transactions are cleared in U.S. dollars through U.S. correspondent banks, Mexico- and [China]-based agents of U.S. MSBs, and U.S. online payment processors."), *available at* https://www.fincen.gov/sites/default/files/advisory/2024-06-20/FinCEN-Supplemental-Advisory-on-Fentanyl-508C.pdf; *see also* Center for Strategic and International Studies, "Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact" (Jan. 15, 2025), ("The expanding volume of remittance transactions provides more than economic benefits to regular Mexicans; it also presents ample opportunity for exploitation.  Criminal organizations take advantage of the small-increment nature of remittance transactions to evade oversight regulations and launder money related to drug trafficking and other illicit income streams, a practice which has increased in frequency since the Covid-19 pandemic disrupted cross-border movement and the associated traditional methods of bulk cash smuggling.") *available at* https://www.csis.org/analysis/understanding-impact-remittances-mexicos-economy-and-safeguarding-their-future-impact.

[21] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.  *See The New York Times*, "The American Drug Mules Smuggling Fentanyl into the U.S." (Sep. 28, 2024) ("Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid.  The amount of fentanyl crossing the border has increased tenfold in the past five years.  Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years."), *available at* https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html; Brookings Institute, "US-Mexico Relations and the fight against fentanyl trafficking" (Oct. 8, 2024) ("Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cartel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl.  They make fentanyl from precursor chemicals that come from China.  These precursors arrived in Mexico.  The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border.  They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine.  And they really work until about the middle layer.  These groups are not the retailers themselves.  They hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States.  And also, they of course then move proceeds from the United States to Mexico as well as weapons."), *available at* https://www.brookings.edu/articles/us-mexico-relations-and-the-fight-against-fentanyl-trafficking/.

all illegal traffic across the southern border of the United States. In light of this fact, President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been named cartels as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[22] MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico.

(U) MSBs typically offer a limited range of services compared to other financial institutions, with many offering services tailored to persons without bank accounts. These MSBs are often agents of a larger MSB and offer MSB services as part of its operation as a corner store or chain retailer. The competitively priced services and convenient location offered near the border by such MSBs make them attractive for persons interested in using cash to fund money transmittals moving value across the border to Mexico, or to Central and South American countries, for both licit and illicit purposes.[23]

(U) MSBs offer a range of services, primarily built around exchanging currencies, cashing checks, receiving cash to fund money transmittals, and paying out cash to recipients of money transmittals. Due to the cash-intensive nature of this industry, it has become an avenue through which drug cartels move untraceable flows of value. For example, illicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico. Similarly, an MSB may be used to receive a money transmittal from anywhere in the United States, funneling the value to the southwest border, which can be cashed out and the value moved to Mexico.[24] Moreover, illicit actors may comingle licit and illicit cash, making dirty money even more difficult to detect for MSBs.

---

[22] (U) Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," 90 FR 8439, (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/; U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), *available at* https://www.state.gov/designation-of-international-cartels/.
[23] (U) D. Ore, "How Mexican narcos use remittances to wire U.S. drug profits home," *Reuters* (Aug. 18, 2023), *available at* https://www.reuters.com/investigates/special-report/mexico-drugs-remittances/.
[24] (U) FinCEN, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), p. 4 ("Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals. Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity. In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account…In some cases, victims also are coerced or forced to

000009

(U) Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including "money mules,"[25] to move funds to Mexico via U.S.-based MSBs, structured to evade reporting requirements (*i.e.*, keeping the amount of any individual cash transaction below the applicable reporting threshold to avoid identification and reporting requirements). Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations.[26]

(U) The services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer. For example, the owner of an MSB in California was convicted in 2024 for conspiracy to commit money laundering on behalf of the Jalisco New Generation Cartel, by knowingly laundering drug proceeds by accepting cash from drug dealers below the CTR threshold and wiring it to Mexico, disguising it to look like routine remittances.[27] Similarly, in 2017, the owners and employees of an MSB pleaded guilty to accepting cash that was represented as coming from drug sales, which, in exchange for a kickback, they agreed to launder to Mexico by breaking the transactions into smaller amounts, resulting in more than $40 million laundered over a roughly four-year timeframe.[28]

---

wire proceeds via [MSBs] to facilitate the funneling of proceeds."), *available at* https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf; FinCEN, "FinCEN Alert on Human Smuggling along the Southwest Border of the United States" (Jan. 13, 2023) ("Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border."), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Human%20Smuggling%20FINAL_508.pdf.

[25] (U) FBI, "Money Mules," *available at* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules.

[26] (U) *See, e.g.*, FinCEN, "Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids" (Aug. 21, 2019), pp. 3, 9 ("An analysis of sensitive financial data illustrates that when U.S. individuals purchase fentanyl directly from China and other foreign countries, they often structure the money transfers to evade [BSA] reporting and recordkeeping requirements. Individuals frequently transfer the funds using multiple MSB agent locations…Professional money laundering organizations hire loosely associated parties (including "money mules") to send money transfers to Mexico via U.S. MSBs, primarily money transmitters, structured to evade reporting requirements. In this context, structuring (*i.e.*, keeping the amount of the money transfer below the applicable threshold of $3,000 in order to avoid identification and reporting requirements) is accomplished through one of, or a combination of, the following: • The illicit proceeds are divided between multiple individuals who send the transfers; • An individual uses multiple MSB agent locations to send transfers; and/or • An individual sends multiple transactions consecutively."), *available at* https://www.fincen.gov/sites/default/files/advisory/2019-08-21/Fentanyl%20Advisory%20FINAL%20508.pdf.

[27] (U) Complaint, *United States v. Chavez Zepeda et al*, No. 2:22-cr-00064 (E.D. Cal., Mar. 14, 2022).

[28] (U) Indictment, *United States v. Perez et al*, No. 1:17-cr-00200 (N.D. Ga., June 16, 2016).

000010

IV.     (U) **Justification for the GTO**

(U//~~FOUO~~) This GTO is necessary to carry out the purposes of the BSA because the GTO, due to the money laundering risks discussed above, would likely result in information highly useful in money laundering investigations, especially in the context of the fentanyl crisis, discussed in Section IV.A.  The anticipated benefits of the GTO are discussed in Section IV.B.

   A.  (U) **Necessity to Address the Fentanyl Crisis**

(U) The supply and sale of fentanyl and other synthetic opioids is one of the greatest national security threats facing the United States.  Nearly 38,000 Americans died from fentanyl use in the first six months of 2023, and fentanyl and other synthetic drugs, including methamphetamine, account for nearly all fatal drug overdoses that occur in the United States.[29]  Drug cartels make billions of dollars in profit from the production and distribution of these drugs in the United States, enriching themselves, and allowing them to continue to traffic in drugs and other illicit goods, as well as expand their economic, political, and social influence.[30]  Drug cartels and the professional money launderers who support their illicit drug trafficking activities—including Chinese Money Laundering Organizations (CMLOs)—introduce smuggled and illicitly generated cash into the legitimate financial system, including through MSBs.[31]

   B.  (U) **Anticipated Benefits of the GTO**

(U//~~FOUO~~) As discussed above, MSBs along the southwest border are a point of vulnerability in the U.S. financial system.  MSBs are, wittingly and unwittingly, facilitating the movement of funds that finance fentanyl trafficking and the commission of other crimes by drug cartels, including Mexico-based cartels, that threaten the national security of the United States.  Drug cartels based in Mexico and other countries in Central and South America need to repatriate illicitly generated proceeds to benefit from their crimes and remain in business.  FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important

---

[29] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 1, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

[30] (U) Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), pp. 18-24 (describing the major money laundering by DTOs of proceeds generated from the trafficking of illicit synthetic opioids), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf; U.S. Drug Enforcement Administration, "National Drug Threat Assessment," (May 2024), pp. 46-50 (describing how DTOs launder profits, providing in part that "The Sinaloa and Jalisco cartels, and other global criminal networks, generate billions of dollars in profits from the sale of illicit drugs"), *available at* https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf.

[31] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 46 (describing how DTOs launder profits), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000011

avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings.[32]

(U//FOUO) By lowering the CTR threshold, the information reported under this GTO would help Treasury, including FinCEN and its fellow Office of Terrorism and Financial Intelligence components, as well as its law enforcement partners identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States. These additional GTO reports are expected to generate new leads and identify new and related subjects in ongoing cases. For example, the resulting reports may allow the identification of a comprehensive network of potential money mules in the geographic areas in question. They may also create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them—meaning that any increased monitoring of MSBs would likely capture information about the laundering of funds related to multiple criminal typologies. The GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls.

(U//FOUO) Finally, the parameters of this GTO, in particular the reduced dollar reporting threshold, will help make structuring more difficult, thereby increasing the cost of doing business for cartels. In addition, the GTO will help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules. Each piece of information collected on a CTR form has the potential to augment an investigation, including the transaction date and amount; the name, date of birth, Social Security Number or Taxpayer Identification Number, phone number, email address, occupation, identification number, and account number of the individual and/or entity sending and receiving funds; the location and business at which the transaction took place; and information about the filer.

**V.** (U) **Scope of the GTO**

    **A.** (U) **Covered Geographic Areas**

The GTO will initially cover the following ZIP codes near the U.S.-Mexico border in the states of California and Texas (the "Covered Geographic Area"), which were selected based on risk

---

[32] Homeland Security Investigations, "Issue #57," *Cornerstone* (Oct. 2024), *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/3babbe0; U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 49, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

000012

factors that include their proximity to the border and to a border crossing, and, based on a
FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is
high relative to the population, in comparison to other ZIP codes.  Therefore, GID assesses that
these same ZIP codes likely correspond to a large number of cash transactions below the $10,000
threshold, relative to other ZIP codes.  While MSBs in Arizona and New Mexico are likely also
vulnerable to exploitation by drug cartels, GID chose to keep this GTO limited in scope,
focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and
to be able to assess trends and effectiveness.  However, FinCEN may consider expanding this
GTO to ZIP codes in Arizona and New Mexico in the future.

*California*

| Zip Code | Rationale |
|----------|-----------|
| *Imperial County* ||
| 92231 | Borders Mexico; contains significant border crossings – Calexico West and Calexico East Ports of Entry; 1,570 CTRs filed for a population of 39,542, the highest CTR to population ratio in the county. |
| 92249 | 43 CTRs filed for a population of 6,975, the second highest CTR to population ratio in the county. |
| 92281 | 11 CTRs filed for a population of 2,122, the third highest CTR to population ratio in the county. |
| 92283 | Borders Mexico; contains a border crossing – Andrade Port of Entry; 13 CTRs filed for a population of 2,695, the fourth highest CTR to population ratio in the county. |
| *San Diego County* ||
| 91910 | 1,358 CTRs filed for a population of 79,613, the seventh highest CTR to population ratio in the county. |

000013

| 92101 | 2,142 CTRs filed for a population of 47,505, the fourth highest CTR to population ratio in the county. |
| 92113 | 930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the county. |
| 92117 | 1,394 CTRs filed for a population of 51,586, the fifth highest CTR to population ratio in the county. |
| 92126 | 4,752 CTRs filed for a population of 74,788, the third highest CTR to population ratio in the county. |
| 92154 | Borders Mexico; contains a significant border crossing – Otay Mesa Port of Entry; 6,494 CTRs filed for a population of 84,027 the second highest CTR to population ratio in the county. |
| 92173 | Borders Mexico; contains significant border crossings – San Ysidro Port of Entry and Cross Border Xpress; 2,793 CTRs filed for a population of 29,703, the highest CTR to population ratio in the county. |

*Texas*

| ZIP Code | Rationale |
| --- | --- |
| *Cameron County* | |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing – Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |
| *El Paso County* | |

000014

| | |
|---|---|
| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,0127, the fourth highest CTR to population ratio in the county. |
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |
| *Hidalgo County* | |
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

000015

| Maverick County | |
|---|---|
| 78852 | Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712. |
| **Webb County** | |
| 78040 | Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county. |
| 78041 | Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county. |
| 78043 | 364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county. |
| 78045 | Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county. |
| 78046 | 46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county. |

**B.** (U) **Covered Transactions**

(U//~~FOUO~~) The impact of the GTO would be to generally lower the existing threshold for filing CTRs from $10,000 to $200. Under the GTO, a covered Transaction would be any deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business (defined, here, as an MSB operating in the Covered Geographic Area), which involves a transaction in currency of more than $200 but less than $10,000. Because the GTO, except as noted therein, would not otherwise alter any currently applicable BSA requirement, money services businesses would still be required to file transactions in currency of more than $10,000. The $200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate. It would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas,

000016

allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances.

(U//~~FOUO~~) The GTO would retain the requirement to aggregate different cash transactions conducted by or on behalf of the same person during a single day, regardless of whether the additional cash transactions occur within the Covered Geographic Areas, but without lowering the $10,000 threshold. Aggregation is meant to detect structured transactions attempting to evade the filing threshold, but GID believes that the $200 filing threshold under the GTO largely negates the risks inherent in aggregation, as it would already capture the majority of cash transactions. Structuring below $200 to evade the requirement would make laundering large amounts of currency at the border more difficult and costly. Not requiring aggregation down to the $200 threshold also would help mitigate burdens on the Covered Businesses, as aggregation is inherently complicated.

(U//~~FOUO~~) GID does not expect that the lower reporting threshold will materially affect the flow of legitimate funds, including remittances, between the United States and Mexico. While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs. GID does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services (compared to which the Covered Businesses generally offer lower fees) and from MSBs outside of the Covered Geographic Areas.

(U//~~FOUO~~) GID recognizes that, due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity. FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO. Based on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP codes or counties in any future issuances. FinCEN anticipates some illicit actors may change the methods by which they launder money, including by attempting to launder illicit funds through banks over MSBs; FinCEN believes that this may be a benefit of the GTO, as banks have more stringent reporting and recordkeeping obligations than MSBs and would likely inform FinCEN of new suspicious activity.

000017

### C. (U) **Covered Businesses**

(U//FOUO) Any person that meets the definition of an MSB operating in the Covered Geographic Areas, as well the subsidiaries and agents of an MSB if such subsidiaries and agents are located in the Covered Geographic Area, would be considered a "Covered Business". MSBs are required to keep current lists of their agents and, as with other GTOs, MSBs would be responsible for communicating the order's requirements to its agents.

### D. (U) **Order Period**

(U) To provide the Covered Businesses time to comply with the GTO, the relevant period for the GTO would begin 30 days after the order is published and be in force for 180 days from that date.

### E. (U) **Analytic Plan**



000018

**V.** (U) **Conclusion**

(U//FOUO) For the foregoing reasons, GID believes that, by requiring reporting of high-risk cash transactions along the southwest border, the proposed GTO is necessary to carry out the purposes of the BSA. Accordingly, GID recommends issuing the proposed GTO.

000019

**Southwest Border Geographic Targeting Order Clearance Sheet**

Subject:   **Administrative Record for Geographic Targeting Order for Cash Transactions at
Southwest Border Money Services Businesses**

Drafted:     Global Investigations Division – Shannon Mizzi/Kieran Murray          (02/27/2025)

Approved:  FinCEN Director – Andrea Gacki                                          (MM/DD/YYYY)

Cleared:     Global Investigations Division – Associate Director Matthew Stiglitz     (02/28/2025)

               Office of Chief Counsel – Sean Boyce                                (03/04/2025)

               Principal Deputy Assistant General Council (E&I) –                   (MM/DD/YYYY)

000020

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Facsimile: 619.235.5351
Email: dsilva@buchalter.com
        asadeghi@buchalter.com
        dwilson@buchalter.com

Attorneys for Amicus Curiae
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-00886-JLS-DDL<br><br>**DECLARATION OF LEE JEFFREY ROSS, JR. IN SUPPORT OF AMICUS CURIAE'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:    May 15, 2025<br>Time:    9:00 a.m.<br>Dept.:    4D<br>Judge:    Hon. Janis L. Sammartino |

I, Lee Jeffrey Ross, Jr., declare as follows:

1.    After over 30 years of both public sector (U.S. Department of Justice and Department of the Treasury) and private sector (Green Dot Corporation and Green Dot Bank) anti-money laundering ("AML") and counter terrorist financing ("CFT") expertise, I retired from Green Dot, and currently provide consulting services leveraging that expertise to the financial industry, as well as other entities at risk for money laundering or terrorist financing. These decades of government and private sector experience in law enforcement, financial crimes, regulatory compliance, and AML laws, regulations, and best practices underpin my ability to counsel financial entities and other businesses on how best to ensure both strict compliance with AML

and Bank Secrecy Act ("BSA") laws and regulations, while most efficiently targeting potential systemic weaknesses in those particular financial entities to AML/CFT threats and risks.

