IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| TEXAS ASSOCIATION OF MONEY | § | |
| SERVICES BUSINESSES (TAMSB); | § | |
| HIGH VALUE, INC.; REYNOSA CASA DE | § | |
| CAMBIO, INC.; NYDIA REGALADO d/b/a | § | |
| BEST RATE EXCHANGE; MARIO | § | |
| REGALADO d/b/a BORDER | § | |
| INTERNATIONAL SERVICES; LAREDO | § | |
| INSURANCE SERVICES, LLC; E.MEX. | § | |
| FINANCIAL SERVICES, INC.; R & C, INC. | § | |
| d/b/a TEMEX MONEY EXCHANGE; SAN | § | |
| ISIDRO MULTI SERVICES, INC.; CRIS | § | |
| WIN INC. d/b/a BROWNSVILLE CASA DE | § | |
| CAMBIO; ESPRO INVESTMENT LLC | § | |
| d/b/a LONESTAR MONEY EXCHANGE; | § | |
| and ARNOLDO GONZALEZ, JR., | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. SA-25-CA-00344-FB |
| | § | |
| PAM BONDI, Attorney General of | § | |
| the United States; SCOTT BESSENT, | § | |
| Secretary of the Treasury; UNITED | § | |
| STATES DEPARTMENT OF THE | § | |
| TREASURY; ANDREA GACKI, | § | |
| Director of the Financial Crimes | § | |
| Enforcement Network; FINANCIAL | § | |
| CRIMES ENFORCEMENT NETWORK, | § | |
| | § | |
| Defendants. | § | |

## ORDER GRANTING PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

For readers unfamiliar with the technical legal analysis to follow, the Court invokes the spirit

of Thomas Paine: "[It] is something absurd . . . to be . . . governed by an island." *Common Sense*

90-91 (1776).  Here, the governing island is a small venue called the District of Columbia, 1,600 miles

from the Texas-Mexico border.  From such island emanated the Government regulation of Plaintiffs'

businesses.

The Court finds the unregulated power of Government to regulate without constitutional protections gives the regulator undue power to destroy.

The genesis of this controversy is an Executive Order dated February 20, 2025, followed by Government action reducing the historic threshold for money exchanges and transfers from $10,000 to $200.  As a result, Plaintiffs would be required to process tens of thousands of documents to send to the Government instead of the relative handful previously needed.  The new regulations do not apply to Plaintiffs' competitors such as banks, credit unions, PayPal, Venmo, Wise and others, resulting in what the Court finds disparately impacts Plaintiffs (it also seemingly contravenes the adage, "what's good for the goose is good for the gander."). Plaintiffs allege their livelihood will be irreparably harmed. The Court agrees and so finds and that Plaintiffs likely will succeed on the merits of at least one of their claims. Moreover, the Court finds that basic equity and fairness favor Plaintiffs.

Within the statutes and regulations relied upon by the Government the word "reasonable" is used several times. The Court finds not only is the Geographic Targeting Order (GTO) (not the Pontiac manufactured in the 1960s) likely unreasonable, but also that it likely overreaches, defies commonsense and, applying the correct legal standard to the facts, likely violates the Fourth Amendment of the Constitution's Bill of Rights prohibiting unreasonable searches and seizures and that it is likely "arbitrary and capricious." The Court also finds the GTO likely violates the Administrative Procedure Act for not allowing notice and comment.

While the Government's goal of ferreting out illegal drug money laundering is laudable, the tactic employed here is akin to using a blunderbuss to target a fly, likely wreaking economic destruction on surrounding law-abiding citizens who the facts show are already subject to the "nth degree" of audits by Internal Revenue Service, Texas bank regulators and other extensive federal reporting requirements, all of which give the Government ample information of suspicious activities. Using proper law

enforcement investigation techniques and other information from Currency Transaction Reports already available, the Government could establish probable cause before a neutral judge to obtain a search warrant. This is called Due Process, the violation of which is the revolutionary reason for the Fourth Amendment to our Bill of Rights. The rebellious idea that King George III should not be able to have his red-coated soldiers and agents rifle haphazardly through American colonists' homes and businesses is foundational to our national existence.  Now, instead of Government agents doing so in person, the violation of that bedrock principle is accomplished by over-burdensome technological requirements.

Moreover, having observed numerous cases of money laundering techniques using airplanes, hidden vehicle compartments, real estate purchases, cryptocurrency and freezers (hence, "cold hard cash"), no self-respecting drug cartel or its Chinese enablers are going to launder millions of dollars supplied by American consumers (Economics 101) in $200 increments.  *See* U.S. Dept. of Justice, *Chinese National Sentenced to Ten Years in Prison for Laundering $62 Million in Drug Proceeds on Behalf of Mexican Traffickers* (Dec. 16, 2024) (last visited May 18, 2025), available at https://www.www.justice.gov/usao-ndil/pr/chinese-national-sentenced-ten-years-prison-laundering-62-million-drug-proceeds-behalfjustice.gov.  For that matter, why not $199? Or $198?

Additionally, the Government would require Plaintiffs to file reports on Mexican citizens exchanging pesos to dollars to shop in the United States. The Court has never seen nor heard of a case of money laundering from pesos to dollars. It appears the Government did not think.  It hastily conceived and prematurely gave birth to the Geographical Targeting Order dated March 15, 2025, fathered three weeks before at 1600 Pennsylvania Avenue named Executive Order 14157.

Although Thomas Paine and his contemporary Benjamin Franklin wrote with feathers, they were quite wise, Mr. Paine in *Common Sense* and Dr. Franklin: "Take time for all things:  Great haste makes great waste."

The Government's attempt at deductive reasoning and its syllogism appears to be: Drug cartels launder money. Plaintiffs' businesses transact money exchanges. Therefore, some Plaintiffs may be criminal money launderers and the Government can cast its large net notwithstanding lack of reasonable suspicion or probable cause. Although Aristotle was not familiar with the Fourth Amendment and Due Process, somewhere he is spinning and saying, "Huh?"

For the in-depth reasons following, the preliminary injunction is granted.

<u>Background</u>

Before the Court are Plaintiffs' Opposed Motion for a Preliminary Injunction (docket no. 22), the Government's response (docket no. 33) and Plaintiffs' reply (docket no. 45) to Government's response, along with the public, non-privileged portions of the certified Administrative Record (sometimes referred to as "AR") for the March 11, 2025 GTO that is the subject of this action (docket no. 28) and proposed findings of fact and conclusions of law filed by Plaintiffs (docket no. 49) and the Government (docket no. 51). The Court held a hearing on Plaintiffs' motion on May 12, 2025. After careful consideration, the Court is of the opinion that the motion should be granted and a preliminary injunction should be entered as to Plaintiffs' claims that the GTO violates the Fourth Amendment and the Administrative Procedure Act in that it was issued without the requisite notice and comment rulemaking and is arbitrary and capricious. The Court will take up Plaintiffs' *ultra vires* and nondeligation arguments at a later date, if necessary.

The Currency and Foreign Transactions Reporting Act of 1970, its amendments, and the other statutes relating to the subject matter of that Act, have come to be referred to as the Bank Secrecy Act ("BSA"). The BSA authorizes the Secretary of the Treasury to impose **reasonable** reporting and other requirements on financial institutions and other businesses to help detect and prevent money laundering. These requirements are codified at 12 U.S.C. § 1829b, 12 U.S.C. §§ 1951-60, 31 U.S.C. §§ 5311-14

and 5316-36, including notes thereto. The BSA and its implementing regulations require financial institutions to file certain reports, including a currency transaction report ("CTR") for transactions in currency greater than an amount set by the Secretary – currently, $10,000. *See* 31 U.S.C. § 5313 (authorizing the Secretary to impose reporting requirements on transactions in an amount prescribed by the Secretary); *see also* 31 C.F.R. § 1010.311 (setting forth currency transaction reporting requirements).

Separately, in the Anti-Drug Abuse Act of 1988, Congress amended the BSA to provide additional authority to the Secretary of the Treasury to collect information about certain transactions in geographic areas thought to pose particular risks. Pub. L. No. 100–690, title VI, § 6185(c), 102 Stat. 4181, 4355 (1988). The original purpose was to grant "the Secretary of [the] Treasury discretionary authority to target a domestic financial institution or a group of institutions located in any specified geographic location where drug trafficking and/or money laundering are prevalent, to obtain, retain and report information." H. R. Rep. No. 101-74, at 111 (Nov. 18, 1988).