2.    Throughout my legal and advisory career, I have served in a number of roles aimed at protecting the U.S. public and financial system from financial crime, money laundering abuses, including cash money laundering via structuring and bulk cash smuggling along the southwest border with Mexico.

## Professional Experience

3.    In 1991, then Criminal Division Assistant Attorney General Robert Mueller created a novel AML litigation section ("Money Laundering Section") in the Criminal Division of the Department of Justice, charged with both supporting and litigating AML statutes and regulations across all forms of federal crimes, including money laundering under 18 U.S.C. §§ 1956 and 1957, as well as the BSA. This new Money Laundering Section was created just after the Financial Crimes Enforcement Network's ("FinCEN") creation in 1990.  I was appointed to be one of the Deputy Chiefs of the Money Laundering Section in 1991. A primary focus of the Money Laundering Section was to support the various U.S. Attorney's Offices to investigate underutilized provisions in the BSA, such as the Geographic Targeting Order ("GTO") regulatory scheme (31 U.S.C. § 5326(a) and 31 C.F.R. § 1010.370), especially where the investigations concerned cash money laundering.

## The First GTO—New York City in 1996

4.    During 1995, I served as the Acting Chief of the Money Laundering Section, and, from October 1995 to September 2001, I served as the AML Special Assistant to the Deputy Assistant Attorney General of the Criminal Division of the Department of Justice, Mary Lee Warren. While in that position I had the opportunity to work on the first significant application of the GTO provision and its associated BSA regulations ("NYC GTO").

/ / /

5.     In 1996, an AML multi-agency task force named the "El Dorado Task Force" was formed and led by the U.S. Attorney's Offices for the Eastern District of New York and the District of New Jersey. The El Dorado Task Force comprised 140 agents, police officers, and support personnel from 13 federal, state, and local law enforcement agencies, sought assistance from the Money Laundering Section to target large-scale cash money laundering between the U.S and Colombia, via money remitters in the New York City and New Jersey areas. Through the work of this Treasury-led task force it became apparent that Colombian drug traffickers were using certain money services businesses ("MSBs"), operating as money remitters, in the New York City area to launder cash proceeds of narcotics trafficking.

6.     The evidence demonstrated that 12 remitters had funneled approximately $800 million in a single year to Colombia. To show how much cash this was, the only way this amount could be legitimate is if each Colombian household in the area had sufficient funds to remit $30,000 to Colombia each year—an amount which exceeds the $27,000 average annual income for this community.

7.     The El Dorado Task Force identified these 12 MSBs as "choke points" through which it appeared that hundreds of millions of drug proceeds were being remitted to Colombia. The GTO statute and regulations are paradigm-shifting tools to be used where distinct money laundering typologies and threats are identified, and where surgical targeting in a restricted geographic area can disrupt and prevent that systemic cash money laundering. The GTO legal regime also would cause money launderers to change the nature, location, and amount of the laundered transactions, leading to drug cash diversions and anomalies that would be targeted as the funds flowed downstream. In approving the NYC GTO, we had secured solid guarantees of law enforcement support both for receiving, reviewing and acting on the GTO reporting, but also proactive law enforcement support to target downstream cash diversions that inevitable would occur.

/ / /

DECLARATION OF LEE JEFFREY ROSS, JR.                    Case No. 3:25-cv-00886-JLS-DDL

8.      The BSA's regulations for a GTO grant the Secretary of the Treasury the ability and authority to require special reporting and recordkeeping by certain businesses and financial institutions in specific geographic areas where necessary to carry out the policies behind the BSA.

9.      In August 1996, the Treasury Department issued the NYC GTO, aimed at these 12 MSBs. It required the subject MSBs and their approximately 1,600 agents to obtain and report identifying information on all cash remittances of $750 or more ($1,500 in 2025 dollars) to Colombia.

10.     In October 1996, the Treasury Department issued a second GTO, which extended the NYC GTO to 10 additional remitters and their agents. Combined, the NYC GTO was extended several more times, to add additional MSBs, before expiring in October 1997. Following the NYC GTO, the Treasury Department issued a series of similar GTOs covering other MSBs providing remittance services to the Dominican Republic by certain remitters in New York, New Jersey, and Puerto Rico.

11.     There are clear points of divergence between the correct use of the GTO regime with the NYC GTO as compared to the Treasury Department's proposed "Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money Services Businesses Along the Southwest Border" ("SWB GTO"). 90 F.R. 49 (Mar. 14, 2025) at 12106-12108. With the NYC GTO, the Treasury Department identified a distinct law enforcement activity, as supported by in-depth analysis by the Departments of Justice and Treasury regarding incontrovertibly-suspicious cash activities. With the NYC GTO, the U.S. effectively used the GTO process to target suspected laundering with specific BSA reporting obligations while imposing the least possible burden on legitimate businesses and financial institutions.

/ / /

/ / /

/ / /

4

## Effective Use of BSA Reports in Money Laundering Investigations

12.    Following the NYC GTO, I helped coordinate the largest drug money laundering undercover operation in the history of the United States— "Operation Casablanca." Operation Casablanca was a three-year operation targeting drug money laundering along the southwest border, resulting in 4 separate criminal indictments, the prosecutions of two of the largest banks in Mexico, and the prosecutions of 40 individuals, including over a dozen lawyers, bankers, and other professionals. Operation Casablanca led to the forfeiture of over $31 million, and significantly disrupted the laundering of drug proceeds throughout the United States, including along the Southwest Border. I received the Department of Justice's highest litigation award, the John Marshall award, from Attorney General Janet Reno, in 1998 for my support of Operation Casablanca.

13.    In the immediate aftermath of the September 11, 2001 terrorist attacks, I was given a special assignment for the Department of Justice's Criminal Division: to assist the FBI create the first-ever multi-agency terrorist financing task force, predecessor to the current Terrorist Financing Operations Section. While in that position, I served as one of the few personnel authorized to move between the law enforcement and intelligence-gathering components for terrorist financing intelligence. During this same time period, I became the only Criminal Division participant and liaison with the Department of the Treasury's multi-agency terrorist financing task force ("Operation Green Quest") for which I received a commendation.

14.    As a result of my AML background, as well as my experience investigation terrorist financing, I was hired by the Treasury Department in June 2002. I worked there until my retirement from government in June 2008. My last position at the Treasury Department was as a Senior Advisor to the Assistant Secretary within the Office of Terrorist Financing and Financial Crime ("TFFC").

/ / /

/ / /

15.     TFFC is one of the Treasury Department components under the Office of Terrorism and Financial Intelligence, which oversees the work of FinCEN. In my role as a senior advisor, I assisted in coordinating and leading the Treasury Department's efforts to identify and prevent terrorist financing, money laundering, and financial crimes from a systemic perspective. Specifically, I advised Treasury Department policy-making officials on all law enforcement, regulatory, and international matters relating to money laundering, terrorist financing, economic sanctions enforcement, and other financial crimes. I also helped develop all BSA and USA PATRIOT ACT regulatory requirements, including customer identification procedures, suspicious activity report ("SAR(s)") filing guidance, and MSB regulations, among other duties. Upon retiring from the Treasury in 2008, I was honored to have received the Treasury Department Meritorious Service Award and engraved medallion from Treasury Secretary Hank Paulson. That Award specifically cited my AML contributions along the southwest border.

16.     Upon retirement from the government in 2008, I joined Green Dot Corporation, and, upon its acquisition by Green Dot Corporation, Green Dot Bank (combined, "Green Dot"). Green Dot is a leading financial technology payments company, which primarily issues and maintains debit accounts receiving billions of dollars in cash deposits across multiple retail and mobile financial products and services. At Green Dot, I served as Senior Vice President and BSA/AML, and Office of Foreign Assets Control ("OFAC") Officer for both the corporation, as well as for its single-branch Utah Bank.

17.     My job duties as BSA/AML SVP included consolidating BSA, AML, and OFAC legal and regulatory compliance requirements across all Green Dot product lines, identifying and recommending AML compliance enhancement opportunities, and serving as Green Dot's AML subject matter expert in connection with the Federal Reserve, which regulated and examined both the BSA/AML-related compliance effectiveness for the company and its bank. Green Dot is a cash-intensive MSB and

bank involving billions of dollars loaded onto and spent on debit cards, as well as cash-loading products, including our proprietary cash loading and reloading product (MoneyPak) and thus was of considerable interest to law enforcement and the regulatory entities for the risk of cash money laundering. I retired from Green Dot in early 2020.

## FinCEN's Role in BSA/AML Compliance

18.    FinCEN's mission is to safeguard the financial system from illicit activity, counter money laundering and the financing of terrorism, and promote national security through strategic use of financial authorities and the collection, analysis, and dissemination of financial intelligence.

19.    FinCEN carries out its mission by receiving and maintaining data and reports of financial transactions; analyzing and disseminating that data for law enforcement purposes; and building global cooperation with counterpart organizations in other countries and with international bodies.

20.    FinCEN exercises regulatory functions primarily under the Currency and Financial Transactions Reporting Act of 1970, as amended by Title III of the USA PATRIOT Act of 2001 and other legislation, which legislative framework is commonly referred to as the "Bank Secrecy Act" or "BSA". The BSA is the United States of America's primary and most comprehensive legal regime regarding AML and counter-terrorism financing ("AML/CFT") laws, regulations, and best practices.

## BSA Reports and FinCEN's Management of BSA Reports

21.    The BSA requires multiple reports by a variety of financial institutions, businesses, and individuals. Of relevance here, is the BSA requirement that all financial institutions" (as defined in 31 U.S.C. § 5312(a)(2) and 31 C.F.R. Chapter X) to file "Currency Transaction Reports" with FinCEN ("CTR(s)"). Since the BSA first came into effect in the 1970s, the threshold amount for CTR filings has remained at $10,000 cash transactions, or multiple cash transactions in a single day totaling $10,000 at banks, casinos, and MSBs. *See*, *e.g.*, 31 U.S.C. § 5313 and 31 C.F.R. Parts 1020

(banks), 1021 (casinos), and 1022 (MSBs); *see also* 37 F.R. 6818, 6912 (Apr. 5, 1972). As a result of these statutes and regulations, financial institutions electronically submit CTRs to FinCEN. A true and correct list of all "BSA Reports" is attached hereto as Exhibit **"A."**

22.    Financial institutions, including MSBs, also have a duty to file "Suspicious Activity Reports" with FinCEN ("SAR(s)") for "any suspicious transaction relevant to a possible violation of law or regulation." 31 U.S.C. § 5318(g)(1). As discussed in more detail below, one of the collateral consequences of the NYC GTO was the requirement for MSBs both to be registered and to file SARs. Neither of these law enforcement-support mechanisms were required of MSBs at the time of the NYC GTO, and thus the amount of BSA Reports and reporting to FinCEN by MSBs at the time of the NYC GTO was far, far less than is available today.

## Registration of MSBs with FinCEN

23.    Although banks, credit unions, and casinos are regulated at the state and/or federal levels, MSBs are unique among financial institutions because they have to register with FinCEN as an MSB, on a form known as a "Registration of MSB" on FinCEN Form 107 (a "RMSB"). FinCEN takes the position that RMSBs assist with "mitigating the risk of criminal abuse of money services businesses." *In re Baltic Financial Services, Inc.*, FinCEN Enforcement No. 2010-5, at 2. A true and correct copy of the FinCEN Enforcement No. 2010-5 is attached hereto as Exhibit **"B."** This MSB registration requirement arose, in part, due to the NYC GTO impact.

24.    Within the broader BSA and FinCEN's regulatory framework, the RSMB requirement:

> [S]eeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked. RMSB forms promote greater transparency with respect to [MSBs] that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, [FinCEN] and other government agencies. RMSB forms are also useful for money transmitters and other types of [MSBs] in establishing and maintaining

8

banking relationships. Banking organizations, in keeping with their responsibilities under the [BSA], normally request registration information from money transmitters and other types of [MSBs] customers that are required to register.

*Ibid*.

25. As a result, FinCEN is the primary federal regulator of MSBs. The RMSB registration obligation applies to a variety of businesses. The Code of Federal Regulations references no fewer than 7 different types of MSBs—ranging from money transmitters that primary engage in person-to-person transfers of funds like Western Union, to the U.S. Postal Service. *See* 31 C.F.R. § 1010.100(ff). The United States Code defines an MSB even more broadly. *See* 31 U.S.C. § 5330(d)(1)(A).

26. Any MSB or money transmitting business that fails to file an RMSB is subject to criminal penalties. 18 U.S.C. § 1960. Violations of 18 U.S.C. § 1960 are punishable by 5 years' imprisonment, forfeiture (18 U.S.C. § 982(a)(1)), and is further defined a "specified unlawful activity" as a predicate for both money laundering and RICO purposes (18 U.S.C. §§ 1956(7)(A) and 1961(1)).

27. Finally, by registering as an MSB with the filing of an RMSB, an MSB also will be subject to examination by the Treasury Department. These examinations scrutinize MSBs for developing a written AML program that effectively and reasonably addresses money laundering and terrorist financing risks. FinCEN worked with several federal and state regulators and MSB trade associations to develop a manual for examining MSBs and compliance with all facets of the BSA. *See* https://www.fincen.gov/sites/default/files/shared/MSB_Exam_Manual.pdf.

### Use of BSA Reports and Reporting

28. One of FinCEN's most critical functions is the maintenance of all BSA Reports securely, while ensuring that the reported information is accessible to law enforcement and other third-parties who agree to FinCEN's terms of use to maintain the confidentiality of that information. Law enforcement at all levels of the U.S.

9

government, and some foreign counterparts, as appropriate, can access BSA Reports through a secure web connection after agreeing to FinCEN's terms of use. FinCEN provides training on, and monitors the use of the "FinCEN Portal" to ensure that the BSA Reports are properly used, disseminated, and kept secure.

29.     Those law enforcement officials and agencies that have direct access to the FinCEN Portal can search individuals and businesses that appear on BSA Reports. For instance, a special agent for Homeland Security Investigations, working in the Southern District of California, can search for CTRs, SARs, RMSBs, and any other BSA Reports available on FinCEN's Portal by entering any known identifiable information. They can search the FinCEN Portal by name, address, taxpayer identification number ("TIN"), social security number ("SSN"), passport number, driver's license number, and several other unique information to a person or business. In all, CTRs contain no less than 57 fields for information, with "some fields allowing for multiple records." U.S. Government Accountability Office Report to Congressional Committees, *Currency Transactions Reports: Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement* (Dec. 2024) at 14 (the "2024 GAO Report"). A true and correct copy of the relevant page of the 2024 GAO Report is attached hereto as Exhibit **"C."** FinCEN estimates that several fields are "rarely or never used" by law enforcement agencies for those CTRs that are ever reviewed in the first place. *Id*. at 18.

30.     Finally, the BSA authorizes the Treasury Department (and specifically, FinCEN) to enact regulations that require certain reports or records that are highly useful in: criminal, tax, or regulatory investigations, risk assessments, or proceedings or intelligence or counterintelligence activities; preventing money laundering and terrorist financing through the establishment by financial institutions of reasonably designed risk-based programs for financial institutions; facilitating the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity; and, among several other items, protecting the financial

10

system of the United States from criminal abuse.

31.    As discussed earlier in connection with the NYC GTO, the BSA permits the Secretary of the Treasury to vary, for example, the CTR reporting threshold. 31 U.S.C. § 5326(a) and 31 C.F.R. § 1010.370, as well as Treasury Order 180-01. Those authorities provide the regulatory authority for the SWB GTO and ultimately sit at the heart of this litigation. In the past, as in the case of the NYC GTO, these regulations have been utilized to great effect. The question for the Court, however, is whether, the SWB GTO, its geographic scope, and its $200 cash reporting threshold are consistent with the Treasury Department's and BSA's regulatory authority to protect the United States from money laundering, as well as ensure the least possible adverse economic effect of the SWB GTO on the parties subject to its reporting obligations.