The statute authorizes the Secretary of the Treasury to issue a Geographic Targeting Order or GTO to "obtain such information as the Secretary may describe" concerning "any transaction in which such financial institution . . . is involved . . . the total amounts . . . of which are equal to or greater than an amount which the Secretary may prescribe" and require the financial institutions to maintain records and file reports. *Id*. The primary prerequisite is that the Secretary find "**reasonable** grounds" to conclude "that additional recordkeeping and reporting requirements are necessary to carry out the purposes of" the BSA, "or to prevent evasions thereof." *Id*. (emphasis added). The purposes of this particular subchapter are codified, and include, for example, requiring certain "highly useful" reports, facilitating the tracking of money sourced from criminal activity, and assessing the money laundering "risks to financial institutions, products, or services." 31 U.S.C. § 5311. A GTO may then be effective

for no more than 180 days, unless renewed. 31 U.S.C. § 5326(d). The authority of the Secretary to issue a GTO has been delegated to the Director of FinCEN. Treasury Order 180-01 (Jan. 14, 2020), Https://home.treasury.gov/about/general-information/orders-anddirectives/treasury-order-180-01.

In March of 2025, the Global Investigations Division (GID) of the Financial Crimes Enforcement Network (FinCEN), a bureau of the Department of the Treasury (Treasury), recommended the issuance of a public GTO to address cash-based money laundering along the southwest border by Mexican drug cartels linked to illicit opioid trafficking. FinCen issued the GTO on March 11, 2025, and it became effective on April 14, 2025.

The GTO lowered the threshold for filing Currency Transaction Reports (CTRs) from $10,000 to $200 for money services businesses, or MSBs, located in thirty zip codes along the southwest border. These zip codes are in two counties in California (Imperial and San Diego counties) and five counties in Texas (Cameron, El Paso, Hidalgo, Maverick, and Webb counties).

An MSB is generally any person offering check cashing, offering foreign currency exchange services, and/or selling money orders, traveler's checks, or pre-paid access products. *See* 31 U.S.C. § 1010(ff)(5) (defining "money services business" to include any "money transmitter," meaning a person who transmits "currency, funds, or other value that substitutes for currency" between persons or locations "by any means"; or "[a]ny other person engaged in the transfer of funds"). Every MSB must register with FinCEN, electronically file CTRs, retain certain records and otherwise comply with FinCEN regulations. 31 U.S.C. §§ 5330(a)(2), (c)(1).

FinCEN issued the GTO pursuant to 31 U.S.C. § 5326 of the Bank Secrecy Act ("BSA"). *See* (GID Memorandum [docket no. 28-2] at page 5) (noting that authority of Secretary of Treasury to administer BSA and its implementing regulations has been delegated to FinCEN pursuant to Treasury Order 180-01 (Jan. 14, 2020)). Section 5326 reads:

If [FinCEN] finds . . . that **reasonable** grounds exist for concluding that additional recordkeeping and reporting requirements are necessary to carry out the purposes of [the BSA] or to prevent evasions thereof, the Secretary may issue an order requiring any domestic financial institution or nonfinancial trade or business or group of domestic financial institutions or nonfinancial trades or businesses in a geographic area–

(1) to obtain such information as the Secretary may describe in such order concerning--

    (A) any transaction in which such financial institution or nonfinancial trade or business is involved for the payment, receipt, or transfer of funds (as the Secretary may describe in such order), the total amounts or denominations of which are equal to or greater than an amount which the Secretary may prescribe; and

    (B) any other person participating in such transaction;

(2) to maintain a record of such information for such period of time as the Secretary may require; and

(3) to file a report with respect to any transaction described in paragraph (1)(A) in the manner and to the extent specified in the order.

31 U.S.C. § 5326(a) (emphasis added); *see also* 31 C.F.R § 1010.370(a). The BSA applies to various categories of financial institutions, including MSBs. *See* 31 U.S.C. § 5312(a)(2)(R). MSBs, in turn, include a number of non-bank financial institutions, including money transmitters. *See* 31 C.F.R. § 103.11(uu)(5). Title 31 U.S.C. § 5326 authorizes a maximum effective period for a GTO of 180 days, unless renewed. 31 U.S.C. § 5326(d).

The purposes of the BSA include "requir[ing] certain reports . . . that are highly useful in criminal, tax, or regulatory investigations, risk assessments, or proceedings," "facilitat[ing] the tracking of money that has been sourced through criminal activity or is intended to promote criminal or terrorist activity," and "assess[ing] the money laundering . . . risks to financial institutions, products, or services to protect the financial system of the United States from criminal abuse and safeguard the national security of the United States." 31 U.S.C. § 5311(1)(A), (3) & (4).

This GTO allegedly "carries out the purposes of the BSA by collecting data that is expected to be highly useful to law enforcement for case generation, ongoing investigations, and prosecutions targeting Mexican drug cartels" and "would assist FinCEN and law enforcement in identifying the extent to which [drug cartels] are exploiting MSBs to launder the proceeds of their crimes, thereby perpetuating narcotics trafficking and the synthetic opioid crisis in the United States." (GID Memorandum [docket no. 28-2] at pages 4-5).

The $200 threshold was chosen because it reportedly includes "nearly all cash transactions vulnerable to abuse by drug cartels through structuring payments to avoid CTRs, while excluding clearly *de minimis* amounts that are more likely to be legitimate." (GID Memorandum [docket no. 28-2] at page 16).

The GTO covers nineteen zip codes in five counties on the U.S.-Mexico border in Texas (the "Covered Geographic Area" or "CGA"). FinCEN selected the CGA based on an MSB's close proximity to the border, to a border crossing, and a high number of $10,000 or more CTRs relative to the population in comparison to other zip codes in 2024. (Docket no. 28-2 at pages 12-13).

The following Texas zip codes are in the Covered Geographic Area::

| Zip Code | Rationale |
| --- | --- |
| | Cameron County |
| 78520 | Borders Mexico; contains significant border crossings – Brownsville B&M and Brownsville Gateway; 207 CTRs filed for a population of 64,949, the second highest CTR to population ratio in the county. |
| 78521 | Borders Mexico; contains a significant border crossing –Brownsville-Veterans Port of Entry; 1,164 CTRs filed for a population of 88,708, the highest CTR to population ratio in the county. |

El Paso County

| | |
|---|---|
| 79901 | Contains significant border crossing – El Paso-PDN Port of Entry; 501 CTRs filed for a population of 10,027, the fourth highest CTR to population ratio in the county. |
| 79902 | 420 CTRs filed for a population of 20,071, the fifth highest CTR to population ratio in the county. |
| 79903 | 2,414 CTRs filed for a population of 16,425, the highest CTR to population ratio in the county. |
| 79905 | Borders Mexico; contains a significant border crossing – El Paso-Bridge of the Americas Port of Entry; 2,603 CTRs filed for a population of 22,483, the third highest CTR to population ratio in the county. |
| 79907 | Contains a significant border crossing – El Paso Ysleta Port of Entry; 529 CTRs filed for a population of 78,652, the sixth highest CTR to population ratio in the county. |
| 79935 | 2,119 CTRs filed for a population of 17,523, the second highest CTR to population ratio in the county. |

Hidalgo County

| | |
|---|---|
| 78503 | 451 CTRs filed for a population of 23,604, the second highest CTR to population ratio in the county. |
| 78557 | Borders Mexico; contains a significant border crossing – Hidalgo Port of Entry; 1,253 CTRs filed for a population of 13,986, the highest CTR to population ratio in the county. |
| 78572 | 256 CTRs filed for a population of 78,280, the fourth highest CTR to population ratio in the county. |
| 78577 | Borders Mexico; contains a significant border crossing – Pharr Port of Entry; 210 CTRs filed for a population of 79,937, the fifth highest CTR to population ratio in the county. |
| 78596 | 318 CTRs filed for a population of 37,329, the third highest CTR to population ratio in the county. |

Maverick County

78852          Borders Mexico; contains significant border crossings – Eagle Pass I and II Ports of Entry; 25 CTRs filed for a population of 56,712.

Webb County

78040          Borders Mexico; contains significant border crossings – Laredo-World Trade; Laredo Bridge I; Laredo Juarez-Lincoln Ports of Entry; 702 CTRs filed for a population of 36,688, the highest CTR to population ratio in the county.

78041          Borders Mexico; 534 CTRs filed for a population of 48,491, the second highest CTR to population ratio in the county.

78043          364 CTRs filed for a population of 43,473, the third highest CTR to population ratio in the county.

78045          Borders Mexico; contains a small border crossing – Laredo-Colombia Solidarity Port of Entry; 340 CTRs filed for a population of 65,354, the fourth highest CTR to population ratio in the county.

78046          46 CTRs filed for a population of 71,956, the fifth highest CTR to population ratio in the county.

FinCen's theory is that certain MSBs in close proximity to the Texas/Mexico border which already have a high number of CTRs at the current threshold of $10,000 are especially vulnerable to exploitation by drug cartels, including the Silaloa and Jalisco New Generation cartels.  This is because:

* FinCEN data from 2024 shows "[t]he illicit financial activities of [drug cartels] pose risks to banks, [MSBs], and other entities . . . ."  (Docket no. 28-2 at page 8) (quoting Treasury, "National Money Laundering Risk Assessment" (2024), p. 21 (https://home.treasury.gov/system/files/136/2024-National-Money-Laundering-Risk-Assessment.pdf.).  The Court notes that, though FinCEN sees the same risks to banks, the banks are not required to file CTRs for $200 transactions.