## Geographic Targeting Orders

32.    A GTO usually aims to address, in a targeted fashion, money laundering hot spots in order to reduce illegal financial activity while also not placing an undue burden on the businesses, financial institutions, or individuals subject to the GTO. Where surgically applied and supported, GTOs have proven to be a very useful tool to identify, disrupt, and prosecute financial crimes.

33.    The NYC GTO was "targeted" not just in a geographical sense, but also in a manner that imposed additional reporting obligations in a reasonably-targeted way, on specific MSBs, based on a statistical review of their transactions, as all underpinned by the real-world findings of the Operation El Dorado task force members.

34.    The NYC GTO's limited scope was the primary reason it was so effective, both in correctly targeting a "hot spot" of identified cash money laundering, and also in diverting targeted illicit funds from that hot spot that could be, and were, targeted as they moved downstream. It could only reach that level of precision in its scope through detailed analysis of transactions, prosecutions, discussions with all levels of law enforcement and government agencies that assisted law enforcement,

11

1  and provide the research.

2      35.    The NYC GTO resulted in an immediate, disruptive, and powerful

3  impact on the flow of narcotics proceeds through the targeted MSBs. From that

4  experience, I learned that a GTO only can be successful to the extent it is limited to a

5  specifically-identified and meticulously-investigated financial problem, that is

6  exclusive to a specific type of transaction, financial institution, or crime. In turn, a

7  GTO that lacks precision or that is not supported by statistical analysis or evidence of

8  a unique type of crime or money laundering technique, will be ineffective. Beyond

9  being ineffective, there will be negative consequences to the businesses and financial

10  institutions that are the subject of the GTO itself. During the planning for the NYC

11  GTO, a primary consideration was the degree of statistical and factual support that the

12  Treasury Department could marshal in support of the anticipated challenges that might

13  arise.

14      36.    Even more troubling, deficient GTOs have detrimental consequences

15  because financial institutions, their employees, agents, and customers, as well as the

16  American public, could begin to lose confidence in the Treasury Department's use of

17  these extraordinary AML powers that Congress has given to the Treasury, and

18  undercut compliance, or lead to questions about the authorities themselves.

19      37.    While, in my opinion, the NYC GTO is an example of an effective GTO,

20  my review of the SWB GTO, as well as FinCEN's *Information Memorandum for*

21  *Director Andrea M. Gacki* supporting discrete contours of the SWB GTO ("FinCEN

22  Memo") causes me to have grave doubts about the SWB GTO's potential

23  effectiveness, and especially about the factual underpinnings that are discussed, as

24  well as those findings that are not discussed in the FinCEN Memo. A true and correct

25  copy of the FinCEN Memo is attached hereto as Exhibit **"D."**

26  / / /

27  / / /

28

DECLARATION OF LEE JEFFREY ROSS, JR.                    Case No. 3:25-cv-00886-JLS-DDL

### **The Risks of the SWB GTO**

38.     On March 11, 2025, FinCEN issued the SWB GTO, which requires all MSBs located in 30 ZIP codes across California and Texas near the southwest border to file CTRs with FinCEN for cash transactions of $200 or more.

39.     Based on my experience in devising and helping to implement federal government policy on AML/CFT, I do not believe the SWB GTO is effectively designed, drafted, or targeted to a specific financial crime, such as was evident in the remitting of hundreds of millions of dollars to Colombia by a narrow range of money remitters, as targeted in the NYC GTO. In fact, if the SWB GTO becomes effective, and these additional CTRs begin to flow into FinCEN, attempts to try to digest this flood of CTRs may ultimately have a detrimental effect on the ability of federal agents to stem unlawful financial activities. I believe this because, in contrast to the NYC GTO, for which there was an extensive investigative basis for the GTO and for its specific, surgical application, the SWB GTO was crafted without any apparent evidence of statistical or law enforcement investigative and prosecutorial rigor.

### **The SWB GTO Lacks a Targeted Scope**

40.     Unlike the NYC GTO, which only initially applied to 12 MSBs (and was later expanded to include a total of 23 MSBs) engaged in international remittances, the SWB GTO applies to *all* MSBs within the ZIP codes—entities as varied as currency dealers or exchangers, cryptocurrency exchange platforms, and check cashers; issuers of traveler's checks, money orders, or stored value; sellers or redeemers of traveler's checks, money orders, or stored value, and money transmitters. Furthermore, the SWB GTO requires reporting for all cash transactions above $200, an extremely low threshold. Adjusting for inflation, this threshold is approximately 13% of the threshold imposed by the NYC GTO, and is only 2% of the typical $10,000 figure that currently requires reporting. For comparison, the $750 cash threshold under the NYC GTO in 1996-1997 is equivalent to approximately $1,500 in today's dollars.

/ / /

41.     Together, in my opinion, these two differences will limit the usefulness of any CTRs filed as a result of the SWB GTO. These CTRs also will flood the FinCEN Portal with relatively insignificant reports of small denomination cash transactions that, from my perspective, show no material connection to money laundering. The "noise" created by these additional and unhelpful low-value CTRs will drown out the cash transactions that law enforcement is more commonly interested in, and is at odds with earlier FinCEN statements regarding FinCEN's goal to reduce the number of CTRs filed by financial institutions. Upon doing so, federal agents, in expending their limited time and resources, would begin to focus on those BSA Reports with a greater likelihood of advancing an investigation or are otherwise prove useful to law enforcement efforts. Ex. C, at 14.

42.     Notably, the FinCEN Director wrote a letter to the Government Accountability Office in October 2024, stating that "FinCEN concurs . . . that the Secretary of the Treasury should ensure that the Director of FinCEN takes steps to reduce the number of CTRs filed that are not used by law enforcement." *Id*. at Appendix V.

### The SWB GTO Lacks Statistical or Evidentiary Support

43.     The FinCEN Memo itself exposes the lack of statistical analysis to support the SWB GTO's chances of successfully targeting money laundering and being highly useful to law enforcement in a BSA context. *See* Ex. D at 4-20.

44.     The SWB GTO and its supporting rationale, in my opinion, contain several flaws, and provide insufficient support for concluding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof." 31 U.S.C. § 5326(a). This is the foundational requirement from which all aspects of any GTO must be examined, together with the government's supporting documentation and analysis for the targeted entities and geography.

/ / /

45.     In my opinion, the FinCEN Memo presents a classic tautology. The reduced reporting in the geographic areas would "identify cartel-related money laundering . . . and generate new leads . . . and identify new and related subjects in ongoing cases." Ex. D, at 9. Well, of course, any new information could be useful for law enforcement to help make cases, but if that barest of minimum triggering were all that was needed  for the Treasury Secretary to reduce CTR reporting to $200, there should at least be a scintilla of analysis pointing to how the Treasury Secretary determined that $200 was reasonable. Instead, the selection of the $200 threshold for this SWB GTO is addressed cavalierly at page 13 of the FinCEN Memo as follows: "The $200 threshold is proposed because it would include nearly all cash transactions *vulnerable to abuse* by drug cartels to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate." *Id*. at 13 (emphasis added).

46.     Nothing in my past extensive professional AML experience remotely suggests that cash transactions of $200 were more likely to be abused by drug money launderers (who are moving hundreds of millions of dollars and thousands of pounds of currency across the southwest border), than are cash transactions at even $1,000. There simply is no support for this extraordinarily-low reduction from the $10,000 reporting requirement threshold.

47.     The FinCEN Memo continually makes sweeping, and indisputable, generalizations about how the SWB GTO will effectively target money laundering by Mexico-based transnational criminal organization. For example, it claims that drug cash money laundering is a problem along the southwest border; that money remitters, and other financial institutions at, or near the border are at risk for possible money laundering; and that financial criminals may mix licit and illicit funds to structure below the $10,000 CTR threshold. I have no argument with any of these generalizations, but there is a complete absence of analysis of these facts that support dropping the CTR threshold for MSBs in certain ZIP codes to $200.

/ / /

15

48.     Despite all my relevant and extensive my training and experience, I am unable to understand how an abundance of CTR filings vis–a-vis population, in and of itself, suggests a GTO should be issued at $200 for those ZIP codes where the alleged CTR/population disparity is present. My inability to understand primarily stems from the fact that there is no analysis to support these statements.

49.     In concluding that this GTO is not properly supported, and accordingly is improperly issued, I would like to address additional dogs that are not barking in the FinCEN Memo:

a.      The FinCEN Memo should, but does not, include law enforcement or FinCEN analysis of the CTRs that have been filed by MSBs in these discrete geographic areas. The FinCEN Memo itself identifies that thousands of CTRs have been filed in these ZIP codes; however, there is no analysis of the specific businesses filing the CTRs; no scrutiny of the demographics and wealth of the individuals in the subject ZIP codes (as was addressed in the NYC GTO); no cases/investigations, concluded or ongoing, have resulted from in-depth analysis of these CTR filings in the Southern District of California. Other than the bare fact that a CTR was filed, that it occurred along the Southwest Border, and that the number filed was high compared to the overall population of the targeted ZIP code, there is absolutely nothing to indicate that the person involved in the cash transaction is engaging in cash money laundering or any type of suspicious activity.

b.      The FinCEN Memo is silent vis a vis any analysis for SARs that have been filed in these targeted ZIP codes by the MSBs. The FinCEN Memo simply contains no analysis of the type, amount, or common criminal activity in SARs filed by financial institutions (let alone MSBs) in the subject ZIP codes. SAR reporting is the primary vehicle by which law enforcement can identify and attack structuring below the $10,000 CTR threshold. SAR obligations for suspicious or unusual activity begin at $2,000. Yet the FinCEN Memo makes

16

no attempt to show the connection between sub-$10,000 cash transactions at MSBs in the subject ZIP codes, as compared to relevant SARs. MSB SAR reporting at the $2,000 level does exist for MSBs in 2025 (it did not at the time of the NYC GTO), yet there is nothing to show these support, in any way, the SWB GTO rationale.

c.      And the same lack of discussion applies for an analysis of RMSBs in the subject ZIP codes. Have the MSB registration requirements been utilized, and if so, have they identified a higher risk of money laundering for MSBs in these ZIP codes? Neither FinCEN, the Treasury Department, the Justice Department, not any law enforcement agency offers any analysis.

### The SWB GTO Otherwise Lacks any Reasonable Basis

50.      The FinCEN Memo is unreasonable in the facts and arguments it presents, including the following:

a.      The FinCEN Memo appears to misread the Treasury Department's 2024 National Money Laundering Risk Assessment (the "NMLRA"), stating that "the illicit financial activities of drug cartels" are "a major risk to MSBs and other types of financial institutions." Ex. D at 4 (a true and correct copy of the relevant pages of the NMLRA are attached hereto as Exhibit **"E."**) The cited footnote, however, references the real, and expansive, focus of the NMLRA: "banks, [MSBs], and other entities, such as real estate agents and attorneys." Ex. D at 4, n. 19. Yet the SWB GTO does not apply to banks, real estate agents, attorneys, or any other financial institution. And even if MSBs were a primary risk vector, which is not what the NMLRA asserted, the SWB GTO's limited ZIP code scope permits all MSBs operating in non-covered locations to continue as usual, further undermining the reasonableness of the SWB GTO's scope.

b.      The FinCEN Memo claims that FinCEN has identified transfers "through MSBs as a financial typology associated with Mexico-based drug cartels and

their illicit procurement of fentanyl precursor chemicals and manufacturing equipment." *Id.* at 5. No doubt this is the case, but the FinCEN publication cited in the FinCEN Memo references "[m]oney transfers through banks, MSBs, and online payment processors." *Id.* at 5, n. 20. And yet the SWB GTO does not target payment processors or banks at all, let alone within the targeted ZIP codes.

c. In light of an Executive Order in February 2025 (signed on January 20, 2025), where "certain drug cartels have been named cartels [sic] as Foreign Terrorist Organizations and Specially Designated Global Terrorists," the FinCEN Memo concludes that "MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico." *Id.* at 6. The Executive Order does not reference MSBs at all. A true and correct copy of the Execute Order dated January 20, 2025 is attached hereto as Exhibit **"F."** Nor does it use the words "money," "service(s)," "business(es)," "bank(s)," "financial," or references to any type of financial institution. As such, FinCEN has no reasonable basis to conclude that MSBs provide a "unique money laundering vulnerability."

d. Similarly untethered from any rational basis in facts or statistical analysis, the FinCEN Memo concludes that "illicit actors may comingle [sic] licit and illicit cash, making dirty money even more difficult to detect for MSBs." Ex. D, at 6. This statement has several flaws. First, there is no footnote for this statement, indicating it is entirely unsupported. Second, it ignores the fact that MSBs have to maintain adequate BSA/AML programs, which often allows them to identify, refuse, or otherwise report, via SARs, any suspicious transactions. Third, commingling by definition makes it harder for any financial institution or third-party to detect, which by that logic should mean that all financial institutions and businesses along the southwest border should be

subject to reporting obligations in a similar way to the MSBs covered by the SWB GTO.

e.      The FinCEN Memo then confuses money laundering typologies, suggesting that MSBs can be abused by money launderers who use "funnel accounts." *Id*. at 6, n. 24. But funnel accounts are a money laundering technique that require a depository account. Only banks have these types of accounts, which the FinCEN Memo implicitly acknowledges: criminals "may open accounts in their name, or escort victims to a bank, and force them to open an account . . . ." *Ibid*.

f.      Finally, the FinCEN Memo identifies criminal prosecutions of MSBs that were operating as "professional money launderer[s]." *Id*. at 7. It then references multiple investigations—none of which have any connection to the southwest border, nor MSBs located in any of the 30 ZIP codes covered by the SWB GTO. *Id*. at 7, n. 27 & 28.

51.     In sum, the SWB GTO, in my opinion, is predicated upon an insufficient record, lacks statistical support, and contains flawed reasoning, all leading to an unsupportable GTO that presents significant risks to MSBs and little support for the targeting of transnational criminal organizations and money launderers engaged in international transactions along the Southwest Border. Further, in my opinion, as issued, the SWB GTO simply will not be "highly useful" for law enforcement in the BSA context.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on May 6, 2025 in Phoenix, Arizona.



LEE JEFFREY ROSS, JR.

DECLARATION OF LEE JEFFREY ROSS, JR.                              Case No. 3:25-cv-00886-JLS-DDL

**EXHIBIT "A"**

Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



🇺🇸 An official website of the United States Government  Here's how you know ⌄

# FINANCIAL CRIMES    ENFORCEMENT NETWORK

HOME    ABOUT ▾    RESOURCES ▾    NEWSROOM ▾    CAREERS ▾    ADVISORIES

Search    🔍

Resources

- Alerts/Advisories/Notices/Bulletins/Fact Sheets
- Bank Secrecy Act Filing Information
- Beneficial Ownership Information Reporting
- COVID-19 Information
- Financial Trend Analyses
- Financial Institutions
- FinCEN Exchange
- Innovation
- International
- Law Enforcement
- Ransomware
- SAR Stats
- Scams
- Statutes and Regulations
- Suspicious Activity Report (SAR) Advisory Key Terms

## QUICK LINKS

- Benefits of Using BSA E-Filing
- Log into BSA E-Filing
- Useful Information for Filing
- Chapter X Main Page
- Webinar on the FinCEN SAR
- Webinar on the FinCEN CTR and DOEP
- Webinar on the Introduction to the BSA E-Filing System
- Webinar on the Updated BSA E-Filing Technical Specifications for FinCEN's New SAR, CTR, and DOEP

## RELATED FAQs

- Mandatory E-Filing FAQs
- FinCEN CTR FAQs
- FinCEN SAR FAQs
- BSA FAQs
- FinCEN FAQs on Cyber-Events

**Ready to E-File?**

Visit the BSA E-Filing System to file your reports.

[Go to BSA E-File]

**Get FinCEN News Updates**

Stay Informed with FinCEN Updates

[Subscribe]

# Bank Secrecy Act Filing Information

## Welcome to the BSA E-Filing System

**REMINDER:** As of April 1, 2013, financial institutions must use the new FinCEN reports, which are available only electronically through the BSA E-Filing System. FinCEN is no longer accepting legacy reports. For more information, click here.

To File a BSA report please visit us at BSA E-Filing System

To view a BSA report or test your batch filing program please visit us at BSA E-Filing Test System. Do not mail or electronically attempt to file a test report.