* "President Trump signed Executive Order 14157 in February 2025, creating a process by which certain drug cartels have been named as Foreign Terrorist Organizations and Specially Designated Global Terrorists." (*Id.* at page 9) (citing Executive Order 14157, "Designating Cartels and Other Organizations as Foreign Terrorist Organizations and Specially Designated Global Terrorists," https://www.whitehouse.gov/presidential-actions/2025/01/designating-cartels-and-other-organizations-as-foreign terrorist-organizations-and-specially-designated-global-terrorists/;

-10-

U.S. Department of State, "Designation of International Cartels" (Feb. 20, 2025), https://www.state.gov/designation-of-international-cartels/.).

The Court fails to see the logic or the connection between the alleged high number of $10,000 CTRs to $200 transactions being connected to money laundering. Additionally, as the Government points out, the zip codes are at high traffic points of entry which is where tourists and local people go to exchange dollars for pesos to cross into Mexico and Mexicans come into the United States to exchange pesos for dollars, which is different from remittances transferring money into Mexico. Obviously, the targeted businesses would be in those zip codes, which is analogous to "Why do you rob banks, Mr. Sutton?" because "That's where the money is."

On April 1, 2025, the Texas Association of Money Services Businesses ("TAMSB") filed this suit against Attorney General Pam Bondi, Secretary of the Treasury Scott Bessent, the Department of Treasury, Director of the Financial Crimes Enforcement Network Andrea Gacki and the Financial Crimes Enforcement Network to challenge the GTO requiring their ten MSBs to report transactions of $200 and higher. TAMSB's original complaint alleged the GTO imposes burdensome and discriminatory obligations on its members in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, and the Due Process Clause of the Fifth Amendment to the United States Constitution.

On April 9, 2025, TAMSB filed an application for a temporary restraining order. The Court held a hearing, with notice to The Government, on April 11, 2025. Later that day, the Court granted TAMSB's motion and issued a Temporary Restraining Order specifically excluding TAMSB and its ten MSBs from having to comply with the new requirement that they report all financial transactions of $200 and above. The Temporary Restraining Order only affected the ten MSBs which were already

members of TAMSB, and the Court made clear that no other MSBs could join TAMSB to avoid the GTO.

With regard to the merits, the Court found: (1) Plaintiff demonstrated a substantial likelihood of success on the merits of its claims under the Administrative Procedure Act, 5 U.S.C. §§ 701–706, and the Fifth Amendment to the United States Constitution; (2) Plaintiff showed that it will suffer immediate and irreparable harm absent emergency injunctive relief, including the threat of business closure, reputational injury, and loss of customers and goodwill; (3) the balance of equities favors Plaintiff, as the requested relief merely preserves the status quo pending further judicial review, while The Government will suffer no cognizable prejudice from a brief delay in implementation; and (5) the public interest is served by maintaining lawful operations of regulated financial institutions and preventing unlawful agency action.  The Temporary Restraining Order was to expire on April 25, 2025, unless extended by the Court for good cause shown or upon the consent of the parties.

On April 18, 2025, TAMSB amended its complaint to identify its ten members and add an individual.  The amended complaint alleges the GTO violates:  (1) the APA because it is arbitrary and capricious, contrary to law, and exceeds the statutory authority of FinCEN to issue GTOs; (2) violates the Due Process Clause and Equal Protection Clause of the Fifth Amendment; (3) the Fourth Amendment right to be free from an unreasonable search; (4) the non-delegation doctrine because the statute under which FinCEN acted, 31 U.S.C. § 5326, grants unfettered discretion to determine the businesses, geographic areas, reporting thresholds and reports that should be required; and (5) the Fifth Amendment right against self-incrimination.

That same day, Plaintiffs also filed an opposed motion to extend the Temporary Restraining Order and an opposed motion for a preliminary injunction. Plaintiffs argue a preliminary injunction is warranted because they can demonstrate a likelihood of success on the merits of their claims that the

GTO violates: (1) the Fourth Amendment to the United States Constitution in that it operates as a general warrant by allowing searches of Plaintiffs' private financial information to uncover evidence of crimes–specifically, by Mexican cartels–but does so without individualized suspicion or probable cause; (2) the APA because: (a) it was promulgated without notice and comment procedures, (b) the threshold it sets is arbitrary and capricious, and (c) the GTO is *ultra vires* and violates the nondelegation doctrine. The Government filed a response to which Plaintiff filed a reply.

On April 21, the Court found good cause to extend the Temporary Restraining Order until May 9, 2025, and requested the parties to submit agreed upon dates for a preliminary injunction hearing.

Issue having been joined, the Court held a hearing on Plaintiffs' motion for preliminary injunction on May 12, 2025. Prior to presenting their arguments and evidence, the parties announced they had agreed to extend the Temporary Restraining Order until May 16, 2025.

At the conclusion of the hearing, the Court granted Plaintiffs' motion for a preliminary injunction, with the exception of the *ultra vires* and nondelegation arguments which have been taken under advisement. Specifically, the Court found that Plaintiffs are likely to succeed on the merits on at least one of their claims, are likely to suffer irreparable harm without an injunction, the balance of equities tips in favor of the Plaintiffs and an injunction is in the public interest. Accordingly, Defendants Pam Bondi, Attorney General of the United States Scott Bessent, Secretary of Treasury Andrea Gacki, and the Financial Crimes Enforcement Network, their agents and employees, are preliminarily enjoined from enforcing the April 14, 2025, Geographic Targeting Order against the Plaintiffs in this case. This written opinion follows the Court's rulings from the bench.

<u>Preliminary Injunction Standard</u>

Federal courts have equitable power to issue preliminary injunctions under Federal Rule of Civil Procedure 65. A preliminary injunction is an extraordinary remedy requiring the movant to

unequivocally show it is entitled to relief. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "Its purpose 'is merely to preserve the relative positions of the parties until a trial on the merits can be held.'" *Starbucks Corp. v. McKinney*, 602 U.S. 339, 346 (2024) (*quoting University of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981)). To obtain one, the movant must show (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *United States v. Abbott*, 110 F.4th 700, 706 (5th Cir. 2024) (*citing Winter*, 555 U.S. at 20).

The first factor is "the most important." *Mock v. Garland*, 75 F.4th 563, 587 n.50 (5th Cir. 2023). The latter two merge when the government is an opposing party. *Nken v. Holder*, 556 U.S. 418, 435 (2009). But no factor has a "fixed quantitative value." *Mock*, 75 F.4th at 587. On the contrary, "a sliding scale is utilized, which takes into account the intensity of each in a given calculus." *Id*. In sum, the "decision to grant or deny [relief] lies within the sound discretion of the trial court." *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). The Fifth Circuit has granted preliminary injunctive relief in recent cases which this Court finds are instructive. *See e.g., Texas Top Cop Shop, Inc. v.. Garland*, No. 24-40792, 2024 WL 5224138 (5th Cir. Dec. 26, 2024) (enjoining FinCEN from enforcing Corporate Transparency Act and its corresponding reporting requirements); *Texas v. United States Dept. of Homeland Security*, 123 F.4th 186 (5th Cir. 2024) (enjoining Border Patrol agents from removing razor wire installed by Texas on the southern border); *Texas v. Yellen* 105 F.4th 755 (5th Cir. 2024) (enjoining provision of American Rescue Plan Act that restricted states' use of COVID-19 funds to offset tax cuts); *Alliance for Hippocratic Medicine & U.S. Food & Drug Admin.,* 78 F.4th 210 (5th Cir. 2023) (partially reinstating restrictions on Mifepristone & reversing FDA decisions that had eased access), *rev'd on other grounds*, 602 U.S. 367 (2024).

<u>Supplementation of the Administrative Record</u>

Plaintiffs' filed an opposed motion to supplement the Administrative Record on May 8th, which the Court granted after hearing arguments at the preliminary injunction hearing on May 12, 2025. Plaintiffs moved to have the Administrative Record supplemented with all testimony and exhibits the Court heard at the temporary restraining order hearing, the declarations the Court received in support of Plaintiffs' motion for preliminary injunction, and the testimony and exhibits from the preliminary injunction hearing. The Government reiterated their position that judicial review of the merits of Plaintiffs' claims should be limited to review of the existing Administrative Record, not a new factual record made in district court.

A basic precept of procedural due process is notice and opportunity to be heard. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("An essential principle of due process is that a deprivation of life, liberty, or property be preceded by notice and opportunity for hearing appropriate to the nature of the case.") (alternations and citations omitted). The Government submitted portions of the transcript from the hearing on Plaintiffs' motion for a temporary restraining order in support of their opposition to Plaintiffs' motion for a preliminary injunction. (Docket no. 33-3). They cannot now seriously argue that Plaintiffs cannot present their own evidence in support of the motion. Moreover, the Administrative Record here consists solely of sources that FinCEN itself selected to justify the GTO. As Judge O'Connor explained when granting a motion to supplement the agency's administrative record with outside evidence:

> Whether an agency considered all relevant factors can sometimes only be determined by looking outside the record to see what the agency may have ignored. There was no public comment period during which Plaintiffs, or anyone else, could weigh in and correct errors in the agency's administrative process as it relates to FRT operation. Rather, Defendants classified FRTs as "machineguns" based entirely on their own analysis and on a record of their own making.