## Bank Secrecy Act Forms and Filing Requirements

▸ FinCEN SAR Form 111

▸ FinCEN CTR Form 112

▸ FinCEN DOEP Form 110

▸ FinCEN RMSB Form 107

▸ FinCEN 8300 (Cash Over 10K Received in Trade/Business)

▸ CMIR 105

▸ Customer Due Diligence (CDD) – APPENDIX A - Certification Form

▸ FBAR (Foreign Bank Account Report) 114



Home
About
Contract Opportunities

Resources
Careers
Get News Updates

Contact
Newsroom
Languages



USA.gov | Regulations.gov | Treasury.gov | IRS.gov | Freedom of Information Act (FOIA) | NO FEAR Act | Vote.gov | Accessibility | Office of Equal Opportunity | Privacy Policy | Public Posting Notice of Finding of Discrimination | Security and Vulnerability Disclosure Policies (VDP) | Office of Inspector General

**EXHIBIT "B"**

Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

UNITED STATES OF AMERICA
DEPARTMENT OF THE TREASURY
FINANCIAL CRIMES ENFORCEMENT NETWORK

IN THE MATTER OF: )
 )
 )
BALTIC FINANCIAL SERVICES, INC. ) Number 2010-5
MONTCLAIR, NEW JERSEY )

## ASSESSMENT OF CIVIL MONEY PENALTY

### I.    INTRODUCTION

Under the authority of the Bank Secrecy Act and regulations issued pursuant to that Act, the Financial Crimes Enforcement Network has determined that grounds exist to assess a civil money penalty against Baltic Financial Services, Inc. ("Baltic" or the "Money Services Business").[1]  To resolve this matter, and only for that purpose, Baltic has entered into a CONSENT TO THE ASSESSMENT OF CIVIL MONEY PENALTY ("CONSENT") without admitting or denying the determinations by the Financial Crimes Enforcement Network, as described in Sections III and IV below, except as to jurisdiction in Section II below, which is admitted.

The CONSENT is incorporated into the ASSESSMENT OF CIVIL MONEY PENALTY ("ASSESSMENT") by this reference.

### II.    JURISDICTION

Baltic is an independent money transmitter, located in Montclair, New Jersey.  The privately owned company is a New Jersey corporation, with assets amounting to approximately $76,000. Baltic markets funds transfer services to and from Latvia, a "major money laundering country."[2]  At all relevant times, Baltic was a "money services business," "money transmitter" and "financial institution" within the meaning of the Bank Secrecy Act and its implementing regulations.[3]  The Internal Revenue Service, Small Business/Self-Employed Division examines money services businesses for compliance with the Bank Secrecy Act, under delegated authority from the Financial

---

[1] 31 U.S.C. § 5311 et seq. and 31 C.F.R. Part 103.

[2] United States Department of State International Narcotics Control Strategy Reports ("INCSRs") for 2006, 2007, 2008, 2009, and 2010 identified Latvia as a "major money laundering country."  The term means a country whose financial institutions engage in currency transactions involving significant amounts of proceeds from international narcotics trafficking.  22 U.S.C. § 2291(e)(7).

[3] 31 U.S.C. § 5312(a)(2) and 31 C.F.R. § 103.11.

Crimes Enforcement Network.[4]  The State of New Jersey Department of Banking and Insurance examines money services businesses for compliance with anti-money laundering requirements, under laws of the State of New Jersey.

III.   DETERMINATIONS

The Financial Crimes Enforcement Network has determined that Baltic violated Bank Secrecy Act registration requirements for money services businesses.[5]  Since 2001, the Bank Secrecy Act has required certain money transmitters to register with FinCEN by filing a registration of money services business ("RMSB") form, and renewing the registration every two years.  If the money services business' ownership or number of agents changes, a re-registration requirement may apply.

Bank Secrecy Act compliance by money services businesses is a critical part of the government's efforts against money laundering, terrorist financing, and other financial crimes. Bank Secrecy Act forms, including RMSB forms, must be filed in an accurate, complete and timely manner.  The registration requirement is an initial and foundational step required as part of the Financial Crimes Enforcement Network's regulations that are intended to assist law enforcement and other government agencies in the enforcement of criminal, tax and regulatory laws, and to prevent money services businesses from engaging in, or being misused to facilitate, the flow of illicit proceeds.[6]  By mitigating the risk of criminal abuse of money services businesses, the Financial Crimes Enforcement Network's regulatory framework seeks to promote the provision of legitimate financial services to consumers, in particular the unbanked and underbanked.  RMSB forms promote greater transparency with respect to money services businesses that serve as gateways to the U.S. financial system, and are an integral part of highly useful investigative audit trails utilized by law enforcement, the Financial Crimes Enforcement Network and other government agencies.  RMSB forms are also useful for money transmitters and other types of money services businesses in establishing and maintaining banking relationships.  Banking organizations, in keeping with their responsibilities under the Bank Secrecy Act, normally request registration information from money transmitters and other types of money services business customers that are required to register.[7]

At all relevant times, Baltic conducted business as an independent money transmitter, and had knowledge of Bank Secrecy Act registration requirements.  Baltic provides money transfer services in any amount to and from Latvia.  In a typical transaction, the customer would complete a

---

[4] 31 C.F.R. § 103.56(b)(8).

[5] 31 U.S.C. § 5330 and 31 C.F.R. § 103.41.

[6] *See* Amendment to the Bank Secrecy Act Regulations-Definitions Relating to, and Registration of, Money Services Businesses, 64 FR 45438 (August 20, 1999).

[7] A money services business should retain a copy of RMSB forms it submitted to the Financial Crimes Enforcement Network, as part of its records, for five years.  Determinative evidence of a money services business' registration is an acknowledgement letter sent by the Internal Revenue Service-Enterprise Computing Center-Detroit upon receipt, and appropriate processing, of a RMSB form.  The Financial Crimes Enforcement Network's website, www.fincen.gov, contains a "MSB Registration List," identifying money services businesses that are currently registered.  The MSB Registration List is updated monthly, and provided as a general reference for the public.

form[8] provided by Baltic, and provide Baltic with cash, check or money order payable to Baltic in U.S. dollars for the amount of the transaction and applicable service fees. The form would typically contain the names, addresses, and telephone numbers for the customer and beneficiary to the transaction including an alternate contact person's name and phone number in the event the beneficiary could not be reached as well as an indication if physical delivery by a Baltic agent in Latvia would be required. Baltic would deposit the cash, checks or money orders provided by the customer in its financial institution account. Once the funds cleared and became available, Baltic would instruct the financial institution to wire transfer the funds to a designated financial institution in Latvia. Baltic's agent would retrieve the funds from the designated financial institution and make the funds physically available to the beneficiary. The funds would be provided in U.S. dollars or a designated currency. The Baltic agent would check identification and obtain the beneficiary's signature in processing the disbursement of funds to the beneficiary. Baltic would also provide the above described process in reverse order to accommodate customer transactions originating in Latvia with beneficiaries in the United States. Baltic filed RMSB forms with the Financial Crimes Enforcement Network in 2001 and 2003. Afterwards, however, Baltic repeatedly failed to comply with biennial renewal requirements in a timely manner, despite notifications that it was not in compliance with Bank Secrecy Act registration requirements for money transmitters.[9] In fact, for a majority of the time between January 2005 and September 2010 Baltic conducted business as an unregistered money transmitter, in violation of the Bank Secrecy Act.

## IV.    CIVIL MONEY PENALTY

As administrator of the Bank Secrecy Act, the Financial Crimes Enforcement Network may impose civil money penalties against Baltic, or any person who owns or controls Baltic, for violations of money transmitter registration requirements.[10] The Financial Crimes Enforcement Network may assess a civil money penalty for failure to register as a money services business, in an amount up to $5,000 per violation. Each day a violation continues constitutes a separate violation. The Financial Crimes Enforcement Network has determined that a civil money penalty is due for the violations of the Bank Secrecy Act and its implementing regulations described in this ASSESSMENT. After considering the seriousness of the violations and the financial resources available to Baltic, the Financial Crimes Enforcement Network has determined that the appropriate penalty in this matter is $12,000. This civil money penalty shall be satisfied by four $3,000 payments to the United States Department of the Treasury.

## V.    CONSENT TO ASSESSMENT

To resolve this matter, and only for that purpose, Baltic, without admitting or denying either the facts or determinations described in Sections III and IV above, except as to jurisdiction in Section II which is admitted, consents to the assessment of a civil money penalty in the sum of $12,000, which shall be satisfied by four $3,000 payments to the United States Department of the Treasury. Baltic shall pay the first $3,000 installment within five business days of the date of this

---

[8] The form is called by Baltic the "Agreement for the Transfer of Funds."
[9] Baltic filed renewals during 2006 and 2010, instead of renewing in 2005, 2007, and 2009 as required by the registration regulation and instructions to the RMSB form. *See* 31 C.F.R. § 103.41(b)(2).
[10] *See* 31 U.S.C. § 5330(e) and 31 C.F.R. § 103.41(e).

ASSESSMENT, and the second, third and fourth $3,000 installments within ninety (90), one hundred and eighty (180), and two hundred and seventy (270) calendar days respectively.

Baltic recognizes and states that it enters into the CONSENT freely and voluntarily and that no offers, promises, or inducements of any nature whatsoever have been made by the Financial Crimes Enforcement Network or any employee, agent, or representative of the Financial Crimes Enforcement Network to induce Baltic to enter into the CONSENT, except for those specified in the CONSENT.

Baltic understands and agrees that the CONSENT embodies the entire agreement between the Money Services Business and the Financial Crimes Enforcement Network relating to this enforcement matter only, as described in Section III above. Baltic further understands and agrees that there are no express or implied promises, representations, or agreements between the Money Services Business and the Financial Crimes Enforcement Network other than those expressly set forth or referred to in this document and that nothing in the CONSENT or in this ASSESSMENT is binding on any other agency of government, whether Federal, State, or local.

VI.    RELEASE

Baltic understands that execution of the CONSENT, and compliance with the terms of this ASSESSMENT and the CONSENT, constitute a complete settlement and release of the Money Services Business' civil liability for violations of the Bank Secrecy Act and regulations issued pursuant to that Act as described in the CONSENT and this ASSESSMENT against Baltic.

By:

_____/s/_____

James H. Freis, Jr., Director
FINANCIAL CRIMES ENFORCEMENT NETWORK
United States Department of the Treasury

Date:

_____December 13, 2010_____

4

**EXHIBIT "C"**
Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



United States Government Accountability Office

Report to Congressional Committees

**December 2024**

# CURRENCY TRANSACTION REPORTS

# Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement

related transactions from multiple branches and sources of cash transactions (e.g., ATMs and certain transactions conducted by armored car services).[30]

FinCEN further expanded the types of information collected in CTRs when it designed the BSA database for electronic CTR filings, which became mandatory for filers in April 2013. FinCEN added fields to the CTR form and designated all data fields as critical (required to file) or noncritical (not required to file). Newly added noncritical fields included gender and North American Industry Classification System (NAICS) code.[31] According to FinCEN's 2012 guidance, fields were added in response to law enforcement feedback that the fields would be useful for their queries.[32] FinCEN officials told us the agency consulted its Data Management Council, comprising federal law enforcement and regulatory stakeholders, before making these form changes. The council reviews any changes to BSA reports, FinCEN officials said.

The CTR form consists of 57 fields, with some fields allowing for multiple records. For example, "person involved in transaction(s)" and "transaction location" fields may include up to 999 records (see fig. 3).

---

[30]Current regulations state that a financial institution must include "all of its domestic branch offices" for the purposes of reporting requirements. 31 C.F.R. § 1010.313(a). For additional information on filing CTRs related to armored cars, see, Department of the Treasury, Financial Crimes Enforcement Network, *Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes,* FIN-2013-R001 (July 12, 2013).

[31]The Census Bureau assigns business classification codes, including Standard Industrial Classification and NAICS codes, to each company to classify its main industry and line of business.

[32]Department of the Treasury, Financial Crimes Enforcement Network, *Filing FinCEN's new Currency Transaction Report and Suspicious Activity Report,* FIN-2012-G002 (Mar. 29, 2012).

phone number, occupation or business type, gender, and email address.[42]

**Table 1: Percentage of Noncritical Currency Transaction Report (CTR) Fields Populated by Filers, Fiscal Years 2019–2023**

| CTR field | Percentage populated |
|---|---|
| Phone number | 86% |
| Occupation or business type | 85% |
| Gender | 77% |
| Email address | 62% |
| Industry code[a] | 41% |

Source: Summary data provided by the Financial Crimes Enforcement Network (FinCEN). | GAO 25-106500

[a]These are standard industry codes from the North American Industry Classification System. Filers must link the codes to an occupation or business type.

FinCEN has stated it added noncritical fields because feedback from law enforcement officials indicated such information was important for query purposes.[43] However, our survey results indicated law enforcement agencies infrequently use some of these noncritical fields.[44] We estimated that about 60 percent of law enforcement agencies rarely or never used gender information and about 75 percent rarely or never used NAICS code information.

In contrast, our survey indicated law enforcement agencies frequently used critical fields, such as those related to account and identification numbers and location. For example, an estimated 94 percent of law

---

[42]We considered a field to be populated if it contained any information for at least one party in a CTR. We considered a field not populated if it contained no information (i.e., a blank field or an "Unknown" value for gender) for any party.

[43]See response to question 1 to Frequently Asked Questions Regarding the FinCEN Currency Transaction Report (CTR), effective October 3, 2019, available at https://www.fincen.gov/frequently-asked-questions-regarding-fincen-currency-transaction-report-ctr.

[44]We surveyed all law enforcement agencies that had an active memorandum of understanding with FinCEN to access BSA reports as of June 30, 2023. See app. I for additional discussion of our survey methodology and app. II for detailed survey results.

# Appendix V: Comments from the Financial Crimes Enforcement Network



**Financial Crimes Enforcement Network**
**U.S. Department of the Treasury**

*Office of the Director*                                                    *Washington, D.C. 20220*

October 31, 2024

Michael Clements
Director
Financial Markets and Community Investment
United States Government Accountability Office
441 G Street, NW
Washington, DC 20548

Dear Mr. Clements:

Thank you for providing the Financial Crimes Enforcement Network (FinCEN) the opportunity to review the Government Accountability Office (GAO) draft report, "Currency Transaction Reports:  Improvements Could Reduce Filer Burden While Still Providing Useful Information to Law Enforcement" (GAO-25-106500).  FinCEN appreciated the opportunity to engage with GAO throughout the process and supports your report's efforts to analyze the importance of currency transaction reports (CTRs) to law enforcement and the effects of raising the CTR threshold.

Sections 6204 and 6205 of the Anti-Money Laundering Act of 2020 (AML Act) include provisions for the Secretary of the Treasury to review reporting requirements for CTRs, including thresholds and aggregation requirements, and propose changes to reduce any unnecessarily burdensome regulatory requirements.  FinCEN is in the process of carrying out these requirements.  In support of this and other reports required by the AML Act, FinCEN issued a Request for Information on December 15, 2021 titled "A Review of Bank Secrecy Act Regulations and Guidance" pursuant to AML Act Section 6216 (the "6216 RFI").  *See* 86 FR 71201 (Dec. 15, 2021).

FinCEN concurs with Recommendation One, which states that "The Secretary of the Treasury should ensure that the Director of FinCEN takes steps to eliminate CTR fields that are unnecessarily burdensome for filers and of little use to law enforcement.  This could be done as part of FinCEN's AML Act review or through a different method."  FinCEN is conducting the necessary analysis and consultations and will address CTR fields as part of its report under section 6204.

FinCEN concurs with Recommendation Two, which states that "The Secretary of the Treasury should ensure that the Director of FinCEN takes steps to simplify and clarify aggregation requirements.  This could be done as part of FinCEN's AML Act review or through a different method."  FinCEN is conducting the necessary analysis and consultations and will address CTR aggregation as part of its reports under section 6204 and 6205.

*www.fincen.gov*

**Appendix V: Comments from the Financial Crimes Enforcement Network**

FinCEN Comments Letter to Mr. Michael Clements

Page 2

FinCEN concurs with Recommendation Three, which states that "The Secretary of the Treasury should ensure that the Director of FinCEN establish a performance management process that defines performance goals and measures for monitoring the usefulness of CTRs." FinCEN considered CTRs to be included in an existing performance measure, as part of improving tracking of overall BSA data. GAO's previous review (GAO-22-105242) from May 2021 to August 2022 of BSA use tracking by the Department of Justice (DOJ) for AML Act § 6201 reporting highlighted FinCEN's limited ability to assess and provide feedback on the value of BSA reports because "agencies collected these data inconsistently or not at all." The DOJ in its most recent 6201 report for FY2023 discussed the challenges of quantifying the use of BSA reporting, including CTRs. However, FinCEN would like to note that the process of implementing consistent and reliable tracking of BSA data generally is an ongoing effort that involves significant resources and time by all agencies with BSA data access. FinCEN is working hard to complete certain AML Act reviews of existing BSA data use, and consider more targeted measures that improve both tracking and usefulness of BSA data to law enforcement, including CTRs.