Imagine that, instead of machineguns, Defendants were classifying fruits. Imagine further that Defendants decided to evaluate an orange and in doing so, on their own and with no public input, determined that the orange is really a potato. Under Defendants' view of the world, there would be no mechanism for challenging Defendants' classification, even though it is plainly wrong, because there is nothing in the administrative record that says differently.

*National Ass'n for Gun Rights, Inc. v. Garland*, 741 Fed. Supp. 3d 569, 600, 599 (N.D. Tex. 2024), *appeal docketed*, No. 24-10707 (5th Cir. Aug. 6, 2024)); *see also Rethink 35 v. Texas Dep't of Transp.*, No. 1:24-cv-00092-ADA, 2025 WL 1191594, at *3 (W.D. Tex. Mar. 6, 2025) (granting motion to supplement record because Defendant Texas Department of Transportation failed to analyze highway expansion's impact on emissions and declined to prepare supplemental environmental impact statement in light of new national air quality standards).

<u>Prior GTOs and Caselaw</u>

In response to Plaintiffs' motion for preliminary injunction, the Government lists examples of past GTOs imposing recordkeeping and reporting requirements, including at thresholds below the $10,000 threshold set by 31 C.F.R. § 1010.311. (Docket no. 33 at Exhibit 1, corrected Gacki Decl. ¶ 7).

In December of 1966, FinCEN issued a GTO in the New York City metropolitan area that required money transmitters and their agents to obtain report identifying information about the sender and receipt of all cash-purchased remittances to Colombia and the Dominican Republic in the amount of $750 or more. *Id.* FinCEN's press release dated December 23, 1966, explained that all money transmitters were targeted because a few had engaged in criminal activity:

> Much of the foundation to justify the GTO was laid during investigations of several money remitters and their agents in New York. On July 24, 1996, Vigo Remittance Corp. pleaded guilty to structuring financial transactions to avoid standard BSA reporting requirements. Earlier this month, Remesas America Oriental was indicted for activities related to money laundering. Numerous other agents and their

employees have been successfully prosecuted for money laundering over the past few years.

https://www.fincen.gov/news/news-releases/treasury-acts-against-flow-dirty-money-colombia#:~:text=Treasury%20Under%20Secretary%20for%20Enforcement%20Raymond%20W.%20Kelly,million%20in%20illicit%20funds%20being%20sent%20to%20.).

In October of 2014, FinCEN issued a GTO that required businesses in the Los Angeles Fashion District to report any instance in which it received at least $3,000 in cash. *See* (Docket no. 33 at Exhibit 1, corrected Gacki Decl. ¶ 7). Again, FinCEN's press release explained that businesses in the fashion industry were targeted because a few had engaged in criminal activity:

> On September 10, more than 1,000 federal, state and local law enforcement officials were in the Fashion District, where they executed dozens of search warrants and arrest warrants linked to businesses suspected to be engaged in money laundering schemes and evasions of required BSA reporting. Criminal investigations have revealed evidence that many of these businesses are routinely accepting bulk cash as part of schemes involving black market peso exchange and trade-based money laundering on behalf of DTOs based in Mexico and Colombia. During the Sept. 10 enforcement action, HSI special agents seized what was ultimately determined to be more than $90 million in currency. The cash was found at various residences and businesses stored in file boxes, duffel bags, backpacks and even in the trunk of a Bentley.

https://www.fincen.gov/news/news-releases/fincen-issues-geographic-targeting-order-covering-los-angeles-fashion-district#:~:text=%E2%80%93The%20Financial%20Crimes%20Enforcement%20Network%20%28FinCEN%29%20announced%20today,businesses%20located%20within%20the%20Los%20Angeles%20Fashion%20District.

In April of 2015, FinCEN issued a GTO requiring electronics exporters near Miami to report currency transactions over $3,000 and to include in those reports information about the transaction. https://www.fincen.gov/news/news-releases/fincen-issues-geographic-targeting-order-covering-Miamit#:~:text=%E2%80%93The%20Financial%20Crimes%20Enforcement%20Network%20%28FinCEN%29%20announced%20today,businesses%20located%20within%20Miami. Like the GTO in this

case, the Miami GTO "does not make any determination about the covered businesses' knowledge or lack thereof of the money laundering schemes." *Id.* However, as with the New York GTO and the Los Angeles GTO, the Miami GTO makes clear that the "enhanced financial transparency provided by the GTO will bolster law enforcement's ability to *identify and prosecute the money launderers who service drug trafficking* organizations and other criminal networks." *Id.* (emphasis added). Additionally, unlike this case, businesses covered by the GTO were served with a copy of the Order. *Id.*

The Government also cites *United States v. Oreira*, 29 F.3d 185, 187 (5th Cir. 1994), for the proposition that the Court "considered a Houston-area GTO with a $100 threshold." (Docket no. 33 at page 4). In *Oreia*, two employees of Continental Transfer Services ("Continental"), an MSB in Houston, Texas, appealed from their criminal convictions on three counts of structuring in order to evade the $10,000 reporting requirement and to evade a GTO requiring Continental to file CRTs for any amount of money over $100 for a six month period beginning in March of 1991. *Id.* at 187. The opinion notes that a criminal investigation showed that the Defendants manufactured customer records to avoid the $10,000 reporting requirement applicable to all currency transmitters, and the $100 reporting requirement applicable to only Continental via the GTO. *Id.* However, the Fifth Circuit reversed the Defendants' convictions and remanded the case for a new trial because the District Court refused to submit Defendants' requested definition of the term "willfully. *Id.* at 188 (citing 31 U.S.C. §§ 5324, 5322).

After the Plaintiffs filed their motion for preliminary injunction, the Government filed the Administrative Record (sometimes referred to "AR") in this case. (Docket no. 28). The AR includes criminal filings related to a corrupt MSB in Sacramento, California, (*id.* at pages 330-47), and another corrupt MSB in Atlanta, Georgia, (*id.* at pages 393-408).

The prior GTOs, the holding in *Oreira,* and the cited references in the AR do not provide substantive support to justify the $200 reporting requirement imposed by this GTO. And, because they involve criminal cases about corrupt businesses located in Houston, Atlanta, New York City, Las Angeles, Sacramento and Miami, they do not support the stated purpose of this GTO, which is to monitor MSBs in selected zip codes along the Texas/Mexico border for criminal activity by drug cartels. (Docket no. 28-2 at pages 11-12).

Success on the Merits

Plaintiffs argue they have shown they are likely to succeed on the merits of their claims under the Fourth Amendment and the Administrative Procedure Act. The Government disagree.

Plaintiffs Have Shown the GTO Likely Violates the Fourth Amendment

Plaintiffs contend the GTO likely violates the Fourth Amendment because it allows The Government to search for evidence of criminal activity without a warrant and without individualized probable cause. The Government responds that Plaintiffs cannot show a likelihood of success on this claim because the Supreme Court has already rejected nearly identical claims in *California Bankers Association v. Shultz*, 416 U.S. 21 (1974).

Long before its decision in *Schultz*, the Supreme Court explained that a "search and seizure" without limits is equivalent to the "general warrants" which prompted the careful drafting of the Fourth Amendment and partly motivated the Declaration of Independence. *Berger v. New York*, 388 U.S. 41, 58 (1967). Although the Federalist Papers do not directly mention "general warrants, Federalist No. 84 touches on ideas related to civil liberties and government restraint, which are indirectly connected to concerns about general warrants. *The Federalist No. 84* at 513 (Alexander Hamilton) (Clinton Rossiter ed., 1961). General warrants or "writs of assistance" were a major source of grievance for the colonists against British rule. *Id.* These warrants allowed British officials to search homes and

businesses without specific cause or a warrant, leading to widespread harassment and seizures of property. *Steagald v. United States,* 451 U.S. 204, 221 (1981). The Declaration of Independence specifically lists this as one of the abuses committed by King George III: "He has sent hither swarms of officers to harass our people, and eat out their substance" using "writs of assistance." *Trump v. United States*, 603 U.S. 593, 646 (2024) (quoting THE DECLARATION OF INDEPENDENCE para. 12 (U.S. 1776)). "Writs of assistance" authorized law enforcement officers to "break open doors, Chests, Trunks, and other Packages" without specifying the goods to be seized or the houses to be searched. Writs of Assistance 1761-72, The Founders' Constitution, https://presspubs.uchicago.edu/founders/documents/amendIVs2.html [https://perma.cc/AGJ7-MFRC] ("By this Act of Parliament . . . entitled an Act for preventing Frauds and regulating Abuses in His Majesty's Customs, . . . it is lawful for any Officer of His Majesty's Customs, authorized by Writ of Assistants under the Seal of His Majesty's Court of Exchequer, to take a Constable, Headborough, or any other public Officer inhabiting near unto the Place, and in the Day Time, to enter and go into any House, Shop, Cellar, Warehouse or Room, or other Place, and in Case of Resistance to break open Doors, Chests, Trunks and other Package, there to seize, and from thence to bring any kinds of Goods or Merchandize whatsoever, prohibited or uncustomed; and to put and secure the same in His Majesty's Storehouse, next to the Place where the Seizure shall be made."). The colonists' outrage over these practices played a significant role in shaping the Fourth Amendment, which protects against unreasonable searches and seizures and requires warrants to be specific and supported by probable cause. *Berger*, 388 U.S. at 58.