FinCEN concurs with Recommendation Four, which states that "The Secretary of the Treasury should ensure that the Director of FinCEN takes steps to reduce the number of CTRs filed that are not used by law enforcement, such as by raising the threshold or expanding criteria to allow for further exemptions. These actions should be informed by an analysis of the characteristics of CTRs that have been less likely to be accessed by law enforcement." FinCEN is conducting the necessary analysis and consultations to complete reports required under sections 6204, which will address exemptions, and 6205, which will address the CTR threshold.

We appreciate the role of GAO in providing oversight of our programs and look forward to working with GAO in the future. FinCEN is committed to full implementation of the AML Act to ensure that the United States maintains an effective and risk-based AML/CFT supervisory and regulatory regime.

Sincerely,

/s/

Jimmy Kirby
Deputy Director

**EXHIBIT "D"**

Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Global Investigations Division* | *Washington, D.C. 20220*

March XX, 2025

**INFORMATION MEMORANDUM FOR DIRECTOR ANDREA M. GACKI**

(U) **THROUGH:**          Matthew R. Stiglitz
                                     Associate Director

                                     Amanda Joca
                                     Deputy Associate Director

                                     Chase Lubbock
                                     Office Director, Western Hemisphere

(U) **FROM:**              Kieran Murray and Shannon Mizzi
                                     Global Investigative Specialists

(U//~~FOUO~~) **SUBJECT:**   Administrative Record for Geographic Targeting Order for Cash
                                     Transactions at Southwest Border Money Services Businesses

**I.**      (U) <u>**Executive Summary**</u>

(U//~~FOUO~~) The Global Investigations Division (GID) of the Financial Crimes Enforcement
Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommends the
issuance of a public Geographic Targeting Order (GTO) to address cash-based money laundering
along the southwest border, including by Mexican drug cartels—including cartels linked to illicit
opioid trafficking.  This GTO would lower the threshold for filing Currency Transaction Reports
(CTRs) to $200 for money services businesses (MSBs) located in 30 ZIP codes along with
southwest border.  These ZIP codes are in two counties in California (Imperial and San Diego
counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties).
The GTO would carry out the purposes of the Bank Secrecy Act (BSA), 31 U.S.C. 5311 *et seq*,
by collecting data that is expected to be highly useful to law enforcement for case generation,
ongoing investigations, and prosecutions targeting Mexican drug cartels, which are both drug
trafficking organizations (DTOs) and transnational criminal organizations (TCOs) and would
assist FinCEN and law enforcement in identifying the extent to which these actors are exploiting

MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States.

## II.　　(U) **Applicable Authority**

(U) FinCEN would issue the proposed GTO pursuant to 31 U.S.C. 5326 ("section 5326"). Section 5326 authorizes the Secretary of the Treasury (Secretary), upon finding that "reasonable grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof," to issue an order requiring "nonfinancial trades or businesses in a geographic area" to:

(1) Obtain specified information concerning any transaction in which such nonfinancial trades or businesses are involved "for the payment, receipt, or transfer of funds" and "any other person participating in such transaction;"

(2) "Maintain a record of such information" for the period set out in the order; and

(3) File a report regarding any such transaction "in the manner and to the extent specified in the order."[1]

(U) The purposes of the BSA include, but are not limited to, "requir[ing] certain reports … that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering … risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States."[2]  The authority of the Secretary to administer the BSA and its implementing regulations has been delegated to FinCEN.[3]

(U) Section 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed.[4]

---

[1] (U) 31 U.S.C. 5326(a); *see also* 31 CFR 1010.370(a).
[2] (U) 31 U.S.C. 5311(1)(A), (3) and (4).
[3] (U) Treasury, Treasury Order 180-01 (Jan. 14, 2020).
[4] (U) 31 U.S.C. 5326(d).

000005

III.     (U) **Background**

A.  (U) **FinCEN's Regulation of MSBs**

(U) An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, travelers' checks, or pre-paid access products for an amount greater than $1,000 per person, per day, in one or more transactions.  All persons that engage in the transfer of funds as a money transmitter are also considered MSBs, regardless of the amount of money transmission activity.[5]

(U) Every MSB must register with FinCEN by electronically filing FinCEN Form 107, Registration of Money Services Business, unless a person or business is only an MSB because they serve as an agent of another MSB.[6]  The MSB's owner or controlling person must register by the end of a 180-day period beginning the day after the date they established the MSB.[7]  They are also required to renew their MSB registration each two-calendar-year period following the initial registration by filing another Form 107.[8]  Although agents are not required to register as MSBs, any MSB must prepare and maintain—but not file with FinCEN—a list of its agents.[9]  There are persons who violate these rules by operating as MSBs without registering with FinCEN, often because they are engaging in illicit activity.  FinCEN and law enforcement agencies target such persons for enforcement measures.

(U) All MSBs (including those that are agents, rather than principals) must electronically file CTRs when they have a cash-in or cash-out currency transaction, or multiple transactions, totaling more than $10,000 during one business day for any one person, or on behalf of any one person.[10]  All individuals (except employees of armored car services)[11] conducting a transaction reportable on a CTR, for themselves or for another person, must be identified by means of an official document, such as a driver's license.[12]  CTRs collect information necessary to identify the person or entity on whose behalf the transaction is being conducted; the identity of the person conducting the transaction, if different; payment information; information about the relevant MSB or agent conducting the transaction (name, address, and identification number of the person

---

[5] (U) 31 CFR 1010.100(ff).
[6] (U) 31 CFR 1022.380(a).
[7] (U) 31 CFR 1022.380(b)(3).
[8] (U) 31 CFR 1022.380(b)(2).
[9] (U) 31 CFR 1022.380(d).
[10] (U) 31 CFR 1022.300-313.
[11] (U) FinCEN, FIN-2013-R001, "Treatment of Armored Car Service Transactions Conducted on Behalf of Financial Institution Customers or Third Parties for Currency Transaction Report Purposes" (July 12, 2013), *available at* https://www.fincen.gov/sites/default/files/administrative_ruling/2024-02-02/FIN-2013-R001.pdf.
[12] (U) 31 CFR 1022.312.

000006

or entity conducting the transaction).  The persons conducting transactions reportable on a CTR are prohibited from structuring the transaction to evade the reporting requirement, such as by splitting transactions into smaller amounts in an attempt to evade the $10,000 reporting threshold.[13]

(U) All MSBs are required to develop, implement, and maintain an effective AML/CFT compliance program.  The program should be reasonably designed to prevent individuals from using the MSB to facilitate money laundering or to finance terrorist activities.  Each program must be written and take into account the inherent risks of the business, as well as:

- Incorporate policies, procedures, and internal controls reasonably designed to assure compliance with the BSA;

- Designate a person to assure day-to-day compliance with the BSA;

- Provide education and training to appropriate personnel; and

- Provide for an independent review to monitor and maintain an adequate program.[14]

(U) Generally, MSBs that know, suspect, or have reason to suspect that a transaction or pattern of transactions is suspicious and involves $2,000 or more, must electronically file a FinCEN Form 111, Suspicious Activity Report (SAR), on the activity.[15]

(U) MSBs are required to retain certain records with respect to transmittals of funds for $3,000 or more;[16] purchases of bank checks or drafts, cashier's checks, money orders or traveler's checks for $3,000 or more in currency;[17] and prepaid access.[18]

## B.  (U) **Vulnerabilities of MSBs to Money Laundering**

(U) While most of the business that MSBs conduct is legitimate and essential, MSBs are vulnerable to exploitation by money launderers.  Treasury's 2024 National Money Laundering Risk Assessment (NMLRA) identified the illicit financial activities of drug cartels,  as a major risk to MSBs and other types of financial institutions.[19]  And, FinCEN has identified money

---

[13] (U) 31 CFR 1022.314.
[14] (U) 31 CFR 1022.210.
[15] (U) 31 CFR 1022.320.
[16] (U) 31 CFR 1010.410.
[17] (U) 31 CFR 1010.415.
[18] (U) 31 CFR 1022.420; 31 CFR 1022.210 (d)(1)(iv).
[19] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 ("The illicit financial activities of DTOs pose risks to banks, [MSBs], and other entities, such as real estate agents and attorneys."), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000007

transfers through MSBs as a financial typology associated with Mexico-based drug cartels and their illicit procurement of fentanyl precursor chemicals and manufacturing equipment.[20]

(U//FOU) MSBs along the southwest border are particularly at risk for abuse by money launderers for cartels, being in an area where cartels engaged in drug, human, and weapons trafficking intensively operate and need to move illicit cash across the border.  Mexico-based drug cartels, including the Sinaloa and Jalisco New Generation cartels, are the dominant producers and suppliers of fentanyl and other illicit drugs destined for the U.S. market.[21]  To enable their efforts to traffic fentanyl and other opioids and to launder their funds back to Mexico, these and other drug cartels have gained functional control, through violence, of nearly

---

[20] (U) FinCEN, "Supplemental Advisory on the Procurement of Precursor Chemicals and Manufacturing Equipment Used for the Synthesis of Illicit Fentanyl and Other Synthetic Opioids," (June 20, 2024), pp. 8-9 ("Money transfers through banks, MSBs, and online payment processors are a common financial typology associated with TCOs' procurement of fentanyl precursor chemicals and manufacturing equipment.  These transactions may be sent from Mexico or the United States to mainland [China] (including via Hong Kong and other jurisdictions) to individuals and shell and front companies associated with either a [China]-based supplier or a chemical broker.  While some money transfers are sent from TCOs in Mexico to [China]-based suppliers without crossing the U.S. financial system, many of these foreign transactions are cleared in U.S. dollars through U.S. correspondent banks, Mexico- and [China]-based agents of U.S. MSBs, and U.S. online payment processors."), *available at* https://www.fincen.gov/sites/default/files/advisory/2024-06-20/FinCEN-Supplemental-Advisory-on-Fentanyl-508C.pdf; *see also* Center for Strategic and International Studies, "Understanding the Impact of Remittances on Mexico's Economy and Safeguarding Their Future Impact" (Jan. 15, 2025), ("The expanding volume of remittance transactions provides more than economic benefits to regular Mexicans; it also presents ample opportunity for exploitation.  Criminal organizations take advantage of the small-increment nature of remittance transactions to evade oversight regulations and launder money related to drug trafficking and other illicit income streams, a practice which has increased in frequency since the Covid-19 pandemic disrupted cross-border movement and the associated traditional methods of bulk cash smuggling.") *available at* https://www.csis.org/analysis/understanding-impact-remittances-mexicos-economy-and-safeguarding-their-future-impact.

[21] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.  *See The New York Times*, "The American Drug Mules Smuggling Fentanyl into the U.S." (Sep. 28, 2024) ("Since 2019, when Mexico overtook China to become the dominant supplier of fentanyl in the United States, cartels have been flooding the country with the synthetic opioid.  The amount of fentanyl crossing the border has increased tenfold in the past five years.  Mexico has been the source of almost all of the fentanyl seized by U.S. law enforcement in recent years."), *available at* https://www.nytimes.com/2024/09/28/world/americas/fentanyl-drug-smugglers-us.html; Brookings Institute, "US-Mexico Relations and the fight against fentanyl trafficking" (Oct. 8, 2024) ("Mexico and specifically Mexican criminal groups, the Sinaloa cartel and Cartel Jalisco Nueva Generación, are the two main actors today that are producing fentanyl.  They make fentanyl from precursor chemicals that come from China.  These precursors arrived in Mexico.  The two cartels then synthesize them into fentanyl and then bring the fentanyl in various forms and through various means to the United States across the U.S.-Mexico border.  They dominate wholesale distribution of drugs in the U.S., certainly fentanyl, but equally so methamphetamine and cocaine.  And they really work until about the middle layer.  These groups are not the retailers themselves.  They the hire, they contract local criminal groups across the United States, but just about until the level of retail they bring drugs, produce drugs, trafficked drugs, distribute drugs in the United States.  And also, they of course then move proceeds from the United States to Mexico as well as weapons."), *available at* https://www.brookings.edu/articles/us-mexico-relations-and-the-fight-against-fentanyl-trafficking/.

5

all illegal traffic across the southern border of the United States.  In light of this fact, President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been  named cartels as Foreign Terrorist Organizations and Specially Designated Global Terrorists.[22]  MSBs along the southwest border are therefore subject to a unique money laundering vulnerability, as, given their proximity to the border, these cartels leverage the services provided by these MSBs to return illicit proceeds to Mexico.

(U) MSBs typically offer a limited range of services compared to other financial institutions, with many offering services tailored to persons without bank accounts.  These MSBs are often agents of a larger MSB and offer MSB services as part of its operation as a corner store or chain retailer.  The competitively priced services and convenient location offered near the border by such MSBs make them attractive for persons interested in using cash to fund money transmittals moving value across the border to Mexico, or to Central and South American countries, for both licit and illicit purposes.[23]

(U) MSBs offer a range of services, primarily built around exchanging currencies, cashing checks, receiving cash to fund money transmittals, and paying out cash to recipients of money transmittals.  Due to the cash-intensive nature of this industry, it has become an avenue through which drug cartels move untraceable flows of value.  For example, illicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico.  Similarly, an MSB may be used to receive a money transmittal from anywhere in the United States, funneling the value to the southwest border, which can be cashed out and the value moved to Mexico.[24]  Moreover, illicit actors may comingle licit and illicit cash, making dirty money even more difficult to detect for MSBs.

---

[22] (U) Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," 90 FR 8439, (Jan. 20, 2025), *available at* https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign-terrorist-organizations-and-specially-designated-global-terrorists/; U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), *available at* https://www.state.gov/designation-of-international-cartels/.

[23] (U) D. Ore, "How Mexican narcos use remittances to wire U.S. drug profits home," *Reuters* (Aug. 18, 2023), *available at* https://www.reuters.com/investigates/special-report/mexico-drugs-remittances/.

[24] (U) FinCEN, "Supplemental Advisory on Identifying and Reporting Human Trafficking and Related Activity" (Oct. 15, 2020), p. 4 ("Funnel accounts generally involve an individual or business account in one geographic area that receives multiple cash deposits, often in amounts below the cash reporting threshold, from which the funds are withdrawn in a different geographic area with little time elapsing between the deposits and withdrawals.  Human traffickers may use interstate funnel accounts to transfer funds between geographic areas, move proceeds rapidly, and maintain anonymity.  In labor and sex trafficking schemes, human traffickers may open accounts in their name, or escort victims to a bank, and force them to open an account…In some cases, victims also are coerced or forced to

000009

(U) Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including "money mules,"[25] to move funds to Mexico via U.S.-based MSBs, structured to evade reporting requirements (*i.e.*, keeping the amount of any individual cash transaction below the applicable reporting threshold to avoid identification and reporting requirements). Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations.[26]

(U) The services provided by MSBs are sometimes provided wittingly to drug cartels, turning the MSB into a professional money launderer. For example, the owner of an MSB in California was convicted in 2024 for conspiracy to commit money laundering on behalf of the Jalisco New Generation Cartel, by knowingly laundering drug proceeds by accepting cash from drug dealers below the CTR threshold and wiring it to Mexico, disguising it to look like routine remittances.[27] Similarly, in 2017, the owners and employees of an MSB pleaded guilty to accepting cash that was represented as coming from drug sales, which, in exchange for a kickback, they agreed to launder to Mexico by breaking the transactions into smaller amounts, resulting in more than $40 million laundered over a roughly four-year timeframe.[28]

---

wire proceeds via [MSBs] to facilitate the funneling of proceeds."), *available at* https://www.fincen.gov/sites/default/files/advisory/2020-10-15/Advisory%20Human%20Trafficking%20508%20FINAL_0.pdf; FinCEN, "FinCEN Alert on Human Smuggling along the Southwest Border of the United States" (Jan. 13, 2023) ("Smuggling fees, often paid by the family members of migrants already settled in the United States and disguised as remittances, are sent to funnel accounts at financial institutions with branches or locations along both sides of the SW border."), *available at* https://www.fincen.gov/sites/default/files/shared/FinCEN%20Alert%20Human%20Smuggling%20FINAL_508.pdf.