In *Schultz*, the Supreme Court upheld a uniform, nationwide requirement to report cash transactions over $10,000. *Id.* at 67. Here, the GTO is not uniform across the country and instead

targets particular MSBs and imposes special reporting burdens on all but *de minimis* transactions of less than $200.

United States v. Morton Salt Company ("Morton Salt"), 338 U.S. 632 (1950), the primary authority in *Shultz*, is instructive. The Court in *Morton Salt* upheld an agency order directing twenty companies and a trade association to file reports verifying compliance with an FTC cease-and-desist order. *Id*. at 634–35. The Court upheld the reporting requirement on the ground that it was sufficiently related to the FTC's need to ensure compliance with its prior orders, but the Court also explained that authority to require reports is limited by the Fourth Amendment—which "is not confined literally to searches and seizures as such, but extends as well to the orderly taking [of information] under compulsion of process." *Id*. at 651–52. The Court emphasized that "a governmental investigation into corporate matters may be of such *a sweeping nature* and so unrelated to the matter properly under inquiry as to exceed the investigatory power." *Id*. at 652 (emphasis added). The GTO appears to be the type of "sweeping" requirement *Morton Salt* rejected. The Court agrees with Plaintiffs that "going after essentially all commerce implicates the Fourth Amendment privacy interests of businesses and individuals much more than the limit in *Schultz*." (Docket no. 45 at page 3).

With regard to business privacy, the Court agrees with Plaintiffs that it is likely the GTO unreasonably demands corporate records. The Court in *Schultz* held that the $10,000 reporting requirement did not violate the Fourth Amendment because it covered only "abnormally large transactions in currency," and therefore was "**reasonable**" in relation to business privacy interests because it intruded on few transactions. 416 U.S. at 67 (emphasis added). As Plaintiffs note, here the GTO low threshold of $200 intrudes on most transactions and thus is not reasonable. *See United States v. Smith*, 110 F.4th 817, 838 (5th Cir. 2024) (invalidating general search of Google phone data for thousands of customers).

The GTO is also likely unreasonable under the Fourth Amendment because it is immensely burdensome. As the Court heard at the temporary restraining order hearing and the preliminary injunction hearing, even small MSBs are spending hours daily to comply and the GTO is costing thousands in monthly commission revenue. The summary of that testimony can be found in Appendix.

In addition to providing detailed information about the MSB facilitating the transaction, and form the currency takes, each person involved in the transaction must reveal personal information, including: full legal name, age, gender, address, phone number, email address, social security number (or other taxpayer identification number), specific occupation (from a dropdown list of dozens), the number from a valid driver's license (or passport or alien registration card [*i.e.* green card]), amounts of money, and bank account numbers that transmit or receive the money. (Docket no. 22 at page 10). Plaintiffs argue requiring this additional information on every transaction over $200 unreasonably invades the privacy of customers.

The Government responds that Plaintiffs' customers' privacy lacks Fourth Amendment protection under the third-party doctrine because the Supreme Court in *United States v. Miller*, 425 U.S. 435 (1976), held that bank customers' privacy interests were not implicated by the requirement that banks report transactions over $10,000. (Docket no. 33 at pages 22–23). As Plaintiffs contend, *Miller* must be read in conjunction with *Carpenter v. United States*, 585 U.S. 296, 319 (2018), where the Supreme Court held that the third-party doctrine does not apply when customers do have a legitimate privacy interest in corporate records. In addressing *Miller*, the Supreme Court in *Carpenter* specifically warned that courts should not "uncritically extend existing precedents" to new contexts. 585 U.S. at 318. In *Carpenter*, the Court warned against uncritical extension of *Miller* to the "novel" context of digital cell-site location data. *Id*. At least at the preliminary injunction stage, the Court declines to extend *Schultz* (requiring all financial institutions to report abnormally large transactions of $10,000)

to a requirement that encompasses only certain money services businesses to report everyday transactions of $200.  For these and the reasons stated in Plaintiffs' proposed findings of fact and conclusions of law (attached hereto), Plaintiffs have shown a likelihood of success on their Fourth Amendment claim.

<u>Plaintiffs Have Shown the GTO Likely Violates the Administrative Procedure Act</u>

The APA provides that a "reviewing court shall . . . hold unlawful and set aside agency action . . . found to be--(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law . . . [or] (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2); *see also Texas v. United States*, 809 F.3d 134, 178 (5th Cir. 2015).  Until the Supreme Court's recent decision in *Loper Bright Enterprises v. Raimondo* ("*Loper Bright*"), 603 U.S. 369 (2024), courts generally applied the two-step *Chevron U.S.A,, Inc. v. National Resources Defense Council, Inc.*, ("*Chevron*"), 467 U.S. 837 (1984), framework in determining whether an agency's action exceeded its statutory authority. Under this framework, courts were required to first exhaust the traditional tools of statutory construction to determine whether "Congress has directly spoken to the precise question at issue;" if it has, the court's inquiry ended and the court had to "give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 842-43.  If the statute was silent or ambiguous as to the legality of the agency's action, a court would proceed to step two of the *Chevron* framework and determine whether the agency's action was "based on a permissible construction of the statute." *Id.* at 843.  "If a statute is ambiguous, and if the implementing agency's construction [of the statute] is **reasonable**," a court would generally defer to the agency's interpretation of the statute. *Acosta v. Hensel Phelps Constr. Co.*, 909 F.3d 723, 730 (5th Cir. 2018) (emphasis added).

The Supreme Court overruled *Chevron* in *Loper Bright*, 603 U.S. at 412.  Now, when an agency's interpretation of statute is challenged, the agency is not entitled to deference even when a

statute is ambiguous. *Id.* at 412-13.  Rather, the APA requires courts to "exercise independent judgment in determining the meaning of statutory provisions." *Id.* at 412.  Courts may consider an agency's interpretation as "a body of experience and informed judgment to which courts and litigants may properly resort for guidance," *id.* at 388, especially when the interpretation "rests on factual premises within the agency's expertise."*Id.* at 374 (quoting *Bureau of Alcohol, Tobacco & Firearms v. FLRA*, 464 U.S. 89, 98 n. 8 (1983)).  Courts might also consider "interpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," when determining the statute's meaning. *Loper Bright*, 603 U.S. at 387.  But an agency's interpretation of a statute cannot supplant the role of the judiciary as the final arbiter of a statute's meaning. *Id.* at 374.

Statutes may authorize an agency to exercise discretion, and that discretion could take many forms.  This includes the authority to define a statutory term that Congress chose not to elucidate, *id.* at 394-95 (citing *Batterton v. Francis*, 432 U.S. 416, 425 (1977)), the authority to "fill up the details" of a statutory scheme, *id.* at 395 (quoting *Wayman v. Southard*, 10 Wheat. 1, 43, 6 L.Ed. 253 (1825)), or merely the authority to regulate within the clear limits of statute in a manner that is "appropriate" or "**reasonable.**" *Id.*  (emphasis added).  When a statute delegates authority to an agency, "the role of the reviewing court under the APA is, as always, to independently interpret the statute and effectuate the will of Congress subject to constitutional limits" by "recognizing constitutional delegations, fixing the boundaries of the delegated authority, and ensuring the agency has engaged in **reasoned** decision-making within those boundaries." *Loper Bright*, 603 U.S. at 395.  (internal quotations, citations, brackets omitted, emphasis added).

Under the APA, federal courts must set aside "agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).  Agency action does not violate this standard so long as it is "**reasonable and**

**reasonably explained**"; in other words, so long as the agency "has acted within a zone of **reasonableness** and, in particular, that the agency has reasonably considered the relevant issues and reasonably explained the decision." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021) (emphasis added). To act **reasonably**, the agency "must examine the relevant data and articulate a satisfactory explanation for its action including a **rational** connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983) (internal quotation omitted, emphasis added). Reasoning that "fails to account for relevant factors or evinces a clear error of judgment" must be set aside. *University of Tex. v. United States Dept. of Health & Hum. Servs.*, 985 F.3d 472, 475 (5th Cir. 2021) (internal quotations omitted).