[25] (U) FBI, "Money Mules," *available at* https://www.fbi.gov/how-we-can-help-you/scams-and-safety/common-frauds-and-scams/money-mules.

[26] (U) *See, e.g.*, FinCEN, "Advisory to Financial Institutions on Illicit Financial Schemes and Methods Related to the Trafficking of Fentanyl and Other Synthetic Opioids" (Aug. 21, 2019), pp. 3, 9 ("An analysis of sensitive financial data illustrates that when U.S. individuals purchase fentanyl directly from China and other foreign countries, they often structure the money transfers to evade [BSA] reporting and recordkeeping requirements. Individuals frequently transfer the funds using multiple MSB agent locations…Professional money laundering organizations hire loosely associated parties (including "money mules") to send money transfers to Mexico via U.S. MSBs, primarily money transmitters, structured to evade reporting requirements. In this context, structuring (*i.e.*, keeping the amount of the money transfer below the applicable threshold of $3,000 in order to avoid identification and reporting requirements) is accomplished through one of, or a combination of, the following: • The illicit proceeds are divided between multiple individuals who send the transfers; • An individual uses multiple MSB agent locations to send transfers; and/or • An individual sends multiple transactions consecutively."), *available at* https://www.fincen.gov/sites/default/files/advisory/2019-08-21/Fentanyl%20Advisory%20FINAL%20508.pdf.

[27] (U) Complaint, *United States v. Chavez Zepeda et al*, No. 2:22-cr-00064 (E.D. Cal., Mar. 14, 2022).

[28] (U) Indictment, *United States v. Perez et al*, No. 1:17-cr-00200 (N.D. Ga., June 16, 2016).

000010

**IV.**     (U) **Justification for the GTO**

(U//FOUO) This GTO is necessary to carry out the purposes of the BSA because the GTO, due to the money laundering risks discussed above, would likely result in information highly useful in money laundering investigations, especially in the context of the fentanyl crisis, discussed in Section IV.A.  The anticipated benefits of the GTO are discussed in Section IV.B.

   **A.**  (U) **Necessity to Address the Fentanyl Crisis**

(U) The supply and sale of fentanyl and other synthetic opioids is one of the greatest national security threats facing the United States.  Nearly 38,000 Americans died from fentanyl use in the first six months of 2023, and fentanyl and other synthetic drugs, including methamphetamine, account for nearly all fatal drug overdoses that occur in the United States.[29]  Drug cartels make billions of dollars in profit from the production and distribution of these drugs in the United States, enriching themselves, and allowing them to continue to traffic in drugs and other illicit goods, as well as expand their economic, political, and social influence.[30]  Drug cartels and the professional money launderers who support their illicit drug trafficking activities—including Chinese Money Laundering Organizations (CMLOs)—introduce smuggled and illicitly generated cash into the legitimate financial system, including through MSBs.[31]

   **B.**  (U) **Anticipated Benefits of the GTO**

(U//FOUO) As discussed above, MSBs along the southwest border are a point of vulnerability in the U.S. financial system.  MSBs are, wittingly and unwittingly, facilitating the movement of funds that finance fentanyl trafficking and the commission of other crimes by drug cartels, including Mexico-based cartels, that threaten the national security of the United States.  Drug cartels based in Mexico and other countries in Central and South America need to repatriate illicitly generated proceeds to benefit from their crimes and remain in business.  FinCEN assesses that cash remittances conducted by MSBs along the southwest border are an important

---

[29] (U) U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 1, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.
[30] (U) Treasury, "2024 National Money Laundering Risk Assessment," (Feb. 2024), pp. 18-24 (describing the major money laundering by DTOs of proceeds generated from the trafficking of illicit synthetic opioids), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf; U.S. Drug Enforcement Administration, "National Drug Threat Assessment," (May 2024), pp. 46-50 (describing how DTOs launder profits, providing in part that "The Sinaloa and Jalisco cartels, and other global criminal networks, generate billions of dollars in profits from the sale of illicit drugs"), *available at* https://www.dea.gov/sites/default/files/2024-05/5.23.2024%20NDTA-updated.pdf.
[31] (U) Treasury, "National Money Laundering Risk Assessment" (2024), p. 46 (describing how DTOs launder profits), *available at* https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.

000011

avenue for this illicit activity, particularly since cartels also engage in bulk cash smuggling along the border, and so collect cash near border crossings.[32]

(U//FOUO) By lowering the CTR threshold, the information reported under this GTO would help Treasury, including FinCEN and its fellow Office of Terrorism and Financial Intelligence components, as well as its law enforcement partners identify cartel-related, money laundering and to conduct targeted investigations and prosecutions of suppliers and facilitators that enable the flow of deadly drugs such as fentanyl into the United States.  These additional GTO reports are expected to generate new leads and identify new and related subjects in ongoing cases.  For example, the resulting reports may allow the identification of a comprehensive network of potential money mules in the geographic areas in question.  They may also create leads related to professional money launderers—operating on behalf of cartels, but also laundering proceeds for whomever will hire them—meaning that any increased monitoring of MSBs would likely capture information about the laundering of funds related to multiple criminal typologies.  The GTO would also support investigations into MSBs themselves that may be complicit in supporting illicit activity or demonstrate poor AML/CFT controls.

(U//FOUO) Finally, the parameters of this GTO, in particular the reduced dollar reporting threshold, will help make structuring more difficult, thereby increasing the cost of doing business for cartels.  In addition, the GTO will help law enforcement identify cases in which MSBs are used to receive cash from funneled to one location from multiple sources, as with the use of money mules.  Each piece of information collected on a CTR form has the potential to augment an investigation, including the transaction date and amount; the name, date of birth, Social Security Number or Taxpayer Identification Number, phone number, email address, occupation, identification number, and account number of the individual and/or entity sending and receiving funds; the location and business at which the transaction took place; and information about the filer.

**V.**     (U) **Scope of the GTO**

    **A.**  (U) **Covered Geographic Areas**

The GTO will initially cover the following ZIP codes near the U.S.-Mexico border in the states of California and Texas (the "Covered Geographic Area"), which were selected based on risk

---

[32] Homeland Security Investigations, "Issue #57," *Cornerstone* (Oct. 2024), *available at* https://content.govdelivery.com/accounts/USDHS/bulletins/3babbe0; U.S. Drug Enforcement Administration, "National Drug Threat Assessment" (May 2024), p. 49, *available at* https://www.dea.gov/sites/default/files/2025-02/508_5.23.2024%20NDTA-updated.pdf.

000012

factors that include their proximity to the border and to a border crossing, and, based on a FinCEN analysis of CTR filings in 2024, whether the number of CTRs filed in the ZIP code is high relative to the population, in comparison to other ZIP codes. Therefore, GID assesses that these same ZIP codes likely correspond to a large number of cash transactions below the $10,000 threshold, relative to other ZIP codes. While MSBs in Arizona and New Mexico are likely also vulnerable to exploitation by drug cartels, GID chose to keep this GTO limited in scope, focusing on states containing the major U.S.-Mexico border crossings, both to limit burden and to be able to assess trends and effectiveness. However, FinCEN may consider expanding this GTO to ZIP codes in Arizona and New Mexico in the future.

*California*

| Zip Code | Rationale |
|---|---|
| *Imperial County* | |
| 92231 | Borders Mexico; contains significant border crossings – Calexico West and Calexico East Ports of Entry; 1,570 CTRs filed for a population of 39,542, the highest CTR to population ratio in the county. |
| 92249 | 43 CTRs filed for a population of 6,975, the second highest CTR to population ratio in the county. |
| 92281 | 11 CTRs filed for a population of 2,122, the third highest CTR to population ratio in the county. |
| 92283 | Borders Mexico; contains a border crossing – Andrade Port of Entry; 13 CTRs filed for a population of 2,695, the fourth highest CTR to population ratio in the county. |
| *San Diego County* | |
| 91910 | 1,358 CTRs filed for a population of 79,613, the seventh highest CTR to population ratio in the county. |

_____

[33]

000013

| 92101 | 2,142 CTRs filed for a population of 47,505, the fourth highest CTR to population ratio in the county. |
|---|---|
| 92113 | 930 CTRs filed for a population of 50,457, the sixth highest CTR to population ratio in the county. |
| 92117 | 1,394 CTRs filed for a population of 51,586, the fifth highest CTR to population ratio in the county. |
| 92126 | 4,752 CTRs filed for a population of 74,788, the third highest CTR to population ratio in the county. |
| 92154 | Borders Mexico; contains a significant border crossing – Otay Mesa Port of Entry; 6,494 CTRs filed for a population of 84,027 the second highest CTR to population ratio in the county. |
| 92173 | Borders Mexico; contains significant border crossings – San Ysidro Port of Entry and Cross Border Xpress; 2,793 CTRs filed for a population of 29,703, the highest CTR to population ratio in the county. |

### Texas

| ZIP Code | Rationale |
|---|---|
| **Cameron County** | |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing – Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |
| **El Paso County** | |

000014

| | |
|---|---|
| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,0127, the fourth highest CTR to population ratio in the county. |
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |
| **Hidalgo County** | |
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

12

| Maverick County | |
|---|---|
| 78852 | Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712. |
| Webb County | |
| 78040 | Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county. |
| 78041 | Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county. |
| 78043 | 364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county. |
| 78045 | Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county. |
| 78046 | 46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county. |

**B.** (U) **Covered Transactions**

(U//FOUO) The impact of the GTO would be to generally lower the existing threshold for filing CTRs from $10,000 to $200.  Under the GTO, a covered Transaction would be any deposit, withdrawal, exchange of currency or other payment or transfer, by, through, or to the Covered Business (defined, here, as an MSB operating in the Covered Geographic Area), which involves a transaction in currency of more than $200 but less than $10,000.  Because the GTO, except as noted therein, would not otherwise alter any currently applicable BSA requirement, money services businesses would still be required to file transactions in currency of more than $10,000. The $200 threshold is proposed because it would include nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly de minimis amounts that are more likely to be legitimate.  It would also provide FinCEN with a snapshot in time of a significant sample of cash transactions in the Covered Geographic Areas,

000016

allowing FinCEN to more fully understand the money laundering risks related to MSBs and cross-border cash remittances.

(U//FOUO) The GTO would retain the requirement to aggregate different cash transactions conducted by or on behalf of the same person during a single day, regardless of whether the additional cash transactions occur within the Covered Geographic Areas, but without lowering the $10,000 threshold.  Aggregation is meant to detect structured transactions attempting to evade the filing threshold, but GID believes that the $200 filing threshold under the GTO largely negates the risks inherent in aggregation, as it would already capture the majority of cash transactions.  Structuring below $200 to evade the requirement would make laundering large amounts of currency at the border more difficult and costly.  Not requiring aggregation down to the $200 threshold also would help mitigate burdens on the Covered Businesses, as aggregation is inherently complicated.

(U//FOUO) GID does not expect that the lower reporting threshold will materially affect the flow of legitimate funds, including remittances, between the United States and Mexico.  While the GTO would place a higher burden on Covered Businesses due to the increased volume of CTRs that would result, it is merely a reporting obligation and does not alter their obligations with respect to AML/CFT programs.  GID does not expect these Covered Businesses to materially alter typical fees charged for cash services, given that the reporting period is temporary, and the Covered Businesses will face continued competition from banks and other financial institutions offering similar services (compared to which the Covered Businesses generally offer lower fees) and from MSBs outside of the Covered Geographic Areas.

(U//FOUO) GID recognizes that, due to its deterrent effect, this GTO may encourage illicit actors to adopt new methods or patterns of activity.  FinCEN and its law enforcement partners will monitor shifts in activity, including any decreases in the flow of funds through Covered Businesses and any increases in activity at MSBs in areas near to the counties covered by this GTO.  Based on the results of this analysis, FinCEN may expand or otherwise modify the geographic scope of this order to cover MSBs in additional ZIP codes or counties in any future issuances.  FinCEN anticipates some illicit actors may change the methods by which they launder money, including by attempting to launder illicit funds through banks over MSBs; FinCEN believes that this may be a benefit of the GTO, as banks have more stringent reporting and recordkeeping obligations than MSBs and would likely inform FinCEN of new suspicious activity.

000017

### C.  (U) **Covered Businesses**

(U//FOUO) Any person that meets the definition of an MSB operating in the Covered Geographic Areas, as well the subsidiaries and agents of an MSB if such subsidiaries and agents are located in the Covered Geographic Area, would be considered a "Covered Business".  MSBs are required to keep current lists of their agents and, as with other GTOs, MSBs would be responsible for communicating the order's requirements to its agents.

### D.  (U) **Order Period**

(U) To provide the Covered Businesses time to comply with the GTO, the relevant period for the GTO would begin 30 days after the order is published and be in force for 180 days from that date.

### E.  (U) **Analytic Plan**



000018

**V.**     (U) <u>**Conclusion**</u>

(U//~~FOUO~~) For the foregoing reasons, GID believes that, by requiring reporting of high-risk cash transactions along the southwest border, the proposed GTO is necessary to carry out the purposes of the BSA.  Accordingly, GID recommends issuing the proposed GTO.

000019

**Southwest Border Geographic Targeting Order Clearance Sheet**

Subject:   **Administrative Record for Geographic Targeting Order for Cash Transactions at Southwest Border Money Services Businesses**

Drafted:   Global Investigations Division – Shannon Mizzi/Kieran Murray          (02/27/2025)

Approved:  FinCEN Director – Andrea Gacki          (MM/DD/YYYY)

Cleared:   Global Investigations Division – Associate Director Matthew Stiglitz          (02/28/2025)

          Office of Chief Counsel – Sean Boyce          (03/04/2025)

          Principal Deputy Assistant General Council (E&I) –          (MM/DD/YYYY)

000020

**EXHIBIT "E"**

Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

# 2024 National Money Laundering Risk Assessment



**February 2024**

Department of the Treasury

# National Money Laundering Risk Assessment (NMLRA)



### SNAPSHOT: Prescription Drug Diversion

While illicit production of synthetic opioids remains a significant concern, U.S. law enforcement also prioritizes the investigation of medical professionals (or those representing themselves as such) who divert controlled substances from legitimate medical supply. Many of these offenses are associated with other predicates for money laundering, such as healthcare fraud.

In March 2023, 14 defendants were sentenced for their respective roles in a variety of crimes stemming from a wide-ranging racketeering conspiracy involving diversion of prescription drugs, money laundering, mail and wire fraud, and additional crimes.[103] According to the government's filings, prescription drugs were procured illicitly at below-market value and then were resold and re-introduced into the market as legitimate drugs at near-market prices. Illicit procurement can involve stealing drugs from manufacturers; buying drugs from patients with prescriptions at below-market prices (the patients' costs are offset or reduced by insurance, including Medicare); buying drugs using false prescriptions and straw patients, usually with the aid of a corrupt doctor (again, with the costs offset or reduced by insurance); and purchasing drugs from a manufacturer at a discounted price through fraud (*e.g.,* falsely claiming a charitable or similar discount).

## 2. Priority DTO Threat Actors

The illicit financial activities of DTOs pose risks to banks, money services businesses, and other entities, such as real estate agents and attorneys. DTOs have also made use of VASPs.[104]

### a) *Sinaloa and CJNG (Mexico)*

According to its 2023 Annual Threat Assessment, the U.S. intelligence community cited Mexico-based TCOs as the dominant producers and suppliers of various illicit drugs destined for the domestic U.S. market.[105] Mexican TCOs, particularly the Sinaloa Cartel and the CJNG remain the most predominant and sophisticated groups overseeing the transportation and distribution routes from Mexico to the United States. According to the DEA, these two cartels, as well as their associates, facilitators, and brokers, operate in all 50 U.S. states and over 50 countries around the world. Both groups have consolidated control over drug corridors from Mexico and are heavily involved in the trafficking of fentanyl, methamphetamine, cocaine, heroin, and marijuana. Both have a history of establishing drug trafficking hubs, strong criminal partnerships, and using violence and corruption to gain control over the territory where they operate.[106]

According to the DOJ, the Sinaloa Cartel operates as an affiliation of drug traffickers and money launderers who obtain precursor chemicals, mainly from suppliers in China, for the manufacture of

---

103   DOJ, "Judgment Entered Against Fourteen Defendants In Case Dismantling Nationwide Racketeering Conspiracy", (March 30, 2023), https://www.justice.gov/usao-ndca/pr/judgment-entered-against-fourteen-defendants-case-dismantling-nationwide-racketeering.