Plaintiffs contend the GTO likely violates the APA because it is: (1) a rule subject to notice and comment, which never happened; (2) arbitrary and capricious, both due to a lack of support in the Administrative Record for such drastic action and because FinCEN ignored the widespread harms the GTO will cause Plaintiffs; (3) *ultra vires* in that the GTO statute, 31 U.S.C. § 5326, does not authorize a reporting requirement so broad in scope and so destructive in effect; and (3) contrary to the nondelegation doctrine because the Government identifies no intelligible standard that FinCEN, or a reviewing court, could apply when deciding what records are necessary. The Government responds that Plaintiffs cannot show a likelihood of success on the merits because Congress specifically authorized FinCEN to act by "order" rather-than-by "rule" and the agency acted reasonably and within its statutory authority.

<u>Rule Subject to Notice and Comment</u>

At the preliminary injunction hearing, the Court inquired whether *Loper Bright* is implicated in this case. Plaintiffs responded that question of whether the GTO is a "rule" or "order"is a question

of statutory interpretation.  The Court agrees.  Therefore, FinCEN is not entitled to the presumption that the GTO is an order and not a rule.

Plaintiffs allege the GTO is invalid because FinCEN did not go through the notice and comment process required for substantive rules.  In response, the Government contends "the challenged agency action is an order, not a rule, and therefore not subject to the rulemaking requirements of the APA." (Docket no. 33 at page 14).  The Government relies on 31 U.S.C. § 5326(a), which "authorize[s] the agency to act by 'order, as opposed to 31 U.S.C. 5313(a), which authorized the agency to act by "regulation," *i.e.*, rule.

"[I]t is only when the agency seeks to make substantive law that notice and comment is required." *Flight Training, Inc. v. FAA*, 58 F.4th 234, 241 n.5 (5th Cir. 2023). The APA defines "rulemaking" as the "agency process for formulating, amending, or repealing a rule." 5 U.S.C. § 551(5). A "rule" is defined "very broadly," *Sugar Cane Growers Coop. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002), to mean "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy." 5 U.S.C. § 551(4). On the other hand, an "adjudication" is the "agency process for the formulation of an order," *id*. § 551(7), and an "order" is "the whole or a part of a final disposition . . . of an agency in a matter other than rulemaking but including licensing," *id*. § 551(6).

Nonetheless, as Plaintiffs note, "[t]wo principal characteristics distinguish rulemaking from adjudication."  (Docket no. 45 at page 9) (quoting *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994)).  "Adjudications typically 'resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals.'" *City of Arlington v. FCC,* 668 F.3d 229, 242 (5th Cir. 2012) (quoting Cisneros, 37 F.3d at 448), *aff'd*, 569 U.S. 290 (2013).

-26-

Here, FinCEN did not adjudicate a "concrete dispute" between "specific individuals" and issue an "order" in their case with an "immediate effect" on them alone.  Instead, the agency announced a "rule" applicable to broad classes of unspecified individuals that has "legal consequences only for the future."  *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 216 (1988) (Scalia, J. concurring).  It is an "agency statement of . . . particular applicability [30 zip codes] and future effect designed to prescribe law."  5 U.S.C. § 551(4).  As Plaintiffs state:

> [W]hen it became effective on April 14, 2025, the GTO applied to MSBs in the 30 zip codes uniformly, simply as result of their being MSBs. The GTO created an affirmative legal obligation for all MSBs—namely, filing CTRs for all transactions . . . $200 [and over]—that did not exist prior to April 14, 2025.  All MSBs subject to the GTO likewise now face significant criminal and civil penalties, including prison sentences, for failure to comply with this new legal obligation.  None of the MSBs subject to the GTO were parties before FinCEN in an adjudicatory proceeding prior to April 14, 2025.

(Docket no. 51 at page 22).  As such, the GTO is not the equivalent of a "judgment" against specific parties as the result of an adjudication.  *See also Neustar, Inc. v. FCC*, 857 F.3d 886, 888 (D.C. Cir. 2017) (explaining that no notice and comment rulemaking was required because case involved individualized adjudication about specific parties on specific record); *National Biodiesel Bd. v. EPA*, 843 F.3d 1010, 1014 (D.C. Cir. 2016) (same).

Finally, the Government notes that the GTO statute authorizes "confidential GTOs, which would not be possible with notice and comment rulemaking." (Docket no. 33 at page 15).  It follows that a confidential GTO would be issued to specific parties as part of a specific investigation under specific facts.

For these reasons, the GTO likely qualifies as a rule and therefore there is a requirement of notice and rulemaking when issuing the $200 reporting requirement.  This Court concurs with Judge O'Connor's example that an agency cannot simply decide to call "an orange a potato." Cite.  This Court finds that "a rose of any other name is still a rose."  Accordingly, the Court finds that Plaintiffs have

shown they have a substantial likelihood of success on the merits of their claim that FinCEN was obligated to follow the APA's notice-and-comment procedures before issuing the GTO.

**Arbitrary and Capricious:  Dropping the Reporting
Threshold by 98 Percent in Certain Zip Codes**

Plaintiffs also allege the GTO is arbitrary and capricious.  As noted, "[t]he APA's arbitrary and capricious standard requires that agency action be **reasonable and reasonably explained**," and "[j]udicial review under that standard is deferential." *Prometheus Radio Project.*, 592 U.S. at 423 (emphasis added).  In general, an agency action is arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, or offered an explanation for its decision that either runs counter to the evidence before the agency or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *State Farm Mut. Auto Ins. Co.,* 463 U.S. at 43.  The reasoning on which an action was based must be articulated by the agency at the time the decision was made, and not developed after the fact.  *Texas v. United States*, 40 F.4th 205, 226-27 (5th Cir. 2022).

Plaintiffs contend the GTO is arbitrary and capricious both due to a lack of support in the administrative record for such drastic action and because FinCEN ignored the widespread harms the GTO will cause legitimate businesses.  The Government responds that Plaintiffs are not likely to succeed on the merits of this claim because FinCEN acted reasonably and considered all relevant factors when issuing the GTO.

**The Scope of the Problem**

Plaintiffs reply that FinCEN failed to consider the scope of the problem.  The Court agrees that the FinCEN memo and administrative record identify problems but contain no evidence about the size of the problem relative to legitimate transactions:

-28-

\*      "[I]llicit actors may move cash or checks to the southwest border from locations across the United States and then use the MSBs' services to exchange the cash to pesos or to cash out checks, with the value moved to Mexico." (Docket no. 28-2 at page 6).  No discussion of legitimate versus illegitimate transactions.

\*      "Drug cartels and their affiliated professional money laundering organizations often hire loosely associated parties, including 'money mules,' to move funds to Mexico via U.S.-based MSBs." Memo at 7 (AR010). But the source is a single page from an FBI document about how to avoid being duped into becoming a "money mule." (Docket no. 28-2 at page 304).  No discussion of what fraction of MSB transactions involve money mules.

\*      "Structuring can be accomplished by dividing illicit proceeds between multiple individuals who conduct transfers at one or multiple MSB locations." (Docket no. 28-2 at page 10).  But the source is a 2019 FinCEN report that identifies MSBs as one of many tools drug cartels use, including online virtual currency such as bitcoin, "bulk cash smuggling," "trade-based money laundering," and "funnel account activity." (*Id.* at 309–14).  No discussion of what fraction of MSB transactions are illicit versus legitimate.

\*      The Memo identifies two criminal cases involving MSBs (from outside the targeted zip codes) whose owners were active conspirators. (Docket no. 28-2 at page 10) (citing AR323–402)). Nothing in the Record connects these cases to a $200 CTR requirement for legitimate MSBs.

(Docket no. 45 at pages 11-12).

$200 is Likely Arbitrary and Ignores the Destructive Impact on Legitimate Businesses

In their reply, Plaintiffs argue that the reporting requirements are financially ruinous and time consuming.  The Government admits FinCEN set the threshold at $200 to capture all but *de minimis* illegal transactions, and concedes that this will also capture all but *de minimis* legal transactions. (*Id.* at page 12) (citing Docket no. 33 at pages 12–13).  However, the Government does not attempt to justify the immense burden Plaintiffs have shown the GTO will likely impose on them.  Plaintiffs estimate

their CTR numbers will go from: 10 CTRs per month to 3,288;[1] 31 CTRs per month to 7,276;[2] 3 to 6 CTRs per month to 830;[3] 5 CTRs per month to 6,000;[4] and 9 CTRs per month to 2,600.[5]

   And each of those CTRs takes time. Plaintiff Arnoldo Gonzalez estimates 25 minutes. Decl. of Arnoldo Gonzalez in Supp. of Pls.' Mot. for Prelim. Inj. ¶ 18. The Government does not deny that FinCEN's own estimates are 8 minutes on average, and for non-bank filers like Plaintiffs, 23.93 minutes. Although the Government corrected a previous estimate as outdated at the preliminary injunction hearing, FinCEN had originally said it could take up to 40 minutes to fill out the CTR fillable form. *See* (docket no. 33 at Exhibit 2, page 1). Even at 24 minutes per form, it would take 40 hours to complete 1,000 forms. Plaintiffs have presented credible evidence that they would have to fill out far more than 1,000 CTRs.