104   DTO Activity as a national AML/CFT priority.

105   DNI, "Annual Threat Assessment of the U.S. Intelligence Community", (February 6, 2023), https://www.dni.gov/files/ODNI/documents/assessments/ATA-2023-Unclassified-Report.pdf.

106   Europol-DEA, "Complexities and Convenances in the International Drug Trade: The involvement of Mexican criminal actors in the EU drug market", (December 5, 2022),  https://www.dea.gov/sites/default/files/2022-12/Europol_DEA_Joint_Report_Final.pdf, pg. 3.

synthetic drugs in Mexico. The Sinaloa Cartel will then traffic those drugs into the United States and collect, launder, and transfer the illicit proceeds back to Mexico. Once led by Joaquin Guzman Loera, aka El Chapo, and Ismael Zambada Garcia, aka El Mayo, the Sinaloa Cartel's members and associates, allegedly including the sons of Guzman Loera (collectively known as Los Chapitos), smuggled significant quantities of illicit drugs through Mexico and into the United States.[107]

In April 2023, the DOJ announced charges against several leaders of the Sinaloa Cartel, including the sons of incarcerated former Sinaloa leader Guzman Loera.[108] According to court documents, Los Chapitos leveraged several methods for laundering proceeds from fentanyl and other illicit drug sales, using various methods long used by the Sinaloa cartel and similar Mexican TCOs such as BCS, domestic and offshore bank accounts, shell companies, real estate, TBML, and virtual assets.[109]

As explained further in the Los Chapitos indictment, two of the defendants allegedly conspired to repatriate the value of drug proceeds through smuggling mobile phones as part of a TBML scheme. As part of the scheme, one defendant allegedly purchased U.S. dollars in bulk from Mexico-based Sinaloa Cartel traffickers at a discount in exchange for Mexican pesos, which represents the proceeds of cartel-linked fentanyl sales in the United States. The defendant directed U.S.-based couriers to collect drug proceeds in specific U.S. cities, which they then used to purchase cellphones in bulk. The defendant then smuggled the phones into Mexico to sell at an inflated price. (*See CMLO section for further information on schemes involving electronics*).

A two-year Organized Crime Drug Enforcement Task Forces (OCDETF) investigation dismantled a sophisticated money laundering organization linked to the Sinaloa Cartel. The investigation led to the indictment of 12 people, the seizure of over $17 million in cash and bank accounts, and the rescue of two extortion victims. The organization allegedly used shell companies incorporated in Wyoming to launder millions of dollars in cash belonging to the cartel. The leader of the organization was Enrique Daan Esparragoza Rosas, a Mexican national based in Sinaloa, who received requests from top cartel leaders like Ismael "El Mayo" Zambada and Joaquin "Chapo" Guzman. One of the defendants, Cristian Amaya Nava, admitted that he extorted two victims to repay a drug debt and laundered over $2.4 million for the cartel. Amaya Nava was sentenced to 60 months in prison.[110]

*b)* *Clan del Golfo (Colombia)*

During the assessment period, Clan del Golfo (CDG), a Colombia-based TCO and paramilitary organization, remained a significant producer and trafficker of cocaine destined for U.S. drug markets and earned a significant amount of proceeds in U.S. dollars. According to the DOJ, CDG is one of the most violent and powerful criminal organizations in Colombia, and it is one of the largest distributors of cocaine in the world. With as many as 6,000 members, the CDG exercises military control over vast amounts of territory in the Urabá region of Antioquia, Colombia, one of the most lucrative drug trafficking areas within Colombia due to its proximity to the Colombia-Panama border and the Caribbean and Pacific coasts.

---

107    DOJ, "Justice Department Announces Charges Against Sinaloa Cartel's Global Operation", (April 14, 2023,) https://www.justice.gov/opa/pr/justice-department-announces-charges-against-sinaloa-cartel-s-global-operation.

108    Ibid.

109    DOJ, SDNY, USA v. Ivan Archivaldo Guzman, case we CR 203, https://www.justice.gov/d9/press-releases/attachments/2023/04/14/u.s._v._salazar_et_al_indictment_2.pdf.

110    DOJ, "Sophisticated Sinaloa Cartel Money Laundering Organization Dismantled", April 11, 2023, https://www.justice.gov/usao-sdca/pr/sophisticated-sinaloa-cartel-money-laundering-organization-dismantled

**EXHIBIT "F"**

Declaration of Lee Jeffrey Ross, Jr. in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

# Presidential Documents

Executive Order 14157 of January 20, 2025

## Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists

By the authority vested in me as President by the Constitution and the laws of the United States of America, including the Immigration and Nationality Act (INA), 8 U.S.C. 1101 *et seq.,* the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. 1701 *et seq.* it is hereby ordered:

**Section 1**. *Purpose.* This order creates a process by which certain international cartels (the Cartels) and other organizations will be designated as Foreign Terrorist Organizations, consistent with section 219 of the INA (8 U.S.C. 1189), or Specially Designated Global Terrorists, consistent with IEEPA (50 U.S.C. 1702) and Executive Order 13224 of September 23, 2001 (Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism), as amended.

(a) International cartels constitute a national-security threat beyond that posed by traditional organized crime, with activities encompassing:

(i) convergence between themselves and a range of extra-hemispheric actors, from designated foreign-terror organizations to antagonistic foreign governments;

(ii) complex adaptive systems, characteristic of entities engaged in insurgency and asymmetric warfare; and

(iii) infiltration into foreign governments across the Western Hemisphere. The Cartels have engaged in a campaign of violence and terror throughout the Western Hemisphere that has not only destabilized countries with significant importance for our national interests but also flooded the United States with deadly drugs, violent criminals, and vicious gangs.

The Cartels functionally control, through a campaign of assassination, terror, rape, and brute force nearly all illegal traffic across the southern border of the United States. In certain portions of Mexico, they function as quasi-governmental entities, controlling nearly all aspects of society. The Cartels' activities threaten the safety of the American people, the security of the United States, and the stability of the international order in the Western Hemisphere. Their activities, proximity to, and incursions into the physical territory of the United States pose an unacceptable national security risk to the United States.

(b) Other transnational organizations, such as Tren de Aragua (TdA) and La Mara Salvatrucha (MS–13) pose similar threats to the United States. Their campaigns of violence and terror in the United States and internationally are extraordinarily violent, vicious, and similarly threaten the stability of the international order in the Western Hemisphere.

(c) The Cartels and other transnational organizations, such as TdA and MS–13, operate both within and outside the United States. They present an unusual and extraordinary threat to the national security, foreign policy, and economy of the United States. I hereby declare a national emergency, under IEEPA, to deal with those threats.

**Sec. 2**. *Policy.* It is the policy of the United States to ensure the total elimination of these organizations' presence in the United States and their ability to threaten the territory, safety, and security of the United States

through their extraterritorial command-and-control structures, thereby protecting the American people and the territorial integrity of the United States.

**Sec. 3**. *Implementation*. (a) Within 14 days of the date of this order, the Secretary of State shall take all appropriate action, in consultation with the Secretary of the Treasury, the Attorney General, the Secretary of Homeland Security, and the Director of National Intelligence, to make a recommendation regarding the designation of any cartel or other organization described in section 1 of this order as a Foreign Terrorist Organization consistent with 8 U.S.C. 1189 and/or a Specially Designated Global Terrorist consistent with 50 U.S.C. 1702 and Executive Order 13224.

(b) Within 14 days of the date of this order, the Attorney General and the Secretary of Homeland Security shall take all appropriate action, in consultation with the Secretary of State, to make operational preparations regarding the implementation of any decision I make to invoke the Alien Enemies Act, 50 U.S.C. 21 *et seq.*, in relation to the existence of any qualifying invasion or predatory incursion against the territory of the United States by a qualifying actor, and to prepare such facilities as necessary to expedite the removal of those who may be designated under this order.

**Sec. 4**. *General Provisions*. (a) Nothing in this order shall be construed to impair or otherwise affect:

(i) the authority granted by law to an executive department or agency, or the head thereof; or

(ii) the functions of the Director of the Office of Management and Budget relating to budgetary, administrative, or legislative proposals.

(b) This order shall be implemented consistent with applicable law and subject to the availability of appropriations.

(c) This order is not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person.

THE WHITE HOUSE,
*January 20, 2025.*

[FR Doc. 2025–02004
Filed 1–28–25; 11:15 am]
Billing code 3395–F4–P

BUCHALTER
A Professional Corporation
Daniel C. Silva (SBN: 264632)
Ava Sadeghi (SBN: 329352)
David S. Wilson (SBN: 348043)
655 West Broadway, Suite 1600
San Diego, CA 92101-8494
Telephone: 619.219.5335
Facsimile: 619.235.5351
Email: dsilva@buchalter.com
        asadeghi@buchalter.com
        dwilson@buchalter.com

Attorneys for Amicus Curiae
MONEY SERVICES BUSINESS
ASSOCIATION, INC.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| NOVEDADES Y SERVICIOS, INC., *et al.*,<br><br>Plaintiffs,<br><br>vs.<br><br>FINANCIAL CRIMES ENFORCEMENT NETWORK, *et al.*,<br><br>Defendants. | Case No. 3:25-cv-00886-JLS-DDL<br><br>**DECLARATION OF KATHRYN TOMASOFSKY IN SUPPORT OF AMICUS CURIAE'S BRIEF IN SUPPORT OF PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION**<br><br>Date:      May 15, 2025<br>Time:      9:00 a.m.<br>Dept.:      4D<br>Judge:      Hon. Janis L. Sammartino |

I, Kathryn Tomasofsky, declare as follows:

1.      I make this declaration based on my own personal knowledge and if called as a witness, could and would testify competently thereto.

2.      I am the Executive Director of the Money Services Business Association, Inc. ("MSBA"). I make this declaration in support of MSBA's Unopposed Brief as Amicus Curiae in Support of Plaintiff's Motion for a Preliminary Injunction.

3.      MSBA is a trade association established in October 2015 to represent and support the non-bank money services industry. Its mission is to advocate for fair regulation, enhance public and regulatory understanding of the secure and beneficial

services provided by its members and to encourage and promote payments innovation. MSBA's members include at least 30 money services businesses ("MSB")—licensed businesses that facilitate the transmission, exchange, or conversion of money—as well as organizations that support and service MSBs.

4.    As an association made up of the MSBs targeted by the Southwest Border Geographic Targeting Order ("SWB GTO"), MSBA has a direct interest in the outcome of the motion for preliminary injunction filed by plaintiffs in this action and is uniquely qualified to highlight the irreparable harm caused by the Department of the Treasury's Financial Crimes Enforcement Network's ("FinCEN") SWB GTO.

5.    On March 14, 2025, FinCEN issued a Geographic Targeting Order requiring all MSBs located in 30 zip codes across the southwest border in California and Texas to file currency transaction reports ("CTR") with FinCEN at a $200 threshold and with a 15-day filing deadline. The SWB GTO became effective beginning April 14, 2025, and will end on September 9, 2025.

6.    On April 2, 2025, given the SWB GTO's significant and detrimental impact on our member MSBs, MSBA, along with the Electronic Transactions Association ("ETA"), INFiN, A Financial Services Alliance ("INFiN"), and The Money Services Round Table ("TMSRT," together with MSBA, ETA and INFiN, the "Organizations"), collectively wrote to Andrea Gacki ("Ms. Gacki"), Director of FinCEN, to request certain modifications to the SWB GTO to, at the least, ensure operational feasibility for the Organizations' member MSBs. Specifically, we requested that (1) the SWB GTO's effective date be extended by 60 days to June 14, 2025; (2) the CTR filing threshold be increased to $2,000; (3) the filing deadline be extended from 15 to 30 days; and (4) the SWB GTO exclude limited categories of transactions with demonstrably low money laundering risk. Attached hereto as **Exhibit A** is a true and correct copy of the letter to Ms. Gacki from the Organizations dated April 2, 2025.

7.    On April 11, 2025, Ms. Gacki, on behalf of FinCEN, sent a letter in

2

response to the Organizations' April 2, 2025, letter. FinCEN summarily denied the requested changes to the SWB GTO. Attached hereto as **Exhibit B** is a true and correct copy of Ms. Gacki's response to the Organizations dated April 11, 2025.

8.    As the Executive Director of the MSBA, I was provided a copy of an April 11, 2025, letter to Ms. Gacki from the Members of the United States Congress Vicente Gonzalez, Juan Vargas, Veronica Escobar and Henry Cuellar.   Like the Organizations, these Members of Congress wrote to FinCEN to request modifications to the SWB GTO, including: (1) extending the SWB GTO's effective date by 60-90 days; (2) raising the reporting threshold to $2,000; and (3) excluding from the SWB GTO certain, low risk transactions. Attached hereto as **Exhibit C** is a copy of the April 11, 2025 letter to FinCEN from Members of Congress.

9.    I surveyed MSBA's members regarding the effects of the SWB GTO and these are my findings:

a.    MSBA members have observed a noticeable reduction in transaction volume, particularly within the SWB GTO-affected zip codes. MSB agents have reported a decline in certain transactions, such as cash-based services like bill payments, money orders, and prepaid cards. MSBs' early data analysis suggests that customers are either avoiding cash transactions altogether or are moving their business outside the affected areas.

b.    The CTR preparation process has severely strained MSBs' operational resources and has forced reallocation of tasks within compliance and operations teams. MSBs have also incurred significant overtime costs and operational delays to review and validate the CTR information before submission because CTR information must be manually validated, corrected, and documented per FinCEN standards.

c.    One MSBA member reported that between the SWB GTO's April 14th effective date and April 28, 2025, it accumulated over 14,000 CTRs as a direct result of the SWB GTO. That same member filed a total of 243 CTRs in 2024.

d.      A second member estimated that, because of the SWB GTO, its CTR filings will increase from 7,000 per year nationwide to 130,000 annually just in the targeted zip codes.

e.      A third member estimates that it would have had to file 55,000 CTRs in 2024 had the SWB GTO been in effect. That same member filed no CTRs in 2024. Because that member is still working on developing an automated system, to complete and submit CTRs it was forced to cease processing all cash transactions of $200 or more, resulting in a 60% decrease in transactions within the zip codes targeted by the SWB GTO.

f.      Due to the unprecedented increase in work caused by the SWB GTO, MSBAs members have been forced to spend significant resources on overtime costs, operational delays, software updates and hiring and training additional employees.

10.     No counsel for any party to this case authored MSBA's amicus brief in whole or in part, and no person or entity, other than MSBA, its members or its counsel, made a monetary contribution intended to fund the preparation or submission of the amicus brief.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 6th day of May, 2025 from Montvale, New Jersey.

KATHRYN TOMASOFSKY

**DECLARATION OF KATHRYN TOMASOFSKY**                          Case No. 3:25-cv-00886-JLS-DDL

**EXHIBIT "A"**

Declaration of Kathryn Tomasofsky in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

   

April 2, 2025

Andrea Gacki
Director
Financial Crimes Enforcement Network (FinCEN)
1801 L Street, NW
Washington, DC 20036

Re:     Geographic Targeting Order requiring certain Money Services Businesses along the
        Southwest Border to file Currency Transaction Reports (CTRs) for transactions of more
        than $200 as of April 14, 2025 (GTO-CTR)

Dear Director Gacki,

On behalf of the Electronic Transactions Association (ETA), INFiN, A Financial Services Alliance
(INFiN), the Money Services Business Association (MSBA), and The Money Services Round
Table (TMSRT) (collectively, the "MSB Group"), we write to request certain modifications to the
recently issued GTO-CTR to ensure its effectiveness and operational feasibility for all
stakeholders.

Our organizations represent the largest coalition of Money Services Businesses (MSBs) in the
United States, encompassing hundreds of companies, many of which facilitate money services
and payment activities along the Southwest Border and throughout the United States. We support
FinCEN's efforts to combat illicit financial activities. However, we believe targeted refinements to
the GTO-CTR requirements will help achieve FinCEN's intended objectives without imposing
undue operational burdens on MSBs and the communities they serve.