   With respect to compliance burdens on MSBs, the Government concedes FinCEN issued the GTO with a sentence dismissing those burdens. (Docket no. 33 at page 12) (stating that "FinCEN 'does not expect these Covered Businesses to materially alter typical fees'"). Plaintiffs point out that the Government does not defend this conclusion; they simply state that the existence of this conclusion (about the impact on the prices MSBs charge) means that FinCEN must have considered all the potential burdens it was imposing: "Plaintiffs may disagree with that conclusion but there is no doubt the agency considered the relevant factors." *Id.* The Court finds Plaintiffs have successfully made their case that there is doubt that the agency considered the relevant factors.

---

[1] Decl. of Efrain Salinas in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

[2] Decl. of Xavier Guerra in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

[3] Decl. of Ricardo Granado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

[4] Decl. of Miguel A. Regalado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

[5] Decl. of Mario Regalado in Supp. of Pls.' Mot. for Prelim. Inj. ¶¶ 6–8.

### The Zip Codes are Arbitrary

Plaintiffs point out that there is no evidence that there are more prosecutions in the targeted zip codes. FinCEN's theory is that CTRs lead to prosecutions and hence a $200 threshold will lead to many more CTRs and thus many more prosecutions. If this theory is true (prosecutions happen in proportion to CTRs filed with FinCEN), then the Government should have proof that the supposedly high number of over-$10,000 CTRs in the targeted zip codes has resulted in above average numbers of prosecutions. Yet, there is no such evidence in the record. But if $10,000 CTRs are not leading to more prosecutions, Plaintiffs question "why should anyone believe that exponentially increasing the number of CTRs via a $200 threshold will lead to more prosecutions?" (Docket no. 45 at page 16).

The Government argues that "[l]ogically, [the targeted zip codes] in general are likely to be targeted by cartels because 'they are nearer to the entry points for drugs and human beings smuggled into the United States and to the exit points for bulk physical cash.'" (Docket no. 33 at page 13). Plaintiffs reply that this is not logical. According to Plaintiffs, the Government cares "most about electronic remittances, which can be sent from anywhere. Indeed, the two criminal cases in the Administrative Record are in northern California and Georgia, not the border, and bulk physical cash, by definition, isn't going through MSBs. Even assuming drug and human smuggling takes place at border checkpoints, the Court agrees with Plaintiffs that it isn't "logical" to "believe that the illicit revenue from these crimes is going to be sent back to Mexico via thousands of structured transactions via MSBs right at the border." (*Id.* at page 16).

### There Was No Consideration of Cartel Countermeasures

Plaintiffs contend that cartels can exploit non-targeted zip codes. (Docket no. 45 at page 16) ("San Diego [Texas] is a Swiss cheese of targeted and non-targeted zip codes") (citing provided maps

of zip codes in Texas).  "Or go to Arizona or New Mexico. Or use bitcoin, bulk cash smuggling, or other laundering techniques."  (*Id.*).

Plaintiffs further point out that FinCEN's own sources cast doubt on the supposition that cartels are remitting millions of dollars back to Mexico via small-dollar cash transactions, noting what the administrative record shows:  "[I]t would take approximately 2,564 deposits of the average $390 remittance to move a million dollars across the border." (*Id.* citing docket no. 28-2, AR at page 160).  That report in the administrative record further explains that rather than use implausible numbers of low-dollar money transfers, cartels use China-based money launderers and cryptocurrency. (*Id.*)   In other words, according to Plaintiffs, FinCEN itself relies on sources that say the GTO will be ineffective but ignores them.  (*Id.*).

<u>FinCEN's Capacity to Act on the CTRs</u>

Plaintiffs further asks whether FinCEN has the capacity to turn millions of new CTRs into actionable leads and real prosecutions.  Again, the administrative record contains no evidence that FinCEN is routinely using $10,000 CTRs for prosecutions.  And at the preliminary injunction hearing, the Government conceded it has no real information as to whether FinCEN has the capacity to act on the $200 CRTs it has received or whether those CRTs have led to usable information about the structuring activity of Mexican cartels.  (Cite).  Finally, as noted above, the Government cites criminal court proceedings, but those involved corrupt MSBs outside the targeted zip codes, not prosecutions against members of drug cartels for activity related to currency structuring. *See United States v. Oreira*, 29 F.3d at 187 (GTO targeting single corrupt MSB in Houston, Texas); AR at pages 330-47 (criminal filings related to corrupt MSB in Sacramento, California); *id.* at pages 393-408) (criminal filings related to corrupt MSB in Atlanta, Georgia, (*id.* at pages 393-408).

The Court at this time makes no ruling on Plaintiffs' allegations that the GTO is *ultra virus* and violates the nondelegation doctrine.

Irreparable Harm

Plaintiffs contend the GTO causes them economic harms, loss of goodwill and reputation, and loss of their constitutional rights are irreparable. In response, the Government argues Plaintiffs have exaggerated the cost of complying with the GTO, have failed to "explore[] automated alternatives like automated batch-filing, and they otherwise merely speculate about the future actions of customers. (Docket no. 33 at page 24). The Government also casts doubt on harms via Defendant Gacki's declaration, which "demonstrates that many covered businesses have begun filing CTRs with respect to the covered transactions." (*Id.* at docket 33-1, corrected Decl. of Andrea Gacki). Plaintiffs reply that they don't doubt they have because the penalties for noncompliance are "ruinous and can include prison; *of course* they are doing whatever they can to comply." (Docket no. 45 at page 18) (emphasis in original). At the temporary restraining order hearing, the Court heard that the affected MSBs neighbor with banks, and MSB customers "are going to walk to the bank right in front of us, where they [have] already put [up] big signs about that they're going to exchange pesos, in front of our stores, or they're just going to go across the border and exchange in Mexico." (*Id.* at page 17). And MSB customers know that the MSBs are going to ask for their social security numbers, their visa and other paperwork, and "'[t]hey're just going to walk right next door, and they're going to exchange with the bank." (Docket no. 33, Exhibit 2 page 51). The Court also heard testimony that 99 percent of most MSBs' business comes from typical tourists, families and people like truck drivers who routinely cross the border, and the average transaction is $200. (*Id.*).

At the preliminary injunction hearing, the Court heard that MSBs are being crushed by the cost of compliance, facing significant losses and incurring dozens of extra hours of labor per day. MSBs in Texas have had to suspend transactions above $200 not only to catch up on paperwork, which is piling up at tremendous rates and resulting in lost income, but because their service partners (such as MoneyGram and Western Union) are also responding to the GTO by limiting services. Witnesses also testified about the expense and complexity of automated software, which cannot be implemented overnight. S*ee* Appendix, attached hereto. Under the circumstances, the Court finds Plaintiffs have sufficiently proven for purposes of their motion that the GTO causes them harms that are irreparable.

<u>The Equities</u>

Plaintiffs argue that their likelihood of success on the merits and profound irreparable harms mean that Plaintiffs are entitled to a preliminary injunction. The Government responds that, "in the face of Plaintiffs' weak evidence of harm to a few MSBs, the agency's finding that these recordkeeping requirements are necessary to address money-laundering and cartel activities along the southwest border should carry the day." (Docket no. 33 at page 36). As Plaintiffs contend, it is always in the public interest to enjoin the violation of individuals' constitutional rights; (2) when it comes to Plaintiffs' claims under the APA, there is "no public interest in the perpetration of unlawful agency action," (quoting *Texas v. Becerra*, 577 F. Supp. 3d 527, 562 (N.D. Tex. 2021)); and (3) the Government's equities argument is just a general argument that Mexican cartels pose "profound national security, homeland security, terrorist financing, and money laundering threats." (*Id.* at page 20) (quoting docket no. 33 and Gacki Decl. at docket no. 33-1 ¶¶ 28–33) (generically asserting this GTO is important for law enforcement)). Accordingly, the Court finds the equities weigh in Plaintiffs' favor.

Plaintiffs' Requested Relief

Plaintiffs request that the Court "vacate the GTO and enjoin its enforcement everywhere." (Docket no. 45 at page 21) (quoting *Corner Post, Inc. v. Board of Governors of Fed. Res. Sys.,* 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("[T]he APA authorizes vacatur of agency rules.")). Plaintiffs' request for vacatur and enjoinment entirely is denied, subject to the forthcoming opinion by the Supreme Court in *Trump v. Casa, Inc.*, No. 24A884, regarding universal injunctions.