**Operational and Compliance Challenges**

The GTO-CTR will transform CTR filings from a manageable compliance activity to a huge daily
reporting obligation for MSBs.  Companies associated with one or more of the MSB Group
members process millions of transactions per day. Many will be swept up in the new CTR filing
requirement (unless consumers drastically change their behaviors in response). As an example,
one member company estimates that the GTO-CTR will increase its CTR filings from the current
7,000 per year filed *nationwide* to 130,000 per year *in just the GTO area alone*.

Imagine a cashier at a small grocery store that is an agent location being required to complete a
CTR every time a customer tries to purchase a money order with cash in an amount of more than
$200. For several covered companies, they may never have had to file a CTR before and the
GTO-CTR will require them to establish a completely new recordkeeping system and training for
their employees.

Moreover, if there are only a limited number of employees at such locations, effectively requiring
one or two cashiers/tellers or employees to stop other transactions (and others in line behind the
customer) to ask the customer for all of the information on the CTR form may not be readily
accomplished. Additionally, customers who have never had to provide such information before
will likely want to ask questions about why they are required to provide such information, adding
additional time, and frustration.

To comply with the GTO-CTR, most companies will have to batch file CTRs, which requires that FinCEN approve their filing capabilities. Any delays in such approvals could result in MSBs missing the CTR filing deadline. Furthermore, the surge in filings could overload FinCEN's systems while simultaneously diluting the usefulness of the data for law enforcement.

The GTO-CTR could also exacerbate the ongoing issue of de-banking of MSBs due to perceived regulatory risks. Such outcomes could push legitimate financial activities into unregulated channels, undermining the stated objectives of the GTO-CTR.

**Key Requests for Consideration**

1. **Extend the Effective Date by 60 Days to June 14, 2025**

   To permit companies subject to the new requirements to appropriately prepare to comply with the GTO-CTR, including implementing necessary technical systems and training programs, we request an extension of at least 60 days for implementation.

   Given the technical and operational changes required, including software upgrades, batch filing capabilities, and staff training, an extended timeline would allow MSBs to effectively comply without service disruptions.  These requirements apply equally to the industry and FinCEN.

2. **Increase the CTR Filing Threshold to $2,000 and Extend the Time Period for Filing**

   We urge FinCEN to raise the CTR threshold to $2,000 to balance enforcement objectives with the realities of high-volume, low-dollar transactions processed by MSBs.

   We urge FinCEN to extend the filing deadline for CTRs to 30 days, to allow companies to handle significant volume increases.

   The current $200 threshold would lead to hundreds of thousands of CTR filings per month, overwhelming compliance teams and FinCEN's data analysis capabilities.

3. **Exclude Limited Categories of Transactions from GTO-CTR Requirements**

   We request that transactions with demonstrably low money laundering risk be exempted from the GTO-CTR requirements. For example, check cashing transactions conducted by registered MSBs involving government-issued checks (e.g., Social Security, SSI, tax refunds) ), and checks issued by insurance companies, workmen's compensation checks and other such checks, as well as electronic bill payments to recognized billers, e.g., utility companies, cable tv providers, national mobile phone companies, and loan transactions by state licensed lenders, should be exempt from CTR filings, as they pose minimal money laundering risk due to their verifiable source of funds. These basic financial transactions allow millions of hard-working people to conveniently conduct their everyday activities. Including such transactions needlessly burdens low-income recipients, while diverting law enforcement resources to monitor transactions that have no criminal nexus.

**Conclusion**

We appreciate FinCEN's commitment to combat illicit financial activity and recognize the importance of the GTO. However, we strongly urge consideration of the modifications outlined above to enhance the effectiveness of this initiative while mitigating unintended consequences for compliant businesses and underserved communities. The GTO is a significant burden that companies must comply with in a very short time period.

We welcome the opportunity to meet with FinCEN representatives to discuss these concerns further and collaborate on solutions that achieve both law enforcement objectives and operational feasibility. Our industry expertise would be valuable in developing practical implementation approaches.  We remain available to provide any additional information or data that may best inform your ultimate decision.

Thank you for your time and consideration.


Respectfully submitted,


Scott Talbott Government Relations
Electronic Transactions Association


Edward D'Alessio
Executive Director
INFiN, A Financial Services Alliance, Inc.


Kathy Tomasofsky
Executive Director
Money Services Business Association, Inc.


Adam J. Fleisher
Counsel to The Money Services Round Table

**EXHIBIT "B"**

Declaration of Kathryn Tomasofsky in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction



Financial Crimes Enforcement Network
U.S. Department of the Treasury

*Washington, D.C. 20220*

April 11, 2025

Kathy Tomasofsky
Money Services Business Association

Scott Talbot
Electronic Transactions Association

Edward D'Alessio
INFiN

Adam J. Fleisher, Esq.
The Money Service Roundtable

Dear Ms. Tomasofsky and Mssrs. Talbot, D'Alessio, and Fleisher:

I am writing in response to your letter dated April 2, 2025, requesting certain changes to the terms of the Geographic Targeting Order (GTO) that was issued by the Financial Crimes Enforcement Network (FinCEN) on March 14, 2025.[1]

As background, under the GTO, MSBs located in the covered geographic region—30 ZIP codes along with U.S. southwest border—are required to file reports with FinCEN on certain cash transactions between $200 and $10,000.  The reporting obligations under the GTO will go into effect on April 14, 2025, and, unless the GTO is renewed, end on September 9, 2025.  In issuing this GTO, FinCEN has determined that reasonable grounds exist for concluding that the additional recordkeeping and reporting requirements set forth in the GTO are necessary to carry out the purposes of the BSA—including Treasury's efforts to further combat the illicit activities and money laundering of Mexico-based cartels and other criminal actors along the southwest border of the United States, which is one of this Administration's highest priorities.

In mandating the temporary enhanced recordkeeping and reporting requirements set out in the GTO, FinCEN assesses that the information obtained will be an important tool for law enforcement and national security agencies, as well as Treasury and the intelligence community.  The data collected under this GTO will be critical in identifying and targeting money laundering typologies and evolving illicit networks in order to hinder the activities of cartels, drug traffickers, and other illicit actors operating along the southwest border.  For these reasons, we

---

[1] FinCEN, *Issuance of a Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements of Certain Money Services Businesses Along the Southwest Border*, 90 FR 12106 (Mar. 14, 2025).

believe that the need to promptly obtain the information sought by the GTO is justified and that the current scope of the GTO is appropriate and necessary to obtain such information.

With respect to your requests, you have sought the following changes to the terms of the GTO: (1) extend the effective date by 60 days to June 14, 2025; (2) raise the filing threshold for covered transactions from $200 to $2,000; and (3) exclude from the GTO's definition of "covered transactions" "transactions with demonstrably low money laundering risk," including, for example, cashing of checks issued by the government, an insurance provider or workman's compensation, and/or cash transactions made to facilitate electronic bill payments.[2]

FinCEN has carefully considered your requests, as well as certain other public and non-public information. Having done so, FinCEN declines to make the requested changes to the GTO at this time. FinCEN has assessed that the GTO is appropriately tailored to further the national security priorities outlined above. Accordingly, FinCEN has determined that revising the GTO as you have requested would be detrimental to the public interest and contrary to the purpose behind the GTO.

*First*, given the critical importance of combating the flow of illicit drugs into the United States and curtailing the activities of drug cartels along the southwest border, FinCEN has determined that it is vital that the GTO go into effect as soon as possible. To further that objective, FinCEN carefully tailored the GTO to mandate reporting through familiar forms and has conducted targeted outreach. The GTO makes no changes to current CTR requirements, other than lowering the filing threshold. All MSBs covered by the GTO should already be familiar with the general requirements of CTRs and, as such, should be able to readily comply with this order. Moreover, to ensure that covered MSBs are ready to comply next week, FinCEN has conducted outreach to the MSB community through two well-attended FinCEN Exchange webinars, issued frequently asked questions (FAQs), and will continue to provide support as additional questions arise. For these reasons, FinCEN assesses that further extending implementation period is not warranted.

*Second*, based on our assessments, increasing the filing threshold—as you have proposed—would make it easier to structure significant cash deposits, making it substantially easier to evade the GTO's requirements and successfully disguise the laundering of illicit funds. The current filing threshold has carefully set to ensure that FinCEN collects highly useful information, while excluding clearly *de minimis* amounts that are more likely to be legitimate. As such, we do not intend to alter the filing threshold at this time.

*Finally*, carving out certain payment types may complicate compliance for MSBs, increasing the burden associated with complying with the GTO, and FinCEN has received feedback from MSBs to this effect. For that reason, we do not intend to exclude additional categories of transactions from the definition of "covered transactions" in the GTO at this time.

Accordingly, FinCEN has determined that, at this time, delaying the effective date of the GTO or otherwise altering its terms is contrary to the gravity of the threat posed by those who would use MSBs for illicit purposes, and so your requests are denied. Should analysis of

---

[2] We note that you raised similar requests during our meeting held on Friday, March 28, 2025, and in an email dated April 8, 2025.

information received in response to the GTO and law enforcement feedback reflect that
adjustments to the GTO's terms are warranted, FinCEN remains open to making appropriate
changes. Should you have any other questions, please do not hesitate to reach out to FinCEN's
Global Investigations team at globalinvestigations@fincen.gov.

Sincerely,

Andrea M. Gacki
Digitally signed by Andrea M.
Gacki
Date: 2025.04.11 16:34:40 -04'00'

Andrea M. Gacki
Director
Financial Crimes Enforcement Network

3

**EXHIBIT "C"**

Declaration of Kathryn Tomasofsky in support of
Amicus Curiae's Brief in support of Plaintiffs' Motion for Preliminary Injunction

# Congress of the United States

## Washington, DC 20515

April 11, 2025

Andrea Gacki
Director
Financial Crimes Enforcement Network
1801 L Street, NW
Washington, DC 20036

Re:     Geographic Targeting Order Imposing Additional Recordkeeping and Reporting Requirements on Certain Money
Services Businesses Along the Southwest Border
(31 CFR Part 1010)

Dear Director Gacki,

We are writing in connection with the Geographic Targeting Order (GTO) issued by the Financial Crimes Enforcement Network (FinCEN) on March 14, 2025. The GTO requires all money services businesses (MSBs) located in 30 ZIP codes across the southwest border in California and Texas to file Currency Transaction Reports (CTRs) with FinCEN at a $200 threshold, as opposed to the current level of $10,000. The terms of the GTO are effective beginning April 14, 2025, and end September 9, 2025.

In announcing the GTO, Treasury Secretary Scott Bessent stated that "[the] GTO underscores our deep concern with the significant risk to the U.S. financial system of the cartels, drug traffickers, and other criminal actors along the Southwest border." We support implementing measures to combat cartel activity along the Mexican border. We are concerned, however, that the scope of the GTO, the significant new costs and expenses imposed on MSB businesses through heightened reporting and identification requirements, the massive amount of new CTR filings that will result, and the extremely short effective date set by FinCEN, will combine to defeat FinCEN's policy goals. We are confident that limited modifications to the GTO, as we propose below, will resolve many of these issues.

In order to accomplish the goals of the Bank Secrecy Act (BSA), and in turn the GTO, there must be a robust network of MSBs to provide services and report transactions to FinCEN. MSBs provide services to millions of Americans that conduct small-dollar transactions as part of their everyday financial lives. These transactions allow consumers to cash paychecks and government benefits checks, pay their bills electronically, acquire money orders, send money to their families domestically and in other countries, and load funds onto prepaid cards. Over the years, the role of MSBs in preventing financial fraud and terrorist financing has been repeatedly recognized by FinCEN. In its November 10, 2014, Statement on Providing Banking Services to Money Services Businesses, FinCEN reiterated: "MSBs play an important role in a transparent financial system, particularly because they often provide financial services to people less likely to use traditional banking services."

The significant new compliance burdens created by the GTO threaten MSBs and the ability of FinCEN itself to fulfill its BSA/AML responsibilities. By lowering the CTR threshold to $200, the GTO will result in the filing of hundreds of thousands of additional CTRs by existing and new MSBs. This substantial increase in filers and filings raises concerns that FinCEN will be swamped with new filings, stretching its already thin resources, diluting the value of CTRs and making it difficult to process, and even harder to detect unlawful activity.

We are also concerned that the significant expansion of the reporting requirements under the GTO will drive MSBs out of business and transactions off the regulatory radar screen. We have been provided with an estimate that one MSB that operates 14 locations in the GTO areas, and that currently files 7,000 CTRs per year throughout its entire enterprise, will now be required to file 130,000 CTRs per year just for a portion of its transactions in the GTO areas. Another MSB with one location in the GTO area will see an increase from 42 CTRs per month to over 6,000 CTRs per month. These volumes reflect only a limited portion of the covered transactions conducted by these companies.

By imposing additional identification, recordkeeping, and reporting requirements, the GTO will significantly increase the costs imposed on MSBs. These costs include updating and modifying compliance systems and hiring and training additional staff. We have been advised by one MSB, which operates just one location in the GTO area, that to comply with the additional filing requirements it must hire an additional full-time employee with AML compliance experience at an annual salary of approximately $90,000.

The new CTR requirements will also lengthen transaction times, potentially driving customers to other, unregulated providers. The CTR form itself requires the completion of 15 fields of information. This process requires front line personnel to ask customers a series of questions while they are waiting in line to conduct their transactions. Some operators estimate the process takes more than five minutes to complete. The GTO also imposes new identification requirements so that even existing customers may elect not to proceed. New customers, unaccustomed to the process, will also likely elect to do business elsewhere. This friction in the transaction process will result in fewer transactions in regulated locations and more transactions falling off the regulatory radar screen.

As noted above, because of the significantly reduced filing threshold, many businesses that do not currently file CTRs will now fall under the GTO's definition of "Covered Businesses." These new MSBs will be required to implement compliance policies and procedures, including data storage and privacy protocols, and prepare for filing of CTRs through FinCEN's electronic portal. Apart from the time and expense to implement compliance mechanisms, the process of becoming registered with FinCEN and approved to access its electronic portal sometimes takes weeks. With an impending effective date, many of these newer MSBs will be caught short in their efforts to comply with the GTO, facing criminal penalties. It is reasonable to assume that many of these companies may simply choose to exit the MSB business, leaving customers to conduct their transactions at unregulated locations.

Finally, we are also concerned that the heightened compliance requirements imposed by the GTO, and the increase in compliance risk (including the imposition of criminal and civil penalties), may cause a new round of debanking of MSBs. Like other businesses, bank relationships are critical to MSBs. It was not that long ago that the MSB industry and other industries faced existential threats due to "high-risk" designations and other political considerations leading to debanking.

In a time when Congress has, by passage of the Anti-Money Laundering Act of 2020, indicated its intention is to modernize the Bank Secrecy Act, and are considering legislation like H.R. 1799, the Financial Reporting Threshold Modernization Act, which would raise the CTR level to $30,000, the GTO's imposition of a substantially reduced threshold is extreme and may have the opposite impact that the desired intent.

We urge FinCEN to consider several reasonable modifications to the GTO that will decrease the burdens on MSBs, clarify its scope, retain transactions, and meet FinCEN's objectives in eliminating cartel and other illegal transactions. These modifications include:

1. Extend the effective date of the GTO for an additional 60-90 days to allow MSBs to implement and adjust their compliance systems to properly process the increase in CTR filings, appropriately staff their locations to ensure proper identification and other information is properly captured and ensure that systems are in place for submission of CTRs and other information in the required time (15 days).

2. Raise the reporting threshold to $2,000 to ensure that only meaningful transactions are captured and eliminate the requirement for *de minimis* transactions to be reported.

3. Eliminate certain categories of transactions, including the cashing of checks from reliable sources that are not prone to money laundering, including, for example, checks issued by federal, state, or local governmental agencies, payroll checks, checks issued by insurance companies, workmen's compensation checks, and other such categories of checks; and loan transactions (disbursements of proceeds or payments by borrowers) by licensed lenders offering state regulated loan products, and bill payment transactions, from the definition of "covered transactions."

We would very much appreciate it if you would provide us with a response to this letter by April 13, so that the GTO will not have become effective.

Sincerely,

Vicente Gonzalez
Member of Congress

Juan Vargas
Member of Congress

Veronica Escobar
Member of Congress

Henry Cuellar
Member of Congress