Conclusion

Having held a hearing on Plaintiff's motion and upon consideration of arguments presented by Plaintiffs and the Government, along with the administrative record, supporting memorandum, declarations and exhibits, and having adopted relevant portions of Plaintiffs' proposed findings of fact and conclusions of law:

IT IS ORDERED that Plaintiff's Opposed Motion for Preliminary Injunction (docket no. 22) is GRANTED such that the Court finds:

1.    Plaintiffs have demonstrated a substantial likelihood of success on the merits on their claims that the GTO violates the Fourth Amendment to the United States Constitution and the Administrative Procedure Act.

2.    Plaintiffs have demonstrated serious irreparable harm, including the destruction of Plaintiffs' businesses, loss of reputation and goodwill.

3.    The balance of equities favors Plaintiffs because of the constitutional and statutory implications and the public interest is served by maintaining lawful operations of regulated financial institutions and preventing unlawful agency action.

IT IS THEREFORE ORDERED that Defendants, and their officers, agents, servants, employees, and all persons acting in concert or participation with them, are PRELIMINARILY ENJOINED from enforcing, implementing, or otherwise giving effect to the Geographic Targeting Order ("GTO")issued by the Financial Crimes Enforcement Network ("FinCEN") on March 11, 2025, and which went into effect on April 14, 2025, as it applies to Plaintiff TAMSB and its ten members. In other words, the GTO does not apply to the ten businesses that are currently members of the Texas Association of Money Services Businesses (TAMSB). Those businesses are: 1) Reynosa Casa de Cambio, Inc.; 2) Nydia Regalado D/B/A Best Rate Exchange; 3) Mario Regalado D/B/A Border International Services; 4) Laredo Insurance Services, LLC; 5) E.Mex. Financial Services, Inc.; 6) R & C, Inc. D/B/A Temex Money Exchange; 7) San Isidro Multi Services, Inc.; 8) Cris Win Inc. D/B/A Brownsville Casa de Cambio; 9) High Value, Inc.; 10) Espro Investment LLC D/B/A Lonestar Money Exchange; along with 11) Arnoldo Gonzalez, Jr.  Plaintiff TAMSB shall not add any new members for purposes of this civil action. This Preliminary Injunction shall remain in effect until further Order of the Court.

IT IF FINALLY ORDERED that Plaintiffs shall not have to post a bond.

It is so ORDERED.

SIGNED this 19th day of May, 2025.

_____
FRED BIERY
UNITED STATES DISTRICT JUDGE

## APPENDIX

Edelmiro Agustin Martinez is the owner of Laredo Insurance Services ("Laredo"), an MSB and Plaintiff in this case, with 8 locations in Webb County, Texas.  All locations are covered by the GTO. Laredo is a family-owned check cashing and currency exchange business.  Ninety-nine percent of Laredo's customers are "typical tourists" and the average transaction is $200.  At the temporary restraining order hearing, Mr. Martinez testified that the GTO is going to affect his daily operations because Laredo "neighbors with some banks" and "now the people know that we're going to ask for the Social Security, their visa and everything" so "they're just going to walk right next door, and they're going to exchange with the bank" or they're going to go to one of "about 300 Casas de Cambio right across the border" because "they're not under the GTO."

Mr.  Martinez also said that he does not have the number of employees necessary to carry out the GTO reporting requirements and that customers would refuse to wait in line for them to do so.  Mr. Martinez further stated that customers will go elsewhere in order to avoid "giving out their Social Security [number] for smaller transactions."

Mr. Martinez testified he had engineers trying to modify Laredo's software to "batch software" to comply with the GTO, but that would cost thousands of dollars for stores like Laredo and smaller MSBs.  Many would lose business and have to lay-off employees, or even shut down.

Mr. Martinez further testified he would probably join Walmart stores that have "already put signs on their [local] stores that they're just going to do transactions under $200" and watch customers walk into the bank right in front of Laredo, "where [the bank] has already put [up] big signs . . .that they're going to exchange pesos" or watch as their customers go across the bridge and exchange their currency in Mexico.

Isidro Salinas testified at the preliminary injunction hearing.  Mr. Salinas is the general manager of his family's business, San Isidro Multi-Services ("San Isidro"), a Plaintiff in this case.  San Isidro is an MSB with 3 locations covered by the GTO.  San Isidro does not offer remittances, check cashing or wire transfers.  San Isidro only offers cash-for-cash exchanges.  In 2024, San Isidro filed a total of 20 CTRs for customer based transactions of $10,000 or more.  If the GTO had applied in 2025, San Isidro would average 3,288 transactions per month.

Mr. Salinas said they do not have the capacity to handle the increase in CTRs.  He estimates that San Isidro would need about six or seven employees per day just to focus on the CTRs.  Mr. Salinas testified that San Isidro does not have the funds, the knowledge or the space to accommodate those employees.

Mr. Salinas also said that the majority of San Isidro's customers will not return if San Isidro must comply with the $200 reporting requirement.  He said he knows this because San Isidro has been receiving customers from other MSBs right across the street who are covered by the GTO.

Andres Payan, Jr. is the manager of Payan's Fuel Center, Incorporated ("Payan's"), a family-owned convenience store/gas station and MSB that cashes payroll checks for low income workers in El Paso.  Payan's is not a plaintiff in this case and has been complying with the reporting requirements of the GTO since it went into effect in April of 2025.  At the preliminary injunction hearing, Mr. Payan testified that the GTO has had several negative impacts on his business.  These include a 30 percent drop in revenue from check cashing, a drop in how many trucks come by per week to buy gas, and how many cigarettes he's selling and other secondary kinds of purchases like Cheetos and beer.  He thinks people are "skipping by" Payan's because they "have an apprehension about giving, you know, a clerk at a gas station their Social Security number."  And "it takes longer and it's a lot more difficult to cash

a check." Payan's "already had to do about 500 CTRs and [it] didn't have to do any before." Mr. Payan expects things to get worse because check cashing and sales continue to slow. And, he concluded, "once [customers] go away, they tend not to come back."

Anna Isabel Alvarado's testified that her family-owned business, Reynosa Casa de Cambio, Incorporated ("Reynosa"), is an MSB and a Plaintiff in this lawsuit. Reynosa has 13 locations: 11 of the locations are within zip codes covered by the GTO, and 2 are outside of the GTO. Reynosa files about 30 CTRs per month at the $10,000 threshold, and would be filing 6,000 to 7,000 CTRs per month at the $200 threshold. At twenty-five minutes per CTR, Ms. Alvarado said it is an insurmountable amount of work with currently 11 locations in the GTO. She said she has looked into streamlining the process, but has gotten no direction from FinCEN or relief on the batch filing system. She also said that Reynosa locations covered by the GTO lost 50 percent of their customers over the Mother's Day weekend. She believes they did not want to wait in long lines or give their personal information when exchanging such a small amount of currency, particularly given that identity theft is increasing so much.

Plaintiff Arnoldo Gonzalez, Jr. is the owner of High Value, Inc ("High Value"), an MSB covered by the GTO with a single location in Laredo, Texas. High Value exchanges dollars to pesos, pesos to dollars, and nothing else. High Value is located five blocks from the International Bridge linking Laredo, Texas, to Nuevo Laredo, Mexico. He described what life is like in a border town. Families go back and forth, relatives go shopping, and tourists also cross the border frequently. Many locals, including Mr. Gonzalez, have family in Nuevo Laredo who work in Laredo. Mr. Gonzalez said that he often visits his physician in Nuevo Laredo and exchanges a few hundred dollars to cover the cost of the visit and medication. He does not believe he should have to divulge his personal information and

be "under the microscope" for such a small amount.  He said he will go to a local bank or to Nuevo Laredo to change his money if the GTO goes into effect.

Clarissa Ashley Light and her family own Valuta Corporation ("Valuta") in El Paso, Texas. Valuta is not a plaintiff in this case and is subject to the GTO.  Valuta was the first MSB to be licensed in Texas.  At its single location, Valuta exchanges currency, cashes payroll checks and does currency transactions as an agent of MoneyGram.  It takes about 20 minutes to complete a CTR.  But, Valuta has had to cap the transactions to just under $200 until she and other staff can catch up with the pending CTRs.  About 75 percent of Valuta's transactions are currency exchange.

Since the GTO went into effect on April 14, 2025, Valuta has gone from filing 10 CTRs to filing 1,500 CTRs a month, with a current backlog of about 700.  As it is, Ms. Light has been working on CTRs until "midnight, 1 or 2 in the morning."  And, these numbers do not even include the loss of Valuta's MoneyGram business.

Valuta has also seen a big drop in customers since it has been complying with the GTO.  Many have left because they do not want to wait in line or fill out the paperwork.  Valuta has called "all hands on deck right now," but that is not stopping customers from going elsewhere.  And, Valuta has attempted to obtain help from FinCEN several times to no avail.

In sum, the witnesses testified that the GTO's impact on the MSBs has been skyrocketing labor costs, a permanent decrease in customers, and a decrease in revenue because the fees charged are proportionate to the amount exchanged.  The explosion in paperwork is a threat to MSBs' employees' livelihood and there is a subsequent danger that the GTO could destroy family businesses.